# Exhibit B

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

D.V.D., *et al.*,
Individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

U.S. Department of Homeland Security, *et al.*,

*Defendants*.

**DECLARATION OF JOHN A. SCHULTZ**

I, John A. Schultz, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a Deputy Assistant Director (DAD) for the Removal Management Division (RMD) (South) with U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). I have held this position since June 2024. I have been employed in various positions with ICE ERO since April 2003.
2. The RMD is located at ICE Headquarters in Washington, D.C. and provides guidance and assistance to ICE officers working to coordinate the removal of aliens who have been ordered removed. The RMD collaborates with embassies and consulates, as well as with interagency and international networks, to facilitate the efficient removal of aliens from the

United States, provides nationwide post-order custody review (POCR) guidance, implements policy and procedures, and is responsible for providing case management support for aliens subject to a final order of removal. The RMD manages and oversees all aspects of the removal process to more than 170 countries around the world.

3. As the DAD RMD South, I am responsible for the day-to-day operations regarding the removal of individuals from the United States pursuant to ICE's enforcement mission, and for ensuring that this mission is conducted safely and within the Agency's priorities. I advise the ERO field offices on the coordination of removals, including the nationwide management of post-order custody guidance, policy, and procedures. I coordinate efforts between ERO and the U.S. Department of State's (DOS) domestic and international personnel to ensure that all efforts are made to gain compliance from uncooperative countries in ICE's efforts to effectuate the timely removal of those aliens with final orders of removal. I provide this declaration based on my personal knowledge, belief, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information maintained and relied upon by DHS in the regular course of business.

4. ICE effectuates removals pursuant to final orders of removal issued under the Immigration and Nationality Act (INA). In the vast majority of cases, aliens are removed to their country of nationality. However, in some circumstances ICE removes aliens to a third country pursuant to statutory authority and consistent with applicable law, regulations, and the United States' international obligations—including aliens who have been ordered removed, but received protection under the Convention Against Torture (CAT) or statutory withholding or removal.

**Country-Specific Protection Does Not Confer a Permanent Right of Residence in the United States**

5. Protection under the CAT and statutory withholding of removal are country-specific in nature. These protections prohibit removal to a specific country or countries where the alien faces a cognizable risk of persecution or torture. They do not confer any status and are not a license to remain in the United States permanently or indefinitely. The Government retains the authority and obligation to execute the order of removal to an alternative country. Otherwise, country-specific protection would serve as an effective bar to removal under all circumstances.

6. ICE currently maintains custody of a significant population of aliens who, despite being subject to final orders of removal, have been granted statutory withholding of removal or protection under the CAT, thereby precluding their removal to the country designated by the immigration court. As a direct consequence of that protection, these aliens cannot be lawfully removed to the designated countries, most often their countries of origin, not because those countries refuse to accept them, but because the law of the United States prohibits their return to the country from which they obtained protection. For this population, third country removal is not one option among several--it is the only option that exists to effectuate the removal order and remove the alien, consistent with United States law. Third country removal is the only mechanism by which ICE can simultaneously honor its two key legal obligations: the obligation not to return individuals to a country from which they have been granted protection, and the obligation to enforce a final order of removal. The practical consequence of this legal framework is that an alien who has been granted withholding of removal or protection under the CAT cannot be removed to

their home country by operation of law and therefore can only be removed through a third-country arrangement.

**Recalcitrant Countries and the Operational Necessity of Third-Country Removal Agreements**

7. Another impediment to ICE's enforcement of United States' immigration law is the practical reality of recalcitrant countries: nations that refuse, delay, or obstruct the repatriation of their nationals, particularly criminal aliens, subject to orders of removal.

8. Additionally, for aliens from such recalcitrant countries who have also received country-specific protection barring removal thereto, the Government confronts a compound enforcement barrier: it cannot remove the alien to the designated country of removal by virtue of a withholding or CAT grant, and it faces obstruction or outright refusal from the alien's country of origin. Under such circumstances, third-country removal agreements represent the only lawful, constitutionally sound mechanism to resolve this enforcement impasse.

9. ICE systems and databases indicate that approximately 559 aliens are currently in ICE custody pending removal to a third country. This population includes approximately 139 aliens convicted of serious offenses such as murder, rape, child sexual abuse, armed robbery, and aggravated assault. Systems also indicate that there are approximately 7,620 non-detained aliens with final orders of removal but granted statutory withholding or CAT protection from removal to the designated countries, out of which approximately 1,293 are convicted criminals. Many individuals within this population have already served their criminal sentences.

10. Under legal constraint, the Government may not detain aliens indefinitely where there is no significant likelihood of removal in the reasonably foreseeable future. Accordingly,

absent the availability of third-country removal, ICE is legally compelled to release these individuals into the United States, including the above-mentioned criminals who present identifiable public safety risks. These individuals are not hypothetical or low-level offenders. Many have committed violent, sexual, and other heinous crimes. They are removable and subject to an administratively final order of removal. The sole obstacle to their departure from the United States, and thus the protection of U.S. citizens, is the absence of a country willing to accept them consistent with applicable law, a gap that third-country removal agreements are designed to precisely address.

