No. 26-1212

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

———————————

D.V.D.; M.M.; E.F.D.; O.C.G.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE
MULLIN, Secretary, U.S. Department of Homeland Security (DHS);
PAMELA J. BONDI, United States Attorney General, ANTONE
MONIZ, Superintendent of the Plymouth County Correctional Facility,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————

**BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

SARAH E. WELCH
*Counsel to the Assistant
Attorney General*

MATTHEW P. SEAMON
*Acting Assistant Director*

MARY L. LARAKERS
*Senior Litigation Counsel*
U.S. Department of
Justice, Civil Division
Office of Immigration
Litigation
P.O. Box 868,
Ben Franklin Station
Washington, DC 20044

# TABLE OF AUTHORITIES

| **Cases** | **Page(s)** |
|---|---|

*Abbott v. Perez,*
585 U.S. 579 (2018) ................................................................. 31

*Aguilar v. ICE,*
510 F.3d 1 (1st Cir. 2007) ....................................................... 48

*Alli v. Decker,*
650 F.3d 1007 (3d Cir. 2011) .................................................. 31

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591, 626-628 (1997) ................................................. 75

*American Well Works Co. v. Layne & Bowler Co.,*
241 U.S. 257 (1916) ............................................................ 43-44

*Ardestani v. INS,*
502 U.S. 129 (1991) ................................................................. 44

*Biden v. Texas,*
597 U.S. 785 (2022) ................................................................ 29

*Brito v. Garland,*
22 F.4th 240 (1st Cir. 2021) ................................................... 34

*California v. Grace Brethren Church,*
457 U.S. 393 (1982) ............................................................ 31, 32

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.,*
98 F.R.D. 254 (D. Del. 1983) .................................................. 33

*DHS v. Regents,*
591 U.S. 1 (2020) ................................................................ 41, 47

*DHS v. Thuraissigiam,*
591 U.S. 103 (2020) ........................................... 24, 64, 65, 66

*E.F.L. v. Prim,*
986 F.3d 959 (7th Cir. 2021) ............................................ 40-41

*Garland v. Aleman Gonzalez,*

596 U.S. 543 (2022) ................................................................... *passim*

*Hamama v. Adducci,*
912 F.3d 869 (6th Cir. 2018) ........................................... 31

*INS v. Cardoza-Fonseca,*
480 U.S. 421 (1987) ....................................................... 11

*Jama v. ICE,*
543 U.S. 335, 338-341 (2005) ....................................... 8, 9

*Jennings v. Rodriguez,*
583 U.S. 281 (2018) ....................................... 34, 47, 53, 71

*Kaplan v. Tod,*
267 U.S. 228 (1925) ....................................................... 64

*Kennedy v. Mendoza-Martinez,*
372 U.S. 144 (1963) ....................................................... 30

*Khouzam v. Attorney General,*
549 F.3d 235 (3d Cir. 2008) ....................................... 62, 63

*Kiyemba v. Obama,*
561 F.3d 509 (D.C. Cir. 2009) (Kavanaugh, J., concurring) . 23, 60, 61

*Kong v. United States,*
62 F.4th 608 (1st Cir. 2023) ........................................... 42

*Landon v. Plasencia,*
459 U.S. 21 (1982) ....................................... 65, 69, 70, 71

*Mapoy v. Carroll,*
185 F.3d 224 (4th Cir. 1999) ........................................... 38

*Mathews v. Eldridge,*
424 U.S. 319, 334-335 (1976) ....................................... 66, 68, 71

*Matter of A-S-M,*
28 I&N Dec. 282 (BIA 2021) ........................................... 67

*Matter of I-S- & C-S-,*
24 I. & N. Dec. 432, 433-434 (B.I.A. 2008) ....................................... 11

*MedImmune, Inc. v. Genentech, Inc.*,

    549 U.S. 118 ................................................................ 30

*Medina v. U.S. Att'y Gen.*,

    800 Fed. Appx. 851 (11th Cir. 2020) ................................. 10

*Munaf*,

    553 U.S. ....................................................... 23, 57, 60, 61

*Nasrallah v. Barr*,

    590 U.S. 573 (2020) ...................................................... 11

*Nielsen v. Preap*,

    586 U.S. 392 (2019) ........................................................ 8

*Nishimura Ekiu v. United States*,

    142 U.S. 651 (1892) .......................................... 24, 64, 70

*Olim v. Wakinekona*,

    461 U.S. 238 (1983) .......................................... 57, 62, 67

*Orelien v. Gonzales*,

    567 F.3d 67 (1st Cir. 2006) ............................................ 10

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,

    566 U.S. 639 (2012) ...................................................... 52

*Rauda v. Jennings*,

    55 F.4th 773, 777-778 (9th Cir. 2022) ............................. 41

*Reno v. Flores*,

    507 U.S. 292 (1993) .......................................... 40, 41, 62

*Riley v. Bondi*,

    606 U.S. 259 (2025) ...................................................... 12

*Rodríguez-Villar v. Barr*,

    930 F.3d 24 (1st Cir. 2019) ......................................... 10-11

*Samuels v. Mackell*,

    401 U.S. 66 (1971) ........................................................ 32

*San Juan Cellular Tel. Co. v. PSC*,

967 F.2d 683 (1st Cir. 1992) ...................................... 30

*SFFA v. President and Fellows of Harvard College,*
600 U.S. 181 (2023) ...................................... 29

*Shapiro v. McManus,*
577 U.S. 39 (2015) ...................................... 45

*Shaughnessy v. United States ex rel. Mezei,*
345 U.S. 206, 214-215 (1953) ...................................... 65

*Smith v. Bayer Corp.,*
564 U.S. 299 (2011) ...................................... 74

*Steel Co. v. Citizens for a Better Environment,*
523 U.S. 83 (1998) ...................................... 40

The *Japanese Immigrant Case,*
189 U.S. 86 (1903) ...................................... 65

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ...................................... 57-58, 73

*U.S. v. Rodriguez,*
527 F.3d 221 (1st Cir. 2008) ...................................... 35

*United States v. Fausto,*
484 U.S. 439 (1988) ...................................... 50

*United States v. Sineneng-Smith,*
590 U.S. 371 (2020) ...................................... 59

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.,*
435 U.S. 519, 543-544 (1978) ...................................... 53

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) ...................................... 73

*Williams v. Ashland Eng'g Co.,*
45 F.3d 588 (1st Cir. 1995) ...................................... 35

*Wong Yang Sung v. McGrath,*
339 U.S. 33 (1950) ...................................... 65

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ........................................................................... 65

**<u>Statutes</u>**

8 U.S.C § 1252 ................................................................................ 38

8 U.S.C. § 1158 ............................................................................... 7

8 U.S.C. § 1182 ............................................................................... 7

8 U.S.C. § 1225 ............................................................................... 36

8 U.S.C. § 1226 ............................................................................... 40

8 U.S.C. § 1228 ............................................................................... 13

8 U.S.C. § 1229a ............................................................... 7, 11, 49

8 U.S.C. § 1229b .............................................................. 7-8, 8

8 U.S.C. § 1231 ............................................................... *passim*

8 U.S.C. § 1252 ............................................................... *passim*

8 U.S.C. § 1331 ............................................................... *passim*

8 U.S.C. § 2242 ............................................................................... 45

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1341 ............................................................................. 31

28 U.S.C. § 2201 ............................................................................. 29

**Other**

8 C.F.R § 1003.2 ...................................................................... 67

8 C.F.R § 1240.10 ...................................................................... 48

8 C.F.R. § 208.18 ................................................................. 10, 43

8 C.F.R. § 1208.1 ...................................................................... 10

8 C.F.R. § 1208.16 .................................................................... 68

8 C.F.R. § 1240.10 .................................................................... 14

8 C.F.R. § 1240.12 ............................................................ 9, 18, 39

8 C.F.R. §§ 1003.2 .................................................................... 49

8 C.F.R. §§ 1240.1 .................................................................... 11

8 C.F.R. §§ 1240.11 ................................................................... 53

Federal Rule of Appellate Procedure 32 ................................... 77

Federal Rule of Civil Procedure 23 ............................... 25, 33, 69

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The Court has scheduled oral argument for May 13, 2026. The government agrees that oral argument is warranted in this appeal.

## JURISDICTIONAL STATEMENT

The district court asserted jurisdiction under 8 U.S.C. § 1331. As explained below, however, the court lacked jurisdiction over the claims in the complaint due to 8 U.S.C. § 1252(a)(4), (a)(5), (b)(9), (g), and Section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA). Further, the district court lacked jurisdiction to issue universal vacatur and classwide declaratory relief under 8 U.S.C. § 1252(f)(1).

The district court issued its order granting Plaintiffs' motion for partial summary judgment on February 25, 2026. Add. 3. Defendants-Appellants timely filed a notice of appeal on February 27, 2026. Add. 86. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because this is an appeal of a final decision of the district court.

## STATEMENT OF THE ISSUES

I.   Whether the district court lacked jurisdiction under 8 U.S.C. § 1252(a)(4), (a)(5), (b)(9), (g), and Section 2242(d) of FARRA to consider Plaintiffs' claims.

1

II.   Whether the district court lacked jurisdiction under 8 U.S.C. § 1252(f)(1) to grant universal vacatur of the Department of Homeland Security's Guidance Regarding Third Country Removals (the Guidance) and issue a classwide declaratory judgment requiring the government to provide additional procedures prior to removing class members to third countries.

III.  Whether Plaintiffs, who all have final orders of removal, are entitled under Section 1231(b) and the Due Process Clause to additional procedures beyond DHS's Guidance prior to their removal to a country not previously designated in removal proceedings.

IV.   Whether the district court erred in certifying the instant class wherein not all members of the class are not entitled to the same relief, if any, and where Rule 23(b)(2) requires that any declaratory relief issued on a classwide basis "correspond" to injunctive relief.

## STATEMENT OF THE CASE

This appeal challenges a remarkable universal vacatur and classwide declaratory judgment issued by the district court that—if the

Court had not stayed it pending appeal—would have effectively prevented the Executive Branch from removing some of the worst of the worst illegal aliens in this country. This judgment is based on the same flawed legal premises as the district court's previous rulings granting relief to Plaintiffs, which were stayed by the Supreme Court. And the nominal new grounds that the district court added to try to buttress its prior decisions are even weaker than the old ones.

This case arises from a DHS policy explaining how the agency executes a final order of removal of an alien who cannot be returned to the country (or countries) listed in the removal order. Add. 1 (copy of DHS's Guidance). Everyone agrees that DHS may remove such an alien to a country not listed in the order (*i.e.*, a "third country") if that country is willing to accept the alien and certain other conditions are met. Everyone likewise agrees that the alien may not be removed to a country where he will likely be persecuted or tortured. The DHS policy therefore states that, when an alien is to be removed to a third country, if that country has credibly assured the Secretary of State that it will not persecute or torture *anyone*, the agency may promptly remove the alien; and absent such assurances, the alien will be given notice of his removal

3

to that country and an opportunity to affirmatively raise any fears of potential persecution or torture there.

Last year, the district court preliminarily enjoined that policy and substituted one of its own making, holding that before an alien is removed to a third country (regardless of the country's assurances), DHS must grant him written notice of the third country of removal, at least ten days to claim a fear of torture, and at least fifteen days to move to reopen immigration proceedings. The Supreme Court stayed that injunction. Appx. 1. The district court then announced that its orders enforcing the same injunction remained in effect notwithstanding the Supreme Court's stay, ECF 176, thus forcing the Supreme Court to intervene yet again, Appx. 20.

The district court has now tripled down, entering final judgment in Plaintiffs' favor and awarding substantially the same relief on substantially the same grounds. *See* Appx. 477-557. With considerable understatement, the court acknowledged that, in light of the Supreme Court's prior stays, it "could be missing something in the final analysis." *Id.* 80. And so, in a transparent attempt to avoid the import of the Supreme Court's previous decisions, the court swapped remedies, tacked

4

on some additional theories, and emphasized the "different relief" and "different claims." *Id.* But the new grounds for the order are just as improper as the earlier ones.

At the earlier stage, the district court held that it could enter a classwide injunction notwithstanding an express statutory prohibition on lower-court orders that "enjoin or restrain the operation" of certain provisions of the immigration laws on a classwide basis. 8 U.S.C. § 1252(f)(1). This time, the court replaced its injunction with a materially identical series of classwide declaratory judgments and a universal vacatur of the DHS Guidance. But the court did not merely declare that *Plaintiffs* have the authority to take (or not take) certain actions; instead, it declared that *the government* must comply with alternative procedures along the lines it imposed at the preliminary-injunction stage—backed by a threat of follow-on injunctions to enforce the declaration. That is no mere declaration, but rather a coercive injunction by another name, which no less "check[s], hold[s] back, or prevent[s]" the government from following different procedures. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 549 (2022). Congress's jurisdictional bar on classwide immigration relief cannot be so easily evaded by slapdash application of the veneer of

declaratory relief.

In addition, the district court held that 8 U.S.C. § 1231(b) implicitly entitles Plaintiffs to the same alternative procedures to claim a fear of removal that the court previously devised under the guise of due process and also creates a due-process entitlement to challenge the government's selection of the country of removal, irrespective of any claim of fear. As to the first, the court identified no text to support its holding; as to the second, the selection of a third country turns on foreign-policy determinations vested in the government's discretion and not subject to second-guessing by the alien. And as to both, Congress expressly directed that the provision on which the court relied should *not* "be construed to create any substantive or procedural right or benefit that is legally enforceable by any party" against the government. 8 U.S.C. § 1231(h).

Otherwise, the district court simply relied on the same meritless grounds that it invoked in issuing the preliminary injunction. The court again disregarded multiple jurisdictional bars that preclude judicial review of aliens' challenges to their removal and claims of persecution or torture except in a petition for review from a removal order. And it again rejected the government's reliance on countrywide assurances that

6

particular nations will not torture or persecute *anyone*, holding that due process requires the government to provide each alien with an individual hearing at which the alien and (eventually) the Judiciary can repeatedly and improperly second-guess those foreign-policy determinations. Moreover, DHS's policy is similar in timing to the expedited-removal process that the Supreme Court has upheld against a due-process challenge, and it amply guards against the removal of aliens to countries where they may face persecution or torture. The Supreme Court has already found that Defendants are likely to succeed on these arguments, and the district court's sweeping order has no basis in law, particularly on a classwide basis. This Court should reverse.

## I. Legal Background

The Immigration and Nationality Act (INA), ch. 477, 66 Stat. 163, as amended (8 U.S.C. § 1101 *et seq.*), authorizes the removal of classes of aliens from the United States. 8 U.S.C. § 1182, 1227. The removal process can include a hearing before an immigration judge, an appeal to the Board of Immigration Appeals, and review in a court of appeals. 8 U.S.C. §§ 1229a, 1252. Aliens facing removal have an opportunity to apply for relief or protection from removal. *See, e.g.*, 8 U.S.C. § 1158 (asylum); 8

7

U.S.C. § 1229b(a) (cancellation of removal); 8 U.S.C. § 1229b(b) (adjustment of status).

Congress also has established a streamlined process for removing aliens who, having previously been removed from the United States under a final order of removal, have reentered the country unlawfully. If DHS "finds that an alien has reentered the United States illegally after having been removed ... under an order of removal, the prior order of removal is reinstated from its original date." 8 U.S.C. § 1231(a)(5); *see Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019) (explaining Congress transferred enforcement of certain provisions from Attorney General to DHS Secretary). DHS may "at any time" effectuate removal "under the prior order." 8 U.S.C. § 1231(a)(5). The reinstated order "is not subject to being reopened or reviewed," and the alien "is not eligible and may not apply for any relief" under the INA from that order. *Id.*

The INA establishes criteria for determining the country to which an alien will be removed. *See Jama v. ICE*, 543 U.S. 335, 338-341 (2005). Specifically, Section 1231(b) provides sequences of countries to which the alien shall be removed, subject to certain disqualifying conditions. *See* 8 U.S.C. § 1231(b)(1)-(2). Possible destinations include a country

8

designated by the alien, the alien's country of citizenship, and the alien's previous country of residence. *Jama*, 543 U.S. at 341. Importantly, Section 1231(b) offers a fail-safe option in the event the others do not work: any other "country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii); *see* 8 U.S.C. § 1231(b)(1)(C)(iv). Such countries may be selected even if not originally listed in an alien's removal order. *See* 8 C.F.R. § 1240.12(d).

Congress also has provided two means for an alien to challenge removal to a particular country where he may face persecution or torture. First, an alien may seek withholding of removal under Section 1231(b)(3). Statutory withholding generally prohibits removing an alien to a country where he would face persecution because of his "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see* 8 U.S.C. § 1231(b)(3)(B) (listing certain aliens ineligible for statutory withholding). "[P]ersecution is an extreme concept involving a severe level of harm that includes actions so severe that they constitute an exigent threat," and requires (among other things) the "infliction" of such harm "by the government of a country or by persons or an organization that the government was unable or

9

unwilling to control." 8 C.F.R. § 1208.1(e); *see, e.g.*, Orelien v. Gonzales, 567 F.3d 67, 71 (1st Cir. 2006) (noting that the "threshold" for demonstrating persecution "is not easily crossed") *Medina v. U.S. Att'y Gen.*, 800 Fed. Appx. 851, 856 (11th Cir. 2020) (alien seeking withholding must clear a "high bar").

Second, the alien may seek relief under regulations implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), *adopted* Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. (1988), 1465 U.N.T.S. 85—a treaty that addresses the removal of aliens to countries where they would face torture. *See* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, § 2242(b), 112 Stat. 2681-822; 8 C.F.R. §§ 208.31, 241.8(e). "Torture" is defined as an "extreme form of cruel and inhuman treatment," which intentionally inflicts "severe pain or suffering" on another for an improper purpose, and is performed "at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) and (a)(2); *see, e.g.*, *Rodríguez-Villar v. Barr*, 930 F.3d 24, 30 (1st Cir. 2019) (characterizing "torture" as a "higher bar" than

persecution).

Statutory withholding and CAT protection affect only *where*, not *whether*, an alien may be removed. A grant of statutory withholding means the alien is "presently protected" from removal to the particular country covered by the grant, though it "would not prevent" that alien's removal to "any other hospitable country." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). Likewise, a grant of CAT protection "means only that, notwithstanding the order of removal, the noncitizen may not be removed to the designated country of removal, at least until conditions change in that country." *Nasrallah v. Barr*, 590 U.S. 573, 582 (2020). The United States remains free to remove the alien "at any time to another country where he or she is not likely to be tortured." *Id.* (citation omitted).

Ordinarily, an alien raises a withholding or CAT claim during removal proceedings under 8 U.S.C. § 1229a, where the immigration judge decides both the alien's removability and claims for relief from removal. *See, e.g.*, 8 C.F.R. §§ 1240.1(a)(1)(iii), 1240.12(c); *Matter of I-S- & C-S-*, 24 I. & N. Dec. 432, 433-434 (B.I.A. 2008). But withholding and CAT claims can arise outside of those proceedings. For instance, an alien subject to a reinstated order of removal may still seek relief in

11

"withholding-only" proceedings, where the "only issue" is whether he may be removed to the country at issue. *Riley v. Bondi*, 606 U.S. 259, 265 (2025).

On President Trump's first day in office, he determined that the millions of aliens who have illegally crossed the border pose a serious threat to national security. Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 30, 2025). To combat that threat, the President directed DHS to take "all appropriate actions" to detain and remove aliens who have been ordered removed, but who nevertheless have been "released into the United States." *Id.* at 8468. One such appropriate action is to execute an alien's removal to a third country.

The need for such "third country removals"—*i.e.* removals to countries other than the ones designated in removal orders—is not uncommon. Sometimes the countries specified in a removal order are no longer viable by the time DHS is prepared to remove the alien. In other cases, an alien may obtain withholding or CAT relief from the only country listed in his removal order, either in his original proceedings or later ones (as with reinstated orders). In those cases, third-country removal is the only way for DHS to execute a lawful removal order. And

as a practical matter, that third country often falls within Section 1231(b)'s catch-all provisions allowing removal to any country willing to accept the alien. *See* 8 U.S.C. §§ 1231(b)(2)(E)(vii), (1)(C)(iv).

On March 30, 2025, DHS clarified its "policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the [INA] to countries other than those designated for removal in those removal orders." Add. 1-2.[1] On July 9, DHS issued a substantially similar document affirming that policy. Appx. 258-59 (together with the March policy, the Guidance). The Guidance distinguishes between removals to countries that have provided credible assurances that any aliens removed there will not be persecuted or tortured, and removals to those countries that have not.

For countries that have provided such assurances, "the alien may be removed without the need for further procedures." Add. 1-2. For countries that have not, DHS must first inform the alien of removal to the country and give him an opportunity to "affirmatively express a fear

---

[1] Section 240 is 8 U.S.C. 1229a ("Removal proceedings"); Section 241(a)(5) is 8 U.S.C. § 1231(a)(5) ("Reinstatement of removal orders against aliens illegally reentering"); and Section 238(b) is 8 U.S.C. § 1228(b) ("Removal of aliens who are not permanent residents").

of persecution or torture" there. *Id.* at 2. DHS "will generally wait at least 24 hours following service of a Notice of Removal before effectuating removal." *Id.* If an alien does express such a fear, an immigration officer will conduct a prompt screening to determine whether he "would more likely than not be" persecuted or tortured in the country of removal. *Id.* If the alien fails to satisfy that standard, he "will be removed." *Id.* If he does satisfy it, he will be put into additional administrative procedures, consistent with how withholding and CAT claims typically are handled. *See id.* "Alternatively, ICE may choose to designate another country for removal" and start the process afresh. *Id.*

## II. Procedural History

The named Plaintiffs are four aliens with final orders of removal resulting from proceedings in which they were notified that they could be removed to a designated country of removal or, potentially, a third country of removal. *See generally* Compl., Appx. 30-67; 8 C.F.R. § 1240.10(f). In March 2025, they filed this putative class action, alleging that there are "valid reasons to fear removal to specific countries that were not included in their removal orders." Compl., Appx. 30-67. Each plaintiff claims, among other things, that the government would violate

due process if it does not provide sufficient "notice and an opportunity to be heard prior to removal to a country that was not designated in their removal orders." Appx. 161.

On April 18, 2025, the district court granted plaintiffs' motion for class certification and issued a classwide preliminary injunction. Appx. 152.[2] The court rejected the government's reliance on 8 U.S.C. § 1252(f)(1), and the government's jurisdictional arguments. *Id.* 162-170. The court then held that the Guidance likely violated due process because it did not provide "notice and a meaningful opportunity to present fear-based claims" under CAT. *Id.* at 188. The court ordered DHS to (i) provide written notice to aliens and counsel of the third country to which they might be removed; (ii) provide aliens with a "meaningful opportunity" to assert a fear of removal; (iii) use a "reasonable fear" rather than a "more likely than not" standard to assess the credibility of those assertions; and

---

[2] The class definition is:
All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.
Appx. 174.

(iv) provide dissatisfied aliens at least 15 days to "move to reopen immigration proceedings." *Id.* at 198.

The government appealed and sought a stay. On May 21, 2025, the court "clarif[ied]" that the injunction's reference to a "meaningful opportunity" to "raise a fear-based claim" meant "a minimum of ten days." Appx. 238. (emphasis omitted).

On June 23, 2025, the Supreme Court stayed the preliminary injunction in full. Appx. 1. Later that same evening, the district court issued an order asserting that its May 21 remedial order "remains in full force and effect, notwithstanding today's stay of the Preliminary Injunction." ECF 176. On July 3, 2025, the Supreme Court granted the government's motion to clarify that the June 23 stay of the preliminary injunction necessarily barred the district court from enforcing that injunction. Appx. 20.

The district court granted Plaintiffs' motion for an indicative ruling that the court would "dissolve the preliminary injunction if the First Circuit remanded [the] appeal for that purpose." ECF 212. On February 20, 2026, after oral argument, this Court remanded the case. ECF 239.

On February 25, 2026, the district court issued a final judgment

dissolving the preliminary injunction and granting summary judgment to Plaintiffs on their claims that the DHS Guidance violates the Due Process Clause and 8 U.S.C. § 1231(b), while dismissing the remaining counts. Add. 5. As in its preliminary-injunction decision, the court held that Section 1252(f)(1) did not prohibit classwide relief, *id.* at 77; that the court had jurisdiction to review Plaintiffs' claims, *id.* at 20-35; and that the Guidance does not provide class members constitutionally adequate notice or opportunity to raise CAT (or withholding) claims before being removed to a third country, *id.* at 52-77. The court additionally held that Section 1231(b) itself requires notice and an opportunity to raise statutory withholding claims, *id.* at 50-52, and that the Guidance did not provide adequate process to challenge compliance with the country-sequencing provisions of Section 1231(b)(2), *id.* at 53.

The district court declared DHS's "third-country removal policy, as embodied in" the Guidance, to be "unlawful," and universally vacated that policy. Add. 83. Echoing the preliminary injunction, the court declared that "class members have the right to meaningful notice before removal to any third country" and that "class members have the right to a meaningful opportunity to raise a country-specific claim against

removal before removal to any third country." *Id.*

The court further declared that before the government may remove a class member to a third country, 8 C.F.R. § 1240.12(d) requires the government to "first seek removal to [a] class member's designated country of removal or specified alternative country or countries of removal, as provided in [the] final order of removal," and that 8 U.S.C. § 1231(b) requires the government to "first seek removal to [a] class member's designated country of removal or country or countries of citizenship, if any." *Id.* at 84-85. The district court stayed its judgment for fifteen days to allow Defendants to seek a stay from this Court.

On March 5, 2026, Defendants filed their stay motion. After granting an administrative stay, on March 16, 2026, this Court granted a stay pending appeal.

## **SUMMARY OF THE ARGUMENT**

In the INA, Congress vested the Executive Branch with broad authority over the removal of aliens and narrowly circumscribed the authority of the Judiciary to superintend those functions. The order below inverts that distribution of power. It sets aside the chosen policy of DHS to effectuate third country removals, replaces that policy with one

of the district court's own devising, and invites continued judicial micromanagement of such removals going forward, contrary to Congress's instruction. As the Supreme Court recognized in staying the district court's substantially similar preliminary injunction on the same claims, the order below exceeds the district court's lawful authority several times over.

I.    The Supreme Court concluded that Defendants are likely to succeed in obtaining reversal of Plaintiffs' claims, which were the basis for the district court's (previously stayed) preliminary injunction and the order below. This Court should therefore reverse and vacate the district court's universal vacatur and classwide declaratory judgment.

At the outset, the order runs afoul of multiple independent jurisdictional bars. *First*, 8 U.S.C. § 1252(f)(1) prohibits lower federal courts from issuing classwide relief that "enjoin[s] or restrain[s] the operation of [specified] provisions" in the INA. Specifically, Section 1252(f)(1) prohibits classwide relief "that order[s] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" their statutory authority to conduct third-country removals. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

19

Contrary to the district court's holding, it makes no difference that the court recharacterized the relief as a series of classwide declarations and a universal vacatur, rather than an injunction. The vacatur and declaratory judgment unquestionably restrain the operation of a provision that is specified in Section 1252(f)(1)—namely, DHS's implementation of Section 1231(b)'s authorization of third-country removals—because they require "federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" such removals, *Aleman Gonzalez*, 596 U.S. at 550-51. That conclusion cannot be avoided by an argument that a vacatur is merely "less drastic" than an injunction. Nor can it be avoided by asserting that a classwide declaratory judgment is somehow not coercive even where it invites each and every class member to obtain a follow-on injunction.

In addition, the immigration laws specifically strip district courts of jurisdiction to adjudicate freestanding suits arising from actions taken to execute removals or to review claims challenging the government's implementation or application of CAT. Such claims may be brought, *if at all*, only in a petition for review of a final removal order filed in a court of

appeals. *See* 8 U.S.C. § 1252(a)(4)-(5), (b)(9), (g); *see also* 8 U.S.C. § 1231 note.

Both sets of bars squarely apply here: Plaintiffs seek to prevent the execution of their removal orders until they receive additional process for their CAT and withholding claims. And in so doing, they also challenge the Executive's implementation and application of CAT. The district court held itself above these limits, largely by ignoring the statutory text and emphasizing the importance of judicial review. That is no way to read any statute, but especially not these.

II. Even assuming the district court had jurisdiction to issue its sweeping relief, its merits analysis was also fatally flawed. The court erred in holding that class members have a constitutional or statutory right to additional procedures beyond those in the Guidance before being removed to a third country. The district court repeated its errors from the preliminary-injunction stage in concluding that the Guidance does not provide constitutionally sufficient process for class members to raise a fear of torture (or persecution). The Guidance ensures that an alien will either be sent to a country where the United States has received adequate assurance the alien will not be tortured or persecuted, or that the alien

will be given notice and an opportunity to be heard regarding any fear as to his country of removal. Add. 1-2. The district court erred in second-guessing the details of those procedures under the guise of constitutional due-process analysis, especially for a class that includes many illegal aliens who lack any due-process rights to contest their removals beyond what the political branches have provided.

The court also reasoned that Section 1231(b) itself requires greater notice and opportunity to contest third country removals, but did not identify *any* text in Section 1231(b)(2) or 1231(b)(3) creating such an entitlement. And Section 1231(h) affirmatively prohibits "constru[ing] [Section 1231] to create any substantive or procedural right or benefit." 8 U.S.C. § 1231(h).

The district court further held that Section 1231(b) gives rise to a due-process interest in compliance with the sequence of countries in Section 1231(b)(2). But that reasoning is once again foreclosed by Section 1231(h). And in any event, the district court erred in addressing the sequencing under Section 1231(b)(2). None of the named Plaintiffs have even alleged—much less demonstrated—sufficient injury to confer standing on a sequencing-based claim. Moreover, Section 1231(b)(2)'s

sequencing directives make clear that whether an alien can be removed to a third country not listed in the removal order generally will depend on discretionary, foreign-policy, and national-security considerations vested in the Executive's exclusive discretion that are not amenable to judicial second-guessing.

The district court further opined that due process requires the Executive Branch to make "an 'individualized determination' that the foreign assurances are sufficient" in each alien's case, Add. 67, and that aliens are entitled to challenge "the Government's reasons for crediting the assurances" of any given country, *id.* at 69. But courts may not "second-guess" the scope of the Executive's conclusion any more than its substance. *See Kiyemba v. Obama*, 561 F.3d 509, 517-18 (D.C. Cir. 2009) (Kavanaugh, J., concurring), *cert. denied*, 559 U.S. 1005 (2010). The decision that a foreign government's categorial assurance against torture or persecution is sufficient for all aliens is *itself* a "foreign policy" judgment the Judiciary "is not suited" to question. *Munaf*, 553 U.S. at 702.