11. More recently, ICE, in close coordination with the DOS and foreign partner governments, has removed approximately 103 aliens with final orders of removal to countries other than their countries of origin where their home countries refused repatriation or when extraordinary public safety considerations so required. These missions represented some of the most operationally complex and diplomatically significant removal efforts. Through the extraordinary cooperation and utilizing agreements with the governments of South Sudan, Eswatini, Rwanda, Ghana, Cameroon and Equatorial Guinea, ICE has successfully removed from the United States aliens who, absent these agreements, would have remained in the United States indefinitely, not because they were entitled to remain, but because no country would accept them.

12. Among those removed through these third-country missions were individuals whose criminal records included convictions for first-degree murder, the rape of minors, repeated violent sexual assaults, and other violent felonies. Specifically, these missions included twenty-three individuals convicted of murder, attempted murder or manslaughter, six individuals convicted of rape or sexual assault, three individuals convicted of indecent and

lewd acts with children under the age of sixteen, to include rape of a child with force, and four individuals convicted of other violent felonies. These are convictions entered by courts in the United States for crimes committed against people living in communities across the country. These individuals served their criminal sentences and, under ordinary circumstances, would have been released directly back into the United States population with no pathway for removal. The threat and danger posed by these aliens is not theoretical. The worst of the worst offenders removed through these missions include individuals with records of extreme depravity. These are not people who pose some abstract or speculative danger. They are people who already demonstrated through their convictions in the U.S. justice systems that they are willing and capable of committing acts of severe violence against innocent people.

13. ICE has also established a third-country removal pathway to Mexico, the country that has accepted the most third-country removals. These removals take place regularly, and each ICE field office along the southwest border that processes third-country removals to Mexico removes a varying number of aliens each week through the corresponding port-of-entry with Mexico. Since January 21, 2025, ICE has removed 7,257 aliens to Mexico as third-country removals.

14. A judicial ruling that would require more processes that goes beyond Secretary of Homeland Security Kristi Noem's March 30, 2025 memorandum, *Guidance Regarding Third Country Removals*, would greatly hinder DHS's ability to conduct third-country removals. The length of time of Immigration Court proceedings in the Executive Office of Immigration Review, including the appellate process at the Board of Immigration Appeals, is lengthy. Currently, ICE elevates names of potential aliens through the Department of

State to the receiving third-country based on that country's nominating criteria. ICE typically receives final confirmation from the receiving third-country only a short time before the intended removal flight based on the terms of the negotiated agreement. Requiring a reopening of Immigration Court proceedings automatically in the Executive Office of Immigration Review would not be operationally feasible given the time constraints from acceptance by the third-country to the removal mission. Requiring a reopen of Immigration Court proceedings prior to the alien's acceptance by the third-country would also not be operationally feasible and potentially futile as these aliens may not even be accepted by the third-country. The swift and dynamic nature of the third-country removal negotiations mandates the efficient process as developed in the Secretary of Homeland Security Kristi Noem's March 30, 2025 memorandum, *Guidance Regarding Third Country Removals*, which still gives the aliens appropriate process. Such an additional requirement threatens to severely disrupt, and in some cases, altogether foreclose, the ICE's ability to carry out removals. Furthermore, the logistical infrastructure underlying third-country removals is similarly fragile. Removal operations require the coordination of aircraft, detention space, escort personnel, and receiving-country logistics, all of which must be arranged in advance. These resources are not indefinitely available. Additionally, providing individualized process to each alien prior to removal, in addition to the already afforded process under existing statutory and regulatory frameworks, will create an administrative bottleneck that will strain agency resources and impose compounding delays across already complex enforcement priorities. The cumulative effect will be to render the third-country removal program functionally inoperable through the accumulated weight of procedural delay.

15. If ICE's authority to remove aliens to third countries becomes operationally burdensome, approximately 8,179 aliens—including almost 1,432 convicted criminals—would likely remain in the United States, contrary to current immigration law and enforcement priorities. The practical consequence is that the Government will be compelled to release into American communities a population of convicted criminal aliens who cannot be removed to their countries of origin and for whom no third-country option exists. The data in this declaration makes clear the magnitude of that risk. Furthermore, a ruling of this nature would also strip ICE of one of the only remaining enforcement tools available for the most dangerous segment of removable aliens. Third-country removals are, for a critical subset of the most dangerous removable aliens, the only such pathway that exists.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 5th day of March, 2026

JOHN A SCHULTZ

Digitally signed by JOHN A SCHULTZ
Date: 2026.03.05 20:47:26 -05'00'

John A. Schultz
Deputy Assistant Director
Removal Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security