The district court's creation of novel due-process requirements is particularly misguided because, for many class members, due process

23

requires no more process than what the political branches provide. The class here plainly includes aliens who have not been admitted. And for aliens who have not been admitted, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (emphasis added); *accord DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020).

Finally, at minimum, this Court should reverse and vacate because the district court improperly certified the class. The district court universally vacated the DHS Guidance under Section 1231(b)(3) (withholding of removal) despite recognizing that the class includes aliens ineligible for that relief. The district court's classwide due process holding is equally erroneous. First, the class includes aliens who have never been admitted and therefore are only entitled to those due process rights conferred by Congress. Second, Plaintiffs' due process claim cannot be sustained due to the wide variance in the proper application of the *Mathews* factors amongst class members. Even if this Court were to find that some aliens in this class may, depending on the third country to which DHS seeks to remove them, have a statutory or due process right

to additional procedures prior to removal to a third country, that alone cannot sustain the district court's sweeping classwide relief under Rule 23(b)(2). And as to the district court's declaration regarding Section 1231(b)(2)'s sequencing, Plaintiffs failed to properly allege that Defendants have "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Accordingly, this Court should vacate and reverse the district court's February 25, 2026 Order as the Supreme Court has already indicated it will.

## ARGUMENT

The district court's latest order rests on the same flawed legal grounds that undergirded its preliminary-injunction ruling. The court offered only three new points to support its latest order: (1) even if Section 1252(f)(1) bars a classwide injunction in this case, it permits classwide declaratory relief and vacatur; (2) the Guidance violates an implicit notice-and-opportunity entitlement supposedly contained in Section 1231(b) itself; and (3) the Guidance does not provide adequate process to challenge compliance with the sequencing directives in Section 1231(b)(2) for selecting a third country for removal. If anything, those points are even weaker than the court's failed due-process justification for its preliminary injunction.

## I. The District Court Lacked Authority to Review Plaintiffs' Claims or Enter the Classwide Relief Here.

The district court issued a classwide order that effectively awards Plaintiffs the same relief that the court tried to provide in its (previously stayed) preliminary injunction. As before, that relief is jurisdictionally barred. Under 8 U.S.C. § 1252(f)(1), lower courts lack jurisdiction to issue classwide orders that "enjoin or restrain" the operation of third-country removals pursuant to 8 U.S.C. § 1231(b). The court's attempt to evade

26

that stricture by relabeling its injunction as a series of classwide declarations and a universal vacatur fails. In purpose and effect, the order restrains DHS from following its own policy and invites every class member to obtain an injunction to enforce the declaratory judgments— thus accomplishing in two steps what is forbidden in one. Moreover, the order suffers from the same additional jurisdictional flaws as the preliminary injunction: under 8 U.S.C. § 1252(g), district courts lack jurisdiction to adjudicate suits (like this one) arising from actions taken to execute removal orders; and under 8 U.S.C. § 1252(a)(5), (b)(9), district courts lack jurisdiction over challenges to removal order or claims arising from removal proceedings. Furthermore, under 8 U.S.C. § 1252(a)(4) and FARRA § 2242(d), district courts lack jurisdiction to review claims (like these) challenging the government's implementation and application of CAT.

## A. Section 1252(f)(1) precludes the new classwide relief.

The INA precludes the classwide relief that the district court ordered. It makes clear that lower federal courts lack "jurisdiction or authority to enjoin or restrain the operation" of certain INA provisions— including the removal provisions in 8 U.S.C. § 1231—"other than with

respect to the application of such provisions to an individual alien" in removal proceedings. 8 U.S.C. § 1252(f)(1). By its terms, Section 1252(f)(1) prohibits lower federal courts from issuing classwide relief that "order[s] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550-551 (2022).

**1.** The district court's universal vacatur and classwide declaratory judgment violate Section 1252(f)(1). Just like the preliminary injunction, it runs to "an entire class of aliens," *Aleman Gonzalez*, 596 U.S. at 550-51, rather than an "individual alien," 8 U.S.C. § 1252(f)(1). Just like the preliminary injunction, it concerns one of the covered statutory provisions, Section 1231(b)—which authorizes the Executive to remove aliens to third countries when appropriate. *See Aleman Gonzalez*, 596 U.S. at 551. And just like the preliminary injunction, the court's order inescapably "restrain[s]"—that is, "check[s], hold[s] back, or prevent[s]"—the "operation" of Section 1231(b), regardless of whether it does so on the theory that the government is violating Section 1231(b), CAT, or the Constitution. *See id.* at 552-554.

The district court attempted to evade Section 1252(f)(1)'s strictures

by recharacterizing the relief as a series of classwide declarations and a universal vacatur, rather than an injunction. But like the Constitution, the INA "deals with substance, not shadows." *SFFA v. President and Fellows of Harvard College*, 600 U.S. 181, 230 (2023). Here, the declarations and vacatur effectively "enjoin or restrain the operation" of third-country removals under Section 1231(b) because, in substance, they require "federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" such removals, *Aleman Gonzalez*, 596 U.S. at 550-551. Indeed, that is the whole point of the order below. This Court rightly stayed the order, presumably recognizing that it had precisely the same practical effect as the preliminary injunction the Supreme Court twice stayed.

2.     The district court insisted that Section 1252(f)(1) does not apply to declaratory judgments, which it viewed as noncoercive. Add. 77-78; *cf. Biden v. Texas*, 597 U.S. 785, 801 n.4 (2022) (reserving the question whether Section 1252(f)(1) applies to declaratory relief or vacatur of agency action). But that wrongly treats all declaratory judgments, which may be issued "whether or not further relief is or could be sought," 28 U.S.C. § 2201(a), the same. Some declaratory judgments are not coercive,

29

such as those that clarify whether *the plaintiff* may act (or not act) in a certain way, *e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 130 (patent licensee may seek declaration on patent's invalidity), or those which declare a policy unlawful but "in [their] agreed substance d[o] not contemplate injunctive relief," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 155 (1963) (plaintiffs cannot automatically be stripped of citizenship for draft evasion). Such declarations do not "check, hold back, or prevent" the defendant, *Aleman Gonzalez*, 596 U.S. at 549, who remains "free to continue to" act as he likes pending appellate review, *Mendoza-Martinez*, 372 U.S. at 155.

In contrast, a declaration that *the defendant* must act (or not act) in a certain way and that contemplates *a follow-on injunction* if the defendant does not comply with the declaration does check, hold back, and prevent the defendant, and thus has the practical effect of an injunction. *See San Juan Cellular Tel. Co. v. PSC*, 967 F.2d 683, 684 (1st Cir. 1992) (Breyer, J.) (noting that "a declaratory judgment that [a practice] is unlawful is equivalent to an injunction"). And that is precisely what is presented here. The district court declared that all class members have an enforceable "right" to "meaningful notice" and "a meaningful

opportunity" to be heard before they could be removed to a third country. Add. 83. That declaration invites "every single member of the class" to "immediately seek an injunction grounded on the authority of the declaratory judgment," even before appellate proceedings have concluded, if the government does not immediately comply. *Alli v. Decker*, 650 F.3d 1007, 1020 n.2 (3d Cir. 2011) (Fuentes, J., dissenting). It necessarily "check[s], hold[s] back, [and] prevent[s]" the challenged policy, *Aleman Gonzalez*, 596 U.S. at 549, and thus has the "practical effect" of a "class-wide injunction," *Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018), *cert. denied*, 141 S. Ct. 188 (2020); *cf. Abbott v. Perez*, 585 U.S. 579, 594 (2018) ("[W]here an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction.").

Indeed, the Tax Injunction Act, which provides that district courts may "not enjoin, suspend[,] or restrain" the collection of state taxes in certain circumstances, 28 U.S.C. § 1341, covers "declaratory judgments holding state tax laws unconstitutional," which "may in every practical sense operate to suspend collection of the state taxes until the litigation is ended." *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982);

31

*cf. Samuels v. Mackell*, 401 U.S. 66, 72 (1971) (instructing that, because declaratory relief frequently would have "virtually the same practical impact as a formal injunction would"—especially when it "might serve as the basis for a subsequent injunction"—"where an injunction would be impermissible" on other grounds, "declaratory relief should ordinarily be denied as well").

Exempting that type of declaration from Section 1252(f)(1) would invite just the sort of evasion that the district court engaged in here. By prohibiting orders that "restrain" as well as "enjoin," Congress did not forbid classwide injunctions, yet welcome classwide declaratory judgments that invite each and every class member to obtain a follow-on injunction. *See Grace Brethren*, 457 U.S. at 408 ("[B]ecause there is little practical difference between injunctive and declaratory relief, we would be hard pressed to conclude that Congress intended to prohibit taxpayers from seeking one form of anticipatory relief against state tax officials in federal court, while permitting them to seek another."). Put differently, a court may not accomplish in two steps (classwide declaration plus follow-on injunctions) what Congress has forbidden it to do in one (classwide injunction).

The district court's attempt to evade Section 1252(f)(1) is particularly misguided given that it certified a class under Rule 23(b)(2), which allows certification of classes that seek "final injunctive relief or *corresponding* declaratory relief." Fed. R. Civ. P. 23(b)(2) (emphasis added). The Advisory Committee defines "corresponding declaratory relief" as any remedy that "as a practical matter ... affords injunctive relief or serves as a basis for later injunctive relief." Fed. R. Civ. P. 23(b)(2) Advisory Committee Note to 1996 Amendment; 7AA Fed. Prac. & Proc. Civ. § 1775 (3d ed.). This definition makes clear that the purpose of the Rule 23(b)(2) class is to enjoin certain action or inaction on a classwide basis and that any declaratory relief issued to a 23(b)(2) class should be equivalent to an injunction. *See id.*; *see also Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.,* 98 F.R.D. 254, 271 (D. Del. 1983) (refusing to certify a Rule 23(b)(2) class where "determination of these issues would not result in corresponding declaratory relief that would have the effect of enjoining the defendant from acting in the future"). Because Rule 23(b)(2) only allows declaratory relief that has the same practical effect as an injunction, Section 1252(f)(1)'s bar on classwide injunctive relief applies with equal force to any corresponding

33

declaratory relief. *See Jennings,* 583 U.S. at 313 (noting that Rule 23(b)(2) requires "final injunctive relief or *corresponding* declaratory relief [to be] appropriate respecting the class as a whole" and suggesting Section 1252(f)(1)'s prohibition on classwide injunctive relief would also prohibit any *corresponding* declaratory relief by stating "if the Court of Appeals concludes that it may issue only declaratory relief, then the Court of Appeals should decide whether that remedy can sustain the class on its own"). Consequently, the court lacked jurisdiction to issue its declaratory relief.

To be sure, this Court previously concluded that Section 1252(f)(1) does not bar classwide declaratory relief. *Brito v. Garland,* 22 F.4th 240, 251 (1st Cir. 2021). But *Brito* was decided before the Supreme Court's decision in *Aleman Gonzalez,* which made clear that "restrain" has a distinct meaning from "enjoin" and explained that Section 1252(f)(1)'s use of the word "restrain" could (read broadly) reach orders that "inhibit particular actions" and at minimum covers orders that "stop (or perhaps compel)" the "Government's efforts to enforce or implement" the covered statutes. 596 U.S. at 548-49. In addition, *Brito* did not grapple with the fact that some declaratory judgments are sufficiently coercive as to have

the same "practical effect" as an injunction, as explained above. This Court is thus not bound by *Brito*'s conclusion that *all* declaratory judgments *categorically* fall outside Section 1252(f)(1). *See U.S. v. Rodriguez*, 527 F.3d 221, 225 (1st Cir. 2008) (prior panel holding not binding when contradicted by subsequent controlling authority); *Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 592 (1st Cir. 1995) (prior panel holding not binding where "authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind.").

**3.** The district court also reasoned that Section 1252(f)(1) does not preclude universal vacatur, which the court viewed as a "less drastic" remedy that "neither compels nor restrains further agency decision-making." Add. 78. That reasoning similarly lacks merit. As noted, Congress precluded not only classwide orders that "enjoin," but also those that "restrain." 8 U.S.C. § 1252(f)(1). The independent meaning of "restrain" in Section 1252(f)(1) is particularly clear given the contrast between Section 1252(f)(1) ("enjoin or restrain") and the very next provision, Section 1252(f)(2), which bars only orders that "enjoin" covered

conduct. And the Supreme Court has explained that "restrain" is broad, reaching all judicial orders that "check, hold back, or prevent" governmental action. *Aleman Gonzalez*, 596 U.S. at 549. Vacatur plainly can have such "inhibit[ing]" effect. *Id.* If a rule provides the legal authority for officials to act, vacating the rule obviously "prevents" officials from acting. And even where (as here) a rule simply directs officials how to exercise their statutory and regulatory authority, vacatur "checks" and "holds back" officials from acting in accordance with the rule, because it leaves officials without instructions about how to act.

4. This Court instructed the parties to address the "significance, if any, of 8 U.S.C. § 1252(e) and its subparts for purposes of Defendants' contention that the district court lacked authority to declare unlawful and set aside the March 2025 Guidance implementing a covered provision of 8 U.S.C. § 1252(f)(1) other than 8 U.S.C. § 1225(b)." Order Granting Stay at 1. Defendants' argument that the decision below violated Section 1252(f)(1) does not rely on Section 1252(e). The Guidance does not apply to expedited removals, Add. 1 n.1 (providing "[t]his memorandum does not address expedited removals pursuant to [8 U.S.C. § 1225(b)(1)]."), and the class does not include aliens with first-instance

expedited removal orders, ECF 64 at 23 (certifying a class of aliens with "a final removal order issued in proceedings under [8 U.S.C. §§ 1229a, 1231(a)(5), 1228(b)]"). It does, however, include individuals who have expedited removal orders that have been reinstated under Section 1231(a)(5), and Defendants maintain that Section 1252(e)(1) prevented the court from entering relief to those individuals or certifying a class that includes them. *See* 8 U.S.C. § 1252(e)(1)(A) ("no court" may enter relief "pertaining to" an expedited removal order except as authorized in Section 1252(e)); § 1252(e)(1)(B) ("no court may [...] certify a class under Rule 23" in any action brought under Section 1252(e)). But Section 1252(e) is not relevant to Defendants' argument that the district court lacked jurisdiction to vacate the Guidance because it restrains DHS's operation of Section 1231(b) in violation of Section 1252(f)(1).

## B. Section 1252 and FARRA preclude review of Plaintiffs' claims.

Independent of the form of relief, Plaintiffs' claims are also not judicially reviewable because district courts lack jurisdiction to adjudicate suits arising from actions to execute removal orders or to review claims challenging the government's implementation and

application of CAT. The district court's contrary reasoning (Add. 20-36) echoes its reasoning at the preliminary-injunction stage and lacks merit.

### i. *Plaintiffs' claims are barred by Section 1252(g).*

Most glaringly, the injunction violates the INA's provisions that prohibit district courts from exercising jurisdiction over suits challenging actions taken to execute removal orders. Congress has explicitly and unambiguously stripped district courts of jurisdiction over "any cause or claim by or on behalf of any alien arising from the decision or action ... to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C § 1252(g). To the extent claims arising from these distinct actions are reviewable at all, they are only reviewable in a petition for review. *Infra* at 47-51; *Mapoy v. Carroll,* 185 F.3d 224, 229-30 (4th Cir. 1999) (holding that Section 1252(g) has "a singular exception to the general rule in § 1252(g) that jurisdiction is stripped from the enumerated claims" and that is for claims "specifically provided for by § 1252.").

Here, Plaintiffs challenge where they are to be removed on the ground that the government's procedures are supposedly deficient. But a claim about where an alien will be removed is, *ipso facto*, a "claim" "arising from the decision or action" to "execute [a] removal order[]." 8

U.S.C. § 1252(g); *see* 8 C.F.R. § 1240.12(d) (removal order "does not limit" DHS's authority to remove alien to third country not listed). Indeed, if the government were not "execut[ing a] removal order[]" against an alien, the alien would not even be a member of the class here, much less have standing to challenge the Guidance. *See* ECF 64 at 23 (defining class to include only aliens who, *inter alia*, DHS "has deported or will deport" to a third country on or after February 18, 2025). By definition, then, each and every class member necessarily is raising a claim arising out of the government's actions to execute his removal order.

The district court brushed aside Section 1252(g) on the ground that it reaches only "discretionary decisions." Add. 21. And, the court reasoned, "it is not within the 'discretion' of the Executive to exceed the scope of its authority or otherwise violate the law." *Id.* That is the precise misreading of Section 1252(g) that tainted the court's previous decision and it remains doubly wrong.

First, it improperly makes jurisdiction "dependent upon the merits of the claim." *Aleman Gonzalez*, 596 U.S. at 554. Under the district court's logic, whether an act is discretionary—and thus whether review is precluded—depends on whether the act is lawful. Put differently, a court

must rule on the merits in order to determine whether it has jurisdiction to rule on the merits. The Supreme Court has repeatedly rejected that logically circular approach to jurisdictional statutes. *E.g.*, *id.*; *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 92 (1998).

Second, nothing in Section 1252(g)'s text is limited to acts of "discretion." Congress knows how to write bars that depend on discretion, and it did not do so in Section 1252(g). *See, e.g.*, 8 U.S.C. § 1252(a)(2)(B)(ii) (no jurisdiction to review a "decision or action … which is specified … to be in the discretion of [the relevant official]"); 8 U.S.C. § 1226(e) ("The [DHS Secretary's] discretionary judgment regarding the application of this section shall not be subject to review."). Rather, the text reaches "*any* cause or claim ... arising from the decision *or* action by the [DHS Secretary] to commence proceedings, adjudicate cases, or execute removal orders."  8 U.S.C. § 1252(g) (emphases added). Of course, such actions often involve discretion on the Executive Branch's part, akin to the exercise of prosecutorial discretion. *Reno*, 525 U.S. at 486. But Section 1252(g) is not limited to only the discretionary aspects of the specified actions; its text reaches "any" "action" taken to "execute removal orders." *See E.F.L. v. Prim*, 986 F.3d 959, 965 (7th Cir. 2021) (rejecting

view that Section 1252(g) is limited to "discretionary decisions"); *see also Rauda* v. *Jennings*, 55 F.4th 773, 777-778 (9th Cir. 2022) (endorsing *E.F.L.* and cases from Third, Sixth, and Eleventh Circuits holding the same).

The district court attempted to distinguish *AADC* on the ground that the claims there challenged the defendants' subjective motives in choosing to deport the aliens, whereas the claims here do not require subjective inquiries. Add. 21. But *AADC* did not rely on that rationale; instead, the Court found review precluded because the claims challenged the "decision to 'commence proceedings' against" the plaintiffs—full stop. 525 U.S. at 487.

The district court also suggested (Add. 21) that Section 1252(g) does not apply to "policy challenge[s]." But a policy about how to remove aliens to third countries is itself an "action" taken to "execute removal orders." 8 U.S.C. § 1252(g). And *AADC* forecloses the court's suggestion, as the selective-enforcement claim there easily could have been cast as a challenge to a discriminatory removal "policy." *See* 525 U.S. at 474.

Nor does *DHS* v. *Regents*, 591 U.S. 1 (2020), support the court's suggestion. There, the Supreme Court held that Section 1252(g) did not

preclude a challenge to the rescission of a program that offered certain substantive immigration benefits to certain deferred-action recipients. *Id.* at 19. The Court explained that the "rescission, which revokes a deferred action program with associated benefits, is not a decision to 'commence proceedings,' much less to 'adjudicate' a case or 'execute' a removal order." *Id.* Unlike *Regents*, this case challenges not some antecedent programmatic determination that could have a downstream effect on class members' immigration status. Instead, this suit frontally attacks a policy that directs the execution of removal orders.

Finally, nothing in this Court's decision in *Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023), supports the district court's atextual exceptions. This Court's decision in *Kong* was based on its conclusion that Kong presented an action for damages arising from his *detention,* not his *removal.* 62 F.4th at 616-17. This Court made clear that if Kong had sought a stay of his removal—as opposed to merely relief from detention—Section 1252(g) would have applied. *Id.* That is no help for Plaintiffs, whose claims are entirely based on DHS's decision to execute their removal orders, and the procedures they seek would interfere with actions "integral to the act of executing a removal order." *Id.*

### ii. *Plaintiffs' claims are barred by Section 2242(d) of the Foreign Affairs Reform and Restructuring Act.*

Independently, the INA and FARRA preclude review of Plaintiffs' CAT-related claims. The INA provides that "[n]otwithstanding any other provision of law," "a petition for review filed with an appropriate court of appeals ... shall be the sole and exclusive means for judicial review of any cause or claim under [CAT]." 8 U.S.C. § 1252(a)(4). And FARRA, which implemented Article 3 of CAT, further confirms that "no court shall have jurisdiction to review ... any ... determination made with respect to the application of [CAT] ... except as part of the review of a final order of removal." § 2242(d), 112 Stat. 2681-822; *see* 8 C.F.R. § 208.18(e). The district court's order runs afoul of those limits. As the district court itself previously recognized, Plaintiffs' suit both concerns the "application" of CAT, and is a "cause or claim under [CAT]." Appx. 507 (recognizing that the "class-wide injunctive relief Plaintiffs seek" is "based on" FARRA). Thus, the CAT-based claims raised here can only be reviewed—if at all— in a court of appeals via a petition for review.

The district court nevertheless held that Plaintiffs' claims did not arise "under" CAT because CAT did not provide their "cause of action." Appx. 507 (quoting *American Well Works Co. v. Layne & Bowler Co.*, 241

43

U.S. 257, 260 (1916)). But CAT, a non-self-executing treaty, does not itself create *any* justiciable cause of action. If the court were correct, Section 1252(a)(4) would not apply to any claims and would effectively be rendered meaningless. That cannot be right. Instead, "any cause or claim under [CAT]" in Section 1252(a)(4) is better read to include any claim that depends on CAT or FARRA for relief. *Cf. Ardestani v. INS*, 502 U.S. 129, 135 (1991) (reading "under" as meaning "subject to" or "governed by"). Indeed, the Supreme Court has described this case as one involving aliens "seek[ing] relief under [CAT]," Appx. 20—a description that the district court disregarded entirely.

The district court also dismissed FARRA's jurisdictional bar. Add. 34-35. FARRA provides that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under [CAT] or this section, or any other determination made with respect to the application of [CAT], except as part of the review of a final order of removal." § 2242(d), 112 Stat. 2681-822. The court reasoned that the "literal terms" of FARRA say only that it "does not provide jurisdiction, not that it repeals jurisdiction." Add. 35. But that myopic reading overlooks that Section 2242(d) states that "nothing" in FARRA

supplies jurisdiction to review CAT claims "*except*" as part of a final order of removal. That language is best read to mean that CAT claims may be reviewed only via a petition for review. The court's contrary reading is violates the INA's command that a petition for review is the "sole and exclusive means" to review CAT claims "[n]otwithstanding any other provision of law." 8 U.S.C. § 1252(a)(4). *Cf. Shapiro v. McManus*, 577 U.S. 39, 43 (2015) (rejecting an interpretation that "needlessly produces a contradiction in the statutory text" where the alternative does not).

The district court's interpretation is further undermined by the fact that Congress chose to defer *all* implementation of the relevant CAT provisions to the Executive. *See* FARRA § 2242(b) (providing that "the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of [CAT]"). And Congress further instructed that "no court shall have jurisdiction to review the regulations adopted to implement this section[.]" *Id.* § 2242(d). By seeking additional procedures with respect to CAT beyond those prescribed by the Executive in the applicable regulations, *see generally* 8 C.F.R. §§ 208.16–208.18, Plaintiffs' claims necessarily constitute a challenge to the CAT regulations.

Furthermore, when the Executive sets the procedures for complying with CAT, it has made a "determination" with "respect to the application of the policy set forth in" CAT. FARRA § 2242(d). A challenge to that determination runs headlong into FARRA's jurisdictional bar. The district court's conclusion that it had jurisdiction to consider Plaintiffs' CAT-related claims—despite FARRA's clear prohibition on judicial review of "the regulations adopted to implement" CAT, *and* "claims raised under" CAT, *and* "any other determination made with respect to the application of" CAT—is plainly wrong.

### iii. *To the extent Plaintiffs' claims are reviewable at all, they are reviewable only in a petition for review.*

To the extent Plaintiffs' claims, which solely and directly relate to relief that must be sought in removal proceedings, are reviewable at all by this Court, it would be in a petition for review. 8 U.S.C. § 1252(a)(4), (a)(5), (b)(9). Whether an alien may be removed to a particular country, and under what procedures, self-evidently are questions of law or fact "arising from any action taken or proceeding brought to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). And review of "all" such questions must occur—if anywhere—"only in judicial review of a final order under this section." *Id*. If that were not clear enough, the INA

46

removes all doubt by confirming that "[n]otwithstanding any other provision of law ... a petition for review filed with an appropriate court of appeals ... shall be the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. § 1252(a)(5).

The district court deemed those provisions inapplicable because Plaintiffs are not "challeng[ing] any removal proceedings." Add. 25. Even if so, Plaintiffs are undoubtedly challenging an "action taken" to remove them—namely removal to a third country. 8 U.S.C. § 1252(b)(9). That basic point distinguishes this case from cases involving claims only tangentially related to removal orders and thus not unreviewable under Section 1252(a)(5) and (b)(9). *See Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018) (plurality opinion) (claims regarding detention); *Regents*, 591 U.S. at 19 (claims regarding recission of DACA).

The district court also relied on the observation that many class members cannot raise their claims in a petition for review because their third-country removal claims arose after entry of their final removal orders. Add. 25-28. And from the premise that Plaintiffs' claims must be reviewable *somewhere* by some court, the court concluded that the INA's jurisdictional bars must not mean what they say. *Id.* at 25. (citing *Aguilar*

*v. ICE*, 510 F.3d 1, 9-12 (1st Cir. 2007)). Although this Court's decision in

*Augilar* interpreted these provisions as conditional on the availability of

meaningful judicial review in a petition for review, *Aguilar,* 510 F.3d at

11, the text of the statue does not support such a reading in this case.

More importantly, the premise is wrong: Many aliens *can* raise such

claims through existing administrative procedures. On the front end,

aliens can detail in their initial removal proceedings the list of all

countries where they fear removal—which typically should not be an

exceedingly demanding task, given the high bar and targeted

maltreatment that is required to establish CAT protection or statutory

withholding. *See* USCIS, *Form I-589: Application for Asylum and for*

*Withholding of Removal* 6 (Jan. 20, 2025) (asking alien to list and explain

"any" country "to which [he] may be returned" where he fears "torture");[3]

*see also* 8 C.F.R §§ 1240.10(f), 1240.11(c). And on the back end, aliens can

move to reopen proceedings to assert new fear claims regarding removal

---

[3] The district court criticized the government for relying on the Form I-589 concluding the form only requires aliens to list countries "to which the applicant has a reasonable expectation of removal." Add. 29-30. But the meaning of "country to which you may be returned" on the Form I-589 is clearly defined by Section 1231(b)(2) which states all the countries an alien may be returned including, a third country to which they have no connection.

to a third country. *See, e.g.*, 8 U.S.C. § 1229a(c)(7) (allowing a motion to reopen within 90 days after removal order becomes administratively final); 8 C.F.R. §§ 1003.2(c), 1003.23(b) (same after 90 days by way of the immigration court's or BIA's *sua sponte* authority). Indeed, some class members have succeeded in reopening their removal proceedings to assert fear claims to third countries. Appx. 574-79 (citing *Matter of A-S-M-*, 28 I&N Dec. 282 (BIA 2021)). That variance alone renders the classwide relief (indeed, the class definition) improper.

As in its preliminary-injunction decision, the district court found those options "illusory," including because the court asserted that plaintiffs should not be expected to claim a fear of removal to a country before that country is designated. Add. 25. But the court ignored that some class members have or will be able to move to reopen their removal proceedings to assert third country fear claims.

To the extent these options are "illusory" for any class member, that only means that those claims are barred. That this channeling provision might occasionally have bite is no reason to disregard it. The whole point of jurisdictional bars is to bar judicial review in at least some situations. And where, as here, a claim does not fit within the "sole and exclusive"

means for judicial review Congress has supplied, 8 U.S.C. § 1252(a)(5), the result is that judicial review is simply not available—not that district courts somehow gain license to manufacture their own jurisdiction. That simply is the consequence of exclusive review. *See United States v. Fausto*, 484 U.S. 439, 454-55 (1988).

## II. Plaintiffs' Claims Are Meritless In Any Event.

Even if Plaintiffs' claims were reviewable, the district court erred in holding that Plaintiffs have a constitutional or statutory right to additional procedures beyond those in the Guidance before being removed to a third country. The district court's reasoning that the Guidance provides insufficient notice and opportunity to raise a withholding or CAT claim (Appx. 526) echoes its reasoning at the preliminary-injunction stage and lacks merit because the district court misidentified the liberty interest, Appx. 527, which taints the entire due process analysis, particularly on a classwide basis. New this time, the court reasoned that Section 1231(b) itself requires greater notice and opportunity to contest third-country removals. But Plaintiffs lack standing to assert claims under the sequencing provisions of Section 1231(b)(2) and Section 1231(b)(3) does not require the procedures the

district court has commanded. Defendants address the district court's new errors first.

## A. Section 1231(b) Does Not Require Additional Procedures.

The district court held that Section 1231(b) requires additional procedures beyond what the Guidance provides, for two reasons: first, Section 1231(b) purportedly itself implicitly requires greater notice and opportunity to raise statutory withholding objections to third-country removals, Appx. 524 and second, Plaintiffs purportedly have a due-process interest in whether the government is complying with Section 1231(b)'s criteria for selecting the country of removal, wholly apart from any fear of torture or persecution, *id.* at 527. Those holdings are meritless.

**1.** The district court held that the Guidance violates Section 1231(b) because "the Court construes section 1231(b)(2) to require notice and an opportunity to present claims for statutory withholding of removal under section 1231(b)(3)" for those aliens who are not ineligible under section 1231(b)(3).[4] Appx. 524. But the court did not identify *any* text in Section

---

[4] In answer to the Court's second question, *see* Stay Order at 2, the Court must address both the statutory and constitutional grounds as to all class members in order to reverse.

*Continued on next page.*

1231(b)(2) or 1231(b)(3) creating such an entitlement.

The district court also ignored that Section 1231(h) prohibits the procedural rights it declared below. Section 1231(h) affirmatively prohibits "constru[ing] [Section 1231] to create any substantive or procedural right or benefit." 8 U.S.C. § 1231(h). While Section 1252(a)(5) and (b)(4) authorizes judicial review of certain withholding of removal determinations in a petition for review, and thus must allow for some determination of rights under Section 1231(b)(3) in the Court of Appeals, there is no corollary exception to Section 1231(h) for district court review and determination of such rights. Sections 1231(h), 1252(a)(5), and 1252(b)(4) are thus best harmonized to mean that any procedural or substantive rights under the withholding statute may be determined *only* in a petition for review, and are not legally enforceable in any *other* type of suit (like this one). *Cf. RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general.") (brackets omitted).

---

Nor can the Court dispose of the appeal even as to class members who are not statutorily ineligible for withholding on this ground. The district court relied on its statutory withholding theory only for vacatur, so affirming on this ground would not dispose of the appeal as to the declaratory judgments with respect to those class members.

The district court's conclusion that Section 1231(b) creates the asserted procedural rights thus has no basis in the statutory text. That likewise dooms the court's reliance (Appx. 526), on the constitutional-avoidance canon, *see Jennings*, 583 U.S. at 298 (avoidance is not a "license to graft" additional limits "onto the text"). The analysis of this theory could thus stop here.

**2.** The district court nevertheless reasoned that Section 1231(b) implicitly creates procedural rights because, in the court's view, the government cannot evaluate a risk of persecution "absent the noncitizen's involvement, or at least his meaningful abstention." Appx., 525 (quotation marks omitted). But withholding applies only "*if the [government] decides* that the alien's life or freedom would be threatened." 8 U.S.C. § 1231(b)(3)(A) (emphasis added). The government thus has discretion to fashion procedures to make that decision. *See Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 543-544 (1978). And while the government has provided a robust process in connection with issuance of removal orders, *e.g.*, 8 C.F.R. §§ 1240.11(c), 1240.17, 1240.33, 1240.49(c), it has opted for a more streamlined process for covered third-country removals, and nothing in Section 1231(b) is to

the contrary.

**3.** Further, the district court's rationale makes no sense even on its own terms. Under the Guidance, the Executive Branch "must determine whether [a] country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured," and whether those assurances are "credible." Add. 1-2. A credible assurance that a foreign country will not persecute or torture anyone logically and necessarily means that the country will not persecute or torture one of the class members. The district court found this procedure inadequate because it read Section 1231(b)(3)(C)'s references to "the trier of fact" and "credibility determinations," as requiring the alien's involvement in that determination process. Appx. 523. But that provision was added in 2005, *see* Pub. L. No. 109-13, Div. B, Tit. I, § 101(c), 119 Stat. 303, and is inapposite because it obviously refers to proceedings under the existing regulations listed above which even the district court agrees do not speak to third country removals.

Where the third country has not provided the requisite credible assurances, the Guidance directs that aliens be provided written notice of the country (which is also read aloud to the alien in a language he

understands) and a reasonable opportunity to claim a fear of persecution (generally at least 24 hours, or after he has had a reasonable means and opportunity to speak with an attorney). *See* Add. 1-2. The district court's preference for more elaborate and lengthy procedures cannot overcome the lack of statutory support for imposing such procedures, much less the sort of requirements the court imposed when enforcing the preliminary injunction (*e.g.*, the 10-day minimum to claim fear, or the 15-day minimum to reopen immigration proceedings).

Rather, Section 1231(b)(2)'s provision "subject to (b)(3)" means nothing more and nothing less than if an alien has been granted withholding of removal to a particular country, the government may not, when applying the sequencing provisions in Section 1231(b)(2), remove an alien to that country. This interpretation is less strained than that of the district court's and consistent with Congress's manifest intent in Section 1231(b)(2) to allow streamlined removal to alternative countries.

2. The district court further held that, wholly apart from a fear of persecution or torture, Section 1231(b) gives rise to a due-process interest in compliance with the sequence of countries in Section 1231(b)(2). Add. 53. The court reasoned that whenever an alien learns that he is to be

removed to a third country, the alien must be given an opportunity to argue that the government violated Section 1231(b)(2)'s sequencing directives in selecting that country. *Id.* at 44-48. But that reasoning is once again foreclosed by Section 1231(h), which forbids reading Section 1231 as creating "any substantive or procedural right or benefit that is legally enforceable by any party." 8 U.S.C. § 1231(h).

Moreover, Section 1231(b)(2)'s sequencing directives make clear that whether an alien can be removed to a third country not listed in the removal order generally will depend *not* on factual findings of the sort that the alien can contest in an individual adversarial proceeding, but instead on inherently executive judgments that are not amenable to judicial second-guessing (much less to second-guessing by the alien)— such as whether removal to the alien-designated country would be "prejudicial to the United States"; whether the home country responded to inquiry "within a period of time the Attorney General decides is reasonable;" whether the home country is "not willing to accept" the alien; or whether it would be "impractical, inadvisable, or impossible" to return the alien to certain other enumerated countries. 8 U.S.C. § 1231(b)(2)(C)(iv), (D)(i)-(ii), and (E)(vii). Such determinations turn on

discretionary, foreign-policy, and national-security considerations vested in the Executive's exclusive discretion and as to which the alien can make no claim. *See Munaf v. Geren*, 553 U.S. 674, 689 (2008) (explaining the need for judicial "circumspection" when "adjudicating issues inevitably entangled in the conduct of our international relations"); *see also* 8 U.S.C. § 1252(a)(2)(B)(ii) (stripping courts of jurisdiction to review discretionary decisions or actions in *inter alia* Section 1231). Requiring that the alien be given the procedural opportunity to challenge those determinations would, once again, serve no purpose besides delay. *Cf. Olim*, 461 U.S. at 250 ("Process is not an end in itself."). Even worse, it would improperly "intrude upon the authority of the Executive" in these sensitive foreign-policy areas. *Munaf*, 553 U.S. at 689.

3. For related reasons, the district court's classwide declarations that 8 U.S.C. § 1231(b)(2) and 8 C.F.R. § 1240.12(d) require following the sequencing requirements, Add. 64, are unwarranted. But the court did not identify any concrete allegation that any named Plaintiff, much less every absent class member, is in imminent danger of be removed to a country to which he has no connection under "step three," even if removal to the home country were required under "step two." *TransUnion LLC v.*

57

*Ramirez,* 594 U.S. 413, 431 (2021) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."). The named Plaintiffs cannot suffer such an injury because none of them can be removed to their home country. They all either have protection from removal from their home country (Plaintiffs E.F.D., O.C.G., and M.M) or their home country is recalcitrant (Plaintiff D.V.D). Appx. 33-34. Even if Plaintiffs had identified a named class member with the required injury, many class members, like the named Plaintiffs here, presumably have previous withholding or CAT claims *against* removal to their home countries, which is why the government had to pursue third-country removal in the first place. Absent such concrete allegations, the named Plaintiffs and the class lacked standing to secure these declarations premised on the government removing an alien to a country to which they have no connection even though their home country will accept them. *See* Add. 46-47 (describing the injury).

The sequencing requirements were not properly before the district court for two other reasons, too. First, Plaintiffs never advanced nor supported any claim that the DHS Guidance violates the sequencing provision of Section 1231(b). Therefore, the district court gravely erred

by purporting to resolve this claim that was not presented by the parties. *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020). Second, the DHS Guidance sets no policy on sequencing under Section 1231(b) at all. Rather, the Guidance applies *after* a potential third country has been identified—that is, after the sequencing has already occurred. Nor was any other agency action or policy regarding sequencing under Section 1231(b)(2) before the district court. The district court had no warrant to reach out in this APA case to probe separate supposed agency policies not implicated in the agency action Plaintiffs challenge.

**B. The District Court Erred in Holding that Due Process Requires Additional Procedures to Raise Fear-Based Claims.**

The district court repeated its errors from the preliminary-injunction stage in concluding that the Guidance does not provide constitutionally sufficient process for class members to raise fear of torture (or persecution). All class members here have final orders of removal. All have had the opportunity to raise CAT and withholding claims in prior proceedings, express fears as to any potential countries of removal, and move to reopen past proceedings as new fears have arisen. The Guidance ensures that an alien will either be sent to a country where

the United States has received credible assurance the alien will not be tortured or persecuted, or that the alien will be given notice and an opportunity to be heard regarding any fear as to his country of removal. *See* Add. 52. The district court erred in second-guessing the details of those procedures under the guise of constitutional due-process analysis, especially for a class that includes many aliens who lack any due-process rights to contest their removals beyond what the political branches have provided.

**1.** For countries that have provided credible assurances, the Constitution requires no further process. When the Executive determines a country will not torture or persecute a person on his removal, that is conclusive. *Munaf*, 553 U.S. at 702-03; *see Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009) (federal courts "may not question the Government's determination that a potential recipient country is not likely to torture a detainee"), *cert. denied*, 559 U.S. 1005 (2010). The "*Munaf* decision applies here a fortiori: That case involved transfer of *American citizens*, whereas this case involves transfer of alien detainees with no constitutional or statutory right to enter the United States." *Kiyemba*, 561 F.3d at 517-518 (Kavanaugh, J., concurring). When the

Executive decides an alien will not be tortured or persecuted abroad, courts may not "second-guess [that] assessment," at least unless Congress has specifically authorized judicial review of that decision. *Id.* at 517 (citation omitted); *see Munaf*, 553 U.S. at 703 n.6.

The district court opined that due process requires the Executive Branch to make "an 'individualized determination' that the foreign assurances are sufficient" in each alien's case, Add. 67, and that aliens are entitled to challenge "the Government's reasons for crediting the assurances" of any given country, *id.* at 69. But courts may not "second-guess" the scope of the Executive's conclusion any more than its substance. *See Kiyemba*, 561 F.3d at 517-18 (Kavanaugh, J., concurring). The decision that a foreign government's categorial assurance against torture or persecution is sufficient for all aliens is *itself* a "foreign policy" judgment the Judiciary "is not suited" to question. *Munaf*, 553 U.S. at 702.

Indeed, the district court's objections do not sound in *procedural* due process at all. They instead reflect the court's *substantive* view that a blanket assurance provides an insufficient basis for the government to find that a particular alien is not likely to be tortured. The Supreme

Court has rightly rejected attempts to "recast in 'procedural due process' terms" what is really a challenge to the "'substantive'" criteria that the government has adopted. *Reno v. Flores*, 507 U.S. 292, 308 (1993) (rejecting similar argument for "individual[ized]" procedure). It makes no sense to require the government to provide additional process with respect to potential evidence that is *immaterial* under the substantive standard the government has adopted. When the government is satisfied based on foreign assurances that *no* alien will be tortured in the receiving country, a further "individualized determination" serves no rational purpose. *Cf. Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself.").

Moreover, the district court's examples of "purely legal challenges" that it claims do not "second guess" the diplomatic assurances, Add. 70, are not present here and highlight the fact that Plaintiffs' claims are not suitable for classwide resolution. *Infra* at 70. Any such claims, should they arise, directly relate to the application of CAT to a particular alien and are only appropriate in a petition for review. 8 U.S.C. § 1231(a)(4); *Khouzam,* 549 F.3d at 244-45.

**2.** Where the third country has not provided credible assurances,

the Guidance's procedures (notice, opportunity to raise fear, and additional screening if necessary, *see* Add. 2) likewise satisfy constitutional due process. The district court asserted in a conclusory footnote that those procedures are "facially inadequate" and not "appropriate to the nature of the case." *Id.* at 64. Although the court did not elaborate, presumably it would require, in future proceedings regarding the requirements for compliance with the declaratory judgment, something akin to what it imposed at the preliminary-injunction stage: *i.e..,*—giving each class member a "minimum of ten days" to assert a fear of torture, (emphasis omitted); "no fewer than 72-hours' notice of the scheduled time for each reasonable fear interview" (at least for the aliens removed to South Sudan); and a "minimum of 15 days" to reopen immigration proceedings in the event the alien did not demonstrate a reasonable fear. Appx. 238. Although the court did not expressly reimpose those specific requirements here, it did not disavow them either. And it used the same open-ended term ("meaningful opportunity") in the final judgment that it previously relied on to impose those specific timing requirements. *Id.* Yet the court offered no basis in law for imposing such procedures apart from a tainted and misguided

63

*Mathews* analysis premised on a poorly defined liberty interest. *See infra* point 4.

**3.** The district court's creation of novel due-process requirements is particularly misguided because, for many class members, due process requires no more process than what the political branches provide. This Court has long held that "the due process rights of an alien seeking initial entry" are no greater than "[w]hatever the procedure[s] authorized by Congress." *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020). The class here plainly includes aliens who have not been admitted, and for those aliens, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (emphasis added); *accord Thuraissigiam*, 591 U.S. at 138-140. At a minimum, that renders the classwide relief (indeed, the class definition) improper.

The Supreme Court has long applied the so-called "entry fiction" that all "aliens who arrive at ports of entry ... are treated for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139. That is true "even [for] those paroled elsewhere in the country for years pending removal." *Id.*; *see, e.g., Kaplan v. Tod,* 267 U.S. 228, 230 (1925);

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 214-215 (1953). *A fortiori*, aliens who evade detection in crossing the border likewise are treated the same as those stopped at the border in the first place. *See Thuraissigiam*, 591 U.S. at 138-140. While aliens who have been *admitted* may claim due-process protections beyond what Congress has provided when the government seeks to remove them, *cf. Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Wong Yang Sung v. McGrath*, 339 U.S. 33, 49-50 (1950), the Supreme Court has not held that aliens who have "entered the country clandestinely" are entitled to such additional rights, *cf. The Japanese Immigrant Case*, 189 U.S. 86, 100 (1903); *Thuraissigiam*, 591 U.S. at 138-140. As *Zadvydas* recognized, "[a]liens who have not yet gained initial admission to this country ... present a very different question" for due-process purposes than "aliens who were admitted to the United States." 533 U.S. at 682.

The district court dismissed the entry fiction on the ground that it pertains to "the determination of a noncitizen's *admissibility*," whereas Plaintiffs' claims relate to statutory withholding and CAT protection, which do not come into play "until *after* the order of removal has been entered and thus *after* any question of admissibility has been resolved."

Add. 56-58. This is clearly wrong. The alien in *Thuraissigiam* challenged the constitutionality of expedited-removal procedures not just with respect to admissibility, but also with respect to the opportunity to file claims for asylum, withholding, and CAT protection. 591 U.S. at 118. Yet the Supreme Court did not rule for the alien as to withholding or CAT— or even conduct a balancing under *Mathews v. Eldridge*, 424 U.S. 319, 334-335 (1976), with respect to those claims. Instead, the Court rejected the due-process claim in toto. *Thuraissigiam*, 591 U.S. at 138-140. The same result should obtain here.

4. Finally, the district court misidentified the liberty interest purportedly entitling Plaintiffs to more notice and opportunity to be heard prior to their removal to a third country. The district court held that Plaintiffs have a liberty interest in *"being able to assert* fear-based claims against third-country removal under FARRA." Add 53 (emphasis added). The district court's analysis under *Mathews v. Eldridge*, 424 U.S. 319 (1976) and objections to the DHS Guidance are tainted by this misidentified interest.

"Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate

claim of entitlement." *Olim,* 461 U.S. 250. The district court erred, therefore, in defining the substantive interest by the process it has determined is required: asserting or applying for CAT relief. Here, the substantive interest, if any, is defined by what the CAT regulations were designed to prevent: an alien being removed to a country where they will be tortured. The substantive interest is not, as the district court held, in asserting a CAT claim or applying for CAT relief. In other words, even if an alien has an interest in not being removed to a country where they will be tortured, it does not follow that they have a liberty interest in *applying* for or *asserting* that relief on their own terms.

When the liberty interest is properly defined, it is clear that the DHS Guidance, taken together with and the procedures class members received in their prior immigration proceedings and the motion to reopen process[5] is sufficient. Those procedures combined substantially eliminates the risk of an erroneous deprivation—*i.e.*, removing an alien to a country where they will be tortured—and leaves class members without a cognizable interest in additional procedures.

---

[5] *See* 8 C.F.R §§ 1003.2(c), 1003.23(b); *see* Appx. 573-79; *Matter of A-S-M,* 28 I&N Dec. 282 (BIA 2021).

The district court's view that the class is entitled to more process is traced to its premise that all class members are entitled to apply for CAT relief. Add. 53. In the district court's view, that *some* class members might have a cognizable claim for protection from a particular country means that all members of the class must have a legitimate expectation of entitlement to apply for CAT relief and the procedures attendant on that claim should *guarantee* that they be given that opportunity. Appx. 544 ("the mere existence of plausible, viable CAT claims" establishes a due process violation). That is wrong (at least) thrice over.

First, it ignores the legal framework. *Mathews* directs balancing the risks of an erroneous deprivation against other interests, so the mere possibility that some class member could have a viable CAT claim is far from sufficient to establish a due process problem. *Mathews*, 424 U.S. at 335. Second, it is inconsistent with the well-established framework for even CAT proceedings. The procedures for run-of-the-mill CAT claims expressly do not seek a 100% accuracy rate. 8 C.F.R. § 1208.16(c)(4). And, as discussed *infra,* classwide relief must reflect the minimum acceptable process, not be controlled by outliers. *Landon*, 459 U.S. at 34-35. For the reasons explained below, the class should not have been certified, and the

district court erred by entering classwide relief on claims that are far from common to the class.

## III. The Class Was Improperly Certified

Finally, the classwide relief should be reversed and the class decertified for failure to comply with Federal Rule of Civil Procedure 23(a)(2)-(4) and (b)(2). Rule 23(a) requires that there be "questions of law or fact common to the class" (commonality); that the "claims or defenses of the representative parties [be] typical of [those] of the class" (typicality); and that "the representative parties will fairly and adequately protect the interests of the class" (adequacy). Fed. R. Civ. P. 23(a)(2)-(4). The class here fails those requirements.

As to commonality and typicality, the class is defined to include "[a]ll" aliens with final removal orders "whom DHS has deported or will deport on or after February 18, 2025" to a third country. Appx. 174. But the district court did not explain how "all" such aliens have the same due process right to additional procedures or the same types of CAT or withholding claims regarding potential third countries, much less how the named plaintiffs' claims are typical of those of the class. Indeed, the court did not even distinguish between admitted aliens and non-admitted

69

aliens who, as discussed above, do not have a due process right to any procedure beyond what the political branches provide. *Nishimura Ekiu*, 142 U.S. at 660; *see* Section II.B., *supra*.

Even setting aside that glaring oversight, Plaintiffs' due process claims cannot be sustained due to the wide variance in the proper application of the *Mathews* factors amongst class members. Under *Mathews*, courts must take care to only order what "would satisfy the *minimum* requirements of due process" under the particular circumstances. *Landon*, 459 U.S. at 34-35 (emphasis added). This is particularly true given the government's "weighty" interest in "efficient administration of the immigration laws" and given that "control over matters of immigration is a sovereign prerogative, largely within the control of the Executive and the Legislature." *Id.* at 34.

This *Mathews* analysis is ill-suited to classwide treatment. This class is comprised of aliens with a near infinite number of different backgrounds critical to a due process analysis and for which it is impossible to account. That variation within the class renders it impossible to limit relief to the *minimum* requirements of due process. *Landon,* 459 U.S. at 34; *see Jennings,* 583 U.S. at 318 (directing

reconsideration of whether due process claims can be litigated on behalf of a Rule 23(b)(2) class). For instance, the class is not limited to aliens with a fear of persecution or torture relating to a third country; instead, it includes aliens who do not have any such fear and will not make any claim for relief. For those class members, the risk of erroneous deprivation and the probable value of additional or different procedures is effectively *zero,* and their procedural due process claims necessarily fail. *See Mathews*, 424 U.S. at 334-35. Even assuming some class members may, depending on the third country to which DHS seeks to remove them, have a statutory or due process right to additional procedures prior to removal to a third country, that alone cannot sustain the district court's sweeping classwide relief under Rule 23(b)(2).

Perhaps realizing that the certified class is calamitously overbroad, the district court's order repeatedly imagines hypothetical class members that do not resemble the named plaintiffs and represent highly specific factual scenarios that are not remotely applicable to the class as a whole. *See, e.g.*, Appx. 502 (imagining a Uyghur activist removed to China), 503 (imagining a gay man removed to a country with laws criminalizing homosexuality). But that is not how classwide litigation works—or at

71

least not how it is supposed to work. Even assuming arguendo that the risk of erroneous deprivation for some *hypothetical* class members may be high, that does not make it true for all members of the class. For every extreme scenario that the district court imagines, the government can point to likely more prevalent scenarios in which DHS's existing procedures are more than adequate to protect against persecution or torture in the third country.

Moreover, the class includes aliens who have expedited removal orders that have been reinstated under Section 1231(a)(5). But the district court lacked authority to enter relief pertaining to such aliens and their expedited removal orders. 8 U.S.C. § 1252(e)(1)(A) ("no court" may enter relief "pertaining to" an expedited removal order except as authorized in Section 1252(e)); see also 8 U.S.C. § 1252(e)(3)(A) ("Judicial review of [expedited removal] is available in an action instituted in the United States District Court for the District of Columbia"). Moreover, the court further lacked authority to certify a class that includes 1252(e)(1)(B) ("no court may […] certify a class under Rule 23" in any action brought under Section 1252(e)). For this additional reason, the class was improperly certified and should be reversed.

It is true that all class members purport to challenge the Guidance. But it is insufficient to allege that "they have all suffered a violation of the same provision of law"; instead, a class may be certified only if they have a "common contention" that can be resolved "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And here, not even all of the named plaintiffs can show they have suffered a violation of the same provision of law . For instance, Plaintiffs O.C.G., E.F.D., and M.M. have been granted either withholding of removal or CAT relief from their home countries. ECF 31-1 at 11, 18, 37. Plaintiff D.V.D. has a final order of removal to his home country of Cuba and does not have withholding or CAT relief. *Id.* at 29. Because Plaintiffs O.C.G., E.F.D., and M.M. have protection from removal to their home countries, they cannot allege that DHS might violate the sequencing requirement of 8 U.S.C. § 1231(b)(2) by failing to first seek removal to their home country—indeed, they lack standing to bring such a claim in the first place. *TransUnion,* 594 U.S. at 431 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."). Similarly, the court relied on its interpretation of Section 1231(b)(3) to *universally* vacate the DHS Guidance, despite the fact that the class includes aliens *ineligible* for

relief under Section 1231(b)(3) who therefore cannot possibly suffer an injury from DHS failing to properly apply the statute to them. Appx. 50. It is simply not true that all named plaintiffs—much less all absent members of the class—have suffered the same alleged violation of law or have a common legal claim that can be resolved in one stroke.

Even worse, the class is not limited to a defined set of aliens, but instead purports to include "[a]ll" aliens *in the future* who will be removed to a third country. Not only does that by definition violate commonality and typicality—for how can Plaintiffs prove that unknown aliens in the future will share a "common contention" with the class members here?—but also violates adequacy, since if this Court or the Supreme Court rules against Plaintiffs on the merits, every alien in the future will be bound by the judgment and thus precluded from bringing his own challenge to the Guidance or similar third-country removal policy in the future. *Cf. Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011). If plaintiffs who have been exposed to asbestos and developed injuries cannot adequately represent even a defined set of plaintiffs who were exposed but not yet injured, *see Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626-628 (1997), *a fortiori* Plaintiffs here cannot adequately represent an open-

ended set of future aliens who might not even be born yet.

Because the class was improperly certified, the classwide relief should be reversed and the class decertified.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court reverse.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney
General

SARAH E. WELCH
Counsel to the Assistant
Attorney General

MATTHEW P. SEAMON
Acting Assistant Director

/s/ *Mary L. Larakers*
MARY L. LARAKERS
(Texas Bar # 24093943)
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 353-4419
(202) 305-7000 (facsimile)
mary.l.larakers@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's extension thereof to 15,600 words because it contains 15,263 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and First Circuit Rule 32(a)(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Mary L. Larakers*
MARY L. LARAKERS

No. 26-1212

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

D.V.D.; M.M.; E.F.D.; O.C.G.,

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE
MULLIN, Secretary, U.S. Department of Homeland Security (DHS);
PAMELA J. BONDI, United States Attorney General, ANTONE
MONIZ, Superintendent of the Plymouth County Correctional Facility,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts

**ADDENDUM**

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

SARAH E. WELCH
*Counsel to the Assistant
Attorney General*

MATTHEW P. SEAMON
*Acting Assistant Director*

MARY L. LARAKERS
*Senior Litigation Counsel*
U.S. Department of
Justice, Civil Division
Office of Immigration
Litigation
P.O. Box 868,
Ben Franklin Station
Washington, DC 20044

# TABLE OF CONTENTS

Department of Homeland Security Guidance on Third Country Removals
(ECF No. 43-1) ................................................................................ 1

Memorandum and Order on Defendants' Motion to Dismiss and Plaintiffs'
Motion for Partial Summary Judgment (ECF No. 241) ................................. 3

Final Judgment (ECF No. 242) ....................................................... 84

Defendants' Notice of Appeal (ECF No. 243) ............................................. 86



*Office of the Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

March 30, 2025

MEMORANDUM FOR:    Kika Scott
Senior Official Performing the Duties of the Director
U.S. Citizenship and Immigration Services

Pete R. Flores
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Todd Lyons
Acting Director
U.S. Immigration and Customs Enforcement

FROM:    Kristi Noem
Secretary of Homeland Security

SUBJECT:    **Guidance Regarding Third Country Removals**

## Purpose

This memorandum clarifies DHS policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the Immigration and Nationality Act (INA) to countries other than those designated for removal in those removal orders (third country removals).[1]  DHS has used similar processes before, including with respect to Title 42 expulsions and the Migrant Protection Protocols.

## Process Regarding Third Country Removals[2]

*Written Notice to the Alien & Fear Screening*

Prior to the alien's removal to a country that had not previously been designated as the country of removal, DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured.  If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien

---

[1] This memorandum does not address expedited removals pursuant to INA § 235(b)(1).

[2] These procedures only apply to aliens who have no ongoing proceeding in which to raise a claim under INA § 241(b)(3) or the Convention Against Torture.  For aliens who have such proceedings, DHS will follow existing procedures.

Add.001

**Page 2**

may be removed without the need for further procedures. If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.

DHS will first inform the alien of removal to that country. Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country. DHS is taking this approach in line with its determination in mid-2024 that such questioning may be suggestive and that asking them leads to false claims rendering the immigration system as a whole less efficient. *Securing the Border*, 89 Fed. Reg. 48710, 48743 (June 7, 2024) (noting that aliens are "more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum" when asked affirmative fear questions); *Securing the Border*, 89 Fed. Reg. 81156, 81235 (Oct. 7, 2024). The allegation that a foreign country's government will torture an alien or allow an alien to be persecuted, particularly a government with which the United States has a diplomatic relationship, is a serious one. It is not unreasonable for an alien in that circumstance to be expected to affirmatively express a fear of persecution or torture.

Immigration officers will refer any alien who affirmatively states a fear of removal to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture (CAT) for the country of removal.

### *Where the Alien Affirmatively States a Fear*

In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer. This screening may be done remotely. USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal. If USCIS determines that the alien has not met this standard, the alien will be removed.

If USCIS determines that the alien has met this standard and the alien was not previously in proceedings before the Immigration Court, USCIS will refer the matter to the Immigration Court in the first instance. In cases where the alien was previously in proceedings before the Immigration Court, USCIS will notify the referring immigration officer of its finding, and the immigration officer will inform U.S. Immigration and Customs Enforcement (ICE). ICE OPLA may file a motion to reopen with the Immigration Court or the Board of Immigration Appeals, as appropriate, for further proceedings for the sole purpose of determining eligibility for protection under INA § 241(b)(3) and CAT for the country of removal. Alternatively, ICE may choose to designate another country for removal.

Add.002

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| D.V.D., et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | Civil Action No. |
| v. | ) | 25-10676-BEM |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS
AND ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**MURPHY, J.**

This case is about whether the Government may, without notice, deport a person to the wrong country, or a country where he is likely to be persecuted, or tortured, thereby depriving that person of the opportunity to seek protections to which he would be undisputedly entitled. The Department of Homeland Security has adopted a policy whereby it may take people and drop them off in parts unknown—in so-called "third countries"—and, "as long as the Department doesn't already know that there's someone standing there waiting to shoot . . . that's fine."[1]

It is not fine, nor is it legal. Congress made it "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country" where that "person would be in danger of being subjected to torture."[2] Congress decided that the Government "may not remove" someone to a country where her "life or freedom would be threatened" on account of

---

[1] Dkt. 44 at 29:12–18 (March 28, 2025 Hr'g Tr.) ("DEFENSE COUNSEL: In short, yes.").

[2] Pub. L. No. 105–277, § 2242(a), 112 Stat. 2681, 2681–822 (1998).

Add.003

her "race, religion, nationality, membership in a particular social group, or political opinion."[3] These are our laws, and it is with profound gratitude for the unbelievable luck of being born in the United States of America that this Court affirms these and our nation's bedrock principle: that no "person" in this country may be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

It may surprise the reader to learn that, in its more candid moments, the Government agrees. As recently as March 24, 2025, during the pendency of this very litigation, the Department of Justice told the Supreme Court: "We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country."[4] This was not a remarkable admission but rather a well-established, decades-old application of due process principles. In 1998, the Seventh Circuit held that it was a "fundamental failure of due process" not to give sufficient notice of a country of removal. *Kossov v. INS*, 132 F.3d 405, 408 (7th Cir. 1998). A year later, the Ninth Circuit followed suit and held that the "last minute designation" of a country of removal "violated a basic tenet of constitutional due process." *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999). These were not, even then, controversial decisions, *id.* ("On this point, the INS has advised us that it is now in agreement."), and the Government thereafter memorialized in official policy its recognition that the individuals in those cases "were not afforded the opportunity to apply for protection as appropriate."[5]

But less than a week after the above-quoted comments to the Supreme Court, the Department of Homeland Security changed its position. According to its new policy, issued on

---

[3] 8 U.S.C. § 1231(b)(3)(A).

[4] Transcript of Oral Argument at 33, *Riley v. Bondi*, 606 U.S. 259 (2025) (No. 23-1270).

[5] *Execution of Removal Orders; Countries to Which Aliens May Be Removed*, 70 Fed. Reg. 661, 671 (Jan. 5, 2005) (citing, inter alia, *Kossov*, 132 F.3d at 405, and *Andriasian*, 180 F.3d at 1041).

2

Add.004

March 30, 2025, immigration officers need *not* give notice or any opportunity to object before removing someone to an unfamiliar and potentially dangerous country, as long as the Government has generally received "assurances" that no persecution or torture will happen there.[6]

This new policy—which purports to stand in for the protections Congress has mandated—fails to satisfy due process for a raft of reasons, not least of which is that nobody really knows anything about these purported "assurances." Whom do they cover? What do they cover? Why has the Government deemed them credible? How can anyone even know for certain that they exist? These are basic questions that the Constitution permits a person to ask before the Government takes away their last and only lifeline.

For these reasons and those stated below, the Court will grant in part and deny in part Defendants' motion to dismiss, dismiss other claims, and grant the remainder of Plaintiffs' motion for summary judgment. Under the extraordinary circumstances presented by this case—both its importance and its unusual history—the Court will stay its judgment for up to fifteen days, allowing Defendants to move for stay in the First Circuit.

## I.    **Procedural History**

This case began on March 23, 2025, when four noncitizens—D.V.D., M.M., E.F.D., and O.C.G.—filed a class-action lawsuit challenging a then-alleged Department of Homeland Security ("DHS") policy of removing noncitizens to so-called "third" countries—countries not designated as countries of removal on the individuals' orders of removal—without first providing notice or an opportunity to assert claims challenging removal to that country.[7] *See generally* Dkt. 1

---

[6] Dkt. 43-1 at 2–3.

[7] Defendants in this case are DHS; Kristi Noem, in her role as DHS Secretary; Pamela Bondi, in her role as Attorney General; and Antone Moniz, in his role as Superintendent of the Plymouth County Correctional Facility. Dkt. 1 ¶¶ 14–17.

("Compl."). Central to Plaintiffs' allegations was a February 18, 2025 DHS memorandum (the "February Directive") directing officers to "review for removal" cases where an individual had been granted protection against removal to one or more specific countries, based on risk of persecution or torture in those countries, to "determine the viability of removal to a third country and accordingly whether the alien should be re-detained." *See* Dkt. 1-4 at 2.

Along with their complaint, Plaintiffs moved for class certification, Dkt. 4, and for preliminary relief, Dkt. 6. Following an initial round of briefing and an expedited hearing, Dkts. 31, 33, the Court issued a temporary restraining order on March 28, 2025, Dkts. 34, 40, which Defendants promptly appealed, Dkts. 35, 39 (noticing *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1311 (1st Cir.)).

While that appeal was pending, on March 30, 2025, DHS issued new "Guidance Regarding Third Country Removal." *See* Dkt. 43-1 (the "March Guidance"). Under the March Guidance, prior to any third-country removal:

4

DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured. If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien may be removed without the need for further procedures. If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.

DHS will first inform the alien of removal to that country. Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country. . . .

In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer. This screening may be done remotely. USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal. If USCIS determines that the alien has not met this standard, the alien will be removed.

If USCIS determines that the alien has met this standard . . . , USCIS will refer the matter to the Immigration Court [either in the first instance or through a motion to reopen, as appropriate]. . . . Alternatively, ICE may choose to designate another country for removal.

*Id.* at 2–3.

On the same day that DHS released the March Guidance, Defendants moved for an indicative ruling that, given the procedures set forth in the March Guidance, the Court would dissolve its temporary restraining order. Dkt. 43. Before the Court could rule on that motion, the First Circuit denied Defendants' emergency motion for stay pending appeal, citing "concerns about whether the underlying temporary restraining order . . . [was] appealable" and stating that Defendants had "made a moving target of their removal policy" through their issuance of the March Guidance. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1029774, at *1 (1st Cir. Apr. 7, 2025). The Court therefore denied the motion for an indicative ruling as moot. Dkt. 66. Meanwhile, the parties continued to brief the motions for class certification and for preliminary injunction, Dkts. 51–52, 57–60, and the Court held another hearing, Dkt. 62.

5

Add.007

On April 18, 2025, the Court granted Plaintiffs' motion for class certification and granted in part their motion for a preliminary injunction. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 394 (D. Mass. 2025) [hereinafter *D.V.D. I*]. The Court certified the following class:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the [Immigration and Nationality Act ("INA")] (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

*Id.* at 378.[8] As to that class, after finding a likelihood of success on Plaintiffs' due process claims, the Court ordered that, prior to any third-country removal, Defendants provide class members with "written notice" and a "meaningful opportunity" to raise claims for protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT" or the "Convention Against Torture"), as provided by the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") and its implementing regulations.[9] *Id.* at 392. Where such a claim was deemed "reasonable," the Court further ordered that Defendants move to reopen the class member's immigration proceedings.[10] *Id.* at 392–93. Where a claim was found

---

[8] Sections 240, 241(a)(5), and 238(b) of the INA, as referenced in the class definition, are codified at 8 U.S.C. §§ 1229a, 1231(a)(5), and 1228(b). Those provisions, respectively, address removal proceedings, reinstated orders of removal, and removal based on an aggravated felony conviction. The class does not include individuals subject to removal based on an expedited removal order under 8 U.S.C. § 1225(b).

[9] *See* CAT, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85; FARRA, Pub. L. No. 105–277, § 2242, 112 Stat. 2681, 2681–822 to 2681–823 (1998); *see also See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003) (explaining how FARRA implements CAT), *superseded in part by statute on other grounds as stated in*, *Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).

[10] *Cf.* Dkt. 43-1 at 3. Under the March Guidance, USCIS would screen out fear-based claims where the individual failed to show that she would "more likely than not" be persecuted or tortured in the removal country. *Id.* That is the same standard as ultimately required for final relief in immigration proceedings. *See* 8 C.F.R. § 1208.16(b)–(c). In other words, "within 24 hours" of an individual's learning to where she is being removed, the March Guidance would require her to make a full merits showing as a prerequisite to her receiving a proper hearing. *See* Dkt. 43-1 at 2–3. For a mere preliminary screening, the Court found a "reasonable fear" threshold showing more appropriate. 778 F. Supp. 3d at 393 n.48.

Add.008

not to be reasonable, the Court ordered that the class member be given at least fifteen days to move to reopen their own immigration proceedings. *Id.* at 393. The Court declined to grant other relief at that time, including a stay of the February Directive, *id.* at 370 n.13, or the return of Plaintiff O.C.G, who was removed before the initiation of the lawsuit, *id.* at 393.

Four days later, Defendants appealed the preliminary injunction and moved the First Circuit for a stay pending appeal. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. May 16, 2025). The First Circuit denied Defendants' motion, highlighting several "merits-related issues" concerning the availability of injunctive relief under 8 U.S.C. § 1252(f)(1), which the parties were instructed to brief. *Id.*

Throughout this time, the Government repeatedly violated, or attempted to violate, this Court's orders. First, in March 2025, the Department of Defense removed at least six class members to El Salvador and Mexico without providing the process required under the temporary restraining order. *See* Dkt. 72. "At a subsequent hearing, an attorney for the Government claimed DHS had not violated the TRO because the Department of Defense," rather than DHS, "had conducted the removals." *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2156 (2025) (Sotomayor, J., dissenting) [hereinafter *D.V.D. II*]. As Justice Sotomayor further explained,

> According to the agreement that governs the relationship between DHS and the Department of Defense at Guantanamo Bay, however, DHS "has legal custody" of noncitizens detained at Guantanamo Bay "and is responsible for the custody of detained aliens for administrative purposes related to immigration law violations." DHS also remains "responsible for the [noncitizens'] physical custody" at Guantanamo Bay, and for any immigration-related "transfers, releases, and removals." By contrast, the Department of Defense merely provides security and logistical support consistent with DHS's "guidance."
>
> The Government was unable to reconcile its representations to this evidence. Nor could it explain "[w]hat authority" the Department had "to effectuate a deportation."[11]

*Id.* (alterations in original) (internal record citations omitted). Notwithstanding Defendants' asserted loophole, the Court ordered discovery on the violation and, for the time being, modified the preliminary injunction, which by then had superseded the temporary restraining order, clarifying that Defendants could not "cede custody or control" to another agency to avoid the order's effect.[12] Dkt. 86.

Next, on May 7, 2025, it was widely reported that a group of apparent class members were on the verge of being removed to Libya without having received notice of their removal or an opportunity to raise CAT claims, as required under the preliminary injunction. *See* Dkt. 90-1. Based on these reports, as well as on individual class members' corroborating accounts, Plaintiffs moved for an emergency temporary restraining order to prevent the removals. Dkt. 89. Agreeing with Plaintiffs "that this motion should not [have been] required," given the preliminary injunction, the Court construed Plaintiffs' motion as one for clarification and stated that "the allegedly imminent removals . . . would clearly violate this Court's Order."[13] Dkt. 91 at 1–2.

---

[11] The Court considered whether these events warranted joining the Department of Defense. *See* Dkt. 93. Ultimately, the Court declined to do so sua sponte. Dkt. 117. Plaintiffs did not thereafter amend.

[12] At Plaintiffs' request, the Court has temporarily stayed discovery to focus on the merits. Dkts. 195, 211.

[13] The Court does not know what happened to these individuals, whether any of them were among those removed to South Sudan on May 20, 2025, or were part of any subsequent removal effort.

Add.010

Next, the Court learned that Defendants had misrepresented material facts concerning the removal of Plaintiff O.C.G. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d 401, 405 (D. Mass. 2025). In opposing Plaintiffs' motions for a temporary restraining order and preliminary injunction, Defendants submitted to the Court an affidavit stating that, "[p]rior to O.C.G. being removed to Mexico, [Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO")] verbally asked O.C.G. if he was afraid of being returned to Mexico" and that, "[a]t this time, O.C.G. stated he was not afraid of returning to Mexico." Dkt. 31-1 ¶ 13. Defendants' claim was surprising because, during his withholding-only proceedings, O.C.G. had testified that he was raped and held hostage in Mexico and thus afraid of being returned there:

> During the withholding-only proceedings, O.C.G. asked if he might be sent to Mexico—because he was afraid of being sent to Mexico—and the immigration judge told him, "we cannot send you back to Mexico, sir, because you're a native of Guatemala."

*D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 407 (quoting the withholding-only transcript). Nevertheless, in light of the competing sworn statements, the Court "declined to conclusively credit O.C.G.'s account," when ruling on Plaintiffs' initial motions, "and instead ordered discovery of additional evidence." *Id.* at 405.

That discovery process led Defendants, on May 16, 2025, to acknowledge an "error" in their previous filing. *Id.* (quoting Dkt. 103 at 2). "Defendants admitted, hours before the scheduled deposition of the witness who could allegedly verify the facts included in the prior declaration made under oath, that, in fact, there was no such witness and therefore no reliable basis for the statements." *Id.* While the Court appreciates that "mistakes obviously happen, the events leading up to this decision [were and] are troubling. The Court was given false information, upon which it relied, twice, to the detriment of a party at risk of serious and irreparable harm." *Id.* at 406. The

Court therefore affirmed its previous conclusion that O.C.G.'s removal lacked due process and, this time, ordered his return, *id.* at 410–12, which the Government later facilitated, Dkt. 143.

Next, on May 20, 2025—before the Court could even resolve the O.C.G. revelation—Defendants placed at least six class members on a flight to South Sudan, "a nascent, unstable country to which the United States [had] recently told its citizens not to travel because of '**crime**, **kidnapping**, and **armed conflict**,'" without any meaningful notice or opportunity to raise a CAT claim, in what could only be described as a "flagrant," willful violation of this Court's order. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 786 F. Supp. 3d 223, 229–34 (D. Mass. 2025) (quoting *South Sudan Travel Advisory*, U.S. Dep't of State, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphases in original)). Plaintiffs moved again for an emergency order to prevent Defendants from effectuating these removals, and the Court quickly called a remote conference, where Defense counsel claimed to have very little information about the status or location of the impacted class members, except that they were then somewhere in transit.[14] *Id.* at 229. At the conclusion of that conference, the Court ordered Defendants to maintain custody of the class members "while everybody figured out what was happening." *Id.*; *see also D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1449032, at *1 (D. Mass. May 20, 2025).

Defendants later told the Supreme Court that, because of the Court's order, DHS had to "slam[] on the brakes while these aliens were literally mid-flight" and was "thus forc[ed] . . . to detain [the class members] at a military base in Djibouti." Application for a Stay at 3, *D.V.D. II* (May 27, 2025) (24A1153). However, on May 21, 2025, the day after the supposedly interrupted

---

[14] After stating that she did not know where the plane was, Dkt. 126 at 6:25–7:1 (May 20, 2025 Hr'g Tr.), Defense counsel stated that its location and final destination were both classified, *id.* at 17:3–6. Later, an attorney for DHS said that he was "not aware if it was classified" but that "it is sensitive information and it could be classified." *Id.* at 38:2–8.

flight, ICE ERO Acting Assistant Director for Field Operations, Marcos Charles, testified differently:

> THE COURT: And they ended up in Djibouti because of my order last night?
>
> MARCOS CHARLES: No, Your Honor.  The plan was to go to Djibouti and then from Djibouti continue on to South Sudan and go from there, sir.

Dkt. 144 at 12:1–5 (May 21, 2025 Hr'g Tr.).[15]  Indeed, publicly available flight-tracking data shows that the class members were likely still in U.S. airspace—possibly within 100 miles of the Boston courthouse—at the beginning of the May 20, 2025 conference and that their plane rested in Ireland for several hours afterward before continuing to Djibouti.[16]

At the May 21, 2025 hearing, the Court further learned that the impacted class members had "received fewer than 16 hours' notice before being removed, most of which were non-waking hours, none within the business day." *D.V.D. v. U.S. Dep't of Homeland Sec.*, 786 F. Supp. 3d at 230.  Moreover, the class members had "limited, if any, ability to communicate with family or legal representatives," and "little, if any, opportunity to access information that would have allowed them to determine for themselves the repercussions of being removed to South Sudan." *Id.*  Defendants claimed that they had not intended to violate the preliminary injunction and that "any misunderstanding . . . from [DHS] may have had to do with the fact that the Court's preliminary injunction motion wasn't specific enough."  *Id.* (quoting Dkt. 145 at 14:9–22 (May 21, 2025 Hr'g Tr.)).  The Court then asked Defendants to weigh in on what specific

---

[15] At Defendants' request, the Court took this testimony under seal.  *See* Dkt. 144 at 7:10–8:24.  However, Chief Magistrate Judge Cabell later granted in relevant part an intervenor's motion to unseal.  *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 3124132, at *9–10, 12 (D. Mass. Nov. 7, 2025).

[16] *See* Alan Feuer et al., *Judge Finds U.S. Violated Court Order With Sudden Deportation Flight to Africa*, N.Y. Times (May 21, 2025), https://www.nytimes.com/2025/05/21/us/politics/south-sudan-deportation.html [https://perma.cc/64NW-EDG3]; *see also* Dkt. 144 at 16:13–17:7, 18:25–19:5 (corroborating the report); *Playback*, Flightradar24, https://www.flightradar24.com/2025-05-20/20:25/100x/3a6bfb10 [https://perma.cc/TH49-L7CB] (last visited February 20, 2026) (showing the aircraft located over the Gulf of Maine at 4:25:44 EDT / 20:25:44 UTC).

procedures the Court could order, consistent with its legal conclusions, and even invited Defendants, after the hearing, to submit a written proposal.[17]  *Id.* at 232–33 & n.14.  Defendants declined.  *Id.* at 233 n.14.  As a result, the Court clarified the preliminary injunction to specify that class members must be given "a minimum of ten days[] to raise a fear-based claim for CAT protection prior to removal."  *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1453640, at *1 (D. Mass. May 21, 2025) (emphasis removed).

As to the class members directly impacted by Defendants' violation, the Court did not order their immediate return, despite Plaintiffs' requests.  *D.V.D. v. U.S. Dep't. of Homeland Sec.*, 786 F. Supp. 3d at 227.  Rather, following Defendants' suggestion, and out of respect for the Executive's "prerogative in the sensitive and political areas of immigration and foreign policy," the Court "offered Defendants complete discretion to provide [the requisite process] in the time and manner they deemed best."  *Id.* at 235.  Accordingly, as a "remedy for Defendants' violations of the Preliminary Injunction," the Court ordered Defendants to follow certain procedures when screening the impacted class members for CAT claims but stated that "DHS, in its discretion, [could] elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad."  *D.V.D. v. U.S. Dep't. of Homeland Sec.*, 2025 WL 1453604, at *1 (D. Mass. May 21, 2025).

Defendants chose to keep the class members in Djibouti and, following this turn of events, applied to the Supreme Court for a stay of the preliminary injunction.  *See generally* Application

---

[17] From the beginning of this case, the Court has recognized that the Government is in a superior position to propose specific, workable measures, consistent with its immigration operation and class members' legal rights.  *See D.V.D. v. U.S. Dep't. of Homeland Sec.*, 786 F. Supp. 3d at 232 (citing the Mar. 28, 2025 hearing transcript).  Defendants, however, have consistently been "unable, unwilling, or incapable of meaningfully engaging in [that] discussion."  *Id.* at 233 (quoting *D.V.D. I*, 778 F. Supp. 3d at 393 n.49).  As a result, the Court based the preliminary injunction's specific procedures on, among other things, Defendants' previous statements and draft documents.  *See id.* at 392–93 & nn.46, 49; *see also* 70 Fed. Reg. at 671 ("In appropriate circumstances, DHS may agree to join motions to reopen that would otherwise be barred by time and number limitations [before removing to a third country].").

Add.014

for a Stay, *D.V.D. II*, (U.S. May 27, 2025) (24A1153).  On June 23, 2025, Defendants' application

was granted, and the preliminary injunction was stayed pending appeal:

> The application for stay presented to Justice JACKSON and by her referred to the Court is granted.  The April 18, 2025, preliminary injunction of the United States District Court for the District of Massachusetts, case No. 25–cv–10676, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such writ is timely sought.  Should certiorari be denied, this stay shall terminate automatically.  In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of the Court.

*D.V.D. II*, 145 S. Ct. at 2153.

In response, Plaintiffs moved for a new temporary restraining order and preliminary

injunction specifically as to the class members Plaintiffs had taken to Djibouti, en route to South

Sudan, in violation of the preliminary injunction.  Dkt. 174.

The Court denied Plaintiffs' request.  Believing the Supreme Court to have stayed only the

"April 18, 2025, preliminary injunction," *D.V.D. II*, 145 S. Ct. at 2153, the Court understood the

May 21, 2025 remedial order to still be in effect and thus found Plaintiffs' motion "unnecessary,"

Dkt. 176.  The next day, Defendants moved the Supreme Court to clarify.  Motion to Clarify,

*D.V.D. II* (U.S. June 24, 2025) (24A1153).  A week later, on July 3, 2025, the Supreme Court

granted Defendants' motion, stating that its June 23, 2025 order "divest[ed] the May 21 remedial

order of enforceability."[18]  *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2627, 2629 (2025).

---

[18] Defendants seize upon this episode to suggest that the Court must "dismiss this case in its entirety" or else fail to "follow the Supreme Court's lead."  *See* Dkt. 231 at 2.  In doing so, they gloss over the case's many unsettled issues and the material differences between last year's preliminary injunction and the ultimate relief now sought.  Plaintiffs no longer ask for an injunction, which moots Defendants' "lead argument" on appeal.  *See D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. Feb. 20, 2026).  Plaintiffs also now advance statutory claims that this Court has not previously addressed.  *See infra* Section III(B)(1).  What difference these will make to higher courts is yet unknowable.  *See D.V.D. II*, 145 S. Ct. at 2160 (Sotomayor, J., dissenting) (stating that Defendants' "only . . . jurisdictional objection . . . with any force" is their argument, under 8 U.S.C. § 1252(f)(1), against class-wide injunctive relief).  *But see Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. at 2629 (noting that "[t]he only authority [this Court] cited" for its understanding of the stay order's scope "was the dissent from the stay order").  Ultimately, this Court has a "duty," in the first instance, "to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

13

Subsequently, on July 9, 2025, DHS effectively reissued its third-country removal policy in a memorandum titled, "Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)," stating that "ICE must adhere to Secretary of Homeland Security Kristi Noem's [March Guidance]."[19] Dkt. 190-1 (the "July Guidance").

Thereafter, the parties advanced competing views for what should happen next in this litigation. On July 15, 2025, Plaintiffs moved for partial summary judgment, asking the Court to vacate DHS's third-country removal policy, as embodied in the March and July Guidances, and to declare the parties' rights and obligations with respect to third-country removal, Dkts. 193–94, simultaneously asking the Court to indicate that it would dissolve the preliminary injunction if the First Circuit remanded for that purpose, Dkts. 191–92. Defendants conversely moved to stay the proceedings in this Court pending appeal of the preliminary injunction. Dkt. 206.

The Court granted Plaintiffs' motion for an indicative ruling, stating that it would dissolve the preliminary injunction if given jurisdiction to do so, concluding that the Supreme Court's stay decision would have to govern, "at least, . . . the precise relief at issue in the very same litigation." *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 2673195, at *1 (D. Mass. Aug. 28, 2025). Even so, the Court highlighted that this conclusion would not necessarily bring about Plaintiffs' desired result because "the decision to remand is left to the discretion of the appellate court." *Id.* at *2 (quoting *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 505 (7th Cir. 2024),

---

[19] Defendants do not appear to dispute Plaintiffs' characterization of the July Guidance as "identical" to the March Guidance. *See* Dkt. 194 at 8. Nevertheless, it does add several details. For example, under the July Guidance, "[ICE] will generally wait at least 24 hours following service of the Notice of Removal before effectuating removal," except in "exigent circumstances." Dkt. 190-1 at 1. That being said, Defendants generally refer to the March Guidance as the embodiment of DHS's third-country removal policy. *See, e.g.*, Dkt. 231 at 31–34. The Court thus treats it as the relevant agency action for purposes of Plaintiffs' challenge under the Administrative Procedure Act and treats the July Guidance as an implementation or extension of that March Guidance.

Add.016

*reh'g and reh'g in banc dismissed*, 2024 WL 4416886 (7th Cir. Oct. 4, 2024), *cert. denied*, 145 S. Ct. 1182 (2025)).  To that end, the Court held Defendants' motion to stay in abeyance pending the First Circuit's decision on Plaintiffs' motion to remand.[20]  *See* Motion to Remand, *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. Aug. 29, 2025).

On October 20, 2025, the First Circuit denied remand but stated that the Court was "'free to carry forward'" and, "if appropriate, 'order permanent relief after the merits are resolved.'" *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. Oct. 20, 2025) (quoting *Contour Design, Inc. v. Chance Mold Steel Co.*, 649 F.3d 31, 34 (1st Cir. 2011)).[21]  As a result, this Court denied Defendants' motion to stay and ordered Defendants to respond to the motion for partial summary judgment.  Dkt. 218.

On November 24, 2025, Defendants opposed Plaintiffs' motion for partial summary judgment and moved to dismiss the complaint.  Dkt. 231.  Plaintiffs replied to Defendants' summary judgment opposition and opposed the motion to dismiss.[22]  Dkt. 232.  The Court then held a hearing on December 16, 2025, and took the matter under advisement.  Dkt. 236.

---

[20] In the interim, the Court allowed Defendants to delay their response to the motion for partial summary judgment until 21 days after their motion for stay was decided.  Dkt. 208.

[21] In *Contour Design, Inc. v. Chance Mold Steel Co.*, 649 F.3d 31 (1st Cir. 2011), the defendant appealed a preliminary injunction issued against it.  *Id.* at 32.  Despite preliminarily concluding that it would affirm the injunction, the First Circuit made no announcement "because a trial was scheduled to be held" and so "expect[ed] that the preliminary injunction would be supplanted by a final injunction and other possible relief."  *Id.* at 33.  Later, a jury found in the plaintiff's favor, but judgment had not yet issued.  *Id.*  Recognizing that "the district court may be awaiting disposition of [the] appeal before entering final judgment," the First Circuit summarily affirmed the (by then, almost obsolete) preliminary injunction and further clarified that "the district court was free, and would remain free even without this affirmance or leave from us, to enter a permanent injunction based on the trial record while the original appeal remained pending," which the court described as "standard practice."  *Id.* at 34.

[22] To their combined filing, Plaintiffs attached 25 exhibits, Dkt. 233, which Defendants moved to strike, Dkt. 235.  For the sake of clarity, and to avoid any prejudice to Defendants with respect to the motion for partial summary judgment, the Court has chosen not to rely on any of Plaintiffs' newly filed exhibits for either motion. Accordingly, Defendants' motion to strike is DENIED as moot.

Add.017

While these motions were pending, on February 20, 2026, the First Circuit granted Plaintiffs' request, renewed at oral argument, to remand the preliminary injunction back to this Court for dissolution, finding it "the most expeditious and efficient path forward . . . so that [the case] may proceed to judgment." *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. Feb. 20, 2026). Accordingly, the Court will dissolve the April 18, 2025 preliminary injunction.

## II.    Motion to Dismiss

Defendants move to dismiss Plaintiffs' core policy challenge under the Administrative Procedure Act ("APA"), Counts I–IV, under Federal Rule 12(b)(1) for lack of subject matter jurisdiction. Dkt. 231 at 8–16. Ultimately, the Court concludes that it has jurisdiction over the challenge and so denies the motion. Simultaneously, however, the Court finds that Counts II and III are duplicative of Count I and so will dismiss those claims.

Defendants also move to dismiss Plaintiffs' claims based on detention, Count V, and under the Freedom of Information Act ("FOIA"), Count VI, under Federal Rules 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim. Dkt. 231 at 17–21. As to Count V, the Court concludes that any detention-based claim is unripe as to D.V.D., M.M., and O.C.G. and is moot as to E.F.D. and so will dismiss those claims. As to Count VI, the Court concludes that the named Plaintiffs lack standing as to the February Guidance and have otherwise failed to state a claim and so will dismiss that claim.

### A.    Legal Standards

With respect to a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden. *Justiniano v. Soc. Sec. Admin.*, 876 F.3d 14, 21 (1st Cir. 2017). In deciding the motion, "the court may consider materials outside the pleadings." *Groden v. N&D Transp. Co., Inc.*, 866 F.3d 22, 24 n.3 (1st Cir. 2017).

Add.018

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, disregarding all "conclusory" statements, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The inquiry is usually limited to the facts alleged in the complaint, incorporated into the complaint, or susceptible to judicial notice," *Whelden v. U.S. Bank Nat'l Ass'n*, 494 F. Supp. 3d 68, 73 (D. Mass. 2020) (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)), "but the court may also consider other documents the authenticity of which is not disputed by the parties, documents central to the plaintiff's claim, and documents sufficiently referred to in the complaint," *id.* (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

"When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." *Katz v. Pershing, LLC*, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) (quoting *Ne. Erectors Ass'n of BTEA v. Sec'y of Lab.*, 62 F.3d 37, 39 (1st Cir. 1995)), *aff'd*, 672 F.3d 64 (1st Cir. 2012).

17

Add.019

**B.    Discussion**

**1.    APA Policy Challenges (Counts I–IV)**

Plaintiffs allege, under the APA and Declaratory Judgment Act, that Defendants' third-country removal policy violates the INA, FARRA, their implementing regulations, and the Due Process Clause of the Fifth Amendment. Compl. ¶¶ 99–122.[23]

Defendants move to dismiss these core policy claims for lack of subject matter jurisdiction, relying variously on the jurisdiction-stripping provisions of the INA, 8 U.S.C. § 1252 ("section 1252"), and on a like FARRA provision, Pub. L. No. 105–277, § 2242(d) ("section 2242(d)") (codified as 8 U.S.C. § 1231 ("section 1231") note). Dkt. 231 at 8–16. The Court has already addressed and rejected several of these arguments.[24] *See D.V.D. I*, 778 F. Supp. 3d at 370–78; *D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 409–10. Below, the Court expands on its reasoning in light of Defendants' renewed arguments.

**a.    Section 1252(g)**

Defendants argue that "Plaintiffs' claims arise entirely from actions taken to 'execute removal orders'—namely, to remove them to third countries without the additional process they demand—and thus those claims 'fall[] squarely within' the INA's jurisdictional bar," section 1252(g). Dkt. 231 at 9 (internal citation omitted) (first quoting 8 U.S.C. § 1252(g); and then

---

[23] More precisely, in Count I, Plaintiffs allege that Defendants' policy or practice of failing to provide notice and an opportunity to challenge third-country removals is arbitrary and capricious and contrary to law. Compl. ¶¶ 99–107. In Count II, Plaintiffs allege that Defendants are unlawfully withholding notice and a meaningful opportunity to challenge third-country removal. *Id.* ¶¶ 108–11. In Count III, Plaintiffs allege that Defendants' third-country removal policy violates Plaintiffs' procedural rights. *Id.* ¶¶ 112–17. In Count IV, Plaintiffs seek a declaration of their rights. *Id.* ¶¶ 118–22. Given the substantial overlap in Counts I–III, the Court will ultimately dismiss Counts II and III. *See infra* Section II(B)(4). The Court further notes that Counts I–III include various detention-related allegations. *See, e.g.*, Compl. ¶¶ 104, 107, 114–17, 120. Ultimately, the Court finds that these allegations properly sound in habeas, not the APA, *see Trump v. J.G.G.*, 604 U.S. 670, 672 (2025), and confines its analysis accordingly, *see infra* Section II(B)(2).

[24] The Court has likewise already laid out much of the relevant legal background. *See D.V.D. I*, 778 F. Supp. 3d at 365–67.

quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487 (1999) [hereinafter *AADC*]).

The Court rejected this argument in *D.V.D. I*, largely based on the conclusion that section 1252(g) "does not bar review of the 'lawfulness' of a removal-related action because such claims are 'collateral' to the discretionary decisions immunized by section 1252(g)." 778 F. Supp. 3d at 376–78 (quoting *Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023)). Put more simply, section 1252(g) prohibits claims based on the exercise of "prosecutorial discretion," *AADC*, 525 U.S. at 489, but it is not within the "discretion" of the Executive to exceed the scope of its authority or otherwise violate the law, *see Ibarra-Perez v. United States*, 154 F.4th 989, 997 (9th Cir. 2025) (holding that claim based on third-country removal without notice "raise[d] purely legal arguments in challenging [the] removal," including whether the plaintiff "had a right to meaningful notice and an opportunity to present a fear-based claim," and thus that the action was not barred by section 1252(g)); *see also id.* ("The government's reading of § 1252(g) would entirely insulate from judicial review any post-hearing decision by ICE to remove noncitizens to third countries where they would be in danger of persecution, torture, and even death.").[25]

Now, the Court would take a further step back to add that Plaintiffs' claims are policy challenges and that the adoption of policy is simply not among the "discrete" set of actions covered by section 1252(g). *See AADC*, 525 U.S. at 482. In *AADC*, the Supreme Court explained that section 1252(g) "applies only to three discrete actions . . . : [the] 'decision or action' to '*commence*

---

[25] At the December 16, 2025 hearing, Defendants argued that *Kong* (like *Ibarra-Perez*) concerned a claim under the Federal Tort Claims Act and thus was inapposite. But in *Kong* itself, the First Circuit squarely rejected that idea: "the text of § 1252(g) cannot be interpreted differently depending on" a plaintiff's cause of action. *Kong*, 62 F.4th at 617 (citing *Clark v. Martinez*, 543 U.S. 371, 382 (2005)).

19

proceedings, *adjudicate* cases, or *execute* removal orders.'"  *Id.* at 482 (emphases in original)

(quoting 8 U.S.C. § 1252(g)).  The *AADC* Court provided further context by way of history:

> There was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the . . . discrete acts of "commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—which represent the initiation or prosecution of various stages in the deportation process. At each stage the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience.
>
> . . .
>
> Since no generous act goes unpunished, however, the INS's exercise of this discretion opened the door to litigation in instances where the INS chose *not* to exercise it.

*Id.* at 483–84 (emphasis in original) (quoting 8 U.S.C. § 1252(g)).[26]

The facts of *AADC*—which the Supreme Court said "precisely" reflect the type of claim

that the drafters of section 1252(g) intended to prevent, *id.* at 487—are further instructive, as they

bear no resemblance to the policy challenge at issue here.  The *AADC* plaintiffs alleged that the

Government "target[ed] them for deportation because of their affiliation with a politically

unpopular group."  *Id*. at 472.  Analogizing these claims to a "selective prosecution" defense in

the criminal context, *id.* at 489, the Supreme Court held that the district court lacked jurisdiction

under section 1252(g) to "subject[] the prosecutor's motives and decisionmaking to outside

inquiry," *id.* at 490 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).[27]

---

[26] "IIRIRA" refers to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.  *See AADC*, 525 U.S. at 498 (Stevens, J., concurring).  "INS" refers to the Immigration and Naturalization Service, which previously exercised immigration-related authority through the Department of Justice, which powers now largely reside within the Department of Homeland Security.  *See Martinez*, 543 U.S. at 374 n.1.

[27] The Supreme Court notably carved out a possible exception for allegations of "outrageous" discrimination, *AADC*, 525 U.S. at 491, presumably because the unlawfulness of such discrimination would be obvious on its face and so would require only a nominal "inquiry" into the prosecutor's motives, *see id.* at 490 (quoting *Wayte*, 470 U.S. at 607).  The *AADC* Court's recognition of this exception lends supports to the idea that section 1252(g) does not bar review of an action's "lawfulness," *see Kong*, 62 F.4th at 617, where review requires *no* motive-based inquiry.

Add.022

Plaintiffs' claims here do not require any subjective inquiry. The Court need not probe anyone's intentions to determine the meanings of statutes, regulations, or the Constitution. And the process noncitizens receive before removal does not follow from ad hoc decision-making that is "particularly ill-suited to judicial review," *cf. id.* at 490 (quoting *Wayte*, 470 U.S. at 607), but rather from those objective authorities.

If anything, the claims at issue here resemble the policy challenge upheld in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), except that Plaintiffs' case presents an even easier call. In *Regents*, the Supreme Court considered an APA policy challenge to DHS's rescission of DACA—Deferred Action for Childhood Arrivals—easily dismissing the Government's argument that section 1252(g) barred district court review.[28] *Id.* at 19. This is especially notable because, unlike with Plaintiffs' challenge, the policy at issue in *Regents* directly implicated the Executive's "exercise [of] prosecutorial discretion." *Id.* at 10 (quoting the DACA Memorandum). Indeed, DACA had as its "defining feature . . . the decision to defer removal," *id.* at 27, and the discretionary decision to grant or deny "deferred action" is squarely within the scope of section 1252(g), *AADC*, 525 U.S. at 484. Yet the *Regents* Court held that section 1252(g) did not apply:

---

[28] The *Regents* Court spilled somewhat more ink analyzing the related but distinct question of whether DACA's rescission was "agency action . . . committed to agency discretion by law" under the APA. *See* 591 U.S. at 16–19 (quoting 5 U.S.C. § 701(a)(2)); *see also id.* at 63–64 (Alito, J., concurring in the judgment in part and dissenting in part) (arguing that the rescission of DACA was unreviewable under 5 U.S.C. § 701(a)(2) but not making that argument as to section 1252(g)). Tellingly, Defendants here do not bother suggesting that the process an individual is due before removal has been committed to agency discretion by law, an easily refutable claim. *See generally, e.g.*, 8 C.F.R. pt. 240.

21

Add.023

> Section 1252(g) is similarly narrow.  That provision limits review of cases "arising from" decisions "to commence proceedings, adjudicate cases, or execute removal orders."    § 1252(g).    We have previously rejected as "implausible" the Government's suggestion that § 1252(g) covers "all claims arising from deportation proceedings" or imposes "a general jurisdictional limitation."  [*AADC*, 525 U.S. at 482].    The rescission, which revokes a deferred action program with associated benefits, is not a decision to "commence proceedings," much less to "adjudicate" a case or "execute" a removal order.

*Regents*, 590 U.S. at 19; *see also Ibarra-Perez*, 154 F.4th at 997 ("[Section] 1252(g) does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders.").  It is that much easier to conclude that section 1252(g) does not apply to Plaintiffs' policy challenge concerning mandatory, rather than discretionary, relief.

In sum, section 1252(g) is a "narrow" provision, *AADC*, 525 U.S. at 487, applicable only to a specific set of "discretionary determinations," *id.* at 485.  The actions at issue here are neither discretionary nor within that limited set.  Accordingly, section 1252(g) does not apply.

**b.    Sections 1252(a)(5), (b)(9)**

In the alternative, Defendants argue that Plaintiffs' claims fall within the "channeling provisions," *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 11 (1st Cir. 2007), of sections 1252(a)(5) and (b)(9).[29]  Dkt. 231 at 11–14.  Those provisions, typically read in tandem, create a vehicle for "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States," 8 U.S.C.

---

[29] To be clear, this argument is mutually exclusive with Defendants' previous one: a claim cannot both be barred under section 1252(g) and subject to channeling under sections 1252(a)(5) and (b)(9).  *See Aguilar*, 510 F.3d at 11 & n.2.  In general, Defendants have sometimes described the jurisdictional provisions of the INA and FARRA as if each additional one were merely an emphatic redundancy, rather than targeted at a specific (and often distinct) type of claim.  *See, e.g.*, Brief for Appellants at 23, *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. July 10, 2025) ("The district court's injunction ran roughshod over *three* independent sets of jurisdictional bars." (emphasis in original)).  But these shotgun arguments tend to betray that Defendants have no consistent, working model for how the statutes operate.

Add.024

§ 1252(b)(9), and then require that such "petition[s] for review [be] filed with an appropriate court of appeals," *id.* § 1252(a)(5).

The question of what claims "aris[e] from" removal, 8 U.S.C. § 1252(b)(9), is subject to both a functional and categorical analysis. Functionally, both the First Circuit and Supreme Court have interpreted section 1252(b)(9) to exclude claims that cannot be "raised efficaciously within the administrative proceedings delineated in the INA," such that they might eventually be heard by an appropriate court of appeals. *See Aguilar*, 510 F.3d at 11; *see also Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018) ("eschew[ing]" an "extreme" interpretation of section 1252(b)(9) that would make certain claims "effectively unreviewable"). More categorically, and more recently, the Supreme Court has held that section 1252(b)(9) "is certainly not a bar where . . . the parties are not challenging any removal proceedings." *Regents*, 591 U.S. at 19.

Beginning with the functional, Defendants claim that Plaintiffs "fail to grapple with the real paths to administrative relief available to them." Dkt. 231 at 12. However, that argument is either dangerously uninformed or blatantly dishonest. The Court has grappled with Defendants' supposed paths to relief, *D.V.D. I*, 778 F. Supp. 3d at 372–75, and continues to find them illusory.

"From the outset," Defendants argue, noncitizens "can seek withholding of removal or other protections from removal to those [third] countries during their removal proceedings." *Id.* at 13. For support, they point to a pair of questions on USCIS's Application for Asylum and for Withholding of Removal. *Id.* But before turning to that form, and Defendants' misreading of it, it must be understood that this entire argument is a red herring. Even if an applicant *were* to raise, during his initial removal proceedings, every country as to which he might have a fear-based claim—impossible, in reality, because of changing country conditions and relevant personal characteristics—it would only matter if he could actually receive *relief*, or any adjudication, as to

Add.025

each of those countries.  But "an applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'"  *Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) (quoting *She v. Holder*, 629 F.3d 958, 965 (9th Cir. 2010), *superseded on other grounds by statute as stated in*, *Ming Dai v. Sessions*, 884 F.3d 858, 867 n.8 (9th Cir. 2018)) ("However, should circumstances change such that Azerbaijan is the designated country of removal, the agency must provide Sadychov with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan.").  This is not only intuitively obvious but clear from the Department of Justice's own regulations, which require noncitizen applicants in immigration proceedings to establish risk of persecution or torture in the "proposed country of removal."   8 C.F.R.  § 1208.16(b)  (establishing,  in  removal proceedings, that the "burden of proof is on the applicant for withholding of removal . . . to establish that his or her life or freedom would be threatened ***in the proposed country of removal***." (emphasis  added));  *id.*  §  1208.16(c)  (likewise  establishing  that  an  applicant  seeking  CAT protections must "establish that it is more likely than not that he or she would be tortured if removed ***to the proposed country of removal***." (emphasis added)).  A noncitizen cannot bear his burden as to a "proposed country of removal," *id.*, that has not been proposed as a country of removal.  Defendants are thus wrong to suggest that "an alien need not await any DHS designation before seeking protection." *See* Dkt. 231 at 13.

To illustrate this point, one need only consider the case of Plaintiff O.C.G., who tried to raise a fear-based claim as to an undesignated country during his withholding-only proceedings but was told by an immigration judge—correctly, in this Court's view—that he could not:

Add.026

> During the withholding-only proceedings, O.C.G. asked if he might be sent to Mexico—because he was afraid of being sent to Mexico—and the immigration judge told him, "we cannot send you back to Mexico, sir, because you're a native of Guatemala." During another hearing before the immigration court, O.C.G. described in detail the violence he experienced while in Mexico. At the close of that hearing, the government's attorney clarified with the immigration judge that, because Guatemala was the country of removal designated on O.C.G.'s order of removal, that was the only relevant country for purposes of the withholding-only proceedings, and the immigration judge agreed.
>
> Two days after being granted withholding of removal, and with no advanced warning, O.C.G. was put on a bus and sent to Mexico.

*D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 407 (footnote and internal citations to the withholding-only transcript omitted).

Given the legal impossibility of raising hypothetical claims as to undesignated countries of removal, the inherent practical difficulty in doing so is technically irrelevant but nonetheless worth mentioning. Defendants argue that "an alien knows to which specific countries they fear removal" and "can seek withholding of removal or other protections from removal to those countries during their removal proceedings." Dkt. 231 at 13. In some instances, however, this is a literal impossibility. Take, for example, class-member D.D., who was removed by Defendants to South Sudan but whose removal proceedings concluded when South Sudan had only been a country for ten days.[30] Indeed, of the eight class members whom Defendants removed in violation of the preliminary injunction, an additional three appear to have been ordered removed before South

---

[30] *See* Dkt. 175-1 ¶ 4.

Sudan was recognized as a country.[31]  What evidence were they supposed to present "during their removal proceedings"?  *Cf. id.*

In other cases, the problem of indirect refoulement (sometimes called "chain refoulement") and ever-shifting diplomatic relations makes a person's risk of persecution or torture less obvious than one might first imagine.  For example, imagine a Chinese-national Uyghur-rights activist who fears removal to China.  Of course, he would be aware of the immediate risk he faces on account of his political beliefs and would likely seek protection from removal directly to China.[32]  But he is equally at risk in any country that would—either by "willful acceptance" or by simply "'turn[ing] a blind eye'"—hand him over to China, such that the ultimate likely result remains the same.[33]  *See H.H. v. Garland*, 52 F.4th 8, 15 (1st Cir. 2022) (quoting *Cruz-Quintanilla v. Whitaker*, 914 F.3d 884, 886–87 (4th Cir. 2019)).[34]

Indeed, this is what nearly happened in the case of Idris Hasan, a Uyghur-rights activist arrested at a Moroccan airport based on an Interpol red notice accusing him of terrorism in China.[35]

---

[31] *Compare* Press Release, U.S. Dep't of Homeland Sec., DHS Reacts to Activist Judge Ruling to Halt the Deportation of Barbaric Criminal Illegal Aliens Including Murderers, Rapists, and Pedophiles (May 21, 2025), https://www.dhs.gov/news/2025/05/21/dhs-reacts-activist-judge-ruling-halt-deportation-barbaric-criminal-illegal-aliens [https://perma.cc/R5P9-425G], *with A Guide to the United States' History of Recognition, Diplomatic, and Consular Relations, by Country, since 1776: South Sudan*, U.S. Dep't of State: Off. of the Historian, https://history.state.gov/countries/south-sudan [https://perma.cc/SGD6-WQYN] (last visited Feb. 24, 2026).

[32] Indeed, he may have a strong claim.  *See* Amy Qin, *Dissident Who Daringly Documented Uyghurs' Repression Wins Asylum*, N.Y. Times (Jan. 28, 2026), https://www.nytimes.com/2026/01/28/us/politics/heng-guan-china-uyghurs-asylum.html [https://perma.cc/8SA4-CS7G].

[33] *See Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972–73 (4th Cir. 2019) (discussing how risk is analyzed when based on a causal chain of events).

[34] *H.H. v. Garland*, 52 F.4th 8 (1st Cir. 2022), concerned the risk of acquiescence to torture for purposes of a CAT claim.  *Id.* at 16–19.  An applicant may likewise show that a country of removal is likely to "countenance [his persecution], or at least prove itself unable or unwilling to combat it" for a statutory withholding claim under section 1231(b)(3).  *Lopez Perez v. Holder*, 587 F.3d 456, 462 (1st Cir. 2009).

[35] *See* Amnesty Int'l, Can., *Morocco: Uyghur Activist Freed After Over Three Years in Prison*, (Mar. 18, 2025), https://amnesty.ca/urgent-actions/morocco-uyghur-activist-freed-after-over-three-years-in-prison/ [https://perma.cc/7EAX-AYSB].

Ironically, Hasan was only in Morocco "after seeing his name on a publicly disclosed Turkish government document about China's wanted Uyghurs in Turkey," where he had previously been granted humanitarian legal status.[36]  After Hasan's arrest, Interpol quickly canceled the notice, but Morocco still ordered him to be extradited.[37]  Ultimately, after almost four years' detention and an international campaign calling attention to his situation, Hasan was released and has since been resettled in the United States.[38]  But his case readily demonstrates a conundrum Defendants ignore: which countries might *acquiesce* to a given instance of persecution or torture is a tremendously complicated and dynamic inquiry that bears little relation to an individual's personal experience and the immediate harm he knows himself to face.

A myriad of examples make the absurdity of Defendants' argument apparent.  Should an Ecuadorian woman have to know her risk of female genital mutilation in Somalia?[39]  Should a gay man keep himself apprised of buggery laws in the too-long and ever-changing list of countries that enforce them?[40]  No person could reasonably be expected to make detailed, prophylactic claims about every country on Earth to which she might have a valid claim against removal.  Nor would it make sense to burden our overburdened immigration courts with their adjudication.

It is thus unsurprising that our immigration system does not expect noncitizens to raise such speculative claims.  As mentioned above, Defendants have repeatedly cited USCIS's

---

[36] Asim Kashgarian, *Uyghur Man's Long Journey to Freedom May End With Return to China*, VOA News (Jan. 13, 2022, 3:32 PM), https://www.voanews.com/a/uyghur-man-s-long-journey-to-freedom-may-end-with-return-to-china/6395787.html [https://perma.cc/X5U6-9XFL].

[37] *Id.*

[38] *See* Amnesty Int'l Can., *supra* note 35.

[39] *See Female Genital Mutilation: A Global Concern*, U.N. Children's Fund (UNICEF) (Mar. 7, 2024), https://data.unicef.org/wp-content/uploads/2024/03/FGM-Data-Brochure-v13.4.pdf  [https://perma.cc/V3PV-SKUP] (documenting 99% rate of female genital mutilation).

[40] *See generally* Matthew M. Kavanagh et al., *Global Legal Environment for LGBTQ+ Sexuality and Public Health*, 53 J.L. Med & Ethics 115 (2025) (describing a complex and dynamic legal landscape).

Add.029

Application for Asylum and for Withholding of Removal (Form I-589) to argue that noncitizens have a fair opportunity to present any claim they might have.[41]  Again, such an opportunity is meaningless unless it is accompanied by adjudication of those claims.  Nonetheless, even the form Defendants cite does not support their argument.  The form asks, with a Yes/No checkbox: "Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?"[42]  And then, open-endedly, "If 'Yes,' explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted."[43]

> 4.  Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?
>
> ☐ No          ☐ Yes
>
> If "Yes," explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted.

Thus, contrary to Defendants' repeated statement, as a literal matter, the form does not ask an applicant to "list" anything.  *Cf.* Dkt. 231 at 13 (characterizing these two questions as "asking [an] alien to list and explain 'any' country 'to which [he] may be returned' where he fears 'torture.'").  Moreover, as an interpretive matter, Defendants' reading of these questions makes little sense: the inclusion of the phrase "to which you may be returned," modifying "any other country," implies that "any other country" cannot mean *every* other country on Earth because then there would be no reason to include the relative clause ("to which you may be removed").[44]  Rather, a more natural

---

[41] *See, e.g.*, Dkt. 231 at 13; *D.V.D. I*, 778 F. Supp. 3d at 388 (citing the hearing transcript).

[42] U.S. Citizenship & Immig. Servs., Form I-589, *Application for Asylum and for Withholding of Removal* (2025), https://www.uscis.gov/sites/default/files/document/forms/i-589.pdf [https://perma.cc/J6YL-5XKS]

[43] *Id.*

[44] *See id.*

28

Add.030

reading of "or any other country to which you may be returned" would be any country to which the applicant has a *reasonable* expectation of removal.[45] Indeed, given that the form refers only to a singular "*country* to which you may be removed," the most natural reading of the question, particularly given the scope of any withholding inquiry to follow, would simply be the "proposed country of removal." *Cf.* 8 C.F.R. § 1208.16(b).

After the close of removal proceedings, Defendants posit that "Plaintiffs may—at any time—move to reopen proceedings to assert new fear claims regarding removal to a third country."[46] Dkt. 231 at 13. As a matter of law, this is a misstatement: under most circumstances, a person may file only one motion to reopen their immigration proceedings, and that motion must be filed within 90 days of their order of removal's becoming final.[47] 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i).

Of course, even if an individual fearing removal to an undesignated third country is procedurally able to file a motion, that motion will still necessarily fail because, "[i]n order for a motion to reopen to succeed, it must," among other requirements, "establish a prima facie case for the underlying substantive relief sought." *See Pandit v. Lynch*, 824 F.3d 1, 3 (1st Cir. 2016) (quoting *Shah v. Holder*, 758 F.3d 32, 36 (1st Cir. 2014)). Again, "an applicant is not entitled to have the agency adjudicate claims of relief that relate to a country that nobody is trying to send

---

[45] *See id.*

[46] To be clear, a "motion to reopen" seeking only withholding of removal or CAT relief does not disturb the underlying order of removal itself because "the finality of [an] order of removal does not depend in any way on the outcome of the withholding-only proceedings." *See Johnson v. Guzman Chavez*, 594 U.S. 523, 539 (2021).

[47] There is notably an exception for motions to reopen seeking withholding of removal or CAT protections. 8 C.F.R. § 1003.23(b)(4)(i). But that exception applies only where the motion is "based on changed country conditions arising in the country of nationality or the country *to which removal has been ordered*," *i.e.*, not with respect to undesignated third countries. *Id.* (emphasis added).

Add.031

them to."[48]  *Sadychov*, 565 F. App'x at 651–52 (internal quotation omitted).  Whether pre- or post-removal order, the standard for relief continues to be based on the risk of persecution or torture "***in the proposed country of removal***."  8 C.F.R. § 1208.16(b)–(c) (emphasis added).  Accordingly, despite Defendants' repeated contention, a noncitizen cannot properly raise a fear-based claim regarding a third country before receiving notice of removal to that country.  Until then, such claims are purely hypothetical and cannot be raised either in the original immigration proceedings or on a motion to reopen.[49]

Turning to the categorical, the Supreme Court has held that section 1252(b)(9)'s reference to "'action[s]' or 'proceeding[s] brought to remove an alien'" is "targeted language" that "'does not present a jurisdictional bar' where those bringing suit 'are not asking for review of an order of removal,' 'the decision . . . to seek removal,' or 'the process by which . . . removability will be determined.'"  *Regents*, 591 U.S. at 19 (alterations in original) (first quoting 8 U.S.C. § 1252(b)(9); and then quoting *Jennings*, 583 U.S. at 294) ("And it is certainly not a bar where, as here, the parties are not challenging any removal proceedings.").  Defendants do not attempt to explain how Plaintiffs' claims—which do not "challeng[e] any removal proceedings," *id.*—fall within any of section 1252(b)(9)'s subject-matter categories as laid out in the statute or as explicated by the

---

[48] This applies with even greater force to so-called sua sponte re-openings, which immigration courts may grant at their discretion, largely without any review.  *See D.V.D. I*, 778 F. Supp. 3d at 373–74.

[49] Surprisingly, Defendants seemed to agree with this point during oral argument before the First Circuit, although their candor may have been only an unintentional slip of the truth.  *See* Oral Argument at 28:00, *D.V.D. v. U.S. Dep't of Homeland Sec.*, Nos. 25-1393, 25-1631 (1st Cir. Feb. 3, 2026), https://www.ca1.uscourts.gov/sites/ca1/files/oralargs/25-1393_20260203.mp3.    [https://perma.cc/R3NT-DBYJ] ("DEFENSE COUNSEL: Your Honor, the way to get back into the [petition for review] process that [section] 2242(d) is referencing is by filing a motion to reopen, or by the government filing a motion.  JUDGE AFRAME: What would you say in this motion to reopen?  I mean, my order says I'm going to Guatemala, and now I'm not.  I'm going to Sudan that has nothing to do with my final order.  What am I saying to the immigration judge? DEFENSE COUNSEL: I think the motion to reopen would say: ***the government has now designated Country X*** as my country of removal.  I fear torture ***in that country***.  Please let me bring a CAT claim.  And the IJ ***can then*** grant that motion and reopen the removal." (emphases added)).

Supreme Court, instead stating, without explanation, that "the allegations here . . . inescapably—indeed, exclusively—target an 'action taken . . . to remove an alien from the United States.'" *See* Dkt. 231 at 11 (quoting 8 U.S.C. § 1252(b)(9)). But this summary statement makes sense only if one adopts an expansive reading of "action," which the Supreme Court has explicitly rejected.[50] In reality, Plaintiffs challenge neither their removal orders nor the processes that produced those orders. Accordingly, their claims fall outside section 1252(b)(9)'s claim-channeling mechanism.

### c. Section 1252(a)(4)

Defendants next argue that section 1252(a)(4) bars Plaintiffs' claims in district court insofar as they constitute a "cause or claim under [CAT]." Dkt. 231 at 14–16 (alteration in original) (quoting 8 U.S.C. § 1252(a)(4)).

"A suit arises under the law that creates the cause of action." *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). Accordingly, courts have uncontroversially interpreted section 1252(a)(4) to provide federal courts of appeal with exclusive "jurisdiction to review a noncitizen's factual and legal challenges to a denial of relief pursuant to the CAT, or 'CAT order.'" *See, e.g.*, *Ali v. Garland*, 33 F.4th 47, 54 (1st Cir. 2022) (citing *Nasrallah v. Barr*, 590 U.S. 573, 581 (2020)); *see also Nasrallah*, 590 U.S. at 585 ("[Section] 1252(a)(4) now provides for direct review of CAT orders in the courts of appeals."); *see also, e.g.*, *Suradi v. Sessions*, 701 F. App'x 633, 634 (9th Cir. 2017) ("We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(4), which 'encompasses legal and constitutional issues arising from claims for deferral of removal under CAT.'" (quoting *Maldonado v. Lynch*, 786 F.3d 1155, 1160 (9th Cir. 2015) (en banc))); *Subrata*

---

[50] The Supreme Court has likewise confirmed a narrow reading of what constitutes an "order of removal," excluding, for example, CAT orders because they "'do[] not disturb' or 'affect the validity' of . . . final order[s] of removal." *Riley*, 606 U.S. at 268 (quoting *Nasrallah v. Barr*, 590 U.S. 573, 582 (2020)).

31

*v. Att'y Gen. of U.S.*, 378 F. App'x 226, 228 n.1 (3d Cir. 2010) ("Section 1252(a)(4) provides us with exclusive jurisdiction over claims under the CAT."). Section 1252(a)(4) does not, as Defendants seem to suggest, apply to any claim that simply *relates* to CAT. *Cf. Aguilar*, 510 F.3d at 10 (in discussing section 1252(b)(9), noting that, "if Congress had intended to accomplish so far-reaching a result, it . . . would have used the term 'related to'").[51]

Because Plaintiffs do not challenge any "CAT orders," *Nasrallah*, 590 U.S. at 585, and because the APA, not CAT, "creates [their] cause of action," *Am. Well Works*, 241 U.S. at 260, Plaintiffs present no "cause or claim under [CAT]," 8 U.S.C. § 1252(a)(4).[52] Indeed, the entire thrust of this litigation is that Defendants have foreclosed Plaintiffs' ability to create an administrative record on which CAT claims might be based. *Cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) (finding it "most unlikely" that Congress intended to foreclose a systemic challenge to immigration procedures "based on the claim that such procedures do not allow applicants to assemble adequate records"). Accordingly, section 1252(a)(4) does not apply to Plaintiffs' claims.

### d.    FARRA, Section 2242(d)

Finally, Defendants turn to FARRA section 2242(d), which states that:

---

[51] Section 1252(b)(9) employs "arising from" as its nexus language, words that "do not lend themselves to precise application." *Aguilar*, 510 F.3d at 10. By contrast, what claims arise "under" certain law has been relatively clear and settled for more than 100 years. *See Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908). It follows that the functional limitations of section 1252(b)(9)—excluding claims that, "by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA," *Aguilar*, 510 F.3d at 11—apply even more so to section 1252(a)(4).

[52] Even taking a broader view of what it means to arise "under" certain law produces the same result. In *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), the Supreme Court distilled the complex question of whether a claim arises under federal law: "does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities[?]" *Id.* at 314. Applying the same logic to reason whether a claim arises "under [CAT]," 8 U.S.C. § 1252(a)(4), one would then first ask: "does [the] . . . claim necessarily raise a stated . . . issue" concerning the application or interpretation of CAT, *cf. Grable*, 545 U.S. at 314. That test settles the question at the start because Plaintiffs' claims raise no such CAT issue. CAT is not FARRA, much less FARRA's regulations, much less the executive policy implementing those regulations.

Add.034

> Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), no court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252).

Pub. L. No. 105–277, § 2242(d).

The First Circuit has interpreted section 2242(d)'s two independent clauses separately.[53] *See Saint Fort v. Ashcroft*, 329 F.3d 191, 201 (1st Cir. 2003), *superseded by statute on other grounds as stated in*, *Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).[54] The first "jurisdiction-limiting provision refers only to review of regulations." *Saint Fort*, 393 F.3d at 191. The second, "by its literal terms, . . . says it 'does not provide' jurisdiction, not that it repeals jurisdiction," *id.*, and is therefore not a bar to this Court's jurisdiction.

"Since no challenge is made in this case to the FARRA regulations," section 2242(d)'s "jurisdiction-limiting provision" does not apply. *Id.* at 201; *see also Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 258–59 & n.14 (3d Cir. 2008) ("Since we find no reason to question the validity of the regulations, section 2242 neither applies nor is itself drawn into constitutional scrutiny."). Defendants imply that any consideration of the "procedures that the Executive Branch has crafted for CAT claims," constitutes "review" of FARRA's regulations. *See* Dkt. 231 at 14–15. But this

---

[53] Defendants conflate the two. *See* Dkt. 231 at 14–15 ("FARRA confirms that 'no court shall have jurisdiction to review . . . any . . . determination made with respect to the application of [CAT] . . . except as part of the review of a final order of removal.'" (alterations in original) (quoting Pub. L. No. 105–277, § 2242(d))).

[54] In *Saint Fort v. Ashcroft*, 329 F.3d 191 (1st Cir. 2003), the First Circuit held that district courts retained habeas jurisdiction to review the denial of CAT relief because section 2242(d) lacked a clear statement of congressional intent to repeal such jurisdiction. *See id.* at 200–02. Two years after *Saint Fort*, "Congress enacted . . . [section] 1252(a)(4)," which some courts have found fills that clear-statement gap. *See Kapoor v. DeMarco*, 132 F.4th 595, 598 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 325 (2025). *But see Trinidad y Garcia v. Thomas*, 683 F.3d 952, 956 (9th Cir. 2012) ("Neither [section 1252(a)(4)] nor FARRA . . . repeals all federal habeas jurisdiction over [the petitioner's] [CAT] claims."). Regardless, section 2242(d) has not changed. Thus, its interpretation in *Saint Fort* remains binding on this Court.

Add.035

expansive reading of section 2242(d) cannot be squared with the First Circuit's decision in *Saint Fort*, which considered the adequacy of executive process in determining a CAT claim but constituted "no challenge . . . to the FARRA regulations."  *See* 329 F.3d at 201–04; *accord Khouzam*, 549 F.3d at 258–59 ("The process . . . in the regulations is not problematic.  It is . . . an issue not covered in the regulations[] that gives us pause from the standpoint of due process. . . . Instead, the Executive, without relying on any statutory or regulatory provision, reached too far by failing to provide Khouzam constitutionally adequate process." (internal citations omitted)).  Accordingly, section 2242(d) presents no bar to Plaintiffs' claims.

### 2.    Detention-Related Claims (Count V)

Plaintiffs assert, under 8 U.S.C. § 1231(a) and the Due Process Clause, that the named Plaintiffs have a right to be free from immigration-related detention insofar as their removals are not reasonably foreseeable.[55]  *See* Compl. ¶¶ 123–30; Dkt. 232 at 26–27.  Defendants counter that "none of the named Plaintiffs are currently in custody and therefore their claims challenging the legality of their detention . . . are unripe."  Dkt. 231 at 17.

The Court substantially agrees with Defendants.  Because Plaintiffs' detention-related claims "'necessarily imply the invalidity' of their [future] confinement . . . their claims fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas."  *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (internal quotation marks omitted) (quoting *Nance v. Ward*, 597 U.S. 159, 167 (2022)).  To bring a habeas petition, an individual must be "'in custody' . . . at the time his petition is filed."[56]  *Maleng v. Cook*, 490 U.S. 488, 490–91 (1989) (quoting 28 U.S.C. § 2241(c)).

---

[55] Plaintiff O.C.G. was not originally included in Count V.  *See* Compl. ¶¶ 123–30.  In their opposition to the motion to dismiss, Plaintiffs state that, "now that [O.C.G.] has been returned [to the United States] and released, Count V is equally applicable to him."  Dkt. 232 at 26.  The Court finds this approach procedurally dubious.  Still, for the sake of completeness, the Court analyzes O.C.G.'s asserted habeas claim.

[56] The custodial requirement is jurisdictional in nature.  *See Maleng v. Cook*, 490 U.S. 488, 490 (1989).

To the extent an individual relies on any "future restraint on liberty," such restraint "may provide a basis for habeas jurisdiction [only] if it is imminent and inevitable," which is not the case where detention is "a matter of executive discretion," even if "the odds are great" that the expected detention will occur.  *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 874 n.8 (1st Cir. 2010).

Here, at time of filing, neither D.V.D., M.M., nor O.C.G. were 'in custody' within the meaning of the habeas statute.[57]  *See* Compl. ¶¶ 10–11, 13.  Any hypothetical future detention would, moreover, be subject to "executive discretion."  *Cf. Gonzalez-Fuentes*, 607 F.3d at 874 n.8. In other words, even if it appears likely that DHS will detain these Plaintiffs, the fact is that they might decline to do so.  Thus, these Plaintiffs' claims are unripe.

Conversely, E.F.D. *was* in custody at time of filing, Compl. ¶ 12, which satisfies the statute's jurisdictional requirement.  *See Leitao v. Reno*, 311 F.3d 453, 455 (1st Cir. 2002). However, E.F.D. has since been released.  Dkt. 232 at 26 n.20.  Typically, "[a] habeas petition will become moot once the prisoner is released from custody unless the petitioner can show some sufficient collateral consequence of the underlying proceeding."  *Leitao*, 311 F.3d at 455. Alternatively, a petitioner may be able to claim "the exception to the mootness doctrine for cases that are capable of repetition, yet evading review."  *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (internal quotation marks omitted).  But that exception does not apply where the factual circumstances "have changed so completely [between filing and hypothetical, future judgment] . . . that any decision . . . would be essentially irrelevant."  *United States v. Reid*, 369 F.3d 619, 627 (1st Cir. 2004).

---

[57] As stated previously, O.C.G. was not originally included in Count V.  *See* Dkt. 232 at 26.  His claim fails, however, even if the Court treats Plaintiffs' opposition as functionally amending the complaint (and thus the relevant time of filing).

Add.037

Such is the case here: the factors relevant to E.F.D.'s March 2025 detention will bear only an attenuated relation to the "set of particular circumstances" that might establish or disprove the reasonableness of any possible future detention. *See Zadvydas v. Davis*, 533 U.S. 678, 699 (2001). Accordingly, the Court will dismiss Count V without prejudice for lack of subject matter jurisdiction.[58]

### 3.     FOIA Claim (Count VI)

Plaintiffs allege that Defendants have violated FOIA, 5 U.S.C. § 552(a)(2) ("section 552(a)(2)"), by failing to affirmatively publish the February Directive, as well as "other statements of policy or instruction or guidance."[59] Compl. ¶¶ 131–38. In their prayer for relief, Plaintiffs ask for an injunction precluding Defendants' reliance on any of these documents, absent their publication. *See id.* at Prayer for Relief ¶ (m).

Defendants chiefly argue that dismissal is appropriate because "the type of relief Plaintiffs seek . . . is not available under FOIA" or else is prohibited by section 1252(f)(1). Dkt. 231 at 18–20. However, these objections are largely premature. Generally, "a motion to dismiss is not a proper vehicle for addressing a prayer for relief." *Bureau of Consumer Fin. Prot. v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 59 (D.R.I. 2020) (quoting *Reininger v. Oklahoma*, 292 F. Supp. 3d 1254, 1266 (W.D. Okla. 2017)). "[T]he only issue on a motion to dismiss is 'whether the claim as stated would give the plaintiff a right to *any* relief, rather than to the particular relief demanded.'" *Johnson v. Rapid Sheet Metal, LLC*, 560 F. Supp. 3d 623, 629 (D.N.H. 2020) (emphasis added) (quoting *Douglas v. Miller*, 864 F. Supp. 2d 1205, 1220 (W.D. Okla. 2012)).

---

[58] Because these are the only claims seeming to implicate Defendant Antone Moniz, *see* Dkt. 1 ¶ 17, the Court will dismiss him from the action.

[59] Plaintiffs state that these "other statements" now include "the March 30 Memo, July 9 Guidance, and [the] list of countries that allegedly have provided diplomatic assurances." Dkt. 232 at 29.

36

Here, Plaintiffs clear that relatively low bar. At a minimum, the Court has authority to order "the production of any agency records improperly withheld," 5 U.S.C. § 552(a)(4)(B), which possibility raises no obvious concern under section 1252(f)(1). Moreover, while the First Circuit is yet to decide whether FOIA itself grants additional, separate authority to "enjoin [an] agency from withholding agency records," *id.*, it has previously stated that district courts retain their usual, broad equitable powers to issue "collateral injunctive relief" after finding a FOIA violation. *Columbia Packing Co. v. U.S. Dep't of Agric.*, 563 F.2d 495, 500 (1st Cir. 1977); *see also Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 20 (1974) ("[T]here is little to suggest, despite [FOIA's] primary purpose, that Congress sought to limit the inherent powers of an equity court.").[60] Given this apparent flexibility, the Court does not find relief so impracticable as to warrant dismissal of the claim.

Defendants next argue that the February Directive "does not fall within the categories of documents [that FOIA] directs agencies to affirmatively publish." Dkt. 231 at 20–21. However, the Court need not reach this argument because, at least as to the February Directive, the Court finds that the named Plaintiffs lack standing.[61]

At the outset, the Court notes that Plaintiffs have not established FOIA standing in the usual manner, by showing "that they sought and were denied specific agency records." *See*

---

[60] Defendants point to the D.C. Circuit's decision in *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191 (D.C. Cir. 1996), to argue that production is the *only* remedy available under FOIA. Dkt. 231 at 18–19. *But see N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 224 (2d Cir. 2021) (holding that FOIA "grants district courts the authority to order injunctive relief to enforce [its publication requirements], including an order requiring the agency to make records available for public inspection in an electronic reading room"). As the Second Circuit pointed out, it is difficult to square *Kennecott*'s narrow reading of section 552 with the Supreme Court's decision in *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974), which "supports an expansive rather than restricted view of the remedies available to a FOIA plaintiff." *See N.Y. Legal Assistance*, 987 F.3d at 218 n.20.

[61] Although framed as a matter of remedy, Defendants do argue that "[p]roviding documents to the individual fully relieves whatever informational injury may have been suffered by that particular complainant." Dkt. 231 at 19 (quoting *Kennecott*, 88 F.3d at 1203).

*Campaign for Accountability v. U.S. Dep't of Just.*, 155 F.4th 724, 733 (D.C. Cir. 2025) (quoting *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989)); *cf.* Compl. ¶¶ 131–38.[62]  In the absence of any request's denial, the Court is left to search for some other sign of a "concrete and particularized informational injury."  *See Nat'l Sec. Archive v. Cent. Intel. Agency*, 104 F.4th 267, 272 (D.C. Cir. 2024) (quoting *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017)).  To that end, "plaintiff[s] must show that '(1) [they] ha[ve] been deprived of information that . . . a statute requires the government . . . to disclose to [them], and (2) [they] suffer[], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'"  *Id*. (ellipses in original) (quoting *Elec. Priv. Info. Ctr.*, 878 F.3d at 378).[63]

The Court struggles to see how any of the named Plaintiffs "suffers . . . the type of harm Congress sought to prevent by requiring disclosure."  *See Nat'l Sec. Archive*, 104 F.4th at 272.  Section 552(a)(2), has "as its 'primary objective [ ] the elimination of secret law.'"  *Campaign for Accountability v. U.S. Dep't of Just.*, 486 F. Supp. 3d 424, 427 (D.D.C. 2020) (Jackson, J.) (alteration in original) (quoting *U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989)), *aff'd in part*, 155 F.4th 724 (D.C. Cir. 2025).  Indeed, as Plaintiffs

---

[62] For purposes of this motion, the Court assumes in Plaintiffs' favor that a formal request is not absolutely necessary since the provision at issue, 5 U.S.C. § 552(a)(2), "require[s] agencies to act *proactively* with respect to the publication of certain types of records and information; *i.e.*, the agency must disclose the records without waiting for a request."  *Campaign for Accountability v. U.S. Dep't of Just.*, 278 F. Supp. 3d 303, 307 (D.D.C. 2017) (Jackson, J.) (emphasis in original).  *But see Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017) ("As to FOIA § 552(a)(2), our decisions dealing with the enforcement of this subsection have not discussed standing.  But in each such case the plaintiff made a request of the agency and the agency denied the request."); *Campaign for Accountability*, 155 F.4th at 734–35 ("Because the plaintiff in [*Prisology*] 'made no request . . . before bringing suit and therefore received no denial from [the] agency,' he had not suffered the type of 'informational injury' that is necessary to establish standing." (quoting *Prisology*, 852 F.3d at 1117)).

[63] Again, in Plaintiffs' favor, the Court assumes that DHS's failure to publish could constitute a "depriv[ation] of information," *Nat'l Sec. Archive*, 104 F.4th at 272, even where "the documents are already publicly available," *Morley v. Cent. Intel. Agency*, 894 F.3d 389, 394 (D.C. Cir. 2018).

38

recognize, section 552(a)(2) itself contemplates no injury where "the party has actual and timely notice of the terms thereof." *See* Compl. ¶ 133 (quoting 5 U.S.C. § 552(a)(2)(E)). Here, Plaintiffs' attachment of the February Directive to their complaint, Dkt. 1-4, belies any allegation that DHS's reliance on it constitutes harmful use of a "secret" law against *them*. Thus, even if DHS has failed in its procedural FOIA publication requirement, the named Plaintiffs have failed to show any particularized harm.

"In a class action, 'federal courts lack jurisdiction if no named plaintiff has standing.'" *Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021) (quoting *Frank v. Gaos*, 586 U.S. 485, 492 (2019)). Accordingly, the Court finds that it lacks jurisdiction over Count VI with respect to the February Directive and will dismiss that part of the claim.

Defendants further argue that Plaintiffs' remaining allegations as to "other statements of policy or instruction or guidance" are too non-specific to meet the Rule 12(b)(6) pleading standard. Dkt. 231 at 21 (quoting Compl. ¶ 136). The Court agrees.

Here, again, the fact that Plaintiffs have not made an actual FOIA request muddies the waters. FOIA requests must "reasonably describe[]" the records sought. 5 U.S.C. § 552(a)(3)(A). That provides a standard for courts to assess whether a given request triggered an agency's disclosure duties and thus whether the agency's failure to act upon it was a violation. In that posture, "a request fails to 'reasonably describe[ ]' a record if it is 'too vague' to allow the 'requested record to be reasonably identified.'" *Leopold v. U.S. Immigr. & Customs Enf't*, 560 F. Supp. 3d 189, 198 (D.D.C. 2021) (alteration in original) (quoting *Krohn v. U.S. Dep't of Just.*, 628 F.2d 195, 198 (D.C. Cir. 1980)). In the absence of any formal request, assuming in Plaintiffs' favor that a claim under section 552(a)(2) can still be stated, the Court defaults to the usual rule that allegations must contain "sufficient detail to provide the defendants with fair notice of a

Add.041

plaintiff's claims and the bases for them." *See Mazzarino v. Mass. State Lottery Comm'n*, 616 F. Supp. 3d 118, 127 (D. Mass. 2022) (citing *Twombly*, 550 U.S. at 555). Under that standard, the Court finds Plaintiffs' "other statements" allegation insufficient. *See* Compl. ¶ 136.

Although Plaintiffs attempt to provide more detail in their opposition, *see* Dkt. 232 at 29 (stating that the "other statements" now include "the March 30 Memo, July 9 Guidance, and list of countries that allegedly have provided diplomatic assurances"), "a plaintiff cannot amend his complaint by adding new allegations or theories in an opposition to a motion to dismiss," *Caldwell v. Cambra*, 802 F. Supp. 3d 8, 41 n.10 (D. Mass. Sept. 10, 2025) (citing *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 7 n.2 (1st Cir. 2005)). Accordingly, the Court will dismiss the remainder of Count VI without prejudice for failure to state a claim.

### 4.      Duplicative Claims (Counts II and III)

As a matter of housekeeping, the Court will dismiss Counts II and III for failing to state a distinct claim for relief, *see Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 237 (1st Cir. 2013) (affirming dismissal of "duplicative claim" that "provide[d] [the plaintiff] with no further remedy"), or as otherwise improperly pled. Dismissal of these claims does not substantively limit Plaintiffs' action. Plaintiffs' statutory and constitutional challenges to Defendants' third-country removal policy, based on Plaintiffs' asserted right to notice and an opportunity to challenge third-country removals, properly sound in the APA's requirement that an agency act "in accordance with law."[64] *See* 5 U.S.C. § 706(2)(A). As such, those theories and that relief are fully captured in Count I. *See* Compl. ¶¶ 99–107.

---

[64] Paragraph (A) has been described as the APA's "catchall" cause of action. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984). Ultimately, because this case turns entirely on legal issues, the Court views the choice between APA paragraphs to be, at most, academic.

Add.042

Review of Counts II and III demonstrates why dismissal is appropriate.[65]  In Count II, Plaintiffs ask the Court to "compel agency action unlawfully withheld"—*i.e.*, the provision of notice and an opportunity to challenge third-country removals.  Compl. ¶¶ 108–11 (quoting 5 U.S.C. § 706(1)).  This is both functionally the same relief sought in Count I and, moreover, fails the requirement that claims under 5 U.S.C. § 706(1) target "*discrete* agency action that [the agency] is *required to take*" rather than pose a "broad programmatic attack."  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases in original).

Likewise, in Count III, Plaintiffs allege that Defendants have violated 5 U.S.C. § 706(2)(D), which proscribes "agency action . . . without observance of procedure required by law,"—*i.e.*, notice and an opportunity to challenge third-country removal.  *See* Compl. ¶¶ 112–17.  This is functionally the same relief sought in Count I.  Moreover, Plaintiffs' claim of an unlawful, systemic lack of procedure does not align with this Court's understanding of what it would mean to review whether "prescribed procedures have been followed.'"  *Cf. Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 116 (1st Cir. 2002) (quoting *Nat. Res. Def. Council, Inc. v. Sec. & Exch. Comm'n*, 606 F.2d 1031, 1045 (D.C. Cir. 1979)).  Accordingly, the Court will dismiss Counts II and III.

## III.    **Motion for Summary Judgment**

Having found dismissal appropriate as to Counts II, III, V, and VI, Plaintiffs' motion for partial summary judgment now encompasses all remaining claims, Counts I and IV, under the APA and Declaratory Judgment Act.  *See* Dkt. 193.  As explained below, the Court concludes that Defendants' third-country removal policy, as embodied in the March Guidance, is contrary to

---

[65] The Court recognizes that sua sponte dismissals are generally disfavored. *See Gonzalez-Gonzalez v. United States*, 257 F.3d 31, 36 (1st Cir. 2001).  Here, however, the issue is straightforward; the parties have had ample opportunity to make clear the scope of their dispute, and Plaintiffs are not prejudiced where the same relief remains available (and, in this case, is ultimately granted) through the remaining count.

Add.043

section 1231(b)(2)–(3) and the Due Process Clause.  Accordingly, the Court will grant the surviving part of Plaintiffs' motion.

### A.    Legal Standard

"[I]n cases involving review of agency action under the APA, the traditional Rule 56 standard does not apply [at summary judgment] due to the limited role of a court in reviewing the administrative record."  *Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174, 189 (D. Mass. 2018) (citing *Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015)).  Rather, "[i]n the administrative law context, a motion for summary judgment is 'simply a vehicle to tee up a case for judicial review.'"  *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 121 (D. Mass. 2025) (quoting *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016)).  Thus, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violated the APA.  *Bos. Redevelopment*, 838 F.3d at 47; *see also Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (explaining that a court's task on motion for summary judgment "is only to determine" whether the agency's action "was consonant with [its] statutory powers, reasoned, and supported by substantial evidence in the record").

### B.    Discussion

#### 1.    Section 1231(b)(2)

The parties dispute whether DHS must "first seek removal to the . . . country of removal (or alternative country of removal)" as designated during a noncitizen's removal proceedings.[66]

---

[66] In their memorandum, as compared to their motion, Plaintiffs refer less precisely only to the "country selected by the noncitizen during removal proceedings," excluding mention of the alternate.  *Compare* Dkt. 194 at 9, *with* Dkt. 193-1 at 1.

Add.044

*See* Dkt. 193-1 at 1.  Defendants call this a "clear misinterpretation of the statutory text" and argue that "the statute permits Defendants to remove individuals to any other 'country whose government will accept the alien into that country' when removal to other countries (including, inter alia, the country in which the alien was born) is 'impracticable, inadvisable, or impossible.'"  Dkt. 231 at 37 (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)).[67]  However, Defendants' gloss elides much detail.

In the first instance, section 1231(b)(2) governs the sequence of countries to which a noncitizen subject to a final order of removal may be removed.  *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 338 (2005).  The Supreme Court has explained that section 1231(b)(2) "provides four consecutive removal commands."  *Id.* at 341.

At step one, the noncitizen "shall be removed to the country of his choice," unless one of several conditions is met, including where the noncitizen: "'fails to designate a country promptly'"; where the designated country fails to accept him; or where "'[DHS] decides that removing the alien to the country is prejudicial to the United States.'"  *Id.* at 339, 341 (quoting 8 U.S.C. § 1231(b)(2)(C)(i)–(iv)).

"[O]therwise," at step two, "he shall be removed to the country of which he is a citizen," unless his government fails to accept him.  *Id.* at 341 (citing 8 U.S.C. § 1231(b)(2)(D)).

"[O]therwise," at step three, "he shall be removed to one of [several listed] countries with which he has a lesser connection," *id.* (citing 8 U.S.C. § 1231(b)(2)(E)(i)–(vi)), unless all of those options are found to be "'impracticable, inadvisable, or impossible,'" *id.* (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)).

---

[67] Defendants further highlight that "the statute permits Defendants . . . to disregard the alien's designated country in various circumstances, including if the alien does not make a prompt designation, if the designated country does not timely inform the United States whether it will accept the alien, or if the Attorney General concludes that removal to the designated country 'is prejudicial to the United States.'"  Dkt. 231 at 37 (quoting 8 U.S.C. § 1231(b)(2)(C)).  Given the totalizing nature of Defendants' argument in the first half, it is difficult to see the separate import of the second.  This is perhaps the first signal that Defendants are ignoring swaths of the statute's text.

As a last resort, at step four, the noncitizen "shall be removed to 'another country whose government will accept the alien into that country.'" *Id.* (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)).

These "consecutive removal commands," *id.*, dovetail with the regulations governing removal proceedings, which require the immigration judge to notify a noncitizen in proceedings "that if he or she is finally ordered removed, the country of removal will in the first instance be the country designated by the respondent, except as otherwise provided under [section 1231(b)(2)]," and further require the immigration judge to "afford him or her an opportunity then and there to make such designation," 8 C.F.R. § 1240.10(f). Following that designation, the regulations require the immigration judge to "identify for the record a country, or countries in the alternative, to which the alien's removal may be made pursuant to [section 1231(b)(2)]." *Id.* Thus, the process results in a country of removal designated by the noncitizen and an alternate country or countries of removal designated by the immigration judge.[68]

The immigration judge's designation of an alternate country of removal is governed by section 1231(b)(2)'s four "steps." *See Jama*, 543 U.S. at 344. To illustrate, if an Irish citizen is ordered removed and has properly designated France as his preferred country of removal, then the record should reflect that, "in the first instance," he will be removed to France. *See* 8 C.F.R. § 1240.10(f). This is step one. *See* 8 U.S.C. § 1231(b)(2)(C). Next, the immigration judge should designate Ireland as the country to which he may be removed "in the alternative," Ireland being his country of citizenship.[69] *See* 8 C.F.R. § 1240.10(f). This is step two. *See* 8 U.S.C.

---

[68] At least in practice, it appears not uncommon for immigration judges to leave undesignated the alternate country of removal where removal to the noncitizen's preferred country of removal seems unproblematic, as this can alleviate the need to adjudicate additional country-specific relief. *See, e.g.*, *Matter of Maccaud*, 14 I. & N. Dec. 429, 430 (BIA 1973) (appearing to approve of this practice).

[69] If he were a dual citizen, then the immigration judge could designate both "*countries* in the alternative." 8 C.F.R. § 1240.10(f) (emphasis added).

§ 1231(b)(2)(D).  The immigration judge could not, however, skip Ireland at step two without violating section 1231(b)(2)(D) and, by extension, 8 C.F.R. § 1240.10(f).

The situation becomes somewhat more complicated where an individual is stateless or where the country of citizenship is otherwise unclear.  *See, e.g.*, *Hadera v. Gonzales*, 494 F.3d 1154, 1156–59 (9th Cir. 2007).  In *Hadera*, a noncitizen, Hadera, declined to designate a country of removal (at step one).  *Id.* at 1157.  At step two, there was a question as to whether Hadera was a citizen of Ethiopia or, as he argued, stateless.  *Id.* at 1156.  The immigration judge found that it was "not likely that Ethiopia would recognize [Hadera] as being a citizen" but nevertheless designated Ethiopia as the country of removal.  *Id.* at 1157.  The Ninth Circuit confirmed that this was error, holding that the immigration judge "should have continued on to Step 3 and designated 'one of the countries with which [Hadera] ha[d] a lesser connection,'" which in that case appeared to be Italy.  *Id.* at 1157 (first alteration in original) (quoting *Jama*, 543 U.S. at 341) (citing 8 U.S.C. § 1231(b)(2)(E)(i)–(vi)).

The same general rules apply to DHS in its *execution* of removal orders, with one additional layer.  Ultimately, DHS is not limited, in executing an order of removal, to the countries specifically identified in the order of removal.  8 C.F.R. § 1240.12(d).  However, "in the first instance," DHS must effect removal "to the specified or alternative country or countries," except "[i]n the event that [DHS] is unable" to do so.  *Id.*  For example, using the facts of *Hadera*, assuming the immigration judge, upon remand, were to designate Italy as Hadera's step-three, alternate country of removal, *see* 494 F.3d at 1158, DHS would not be able to effect removal to any other country, pursuant to the order of removal, unless it were "unable" to remove to Italy, 8 C.F.R. § 1240.12(d).

Add.047

DHS is further directly constrained by section 1231(b)(2)'s "four consecutive removal commands." *Jama*, 543 U.S. at 341. For example, if a German citizen were to designate Germany as his preferred country of removal (and if no alternate country of removal were designated in his immigration proceedings), DHS could technically "disregard [the] designation," including if it were to deem such removal "prejudicial to the United States." *See* 8 U.S.C. § 1231(b)(2)(C)(iv). However, section 1231(b)(2) would then "command[]" DHS, *Jama*, 543 U.S. at 341, to attempt removal to the "country of which the alien is a . . . citizen," in that case, to Germany.[70] *See* 8 U.S.C. § 1231(b)(2)(D); *see also, e.g.*, *Enwonwu v. Gonzales*, 438 F.3d 22, 29 n.7 (1st Cir. 2006) ("As a practical matter, . . . if [an] alien does not designate a country, the Attorney General has little choice but to remove him to the country of which he is a subject, national, or citizen.").

Defendants are thus wrong to suggest that removal to "any" country is permitted whenever other options are deemed "'impracticable, inadvisable, or impossible.'" Dkt. 231 at 37 (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)). Section 1231(b)(2) provides no discretion between steps two and three. 8 U.S.C. § 1231(b)(2)(D)–(E). And by regulation, DHS must execute removal to the immigration judge's "specified or alternative country or countries" unless it is "unable" to do so. 8 C.F.R. § 1240.12(d).

### 2.    <u>Section 1231(b)(3)</u>

The entire scheme outlined in the previous section—which provides DHS with its command and authority to remove noncitizens upon their final orders of removal—must be exercised "[s]ubject to" section 1231(b)(3). 8 U.S.C. § 1231(b)(2)(1). Section 1231(b)(3) provides for mandatory withholding of removal (sometimes called "statutory withholding") based

---

[70] *Jama* makes clear that it does not matter that countries identified in successive steps are "the same country." *See* 543 U.S. at 345–46. Thus, the statutory lack of discretion between steps two and three holds even where the countries identified at steps one and two are the same.

Add.048

on a likelihood of persecution.  *See Johnson v. Guzman Chavez*, 594 U.S. 523, 530 (2021).  As such, DHS "may not remove an alien to a country if [the Government] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."[71]  8 U.S.C. § 1231(b)(3)(A).  Section 1231(b)(3) further provides that the determination of "whether an alien has demonstrated that the alien's life or freedom would be threatened" shall be made by a "trier of fact" and pursuant to a formal process.  *Id.* § 1231(b)(3)(C); *see also* 8 C.F.R. §§ 208.16, 1208.16 (establishing standards and procedures for adjudication).[72]

### 3.    FARRA

Apart from the INA, FARRA also makes available country-specific relief from removal, under CAT.  Pub. L. No. 105–277, § 2242.  To obtain CAT relief, an individual must demonstrate "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 208.16(c)(2).  Like statutory withholding, CAT relief is mandatory, rather than discretionary, which is to say that the Government "has no discretion to deny relief to a noncitizen who establishes his eligibility."  *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

### 4.    Due Process

"A court presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional question."  *Califano v. Yamasaki*, 442 U.S. 682, 692 (1979).  "'[I]f 'a construction of [a] statute is

---

[71] *See supra* note 26 (citing *Martinez*, 543 U.S. at 374 n.1).

[72] "The process for applying for withholding of removal [or CAT relief] depends on whether the alien is subject to the standard removal proceedings or a reinstated order of removal. . . . [A]n alien subject to the standard removal process typically applies for withholding [or CAT relief] during the course of his removal proceedings.  But because an alien subject to a reinstated order of removal will not have any removal proceedings," the process begins with a screening interview before an asylum officer, who may then refer the individual for "withholding-only proceedings" before an immigration judge.  *Guzman Chavez*, 594 U.S. at 531 (internal citation omitted).

fairly possible by which [a serious doubt of constitutionality] may be avoided,' a court should adopt that construction." *Id.* at 693 (last alteration in original) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

**a.      Statutory**

As a matter of statute, the Court construes section 1231(b)(2) to require notice and an opportunity to present claims for statutory withholding of removal under section 1231(b)(3). *See* 8 U.S.C. § 1231(b)(2)(1) (making removal authority "[s]ubject to paragraph (3)").

"On its face, [section 1231(b)(3)] requires that [the Government] make a pre-[removal] decision, and that the decision . . . be accurate." *Cf. Califano*, 442 U.S. at 693. "In the imperative voice," *cf. id.*, it says that DHS "may not remove an alien to a country if [the Government] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1231(b)(3)(A), and further sets the terms for how that decision is to be made, *id.* § 1231(b)(3)(C).

Defendants do not seem to believe that section 1231(b)(3) requires any pre-removal decision about a noncitizen's risk of persecution (or worse):

48

Add.050

THE COURT: I want to make sure that I understand your position correctly, that, if the Government is saying, We can deport people to any country that is not prohibited on the notice of removal, and we are not obligated to listen to anything that the deportee has to say about the danger of torture or death that they may face there -- if that's your position, okay. Great. I understand your position.

But I don't want to mischaracterize your position; so that's why I'm saying it back to you, to make sure.

Is your position that the Government can decide right now that someone who is in their custody is getting deported to a third country, give them no notice and no opportunity to say, I will be killed the moment I arrive there, and, as long as the Department doesn't already know that there's someone standing there waiting to shoot him, that that's fine?

DEFENSE COUNSEL: In short, yes.

Dkt. 44 at 29:12–18 (March 28, 2025 Hr'g Tr.).

But even assuming—for no particularly good reason—that there *is* someone, somewhere within the Government evaluating a noncitizen's risk of persecution before he is removed to a third country, the Court "do[es] not see how [risk of persecution] can be evaluated absent" the noncitizen's involvement, or at least his meaningful abstention. *Cf. Califano*, 442 U.S. at 697. Risk of persecution depends, among other things, on an individual's religion, social group membership, and political opinions. 8 U.S.C. § 1231(b)(3)(A). It is unrealistic to imagine that an officer could conceivably have enough information about those personal characteristics, which genuinely change over time, to make that decision, absent some kind of input from the individual.

Accordingly, given the substantial constitutional issues borne out by a contrary reading, discussed in greater detail below, as well as the proper assumption of "congressional solicitude for fair procedure, absent explicit statutory language to the contrary," *Califano*, 442 U.S. at 693, the Court concludes that Defendants' third-country removal policy is unlawful, at a minimum, because it is contrary to sections 1231(b)(2) and 1231(b)(3).

Add.051

Vacatur of the policy is therefore appropriate. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) ("When a reviewing court determines that agency [actions] are unlawful, the ordinary result is that the [actions] are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).

However, not every class member is eligible for statutory withholding under section 1231(b)(3).[73] For those class members, for purposes of declaratory judgment, the right to notice and an opportunity to challenge third-country removal must be predicated either on the right to be removed to the correct country or countries, pursuant to section 1231(b)(2), its regulations, and their orders of removal, or on the right to seek CAT relief. Although an argument could be made that the same constitutional-avoidance logic should apply to those bases, "absent explicit . . . language to the contrary," *Califano*, 442 U.S. at 693, there is less direct, affirmative textual support for it. The Court is further mindful that the avoidance canon cannot be used to "rewrite a statute." *Jennings*, 583 U.S. at 298. Accordingly, the Court proceeds to the constitutional analysis.

### b.    Constitutional

To the extent any class members' entitlement to notice and an opportunity to challenge their third-country removal is not established directly by statute or regulation, Plaintiffs assert that such procedures are guaranteed by the Due Process Clause of the Fifth Amendment. Dkt. 194 at 10–16. As a result, Plaintiffs argue, Defendants' third-country removal policy, as embodied in the March Guidance, is unlawful. *Id.* at 16–20.

---

[73] *See* 8 U.S.C. § 1231(b)(3)(B) (excluding, for example, those who have previously been convicted of a "particularly serious crime").

Courts analyze procedural due process claims in two steps: first, courts "ask whether there exists a liberty or property interest"; if so, courts "ask whether the procedures followed by the [Government] were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by . . . laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Once the existence of a protected interest is established, the sufficiency of governmental process related to that interest is analyzed according to the "three-part balancing test articulated in *Mathews v. Eldridge*." *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

### i.    Liberty Interests

Plaintiffs have identified two distinct liberty interests, both arising out of statute. First, they claim an interest in being removed to the countries of removal designated on their orders of removal or otherwise pursuant to the sequencing requirements of section 1231(b)(2). Dkt. 194 at 9–10.[74] Second, Plaintiffs claim an interest under FARRA and the INA in being able to assert fear-based claims against third-country removal. *Id.* at 10–16. Because the Court has already concluded that the right to notice and an opportunity to raise withholding claims under section 1231(b)(3) inures by statute, the Court limits its constitutional analysis to Plaintiffs' interest in bringing CAT claims under FARRA.

Defendants do not dispute that such liberty interests may generally arise out of these statutes and regulations. However, they do dispute whether every class member can claim

---

[74] *See also* Dkt. 194 at 17 (arguing that Defendants' reliance on diplomatic assurances "deprives a person of any meaningful opportunity to challenge the removal on the grounds that, inter alia, DHS has an obligation to remove the person to the country designated in the removal order") (citing, inter alia, *J.R. v. Bostock*, 796 F. Supp. 3d 684, 690 (W.D. Wash. 2025) (restraining third-country removal where the plaintiff's country of citizenship had allegedly accepted repatriation, leaving "no grounds upon which the Government [could] designate an alternative country")).

51

entitlement to them.   In particular, Defendants argue that the Due Process Clause provides no additional protection to those "aliens who have never been admitted," a group which Defendants posit, "undoubtedly includes many members of the certified class."  Dkt. 231 at 28.

At the outset, it is worth noting what Defendants' argument does not, and cannot, suggest: that the Due Process Clause simply does not apply to individuals present without admission in the United States.  Rather, the Supreme Court has repeatedly held that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693 (quoting, inter alia, *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)).  It is beyond argument that "[t]he Fifth Amendment . . . protects every one of ['literally millions of aliens within the jurisdiction of the United States'] from deprivation of life, liberty, or property without due process of law" and that, "[e]ven one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976).  "'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *J.G.G.*, 604 U.S. at 673 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).  "No one can claim, nor since the time of slavery has anyone . . . successfully claimed, that persons held within the United States are totally without constitutional protection." *Jennings v. Rodriguez*, 583 U.S. 281, 332 (2018) (Breyer, J., dissenting).[75]   This conclusion is particularly obvious when one considers the implications of any contrary statement: "would the Constitution leave the Government free to starve, beat, or lash those held within our boundaries?" *Id.*

---

[75] Although written in dissent, Justice Breyer's constitutional analysis was not contradicted by the *Jennings* majority, which instead remanded those arguments.  *See Jennings*, 583 U.S. at 312.

Add.054

To counter this baseline rule, Defendants invoke the so-called entry-fiction doctrine. Dkt. 231 at 28. According to that principle, "aliens who arrive at ports of entry . . . are 'treated' for due process purposes 'as if stopped at the border'" and thus "ha[ve] only those rights regarding admission that Congress has provided by statute." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020). To spell out this idea, "[w]hen an alien arrives at a port of entry . . . the alien is on U. S. soil." *Id.* at 139. Thus, he is technically a "'person[]' within the United States." *Zadvydas*, 533 U.S. at 693. As such, a mechanical application of the Due Process Clause might entail that he could be "expelled [from the United States] only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). To avoid this result, and in service of the political branches' "'sovereign prerogative' of governing admission to this country," courts deploy a legal fiction whereby "the alien is not considered to have entered the country for the purposes of this rule." *Thuraissigiam*, 591 U.S. at 139–40 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)).

To illustrate, the *Thuraissigiam* Court provides the apt example of "an international airport." *Id.* at 139. In that context, if due process protections against removal were to attach "as soon as an arriving alien set foot on U.S. soil," *id.*, the Government would be forced to perform inspections and decide the admissibility of every passenger out on the tarmac (or perhaps even in mid-air) or else waive its sovereign right, *see id.* This result would not only be absurd but in direct tension with the "accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty . . . to admit [noncitizens] only in such cases and upon such conditions as it may see fit to prescribe." *See Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Indeed, the Supreme Court has reasoned that this rule of sovereign power over admission would be "meaningless" if it could be overcome by a noncitizen's mere arrival. *Thuraissigiam*, 591 U.S.

at 139. Thus, to account for the practical realities of international travel, immigration processing, and border management, the entry-fiction doctrine fills the gap by providing the Government with a degree of flexibility in how it treats arriving noncitizens at ports of entry or near the border: for admissions purposes, as if still "at the threshold of initial entry."[76] *See, e.g.*, *id.* at 107, 140 (holding that an asylum-seeker apprehended "just 25 yards from the border" could not claim that his expedited removal violated the Due Process Clause because he had "only those rights regarding admission that Congress has provided by statute").

However, in such cases, which provide an exception to the otherwise "geographic" scope of the Due Process Clause, *Zadvydas*, 533 U.S. at 693, the due process rights impacted are only those "regarding admission," *Thuraissigiam*, 591 U.S. at 140. This distinction arises near the very inception of the entry-fiction case law: in *Wong Wing v. United States*, 163 U.S. 228 (1896), the Supreme Court contrasted the case of an immigrant who could not challenge his immigration officer's "exclusive authority to determine whether a particular alien seeking admission into this country" was so entitled, *id.* at 232–33 (quoting *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895)), with another who *could* challenge, on due process grounds, the imposition of an immigration-related term of hard labor, *id.* at 235–38. And although *Wong Wing* presented the particularly egregious circumstance of an "infamous punishment," *id.* at 237, the Supreme Court expressed its holding in terms of the broader protections afforded by the Due Process Clause:

---

[76] Indeed, the Government may even permit a noncitizen to physically enter the United States in a more substantial way—by "parol[ing]" him into the country, *Thuraissigiam*, 591 U.S. at 139—without necessarily subjecting its admission decision to the strictures of the Fifth Amendment. *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 229–30 (1925) (holding that a mentally handicapped child's "prison bounds" were merely "enlarged" by her commitment to the custody of an immigrant aid society "until she could be deported safely").

> Applying this reasoning to the fifth and sixth amendments, it must be concluded that all persons within the territory of the United States are entitled to the protection guarantied by those amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law.

*Id.* at 238.

It makes sense to distinguish between "rights regarding admission" and other interests that might be protected by the Due Process Clause. *See Thuraissigiam*, 591 U.S. at 140. The Government's countervailing interest, in the entry-fiction context, is its sovereign authority to "admit [noncitizens] only in such cases . . . as it may see fit." *Nishimura Ekiu*, 142 U.S. at 659. Where that sovereign prerogative is not implicated, however, the legal fiction loses its justification. *See Zadvydas*, 533 U.S. at 699 (citing 1 Edward Coke, *Institutes of the Lawes of England* *70b (1628), for the maxim that, "[when] the rationale of a legal rule [is] no longer . . . applicable, that rule itself no longer applies").

Unsurprisingly then, more than a century of Supreme Court case law confirms that the proper application of an entry fiction, where otherwise appropriate, is to preserve the Government's authority over the determination of a noncitizen's *admissibility*.[77] For example, in *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892), which first articulated these principles in U.S. law, the Supreme Court held that a habeas petitioner's "*right to land in the United States*" was not increased by the Government's permitting her to stay in a "mission-house as a more suitable place than the steam-ship, pending [its] decision." *Id.* at 661 (emphasis added). Likewise, in *Kaplan v. Tod*, 267 U.S. 228 (1925), the Supreme Court held that the Government's authority to "*rightly . . . den[y] admission*" to a handicapped child was unaffected by its decision to permit her stay with an immigrant aid society "until she could be deported safely." *Id.* at 229 (emphasis

---

[77] Each of the cases to follow is cited by Defendants. *See* Dkt. 231 at 28–29.

added).[78]  And in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), the Supreme Court held that a petitioner's liminal presence on Ellis Island did not "transform[] [his case] into something other than an *exclusion proceeding*," *id.* at 213 (emphasis added), which was then "the usual means of proceeding against an alien outside the United States *seeking admission*," *Plasencia*, 459 U.S. at 25 (emphasis added).

Because Plaintiffs challenge neither their orders of removal nor any of the processes that produced those orders, their claims do not implicate, nor even "relate[] to," the issue of their admissibility.  *See Guzman Chavez*, 594 U.S. at 536.  Withholding of removal and CAT relief cannot issue until *after* the order of removal has been entered and thus *after* any question of admissibility has been resolved.  *Id.* at 539–40 (citing *Matter of I-S- & C-S-*, 24 I. & N. Dec. 432, 432–33 (BIA 2008)).  "In short, withholding-only relief is country-specific.  It relates to *where* an alien may be removed.  It says nothing, however, about the antecedent question *whether* an alien is to be removed from the United States."  *Id.* (emphases in original).  The Supreme Court has indeed explicitly rejected attempts to conflate the two "as a practical matter" based on the mere possibility that withholding relief might lead to continued presence (which is, as Defendants clearly recognize, *not* admission).  *See id.* at 537–38 (noting that "withholding-only relief 'does not afford [an alien] any permanent right to remain in the United States'" (alteration in original) (quoting *Matter of I-S- & C-S-*, 24 I. & N. Dec. at 434)).

---

[78] *Kaplan* is somewhat inapposite because, at bottom, it concerned the meanings of statutes rather than the scope of the Due Process Clause.  *See* 267 U.S. at 230–31 ("She never has been dwelling in the United States within the meaning of the Act.").  Nevertheless, it is useful to illustrate the historic application of entry fictions to practically facilitate admission and exclusion.  Defendants' citation to *Landon v. Plasencia*, 459 U.S. 21 (1982), is particularly confounding since, in that case, the Supreme Court upheld the due process rights of a noncitizen *outside* the United States, seeking admission *into* the United States, based on established "ties" to the country.  *See id.* at 32–34.

The Court thus rejects Defendants' argument that the Due Process Clause excepts certain class members from asserting due process challenges based on these non-admission interests.[79] Plaintiffs are uniformly "'persons' within the United States." *Zadvydas*, 533 U.S. at 693. Accordingly, the Fifth Amendment "imposes constraints" on any process that deprives them of their liberty interests.[80] *Mathews*, 424 U.S. at 332. Plaintiffs have identified two such legitimate interests falling within that protection.

---

[79] Because Plaintiffs' claims are not within the substantive scope of the entry-fiction doctrine, it is somewhat of a distraction to argue about whether any class members might be (or might have been) impacted by it in other contexts. Nevertheless, the Court would be remiss not to point out that Defendants' misstatement of the law is striking.

Defendants argue that all "applicants for admission," defined as "'alien[s] present in the United States who ha[ve] not been admitted,'" lack a constitutional basis to make "due-process objections to removal." *See* Dkt. 231 at 29–30 (quoting 8 U.S.C. § 1231(a)(1)) ("When an illegal alien has never been admitted to this country by immigration officers, his constitutional status for due-process objections to removal is no different from an alien stopped at the border."). But that argument has been squarely and repeatedly rejected by the Supreme Court for more than 100 years, including in the very case Defendants misleadingly cite to suggest that "the Supreme Court has never held that aliens who have 'entered the country clandestinely' are entitled to such additional rights." Dkt. 231 at 29 (quoting *Yamataya v. Fisher*, 189 U.S. 86, 100 (1903) (*The Japanese Immigrant Case*)). To start, a 123-year-old citation purporting to show what the Supreme Court has "never held" should raise a red flag for any conscientious litigant or close reader. Indeed, in the intervening century-plus, the Supreme Court *has* held that "additional rights and privileges" apply for "those who are within the United States after an ***entry***, irrespective of its legality." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) (emphasis added); *see also Zadvydas*, 533 U.S. at 693 ("[O]nce an alien ***enters*** the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.*"* (emphasis added)); *see also Thuraissigiam*, 591 U.S. at 105 (holding that an asylum-seeker could not raise a due process challenge to his expedited removal because he had not "effected an ***entry***" (emphasis added)); *Matter of Pierre et al.*, 14 I. & N. Dec. 467, 468 (B.I.A. 1973) (defining "entry" into the United States as "(1) a crossing into the territorial limits of the United States, i.e. physical presence; plus (2) inspection and admission by an immigration officer; or (3) actual and intentional evasion of inspection at the nearest inspection point; coupled with (4) freedom from restraint." (internal citations omitted)). And while the *Yamataya* Court did, in 1903, "[l]eav[e] on one side the question whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, *and who has been here for too brief a period to have become, in any real sense, a part of our population*"—a much more cabined construction than Defendants represent—the *Yamataya* Court also stated, in the same paragraph, that an "executive officer" could not "arbitrarily . . . cause an alien who has ***entered*** the country . . . , although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States" because "[n]o such arbitrary power can exist where the principles involved in due process of law are recognized." 189 U.S. at 101 (emphases added). In short, Defendants' suggestion that the entry-fiction doctrine, however conceived, applies to all class members who have never been admitted is wrong.

[80] For this reason, Defendants' repeated analogy to expedited removal continues to be a "red herring." *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 786 F. Supp. 3d at 234; *cf.* Dkt. 231 at 35–36. Expedited removal typically involves individuals "apprehended at or near the border" or who are denied admission at ports of entry, before due process rights attach. *See, e.g.*, *Thuraissigiam*, 591 U.S. at 106–08.

## ii.    *Mathews* **Factors**

"Once it is determined that due process applies, the question remains what process is due."[81]  *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 66 (1st Cir. 2019) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  "To determine what process is constitutionally due, [courts] generally balance three factors":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (quoting *Mathews*, 424 U.S. at 335).  "Due process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews*, 424 U.S. at 334 (alteration omitted) (quoting *Morrissey*, 408 U.S. at 481).  However, "[n]otice and an opportunity to be heard have traditionally and consistently been held to be the essential requisites of procedural due process."  *Haidak*, 933 F.3d at 66 (quoting *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988)).

### (A)    **Private Interest**

Defendants do not dispute that the private interests at stake here are weighty.  *See* Dkt. 231 at 31–36.  Plaintiffs state that "[t]he predictability of the country of removal is critical because noncitizens make decisions about whether to fight removal and to seek relief or protection based on where they may be removed."  Dkt. 194 at 10.  As to the importance of fear-based relief, the Court recalls the case of Plaintiff O.C.G., who was denied the opportunity to seek protection from third-country removal and who, as a result, was forced to return to the very place an immigration

---

[81] Although the two liberty interests identified by Plaintiffs are arguably distinct, having different statutory bases, a single *Mathews* analysis is appropriate to test the sufficiency of Defendants' process with respect to third-country removal.  *See, e.g.*, *Vitek v. Jones*, 445 U.S. 480, 488–95 (1980).

58

judge found, only days before, that he would likely be persecuted.[82]  *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 405.  O.C.G. has provided a glimpse of the personal toll:

> Just yesterday, O.C.G. submitted a declaration informing the Court of his current status.  He reports living in constant fear of his attackers, being unable to leave the place where he is staying, not being able to rely on the police to protect him, and not being able to see his mother for fear of exposing her to violence, among other hardships.

*Id.* at 407 (internal citations omitted).

For Plaintiffs, the availability of CAT relief can be a matter of life and death, and "of all that makes life worth living."  *See Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).  "To say more would be to paint the lily."  *Rodriguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 783 (1st Cir. 2025).  The Court weighs this factor heavily in Plaintiffs' favor.

### (B)    Risk of Erroneous Deprivation

Notwithstanding the importance of these interests, Defendants argue that "[t]he combination of the March Guidance and the procedures class members received in their prior immigration proceedings substantially eliminate the risk of an erroneous deprivation," which they argue is "further undermined by the high bar that Plaintiffs must meet in order to prevail on their potential fear claims."  Dkt. 231 at 32, 34.  Recognizing that Defendants' argument is essentially cumulative in nature, the Court takes each of these asserted risk-mitigating factors in turn.

---

[82] For an even more recent example of "chain refoulement," see Pranav Baskar & Hamed Aleaziz, *U.S. Deports Nine Migrants in Secret, Ignoring Legal Protections*, N.Y. Times (Feb. 14, 2026), https://www.nytimes.com/2026/02/14/world/africa/us-secret-deportation-cameroon.html  [https://perma.cc/FA6A-L3DP] ("Among those now in the [Cameroonian] compound are people who said they escaped imprisonment for their political beliefs, survived wars and fled countries where their sexual orientations are criminalized. . . . [T]he Cameroonian government has treated their deportation there as a matter of transit, urging them to go back to their home countries.").

**(1)**     <u>**Prior Immigration Proceedings**</u>

To begin, "the procedures class members received in their prior immigration proceedings," *id.* at 32, are irrelevant because those proceedings necessarily excluded adjudication of third countries, *see Sadychov*, 565 F. App'x at 651–52 ("[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate to a country that nobody is trying to send them to." (internal quotation marks omitted)).[83]   Defendants' argument is essentially that everybody gets their day in court and nothing more, which is fair enough as an aphorism but ignores that the law does not require—and indeed, does not permit—litigants to exhaust hypothetical, "unavailable" claims based on circumstances not yet in existence.  *See Ross v. Blake*, 578 U.S. 632, 642–44 (holding that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end" or when "administrators thwart [claimants] from taking advantage of a grievance process through machination").

Defendants' recourse to "prior immigration proceedings" is especially concerning when one thinks prospectively: to avoid litigating CAT claims, DHS need only avoid having the actual country of removal designated during removal proceedings.  That way, DHS gets to test the suitability of that country for removal through the less-rigorous March Guidance procedures, if it gets tested at all, while still being able to claim that the individual received "the panoply of procedural safeguards and protections available to them in their prior immigration proceedings." Dkt. 231 at 24.  Previously, one could have found some comfort in the idea that the Government would not *intentionally* engage in this kind of gamesmanship because, at least as of

---

[83] *See also supra* pp. 23–25, 29–30.

60

March 24, 2025, it claimed to believe that late designations could not prevent fear-based claims.[84]

However, given the existence of the March Guidance, it defies logic to imagine that DHS would

not avail itself of this obviously less burdensome, if somewhat furtive, approach.

### (2)    The March Guidance

Turning to the March Guidance itself, it provides that DHS may remove a noncitizen

"without the need for further procedures" if he is to be removed to a "country [that] has provided

diplomatic assurances that aliens removed from the United States will not be persecuted or

tortured" and if the State Department finds such assurances to be credible. Dkt. 43-1 at 2–3. If

the noncitizen is to be removed to a country not covered by such assurances, ICE will "generally

wait at least 24 hours following service of the Notice of Removal before effectuating removal,"

except under certain "exigent circumstances."[85] Dkt. 190-1 at 1. ICE "will <u>not</u> affirmatively ask

whether the alien is afraid of being removed to the country of removal." *Id.* (emphasis in original).

However, "[i]f the alien <u>does affirmatively state</u> a fear if removed to the country of removal listed

on the Notice of Removal, [ICE] ERO will refer the case to U.S. Citizenship and Immigration

Services (USCIS)." *Id.* at 2 (emphasis in original). USCIS will then "generally screen the alien

within 24 hours" and determine whether he "would more likely than not" be persecuted or tortured

---

[84] Transcript of Oral Argument at 33, *Riley*, 606 U.S. 259 (2025) (No. 23-1270) ("We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country.").

[85] As explained above, the Court treats the July Guidance as an implementation of the March Guidance and will generally refer to DHS's third-country-removal policies and procedures accordingly. *See supra* note 19.

Add.063

if sent to that country.[86]  *Id.*  If USCIS determines that there is no such likelihood of persecution or torture, the noncitizen is removed.  *Id.*  If USCIS determines that there is, it may either refer the case to the immigration courts or ICE can designate a new country of removal and start the process over again.  *Id.*

As such, the March Guidance mitigates *no* risk of a person's being unlawfully removed to a country other than as designated on their order of removal, *see* 8 C.F.R. § 1240.12(d) (providing that DHS may do so only where it is "unable" to effect removal to one of the designated countries), or contrary to the "four consecutive removal commands" of section 1231(b)(2), *see Jama*, 543 U.S. at 341.  Insofar as the March Guidance, on its face, not only fails to protect against but appears to contemplate and authorize this type of removal—and particularly given Defendants' insistence that such removal is lawful—the risk of erroneous deprivation of that right appears high.

Similarly, the March Guidance provides little, if any, protection from the erroneous deprivation of CAT claims.  Defendants argue that the March Guidance procedures functionally satisfy the substantive standard for extinguishing CAT claims based on diplomatic assurances, as prescribed by regulation, and thus it makes "no sense to require the government to provide additional process."  Dkt. 231 at 27 & n.4.  Put another way, Defendants argue that when, as a matter of law, they must ultimately win on the merits, Plaintiffs have no enforceable due process right to bring a claim.  Defendants are forced to make this argument categorically because "[t]he

---

[86] The Court focuses on the higher-order problems with the March Guidance.  Nevertheless, it bears mentioning that, even where the Guidance provides some noncitizens (only a subset) with notice and an opportunity to challenge third-country removal, it is still facially inadequate.  *See J.G.G.*, 604 U.S. at 673 (2025) ("[N]otice must be afforded within a reasonable time and in such a manner as will allow them to actually seek . . . relief in the proper venue before such removal occurs.").  On as little as 24 hours' notice (or six hours' notice in "exigent circumstances"), a noncitizen is expected to demonstrate full entitlement to their fear-based claim or, in other words, what would be expected of them in a full hearing on the merits.  *Compare* Dkt. 43-1 at 3, *with* 8 C.F.R. § 1208.16(b)(2), (c)(2) (requiring an applicant to show that she is "more likely than not" entitled to relief).  This is not "notice and opportunity to be heard 'appropriate to the nature of the case.'"  *See J.G.G.*, 604 U.S. at 673 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions." *Gonzalez-Fuentes*, 607 F.3d at 894 (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978)).  "A right to seek relief is analytically separate and distinct from a right to the relief itself." *Arevalo v. Ashcroft*, 344 F.3d 1, 15 (1st Cir. 2003) (citing, inter alia, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)).  Thus, it would be insufficient for Defendants to say that, in the mine-run of cases, the Government will win.  Rather, Defendants' position must be that the Government will always win.

But Defendants are wrong on the merits and thus cannot pre-extinguish Plaintiffs' CAT claims by workaround.  Read in its proper context, as well as in isolation, the regulation does not permit generalized, country-wide, "blanket" assurances, as provided in the March Guidance.[87]  The relevant regulation states that "assurances . . . from the government of a specific country that *an* alien would not be tortured there if *the* alien were removed to that country," 8 C.F.R. § 208.18(c)(1) (emphases added), when found by the Executive to be "sufficiently reliable to allow *the* alien's removal to that country consistent with Article 3 of the Convention Against Torture," *id.* § 208.18(c)(2) (emphasis added), conclude consideration of "*the* alien's" CAT claim, *id.* § 208.18(c)(3) (emphasis added).  In turn, Article 3 of the Convention Against Torture states:

---

[87] *Cf.* Dkt. 231 at 27 n.4 (arguing otherwise).

1.      No State Party shall expel, return (*refouler*) or extradite *a person* to another State where there are substantial grounds for believing that *he* would be in danger of being subjected to torture.

2.      For the purpose of determining whether there are such grounds, the competent authorities shall take into account *all relevant considerations* including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 [hereinafter Art. 3] (emphases added).

Beginning with the text of the regulation itself, it repeatedly refers in the singular to "*an* alien" whom the foreign government may assure will not be tortured if "*the* alien" is removed there. 8 C.F.R. § 208.18(c)(1) (emphases added); *cf. Niz-Chavez v. Garland*, 593 U.S. 155, 161–62 (2021) (concluding that the indefinite article "a" indicates "[t]o an ordinary reader" a singular referent). Defendants argue that an assurance that "*an* alien" will not be tortured leaves DHS "free to conclude" that "*no* alien would be treated that way." Dkt. 231 at 27 n.4 (emphases added). However, this reading does not account for the regulation's second use of the singular, paired with a *definite* article. *See* 8 C.F.R. § 208.18(c)(1) (referring to "assurances . . . that an alien would not be tortured there if *the* alien were removed to that country" (emphasis added)). "[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000) (quoting *Brooks v. Zabka*, 168 Colo. 265, 269 (1969) (en banc)); *cf. Corner Post*, 603 U.S. at 817 (linking "*the* plaintiff" with "this particular plaintiff" (emphasis in original)) (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016))).

"Nor is this the only contextual clue before us." *Cf. Niz-Chavez*, 593 U.S. at 163. CAT Article 3, with which any assurance must be "consistent," 8 C.F.R. § 208.18(c)(2), likewise refers

64

in the singular to the duty owed by a state to "*a person*" should "*he*" be in danger, Art. 3 (emphases added).[88]  More fundamentally, Article 3 requires signatories to "take into account all relevant considerations" when evaluating the possibility of torture.  Art. 3.  Importantly, under CAT, torture can include harm "inflicted by private parties," even where the receiving government might not have actual knowledge of the torturous conduct.[89]  *Murillo Morocho v. Garland*, 80 F.4th 61, 67 (1st Cir. 2023).  While a government could theoretically promise, in the abstract, not to commit torture, it cannot plausibly rule out private torture—"tak[ing] into account all relevant considerations," Art. 3—without knowing at least the *name* of the person whom it is purportedly pledging to protect, let alone the individualized risks they might face.  Thus, reading 8 C.F.R. § 208.18(c) as requiring individualized assurances not only follows from the text but saves the regulation from absurdity.

Concomitantly, it follows that there must be an "individualized determination" that the foreign assurances are sufficient.[90]  *Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 258 (3d Cir. 2008).  Starting with the text, the regulation again refers to a singular "alien," alongside the definite article.  *See* 8 C.F.R. § 208.18(c)(2) (providing that the Executive "shall determine . . . whether the assurances are sufficiently reliable to allow *the alien's* removal to that country" (emphasis added)).  Thus, the same textual arguments apply and recommend a similar conclusion.  *See Niz-Chavez*, 593 U.S. at 162; *Am. Bus Ass'n*, 231 F.3d at 4–5.

---

[88] The Supreme Court has instructed that "courts should be most cautious before interpreting . . . domestic legislation in such manner as to violate international agreements," lest the United States lose "the benefits of international accords" and its "role as a trusted partner in multilateral endeavors."  *See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 539 (1995).

[89] In this context, private parties can include third-party foreign state actors, including as a result of "chain refoulement."  *See supra* pp. 26–27 and note 82.

[90] As they have distinct textual and logical bases, one could theoretically imagine a version of the regulation that required an individualized determination but not individualized assurances.  To be clear, the Court reads these as separate requirements, independently mandated.

In *Khouzam v. Attorney General*, 549 F.3d 235, the Third Circuit not only held that the regulation required an individualized determination as to the reliability of diplomatic assurances, *see id.* at 254–55, but that a noncitizen has a due process right to challenge the reasoning and evidence behind that determination, *id.* at 259 ("The alien must have an opportunity to present, before a neutral and impartial decisionmaker, evidence and arguments challenging the reliability of diplomatic assurances proffered by the Government, and the Government's compliance with the relevant regulations.").[91]   The petitioner, Khouzam, was a Coptic Christian who had been granted CAT relief from Egypt. *Id.* at 238–40. Three years later, Khouzam was detained at an ICE check-in, and his attorney was sent a summary letter stating that DHS had "credited as sufficiently reliable . . . diplomatic assurances received by the Department of State from the Government of Egypt that . . . Mr. Khouzam[] would not be tortured if removed there" and that DHS had therefore terminated Khouzam's CAT relief. *Id.* at 240. DHS confirmed, however, that it would not remove Khouzam before a date certain, roughly four months away. *Id.*

Under these circumstances, the Third Circuit called it "obvious that Khouzam was not afforded notice and a full and fair hearing prior to his imminent removal on the basis of diplomatic assurances" and "conclud[ed] that the Government terminated Khouzam's deferral of removal without constitutionally sufficient process":

> First, the Government failed to make any factfinding based on a record that was disclosed to Khouzam. . . . Second, Khouzam had no opportunity to make arguments on his own behalf. . . . Finally, we also find that Khouzam was denied his right to an individualized determination.

*Id.* at 257–58.

---

[91] It is unsurprising that, aside from *Khouzam*, there is a dearth of case law on diplomatic assurances under FARRA. In 2011, the DHS Inspector General reported that there had only ever been four DHS assurances cases: three Rwandan nationals, whom the DHS Secretary had not yet decided whether to remove, and an Egyptian national, presumably Khouzam. *See* U.S. Dep't of Homeland Sec., Office of Inspector Gen., OIG-11-100, *DHS Detainee Removals and Reliance on Assurances* 14–15 (2011).

It is remarkable to recognize that Khouzam received significantly *more* process in 2007 than he would now under the March Guidance. Khouzam was notified of the circumstances more than *four months* in advance. *Id.* at 240. Indeed, that notice is what gave him the opportunity to properly seek relief in the court of appeals via a petition for review.[92] *See id.* at 245–49.

This Court need not even go as far as did the *Khouzam* court to find the March Guidance procedurally insufficient. The March Guidance provides *no* notice to a noncitizen that his prospective CAT claim has been foreclosed by purported diplomatic assurances. Thus, he is not only cut off from challenging "the Government's reasons for crediting [the] assurances" before a "neutral and impartial decisionmaker," as the *Khouzam* court found was constitutionally required. *Cf. id.* at 257–58. Rather, under the March Guidance, a noncitizen lacks even the chance to clarify whether the purported diplomatic assurances *exist*. Existential challenges to diplomatic assurances could conceivably take several valid forms. For example, a noncitizen might reasonably question whether the purported assurance exists *at all*—*i.e.*, make the Government show at least some valid

---

[92] Defendants argue that *Khouzam* supports their position because the Third Circuit also held that the district court lacked jurisdiction over a parallel habeas petition which made similar arguments (and which was consolidated with the petition for review upon appeal). *See* Dkt. 231 at 26–27 n.3 (citing *Khouzam*, 549 F.3d at 244–45). This misses the point. Plaintiffs cannot file, and have not filed, any "cause or claim under [CAT]," 8 U.S.C. § 1252(a)(4), precisely because Defendants have adopted a policy that blocks the creation of (and thus the review of) an administrative record on which such claims could be based. *Cf.* 549 F.3d at 245 (holding that the district court lacked jurisdiction because the petitioner "challenge[d] the Government's termination of his deferral of removal based on diplomatic assurances"); *see also McNary*, 498 U.S. at 496 (finding a similar result "most unlikely").

To illustrate, imagine if there were a statute that withdrew courts of appeals' jurisdiction to hear challenges to criminal sentences based on the length of the sentence but simultaneously granted criminal defendants a right to appeal any sentence "of more than ten years" directly to the Supreme Court. (To make this constitutional, presumably, any district court sentence could be reviewed by the Supreme Court upon a writ of certiorari.) Now, imagine that a district court sentenced a defendant to prison "until further order of the Court." That defendant would *not* have a right to directly appeal their sentence to the Supreme Court because it is not a sentence "of more than ten years." However, he *would* be able to seek review in a court of appeals based on the district court's procedural failure to assign a duration to his sentence. That appeal would be permissible both because it would not be a challenge based on the length of his sentence and because the district court's action would otherwise deprive him of the opportunity to appeal his sentence to the Supreme Court (if it ultimately meets the durational element). Likewise, here, Defendants have foreclosed noncitizens' ability to seek review of any CAT claim by withholding all of the jurisdictionally relevant information. Review of that deprivation is fundamentally unlike a challenge to the "termination of [CAT relief]," as addressed in *Khouzam*, 549 F.3d at 245, and properly belongs in the district court as review of agency action.

Add.069

evidence demonstrating that the purported assurance is real (if not the actual assurance itself, reduced to some form of writing).  Alternatively, one might reasonably question whether, as a matter of law, a given assurance is "consistent with Article 3 of the Convention Against Torture," credited or not.[93]  *See* 8 C.F.R. § 208.18(c)(2).

Adjudicating such claims would not require courts to "second-guess" the Executive's judgment.  *Cf. Munaf v. Geren*, 553 U.S. 674 (2008).  Again, Defendants' argument is essentially that, under the March Guidance, the Government is predestined to win on *any* third-country CAT challenge, such that it "makes no sense" to allow noncitizens to raise such claims in the first place.  Dkt. 231 at 27.  But it is easy to imagine purely legal challenges that implicate no executive judgment.  For example, if a country were to (reliably, from the Executive's point of view) assure the United States that it would "do no worse to an individual removed there than force him to work in a hard labor camp," the sufficiency of that assurance would present a question of law, not judgment, for an immigration court and, ultimately, for a court of appeals to determine: would forcing the individual to work in a "hard labor camp" constitute "torture" under CAT, such that the assurance, even properly credited, fails to satisfy 8 C.F.R. § 208.18(c)?[94]

The point is sufficiently made because the mere existence of plausible, viable CAT claims defeats Defendants' argument that the March Guidance, in and of itself—absent any way of verifying whether or how that Guidance is being followed—satisfies due process.  Yet, to

---

[93] Of course, as with the pre-removal decision regarding a noncitizen's risk of persecution, required under section 1231(b)(3), it is difficult to imagine how any individualized determination could be meaningful without input from the noncitizen himself.  *Cf. supra* Section III(B)(4)(a).  In *Khouzam*, the petitioner's oppressed religious beliefs were at least already a matter of record.  *See* 549 F.3d at 238–40.  But in many cases, DHS will simply not have the relevant information, either because that information has changed or because it was not part of the original proceedings.

[94] It appears that the answer is generally that it depends.  *See, e.g., Ke Da Fu v. Holder*, 447 F. App'x 780, 782 (9th Cir. 2011) ("The generally harsh and degrading conditions in Chinese prisons and labor reeducation camps do not in and of themselves constitute torture.").

Add.070

appreciate the very broad swath of claims that would be lost, and thus the weight this factor bears under the *Mathews* analysis, it is necessary to go further and push back on Defendants' claim that, "when the Executive determines a country will not torture a person on his removal, that is conclusive." Dkt. 231 at 26 (first citing *Munaf*, 553 U.S. at 702–03; and then citing *Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009), *cert. denied*, 559 U.S. 1005 (2010)).

To begin, the claim is demonstrably, obviously wrong. The Executive routinely "determines a country will not torture a person on his removal." *See id.* This happens every time an immigration court denies CAT relief. *See* 8 U.S.C. § 1101(b)(4) ("The term 'immigration judge' means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review."). Those decisions are not, as Defendants claim, "conclusive." *See* Dkt. 231 at 26. Rather, they are reviewable, by Congressional mandate, in courts of appeal. 8 U.S.C. § 1252(a)(4). Indeed, there they are routinely reviewed for procedural and substantive errors. *See, e.g.*, *Fleurimond v. Bondi*, 157 F.4th 1, 6 (1st Cir. 2025) (remanding CAT claim for further consideration).

The availability of CAT relief to every member of the class immediately distinguishes their situation from the unsuccessful habeas petitioners in *Munaf* and *Kiyemba*. Neither of those cases involved removal in the immigration context. Indeed, both feature unusual and inapposite facts: *Munaf* concerned American citizens who were detained by a U.S.-led, "international coalition" in Iraq pending Iraqi prosecution for violating Iraqi law, 533 U.S. at 679–80; *Kiyemba* concerned wartime detainees, held at Guantanamo Bay, with "no cognizable interest against being moved . . . to a foreign country," *Doe v. Mattis*, 889 F.3d 745, 762 (D.C. Cir. 2018) (distinguishing *Kiyemba*, 561 F.3d at 515–16). Both the Supreme Court and D.C. Circuit explicitly distinguished circumstances where FARRA might apply. In *Munaf*, the Supreme Court was careful to clarify

69

that no claim had been raised under CAT and expressed "no opinion" as to the hypothetical viability of such claims.  553 U.S. at 703 & n.6.  Notably, to the extent the *Munaf* Court expressed any doubt about the facial viability of potential CAT claims, their focus was on whether FARRA applied to "the [intra-country] transfer of an individual located in Iraq to the Government of Iraq" and whether a CAT claim could be asserted in habeas proceedings, rather than on the Executive's supposed predetermination of the issue.  *See id.*  In *Kiyemba*, the D.C. Circuit focused on the same, concluding that a group of petitioners could not raise CAT claims in habeas.  561 F.3d at 514–15.  Of course, Plaintiffs here would not be raising CAT claims in habeas proceedings but, as the *Kiyemba* court said they must, in immigration proceedings, *see id.*, if only Defendants would tell them where they are going.

The Court has lingered on these two cases because Defendants raise them, but that should not be mistaken for affirming their relevance.  Neither *Munaf* nor *Kiyemba* supports the argument Defendants are implicitly making, and that the Third Circuit explicitly rejected in *Khouzam*: "that [CAT claims] are non-justiciable under the so-called 'rule of non-inquiry'":

70

When it applies, this doctrine bars courts from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters. *See Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006). However, it has traditionally been applied only in the extradition context. *See, e.g.*, *Mironescu v. Costner*, 480 F.3d 664, 668–70 (4th Cir. 2007); *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005); *Hoxha*, 465 F.3d at 563; *United States v. Kin-Hong*, 110 F.3d 103, 111 (1st Cir. 1997); *In re Smyth*, 61 F.3d 711, 714 (9th Cir. 1995); *In re Howard*, 996 F.2d 1320, 1329 & n. 6 (1st Cir. 1993); *In re Manzi*, 888 F.2d 204, 206 (1st Cir. 1989). In fact, we routinely evaluate the justice systems of other nations in adjudicating petitions for review of removal orders. *See, e.g.*, [*Pierre v. Att'y Gen. of U.S.*, 528 F.3d 180, 186–90 (3d Cir. 2008)]; *Auguste v. Ridge*, 395 F.3d 123, 129, 152–54 (3d Cir. 2005); *Chang v. INS*, 119 F.3d 1055, 1060–68 (3d Cir. 1997). The Second Circuit did as much in 2004 when it found that Khouzam was likely to be arrested and tortured if removed to Egypt. [*Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004)]. Furthermore, we have expressly reserved the possibility that, even in the extradition context, the rule of non-inquiry would not apply if an alien raises a CAT claim. *Hoxha*, 465 F.3d at 564–65. The Fourth Circuit has held that it does not. *Mironescu*, 480 F.3d at 670–73.

549 F.3d at 253–54.

The Executive's own past statements about its obligations under FARRA provide "one more reason yet to question whether [Defendants'] current position represents the best view of the law." *See Bittner v. United States*, 598 U.S. 85, 97 (2023) ("[C]ourts may consider the consistency of an agency's views when . . . weigh[ing] the persuasiveness of any interpretation it proffers in court."). Starting in 1999, when the Department of Justice announced FARRA's regulations, it referred to "rare" "cases" (rather than whole countries) where assurances might be relied upon and stated that such "cases . . . will receive consideration at senior levels within the Department of Justice, which is appropriate to the delicate nature of a diplomatic undertaking to ensure that *an alien* is not tortured in another country."[95]  Then, in 2005, then-Attorney General Gonzales was asked by the Senate Judiciary Committee whether he "really" believed that "the assurances we get from countries that are known to be torturers . . . are credible" and answered that it "requires . . . a

---

[95] *Regulations Concerning the Convention Against Torture*, 64 Fed. Reg. 8478, 8484 (Feb. 19, 1999).

case-by-case analysis."[96]    Then, in 2011, the DHS Inspector General published a report on the

Government's practices with respect to diplomatic assurances under CAT and stated that there

"appear[ed] to be a consensus within DHS that assurances need to be fact-specific"; that "[b]y

their nature, assurances are fact-dependent and ad hoc"; that "[c]onsequently, DHS approaches

them on an ad hoc basis"; and that "the risk analysis as to likelihood of torture in light of assurances

depends on various factors," including "the reasons the *particular alien* would be at risk of

torture."[97]    To put an even finer point on it, the DHS Inspector General reported: "The consensus

was that assurances need to be and are case specific, not country specific."[98]

In sum, the March Guidance extinguishes valid challenges to third-country removal by

effecting removal before those challenges can be raised.[99]    And Defendants' fatalistic

argument—that those claims would necessarily fail—is wrong.    The March Guidance does nothing

to safeguard claims against violations of section 1231(b)(2) and its regulations.    And with respect

to CAT claims, the best one could say is that it is insufficient.

### (3)    The "High Bar" to Relief

More generally, Defendants argue that the risk of erroneous deprivation is "undermined by

the high bar that Plaintiffs must meet in order to prevail on their potential fear claims."    Dkt. 231

at 34.    This is a breathtaking argument—that, because the bullseye is small, there is nothing wrong

---

[96] *Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 10 (2005) (first quoting Senator Patrick Leahy).

[97] *DHS Detainee Removals and Reliance on Assurances*, *supra* note 91, at 1, 5, 20 (emphasis added).

[98] *Id.* at 20.    Further demonstrating that the assurances themselves are meant to be specific to the individual, the DHS Inspector General reported that "[t]he Department of State would not approach a country about assurances until the alien ha[d] been granted CAT protection."    *Id.* at 14.    By contrast, Defendants now assert that they may seek assurances before they even know who will be impacted.

[99] Although the Court has already settled the issue of statutory withholding, *see supra* Section III(B)(4)(a), it bears mentioning that there is no legal basis whatsoever to pre-extinguish those claims with diplomatic assurances. *See* 8 U.S.C. § 1231(b)(3)(C) (requiring that a "trier of fact shall determine whether the alien has sustained the alien's burden . . . in the manner described in [8 U.S.C. § 1158(b)(1)(B)(ii)–(iii), concerning asylum applications]").

Add.074

with stealing the archer's bow.  While Defendants are undoubtedly correct that the standard for CAT claims is exacting, *see, e.g.*, *Settenda v. Ashcroft*, 377 F.3d 89, 96 (1st Cir. 2004) (affirming denial of CAT relief predicated on "alarming . . . prison conditions in Uganda" because those conditions were the result of "inadequate funding" rather than an "'inten[t] to inflict severe physical or mental pain or suffering'" (quoting 8 C.F.R. § 208.18(a)(5))), "[t]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions," *Gonzalez-Fuentes*, 607 F.3d at 894 (quoting *Carey*, 435 U.S. at 266). "This means that courts should take . . . , 'an *ex ante* perspective on the right to due process hearings.'" *Id.* (quoting *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 944 (10th Cir. 2003)). The simple reality is that nobody knows the merits of any individual class member's claim because Defendants are withholding the predicate fact: the country of removal.

Overall, Defendants' risk-of-erroneous-deprivation arguments favor quantity over quality. Plaintiffs' prior process as to different countries of removal is irrelevant, and it is no defense to a procedural due process claim that the underlying right is difficult to vindicate.  The March Guidance is inadequate as to CAT claims and offers no protection against Defendants' violating Plaintiffs' rights to be removed, in the first instance, pursuant to their order of removal—indeed, it appears to explicitly condone such violations.  Under these circumstances, the Court considers the risk of erroneous deprivation to be high and likewise weighs this factor in Plaintiffs' favor.

### (C)    Government's Interest

Finally, the Court considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *See Mathews*, 424 U.S. at 335.  Defendants correctly highlight that the Government has a "weighty" interest in the "efficient administration of the immigration laws," particularly since "control over matters of immigration is a sovereign prerogative." *Plasencia*, 459 U.S. at 34.

Add.075

Of course, the Government's interest in efficiency is tempered by the stark realities of torture, in which it has no legitimate interest. Indeed, militating somewhat in the opposite direction, Congress has expressed a specific interest in avoiding such results, even where it might not necessarily be convenient:

> It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.

Pub. L. No. 105–277, § 2242(a). Congress has further substantiated its interest in not abetting torture by mandating relief where appropriate. *Moncrieffe*, 569 U.S. at 187 n.1. Defendants admonish that "the Due Process Clause . . . does not extend to impos[e] procedures that merely displace congressional choices of policy." Dkt. 231 at 32 (quoting *Plasencia*, 459 U.S. at 34–35). Yet, it does not honor "congressional choices of policy," *id.*, to exploit a statute's silence to extinguish its purpose.

Admitting these reservations, the Court recognizes that the Government has some interest in streamlining the process by which noncitizens challenge third-country removals. The practical difficulties in facilitating deportation, with which courts have limited experience, are real and, when insurmountable, can lead to a noncitizen's becoming paradoxically "removable-but-unremovable." *Jama*, 543 U.S. at 347. And even where removal is ultimately achieved, prolonged proceedings may strain limited government resources.

"But the Constitution recognizes higher values than speed and efficiency." *Stanley v. Illinois*, 405 U.S. 645, 656 (1972). "Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." *Id.*

Add.076

Accordingly, although the "establishment of prompt efficacious procedures to achieve legitimate . . . ends is a proper [governmental] interest worthy of cognizance in constitutional adjudication," *id.*, the Court finds the liberty interests at stake here too weighty and the risk of their erroneous deprivation too great.  On balance, the *Mathews* factors weigh in Plaintiffs' favor.

## IV.  Remedy

As judgment, Plaintiffs seek declaratory relief and vacatur of the March Guidance.[100] Dkt. 193.  Merits aside, Defendants do not dispute that a declaration of the parties' rights and obligations is generally available as a remedy for this type of claim.[101]  *See* Dkt. 231 at 38.

As to vacatur, Defendants argue that it runs afoul of the remedial limitation in section 1252(f)(1)—which removes courts' "authority to enjoin or restrain" the "operation of" certain immigration statutes "other than with respect to . . . an individual alien," 8 U.S.C. § 1252(f)(1)—because, according to Defendants, vacatur is "still coercive."  Dkt. 231 at 38.

---

[100] Plaintiffs requested that the Court enter partial final judgment on Counts I, III, and IV, upon which they moved for summary judgment.  Dkt. 193 at 1–2.  However, because all claims are now resolved, the Court will enter complete and final judgment.  In their complaint, Plaintiffs also request costs and reasonable attorney fees.  Compl. at Prayer for Relief ¶ (n).  Any such request should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

[101] In a footnote, Defendants state their belief that declaratory relief must be "properly crafted—that is, . . . not compel or purport to compel the government to operate the covered provisions in a particular way."  Dkt. 231 at 38 n.7 (citing Supp. Br. For The Petitioners, *Biden v. Texas*, 597 U.S. 785, at 11–13, 22 (May 9, 2022) (No. 21-954)). In general, "arguments raised only in a footnote or in a perfunctory manner are waived."  *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).  In this case, Defendants' implied argument also fails on the merits.  In *Biden v. Texas*, the Government took the position (which Defendants now incorporate by reference) that section 1252(f)(1) barred certain "class-wide declaratory relief," including where the class consisted of "noncitizens in removal proceedings."  *See* Supplemental Brief for the Petitioners, *Biden v. Texas*, 597 U.S. 785, at 13–14 (May 9, 2022) (No. 21-954).  "If such relief were permissible," the Government argued, "'every single member of the class' could, and potentially would, 'immediately seek an injunction grounded on the authority of the declaratory judgment'—even before appellate proceedings had concluded."  *Id.* (quoting *Alli v. Decker*, 650 F.3d 1007, 1020 n.2 (3d Cir. 2011) (Fuentes, J., dissenting)).  The Supreme Court did not adopt the argument.  *See Biden v. Texas*, 597 U.S. at 798 (holding that section 1252(f)(1) applied only to a "specific category of remedies" and stating that the provision's "title—'Limit on injunctive relief'—makes clear the narrowness of its scope").  The First Circuit has, moreover, squarely rejected it.  *Brito v. Garland*, 22 F.4th 240, 251–52 (1st Cir. 2021).

75

Defendants' argument ignores the plain text of the statute, which specifically and exclusively refers to courts' "authority to *enjoin* or *restrain*."  8 U.S.C. § 1252(f)(1) (emphases added).  "The most sensible way to give operative effect to both words in this statutory scheme is to treat the word 'enjoin' as referring to permanent injunctions and the word 'restrain' as referring to temporary injunctive relief."  *Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003).  "Congress . . . included that language in a provision whose title—'Limit on injunctive relief'—makes clear the narrowness of its scope."  *Biden v. Texas*, 597 U.S. 785, 798 (2022); *see also Brito*, 22 F.4th at 251–52 (distinguishing more expansive language in the statute) ("In so holding, we reach the unremarkable conclusion that Congress meant only what it said – and not what it did not say.").[102]

Defendants' functional argument fares no better, as it ignores the "meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'"  *See Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).  Vacatur "act[s] directly against the challenged agency action," *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring) (quoting J. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018)), whereas "'an injunction is a judicial process or mandate operating *in personam*' . . . directed at someone, and govern[ing] that party's conduct," *Nken v. Holder*, 556 U.S. 418, 428 (2009) (quoting *Black's Law Dictionary* 800 (6th ed. 1990)).  "Apart from the constitutional or statutory basis on which the

---

[102] In *Brito v. Garland*, 22 F.4th 240 (1st Cir. 2021), the First Circuit held that 1252(f)(1) does not preclude declaratory relief.  *Id.* at 250–52.  This is notable because declaratory judgment suits are "essentially an equitable cause of action . . . analogous" to causes of action historically available in chancery courts.  *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943).  Thus, the *Brito* court found that section 1252(f)(1)—which again is titled "Limit on injunctive relief"—distinguishes among types of *equitable* relief, of which it held "injunctive relief" was the only relevant subset.  *See* 22 F.4th at 251 (contrasting section 1252(f)(1) with section 1252(e)(1), which prohibits, with respect to expedited removal orders, "declaratory, injunctive, *or other equitable relief*" (emphasis added) (quoting 8 U.S.C. § 1252(e)(1)).  By contrast, vacatur, though also a creature of statute in its modern form, has its roots in the "use of the so-called prerogative writs," *Norton*, 542 U.S. at 63, historically available not in equity but at law, *see* S.A. de Smith, *The Prerogative Writs*, 11 Cambridge L.J. 40, 52 (1951).  Thus, even if one were to read section 1252(f)(1) to disallow all equitable remedies—contrary to *Brito*—vacatur would still be permitted.

76

court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Texas*, 40 F.4th at 220. Thus, it need not inspire the same concern as to separation-of-powers or enforcement.

Accordingly, the Court will issue declaratory relief and vacate the March Guidance as "not in accordance with law." 5 U.S.C. § 706(2)(A).

## V.    **Stay**

Defendants ask the Court to stay judgment pending appeal. Dkt. 231 at 24. The Court will grant Defendants' request in narrow part and stay its judgment for fifteen days. In that time, Defendants will have the opportunity to move for further stay in the First Circuit.

Under normal circumstances, the Court would be hard-pressed to justify granting Defendants' request. "A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result.'" *Nken*, 556 U.S. at 427 (internal citation omitted) (first quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam); and then quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)). The relevant factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The last two factors "merge when the Government is the opposing party." *Id.* at 435.

The Court does not find here that the law favors Defendants, as set forth with exhaustion above. Likelihood of success is the "sine qua non" of the stay standard. *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) (quoting *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)). That might end the inquiry.

77

Yet, the Court is forced to wrestle with the fact that the Supreme Court did previously stay the preliminary injunction, relying on the same *Nken* factors, presumably weighing likelihood of success, though on different claims and seeking different relief. *See D.V.D. II.*, 145 S. Ct. at 2153. Ultimately, this Court could be missing something in the final analysis. However, at this juncture, the Court cannot say that Defendants have "made a strong showing that [they] [are] likely to succeed on the merits." *Nken*, 556 U.S. at 434.

In some broad sense, one could say that Defendants will be injured absent a stay. "'Any time' that the Government is 'enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 4 (2025) (Kavanaugh, J., concurring) (internal quotation marks omitted) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 835 (2025)).

Of course, in this instance, there is no injunction, so the Government will not be "enjoined." *Cf. id.* And the Government "cannot suffer harm" from "merely end[ing] an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Nevertheless, the Court views this factor with a broad eye, particularly given the Government's "weighty" interest in the "efficient administration of the immigration laws." *See Plasencia*, 459 U.S. at 34.

As to the final two factors, the Supreme Court has recognized a general tension between the public's interests "in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," and, conversely, in the "prompt execution of removal orders." *See Nken*, 556 U.S. at 436. In this litigation, Defendants have argued that this tension breaks in their favor because the case involves "some of the worst of the worst illegal aliens in this country." Brief for Appellants at 2, *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. July 10, 2025).

78

Add.080

But Defendants' incendiary gloss—focused on those class members whose "countries of origin are . . . unwilling to take them back," *id.* at 3—ignores a different subset: those who were previously granted protection from being sent back to their home countries.  From the beginning, DHS's third-country removal policy has targeted these individuals, many of whose personal characteristics make them targets of persecution and oppression around the globe.  Indeed, the starting point for this entire case was DHS's February Directive, which featured a section titled, "Aliens Granted Withholding of Removal or CAT Protection," and directed officers to determine whether noncitizens "granted such protections . . . should be re-detained" for third-country removal.  Dkt. 1-4 at 2.

An account of nine such class members, deported to Cameroon in January, was reported just days ago:

> Among those now in the [Cameroonian] compound are people who said they escaped imprisonment for their political beliefs, survived wars and fled countries where their sexual orientations are criminalized.  When officials from the United Nations' International Organization of Migration, which is handling their cases, visited, the deportees say the officials told them there was no support for them to receive asylum in Cameroon.  They felt that their sole option was to return to their home countries.
>
> . . .
>
> Many of those deported in Cameroon said going back would be life-threatening.  A 32-year-old woman from Ghana who fled persecution for her sexual orientation said she came to the U.S. for protection, because she has faced murder threats from members of her family and community.  She added the Cameroonian government has treated their deportation there as a matter of transit, urging them to go back to their home countries.

Pranav Baskar & Hamed Aleaziz, *U.S. Deports Nine Migrants in Secret, Ignoring Legal Protections*, N.Y. Times (Feb. 14, 2026), https://www.nytimes.com/2026/02/14/world/africa/us-secret-deportation-cameroon.html [https://perma.cc/FA6A-L3DP].  "Their lawyers said none of the deportees had any history of violent crime." *Id.*

Add.081

Of course, to witness this point, the Court need have looked no further than Plaintiff O.C.G., who likewise has no known criminal history, and who was granted withholding of removal from Guatemala based on sexual violence he experienced there. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 405. In response to his being granted that protection, Defendants threw him on a bus to Mexico, where he had just been raped, and where he was quickly sent back to Guatemala, the place an immigration judge had just found he would likely be persecuted. *Id.* And then Defendants lied about it. *Id.*

Under these extraordinary circumstances, the Court will exercise its discretion and stay the judgment for fifteen days to allow the First Circuit time to decide if a further stay is warranted.

## VI.    Conclusion

For the foregoing reasons, the April 18, 2025 preliminary injunction, Dkt. 64, is DISSOLVED. Defendants' motion to dismiss is GRANTED in part. Counts II and III are DISMISSED. Counts V and VI, including all claims against Defendant Antone Moniz, are DISMISSED without prejudice. Plaintiffs' motion for summary judgment against the remaining Defendants is GRANTED as to Counts I and IV. Judgment will enter for Plaintiffs as follows:

1. The Court DECLARES that 8 C.F.R. § 1240.12(d) requires Defendants, before effecting removal of a class member to any third country, to first seek removal to that class member's designated country of removal or specified alternative country or countries of removal, as provided in that class member's final order of removal.

2. The Court DECLARES that 8 U.S.C. § 1231(b) requires Defendants, before effecting removal of a class member pursuant to 8 U.S.C. § 1231(b)(2)(E), to first seek removal to that class member's designated country of removal or country or countries of citizenship, if any.

3.  The Court DECLARES that class members have the right to meaningful notice before removal to any third country.

4.  The Court DECLARES that class members have the right to a meaningful opportunity to raise a country-specific claim against removal before removal to any third country.

5.  The Court DECLARES that Defendants' third-country removal policy, as embodied in DHS's March 30, 2025 memorandum, titled "Guidance Regarding Third Country Removals," and ICE's July 9, 2025 memorandum, titled "Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)," is unlawful and SETS ASIDE that policy.

6.  This JUDGMENT is STAYED until fifteen days from date of issuance or until the First Circuit rules on any motion for an administrative stay or stay pending appeal, whichever occurs first.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated: February 25, 2026                    Judge, United States District Court

Add.083

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| D.V.D., et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **25-10676-BEM** |
| | ) | |
| **DEPARTMENT OF HOMELAND** | ) | |
| **SECURITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**FINAL JUDGMENT**

**MURPHY, J.**

For the reasons stated in the Court's Memorandum and Order on Defendants' Motion to Dismiss and on Plaintiffs' Motion for Partial Summary Judgment, Dkt. 241, it is hereby ORDERED, ADJUDGED, and DECREED:

1.     Judgment is ENTERED as to Counts I and IV in favor of Plaintiffs D.V.D., M.M., E.F.D., and O.C.G., individually and on behalf of all individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the Immigration and Nationality Act (including withholding-only proceedings) whom the Department of Homeland Security has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

2.     The Court DECLARES that 8 C.F.R. § 1240.12(d) requires Defendants, before effecting removal of a class member to any third country, to first seek removal to that class

Add.084

member's designated country of removal or specified alternative country or countries of removal, as provided in that class member's final order of removal.

3.      The Court DECLARES that 8 U.S.C. § 1231(b) requires Defendants, before effecting removal of a class member pursuant to 8 U.S.C. § 1231(b)(2)(E), to first seek removal to that class member's designated country of removal or country or countries of citizenship, if any.

4.      The Court DECLARES that class members have the right to meaningful notice before removal to any third country.

5.      The Court DECLARES that class members have the right to a meaningful opportunity to raise a country-specific claim against removal before removal to any third country.

6.      The Court DECLARES that Defendants' third-country removal policy, as embodied in DHS's March 30, 2025 memorandum, titled "Guidance Regarding Third Country Removals," and ICE's July 9, 2025 memorandum, titled "Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)," is unlawful and SETS ASIDE that policy.

7.      This JUDGMENT is STAYED until fifteen days from date of issuance or until the First Circuit rules on any motion for an administrative stay or stay pending appeal, whichever occurs first.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated: February 25, 2026                Judge, United States District Court

2

Add.085

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| D.V.D., *et al.*, | ) ) | |
| Individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:25-cv-10676-BEM |
| v. | ) ) ) | |
| U.S. Department of Homeland Security, *et al.*, | ) ) | |
| Defendants. | ) ) ) ) | |

## DEFENDANTS' NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT

i

Add.086

## <u>NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT</u>

Notice is hereby given that the Defendants appeal to the United States Court of Appeals for the First Circuit from the Court's final judgment and memorandum granting Plaintiffs' partial motion for summary judgment (ECF Nos. 241, 242) entered in this action.

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

MATTHEW P. SEAMON
Senior Litigation Counsel

/s/*Mary L. Larakers*
MARY L. LARAKERS
(Texas Bar # 24093943)
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 353-4419
(202) 305-7000 (facsimile)
mary.l.larakers@usdoj.gov

1

Add.087

**<u>CERTIFICATE OF SERVICE</u>**

I, Mary Larakers, Senior Litigation Counsel, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ <u><em>Mary L. Larakers</em></u><br>
Mary L. Larakers<br>
Senior Litigation Counsel

Dated: February 27, 2026

2

Add.088