No. 26-1212

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

D.V.D.; M.M.; E.F.D.; O.C.G.,

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security (DHS); TODD BLANCHE, Acting United States Attorney General, ANTONE MONIZ, Superintendent of the Plymouth County Correctional Facility,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts

## CORRECTED JOINT APPENDIX

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

SARAH E. WELCH
*Counsel to the Assistant
Attorney General*

MATTHEW P. SEAMON
*Acting Assistant Director*

MARY L. LARAKERS
*Senior Litigation Counsel*
U.S. Department of
Justice, Civil Division
Office of Immigration
Litigation
P.O. Box 868,
Ben Franklin Station
Washington, DC 20044

# TABLE OF CONTENTS

### I.       Supreme Court Orders

Supreme Court Order Granting Stay of Preliminary Injunction...................... 1

Supreme Court Order Granting Defendants' Motion for Clarification ........ 20

### II.       Docket Entries

Plaintiffs' Complaint & Exhibits (ECF No. 1) ............................................. 30

Select Exhibits in Support of Plaintiffs' Motions for Class Certification, Temporary Restraining Order, Preliminary Injunction and Stay of Administrative Action, and Leave to Appear Under Pseudonyms (ECF Nos. 8-1 – 8-4, 8-8, 8-11, 8-12, 8-18, 8-22, 23).................................. 80

Exhibit in Support of Defendants' Opposition to Motion for Temporary Restraining Order, Preliminary Injunction, and Stay of Administrative Action (ECF No. 31-1) ....................................................................................... 109

Department of Homeland Security Guidance Regarding Third Country Removals (ECF No. 43-1) ....................................................................................... 117

Select Exhibit in Support of Plaintiffs' Opposition to Motion for an Indicative Ruling (ECF No. 50-9) ............................................................................... 119

Select Exhibits in Support of Plaintiffs' Reply in Support of Motions for Class Certification and Preliminary Injunction (ECF Nos. 59-9 – 59-16)........... 136

Order Granting Plaintiffs' Motion for a Preliminary Injunction and Class Certification (ECF No. 64) ......................................................................... 166

Select Exhibits in Support of Plaintiffs' Brief in Support of Joinder of the Department of Defense (ECF Nos. 99-2, 99-3).......................................... 214

Exhibit in Support of Defendants' Notice of Errata (ECF No. 103-1)....... 225

Select Exhibits in Support of Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction (ECF Nos. 112-1, 112-3) ................................................................................................ 231

Order Clarifying Preliminary Injunction (ECF No. 118) ........................... 248

Redacted Declaration of Plaintiff O.C.G. (ECF No. 123) ......................... 251

Memorandum and Order on Plaintiffs' Motion for Preliminary Injunction (ECF No. 132).................................................................................................. 254

Declaration of Simon Sandoval-Moshenberg and Exhibit (ECF Nos. 190, 190-1) ................................................................................................ 268

Select Exhibit in Support of Defendants' Motion to Quash and for Relief from Discovery (ECF No. 197-2)........................................................................ 271

Exhibit in Support of Plaintiffs' Opposition to Defendants' Motion to Stay Proceedings Pending Appeal (ECF No. 210-1)......................................... 276

Index, Exhibits, and Redacted Exhibits in Support of Plaintiffs' Reply in Support of Motion for Partial Summary Judgment and Opposition to Defendants' Motion to Dismiss (ECF Nos. 233 – 233-25).............................................................. 278

Defendants' Motion to Strike Plaintiffs' Exhibits Filed With Their Reply In Support of Their Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss (ECF No. 234).............................................................. 454

Plaintiffs' Notice of Supplemental Authority in Support of Their Motion for Partial Summary Judgment (ECF Nos. 240, 240-1)................................................ 463

Memorandum and Order on Defendants' Motion to Dismiss and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 241) ......................................... 495

Final Judgment (ECF No. 242).................................................................. 576

Defendants' Exhibits in Support of their Emergency Motion for a Stay Pending Appeal ............................................................................................... 578

### III.    <u>Transcripts</u>

Excerpts of Transcript of March 28, 2025 Hearing .................................... 598

Excerpts of Transcript of April 10, 2025 Hearing ..................................... 606
Excerpts of Transcript of May 21, 2025 Hearing ...................................... 620

### IV.    <u>Docket Report</u>

Docket Report March 30, 2026 ................................................................... 633

Cite as: 606 U. S. \_\_\_\_ (2025)    1

# SUPREME COURT OF THE UNITED STATES

No. 24A1153

DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* D.V.D., ET AL.

ON APPLICATION FOR STAY

[June 23, 2025]

The application for stay presented to JUSTICE JACKSON and by her referred to the Court is granted. The April 18, 2025, preliminary injunction of the United States District Court for the District of Massachusetts, case No. 25–cv–10676, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of the Court.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

In matters of life and death, it is best to proceed with caution. In this case, the Government took the opposite approach. It wrongfully deported one plaintiff to Guatemala, even though an Immigration Judge found he was likely to face torture there. Then, in clear violation of a court order, it deported six more to South Sudan, a nation the State Department considers too unsafe for all but its most critical personnel. An attentive District Court's timely intervention only narrowly prevented a third set of unlawful removals to Libya.

Rather than allowing our lower court colleagues to manage this high-stakes litigation with the care and attention

Appx.001

2                              DHS *v.* D.V.D.

SOTOMAYOR, J., dissenting

it plainly requires, this Court now intervenes to grant the
Government emergency relief from an order it has repeat-
edly defied.  I cannot join so gross an abuse of the Court's
equitable discretion.

I

A

Federal law generally permits the Government to deport
noncitizens found to be unlawfully in the United States only
to countries with which they have a meaningful connection.
8 U. S. C. §1231(b).  To that end, Congress specified two de-
fault options: noncitizens arrested while entering the coun-
try must be returned to the country from which they ar-
rived, and nearly everyone else may designate a country of
choice.  §§1231(b)(1)(A), (b)(2)(A).  If these options prove in-
feasible, Congress specified which possibilities the Execu-
tive should attempt next.  These alternatives include the
noncitizen's country of citizenship or her former country of
residence.  §§1231(b)(1)(C), (2)(E).

This case concerns the Government's ability to conduct
what is known as a "third country removal," meaning a re-
moval to any "country with a government that will accept
the alien."    §1231(b)(1)(C)(iv);  see  §1231(b)(2)(E)(vii).
Third-country removals are burdensome for the affected
noncitizen, so Congress has sharply limited their use.  They
are permissible only after the Government tries each and
every alternative noted in the statute, and determines they
are  all  "impracticable,  inadvisable,  or  impossible."
§§1231(b)(1)(C)(iv), (2)(E)(vii).

Noncitizens facing removal of any sort are entitled under
international and domestic law to raise a claim under the
Convention Against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, Dec. 10, 1984, S.
Treaty Doc. No. 100–20, 1465 U. N. T. S. 113.  Article 3 of
the Convention prohibits returning any person "to another
State where there are substantial grounds for believing

SOTOMAYOR, J., dissenting

that he would be in danger of being subjected to torture." The United States is a party to the Convention, and in 1998 Congress passed the Foreign Affairs Reform and Restructuring Act to implement its commands. The Act provides that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." §2242(a), 112 Stat. 2681–822, codified as note to 8 U. S. C. §1231. It also directs the Executive to "prescribe regulations to implement" the Convention. §2242(b), 112 Stat. 2681–822. Those regulations provide, among other things, that "[a] removal order . . . shall not be executed in circumstances that would violate Article 3." 28 CFR §200.1 (2024).

B

On February 18, 2025, the Department of Homeland Security (DHS) issued an internal guidance document directing immigration officers to "review for removal all cases . . . on the non-detained docket" and "determine the viability of removal to a third country." No. 1:25–cv–10676 (D Mass.), ECF Doc. No. 1–4, p. 2.

Just as DHS circulated this new policy, a Guatemalan man known in this litigation as O. C. G. appeared before an Immigration Judge to seek relief from his impending removal to Guatemala. O. C. G. explained that he had previously been forced to flee Guatemala after facing torture and persecution there for his identity as a gay man. See Dkt. 8–4, p. 1; ECF Doc. 1, p. 24. He fled initially to Mexico, he said, but had not found safety there, either: A group of men raped him and locked him in a room until his sister paid them a ransom. ECF Doc. 8–4, at 1. O. C. G. accordingly asked the judge whether he "could be deported to a country other than Mexico or Guatemala." *Ibid.* The Immigration

4                          DHS *v.* D.V.D.

Judge granted withholding of removal to Guatemala, the only country designated in the order of removal. *Id*., at 1–2; see also ECF Doc. 1, p. 25. Because the government had not sought to remove O. C. G. to Mexico, the Immigration Judge did not address his request for protection against removal there. ECF Doc. 8–4, at 1–2; ECF Doc., at 25.

Two days later, Immigration and Customs Enforcement escorted O. C. G. out of his cell and put him on a bus to Mexico. ECF Doc No. 8–4, at 2. On the way, they provided him with "oral notice that he would be removed to Mexico." See ECF Doc. 106–1, p. 3 (Defendants' Response to Requests for Admission). DHS did not issue a new order of removal designating Mexico, did not reopen the prior proceedings, and did not provide either O. C. G. or his lawyer with advance notice. *Id*., at 3–4. Mexican authorities promptly deported O. C. G. back to Guatemala, where he went into hiding. ECF Doc. 1, at 5.

Along with three noncitizens who feared that they, too, would imminently be whisked off to a "third country" without notice, O. C. G. filed this putative class action under the Administrative Procedure Act (APA) against DHS, Secretary Noem, and Attorney General Bondi. Plaintiffs alleged that the Government's apparent policy of removing noncitizens to a third country without notice or the opportunity to file a claim under the Convention violated the immigration laws, the regulations implementing the Convention, and the Fifth Amendment's Due Process Clause. Among other things, plaintiffs sought temporary and permanent injunctive relief preventing their own removal and the removal of putative class members without adequate notice and a "meaningful opportunity" to present a claim under the Convention. *Id*., at 37. Plaintiffs also requested that the Government return O. C. G. to the United States.

On March 28, 2025, the District Court entered a temporary restraining order (TRO) as to both the three individual plaintiffs who remained in the United States and a putative

SOTOMAYOR, J., dissenting

class of all individuals "subject to a final order of removal from the United States to a third country." ECF Doc. 34, p. 2. The order prohibited the defendants from removing the plaintiffs and putative class members to a third country without "written notice of the third country" and "a meaningful opportunity . . . to submit an application" for relief under the Convention. *Ibid.*

C

On March 30, DHS issued a second guidance document, which contained a two-step process for executing third-country removals. If a country provides the United States with what DHS believes to be "credible" "assurances that aliens removed from the United States will not be persecuted or tortured," then (the policy says) DHS may remove the noncitizen to that country without any process. See App. to Application for Stay of Injunction 54a–55a (App.) The Government says this policy permits DHS to change someone's "deportation country to Honduras . . . at 6:00 a. m., put [them] on a plane, and fl[y them] to Honduras" 15 minutes later. ECF Doc. No. 74, p. 12 (Tr. Apr. 10, 2025).

In the absence of credible "assurances" from a foreign country, the policy provides, "DHS will first inform the alien of" her impending removal. App. 55a. Even so, the policy prohibits officers from providing the noncitizen with an affirmative opportunity to raise her fear of torture. Only one who "states a fear of removal" unprompted will be given a screening interview, which will take place "within 24 hours of referral." *Ibid.* Those who cannot establish their eligibility for relief at the screening interview can apparently be deported immediately, without a chance to provide evidence or seek judicial review. See ECF Doc. 74, at 52–53.

Around the time it adopted this new policy, DHS arrested four putative class members covered by the TRO. As the Government admits, "DHS . . . typically arrests people to

6                            DHS *v.* D.V.D.

remove them." ECF Doc. 101, p. 39 (Tr. Apr. 28, 2025). Indeed, DHS promptly transferred the four arrested class members to Guantanamo Bay. *Id.,* at 29.

Notwithstanding the TRO's express prohibition on third-country removals without notice or process, on March 31, the Government placed all four class members held in Guantanamo Bay on a Department of Defense flight to El Salvador.[1]

At a subsequent hearing, an attorney for the Government claimed DHS had not violated the TRO because the Department of Defense had conducted the removals. According to the agreement that governs the relationship between DHS and the Department of Defense at Guantanamo Bay, however, DHS "has legal custody" of noncitizens detained at Guantanamo Bay "and is responsible for the custody of detained aliens for administrative purposes related to immigration law violations." ECF Doc. 99–1, p. 2. DHS also remains "responsible for the [noncitizens'] physical custody" at Guantanamo Bay, and for any immigration-related "transfers, releases, and removals." *Id.*, at 3. By contrast, the Department of Defense merely provides security and logistical support consistent with DHS's "guidance." *Id.*, at 4.

The Government was unable to reconcile its representations to this evidence. Nor could it explain "[w]hat authority" the Department had "to effectuate a deportation." ECF Doc. 101, at 37.

## D

On April 18, the District Court granted the plaintiffs' motion for class certification and for a preliminary injunction,

———————

[1] Other class members may have been removed to El Salvador as well, but the Government declined to respond to four consecutive requests for information from class counsel seeking clarification. See ECF Doc. 101, at 27. This is presently the subject of discovery in the District Court. See ECF Doc. 88.

SOTOMAYOR, J., dissenting

holding that the plaintiffs had shown the Government's process for conducting third-party removals likely violated the Due Process Clause.  The injunction requires the Government to provide noncitizens with written notice in advance of a third-country removal (as is statutorily required, see *infra*, at 15), along with a meaningful opportunity to raise a claim under the Convention.  ECF Doc. 64, pp. 46–47.

 On May 7, plaintiffs' counsel received news reports "announcing the imminent removal of . . . Laotian, Vietnamese, and Philippine class members . . . to Libya," again without notice or an opportunity to object.  ECF Doc. 89, p. 2.  Plaintiffs thus sought emergency relief from the district court.  That same day, the court issued an order "clarif[ying]" its preliminary injunction so as to leave no doubt that "the allegedly imminent removals . . . would clearly violate" the preliminary injunction.  ECF Doc. 91, pp. 1–2.  That order narrowly averted the deportations.

 Had the court not acted, 13 class members would have landed in Tripoli in the midst of violence caused by opposition to their arrival.  Secretary of State Marco Rubio later averred in a sworn affidavit that "Libya's Government of National Unity (GNU) publicly rejected the use of Libyan territory for accepting deportees," as did "rival authorities based in Benghazi."  App. 71a.  Indeed (he explained) the "public reports of potential migration removals to Libya" had caused such unrest that "GNU-aligned forces took action against the two largest armed groups in the Libyan capital on May 12–13, sparking the most serious street fighting in Tripoli since 2022."  *Ibid.*  Contemporary news reports confirm these armed clashes.  See, *e.g.*, Armed Clashes Erupt in Libya's Tripoli After Reported Killing of Armed Group Leader, Reuters, May 12, 2025.

 Less than two weeks later, plaintiffs' counsel received reports of plans for yet more unannounced third-country removals, this time to South Sudan.  ECF Doc. 111.  At an

8                                DHS *v.* D.V.D.

SOTOMAYOR, J., dissenting

emergency hearing, Government lawyers confirmed that several class members were indeed *en route* to South Sudan after having received less than 24 hours' notice of their impending deportations.  By the time of the hearing, "DHS believe[d] that the plane [could not] be turned around," but was unwilling to share its location.  ECF Doc. 126, pp. 10, 17 (Tr. May 20, 2025).  Attorneys for the government also could not confirm whether "the pilot of the plane and the staff onboard" were aware of the District Court's preliminary injunction prohibiting the removals.  *Id.*, at 16–17.

More details emerged the next day.  At approximately 5:45 on the evening of May 19, DHS provided six inmates of an immigration detention facility with a document indicating that they would be removed to South Sudan.  See ECF Doc. 145, p. 11 (Tr. May 21, 2025).  At 9:35 a.m. the next morning, DHS removed them from their cells and put them on a flight.  *Id.*, at 16.  Short of the noncitizens "yelling at any of the jailers that they were afraid to go to South Sudan" (as the District Court put it), *id.*, at 13, DHS did not offer the noncitizens an opportunity to assert a claim under the Convention.[2]

The District Court found that DHS had "unquestionably" violated its order.  *Id.*, at 12.  Nonetheless, at the Government's request, the court permitted the Government to provide the requisite process in South Sudan, and it did not order the class members' return to the United States.  See *id.*, at 21, 86, 96.

Meanwhile, discovery proceeded on the status of O. C. G., the Guatemalan man with whom this case began.  The Government had previously attested that, before O. C. G.'s removal, an officer had asked him whether he was afraid of

_____

[2] Notably, days before the plaintiffs filed this suit, the administration "ordered the departure of non-emergency U. S. Government employees from South Sudan," due to risks posed by "armed conflict" and "fighting between various political and ethnic groups."  Dept. of State, South Sudan Travel Advisory (Mar. 8, 2025).

SOTOMAYOR, J., dissenting

returning to Mexico, and O. C. G. had responded that he was not. On the eve of that officer's deposition, however, the Government submitted an "errata sheet" admitting the information had been false. See ECF Doc. 103–1, p. 2; ECF Doc. 105, pp. 2–3. Because O. C. G. had been removed to Mexico without notice or an opportunity to file a claim under the Convention, the District Court ordered the Government to facilitate his return. The Government eventually agreed to comply with that order. See ECF Doc. 143.

The Government has appealed the merits of the preliminary injunction to the First Circuit, where briefing is ongoing. Pending that appeal, it seeks permission to continue its practice of conducting third-country removals without notice. Both the District Court and the First Circuit denied that request. The Government now asks this Court for an emergency stay of the preliminary injunction.

## II

This Court "will grant a stay pending appeal only under extraordinary circumstances," *Ruckelshaus* v. *Monsanto, Co.*, 463 U. S. 1315, 1316 (1983) (Blackmun, J., in chambers), especially where two lower courts have already denied such relief, *Packwood* v. *Senate Select Comm. on Ethics*, 510 U. S. 1319, 1320 (1994) (Rehnquist, C. J., in chambers). Ordinarily, the Court considers the likelihood of irreparable harm to the applicant absent emergency intervention, the applicant's likelihood of success on the merits of an appeal to this Court, and the equities. See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*); see also *Nken* v. *Holder*, 556 U. S. 418, 434 (2009).

## A

"[B]egin with the basic proposition that all orders and judgments of courts must be complied with promptly." *Maness* v. *Meyers*, 419 U. S. 449, 458 (1975). This Court often reiterates that "'[a] stay is not a matter of right,'" but "an exercise of judicial discretion." *Scripps-Howard Radio, Inc.*

v. *FCC*, 316 U. S. 4, 10 (1942); see also *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 24 (2008). That is so because stays are equitable remedies, which courts may (but need not) grant in order to resolve ongoing emergencies and "'clear away all intermediate obstructions against complete justice.'" *Hipp* v. *Babin*, 19 How. 271, 274 (1857).

For centuries, courts have "close[d] the doors" of equity to those "tainted with inequitableness or bad faith relative to the matter in which [they] see[k] relief." *Precision Instrument Mfg. Co.* v. *Automotive Maintenance Machinery Co.*, 324 U. S. 806, 814 (1945); see generally T. Anenson, Announcing the "Clean Hands" Doctrine, 51 U. C. D. L. Rev, 1827 (2018) (reviewing this doctrine's long history). That principle, "rooted in the historical concept of [the] court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith," ensures that courts do not become "'abettor[s] of inequity.'" *Precision Instrument*, 324 U. S., at 814.

Here, in violation of an unambiguous TRO, the Government flew four noncitizens to Guantanamo Bay, and from there deported them to El Salvador. Then, in violation of the very preliminary injunction from which it now seeks relief, the Government removed six class members to South Sudan with less than 16 hours' notice and no opportunity to be heard. The Government's assertion that these deportations could be reconciled with the injunction is wholly without merit. Notice at 5:45 p.m. for a 9:35 a.m. deportation, provided to a detainee without access to an attorney, plainly does not "'affor[d]'" that noncitizen with "'a reasonable time'" to seek relief. *A. A. R. P.* v. *Trump*, 605 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 4).

Even if the Government's overnight notice had been adequate, moreover, DHS also did not provide the required "meaningful opportunity . . . to raise a fear of return" under the Convention. ECF Doc. 64, at 46. The affected class

SOTOMAYOR, J., dissenting

members lacked any opportunity to research South Sudan, to determine whether they would face risks of torture or death there, or to speak to anyone about their concerns. Instead, they were left in their cells overnight with no chance to raise a claim and deported the next morning.

The Government thus openly flouted two court orders, including the one from which it now seeks relief. Even if the orders in question had been mistaken, the Government had a duty to obey them until they were "'reversed by orderly and proper proceedings.'" *Maness*, 419 U. S., at 459 (quoting *United States* v. *Mine Workers*, 330 U. S. 258, 293 (1947)). That principle is a bedrock of the rule of law. The Government's misconduct threatens it to its core.

So too does this Court's decision to grant the Government equitable relief. This is not the first time the Court closes its eyes to noncompliance, nor, I fear, will it be the last. See *Trump* v. *J. G. G.*, 604 U. S. \_\_\_ (2025) (*per curiam*). Yet each time this Court rewards noncompliance with discretionary relief, it further erodes respect for courts and for the rule of law.

B

In light of the Government's flagrantly unlawful conduct, today's decision might suggest the Government faces extraordinary harms. Yet even that is not the case. Rather, following a recent trend, the Court appears to give no serious consideration to the irreparable harm factor. See, *e.g.*, *id.*, at \_\_\_ (slip op., at \_\_\_); *SSA* v. *AFSCME*, 605 U. S. \_\_\_ (2025). Without a showing that a stay is necessary to avoid irreparable harm, however, this Court's midstream intervention is inexcusable. See, *e.g.*, *Hollingsworth*, 558 U. S., at 190.

Besides the facially absurd contention that the Executive is "irreparabl[y]" harmed any time a court orders it temporarily to refrain from doing something it would like to do, see Application for Stay of Injunction 37, the Government

12                                    DHS *v.* D.V.D.

has identified no irreparable harm from the challenged preliminary injunction. Instead, the Government locates the source of its injury in the District Court's efforts to provide relief to the class members in South Sudan. *Id.,* at 37–39. That argument is misguided. First, the District Court's remedial orders are not properly before this Court because the Government has not appealed them, nor sought a stay pending a forthcoming appeal. Second, the court adopted the narrowest possible remedy, allowing the Government itself to choose whether it would return the class members to the United States or provide them with process where they are held. Finally, the Government is in every respect responsible for any resulting harms. Had it complied with the preliminary injunction, no followup orders would have been necessary, nor would the Government have faced a "sudden need . . . to detain criminal aliens" abroad. *Id.,* at 39. It does not face such "need" today, as it can return the noncitizens it wrongfully removed at any time. No litigant, not even the Government, may "satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §2948.1 (3d ed. 2013); *Bennett* v. *Isagenix Int'l, LLC*, 118 F. 4th 1120, 1129–1130 (CA9 2024).

For their part, the plaintiffs in this case face extraordinary harms from even a temporary grant of relief to the Government. *A. A. R. P.* v. *Trump*, 605 U. S., at ___ (slip op., at 4) (recognizing detainees' interests against removal are "particularly weighty"). The Government has made clear in word and deed that it feels itself unconstrained by law, free to deport anyone anywhere without notice or an opportunity to be heard. The episodes of noncompliance in this very case illustrate the risks. Thirteen noncitizens narrowly escaped being the target of extraordinary violence in Libya; O. C. G. spent months in hiding in Guatemala; others face release in South Sudan, which the State Department says is in the midst of "'armed conflict'" between

SOTOMAYOR, J., dissenting

"'ethnic groups.'" N. 2, *supra.* Only the District Court's careful attention to this case prevented worse outcomes. Yet today the Court obstructs those proceedings, exposing thousands to the risk of torture or death.

## III

On the merits of its appeal, the Government principally raises a bevy of jurisdictional objections. Given its conduct in these proceedings, the Government's posture resembles that of the arsonist who calls 911 to report firefighters for violating a local noise ordinance. In any event, the Government has not established a likelihood of success on any of its arguments.

## A

The Government points to six separate provisions that, it says, deprived the District Court of jurisdiction to hear this dispute. See Application for Stay of Injunction 4–6, 19–28.

The Government's core objection is this: By way of a series of complicated immigration-law provisions, Congress sought to consolidate all of an individual's objections to an order of removal into a single petition for review. See 8 U. S. C. §§1252(a)(4), (5), (b)(9), §1231 note. Ultimately, the Government says, the plaintiffs in this case object to their removal. So, they should bring their challenges in a petition for review of an order of removal. Yet the Government also claims that it need not issue or reopen any orders of removal before deporting someone to a third country. That is part of the problem plaintiffs seek to remedy: Without an applicable order of removal, they have no way to raise their claims under the Convention. In the end, then, the Government's view is that the only way to challenge its refusal to provide orders of removal is to appeal those (nonexistent) orders. That is absurd. Nothing in the Government's cited provisions bars the plaintiffs from bringing a challenge to

SOTOMAYOR, J., dissenting

the Government's no-notice removals directly in federal district court.

Only one jurisdictional objection remains with any force. Under §1252(f)(1), "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation" of certain provisions in the immigration laws, except on an individual basis. Section 1231(b), the provision governing third-country removals, is one of those provisions. As a consequence, courts may not grant "classwide injunctive relief" to enjoin the "operation" of §1231(b). *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 481 (1999).

As an initial matter, §1252(f)(1) undisputedly does not affect the District Court's authority to grant relief to the individual plaintiffs here; it affects only the classwide injunction. Thus, even if the Government is correct that classwide relief was impermissible here, it plainly remains obligated to comply with orders enjoining its conduct with respect to individual plaintiffs.

As for the propriety of classwide relief, it is difficult to say whether the District Court's injunction enjoined the "operation" of §1231(b). Certainly, the Government is not enjoined from executing third-country removals. The court has only barred the Government from executing such removals without notice, pursuant to the DHS policy, which (the court found) deprives noncitizens of their statutory and due process rights. This Court has indicated that courts "may enjoin the unlawful operation" of laws "not specified in §1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." *Garland* v. *Aleman Gonzalez*, 596 U. S. 543, 553, n. 4 (2022) (emphasis deleted). So §1252(f)(1) would bar classwide relief here only if the Government's no-process policy were central to the "operation" of §1231(b) and not merely "collateral" to it. *Ibid.*, n. 4. At a minimum, that presents a difficult question this Court should not decide without briefing, argument, or

SOTOMAYOR, J., dissenting

time for reflection.

Even if the Government could establish that its enjoined actions (of providing no notice or process) are integral to the "operation" of §1231(b), that in turn would raise a "'serious constitutional question.'" *Webster* v. *Doe*, 486 U. S. 592, 603 (1988). That is because, as the Government reads it, §1252(f)(1) threatens to nullify plaintiffs' procedural due process rights entirely. Recall that the Government claims it may remove noncitizens in the space of 15 minutes. See *supra*, at 4. Such noncitizens cannot practically file individual lawsuits to vindicate their due process rights. After all, they will not know of the need to file a claim until they are on a bus or plane out of the country. Nor will their counsel, whom the Government refuses to notify. The Government can hardly expect every deportable noncitizen to file a pre-emptive lawsuit. Thus, if §1252(f)(1) precludes classwide vindication of the right to notice and due process under these circumstances, then it effectively nullifies those rights.

Whether Congress can nullify a due process right by way of a jurisdiction-stripping provision is a difficult question. See *Webster*, 486 U. S., at 603 (citing *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 681, n. 12 (1986)). The Government has not attempted to show that it is likely to succeed on that issue.

B

That leaves, finally, the merits of plaintiffs' underlying APA and due process claims. Begin with the statutory and regulatory scheme governing removal. In the Government's view, once a noncitizen has been found removable, she can effectively be removed anywhere at any time. That view would render meaningless the countless statutory and regulatory provisions providing for notice and a hearing. See, *e.g.*, 8 U. S. C. §1229(a)(1) ("In removal proceedings under section 1229a . . . written notice . . . shall be given . . .

16 DHS *v.* D.V.D.

SOTOMAYOR, J., dissenting

to the alien or to the alien's counsel of record"); 8 CFR §1240.10(f) (2024) (in removal hearing, the Immigration Judge "shall . . . identify for the record a country, or countries in the alternative, to which the alien's removal may be made"); §241.8(e) (when a removal order is reinstated after a noncitizen illegally reenters the country, noncitizen who "expresses a fear of returning to the country *designated in that order*" must be given an interview (emphasis added)); 8 U. S. C. §§1228(b)(1)–(3) (noncitizens determined removable due to felony conviction must be given notice under §1229(a) and 14 days "to apply for judicial review"); 8 CFR §238.1(b)(2) (requiring notice to noncitizens removable due to felony convictions).

The Government asserts that it need only comply with these provisions once, for the first removal proceeding, and can disregard them afterwards. The consequence of that view is that what happens in removal proceedings simply does not matter. The Government could designate any location in its initial order, lose before the immigration judge, decline to appeal, and promptly thereafter deport the noncitizen to a country of the Government's choosing. Indeed, that is precisely what happened in O. C. G.'s case.

Where did the Government find the authority to disregard Congress's carefully calibrated scheme of immigration laws? It does not argue the third-country removal statute provides it. See Application for Stay of Injunction 13. Instead, the Government simply falls back on the Executive's implied authority in this field. Yet "the President must comply with legislation regulating or restricting the transfer of detainees" even in "wartime." *Kiyemba* v. *Obama*, 561 F. 3d 509, 517 (CADC 2009) (Kavanaugh, J., concurring). It is a "'cardinal principle of statutory construction,'" moreover, that statutes should be construed so that "'no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001). Here the Government construes the statute's lack of "a particular

SOTOMAYOR, J., dissenting

process for carrying out" third-country removals, Application for Stay of Injunction 13, as conveying near-unlimited power to the Executive, rendering the remaining statutory scheme "'void . . . or insignificant.'" *TRW*, 534 U. S., at 31. To make this claim is to ignore the clear statutory command that notice and a hearing must be provided. See *supra*, at 15. The Government cannot show a likelihood of success on plaintiffs' statutory and regulatory claims, nor can it defend the lawfulness of its no-notice removals.

Turning to the constitutional claim, this Court has repeatedly affirmed that "'the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *J. G. G.*, 604 U. S., at ___ (slip op., at 3); *A. A. R. P.*, 605 U. S., at ___ (slip op., at 3). Due process includes reasonable notice and an opportunity to be heard. *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314 (1950). Of course the Government cannot avoid its obligation to provide due process "in the context of removal proceedings," *J. G. G.*, 604 U. S., at ___ (slip op., at 3), by skipping such proceedings entirely and simply whisking noncitizens off the street and onto busses or planes out of the country.

It is axiomatic, moreover, that when Congress enacts a statutory entitlement, basic procedural due process protections attach. *Mathews* v. *Eldridge*, 424 U. S. 319, 332 (1976). Congress expressly provided noncitizens with the right not to be removed to a country where they are likely to be tortured or killed. See 8 U. S. C. §1231 note. As this Court has explained, the "'right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society.'" *Mathews*, 424 U. S., at 333 (quoting *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring)). Being deprived of the right not to be deported to a country likely to torture or kill you plainly counts. Thus, plaintiffs have a right to be heard.

18                    DHS *v.* D.V.D.

SOTOMAYOR, J., dissenting

The Government barely disputes these basic principles. Instead, it obfuscates the issue by asserting that some (perhaps "many") members of the class should be treated as if they never entered the United States. Application for Stay of Injunction 33–34. Yet even if that were true as to some class members, it could show at most that the class might be too broadly defined, not that the Government is likely to succeed on the constitutional merits.

Similarly, the Government relies on precedent about the wartime transfer of detainees to assert that the Executive's determination that "a country will not torture a person on his removal" is "conclusive." *Id.,* at 29 (citing *Munaf* v. *Geren*, 553 U. S. 674 (2008) and *Kiyemba*, 561 F. 3d 509). Yet the immigration laws provide for judicial review of "factual challenges to" orders denying relief under the Convention, *Nasrallah* v. *Barr*, 590 U. S. 573, 581 (2020), so plainly the Executive's determinations are not "conclusive" here. In any event, the plaintiffs in this case do not challenge any executive determination. There is no evidence in this case that the Government ever did determine that the countries it designated (Libya, El Salvador, and South Sudan) "w[ould] not torture" the plaintiffs. Application for Stay of Injunction 29. Plaintiffs merely seek access to notice and process, so that, in the event the Executive makes a determination in their case, they learn about it in time to seek an immigration judge's review. The Fifth Amendment unambiguously guarantees that right.

\*   \*   \*

The Due Process Clause represents "the principle that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 646 (1952) (Jackson, J., concurring). By rewarding lawlessness, the Court once again undermines that foundational principle. Apparently, the Court finds the idea that thousands will suffer

SOTOMAYOR, J., dissenting

violence in farflung locales more palatable than the remote possibility that a District Court exceeded its remedial powers when it ordered the Government to provide notice and process to which the plaintiffs are constitutionally and statutorily entitled.  That use of discretion is as incomprehensible as it is inexcusable.  Respectfully, but regretfully, I dissent.

# SUPREME COURT OF THE UNITED STATES

No. 24A1153

DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.*
D. V. D., ET AL.

ON MOTION FOR CLARIFICATION

[July 3, 2025]

On April 18, 2025, the District Court for the District of Massachusetts preliminarily enjoined the Government from removing "any alien" to a "country not explicitly provided for on the alien's order of removal" without following certain procedures designed to enable the alien to seek relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), Dec. 10, 1984, S. Treaty Doc. No. 100−20, 1465 U. N. T. S. 113. No. 25−cv−10676, ECF Doc. 64, pp. 46−47. The District Court later found that the Government had violated that injunction by failing to provide six class members a "meaningful opportunity" to assert CAT claims before such removal. ECF Doc. 118, p. 1. On May 21, the District Court issued an "order on remedy," directing the Government to follow specified procedures with respect to those individuals, tailored to the circumstances. ECF Doc. 119. The Government sought a stay of the April 18 injunction before our Court.

On June 23, we stayed the April 18 preliminary injunction pending disposition of any appeal and petition for writ of certiorari. Later that day, however, the District Court issued a minute order stating that the May 21 remedial order "remain[ed] in full force and effect," "notwithstanding" our stay of the preliminary injunction. ECF Doc. 176. The only authority it cited was the dissent from the stay order.

The Government has moved for "an order clarifying" our

Appx.020

stay.  Motion for Clarification.  It argues that the stay of the April 18 preliminary injunction divests the May 21 remedial order of enforceability.  Respondents argue that the District Court correctly understood the May 21 order to remain in effect—despite our stay of the preliminary injunction it purported to enforce—because the May 21 order effectively operates as a remedy for civil contempt.

The motion for clarification is granted.  Our June 23 order stayed the April 18 preliminary injunction in full.  The May 21 remedial order cannot now be used to enforce an injunction that our stay rendered unenforceable.  See *Nken* v. *Holder*, 556 U. S. 418, 428 (2009) (explaining that a reviewing court's stay order "divest[s]" the district court "order of enforceability").  Even if we accepted respondents' characterization of the May 21 order, such a remedy would serve to "coerce" the Government into "compliance" and would be unenforceable given our stay of the underlying injunction. *United States* v. *Mine Workers*, 330 U. S. 258, 303 (1947); see  *id.*, at 295 ("The right to remedial relief falls with an injunction which events prove was erroneously issued and *a fortiori* when the injunction or restraining order was beyond the jurisdiction of the court." (citations and footnote omitted)).

Despite the dissent's provocative language, see *post*, at 6 (opinion of SOTOMAYOR, J.), a claim that a lower court has failed to give effect to an order of this Court is properly addressed here.  *General Atomic Co.* v. *Felter*, 436 U. S. 493, 497 (1978) (*per curiam*) ("A litigant who . . . has obtained judgment in this Court after a lengthy process of litigation, involving several layers of courts, should not be required to go through that entire process again to obtain execution of the judgment of this Court."); see *United States* v. *Fossatt*, 21 How. 445, 446 (1859).  "Assuming as we do" that the District Court will now conform its order to our previous stay and cease enforcing the April 18 injunction through the May 21 remedial order, we have no occasion to reach the

Cite as:  606 U. S. ____ (2025)                3

Government's other requests for relief.  Cf. *Deen* v. *Hickman*, 358 U. S. 57, 58 (1958) (*per curiam*).  If the Government wishes to seek additional relief in aid of the execution of our mandate, it may do so through mandamus.  See *In re Sanford Fork & Tool Co.*, 160 U. S. 247, 255 (1895) (explaining that any matter "disposed of by" decree of this Court must be carried "into execution, according to the mandate," by the courts below).

Appx.022

Cite as:  606 U. S. ____ (2025)          1

# SUPREME COURT OF THE UNITED STATES

---

No. 24A1153

---

## DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* D. V. D., ET AL.

### ON MOTION FOR CLARIFICATION

[July 3, 2025]

JUSTICE KAGAN, concurring.

I voted to deny the Government's previous stay application in this case, and I continue to believe that this Court should not have stayed the District Court's April 18 order enjoining the Government from deporting non-citizens to third countries without notice or a meaningful opportunity to be heard.  See *DHS* v. *D. V. D.*, 606 U. S. ___, ___–___ (2025) (SOTOMAYOR, J., dissenting) (slip op., at 9–18).  But a majority of this Court saw things differently, and I do not see how a district court can compel compliance with an order that this Court has stayed.  See *United States* v. *Mine Workers*, 330 U. S. 258, 294–295 (1947); *Worden* v. *Searls*, 121 U. S. 14, 24–26 (1887).  Because continued enforcement of the District Court's May 21, 2025 order would do just that, I vote to grant the Government's motion for clarification.

Appx.023

Cite as: 606 U. S. ____ (2025)          1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 24A1153

———————

## DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* D. V. D., ET AL.

### ON MOTION FOR CLARIFICATION

[July 3, 2025]

JUSTICE SOTOMAYOR, with whom JUSTICE JACKSON joins, dissenting.

The United States may not deport noncitizens to a country where they are likely to be tortured or killed. International and domestic law guarantee that basic human right. In this case, the Government seeks to nullify it by deporting noncitizens to potentially dangerous countries without notice or the opportunity to assert a fear of torture. Because the Fifth Amendment, immigration law, federal regulations, and this Court's precedent unambiguously prohibit such no-notice deportations, see *DHS* v. *D. V. D.*, 606 U. S. ___, ___–___ (2025) (SOTOMAYOR, J., dissenting) (slip op., at 15–18), a Federal District Court issued a classwide preliminary injunction barring the Government from removing noncitizens without notice and adequate process.

The Government appealed, and pending its appeal repeatedly violated the District Court's order. See *id.*, at ___– ___ (slip op., at 2–9). Meanwhile, the Government sought an emergency stay of the injunction from this Court. In its briefing, the Government took a kitchen-sink approach, arguing that the District Court lacked jurisdiction to grant classwide injunctive relief, that it also lacked jurisdiction over individual plaintiffs' claims under the Due Process Clause, and that the plaintiffs were not entitled to notice or a hearing before their removal. Without citing any of these arguments, or indeed providing any legal justification, this

Appx.024

2       DEPARTMENT OF HOMELAND SECURITY *v.* D. V. D.

SOTOMAYOR, J., dissenting

Court granted the Government its requested stay.

Now, the Government returns for more. At issue in its latest filing is a month-old remedial order, which the District Court issued after the Government attempted illegally to deport eight class members to South Sudan. The remedial order required the Government to provide those noncitizens, whom it is currently holding in Djibouti, with the process to which the Constitution and federal law entitled them: adequate notice and an opportunity to be heard. No. 25–cv–10676 (D Mass., May 21, 2025) ECF Doc. 119. Following this Court's unreasoned stay of the original preliminary injunction, the District Court issued a minute order explaining that its remedial order (which the Government did not appeal, and whose validity this Court therefore did not consider) remained in effect. ECF Doc. 176. Rather than complying with the remedial order, the Government immediately returned to this Court, purporting to seek "clarification" of the stay.

What the Government wants to do, concretely, is send the eight noncitizens it illegally removed from the United States from Djibouti to South Sudan, where they will be turned over to the local authorities without regard for the likelihood that they will face torture or death. Because "'the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings," *Trump* v. *J. G. G.*, 604 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 3), the Government's no-notice removals are undoubtedly illegal, see *D. V. D.*, 606 U. S., at ___–___ (slip op., at 15–18) (SOTOMAYOR, J., dissenting). In simple terms, the Government requests that the Court remove an obstacle to its achieving those unlawful ends. That obstacle, again, is the District Court's remedial order, which it issued to resolve the Government's violations of the preliminary injunction this Court later stayed. The Government now asks this Court to hold that the stay invalidated the remedial order.

In substance, of course, the Government's new request for

Appx.025

SOTOMAYOR, J., dissenting

relief has nothing to do with clarification, so this Court has no business considering its merits now. The Court's Rules make plain where the Government should have pressed its argument about the nature and validity of the remedial order: before the lower courts. See this Court's Rule 23(3) ("Except in the most extraordinary circumstances, an application for a stay will not be entertained unless the relief requested was first sought in the appropriate court or courts below"); cf. *A. A. R. P.* v. *Trump*, 604 U. S. \_\_\_, \_\_\_ (2025) (ALITO, J., dissenting) (slip op., at 3) (emphasizing need to comply with Rule 23, and criticizing this Court for granting relief when it was "doubtful" that the applicants' request to the lower courts had been adequate). The Government undisputedly did not comply with that Rule.

Litigants may alternatively seek an "extraordinary writ," such as an injunction, even without complying with Rule 23. See this Court's Rule 20(1). Yet that relief is available only if it would "aid . . . the Court's appellate jurisdiction." *Ibid.* Far from maintaining our jurisdiction, vacating the District Court's remedial order risks doing the opposite: destroying jurisdiction over the noncitizens the Government intends to deport without notice or process. The Government thus plainly cannot satisfy Rule 20's requirements, either. Finally, even the majority does not believe that the Government is entitled to mandamus relief.

Although Members of today's majority have previously insisted that "this Court should follow established procedures" when granting emergency relief, *A. A. R. P.*, 604 U. S., at \_\_\_\_ (ALITO, J., dissenting) (slip op., at 5), the Court now ignores its Rules to grant the Government its desired "clarification" immediately. The majority suggests (relying on an argument the Government did not make) that a remedy for civil contempt is not enforceable when the

4        DEPARTMENT OF HOMELAND SECURITY *v.* D. V. D.

SOTOMAYOR, J., dissenting

underlying injunction has been stayed.[1]  *Ante,* at 2.  Perhaps that should be the rule, but the question appears to be a matter of first impression in this Court.  In support of its view, the majority cites a single line of dictum in *United States* v. *Mine Workers*, 330 U. S. 258 (1947), which says that the right to remedial relief for civil contempt "falls with an injunction which events prove was erroneously issued." *Id.*, at 295.  "Preliminary injunctions, however, do not conclusively resolve legal disputes," and neither do temporary stay orders.  See *Lackey* v. *Stinnie*, 604 U. S. \_\_\_, \_\_\_ (2025) (slip op., at 6).  Accordingly, this Court's stay certainly did not "prove" that the District Court's injunction was "erroneously issued." *Mine Workers*, 330 U. S., at 295.[2]

Given that the majority can muster no more than a sentence of 80-year-old dictum in support of today's holding, the District Court can hardly be faulted for reaching a contrary conclusion.  The District Court, moreover, had only moments to decide the question, for (unlike this Court) it

—————

[1] To be clear, even the majority today does not dispute that "[v]iolations of an order are punishable as criminal contempt even though the order is set aside on appeal, . . . or though the basic action has become moot." *United States* v. *Mine Workers*, 330 U. S. 258, 294 (1947) (citing *Worden* v. *Searls*, 121 U. S. 14 (1887), and *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418 (1911)).  Civil contempt orders in turn "may . . . be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."  330 U. S., at 303–304.  The majority appears to construe the District Court's order as serving the former purpose.  See *ante,* at 2.

[2] After first adopting the Government's characterization of its request as one for "clarification," see *ante,* at 1–2, the majority later appears to justify its premature intervention by treating it as a request for mandamus relief, see *ante,* at 2 ("[A] claim that a lower court has failed to give effect to an order of this Court is properly addressed here").  Even the majority, however, does not believe that mandamus relief is warranted. Its reliance on *General Atomic Co.* v. *Felter*, 436 U. S. 493 (1978) explains why.  There, a District Court disobeyed a clear instruction "specifically addressed" in this Court's opinion.  *Id.*, at 496.  Here, this Court did not see fit to provide the District Court with any instructions.

SOTOMAYOR, J., dissenting

realized that the lives and safety of eight noncitizens were at stake. Any suggestion that the District Court failed to carry "'into execution'" this Court's mandate (which said no more than that the Government's application was "granted") is patently inappropriate. Cf. *ante,* at 3. That the Government accuses the District Court, whose orders it has consistently ignored, of "unprecedented defiance," is more extraordinary still. Motion for Clarification 1. Even now, the Government seeks to defy this Court's clear holdings that it must afford noncitizens with due process of law before removing them.

In the end, the majority ignores the Court's Rules for seeking emergency relief and creates new law on civil contempt, all to allow the Government to circumvent the appellate process with respect to an order it continues to defy. In so doing, the Court focuses on dictum in *Mine Workers* at the cost of discarding that case's central message: "'An injunction duly issuing out of a court of general jurisdiction . . . and served upon persons made parties therein . . . must be obeyed by them however erroneous the action of the court may be.'" 330 U. S., at 293–294.

For all that, moreover, the majority does not actually clarify its prior decision. The majority says it expects "that the District Court will now conform its order to our previous stay," *ante,* at 2, but it refuses to explain what such conformity would involve. As a result, today's order not only excuses (once again) the Government's undisguised contempt for the Judiciary; it also leaves the District Court without any guidance about how this litigation should proceed. The District Court cannot adjudicate plaintiffs' serious due process claims on their merits without ensuring, by way of injunctive relief, its jurisdiction over the case. Yet this Court refuses to explain what injunctive relief, if any, it believes the District Court can issue.

Perhaps the majority hopes that, in light of its contentless stay order, the District Court will simply give up on

6        DEPARTMENT OF HOMELAND SECURITY *v.* D. V. D.

SOTOMAYOR, J., dissenting

adjudicating this case. But if this Court wishes to permit the Government to flout the fundamental rights guaranteed by the Due Process Clause, it cannot avoid accountability for that lawlessness by tasking the lower courts with inventing a rationale. The Court's continued refusal to justify its extraordinary decisions in this case, even as it faults lower courts for failing properly to divine their import, is indefensible.

\*    \*    \*

   "In a democracy, power implies responsibility. The greater the power that defies law the less tolerant can this Court be of defiance. As the Nation's ultimate judicial tribunal, this Court, beyond any other organ of society, is the trustee of law and charged with the duty of securing obedience to it." *Mine Workers*, 330 U. S., at 312 (Frankfurter, J., concurring in judgment). This Court continues to invert those principles. Today's order clarifies only one thing: Other litigants must follow the rules, but the administration has the Supreme Court on speed dial. Respectfully, I dissent.

Appx.029

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

D.V.D.; M.M.; E.F.D.; and O.C.G.,

       Plaintiffs,

       v.

U.S. DEPARTMENT OF HOMELAND SECURITY;
Kristi NOEM, Secretary, U.S. Department of
Homeland Security, in her official capacity; Pamela
BONDI, U.S. Attorney General, in her official
capacity; and Antone MONIZ, Superintendent,
Plymouth County Correctional Facility, in his official
capacity,

       Defendants.

Case No. _____

**CLASS ACTION COMPLAINT**

## INTRODUCTION

1.  Plaintiffs and proposed class members are noncitizens with final removal orders resulting from proceedings in which they have been notified that they could be deported to a designated country of removal (usually their country of origin) and, in some cases, an alternative country of removal (usually a country of which they are a citizen or in which they hold status) and had an opportunity to contest removal to the designated country based on a claim of fear. They bring this class action to challenge the policy or practice of the Department of Homeland Security (DHS) of deporting, or seeking to deport, them to a *third* country – a country *never* designated for removal – without first providing them with notice or opportunity to contest removal on the basis that they have a fear of persecution, torture, and even death if deported to that third country.

2.  DHS' policy or practice of failing to afford these basic, minimal protections violates the Immigration and Nationality Act, the Foreign Affairs Reform and Restructuring Act

1

Appx.030

of 1998, the Due Process Clause of the Fifth Amendment, and the treaty obligations of the United States. Indeed, the Office of the Solicitor General (OSG) recognized these legal obligations when it informed the Supreme Court in *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021), that DHS will not deport to a third country noncitizens with final orders who have already been granted protection by an immigration judge (IJ) until after the individual receives meaningful notice of the opportunity to assert a fear-based claim against removal to that third country. *See* Transcript of Oral Argument at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021).

3.      As Plaintiffs and proposed class members' cases demonstrate, and as litigation after the OSG's representations revealed, DHS has *no* written policy to provide noncitizens either with notice or an opportunity to present a fear-based claim before DHS deports them to a third country where they face persecution, torture, and/or death.

4.      The absence of written policies and procedures has in the past resulted in cases where individuals, including those granted protection from removal, were deported to third countries without warning. But on February 18, 2025, DHS issued a policy directive that has magnified the practical impact of this lack of a written policy. The directive instructs DHS officers to review all cases of individuals previously released from immigration detention – including those who have complied with the terms of their release for years, even decades – for re-detention and removal to a third country. This directive to re-detain places an untold number of noncitizens at imminent risk of the deprivation of liberty and deportation to a third country without the basic procedural protections of notice and opportunity to present a fear-based claim.

5.      DHS' failure to provide a meaningful notice and opportunity to present a fear-based claim before deportation to a third country has caused, and is causing, irreparable harm.

For example, Plaintiff O.C.G., a Guatemalan man to whom the IJ granted protection from deportation to Guatemala, thought he was being released from immigration detention when DHS instead placed him and approximately 20 other men on a bus without telling them that they were being deported to Mexico. Plaintiff O.C.G. had no notice and no opportunity to present his claim that he had been raped in Mexico and feared persecution and torture there. In Mexico, authorities gave Plaintiff O.C.G. the Hobson's choice of waiting several months in detention to apply for asylum in Mexico, a country in which he had been persecuted and feared future persecution, or being deported to Guatemala, the country where an IJ had found it was more likely than not that he would be persecuted. He currently remains in hiding in Guatemala.

6.      Plaintiffs, on behalf of themselves and similarly situated individuals, challenge DHS' policy or practice of failing to provide meaningful notice and the opportunity to present a fear-based claim prior to deportation to a third country and DHS' policy of re-detention pursuant to the February 18, 2025 directive. Plaintiffs ask this Court to declare these policies unlawful and to set them aside, to enjoin DHS from continuing to fail to provide meaningful advanced notice in writing and the opportunity to present a fear-based claim to an IJ prior to any deportation to a third country, and to order DHS to return Plaintiff O.C.G. and proposed class members who have been deported without these procedural protections.

## JURISDICTION

7.      This case arises under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, the regulations implementing the INA, the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105–277, div. G, Title XXII, § 2242(a), 112 Stat. 2681, 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231), the regulations implementing the FARRA, the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*; and 5 U.S.C. §

552 *et. seq.*

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as the instant case is a civil action arising under the laws of the United States. For Plaintiffs in immigration custody, 28 U.S.C. § 2241 also provides jurisdiction. The Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. §§ 705-06, 28 U.S.C. § 1651, 28 U.S.C. §§ 2201–02, 28 U.S.C. § 2241, and its equitable powers. The government has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

## VENUE

9.      Venue properly lies in this District pursuant to 28 U.S.C. § 1391(e) because this is a civil action in which one of the defendants is an agency of the United States, there is no real property involved in this action, and Plaintiffs D.V.D. and E.F.D. reside in this District.

## PARTIES

10.      Plaintiff D.V.D. is a noncitizen from Cuba and resident of Pittsfield, Massachusetts. He has a final removal order from 2017 following removal proceedings in which Cuba was the only country designated for removal. On March 28, 2025, Plaintiff D.V.D. faces imminent risk of re-detention and deportation to a third country when he is required to report for an in-person check-in with U.S. Immigration and Customs Enforcement (ICE) in Burlington, Massachusetts – only three weeks after his last check-in with that office.

11.      Plaintiff M.M. is a noncitizen from Honduras and resident of Fort Worth, Texas. In 2021, an IJ granted her application for withholding of removal to Honduras, the only country designated for removal, in withholding-only proceedings. On April 4, 2025, Plaintiff M.M. faces imminent risk of re-detention and deportation to a third country when she is required to report for an in-person check-in with ICE in Dallas, Texas – only three weeks after her last check-in with

Appx.033

that office and after ICE officers informed her that she was on a list of people scheduled to be deported.

12.     Plaintiff E.F.D. is a noncitizen from Ecuador and resident of Milford, Massachusetts. In 2018, in removal proceedings, an IJ granted his application for protection from deportation to Ecuador, the only country designated for removal, under the United Nations Convention Against Torture (CAT). On March 18, 2025, ICE and other agents took E.F.D. and his other co-workers into custody after their search for a different person was unsuccessful. He is currently detained at the Plymouth County Correctional Center in Plymouth, Massachusetts. He is at imminent risk of deportation to a third country.

13.     Plaintiff O.C.G. is a noncitizen from Guatemala. On February 19, 2025, an IJ granted his application for withholding of removal to Guatemala, the only country designated for removal, in withholding-only proceedings. On or around February 19, 2025, DHS deported Plaintiff O.C.G to Mexico without any advance notice, and Plaintiff O.C.G. had no opportunity to present his claim that he would suffer persecution and/or torture in Mexico. Following his deportation to Mexico, Mexican authorities deported him to Guatemala, the country from which the United States has granted him protection, where he remains in hiding to this day.

14.     Defendant U.S. Department of Homeland Security (DHS) is the federal agency responsible for implementing and enforcing the INA and is an agency within the meaning of the APA, 5 U.S.C. § 551(1). DHS oversees its component agencies, including ICE, U.S. Customs and Border Protection, and U.S. Citizenship and Immigration Services.

15.     Defendant Kristi Noem is the Secretary of DHS. In that capacity, she is charged with the administration and enforcement of the INA. She is sued in her official capacity.

16.     Defendant Pamela Bondi is the United States Attorney General. In this capacity,

5

Appx.034

she directs agencies within the United States Department of Justice, including the Executive Office for Immigration Review (EOIR), which houses the immigration courts and Board of Immigration Appeals. Defendant Bondi is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103(g) and oversees EOIR. She is sued in her official capacity.

17.　　Antone Moniz is the Superintendent of the Plymouth County Correctional Facility, and he has physical custody of Plaintiff E.F.D. pursuant to the facility's contract with ICE to detain noncitizens. Mr. Moniz is a legal custodian of Plaintiff E.F.D.

## FACTUAL ALLEGATIONS

## I.　　Legal Background

### A.　　Section 240 Removal Proceedings

18.　　In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). The Act generally retained prior procedures for removal hearings for all noncitizens—i.e., full immigration court hearings, appellate review before the Board of Immigration Appeals, and federal court review. *See* 8 U.S.C. § 1229a; 8 U.S.C. § 1252(a). In these removal proceedings (commonly referred to as "Section 240" proceedings), the noncitizen is entitled to select a country of removal. 8 U.S.C. § 1231(b)(2)(A); *see also* 8 C.F.R. § 1240.10(f) ("[T]he immigration judge shall notify the respondent that if he or she is finally ordered removed, the country of removal will in the first instance be the country designated by the respondent . . . ."). The IJ will designate the country where the person "is a subject, national, or citizen," if either the noncitizen does not select a country or as an alternative in the event the noncitizen's designated country does not accept the individual. 8 U.S.C. § 1231(b)(2)(D). The IJ also may designate alternative countries, as specifically set out by 8 U.S.C. § 1231(b)(2)(E). For individuals placed in Section 240 proceedings upon arrival, the statute provides designation to

6

the country from which the individual boarded a vessel or aircraft and then can consider alternative countries. *See* 8 U.S.C. § 1231(b)(1); *see also* 8 C.F.R. § 1240.10(f).

19.     An IJ must provide sufficient notice and opportunity to apply for protection from a designated country of removal. 8 C.F.R. § 1240.10(f) (providing that the "immigration judge *shall* notify the respondent" of designated countries of removal) (emphasis added); 8 C.F.R. § 1240.11(c)(1)(i) (providing that the IJ shall "[a]dvise the [noncitizen] that he or she may apply for asylum in the United States or withholding of removal to [the designated countries of removal]").

20.     Asylum is a form of protection available in Section 240 removal proceedings. An IJ may grant asylum in the exercise of discretion where the applicant demonstrates a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" in their country of origin. 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A); *see also* 8 C.F.R. §§ 208.1, 1208.1. Once granted asylum, an individual generally cannot be deported to their country of origin or any other country absent subsequent unlawful conduct, evidence of fraud in the asylum application, or a fundamental change in country conditions. *See generally* 8 U.S.C. § 1158(c)(2); 8 C.F.R §§ 208.24, 1208.24.

21.     For individuals determined to be ineligible for asylum, Congress further provided, with certain exceptions not relevant here, that "notwithstanding [8 U.S.C. §§ 1231(b)(1) and (2)], the Attorney General [i.e., DHS] may not remove [a noncitizen] to a country if the Attorney General [(i.e., an immigration judge)] decides that [the noncitizen's] life or freedom would be threatened in that country because of [the noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16, 1208.16.  This form of protection, known as withholding of removal, is mandatory,

7

i.e., it cannot be denied to eligible individuals in the exercise of discretion. Unlike asylum, the protection of withholding of removal is country-specific.

22.     Individuals in Section 240 proceedings who are ineligible for withholding of removal, are still entitled to receive protection under the Convention Against Torture (CAT), in the form of withholding or deferral of removal, upon demonstrating a likelihood of torture if removed to the designated country of removal. *See* FARRA (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16(c), 208.17(a), 1208.16(c), 1208.17(a); 28 C.F.R. § 200.1. Like withholding of removal under 8 U.S.C. § 1231(b)(3), CAT protection is mandatory. *Id*. With respect to any individual granted deferral of removal under CAT, the IJ "shall also inform the [noncitizen] that removal has been deferred only to the country in which it has been determined that the [noncitizen] is likely to be tortured, and that the [noncitizen] may be removed at any time to another country where he or she is not likely to be tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2).

23.     An IJ may only terminate a grant of CAT protection based on evidence that the person will no longer face torture. DHS must move for a new hearing and provide evidence "relevant to the possibility that the [noncitizen] would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing." 8 C.F.R. §§ 208.17(d)(1), 1208.17(d)(1). If a new hearing is granted, the IJ must provide notice "of the time, place, and date of the termination hearing," and must inform the noncitizen of the right to "supplement the information in his or her initial [withholding or CAT] application" "within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail)." 8 C.F.R. §§ 208.17(d)(2), 1208.17(d)(2).

24.     Individuals in Section 240 proceedings are entitled to an administrative appeal to

8

the BIA along with an automatic stay of deportation while the appeal is pending, and to seek judicial review of an adverse administrative decision by filing a petition for review in the court of appeals. *See* 8 U.S.C. §§ 1101(a)(47)(B), 1252(a); 8 C.F.R. §§ 1003.6(a), 1240.15.

### B.        Withholding-Only Proceedings

25.        Individuals who have been deported and subsequently return to the United States without inspection are subject to a summary removal process known as reinstatement of removal. *See* 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8. This summary process is carried out by DHS officers. Individuals subject to reinstatement orders are barred from seeking most forms of relief from removal, including asylum.

26.        Some individuals who are not lawful permanent residents are subject to a separate summary removal process—known as Section 238(b) administrative removal—if a DHS officer determines that they are deportable due to an aggravated felony conviction. *See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1(b)(1). That process is also carried out by DHS officers and, like individuals subject to reinstatement orders, individuals with 238(b) administrative removal orders are barred from most forms of relief from removal, including asylum.

27.        However, consistent with the United States' commitment to *non-refoulement*—the fundamental principle that no one should be returned to a country where they would face persecution, torture, cruel, inhuman, or degrading treatment, or serious harm—critical protections from removal remain available in reinstatement and 238(b) administrative removal proceedings: withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT protection. *See* 8 C.F.R. §§ 241.8(e), 238.1(f)(3); *see also* 8 C.F.R. §§ 208.31, 1208.31. Individuals who express a fear of return to their countries of origin are given the opportunity to demonstrate a reasonable fear of persecution or torture in interviews before asylum officers. *Id.* If the asylum officer

9

determines their fear is not reasonable, the individual can seek review of that determination before an IJ in reasonable fear proceedings. 8 C.F.R. §§ 208.31(g), 1208.31(g). If either the asylum officer or the reviewing IJ finds their fear is reasonable, the individual is placed in withholding-only proceedings before an IJ where they can seek protection from deportation by applying for withholding of removal and/or CAT protection. 8 C.F.R. §§ 208.31(e), (g)(2), 1208.31(e), (g)(2).

28.    If the IJ denies the withholding and/or CAT application, the individual may seek review before the BIA, 8 C.F.R. §§ 208.31(e), (g)(2)(ii), 1208.31(e), (g)(2)(ii). Judicial review of these orders and administrative decisions is available by filing a petition for review in the court of appeals. 8 U.S.C. § 1252(a).

**C.    Statutory Scheme for Removal to a Third Country**

29.    Congress established the statutory process for designating countries to which noncitizens may be removed, 8 U.S.C. § 1231(b)(1)-(3).[1]

30.    Subsection (b)(1) applies to noncitizens "[a]rriving at the United States," including from a contiguous territory, but expressly contemplates arrival via a "vessel or aircraft." It designates countries and alternative countries to which the noncitizen may be removed. 8 U.S.C. § 1231(b)(1)(B) (removal to contiguous country from which the noncitizen traveled), § 1231(b)(1)(C) (alternative countries).

31.    Subsection (b)(2) applies to all other noncitizens, and like Subsection (b)(1), designates countries and alternative countries to which the noncitizen may be removed. 8 U.S.C.

---

[1]    References to the Attorney General in Section 1231(b) refer to the Secretary of DHS for functions related to carrying out a removal order and to the Attorney General for functions related to selection of designations and decisions about fear-based claims. 6 U.S.C. § 557. The Attorney General has delegated the latter functions to the immigration courts and Board of Immigration Appeals. *See* 8 C.F.R. §§ 1208.16, 1208.17, 1208.31,1240.10(f), 1240.12(d).

§ 1231(b)(2)(A) (noncitizen's designation of a country of removal), 1231(b)(2)(B) (limitation on designation), 1231(b)(2)(C) (disregarding designation), 1231(b)(2)(D) (alternative country), 1231(b)(2)(D) (alternative countries), 1231(b)(2)(E) (additional removal countries).

32.     Critically, both Subsections (b)(1) and (b)(2), have a specific carve-out provision prohibiting removal of persons to countries where they face persecution or torture. Specifically, § 1231(b)(3)(A), entitled "Restriction on removal to a country where [noncitizen's] life or freedom would be threatened," reads:

> **Notwithstanding paragraphs [b](1) and [b](2)**, the Attorney General **may not remove** [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion.

*Id.* § 1231(b)(3)(A) (emphasis added).

33.     Similarly, with respect to the Convention Against Torture, the implementing regulations allow for removal to a third country, but only "where he or she is not likely to be tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2).

34.     In *Jama v. Immigr. & Customs Enf't*, the Supreme Court addressed the designation procedure under Subsection (b)(2). 543 U.S. 335 (2005). Critically, the Court stated that noncitizens who "face persecution or other mistreatment in the country designated under § 1231(b)(2), . . . have a number of available remedies: asylum; withholding of removal; relief under an international agreement prohibiting torture . . . ." *Jama*, 543 U.S. at 348 (citing 8 U.S.C. §§1158(b)(1), 1231(b)(3)(A); 8 C.F.R. §§ 208.16(c)(4), 208.17(a)).

35.     Although individuals granted CAT protection may be removed to a third country, the regulations provide that they may not be removed to a country where they are likely to be tortured: "The immigration judge shall also inform the [noncitizen] that removal has been deferred only to the country in which it has been determined that the [noncitizen] is likely to be

11

tortured, and that the [noncitizen] may be removed at any time to another country where he or she is not likely to be tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2).

36.     Notably, the regulations also provide that protection under CAT may be terminated based on evidence that the person will no longer face torture but nevertheless provides certain protections to noncitizens. First, the regulations require DHS to move for a new hearing, requiring that DHS support their motion for the new hearing with evidence "relevant to the possibility that the [noncitizen] would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing. 8 C.F.R. §§ 208.17(d)(1), 1208.17(d)(1). Second, even if a new hearing is granted, the regulations require that the IJ provide the noncitizen with notice "of the time, place, and date of the termination hearing. Such notice shall inform the [noncitizen] that the [noncitizen]  may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the [noncitizen] must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail)." 8 C.F.R. §§ 208.17(d)(2), 1208.17(d)(2). Thus, not only is the noncitizen provided notice, but also an opportunity to submit documentation in support of their claim for protection.

> **D.     DHS' Obligation to Provide Notice and Opportunity to Present a Fear-Based Claim Before Deportation to a Third Country**

37.     For individuals in removal proceedings, the designation of a country of removal (or, at times, countries in the alternative that the IJ designates) on the record provides notice and an opportunity to permit a noncitizen who fears persecution or torture in the designated country (or countries) to file an application for protection. *See* 8 C.F.R. § 1240.10(f) (stating that "immigration judge shall notify the [noncitizen]" of proposed countries of removal); 8 C.F.R. § 1240.11(c)(1)(i) ("If the [noncitizen] expresses fear of persecution or harm upon return to any of

12

Appx.041

the countries to which the [noncitizen] might be removed pursuant to § 1240.10(f) . . . the immigration judge shall . . . [a]dvise [the noncitizen] that he or she may apply for asylum in the United States or withholding of removal to those countries[.]").

38.     Pursuant to § 1231(b)(3)(A), courts repeatedly have held that individuals cannot be removed to a country that was not properly designated by an IJ if they have a fear of persecution or torture in that country. *See Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999); *Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998); *El Himri v. Ashcroft*, 378 F.3d 932, 938 (9th Cir. 2004); *cf. Protsenko v. U.S. Att'y Gen.*, 149 F. App'x 947, 953 (11th Cir. 2005) (per curiam) (permitting designation of third country where individuals received "ample notice and an opportunity to be heard").

39.     Providing such notice and opportunity to present a fear-based claim prior to deportation also implements the United States' obligations under international law. *See* United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150; United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267; Refugee Act of 1980, Pub. L. 96-212, § 203(e), 94 Stat. 102, 107 (codified as amended at 8 U.S.C. § 1231(b)(3)); *INS v. Stevic*, 467 U.S. 407, 421 (1984) (noting that the Refugee Act of 1980 "amended the language of [the predecessor statute to § 1231(b)(3)], basically conforming it to the language of Article 33 of the United Nations Protocol"); *see also* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, art. III, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, 114; FARRA at 2681–822 (codified at Note to 8 U.S.C. § 1231) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of

Appx.042

being subjected to torture, regardless of whether the person is physically present in the United States."); United Nations Committee Against Torture, General Comment No. 4 ¶ 12, 2017, Implementation of Article 3 of the Convention in the Context of Article 22, CAT/C/GC/4 ("Furthermore, the person at risk [of torture] should never be deported to another State where he/she may subsequently face deportation to a third State in which there are substantial grounds for believing that he/she would be in danger of being subjected to torture.").

40.     Meaningful notice and opportunity to present a fear-based claim prior to deportation to a country where a person fears persecution or torture are also fundamental due process protections under the Fifth Amendment. *See Andriasian*, 180 F.3d at 1041; *Protsenko*, 149 F. App'x at 953; *Kossov*, 132 F.3d at 408; *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1004 (W.D. Wash. 2019). Similarly, a "last minute" IJ designation of a country during removal proceedings that affords no meaningful opportunity to apply for protection "violate[s] a basic tenet of constitutional due process." *Andriasian*, 180 F.3d at 1041.

41.     The federal government has repeatedly acknowledged these obligations. In June 2001, the former Immigration and Naturalization Service drafted a document entitled "Notice to Alien of Removal to Other than Designated Country (Form I-913)," which would have provided noncitizens with written notice of deportation to a third country and a 15-day automatic stay of removal to allow the noncitizen to file an unopposed motion to reopen removal proceedings and accompanying Form I-589 (protection application) before an IJ. *See* Attachment A, Records Produced in Response to Freedom of Information Act (FOIA) Litigation, *Nat.'l Immigr. Litigation Alliance v. ICE*, No. 1:22-cv-11331-IT (D. Mass. filed Aug. 17, 2022), at 2022-ICLI-00055* 9-14. Almost twenty years later, in June 2020, DHS again drafted a model "Notice of Removal to Other than Designated Country," that likewise provided these protections. *See*

14

Attachment B, Records Produced in Response to FOIA Litigation, *Nat.'l Immigr. Litigation Alliance v. ICE*, No. 1:22-cv-11331-IT (D. Mass. filed Aug. 17, 2022), at 2022-ICLI-00055* 8 (Notice).[2] Although neither form was ever published, both reflect how notice must be provided to be meaningful.[3]

42.     Additionally, in 2005, in jointly promulgating regulations implementing 8 U.S.C. § 1231(b), the Departments of Justice and Homeland Security asserted that "[a noncitizen] will have the opportunity to apply for protection as appropriate from any of the countries that are identified as potential countries of removal under [8 U.S.C. § 1231(b)(1) or (b)(2)]." Execution of Removal Orders; Countries to Which Aliens May Be Removed, 70 Fed. Reg. 661, 671 (Jan. 5, 2005) (codified at 8 C.F.R. pts. 241, 1240, 1241) (supplementary information). Furthermore, the Departments contemplated that, in cases where ICE sought removal to a country that was not designated in removal proceedings, namely, "removals pursuant to [8 U.S.C. § 1231(b)(1)(C)(iv) or (b)(2)(E)(vii)]," DHS would join motions to reopen "[i]n appropriate circumstances" to allow the noncitizen to apply for protection. *Id*.

43.     Furthermore, consistent with the above-cited authorities, at oral argument in *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021), the Assistant to the Solicitor General represented that the government must provide a noncitizen with notice and an opportunity to present a fear-based claim before that noncitizen can be deported to a non-designated third country. Specifically, at oral argument in that case, the following exchange between Justice Kagan and Vivek Suri, Assistant to the Solicitor General, took place:

> JUSTICE KAGAN: . . . [S]uppose you had a third country that, for whatever reason,

---

[2]     The complete production is available at https://tinyurl.com/2t868ykr. Pages 1-7 (Bates 2022-ICLI-00055* 1-7) indicate that the notice was drafted on or about May 21, 2020.

[3]     The forms fell short of providing a meaningful opportunity to present a fear-based claim, however, because they placed the burden on the noncitizen to file a motion to reopen.

was willing to accept [a noncitizen]. If -- if -- if that [noncitizen] was currently in withholding proceed -- proceedings, you couldn't put him on a plane to that third country, could you?

MR. SURI: We could after we provide the [noncitizen] notice that we were going to do that.

JUSTICE KAGAN: Right.

MR. SURI: But, without notice --

JUSTICE KAGAN: So that's what it would depend on, right? That -- that you would have to provide him notice, and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country. Isn't that right?

MR. SURI: Yes, that's right.

JUSTICE KAGAN: So, in this situation, as to these [noncitizens] who are currently in withholding proceedings, you can't put them on a plane to anywhere right now, isn't that right?

MR. SURI: Certainly, I agree with that, yes.

JUSTICE KAGAN: Okay. And that's not as a practical matter. That really is, as -- as you put it, in the eyes of the law. In the eyes of the law, you cannot put one of these [noncitizens] on a plane to any place, either the -- either the country that's referenced in the removal order or any other country, isn't that right?

MR. SURI: Yes, that's right.

*See* Transcript of Oral Argument at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021).

44.     Notice is only meaningful if it is presented sufficiently in advance of the deportation to stop the deportation, is in a language the person understands, and provides for an automatic stay of removal for a time period sufficient to permit the filing of a motion to reopen removal proceedings so that a third country for removal may be designated as required under the regulations and the noncitizen may present a fear-based claim. *Andriasian*, 180 F.3d at 1041; *Aden*, 409 F. Supp. 3d at 1009 ("A noncitizen must be given sufficient notice of a country of deportation [such] that, given his capacities and circumstances, he would have a reasonable

16

opportunity to raise and pursue his claim for withholding of deportation.").

45.     An opportunity to present a fear-based claim is only meaningful if the noncitizen is not deported before removal proceedings are reopened. *See Aden*, 409 F. Supp. 3d at 1010 (holding that merely giving petitioner an opportunity to file a discretionary motion to reopen "is not an adequate substitute for the process that is due in these circumstances" and ordering reopening); *Dzyuba v. Mukasey*, 540 F.3d 955, 957 (9th Cir. 2008) (remanding to BIA to determinate whether designation is appropriate).

### E.     DHS Routinely Violates Its Obligations to Provide Notice and Opportunity to Present a Fear-Based Claim Before Deportation to a Third Country

46.     As a matter of policy or practice, DHS violates the statutory, regulatory, and due process framework by depriving Plaintiffs of any notice, let alone meaningful notice, and any opportunity, let alone a meaningful opportunity, to present a fear-based claim prior to deportation to a third country.

47.     Although DHS has a nondiscretionary duty to provide both these protections, DHS routinely fails to do so.

48.     DHS has no written policy to provide, or guarantee provision of, either of these protections.

49.     DHS did not produce any policy in response to the FOIA request and subsequent litigation for such a policy in *Nat.'l Immigr. Litigation Alliance v. ICE*, No. 1:22-cv-11331-IT (D. Mass filed Aug. 17, 2022).

50.     In litigation involving a plaintiff who was removed to a third country after being granted withholding of removal to Cuba, DHS has admitted it has no policy to provide notice or an opportunity to apply for protection regarding removal to a third country. *See Ibarra-Perez v. United States*, No. 2:22-cv-01100-DWL-CDB (D. Ariz. filed Jun. 29, 2022). In both written

discovery and two depositions of DHS witnesses conducted pursuant to Federal Rule of Civil Procedure 30(b)(6), the government repeatedly stated it has no obligation to provide written or oral notice if it intends to deport a noncitizen to a third county, and has no written policy requiring such written notice; instead, the government claimed that if such notifications are provided, they are usually oral. In addition, the government admitted it has no policy to ensure a noncitizen has an opportunity to seek fear-based protection from removal to a third country before that removal takes place.

51.    Nonetheless, DHS has, in a limited number of cases over the years, filed a motion to reopen removal proceedings to designate a new country and allow a noncitizen to pursue a fear-based claim, demonstrating that it is aware of what should be done to provide a meaningful opportunity to seek protection prior to removal to a third country.

52.    DHS' routine failure to provide meaningful notice and opportunity to present a fear-based claim prior to deportation to a third country has led to hundreds of unlawful deportations, placing individuals at serious risk of persecution, torture, and/or death.

**II.    Increased Third Country Deportation Efforts and Re-detention Directive**

53.    Defendants have been in longstanding violation of their obligation to create a system to provide noncitizens with notice and an opportunity to present a fear-based claim to an immigration judge before DHS deports them to a third country.

54.    On information and belief, until January 20, 2025, the number of individuals subjected to DHS' policy or practice was relatively small.

55.    Prior to taking office, the Trump Administration stated its intention to pressure

18

third countries to accept noncitizens ordered deported from the United States.[4]

56.　On January 20, 2025, President Trump signed an Executive Order, entitled Securing our Borders, in which he instructed the Secretary of State, Attorney General, and DHS Secretary to "take all appropriate action to facilitate additional international cooperation and agreements, . . ., including [safe third country agreements] or any other applicable provision of law." *See* Exec. Order No. 14165, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025).

57.　In early February, news outlets reported that Secretary of State Marco Rubio visited several Central American countries to negotiate increased acceptance of noncitizens in or arriving in the United States, including individual with final removal orders.[5]

58.　On or about February 18, 2025, ICE issued a directive instructing officers to review cases for third country deportations and re-detained previously released individuals, including individuals granted withholding or removal or CAT protection and individuals previously released because removal was not reasonably foreseeable. Attachment C.[6]

59.　On March 5, 2025, the New York Times reported: "[ICE leadership] are considering deporting people who have been found to have a legitimate fear of torture in their home countries to third nations, according to documents obtained by The New York Times."[7]

---

[4]　Julia Ainsley, *Incoming Trump Administration Plans to Deport Some Migrants to Countries Other Than Their Own,* NBC News (Dec. 5, 2024); Commonwealth of the Bahamas, *Statement from the Office of the Prime Minister on the Trump Administration Transition Team Proposal* (Dec. 5, 2024) (rejecting Trump transition team proposal to "to accept deportation flights of migrants from other countries").

[5]　Camilo Montoya-Galvez, *Trump Eyes Asylum Agreement with El Salvador to Deport Migrants There*, CBS News (Jan. 27, 2025); Matthew Lee, *Guatemala Gives Rubio a Second Deportation Deal for Migrants Being Sent Home from the US*, AP News (Feb. 5, 2025).

[6]　Nick Miroff and Maria Sacchetti, *Trump Seeks to Fast-Track Deportations of Hundreds of Thousands*, The Washington Post (Feb. 28, 2025).

[7]　Hamed Aleaziz and Zolan Kanno-Youngs, *Frustration Grows Inside the White House Over Pace of Deportations*, N.Y. Times (Mar. 5, 2025).

19

60.     On March 6, 2025, Reuters published a copy of the February 18, 2025, directive.[8] The directive expressly instructs officers to review the cases of noncitizens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the [noncitizen] should be re-detained" and, in the case of those who previously could not be removed because their countries of citizenship were unwilling to accept them, to "review for re-detention . . . in light of . . . potential for third country removals."

61.     Since on or about January 20, 2025, on information and belief, DHS has dramatically increased the number of individuals being re-detained and/or deported to third countries and being considered for deportation to a third country.

## III.    Plaintiffs' Cases

### A.    Plaintiff D.V.D.

62.     Plaintiff D.V.D. is a citizen of Cuba who is married to a U.S. citizen and has two U.S. citizen children. He has a history of severe mental illness which currently is controlled by psychiatric treatment he receives. In February 2017, an IJ ordered him removed to Cuba in removal proceedings. In those proceedings, the IJ designated only Cuba as a country to which he could be removed. ICE released him from detention on an Order of Supervision (OSUP) in May 2017.

63.     Plaintiff D.V.D. consistently has checked in with ICE as required, starting in December 2017. Since September 2019, his check-ins were with ICE's Enforcement and

---

[8]     Ted Hesson and Kristina Cooke, *Trump Weighs Revoking Legal Status of Ukrainians as US Steps Up Deportations*, Reuters (Mar. 6, 2025). The article links to the directive (Attachment C): https://fingfx.thomsonreuters.com/gfx/legaldocs/gkpljxxoqpb/ICE_email_Reuters.pdf (last visited Mar. 23, 2025).

Removal (ERO) office in Burlington, Massachusetts.[9] His most recent check-ins were by telephone or email. He only needed to check in once a year, except in 2019, when he checked in twice.

64.     On Friday, March 7, 2025, D.V.D. completed a check-in with ICE's ERO office in Burlington by email through his immigration attorney. Three days later, on Monday, March 10, 2025, ICE instructed his attorney that he needed to report in person on March 28, 2025 at 8:00am to the Burlington ERO office, only three weeks from the date of his last check-in.

65.     On March 12, 2025, his attorney asked ICE why he needed to check in again so soon after the email check and why it needed to be in person. She also informed them of a separate pending immigration relief application that had been filed in 2021.

66.     On March 15, 2025, the ICE office responded that ICE was requiring all people to report in person and more frequently on a case-by-case basis. Plaintiff D.V.D. is worried because his attorney has never heard of ICE calling someone back for an in-person check-in three weeks after the earlier check-in.

67.     On information and belief, ICE intends to re-detain D.V.D. at the March 28, 2025 check-in pursuant to the February 18, 2025 directive. D.V.D. fears deportation to any third country without notice and a meaningful opportunity to apply for protection—especially with respect countries where he will be deprived of access to psychiatric treatment and will therefore be at risk of persecution due to his mental health conditions or countries where he will be imprisoned upon arrival.

---

[9]     The Burlington ERO office is part of the Boston Field Office of ICE. *See* https://www.ice.gov/contact/field-offices.

21

**B.    Plaintiff M.M.**

68.    M.M. is a citizen of Honduras and resident of Fort Worth, Texas. In 2014, she arrived in the United States, fleeing persecution and torture by her husband, the father of her three eldest children, who had beaten her and the children after having been released from prison for killing two people. M.M. had previously fled Honduras and her husband found her in Mexico and threw her out a second-floor window.

69.    Because M.M. had previously been ordered removed, when she arrived in 2014, DHS reinstated her earlier order, but because M.M. expressed a fear of return to Honduras, an asylum officer interviewed her. The officer found that she had a reasonable fear of persecution or torture in Honduras, and she was placed in withholding-only proceedings before an immigration judge.

70.    In 2021, an IJ granted M.M.'s withholding of removal application, protecting her against deportation to Honduras. Following the IJ's decision, M.M. had to report to ICE in Dallas once a year, which she has been doing.

71.    At her regularly scheduled check-in on February 21, 2025, an ICE officer told M.M. to report again on March 7, 2025, and also placed an ankle shackle on her. On March 7, 2025, M.M. again reported to ICE and an officer told her that she needed to leave the United States because she was on a list of people who would be deported on March 21. The officer made a copy of her passport. M.M. was terrified.

72.    Then, on March 17, 2025, an ICE officer telephoned M.M. in the morning and told her she needed to report in person on April 4, 2025, to the same ICE office that had put on the ankle shackle and where she was told that she is on a list of people ICE is going to deport.

73.    On information and belief, ICE intends to re-detain M.M. at the April 4, 2025

22

check-in pursuant to the February 18, 2025 directive. M.M. is afraid that, if she is deported to a third country, they would send her back to Honduras, where her husband will hurt or kill her. She also fears that her husband would find her in a third country through his connections in the region, as he previously found her in Mexico, or through his connections in other countries, including his family in El Salvador. She is afraid that her children would suffer and that they would be in danger if she cannot continue to protect them.

**C.      Plaintiff E.F.D.**

74.      E.F.D. is citizen of Ecuador who resides in Milford, Massachusetts. He fled the country after he was threatened and beaten by Ecuadorian police after he refused to transport drugs for them in his taxi. The police smashed his taxi's windshield and windows, robbed him, and promised to come back to "finish" him and his family. During his journey to the United States, E.F.D. was kidnapped and robbed in Guatemala and Mexico. He arrived in the United States in 2015 and told immigration officers he was afraid of being returned. After E.F.D. demonstrated to an asylum officer that his fear was credible, he was placed in removal proceedings.

75.      In 2018, an IJ granted E.F.D.'s application for CAT protection, preventing his deportation to Ecuador. Subsequently, ICE released E.F.D. from immigration custody and he has been reporting to ICE in Burlington as part of the terms of his release.

76.      On March 18, 2025, ICE encountered E.F.D. and his co-coworkers when agents were conducting a search for another person who was not there. ICE took E.F.D. and his co-workers into custody. E.F.D. has been at the Plymouth County Correction Facility since that time.

77.      On information and belief, ICE has re-detained E.F.D. pursuant to the February

23

18, 2025 directive with the intention of deporting to him to a third country. E.F.D. fears deportation to any third country without notice and a meaningful opportunity to apply for protection—especially with respect countries that will deport him back to Ecuador where he won protection, with respect to El Salvador, Colombia, or Peru, where he fears individuals in the drug trade will mark him, and to Mexico and Guatemala based on his past experiences of being robbed and kidnapped.

### D.      Plaintiff O.C.G.

78.     Plaintiff O.C.G. is a gay man from Guatemala who fled the country after facing multiple death threats on account of his sexuality. He arrived at the U.S. border in March 2024 and attempted to present himself for inspection to seek asylum. At the border, he told DHS officers that he was afraid to go back to Guatemala. After he spent about a week in immigration custody, DHS officers told O.C.G. that he would be removed. O.C.G. asked officers to have a credible fear interview, but DHS officers told him that it would not be possible, without providing an explanation. He was summarily ordered removed pursuant to 8 U.S.C. § 1225(b) and deported to Guatemala. Still unsafe, he again fled Guatemala and entered Mexico in April 2024.

79.     Shortly after arriving in Iztapalapa, Mexico, O.C.G. was raped by one of the men who had been helping him reach the U.S.-Mexico border. These men locked O.C.G. in a room for several days. O.C.G. was let go after his sister paid these men. He then fled to the United States seeking protection.

80.     O.C.G. entered the United States in May 2024 and voiced his fear of return to Guatemala. DHS officers issued a reinstatement order against him pursuant to 8 U.S.C. § 1231(a)(5), designating Guatemala as the country of removal. But because O.C.G. articulated a

24

fear of persecution in Guatemala, DHS referred him for an interview with an asylum officer. After he established in that interview that his fear was reasonable, DHS placed him in withholding-only proceedings before an IJ in Eloy, Arizona.

81.    In June 2024, O.C.G. appeared pro se for his first hearing. After the IJ told him that he was ineligible for asylum, O.C.G. asked the IJ if he could be deported to a country other than Guatemala or Mexico. The IJ advised O.C.G. that Guatemala was already designated as the country of removal but reassured him that "we cannot send you back to Mexico, sir, because you are a native of Guatemala."

82.    Even though Mexico was not designated as a country or alternative country of removal in the course of those proceedings, O.C.G. nevertheless provided both documentation and testimony about his past harm in Mexico. On February 19, 2025, after hearing testimony and reviewing his documentary evidence, the IJ granted his application for withholding of removal to Guatemala. The IJ determined that it was more likely than not he would be persecuted in Guatemala on account of his sexuality because of the threats of serious harm against him.

83.    Prior to his closing arguments, DHS counsel asked the IJ to clarify whether Mexico was designated as a country of removal. The IJ indicated that Mexico was not designated as a country of removal and that it was too late to designate Mexico as alternate country of removal.

84.    After rendering his decision, the IJ then asked DHS counsel if DHS wanted to reserve appeal. DHS counsel stepped out of the courtroom for approximately 10 minutes and, upon return, indicated that the government waived appeal.

85.    O.C.G. remained detained at Eloy Detention Center after he won withholding. Approximately two days later, a deportation officer told him to gather his belongings because he

Appx.054

was being taken out of the facility. O.C.G. asked where he was being taken, but the officer would not specify. O.C.G. signed a document he was informed was to reclaim his belongings.

86.     After O.C.G. was taken out of the detention center, an officer told him that he was being deported to Mexico. O.C.G. protested that he had won his case and showed the IJ's order. The officer told him that the grant had "expired." He then asked to use a phone to call his attorney, but the officer told him that it was too late to call anyone now that they were outside the facility.

87.     O.C.G. was then taken by bus to Nogales, Mexico with approximately 20 other men. In Nogales, the group was made to board a second bus driven by a man that appeared to be with the Mexican national guard/armed forces and taken to Tabasco, Mexico.

88.     In Tabasco, O.C.G. and the other men were held at a detention facility where he was permitted a two-minute phone call. At the facility, Mexican authorities gave O.C.G. a Hobson's choice: he could either go to another detention facility hours away by bus where they said he would remain detained and wait several months to apply for asylum in Mexico, a foreign country in which he was raped, held hostage, and extorted and did not feel safe, or Mexican authorities would take him to Guatemala, the country from which he fled and in which an IJ had found it was more likely than not he would again be persecuted.

89.     With no safe option, on February 25, 2025, Mexican authorities deported Plaintiff O.C.G. to Guatemala. To date, Plaintiff O.C.G. remains in hiding in Guatemala.

## CLASS ACTION ALLEGATIONS

90.     Plaintiffs bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2). A class action is proper because this action involves questions of law and fact common to the class, the class is

26

so numerous that joinder of all members is impractical, Plaintiffs' claims are typical of the claims of the class, and Plaintiffs will fairly and adequately protect the interests of the class. Defendants have acted on grounds that apply generally to the class, so that relief under the Administrative Procedure Act and declaratory relief are appropriate with respect to the class as a whole.

91.    Plaintiffs seek to represent the following class:

All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

92.    The proposed class meets the numerosity requirements of Federal Rule of Civil Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable. DHS is in sole possession of the information regarding the precise number of potential class members. On information and belief, there are thousands of individuals with final removal orders that DHS presently cannot execute to the designated country(ies), including because, inter alia, the individual has won withholding of removal or CAT protection specific to the designated country of removal or because the designated country of removal or alternative country of removal is recalcitrant, uncooperative, or unwilling to accept the individual. These individuals are now at significant risk of both re-detention and deportation to third countries without an opportunity to present a fear-based claim of persecution or torture. On information and belief, there are hundreds of individuals DHS has deported to third countries since January 20, 2025.

93.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The members of the class are all subject or will be subject to DHS' unlawful policy or practice of refusing to provide meaningful notice and opportunity to present a fear-

27

based claim to an immigration judge prior to deportation to a third country and to the February 18, 2025 re-detention directive. The lawsuit raises questions of law common to members of the proposed class, including whether DHS' policy or practice of third country removal, and the re-detention directive, violate the INA, FARRA, implementing regulations, and/or due process.

94.     The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Plaintiffs are typical of the class. Each of the class members will be subject to, or has been subjected to, DHS' policy or practice of not providing notice or a meaningful opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country and ICE's re-detention directive. This is true even though the INA, FARRA, implementing regulations, and due process requires Defendants to provide these basic safeguards and due process mandates that detention must be narrowly tailored to achieve a legitimate government purpose. Plaintiffs and the proposed class share the same legal claims, which assert the same substantive and procedural rights under the INA, FARRA, implementing regulations, APA, and Due Process Clause.

95.     The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Plaintiffs seek the same final relief as the other members of the class—namely, an order declaring Defendants' policy or practice and February 18, 2025 re-detention directive unlawful, declaring Plaintiffs' rights under the INA, FARRA, implementing regulations, and the Constitution, enjoying Defendants from failing to provide Plaintiffs with meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country, and setting aside Defendants' February 18, 2025 directive.

96.     Plaintiffs will fairly and adequately protect the interests of the proposed class

members because they seek relief on behalf of the class as a whole and have no interest that is antagonistic to other class members.

97.     Plaintiffs are represented by competent counsel with extensive experience in complex class actions and immigration law.

98.     The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the proposed class, thereby making final declaratory, APA, and injunctive relief appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### Count I

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)

99.     The allegations in the above paragraphs are realleged and incorporated herein.

100.    The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review." 5 U.S.C. § 702.

101.    The APA compels a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious, . . . otherwise not in accordance with law," *id.* § 706(2)(A), or "short of statutory right," *id.* § 706(2)(C).

102.    Defendants have a policy or practice of failing to provide noncitizens who have final removal orders with meaningful notice and opportunity to present a fear-based claim prior to deportation to a third country.

103.    Defendants' policy or practice is arbitrary and capricious. It deprives individuals with final removal orders of meaningful notice of DHS' intent to deport them to a third country and deprives them of an opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country. It endangers their lives and safety by subjecting them to the

very persecution and torture they fear in the third country.

104.    In addition, Defendants' February 18, 2025 directive explicitly instructing DHS officers to review cases for removal to third countries and to re-detain individuals prior to providing notice of the third country and an opportunity to apply for protection is arbitrary and capricious and not in accordance with law because Defendants have no mechanism to ensure meaningful notice and an opportunity to present a fear-based claim prior to removal to a third country. As such, their civil detention is not tied to a lawful purpose.

105.    Defendants' policy or practice is also not in accordance with law, short of statutory rights, and violates the INA, FARRA, and implementing regulations all of which mandate that Defendants refrain from removing Plaintiffs to a third country where they will likely be persecuted or tortured, thus requiring Defendants to provide meaningful notice of deportation to a third country and the opportunity to present a fear-based claim to an immigration judge before deporting an individual to a third country, yet Defendants do not do so.

106.    Accordingly, the Court should hold unlawful and set aside Defendants' policy or practice of failing to provide noncitizens who have final removal orders with meaningful notice and opportunity to present a fear-based claim prior to deportation to a third country.

107.    The Court also should order Defendants to provide Plaintiffs and class members with meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country, and should set aside Defendants' February 18, 2025 directive to re-detain Plaintiffs D.V.D. and M.M. and previously released class members until they have been provided meaningful notice and opportunity to apply for protection.

## Count II

### Administrative Procedure Act, 5 U.S.C. § 706(1)

108.    The allegations in the above paragraphs are realleged and incorporated herein.

109.    The APA empowers federal courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

110.    The INA, FARRA, and implementing regulations, and the Constitution mandate meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country. Defendants have unlawfully withheld the provision of these statutory, regulatory, and constitutional rights.

111.    Accordingly, the Court should compel Defendants to provide Plaintiffs and class members with meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country.

## Count III

### Fifth Amendment Due Process Clause and
### Administrative Procedure Act, 5 U.S.C. § 706(2)(D)

112.    The allegations in the above paragraphs are realleged and incorporated herein.

113.    The INA, FARRA, and implementing regulations mandate meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country.

114.    Plaintiffs have a due process right to meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country. *See, e.g.*, *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1004 (W.D. Wash. 2019). Plaintiffs also have a due process right to implementation of a process or procedure to afford these protections. *See, e.g.*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491 (1991). Plaintiffs also have a due

31

process right to not be re-detained pursuant to the February 18, 2025 directive because Defendants have no procedural protections to ensure meaningful notice and an opportunity to present a fear-based claim prior to removal to a third country. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The APA also compels a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

115.    By failing to implement a process or procedure to afford Plaintiffs meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country and by re-detaining previously released individuals pursuant to the February 18, 2025 directive, Defendants have violated Plaintiffs' substantive and procedural due process rights and are not implementing procedures required by the INA, FARRA, and the implementing regulations.

116.    Accordingly, the Court should declare that Defendants have violated Plaintiffs' constitutional right to due process and that the Due Process Clause affords Plaintiffs the right to a process and procedure ensuring that DHS provides meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country and ensuring that Plaintiffs D.V.D. and M.M. and previously released class members are not re-detained pursuant to the February 18, 2025 directive.

117.    The Court should enjoin Defendants from failing to provide Plaintiffs and class members with meaningful notice and opportunity to present a claim for protection to an immigration judge before DHS deports a person to a third country. The Court should also set aside the implementation of the February 18, 2025 directive to re-detain Plaintiffs D.V.D. and M.M. and previously released class members, and should release Plaintiff E.F.D., until

32

Defendants provide meaningful notice and an opportunity to apply for protection.

## Count IV

### Declaratory Judgment, 28 U.S.C. § 2201

118.    The allegations in the above paragraphs are realleged and incorporated herein.

119.    Under 28 U.S.C. § 2201(a), a court "may declare the rights and other legal relations of any interested party seeking such declaration."

120.    Plaintiffs seek a declaration that the Immigration and Nationality Act, the Foreign Affairs Reform and Restructuring Act of 1998, implementing regulations, the Due Process Clause of the Fifth Amendment, and the treaty obligations of the United States require Defendants to provide meaningful notice and opportunity to present a fear-based claim to an immigration judge prior to deportation and prior to re-detaining Plaintiffs and class members based on potential removal to a third country.

121.    Defendants have a policy or practice of ignoring these statutory, regulatory, and constitutional mandates.

122.    Accordingly, Plaintiffs request that the Court declare their rights and legal relations under the INA, and FARRA and implementing regulations and the Due Process Clause of the Fifth Amendment.

## Count V

### Violation of 8 U.S.C. § 1231(a) and Fifth Amendment Due Process Clause
### (Brought by Plaintiffs E.F.D., D.V.D., and M.M.)

123.    The allegations in the above paragraphs are realleged and incorporated herein.

124.    The INA requires mandatory detention of individuals with final removal orders only during the 90-day removal period. 8 U.S.C. § 1231(a)(2).

125.    A noncitizen who is not removed within that period "shall be subject to

33

Appx.062

supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3).

126.    While § 1231(a)(6) permits detention beyond the removal period in certain situations, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Zadvydas*, 533 U.S. at 699.

127.    No statute permits Defendants to re-detain an individual who has been released under § 1231(a)(3) without evidence that removal is now reasonably foreseeable or that the individual has violated the conditions of their release.

128.    The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law." U.S. Const. amend. V.

129.    Plaintiffs E.F.D., D.V.D., and M.M. were previously detained by ICE and released after an individualized custody determination that considered any danger or unmitigable flight risk. They have a liberty interest in remaining free from physical confinement where removal is not reasonably foreseeable, they have not violated the conditions of their release, and where re-detention is unlawful because Defendants have not created a lawful mechanism to ensure that noncitizens receive meaningful notice and an opportunity to present a fear-based claim before deportation to a third country.

130.    For these reasons, Defendants have violated the INA, implementing regulations, and the Due Process Clause of the Fifth Amendment.

### Count VI

**Violation of FOIA, 5 U.S.C. § 552**
**Failure to Proactively Disclose Records**
**(Against Defendant DHS)**

131.    The allegations in the above paragraphs are realleged and incorporated herein.

132.    Defendant DHS is obligated under 5 U.S.C. § 552(a)(2)(B) and (a)(2)(C) to proactively disclose "those statements of policy and interpretations which have been adopted by

34

the agency and are not published in the Federal Register" and "administrative staff manuals and instructions to staff that affect a member of the public."

133.    Defendant DHS may not "rel[y] on, use[], or cite[] as precedent" any "final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public" against a party unless the material is "indexed and either made available or published as provided by [5 U.S.C. § 552(a)(2)(E)]" or "the party has actual and timely notice of the terms thereof." 5 U.S.C. § 552(a)(2)(E).

134.    The February 18, 2025 directive is a statement of policy adopted by DHS but not published in the Federal Register and an instruction to staff which affects members of the public. On information and belief, Defendant DHS has similar statements of policy, instruction, or guidance covered by 5 U.S.C. § 552(a)(2)(E) related to Defendants' increased efforts to deport noncitizens to third countries exist.

135.    Defendant DHS has failed to proactively disclose the February 18, 2025 directive and/or related statements of policy, instruction, or guidance covered by 5 U.S.C. § 552(a)(2)(E), and no legal basis exists for Defendant DHS's failure to proactively disclose these materials.

136.    Defendant DHS has nonetheless relied upon the February 18, 2025 directive, and has possibly relied on other statements of policy or instruction or guidance covered by 5 U.S.C. § 552(a)(2)(E), against Plaintiffs.

137.    Defendant DHS's failure to proactively disclose the February 18, 2025 directive and other statements of policy, instruction, or guidance covered by 5 U.S.C. § 552(a)(2)(E), is in violation of 5 U.S.C. § 552(a)(2). Defendant DHS's reliance on these materials against Plaintiffs is violation of 5 U.S.C. § 552(a)(2)(E).

138.    For these reasons, Defendants cannot rely on or use the February 18, 2025

35

directive to re-detain Plaintiffs and class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.   Assume jurisdiction over this action;

b.   Certify the case as a class action as proposed herein and in the accompanying motion for class certification;

c.   Declare that Defendants have violated Plaintiffs' and class members' statutory, regulatory, and constitutional rights by depriving them of meaningful notice and opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country and by re-detaining them pursuant to the February 18, 2025 directive;

d.   Declare that Defendants have a mandatory duty to provide Plaintiffs and class members with meaningful notice and opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country;

e.   Declare that Defendants' February 18, 2025 directive is unlawful because re-detention is not tied to a lawful removal process;

f.   Set aside Defendants' current policy of failing to provide Plaintiffs and class members with written notice and a meaningful opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country;

g.   Set aside Defendants' February 18, 2025 directive to re-detain Plaintiffs and class members who were previously released based on potential removal to a third country;

h.   Preliminarily and permanently enjoin Defendants from failing to provide individual named Plaintiffs with written notice and a meaningful opportunity to present a fear-based claim under 8 U.S.C. § 1231(b)(3) and/or under the Convention Against Torture to an

36

immigration judge prior to deportation to a third country;

i.    Preliminarily and permanently enjoin Defendants from failing to provide class members with written notice and a meaningful opportunity to present a fear-based claim under the Convention Against Torture to an immigration judge prior to deportation to a third country;

j.    Stay and set aside Defendants' February 18, 2025 directive to re-detain Plaintiffs and class members who were previously released where re-detention is not tied to a lawful removal process (i.e., without providing meaningful notice and an opportunity to present a protection claim regarding removal to a third country);

k.    Order Defendants to immediately return Plaintiff O.C.G. to the United States and provide him with written notice and a meaningful opportunity to present a fear-based claim under 8 U.S.C. § 1231(b)(3) and/or under the Convention Against Torture to an immigration judge prior to any effort to again deport him to a third country;

l.    Order Defendants to immediately return class members who have been removed to a third country without written notice and a meaningful opportunity to apply for protection under the Convention Against Torture unless the class member confirms they do not wish to return;

m.    Enjoin Defendants from relying on or using the February 18, 2025 directive pursuant to 5 U.S.C. § 552(a)(2);

n.    Award costs and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

o.    Order all other relief that the Court deems just and proper.

37

Respectfully submitted,

s/*Tomás Arango*

Tomas Arango
Trina Realmuto*
Kristin Macleod-Ball*
Mary Kenney*
**NATIONAL IMMIGRATION
    LITIGATION ALLIANCE**
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4649
trina@immigrationlitigation.org

Anwen Hughes*
**HUMAN RIGHTS FIRST**
75 Broad Street, 31st Floor
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

Matt Adams*
Leila Kang*
Aaron Korthuis*
Glenda M. Aldana Madrid*
**NORTHWEST IMMIGRANT
    RIGHTS PROJECT**
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org

*Attorneys for Plaintiffs*

* *Application for admission pro hac vice forthcoming*

Dated: March 23, 2025

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
D.V.D.; M.M.; E.F.D.; and O.C.G.

**DEFENDANTS**
U.S. Department of Homeland Security, et al.

**(b)** County of Residence of First Listed Plaintiff   Berkshire County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See attached sheet.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☒ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &   Pharmaceutical Slander   Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability   ☐ 368 Asbestos Personal ☐ 340 Marine   Injury Product ☐ 345 Marine Product   Liability | | ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability   **PERSONAL PROPERTY** ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury   ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -   Product Liability Medical Malpractice | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | Exchange ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation ☐ 791 Employee Retirement | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | Income Security Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/   Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | ☐ 871 IRS—Third Party | ☒ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty Employment | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of Agency Decision |
| | ☐ 446 Amer. w/Disabilities -   **Other:** Other   ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education   ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee -   Conditions of   Confinement | Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. § 701 et seq.; 8 U.S.C. § 1101 et seq.; 28 U.S.C. § 2201; 5 U.S.C. § 552; FARRA; 5th Am. Due Process Cl.;

Brief description of cause:
Class action challenging lack of notice and opportunity to present fear-based claim prior to third country deportation

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $   n/a

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE ___n/a___   DOCKET NUMBER ___n/a___

DATE   3/23/2025

SIGNATURE OF ATTORNEY OF RECORD   s/ Tomas Arango

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

Appx.068

**Attachment to JS-44**

**I.(c) Complete listing of Plaintiffs' counsel**

Tomas Arango
Trina Realmuto
Kristin Macleod-Ball
Mary Kenney
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4649

Matt Adams
Leila Kang
Aaron Korthuis
Glenda M. Aldana Madrid
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

Anwen Hughes
Human Rights First
75 Broad Street, 31st Floor
New York, NY 10004
(212) 845-5244

**U.S. Department of Justice**
Immigration and Naturalization Service

## Notice to Alien of Removal to Other than Designated

Alien's Name _____  A# _____  Detention Facility _____

You have been ordered removed to _____ , as you or the immigration judge designated during your removal proceeding. The immigration judge has ordered, in the alternative, that you be removed to _____ . The INS has made a formal request(s) to the government(s) of this/these country(ies) for a travel document.

The government of _____ :

☐ has formally responded to the INS request by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

In the alternative, the government of_____ :

☐ has also responded by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

Since your removal to the country(ies) designated in the removal order is not possible, you are hereby notified that the INS intends to disregard the designation in accordance with section 241(b)(2)(C) of the Immigration and Nationality Act (Act). Pursuant to section 241(b)(2)(D) or (E) of the Act, the INS is making arrangements to remove you to an alternate country, specifically _____ , which is:

☐ the country of which you are a subject, national, or citizen;

☐ the country from which you were last admitted to the United States;

☐ the country in which is located the foreign port from which you left for the United States;

☐ the country of which you last resided before entering the country from which you entered the United States;

☐ the country of your birth;

☐ whose government is willing to accept you.

☐ the country that had sovereignty over your birthplace when you were born;

If you believe that your life or freedom would be threatened in the alternate country of removal, due to your race, religion, nationality, membership in a particular social group, or political opinion, or that you would be tortured in that country, you may file a motion to reopen with the immigration court or the Board of Immigration Appeals, as applicable, for the purpose of applying for withholding of removal or relief under the Convention Against Torture. Your motion must be accompanied by your application (Form I-589) and any supporting documentation. If you fail to file a motion to reopen within fifteen (15) days of the date you are served with this notice, you will be considered to have waived any opportunity to contest removal to that country, and the INS will proceed with your removal. The INS may extend the fifteen (15) day time period for good cause.

Sincerely,

_____      _____
Name                                                      Title

Appx. 070 Form I-710 (06/15/01)

**Attachment A**

Alien's Name _____ A# _____ Detention Facility _____

You have been ordered removed to _____ , as you or the immigration judge designated during your removal proceeding.  The immigration judge has ordered, in the alternative, that you be removed to _____ .  The INS has made a formal request(s) to the government(s) of this/these country(ies) for a travel document.

The government of _____ :

☐ has formally responded to the INS request by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

In the alternative, the government of _____ :

☐ has also responded by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

Since your removal to the country(ies) designated in the removal order is not possible, you are hereby notified that the INS intends to disregard the designation in accordance with section 241(b)(2)(C) of the Immigration and Nationality Act (Act). Pursuant to section 241(b)(2)(D) or (E) of the Act, the INS is making arrangements to remove you to an alternate country, specifically _____ , which is:

☐ the country of which you are a subject, national, or citizen;

☐ the country from which you were last admitted to the United States;

☐ the country in which is located the foreign port from which you left for the United States;

☐ the country of which you last resided before entering the country from which you entered the United States;

☐ the country of your birth;

☐ whose government is willing to accept you.

☐ the country that had sovereignty over your birthplace when you were born;

If you believe that your life or freedom would be threatened in the alternate country of removal, due to your race, religion, nationality, membership in a particular social group, or political opinion, or that you would be tortured in that country, you may file a motion to reopen with the immigration court or the Board of Immigration Appeals, as applicable, for the purpose of applying for withholding of removal or relief under the Convention Against Torture.  Your motion must be accompanied by your application (Form I-589) and any supporting documentation.  If you fail to file a motion to reopen within fifteen (15) days of the date you are served with this notice, you will be considered to have waived any opportunity to contest removal to that country, and the INS will proceed with your removal.  The INS may extend the fifteen (15) day time period for good cause.

Sincerely,

_____         _____
Name                                Title

Appx. 071  Form I-713 (06/15/01)

Alien's Name _____  A# _____  Detention Facility _____

You have been ordered removed to _____ , as you or the immigration judge designated during your removal proceeding. The immigration judge has ordered, in the alternative, that you be removed to _____ . The INS has made a formal request(s) to the government(s) of this/these country(ies) for a travel document.

The government of _____ :

☐ has formally responded to the INS request by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

In the alternative, the government of _____ :

☐ has also responded by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

Since your removal to the country(ies) designated in the removal order is not possible, you are hereby notified that the INS intends to disregard the designation in accordance with section 241(b)(2)(C) of the Immigration and Nationality Act (Act). Pursuant to section 241(b)(2)(D) or (E) of the Act, the INS is making arrangements to remove you to an alternate country, specifically _____ , which is:

☐ the country of which you are a subject, national, or citizen;

☐ the country from which you were last admitted to the United States;

☐ the country in which is located the foreign port from which you left for the United States;

☐ the country of which you last resided before entering the country from which you entered the United States;

☐ the country of your birth;

☐ whose government is willing to accept you.

☐ the country that had sovereignty over your birthplace when you were born;

If you believe that your life or freedom would be threatened in the alternate country of removal, due to your race, religion, nationality, membership in a particular social group, or political opinion, or that you would be tortured in that country, you may file a motion to reopen with the immigration court or the Board of Immigration Appeals, as applicable, for the purpose of applying for withholding of removal or relief under the Convention Against Torture. Your motion must be accompanied by your application (Form I-589) and any supporting documentation. If you fail to file a motion to reopen within fifteen (15) days of the date you are served with this notice, you will be considered to have waived any opportunity to contest removal to that country, and the INS will proceed with your removal. The INS may extend the fifteen (15) day time period for good cause.

Sincerely,

_____        _____
Name                                     Title

## Certificate of Service

Alien's Name _____    Alien's A-Number _____

- I hereby certify that I served this notice on the above-named alien.

_____    _____
(Signature)                        (Date)

_____    _____
(Name)                             (Title)

- I have read this notice to the above-named alien in the _____ language, which the alien understands.

_____    _____
(Signature)                        (Date)

_____    _____
(Name)                             (Title)

- I hereby certify that I served this notice on the attorney or personal representative of record, if any, of the above-named alien.

Attorney's/Representative's Name: _____

Method of Service *(Check one):*    ☐ By personal delivery
☐ By fax
☐ By first class mail

_____    _____
(Signature)                        (Date)

_____    _____
(Name)                             (Title)

## Alien's Acknowledgment of Service

- I have been personally served with the attached Notice to Alien of Removal to Other than Designated Country and have been read this Notice in the _____ language, which I understand.

_____    _____
(Signature)                        (Date)

Appx 073 Form I-913 (06/15/01)

## Certificate of Service

Alien's Name _____    Alien's A-Number _____

- I hereby certify that I served this notice on the above-named alien.

_____
(Signature)

_____
(Name)

_____
(Date)

_____
(Title)

- I have read this notice to the above-named alien in the _____ language, which the alien understands.

_____
(Signature)

_____
(Name)

_____
(Date)

_____
(Title)

- I hereby certify that I served this notice on the attorney or personal representative of record, if any, of the above-named alien. Attorney's/Representative's Name: _____

Method of Service *(Check one):*     ☐ By personal delivery
☐ By fax
☐ By first class mail

_____
(Signature)

_____
(Name)

_____
(Date)

_____
(Title)

## Alien's Acknowledgment of Service

- I have been personally served with the attached Notice to Alien of Removal to Other than Designated Country and have been read this Notice in the _____ language, which I understand.

_____
(Signature)

_____
(Date)

Appx074

Form I-713 (06/15/01)

## Certificate of Service

Alien's Name _____    Alien's A-Number _____

● I hereby certify that I served this notice on the above-named alien.

_____    _____
(Signature)                              (Date)

_____    _____
(Name)                                   (Title)

● I have read this notice to the above-named alien in the _____ language, which the alien understands.

_____    _____
(Signature)                              (Date)

_____    _____
(Name)                                   (Title)

● I hereby certify that I served this notice on the attorney or personal representative of record, if any, of the above-named alien.
Attorney's/Representative's Name: _____

Method of Service *(Check one):*    ☐ By personal delivery
☐ By fax
☐ By first class mail

_____    _____
(Signature)                              (Date)

_____    _____
(Name)                                   (Title)

## Alien's Acknowledgment of Service

● I have been personally served with the attached Notice to Alien of Removal to Other than Designated Country and have been read this Notice in the _____ language, which I understand.

_____    _____
(Signature)                              (Date)

**\* DRAFT MODEL NOTICE FOR REPRESENTED ALIENS ONLY & FOLLOWING ICE OPLA ILPD CLEARANCE \***

[Alien Name and A#]

## Notice of Removal to Other than Designated Country

In a decision dated _____, the Immigration Court ordered you removed to _____, but subsequently granted withholding of removal to that country under section 241(b)(3) of the Immigration and Nationality Act (Act).  By this notice, the Department of Homeland Security (DHS) formally advises you that it is pursuing your removal to _____ as an alternate country pursuant to section 241(b)(2) of the Act.

If you believe that your life or freedom would be threatened in the alternate country of removal, due to your race, religion, nationality, membership in a particular social group, or political opinion, or that you would be tortured in that country, you may wish to apply with the Immigration Court for withholding of removal under section 241(b)(3) of the Act, or protection pursuant to the regulations implementing the U.S. obligations under Article 3 of the Convention Against Torture.[1]

Accordingly, assuming that you do so within fifteen (15) days of the date of service of this notice, DHS will not oppose your filing of a motion to reopen with the Immigration Court for this purpose accompanied by a properly completed Form I-589 and any supporting documentation.  DHS reserves the right to contest your applications for protection from removal on the merits.

If you believe that you need more time to prepare and file any such motion to reopen, please contact the undersigned immediately and explain why you need additional time and how much additional time is needed.

If you fail to file a motion to reopen as set forth above, DHS will assume that you do not wish to seek protection from removal to the alternate country of removal and will proceed with your removal.

[OPLA Signature Bloc]

[cc: Immigration Court]

[Certificate of Service on Alien's Counsel]

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted and opened for signature Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) (implemented in the removal context in principal part at 8 C.F.R. §§ 1208.16(c) - .18).

**Attachment B**

Apx.076

On January 20, 2025, President Donald J. Trump issued Executive Order 14165, *Securing Our Borders*, in which he highlighted that "catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States" and directed "the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as 'catch-and-release,' whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law." 90 Fed. Reg. 8467, 8468.

## Unprocessed Cases

ERO officers should consider for expedited removal (ER) all aliens previously released by U.S. Customs and Border Protection (CBP) who have not affirmatively filed an application for asylum with U.S. Citizenship and Immigration Services, when they report to an ERO Field Office. This includes: (1) paroled arriving aliens; (2) aliens issued a CBP "Notice to Report" (NTR); and (3) aliens processed for "Parole + ATD" or "Parole with Conditions" (PWC).

### Arriving Aliens

ERO officers may process for ER any arriving alien (i.e., encountered at a port of entry) who CBP determined to be inadmissible and released, as long as the alien is inadmissible under INA § 212(a)(6)(C) (fraud or willful misrepresentation) or 212(a)(7) (lack of valid immigration documents). There is no time limit on the ability to process such aliens for ER.

### NTR Cases, Parole + ATD, and PWC Cases

Under the NTR process, certain aliens encountered at the Southwest Border were released into the United States without a Notice to Appear (NTA) or parole. Parole + ATD and PWC were two processes whereby aliens encountered at the Southwest Border were paroled without an NTA and instructed to report to ICE for further processing.

**Attachment C**

1

Appx.077

Case: 26-1212    Document: 00118426955    Page: 81    Date Filed: 04/06/2026    Entry ID: 6798915

Aliens identified as having been subject to any of these processes are subject to ER if they are inadmissible under INA § 212(a)(6)(C) or (a)(7) and either (1) the initial CBP encounter was within 14 days and 100 air miles of the border; or (2) the alien has not been continuously physically present in the United States for two years prior to the finding of inadmissibility by ERO.

If an alien identified above is not processed for ER, he or she should be processed for section 240 removal proceedings with issuance of an NTA.

If the alien is on an active parole, the NTA or ER charging document will terminate the parole.

**Non-detained Reporting Generally**

Recognizing the unprecedented strides the Administration has made with regard to removal cooperation, ERO should carefully review for removal all cases reporting on the non-detained docket.

*Aliens Granted Withholding of Removal or CAT Protection*

Withholding of removal under the INA and under the regulations implementing U.S. obligations under the Convention Against Torture (CAT) and CAT deferral of removal (DCAT) are country-specific protections from removal. Accordingly, when an alien granted such protection reports on the non-detained docket, ERO officers should review the case to determine the viability of removal to a third country and accordingly whether the alien should be re-detained.

*Aliens Previously Released for Lack of SLRRFF*

ERO officers should review for re-detention the case of any alien reporting on the non-detained docket who was previously released due to no significant likelihood of removal in the reasonably foreseeable future (SLRRFF) in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third count removals. Revocation of release is authorized for removal or to enforce conditions of release and is provided for in 8 C.F.R. §§ 241.4 and 241.13. If removal appears significantly likely in the reasonably foreseeable future, the arrest may proceed without further investigation. At the time of arrest, the alien should be provided written notification of the reason for his or her detention. Promptly, ideally, within two days, the arresting officer or another officer, if necessar should conduct an informal interview of the alien and provide an opportunity for the alien to ask questions and tell th interviewer anything that the alien wishes in support of why he or she should be released.

Appx0078

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. **Title of case (name of first party on each side only)** D.V.D. v. U.S. Department of Homeland Security

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).**

   [ ]   **I.**    160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

   [✔]   **II.**   110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

   [ ]   **III.**   120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

       *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. **Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

   n/a

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**

   YES [ ]   NO [✔]

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?    (See 28 USC §2403)**

   YES [ ]   NO [✔]

   **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**

   YES [ ]   NO [ ]

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**

   YES [ ]   NO [✔]

7. **Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).**

   YES [ ]   NO [✔]

   A.   **If yes, in which division do all of the non-governmental parties reside?**

      **Eastern Division** [ ]   **Central Division** [ ]   **Western Division** [ ]

   B.   **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**

      **Eastern Division** [✔]   **Central Division** [ ]   **Western Division** [ ]

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)**

   YES [ ]   NO [✔]

**(PLEASE TYPE OR PRINT)**

**ATTORNEY'S NAME** Tomas Arango

**ADDRESS** National Immigration Litigation Alliance, 10 Griggs Terrace, Brookline, MA 02446

**TELEPHONE NO.** (617) 819-4649

**(CategoryForm11-2020.wpd )**

Appx.079

**DECLARATION OF** ████████████████

I, ████████████████ make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  My name is ████████████████ I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I am a citizen of Cuba. I reside in Pittsfield, Massachusetts.

3.  In 1999, I first arrived in the United States. I left Cuba because I was opposed to the government and involved in the resistance.

4.  I suffer from schizoaffective disorder, major depressive disorder, and post-traumatic stress disorder. About a year after I arrived in the United States, I went to a psychologist for the first time because of the voices I had been hearing in my head, but I had been having symptoms for a long time before that. Because of the noises and voices in my head, I had not been able to keep a stable job; at times the voices would tell me to hurt myself or end my life. I was homeless for some years and also suffered from alcoholism and drug addiction until 2017, when I began going to church and became sober.

5.  In January 2017, I was arrested by immigration officials when reentering the United States. I explained that I was afraid of being deported to Cuba and an asylum officer found that I had a credible fear of persecution.

6.  I received a Notice to Appear in February 2017. The immigration judge said that Cuba was the country where I could be deported. On February 10, 2017, the immigration judge ordered me deported to Cuba. I appealed but then withdrew my appeal because I could not remain detained. U.S. Immigration and Customs Enforcement (ICE) released me from detention on an Order of Supervision in May 2017.

7.  I checked in with ICE like I was required to, starting in November 2017. Since September 2019, my check-ins were with the office in Burlington, Massachusetts. My most recent check-ins were by telephone or email. I usually only needed to check in once a year, except in 2019, when I checked in twice.

8.  I married my wife who is a U.S. citizen in 2023. I have a daughter and a step-son who are also U.S. citizens.

9.  On Friday, March 7, 2025, I checked in by email with the Burlington ICE office with the help of my attorney, Laura Putnam.

10. Three days later, on Monday, March 10, 2025, the ICE office sent an email to Ms. Putnam, telling her that I needed to report to the office in Burlington, Massachusetts in person on March 28, 2025 at 8:00 am.

 EXHIBIT A

Addx.080

11. On March 12, 2025, Ms. Putnam emailed back to ask why I needed to check in again so soon after the email check and why it needed to be in person. She also told them that I have a pending application for a U visa filed in 2021.

12. On March 15, 2025, the ICE office told Ms. Putnam by email that they were requiring all people to report in person and more frequently on a case-by-case basis. I am worried because my attorney told me that she has never heard of ICE calling someone back for an in-person check-in three weeks after the earlier check-in.

13. I am very afraid that, at the check-in, they will arrest me and deport me to a country without any warning. I am afraid of being deported to any country where I will be imprisoned when I arrive and/or where I will be deprived of access to psychiatric treatment and will therefore be at risk of persecution due to my mental health conditions. If I was deported and separated from my partner and family, I would not have health insurance and mental health treatment. I am very afraid that I would become homeless again or even die without that support.

14. As a named plaintiff in this case, I understand that if the Court grants the motion for class certification, I would represent a large number of people with final removal orders who have been deported, or who are threatened with being deported, to a country or countries where they have not been provided notice and/or an opportunity to apply for protection relating to a fear of persecution or torture related to that country.

15. I understand that, as a class representative, I represent the interests of all class members in this lawsuit and that it is my responsibility to represent the interests of the whole class and not just my own personal interests.

16. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action, or the case is over.

17. I understand and accept that any resolution of the lawsuit, for example by settlement and dismissal, is subject to Court approval and must be in the best interests of the class as a whole.

18. I understand that, by agreeing to become a class representative, I have a duty to take steps to help move the case forward, which I will do with my attorneys. I know that I must attend court if necessary; provide information to my attorneys that they feel is necessary for the case; give them documents I have if it is required; testify at a deposition or trial if necessary; and provide my attorneys with my contact information and current whereabouts because it may be necessary for them to contact me on short notice.

19. I understand that I am volunteering to represent many other persons with similar claims. I believe it is important that people in my situation receive advanced notice and a fair opportunity to apply for protection before they are deported to a third country.

Case: 26-1212    Document: 00118426955    Page: 86    Date Filed: 04/06/2026    Entry ID: 6798915

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Pittsfield, Massachusetts on March ⎯⎯⎯, 2025.

By ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

Appx.082

## DECLARATION OF █████████████

I, █████████████ make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. My name is █████████████ I am over the age of 18 and am competent to testify regarding the matters described below.

2. I am a citizen of Honduras. I reside in Fort Worth, Texas. I am the mother to four children and the primary caretaker of my three youngest children. Two of my children, who are teenagers, ages 13 and 17, have lawful permanent resident status. My youngest child, who is 5 years-old, is a U.S. citizen.

3. In 2014, I arrived in the United States. I was fleeing persecution and torture by my husband, the father of my three eldest children.

4. I had been ordered removed in the past, so after I arrived in 2014, that old order of removal against me was reinstated. I had an interview with an asylum officer. The officer found that I had a reasonable fear of persecution or torture in Honduras and sent my case to the immigration court so that I could apply for withholding of removal before an immigration judge.

5. During proceedings, I was released from detention. At the beginning, I had to wear an ankle shackle. I had to report to Immigration and Customs Enforcement (ICE) in Dallas every eight days and then every fifteen days.

6. During my proceedings, the immigration judge said that Honduras was the country where I could be deported.

7. I applied for withholding of removal and protection under the Convention Against Torture, because of my fear of what my husband had done and would do to my children and me if we were forced to return there. My husband beat me and my children. If I tried to leave him or go to the police, he would threaten me. He threatened me with a gun and put it in my mouth and against my neck. He went to prison for killing two people and, when he was released, he began to threaten me again and I fled Honduras.

8. The immigration judge granted my application for withholding of removal on July 19, 2021. The government did not appeal the judge's decision to the Board of Immigration Appeals.

9. After the judge's decision, I had to check in with ICE in Dallas once a year, which I have been doing.

10. This year, my check-in was on February 21. I met with a specialist at the Immigration and Customs Enforcement (ICE) office in Dallas. She told me that I had a removal order.

which I did not understand because the judge had told me I could not be deported to Honduras. The woman told me to come back and report in again on March 7, 2025. That had not happened at any of my previous check ins. I thought maybe the officer had made a mistake about my case. ICE also put an ankle shackle on me again.

11. On March 7, 2025, I went to the ICE office again, and the officer I met with said that I needed to leave the United States because I was on a list of people who would be deported on March 21. My 13-year-old daughter was with me because she would not go to school because she was afraid, I would be taken away. The officer asked for my passport and the passports of my children, but I only had my passport with me. The officer made a copy of my passport. I was terrified that I would be deported that day.

12. Then, on March 17, 2025, I received a telephone call from someone at ICE at about 9:30 in the morning. They told me that I needed to report in person to the ICE office again on April 4, 2025. The ICE officer did not explain anything else about why I needed to go back to the ICE office. But the ICE office where I must report on April 4 is the same office that had put the ankle shackle on me and the same office that told me I am on a list of people they are going to deport.

13. I am afraid that if I am deported to another country, I will be harmed, tortured, or killed. I am afraid that if I am deported to another country, they will send me back to Honduras, where my husband will hurt me or kill me. I am also afraid that he could find me in another country, because he is a very dangerous and well-connected person. In 2006, when I left Honduras, he found me in Mexico and hurt me because I had left—he threw me out of a second-floor window. He also has family and knows people in other countries, including El Salvador and Mexico, who could help him to find me. I am also afraid that my children would suffer if I am deported to another country and that they would be in danger if I cannot continue to protect them.

14. As a named plaintiff in this case, I understand that if the Court grants the motion for class certification, I would represent a large number of people with final removal orders who have been deported, or who are threatened with being deported, to a country or countries where they have not been provided notice and/or an opportunity to apply for protection relating to a fear of persecution or torture related to that country.

15. I understand that, as a class representative, I represent the interests of all class members in this lawsuit and that it is my responsibility to represent the interests of the whole class and not just my own personal interests.

16. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action, or the case is over.

17. I understand and accept that any resolution of the lawsuit, for example by settlement and dismissal, is subject to Court approval and must be in the best interests of the class as a whole.

18. I understand that, by agreeing to become a class representative, I have a duty to take steps to help move the case forward, which I will do with my attorneys. I know that I must attend court if necessary; provide information to my attorneys that they feel is necessary for the case; give them documents I have if it is required; testify at a deposition or trial if necessary; and provide my attorneys with my contact information and current whereabouts because it may be necessary for them to contact me on short notice.

19. I understand that I am volunteering to represent many other persons with similar claims. I believe it is important that people in my situation receive advanced notice and a fair opportunity to apply for protection before they are deported to a third country.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Fort Worth. Texas on March 21, 2025.

By:

I, Yovanna Vargas, hereby certify that I am fully competent in both English and Spanish languages, that I have read the above English document to [redacted] in true and accurate Spanish to the best of my ability, and that she has signed her name with full understanding of its contents.

Dated this 21st day of March 2025.

Yovanna Vargas

Appx.085

## DECLARATION OF ██████████

I, ████████████████ make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. My name is ████████████████ I am over the age of 18 and am competent to testify regarding the matters below.

2. I am a citizen of Ecuador. I am currently detained at Plymouth County Correctional Facility in Plymouth, Massachusetts. I am a resident of Milford, Massachusetts.

3. I was a taxi driver in Ecuador. After I refused to transport drugs for the Ecuadorian police in my taxi, the police told me to think twice about denying them. In 2015, two people who worked as drug mules for the police were arrested, and I was again accosted by the police who threatened me to run drugs for them. The police officer blamed me for the drug mules' arrest, and stated I would "pay the consequences" for his losses. I was once again asked to join them in order to compensate them for "losses" and when I refused, the police officer directed two bodyguards to beat me. They also smashed my taxi's windshield and windows to deprive me of my work, robbed me of all my money, and promised to come back to "finish" me and my family.

4. Terrified, I made plans to flee Ecuador. I took my wife and daughter to my mothers-in-law home, sold my car, and borrowed money to make the difficult journey to the United States.

5. During my journey to the United States, there were two times when the coyotes stole my money, this happened in Mexico and Guatemala.  I was also kidnapped in a house in Huehuetenango, Guatemala for fifteen days, where I was not allowed to go out or have contact with my family. This also happened in Chiapas, Mexico for fifteen days too, under the same circumstances.

6. I arrived in the United States in October 2015. After I told immigration officials that I was afraid to return to Ecuador, an officer interviewed me about my fear. The officer found that my fear was credible, and I was released from the detention facility and placed in removal proceedings before an immigration judge.

7. I was detained by ICE upon entry for a total of three months. After release, I went to live with my brother in New York. I was detained again from November 2017 to June 2018.

8. During my proceedings, the immigration judge said that Ecuador was the only country where I could be deported. I applied for asylum, withholding of removal, and protection under the Convention Against Torture based on my fear of harm by the Ecuadoran police who threatened my life when I refused to run drugs for them.

EXHIBIT 86    Appx.086

9. In April 2018, the judge granted my application for protection under the Convention Against Torture. The government attorney reserved appeal but then did not appeal and so the order was final.

10. On or about June 11, 2018, Immigration and Customs Enforcement (ICE) released me from detention under an Order of Supervision. As part of the terms of my release, I had to regularly report to ICE in Burlington, Massachusetts. My next check in date is scheduled for September 9, 2025.

11. I work in construction/roofing. On March 18, 2025, I was outside my brother-in-law's house preparing for the workday with about five of my co-workers at around 6:30 in the morning, when a lot of law enforcement officers showed up. I think they were a mix of police officers and immigration officers, but I am not sure. They were looking for a person named Luis Quispe, who was not there. Even though he was not there, the officers detained everyone else. They arrested all of us and took us to the Milford Police Station.

12. We were there only briefly. Only one woman who had a young daughter at home was released. From there, they took the four of us who remained to the ICE office in Burlington where immigration officers took our fingerprints and collected personal information about each of us.

13. After that, ICE took us to the detention center in Plymouth. I asked immigration officers why I was there. They would not tell me anything, only that I need to contact my lawyer.

14. That same day, my wife contacted my lawyer who emailed ICE a copy of the judge's decision blocking my deportation to Ecuador. ICE told her that they would forward it to my deportation officer.

15. My lawyer sent another email the next day, March 19, but ICE did not respond.

16. I am afraid. ICE will not tell me or my lawyer why I am detained. I fear that ICE is going to deport me to another country, including El Salvador or Mexico, because I know from my lawyer that ICE deported hundreds of people to those countries and also to Panama and Guantanamo. I am afraid that if I am deported to another country, I could be detained or that they will send me back to Ecuador. If I am sent back to Ecuador, I am sure to be harm, tortured, or even killed. I am also afraid that if I am deported to El Salvador, Colombia, or Peru, as the drug trade is also deeply entrenched in the police culture in those countries, and I fear that I will be marked as someone who dissents when police recruit you to engage in their corruption, which would make me vulnerable to torture by police forces yet again. I am also afraid to be deported to Mexico or Guatemala based on my past experience with being kidnapped in those countries.

17. As a named plaintiff in this case, I understand that if the Court grants the motion for class certification, I would represent a large number of people with final removal orders who have been deported, or who are threatened with being deported, to a country or countries

where they have not been provided notice and/or an opportunity to apply for protection relating to a fear of persecution or torture related to that country.

18.    I understand that, as a class representative, I represent the interests of all class members in this lawsuit and that it is my responsibility to represent the interests of the whole class and not just my own personal interests.

19.    I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action, or the case is over.

20.    I understand and accept that any resolution of the lawsuit, for example by settlement and dismissal, is subject to Court approval and must be in the best interests of the class as a whole.

21.    I understand that, by agreeing to become a class representative, I have a duty to take steps to help move the case forward, which I will do with my attorneys. I know that I must attend court if necessary; provide information to my attorneys that they feel is necessary for the case; give them documents I have if it is required; testify at a deposition or trial if necessary; and provide my attorneys with my contact information and current whereabouts because it may be necessary for them to contact me on short notice.

22.    I understand that I am volunteering to represent many other persons with similar claims. I believe it is important that people in my situation receive advanced notice and a fair opportunity to apply for protection before they are deported to a third country.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Person, _____ on March 21, 2025.

By: _____

I, Nuria Gonzalo _____, hereby certify that I am fully competent in both English and Spanish languages, that I have read the above English document to ▮▮▮▮▮▮▮ in true and accurate Spanish to the best of my ability, and that he has signed his name with full understanding of its contents.

Dated this 21 day of March 2025.

signature

Appx.088

**DECLARATION OF** ████████████████████

I, ██████████████████████████ make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

My name is ████████████████████ I am over the age of 18 and am competent to testify regarding the matters described below.

1. I am a citizen of Guatemala. I am currently living in hiding in Guatemala.

2. In March of 2024, I first left my home country and travelled to the United States to escape persecution and torture. At the border I presented myself so I could apply for asylum. I was arrested and held for about a week. The immigration officers told me that I could not have an interview with an asylum officer, an instead they deported me to Guatemala.

3. I was threatened again in Guatemala so I decided the only option was to try to return again and see if they would let me apply for asylum. I crossed into Mexico on my way back to the U.S. in April of 2024. Shortly after arriving in Iztapalapa, Mexico, I was raped. A group of men then locked me in a room for several days. I was only released after my sister sent the men money so they would release me.

4. I then continued on to the United States, arriving in May of 2024. I told the immigration officers I was afraid of returning to Guatemala and I wanted to apply for asylum. I explained why I was afraid to go back to my country and they referred me for an interview with an asylum officer. The asylum officer interviewed me and determined that I had a reasonable fear. I was then transferred to present my case in front of the immigration judge. I remained in immigration detention during this time.

5. I had my first hearing in June of 2024. When the immigration judge told me I was ineligible for asylum because I had a prior expedited removal order from the first I came, I asked if I could be deported to a country other than Mexico or Guatemala. He told me Guatemala was designated as the country of removal, but also told me that they cannot send me back to Mexico, because I am from Guatemala.

6. At the final hearing on February 19, 2025, I explained to the judge what had happened to me in Guatemala and why I had to flee. I also explained how I had been targeted in Mexico because I was gay, and how I had been raped, and how the men kept me locked up until my sister sent them money.

7. At the immigration hearing the government attorney asked the judge whether Mexico was a country for removal, but the judge said that it was not e. The judge then found that it was likely that I would be persecuted if I were sent back to Guatemala and granted me

EXHIBIT 089  AppX.089

protection called withholding. I was so relieved that I was finally going to be able to stay somewhere safe. The judge asked the prosecutor if he wanted to appeal, but after leaving the room for several minutes, the attorney returned and said they were not going to appeal.

8. However, they kept me locked up at the detention center in Arizona for another couple of days. About two days later an immigration officer told me to grab my stuff because I was leaving. I asked where they were taking me but he did not answer. He gave me a document to sign to get my belongings back.

9. After I was taken out of the prison the immigration officer told me that I was being deported to Mexico. I was so scared and surprised. I told him that I had won my case and showed him the order the judge gave me. But the immigration officer said the order had expired. I begged him to let me call my attorney but he said it was too late to call anyone now.

10. I was put on a bus with about 20 other men, and they drove us to Nogales, Mexico. In Nogales, Mexico, they made us get on a second bus, where they drove us Tabasco, Mexico. Once we got there they held us in another facility. They told me I could apply for asylum in Mexico, but I would be kept locked up for the months it took to make a decision or I could just accept for them to take me back to Guatemala. After what had happened to me in Mexico I was too afraid to ask for asylum there. I had no safe options so I just told them to send me back to Guatemala so I would not be kept locked up.

11. As a named plaintiff in this case, I understand that if the Court grants the motion for class certification, I would represent a large number of people with final removal orders who have been deported, or who are threatened with being deported, to a country or countries where they have not been provided notice and/or an opportunity to apply for protection relating to a fear of persecution or torture related to that country.

12. I understand that, as a class representative, I represent the interests of all class members in this lawsuit and that it is my responsibility to represent the interests of the whole class and not just my own personal interests.

13. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action, or the case is over.

14. I understand and accept that any resolution of the lawsuit, for example by settlement and dismissal, is subject to Court approval and must be in the best interests of the class as a whole.

15. I understand that, by agreeing to become a class representative, I have a duty to take steps to help move the case forward, which I will do with my attorneys. I know that I must attend court if necessary; provide information to my attorneys that they feel is necessary for the case; give them documents I have if it is required; testify at a deposition or trial if

necessary; and provide my attorneys with my contact information and current whereabouts because it may be necessary for them to contact me on short notice.

16.     I understand that I am volunteering to represent many other persons with similar claims. I believe it is important that people in my situation receive advanced notice and a fair opportunity to apply for protection before they are deported to a third country.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in ▮▮▮▮▮ Guatemala on March 19, 2025.

By: ▮▮▮▮▮▮▮▮

I, ___Matt Adams___, hereby certify that I am fully competent in both English and Spanish languages, that I have read the above English document to ▮▮▮▮▮▮ in true and accurate Spanish to the best of my ability, and that he has signed his name with full understanding of its contents.

Dated this 19 day of March 2025.

_____
Matt Adams

# DECLARATION OF TIFFANY WANG

I, Tiffany Wang, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of New Mexico. My business address is PO Box 90191, Albuquerque, NM 87199. I have been employed as a Fellow Attorney at Innovation Law Lab since August 2024. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I work almost exclusively with immigrants currently and formerly detained at the Torrance County Detention Facility in Estancia, NM. In addition to providing legal orientations to hundreds of detained individuals with fear-based claims on a biweekly basis, I have provided selective representation to some of these people in front of the Board of Immigration Appeals (BIA) or with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services.

3. I represent AL before the BIA. On or about February 21, 2025, AL was deported to a third country. AL is a citizen of Venezuela, and the only country the immigration judge (IJ) designated for removal was Venezuela.

4. AL entered the United States in January 2024 and was placed in removal proceedings pursuant to 8 U.S.C. § 1229a. He entered the United States from Mexico, where he had been robbed. He was detained at the Torrance County Detention Facility. AL was originally served with a Notice to Appear at the immigration court where his U.S. sponsor was located and was set to be released from detention. However, a few days later, AL provided potentially life-saving assistance to another detained individual who was experiencing a medical emergency and needed medical attention. After doing so, ICE placed AL in administrative segregation and he was forced to attend all his immigration hearings while remaining detained.

5. AL was pro se before the immigration court. AL filed Form I-589, the application for asylum, withholding of removal, and protection under the Convention Against Torture, with the immigration court on or about April 2, 2024. AL expressed fear of persecution based on his opposition to the Venezuelan government. After participating in peaceful protests against the Venezuelan government, AL was detained and tortured by the Bolivarian National Guard. He was subsequently labeled as a traitor to the country, harassed by members of the Bolivarian National Guard and the Colectivos, a pro-government criminal organization, and captured and tortured by the Colectivos.

6. At his merits hearing on June 18, 2024, the IJ denied AL's application for protection and ordered him removed. AL felt forced to waive his right to appeal due to threats of prolonged detention.

7. AL was released from detention around July 2024 and went to North Carolina to live with his sponsor. He wore an ankle monitor and had monthly phone check-ins with U.S.

EXHIBIT 092

Immigration and Customs Enforcement (ICE) in Charlotte, North Carolina. ICE once visited his home. AL complied with all requirements of release set by ICE.

8.   On or around January 26, 2025, ICE came to AL's home to arrest him. ICE redetained him at the Stewart Detention Center in Lumpkin, GA.

9.   On February 6, 2025, I filed a *sua sponte* Motion to Reopen AL's removal proceedings with the IJ. After the IJ denied the motion without any reasoning, I represented AL in an appeal to the BIA and submitted a motion to stay his removal pending the adjudication of his appeal. AL's appeal and motion to stay were filed on February 12, 2025 and February 18, 2025, respectively, and remain pending to date.

10.   On or around February 14, 2025, ICE transferred AL to the Adams County Correctional Center in Natchez, MS, with a group of other Venezuelan men who had also received final orders of removal. While detained, AL heard rumors about deportations to Guantanamo Bay and Mexico. During a call, he expressed to me his fear of being sent to either of those locations, especially since he had been threatened and robbed in Mexico during his initial journey to the United States.

11.   On or around February 20, 2025, AL, along with other Venezuelan men with final orders of removal, was transferred to Florence Service Processing Center in Florence, AZ, where they spent one night. ICE officers told AL and the other men that they were going to be deported to Venezuela. Instead, ICE took them on a bus to Nogales, AZ, where they were handed over to Mexican authorities. The Mexican authorities told the men they had been voluntarily expelled to Mexico, despite the men never having been told where they were going. The men then spent three days on a bus that transported them to Villahermosa, Mexico, near the Mexico-Guatemala border. AL did not have an opportunity to express fear of being deported to Mexico before his deportation.

12.   As AL's attorney of record on an ongoing BIA appeal, I was never informed of AL's deportation.

13.   AL was left in southern Mexico without any identification documents, which had been confiscated by ICE. While making every effort to remain undetected, AL traveled to Mexico City, where he is currently in hiding. He continually fears harm from gangs or militias, who he reasonably fears will assault and rob him, as they did during AL's initial journey to the United States.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 5th day of March 2025 at Albuquerque, NM.

_____
Tiffany Wang

Appx.093

## DECLARATION OF LAURA JONES

I, Laura Jones, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of California. My business address is P.O. Box 70610, Oakland, CA 94612. I have been employed as an attorney at the Law Office of Helen Lawrence since 2021. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since being barred in January 2021, representing dozens of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR), federal courts, state courts, and with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3. I have represented approximately five clients with final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings) or by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders). I have represented about 20 clients with fear-based claims in either removal or withholding-only proceedings.

4. Before receiving a call from my client on March 3, 2025, I had never had one of my clients, who was granted withholding of removal or protection under the Convention Against Torture (CAT) and released from Immigration and Customs Enforcement (ICE) custody, be re-detained by ICE after appearing for a routine check-in with no new criminal conduct and threatened with deportation to a third country.

5. I represent a client who I will refer to as J.R.R.. J.R.R. is from El Salvador. In May 2022 DHS issued a reinstatement order against him. After he demonstrated a reasonable fear of persecution in El Salvador to an asylum officer, ICE placed him in withholding-only proceedings before an immigration judge. The only country designated for removal was El Salvador.

6. The immigration judge granted J.R.R's application for CAT protection on July 5, 2023. The judge found that if J.R.R. returns to El Salvador, he will be targeted by authorities and criminals under the current State of Emergency in El Salvador and would be imprisoned and tortured. The ICE attorney did not appeal the judge's decision, and it became final.

7. From apprehension until he won CAT protection, J.R.R. was detained. After he won his case, he was finally released under conditions set forth in an Order of Supervision (OSUP) requiring him to periodically check-in with ICE in Santa Maria and with an ankle monitor. ICE removed the ankle monitor after his first check-in, about five days

EXHIBIT 094Appx.094

post-release. His next check-in was three months after that, and the third check-in was five months after that. His subsequent check-ins were six months apart. J.R.R. was compliant with all the terms and conditions in his OSUP.

8.    J.R.R. reported to his ICE check-in on March 3, 2025 at the Santa Maria ICE Field Office, as he had been doing since July 5, 2023. When he was at the check-in, although he has no new criminal history, ICE detained him and told him he was going to be deported. He requested a call to me, his attorney, and asked where he would be detained, however was only provided with a general guess of likely Los Angeles. When I entered his information into the ICE detainee locator system, it yielded zero results.

9.    J.R.R. called me from detention in Santa Maria, California. I briefly spoke with an officer who told me they had taken him into custody so that he can be removed to a third country. I asked what country, and the officer would not tell me. I asked where they would be detaining J.R.R., and the officer said maybe Los Angeles, California, but provided no other information. After trying to get more information, the officer interrupted me and said he was handing the phone back to J.R.R. and refused further communication.

10.    Immediately after this phone call, I sent a letter on behalf of my client expressing fear of removal to eight other countries, in addition to El Salvador, including removal to: Mexico, Guatemala, Honduras, Costa Rice, Panama, Cuba, Belize, Nicaragua, as no third country had been designated yet. I sent the letter via email to LosAngeles.Outreach@ice.dhs.gov. I then called the Santa Maria Field Office to ensure that an officer saw the letter, however no one answered. I left a voicemail. The following day I called the detention center in Santa Maria and was told that J.R.R. had been transferred to Adelanto ICE Processing Center. I then emailed the Los Angeles Outreach email as well as #APCERO000-500@ice.dhs.gov, and #APCERO501-999@ice.dhs.gov with the same letter. DVFERORExesponseice.dhs.gov@ice.dhs.gov responded that they received my G-28.

11.    On March 5, 2025, I had a confidential video meeting with J.R.R., and he told me he feared being deported to Mexico, as he is afraid that gangs will target him there and that Mexico will deport him to El Salvador, where he will be tortured.

12.    On March 7, 2025, after numerous requests, Officer Quevedo communicated that DHS was going to deport J.R.R. to Mexico.

13.    On March 7, 2025, I called the Adelanto Detention Center to speak with J.R.R. and was told by Officer Monroy that he had been deported. After numerous other calls and emails to the detention center, ICE, and the Office of the Principal Legal Advisor (OPLA), I discovered he had not been deported yet, but was in Florence, Arizona. I attempted to speak with him multiple times, but was only given access to J.R.R. on March 10, 2025. On March 10, 2025, in a confidential legal call, he told me that on March 7, 2025, around 3:00 am, ICE officers woke him while he was in the detention center in Adelanto. He reported that phone access was denied. Around 7:00 am, ICE officers loaded him onto a

Appx.095

bus but they did not tell him where he was going. Around 9:00 am, ICE officers loaded him onto a plane with about 37 other detainees, and they landed in El Paso, Texas. After about an hour, they were then taken to Florence, Arizona. On Saturday, March 8, 2025, immigration officers loaded two buses of people around 7:00 am. At this time, ICE officers told J.R.R. that he was being deported to Mexico. He screamed and demanded to see an immigration judge and talk to his attorney; he refused to get on the bus that would take him to Mexico. He also refused to sign any deportation order and was taken back to the detention center.

14.  On March 10, 2025, I filed an Emergency Motion to Reopen and Stay Request with the Adelanto Immigration Court, including a declaration from J.R.R. articulating his fear of deportation to Mexico, attached to this declaration as Exhibit A. I also emailed a copy to the Office of the Principal Legal Advisor (OPLA, attorneys with ICE who represent DHS in immigration court proceedings) and the ICE officers in Arizona and Los Angeles. On March 10, 2025, Officer Quevedo stated that they would wait and see the IJ's decision on the Motion to Reopen.

15. On March 11, 2025, Immigration Judge Halperin denied the Motion to Reopen and Motion to Stay Removal. A copy of that decision is attached as Exhibit B. Contrary to Ninth Circuit law, IJ Halperin refused to reopen the case. I then filed a Notice of Appeal and accompanying Emergency Motion to Stay Removal with the Board of Immigration Appeals. It remains pending. I also emailed Los Angeles OPLA, Los Angeles Asylum Office, among others to request a Reasonable Fear Interview (RFI) for J.R.R. because he fears persecution and torture in Mexico. An ICE deportation officer named E. Navarro from the Los Angeles Field Office responded the same day, March 11, 2025. Officer Navarro indicated that ICE had received the RFI request and that J.R.R. would transferred back to Adelanto. As of March 18, 2025, J.R.R. has been returned to the Adelanto Detention Center in California; no RFI has yet been scheduled.

11.    J.R.R. is fearful of being removed to Mexico for several reason. Mexican authorities could deport him back to the El Salvador where he won protection from removal, as it is more than likely his own government would torture him there. Additionally, due to his criminal background and gang-affiliated background, he is at a similar risk of persecution or torture if removed to Mexico.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 18th day of March 2025 at Oakland, California.

_____

Laura Riley Jones

## DECLARATION OF █████████████

I, ██████████, hereby declare and state:

1.      I make this declaration in support of my emergency request to reopen removal proceedings based on my fear of being deported to Mexico and my emergency request to stay deportation.

2.      I won protection from deportation to El Salvador in July 2023.

3.      When I attended my ICE check in in Santa Maria, CA on March 3, 2025, I was detained and told I was going to be deported to a third country.

4.      I am afraid of deportation to Mexico. I am afraid because I was associated with █████ and they are present in Mexico. You cannot just leave a gang; the current gang members will punish you for defecting through torture and death. I am also very afraid that Mexico will deport me back to El Salvador where my own government will torture or kill me. I will be hurt or killed by MS-13 gang members, other gangs' members, or the government of Mexico or El Salvador.

5. I am not a Mexican citizen.


I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 5 day of March at Adelanto, CA.



1

Exhibit A to Laura Jones Decl.



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ADELANTO IMMIGRATION COURT**

Respondent Name:

███████████████

To:

Jones, Laura Riley
P.O. Box 70610
Oakland, CA 94612

A-Number:

███████████████

Riders:
In Withholding Only Proceedings
Initiated by the Department of Homeland Security
Date:
03/11/2025

**ORDER OF THE IMMIGRATION JUDGE**

EMERGENCY MOTION TO REOPEN BASED ON DHS'S INTENT TO DEPORT
RESPONDENT TO MEXICO WITHOUT AN OPPORTUNITY TO CONTEST REMOVAL
BASED ON HIS FEAR OF PERSECUTION AND TORTURE
AND
EMERGENCY MOTION TO STAY REMOVAL PENDING
ADJUDICATION OF RESPONDENT'S FEAR-BASED CLAIMS.

Respondent was granted protection under the United Nations Convention Against Torture
(CAT) on July 5, 2023, which prevents Respondent's deportation to El Salvador. The
regulations provide that the Immigration Judge is charged with identifying the country to which
the respondent's removal may in the first instance be made pursuant to the provisions of section
241(b) of the Act. 8 C.F.R. § 1240.12(d). The Immigration Judge identified El Salvador as the
country of removal in the first instance, and there is no dispute as to the propriety of that order
of removal.

On March 7, 2025, the Department of Homeland Security (DHS) informed Respondent that it
intends to remove Respondent to Mexico. During his removal proceedings, the
Immigration Judge (IJ) only designated El Salvador as a country of removal, and did not
designate Mexico or any other countries, as either the country of removal or an alternative
country of removal. Respondent has not meaningfully argued that he is a native or citizen of
Mexico, or that he has "resided" in Mexico. See INA Section 241(b)(2)(B) (permitting the
Immigration Judge to place limitations on designations of certain contiguous countries,
including Mexico).  Immigration Judges nor the Board of Immigration Appeals have
jurisdiction to review any determination by officers of the DHS under 8 C.F.R. § 241.15
regarding the country of removal. See 8 C.F.R. § 1241.15. See also Execution of
Removal Orders; Countries to Which Aliens May Be Removed, 70 Fed. Reg. 661 et. seq. (Jan.
5 2005).

Nothing in this order forbids DHS from acting on its own authority to designate a

Exhibit BAppx.098Jones Decl.

country, or forbids the parties from litigating that issue in any forum outside of the Executive Office of Immigration Review.  The Court declines to Sua Sponte Reopen this matter.

**Order:**

 Motion is DENIED.

Immigration Judge: HALPERIN, RAVIT 03/11/2025

Appeal:     Department of Homeland Security:  ☐   waived     ☐   reserved

Respondent:                                    ☐   waived     ☐   reserved

Appeal Due:

### Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ████████████████ | A-Number ██████████

Riders:

Date: 03/11/2025 By: BOUWHUIS, BRITTANY, Court Staff

Appx.099

**DECLARATION OF LESLIE PARRA**

I, Leslie Parra, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of Texas. My business address is 314 E. Highland Mall Blvd, Ste. 501, Austin, Texas 78752. I have been employed as a staff attorney at American Gateways since November 2021. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since 2019, representing at least a hundred noncitizens, both in removal proceedings before the Executive Office for Immigration Review (EOIR) and noncitizens applying for immigration benefits with U.S. Citizenship and Immigration Services (USCIS). I have also provided pro se assistance to many more noncitizens.

3. Many of my clients and the pro se applicants I assisted applied for asylum, withholding of removal, or protection under the Convention Against Torture in removal proceedings. Several of these individuals also had had final orders of removal that were issued in removal proceedings under 8 U.S.C. 8 U.S.C. § 1229a (Section 240 proceedings) or by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders).

4. Until last month, I had never seen a case in which a non-citizen was removed to a country other than their country of nationality/the designated country of removal. However, in late February, one of my clients—a Venezuelan man—was removed to Mexico.

5. Prior to my representation, my client applied for asylum and withholding of removal pro se in Section 240 proceedings, while in ICE custody. I believe that Venezuela was the only designated country of removal. His application was denied, and he was issued a final order of removal in December 2023. In February 2024, he was released on an Order of Supervision, which required him to check-in with ICE.

6. I represented this client in his application for Temporary Protected Status (TPS), which was filed in February 2024. Since the client was prima facie eligible for TPS, he was entitled to "temporary treatment benefits" pursuant to 8 U.S.C. § 1254a(a)(4). Temporary treatment benefits include a work permit, which he received in April 2024, and an automatic stay of deportation while the TPS application is pending (unless the executive publishes notice of the termination of the country's designation). 8 C.F.R. §§ 244.13, 244.10(e)(2).

7. My client was re-detained at the beginning of December 2024 after reporting for a scheduled ICE check-in appointment. He remained detained by ICE for almost three

EXHIBIT 00 / Appx. 100

months before he was abruptly removed to Mexico in late February 2025 even though his TPS application was pending at the time.

8.  Based on what he has told me when I spoke with him after the deportation, my client was not given advance notice of this removal to Mexico, nor was he given an opportunity to contest removal or express a fear of removal to Mexico.

9.  The client remains in Mexico today.  I have had limited communication with him because he is transient.  He does not have money or a phone—DHS refused to return his phone to him upon removal.  My understanding is that he is traveling on top of a train to the interior of the country, which is presumably safer than the border region. I am very concerned for his safety given high rates of violence and discrimination against migrants in Mexico.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 18th day of March 2025 at Austin, Texas.

_Leslie Parra_____
Leslie Parra

Appx.101

# DECLARATION OF MELISSA CHUA

I, Melissa Chua, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of New York. My business address is 100 Pearl Street, 19th Floor, New York, NY 10004. I am the Co-Director of the Immigrant Protection Unit at the New York Legal Assistance Group (NYLAG) and have most recently been employed at NYLAG since 2019. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I am currently the Co-Director of the Immigrant Protection Unit at NYLAG. I have practiced immigration law exclusively for over a decade, focusing on the representation of individuals in removal proceedings, appeals, and with final orders of removal. I have also taught the course on Immigration Law at Cardozo Law School and currently serve as an Adjunct Professor at Brooklyn Law School, teaching the Deportation Defense Clinic. As such, I have represented and supervised the representation of hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR), the Board of Immigration Appeals (BIA) and federal courts and/or with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3. NYLAG is one of three organizations that comprise the Rapid Response Legal Collaborative (RRLC). The RRLC provides free representation to individuals who have final orders of removal in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and/or final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders). I supervise NYLAG staff representing clients as part of the RRLC.

4. NYLAG is currently representing D.N.B., a national of Venezuela, in removal proceedings pursuant to 8 U.S.C. § 1229a. In or around April 2024, D.N.B. was ordered removed *in absentia* after failing to attend an immigration court hearing because of a serious motor vehicle accident. D.N.B. was charged as a national of Venezuela on the Notice to Appear on Form I-862, the Immigration Judge designated Venezuela for removal, and D.N.B. was subsequently ordered removed to Venezuela. Upon information and belief, no other countries were designated for removal.

5. In or around November 2024, NYLAG assisted D.N.B. with a Motion to Reopen for D.N.B. pursuant to 8 U.S.C. § 1229a(b)(5)(C). Along with the Motion to Reopen, NYLAG attached D.N.B.'s application for asylum on Form I-589 stating D.N.B.'s fear of returning to Venezuela because of his participation in political protests. In November 2024, D.N.B.'s Motion to Reopen was denied by the Immigration Judge. NYLAG filed a timely appeal with the BIA on behalf of D.N.B.; that appeal is currently pending. Pursuant to that representation, NYLAG has had numerous calls with D.N.B.

EXHIBIT 02 / App. 102

6.  Upon information and belief, D.N.B. has no ties to Tren de Aragua, nor has the government alleged any against him. ICE did not indicate that D.N.B. is a gang member on his detention booking paperwork, leaving the box labeled "Gang Member/Leader" unchecked.

7.  In or around October 2024, D.N.B. was detained by Immigration and Customs Enforcement (ICE) and sent to Orange County Correctional Center (OCJ) in Goshen, New York.  As of March 2025, D.N.B. was housed in an OCJ unit with approximately 14 other men.  All of the men in D.N.B.'s unit at OCJ were Venezuelan nationals.

8.  D.N.B. was detained at OCJ until the evening of Thursday, March 13, 2025.  At approximately 11 pm on March 13, 2025, D.N.B. and all of the other men in his unit were informed that they were going to be deported to Venezuela at 3 am the following morning. D.N.B. believes that of the 14 individuals in his unit, 12 individuals have final orders of removal after proceedings pursuant to 8 U.S.C. § 1229a, and two are in active proceedings pursuant to 8 U.S.C. § 1229a.

9.  In the middle of the night on March 14, 2025, D.N.B. and the rest of the men in his unit were taken to the Jacob J. Javits Federal Building at 26 Federal Plaza.  From there, D.N.B. and the rest of the men in his unit were transferred to the Nassau County Jail, where they spent the rest of the evening.

10. At approximately 1 pm on Friday, March 14, 2025, NYLAG spoke to D.N.B.'s deportation officer (DO) regarding D.N.B.'s location. The DO stated that D.N.B. was in New Jersey and would be transferred to Webb County Detention Center in Laredo, Texas by the end of the weekend. The DO further stated that ICE did not have a removal date for D.N.B. and was transferring D.N.B. due to lack of bed space at OCJ. NYLAG asked if ICE planned to remove D.N.B. to any country other than Venezuela, and the DO said no.

11. On Saturday, March 15, 2025, D.N.B. and all of the other men in his unit were flown to Buffalo, New York; then Boston, Massachusetts; and eventually to the Alexandria Staging Facility in Louisiana. They spent the night of March 15, 2025 at the Alexandria Staging Facility. On Sunday, March 16, 2025, D.N.B. and those in his unit were flown to Miami, Florida and then to the Webb County Detention Center in Laredo, Texas.

12. As of March 19, 2025, D.N.B. was still at the Webb County Correctional Center. NYLAG spoke with D.N.B. on March 18, 2025 by phone, during which he reported that four men from his unit were taken on the evening of March 17, 2025.  Those four men were told that they were being moved to another detention center.  Yesterday, March 18, 2025, two ICE officers visited D.N.B. and the remaining men in his unit and told them that if removal to Venezuela was not feasible, they may be removed to Mexico, Colombia, or Panama.  D.N.B. and the remaining men in his unit all expressed a fear of removal to El Salvador to the officers.

13. On March 17, 2025, NYLAG emailed D.N.B.'s DO to report D.N.B.'s fear of removal to El Salvador and request to have an individualized hearing as to his fear of return before removal to El Salvador. The DO confirmed receipt of NYLAG's email. On March 18,

2

Appx.103

2025, NYLAG emailed the DO a second time, reasserting D.N.B.'s fear of removal to El Salvador and communicating his assent to removal to Venezuela, Panama, Colombia or Mexico. NYLAG is in the process of amending D.N.B.'s briefing before the BIA to assert his fear of removal to El Salvador and request to have an individualized hearing about his fear of return to El Salvador.

14.    NYLAG also currently represents E.F.G. E.F.G is a national of Venezuela. Pursuant to that representation, NYLAG has had numerous calls with E.F.G. ICE reinstated E.F.G.'s prior removal order pursuant to 8 U.S.C. § 1231(a)(5). After passing a Reasonable Fear Interview, E.F.G. was placed into withholding only proceedings. Upon information and belief, the only country designated for removal was Venezuela. In March 2024, E.F.G. was ordered removed to Venezuela after missing his hearing because of a medical emergency. In March 2025, NYLAG assisted E.F.G. in filing a Motion to Reopen pursuant to 8 U.S.C. § 1229a(b)(5)(C). Along with the Motion to Reopen, NYLAG attached E.F.G.'s application for asylum on Form I-589 stating E.F.G.'s fear of returning to Venezuela because of his sexual orientation, and work as a police officer, during which he participated in the investigation of Tren de Aragua.

15.    E.F.G.'s Motion to Reopen is currently still pending and he is currently detained at OCJ. E.F.G. fears that ICE intends to remove him to a nondesignated country because other Venezuelan nationals from his unit have been removed from OCJ and believes they have been or will be removed to El Salvador. E.F.G. fears persecution in several third countries, including El Salvador. On March 20, 2025, NYLAG alerted ICE to E.F.G.'s fears of being removed to El Salvador and requested a hearing before such a removal is initiated.

16.    E.F.G. currently has a motion to rescind and reopen pending before the immigration court and, as such, has an administrative stay pursuant to 8 U.S.C. § 1229a(b)(5)(C) and 8 C.F.R. § 1003.23(b)(4)(ii). In addition, E-F-G has submitted an application for asylum on Form I-589 seeking protection because of his fear of persecution on account of his sexual orientation and work as a police officer.

17.    Upon information and belief, E.F.G. has no ties to Tren de Aragua, nor has the government alleged any against him.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 20th day of March 2025 at New York, New York.

_____
Melissa Chua

3

Appx.104

## DECLARATION OF ELYSSA N. WILLIAMS

I, Elyssa N. Williams, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  I am a practicing attorney licensed to practice before the State of New York.  My business address is 360 E. 161st Street, Bronx, New York, 10451. I am currently employed as the Interim Legal Director at the Bronx Defenders and have worked at the organization since 2018 as a Staff Attorney, Supervising Attorney and Senior Legal Counsel. I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I have practiced immigration law since 2010, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR), federal courts and with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3.  At the Bronx Defenders we represent individuals with: (a) final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and (b) final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders).

4.  Our client, A.A., is a citizen of the Dominican Republic. A.A. was placed into Section 240 removal proceedings and detained in ICE custody.  The Immigration Judge in his case designated the Dominican Republic, and no other country, as the country of removal.  A.A. was granted deferral of removal under the Convention Against Torture ("CAT").  His application for CAT was based on his fear of torture by a cartel. The Department of Homeland Security waived appeal.

5.  A.A. remains detained in ICE custody.  Recently, A.A. informed us that ICE stated that they are looking for a third country to remove him to.  A.A. has a fear of removal to any country where the cartel he fears operates.  ICE has not provided A.A. any information about an opportunity to express fear of removal to a third country.

6.  Our former client, B.B., is a citizen of Venezuela.  B.B. was placed into section 240 removal proceedings and detained in ICE custody.  The Immigration Judge in his case designated Venezuela, and no other country, as the country of removal. The Immigration Court ordered B.B. removed.  B.B. had a pending application for Temporary Protected Status and a pending I-130 Petition for Alien Relative based on his marriage to a U.S. Citizen.

7.  In March 2025, the attorney who had represented B.B. in removal proceedings

1

EXHIBIT 05 / Appx.105

spoke with an ICE Deportation Officer who informed him that B.B. had been recently removed to San Salvador, El Salvador. Based on our communications with B.B., it does not appear that B.B. was ever informed that he was going to be removed to a third country. B.B. had been preparing for a review of his custody and his attorney submitted documents to ICE in support of release. The attorney who represented B.B. in removal proceedings last spoke with B.B. on March 13, 2025. Since then, we have not spoken with B.B. and the ICE detainee locator now shows that he is not in ICE custody. B.B.'s attorney was never informed that B.B. would be removed to a third country. At no point did B.B. share with his legal team that he had been informed about removal to a third country. B.B. was not provided with advanced notice prior to his deportation to El Salvador, and DHS did not provide an opportunity to contest removal on the basis of fear to removal to a third country.

8. Our client, C.C., is a citizen of Venezuela. He was placed into section 240 removal proceedings and detained in ICE custody. In February 2025, C.C. was ordered removed and he waived appeal. C.C.'s attorney has been in communication with the assigned ICE Deportation Officer. The DO has C.C.'s Venezuelan identity documents and has indicated that C.C. is on a list for removal. The DO has not provided C.C. with any information about an opportunity to express a fear of removal to a third country. Based on experiences with other clients, we believe that C.C. will be removed to a third country such as El Salvador or Mexico.

9. Our client, D.D., is a citizen of Gambia. D.D. was placed into section 240 removal proceedings and was ordered removed. D.D. was recently asked to report to the ICE field office for the purpose of removal. ICE has not provided D.D. with any information about an opportunity to express a fear of removal to a third country. We believe that D.D. will be removed to a third country because Gambia does not regularly accept deportees.

10. A former client, E.E., recently called us because ICE abruptly asked him to return for a check-in within just two months of his previous one. Our former client was granted CAT over a decade ago. He informed us that he had previously only had to check in once a year.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 21st day of March 2025 at New York, New York.

Elyssa Williams
Elyssa N. Williams, Esq.

2

Appx.106

**DECLARATION OF GUADALUPE PEREZ**

I, Guadalupe Perez, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of Illinois. My business address is 69 W. Washington, Suite 1600, Chicago, Il 60602. I have been employed as an Immigration Attorney/Assistant Public Defender II at Law Office of the Cook County Public Defender since February 14, 2022. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since 2016, representing dozens of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts and/or with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS). Prior to my work at the Law Office of the Cook County Public Defender, I worked with the Detention Project at the National Immigrant Justice Center, representing detained individuals in removal proceedings. I represent individuals with:
    (a) final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and
    (b) final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders).

3. I currently represent two individuals who DHS is seeking to deport to a country that was not designated as a country of removal:

    OGM is from El Salvador and was detained in withholding only proceedings after DHS issued a reinstatement order. He was granted withholding of removal under the Convention Against Torture to El Salvador. MGO feared returning to El Salvador due to having been kidnapped and tortured by gangs and police in El Salvador. The DHS did not reserve or appeal the decision. He is currently detained in DHS custody despite being granted protection. OGM has been moved from the detention facility he was originally held at during the six months of his proceedings to a new jail. A couple of days after he was granted relief, he had an interview with an ICE official who asked him if he was willing to return to Mexico. As counsel I informed DHS that they needed to inform me of any attempts to remove him to a third country, but DHS has not provided further information.  Due to the prevalence of gangs from El Salvador to Mexico, OGM fears that they will be able to reach him in other Latin American countries. OGM also fears that other countries will remove him to El Salvador.

    RRJ is from Honduras and was detained in withholding-only proceedings after DHS issued a reinstatement order. He was granted deferral of removal under the Convention Against Torture to Honduras. JRR feared returning to Honduras due to having been kidnapped and tortured by gangs and police in Honduras. The DHS did not reserve or

1

EXHIBIT 10

appeal the decision. He is currently detained in DHS custody despite being granted protection. Recently, RRJ was moved from the facility he had been at for the last 8 months. I was informed that DHS would attempt a third country removal, most likely to Mexico, but they refused to provide me with further details. I informed them that I needed to be updated as my client has a fear of deportation to other countries where the Honduran gangs may reach him.

4.      Both OGM and RRJ have a post-traumatic stress disorder diagnosis stemming from the time they were kidnapped and beaten by police members. Their time in detention has exacerbated these symptoms. Further, the uncertainty of not knowing whether DHS will deport them to a third country without having an opportunity to make a fear claim is traumatic to both them and their families.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 21 day of March 2025 at Chicago, Illinois

Guadalupe Perez

2

Appx.108

# Exhibit A

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **D.V.D**, *et al.* | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | CIVIL NO.: 2:25-cv-10676-BEM |
| | : | |
| **U.S. Department of Homeland** | : | |
| **Security,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### DECLARATION OF BRIAN ORTEGA

I, Brian Ortega, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am employed by U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), as the Assistant Field Office Director (AFOD) for the ERO Phoenix Field Office. I have held this position since January 2022. Included in my official duties as an AFOD in the ERO Phoenix Field Office is the responsibility of assisting in and the managing, monitoring, scheduling, and executing removal orders for aliens in ICE custody at the Eloy Detention Center in Eloy, Arizona.

1

Appx.110

2. I provide this declaration based on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

3. I am aware of the above captioned litigation. While preparing this declaration, I reviewed information contained in the official records and databases maintained by ICE regarding the immigration and custody status of the named Plaintiffs, ████ ████ ████ ████ (O.C.G.), ████ ████ ████ ████ (E.F.D.), ████ ████ ████ (D.V.D.), and ████ ████ ████ (M.M.). I am therefore familiar with the facts and circumstances regarding the Plaintiffs' immigration proceedings and state as follows:

████ ████ ████ ████ **(O.C.G.)**

4. O.C.G. is a 30-year-old, native and citizen of Guatemala.

5. O.C.G. entered the United States on March 27, 2024, at or near Santa Teresa, New Mexico without being admitted or paroled by an immigration official. On this same date, United States Border Patrol (USBP) agents arrested O.C.G. and issued him an expedited removal under 8 U.S.C. § 1225.

6. On or about April 2, 2024, ICE removed O.C.G. to Guatemala.

7. On May 5, 2024, O.C.G. re-entered the United States at or near Sasabe, AZ,

2

without being admitted or paroled by an immigration official. On this same date, USBP agents arrested O.C.G.

8.  On May 6, 2024, USBP agents issued O.C.G. a Notice of Intent/Decision to Reinstate Prior Order under 8 U.S.C. § 1231(a)(5). On this same date, O.C.G. claimed fear of returning to Guatemala.

9.  On or about May 7, 2024, USBP agents transferred O.C.G. to the Eloy Detention Center in Eloy, AZ, pending a reasonable fear interview with an asylum officer.

10. On or about June 11, 2024, the asylum officer made a positive reasonable fear determination and O.C.G.'s case was referred to an immigration judge.

11. On February 19, 2025, an immigration judge in Eloy, AZ issued an order granting O.C.G.'s request for withholding of removal to Guatemala under 8 U.S.C. § 1231(b)(3).

12. On or about January 31, 2025, ERO Phoenix was advised that Mexico was accepting removals from other countries, such as Guatemala, El Salvador, and Nicaragua. Based on this information, ERO scheduled O.C.G. for removal to Mexico.

13. On or about February 21, 2025, prior to O.C.G being removed to Mexico, ERO verbally asked O.C.G. if he was afraid of being returned to Mexico. At this time, O.C.G. stated he was not afraid of returning to Mexico.

3

Appx.112

14. On or about February 21, 2025, ICE removed O.C.G. to Mexico.

██████ ██████ ██████ (E.F.D.)

15. E.F.D. is a 35-year-old, native and citizen of Ecuador.

16. E.F.D. entered the United States at an unknown time, date and place.

17. On or about October 20, 2015, immigration officials encountered E.F.D. shortly after his entry into the United States. He was placed in expedited removal proceedings under 8 U.S.C. §1225 and after a positive credible fear finding E.F.D was placed in removal proceedings under 8 U.S.C. §1229(a) as an arriving alien with no valid entry document.

18. On or about April 12, 2018, an immigration judge in Boston, MA ordered the removal of the E.F.D. to Ecuador but granted him withholding of removal under the Convention Against Torture.

19. On or about June 11, 2018, E.F.D was released by ERO on an order of supervision.

20. On March 18, 2025, ERO Boston arrested E.F.D. and revoked his order of supervision based upon ERO's intention to remove E.F.D to a third country. On this same date, ERO Boston placed him in ICE custody at the Plymouth County Correctional Facility, in Plymouth, MA.

21. As of the date of this declaration, E.F.D.'s removal has not yet been scheduled.

4

Appx.113

22. ERO Boston is aware this Court's March 23, 2025, order requiring forty-eight hours' notice prior to any transfer of E.F.D. outside the jurisdiction of the United States District Court of Massachusetts.

██████ ██████ ██████ (D.V.D.)

23. D.V.D. is a 52-year-old native and citizen of Cuba.

24. D.V.D. was placed in removal proceedings under 8 U.S.C. § 1229a, after he applied for entry from Mexico into the United States through the San Ysidro Port of Entry on or about December 26, 2011.

25. On August 21, 2013, an immigration judge in San Diego, CA administratively closed D.V.D.'s removal proceedings.

26. On or about January 12, 2017, D.V.D. again applied for admission from Mexico into the United States at the San Ysidro Port of Entry.

27. On or about January 15, 2017, D.V.D. was placed in ICE custody at Otay Mesa Detention Center.

28. On or about January 23, 2017, DHS moved to re-calendar D.V.D.'s removal proceedings and change venue to Otay Mesa Detained Docket, in San Diego California.

29. On February 10, 2017, an immigration judge in San Diego, California denied D.V.D.'s request for voluntary departure to Cuba and ordered his removal to Cuba.

5

30. D.V.D. filed an appeal of this decision but then withdrew his appeal before the Board of Immigration Appeals (BIA). The BIA, with nothing new pending before it, returned the record to the Immigration Court without further action on April 12, 2017.

31. On or about May 16, 2017, D.V.D. was booked out of Otay Mesa Detention Center and released on an order of supervision.

32. D.V.D. is scheduled to check in with ERO Boston on March 28, 2025.

33. As of the date of this declaration, D.V.D is not in ICE custody.

████████ ████ ████ (M.M.)

34. M.M. is a 43-year-old native and citizen of Honduras.

35. On or about May 29, 2014,[1] USBP agents encountered M.M. in the Rio Grande Valley, Texas Border Patrol Sector. A USBP agent determined M.M. had unlawfully re-entered the United States from Mexico.

36. During this encounter, M.M. was processed for Reinstatement of Prior Order of Removal under 8 U.S.C. § 1231(b)(5). On May 31, 2014, M.M. was transferred into ICE custody but released on an Order of Supervision on this same date.

37. On July 19, 2021, an immigration judge in Dallas, Texas granted M.M.'s

---

[1] M.M. has a previous apprehension from May 12, 2006, and was processed as an expedited removal and removed through the Albuquerque, NM Port of Entry on June 9, 2006.

6

request for withholding of removal to Honduras under 8 U.S.C. § 1231(b)(3).

38. M.M. was subsequently enrolled in the Alternatives to Detention (ATD) program.

39. Records reveal that M.M.'s last ATD check in was on February 21, 2025, with ERO Dallas.

40. As of the date of this declaration, M.M. is not in ICE custody.

I declare, under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

Executed this _25th___ day of March, 2025.

BRIAN A ORTEGA  Digitally signed by BRIAN A ORTEGA
Date: 2025.03.25 12:58:05 -07'00'
_____

Brian Ortega
Assistant Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security



*Office of the Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

March 30, 2025

| MEMORANDUM FOR: | Kika Scott |
| | Senior Official Performing the Duties of the Director |
| | U.S. Citizenship and Immigration Services |
| | |
| | Pete R. Flores |
| | Senior Official Performing the Duties of the Commissioner |
| | U.S. Customs and Border Protection |
| | |
| | Todd Lyons |
| | Acting Director |
| | U.S. Immigration and Customs Enforcement |
| FROM: | Kristi Noem |
| | Secretary of Homeland Security |
| SUBJECT: | **Guidance Regarding Third Country Removals** |

## Purpose

This memorandum clarifies DHS policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the Immigration and Nationality Act (INA) to countries other than those designated for removal in those removal orders (third country removals).[1] DHS has used similar processes before, including with respect to Title 42 expulsions and the Migrant Protection Protocols.

## Process Regarding Third Country Removals[2]

*Written Notice to the Alien & Fear Screening*

Prior to the alien's removal to a country that had not previously been designated as the country of removal, DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured. If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien

---

[1] This memorandum does not address expedited removals pursuant to INA § 235(b)(1).

[2] These procedures only apply to aliens who have no ongoing proceeding in which to raise a claim under INA § 241(b)(3) or the Convention Against Torture. For aliens who have such proceedings, DHS will follow existing procedures.

Appx.117

**Page 2**

may be removed without the need for further procedures. If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.

DHS will first inform the alien of removal to that country. Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country. DHS is taking this approach in line with its determination in mid-2024 that such questioning may be suggestive and that asking them leads to false claims rendering the immigration system as a whole less efficient. *Securing the Border*, 89 Fed. Reg. 48710, 48743 (June 7, 2024) (noting that aliens are "more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum" when asked affirmative fear questions); *Securing the Border*, 89 Fed. Reg. 81156, 81235 (Oct. 7, 2024). The allegation that a foreign country's government will torture an alien or allow an alien to be persecuted, particularly a government with which the United States has a diplomatic relationship, is a serious one. It is not unreasonable for an alien in that circumstance to be expected to affirmatively express a fear of persecution or torture.

Immigration officers will refer any alien who affirmatively states a fear of removal to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture (CAT) for the country of removal.

### *Where the Alien Affirmatively States a Fear*

In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer. This screening may be done remotely. USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal. If USCIS determines that the alien has not met this standard, the alien will be removed.

If USCIS determines that the alien has met this standard and the alien was not previously in proceedings before the Immigration Court, USCIS will refer the matter to the Immigration Court in the first instance. In cases where the alien was previously in proceedings before the Immigration Court, USCIS will notify the referring immigration officer of its finding, and the immigration officer will inform U.S. Immigration and Customs Enforcement (ICE). ICE OPLA may file a motion to reopen with the Immigration Court or the Board of Immigration Appeals, as appropriate, for further proceedings for the sole purpose of determining eligibility for protection under INA § 241(b)(3) and CAT for the country of removal. Alternatively, ICE may choose to designate another country for removal.

**Diplomatic Assurances**

**Statement for the Record**
**By**
**John B. Bellinger, III**
**Legal Advisor to the Secretary of State**

**Before the House Foreign Affairs Subcommittee on International**
**Organizations, Human Rights, and Oversight**

**June 10, 2008**

Chairman Delahunt and distinguished members of the Committee, I welcome the opportunity to appear before you today to discuss the United States' use of diplomatic assurances to protect individuals against torture in other countries.

The use of diplomatic assurances in the practice of the Department of State arises in three different contexts: (1) in the surrender of fugitives by extradition from the United States; (2) in immigration removal proceedings initiated by the Department of Homeland Security, and (3) in the transfer of terrorist combatants from detention at the Department of Defense detention facility at Guantanamo Bay, Cuba. My testimony today will describe the use of diplomatic assurances in these contexts, and explain the reasons why we believe diplomatic assurances, in appropriate cases, can be an important tool for protecting individuals against torture.

1

**Article 3 and the Related Policy Against Transfers to Torture**

First, it is important to understand the United States' legal obligations and related policies with respect to the sending of individuals to countries where they there is a risk they may be tortured. The touchstone of our legal obligations is Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, ("Convention" or "Convention Against Torture"). As a party to the Convention, the United States has undertaken an international legal obligation under Article 3 not to expel, return ("refouler") or extradite a person from the territory of the United States to a country where there are substantial grounds for believing that person would be subjected to torture. Pursuant to the formal treaty understanding approved by the Senate and included in the U.S. instrument of ratification, the United States interprets the phrase, "where there are substantial grounds for believing that he would be in danger of being subjected to torture," as used in Article 3 of the Convention Against Torture, to mean "if it is more likely than not that he would be tortured." According to the August 30, 1990 Report from the U.S. Senate Committee on Foreign Relations, this understanding sought to apply the same legal standard under Article 3 that is used in determinations under the 1967 Protocol Relating to the Status of Refugees ("Refugee Protocol"). Under the Refugee Protocol,

2

Appx.120

an individual may not normally be expelled or returned if it is more likely than not that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion.   It is important to note that, by expressing the "more likely than not" standard as an Understanding to Article 3, the United States deemed it to be merely a clarification of the definitional scope of Article 3, rather than a standard that would modify or restrict the legal effect of Article 3 as it applied to the United States.

The non-refoulement obligations in Article 3 apply only with respect to individuals who are *in the territory of the United States*.   This accords with our interpretation of similar language in the Refugee Protocol.  Neither the text of the Convention, its negotiating history, nor the U.S. record of ratification supports a view that Article 3 of the Convention applies to persons outside the territory of the United States.   By its terms, Article 3 applies only to expulsion, to what is described as "returns ('refouler')", and to extradition.   "Expulsion" and "extradition" clearly describe conduct taken to remove individuals from a State Party's territory.

Likewise, the U.S. Supreme Court has concluded that the term "return ('refouler')," in the context of Article 33 of the Convention Relating to the Status of Refugees (incorporated by reference into the Refugee Protocol),

3

Appx.121

"was not intended to have extraterritorial effect."[1]  There is no basis for attaching a different meaning to "refouler" in Article 3 of the Convention Against Torture.  This reading is further supported by the Convention's negotiating record.[2]  In addition, the record of proceedings related to U.S. ratification of the Convention demonstrates that at the time of ratification in 1994, the United States did not interpret Article 3 to impose obligations with respect to individuals located outside of U.S. territory.

Although the reach of Article 3 itself is limited, it is nevertheless the policy of the United States not to send *any* person, no matter where located, to a country in which it is more likely than not that the person would be subjected to torture.  This policy applies to all components of the U.S. Government and applies with respect to individuals in U.S. custody or control regardless of where they may be detained.  It has been set forth in statute and articulated at the highest levels of the United States Government.

---

[1] *Sale* v. *Haitian Centers Council, Inc.*, 509 U.S. 155, 179 (1993).  In examining the text of Article 33, the Supreme Court found that the legal meaning of the term "return," as modified by reference to the French "refouler" (English translations of which included "repulse," "repel," "drive back," and "expel"), implied that "'return' means a defensive act of resistance or exclusion at a border rather than an act of transporting someone to a particular destination."

[2] The original Swedish proposal spoke only of expulsion or extradition, and did not employ the term "return ('refouler')."  However, when the draft was revised to expand the prohibition to include "return ('refouler')," considerable discussion ensued over the advisability of including the term, including references to ambiguity surrounding the extraterritorial reach of the provision.  At no point was there agreement that the term was intended to apply to individuals located outside the territory of a State Party. Additionally, both the text and the negotiating history make clear that negotiators used explicit language applying certain provisions of the Convention extraterritorially when they intended those provisions to have extra-territorial effect (See, e.g. Articles 2(1), 5, 12, 13, and 16).  The negotiators' failure to do so in Article 3 further confirms that there was no express intent to apply Article 3 extraterritorially.

Appx.122

*See* Section 2242 of the 1998 Foreign Affairs Reform and Restructuring Act (PL 105-277).

I want to make clear that U.S. commitments under Article 3 and our related policy are absolute. There are no exceptions based on national security or the criminality of an individual, as there are regarding the non-refoulement obligation under the Refugee Protocol. Nor is the likelihood that an individual will be tortured weighed against the threat he or she poses to the safety and security of the American people.

**The Role of Diplomatic Assurances**

Let me now explain where diplomatic assurances fit in the context of our obligations under Article 3 and related policies. When confronted with a dangerous foreign national – such as a serious criminal or terrorist – our Article 3 obligations may seriously constrain our options for removing or extraditing that individual from the United States. On the one hand, we may not have the ability to detain the individual. For example, even though we have reliable information that the individual poses a terrorist threat, we might lack admissible evidence to support charging the individual with anything more than a minor crime or immigration violation. Even if we could detain the individual under the laws of war or in immigration

5

detention, there are legal restrictions on holding the individual for an extended period of time. A better option might therefore be to send the individual to his home country, or to a third country that is seeking to have him extradited for prosecution. But as I have explained, the Article 3 prohibition is categorical: no matter how dangerous the individual, he cannot be sent from the United States to any country if it is more likely than not that the individual will face torture there. In fact, it is often the case that very dangerous individuals may be nationals of, or sought for prosecution by, States with poor human rights records, giving rise to a concern about torture. This presents the United States – and all governments that, like ours, respect the rule of law – with a serious problem.

In such situations, diplomatic assurances can be a way to protect U.S. national security and public safety while still complying with relevant international law and policy not to send people to countries where they will be tortured. Credible diplomatic assurances from the receiving state may *reduce the risk of torture* such that the individual can be safely and appropriately transferred consistent with our Article 3 obligations. In other words, diplomatic assurances and the senior level communications with the foreign government on which they are based can be the vehicle by which the United States Government can reasonably find that it would not be more

likely than not that the individual would be tortured by the receiving country if transferred.

To reduce the risk of torture, it is of course essential that diplomatic assurances be credible. This requires direct engagement with the potential receiving country. In such cases, where appropriate, the U.S. Government can change the facts on the ground by directly engaging with the receiving country regarding the treatment that a particular individual will receive and securing explicit, credible assurances that the individual will not be tortured.[3]

The seeking of diplomatic assurances is, of course, not appropriate in all cases. We would not rely upon assurances unless we were able to conclude that with those assurances, an individual could be expelled, returned, extradited, or otherwise transferred consistent with our treaty obligations and stated policy. The efficacy of assurances must be assessed on a case-by-case basis and can depend on a number of factors related to the particular country involved, including the extent to which torture may be a pervasive aspect of its criminal justice, prison, military or other security

---

[3] Of course, the United States also engages in bilateral and multilateral efforts to assist other countries in improving their human rights records. This policy is fully consistent with longstanding U.S. human rights policy, which strives to encourage countries around the world to improve their human rights performance to protect a broad array of civil and political rights. While we hope that such efforts will produce sustainable improvements in the conditions in those countries over the long term, they are inadequate for addressing the immediate problem of removing a charged or convicted criminal or suspected terrorist alien who is unlawfully present in the United States.

system; the ability and willingness of that country's government to protect a potential returnee from torture; and the priority that government would place on complying with an assurance it would provide to the United States government (based on, among other things, its desire to maintain a positive bilateral relationship with the United States government). But in cases where credible assurances could be effective in permitting removal or extradition consistent with our non-refoulement obligations, such assurances are a critical and valuable tool.

**Procedures for Implementing Article 3 and the Related Policy**

In 1999, the United States government promulgated regulations to implement its Article 3 obligations, including regulations addressing diplomatic assurances.  In the extradition context, the Secretary of State is the U.S. official responsible for determining whether to surrender a fugitive to a foreign country and decisions on extradition where there is a potential issue of torture are presented to the Secretary (or, by delegation, to the Deputy Secretary) pursuant to regulations at 22 C.F.R. Part 95.  The decision to surrender a fugitive occurs only after a fugitive has been found extraditable by a United States judicial officer.  In order to implement our Article 3 obligations, in cases where the issue arises, the Secretary or Deputy

Appx.126

Secretary, in making the determination whether to surrender, considers the question of whether a person facing extradition from the U.S. `is more likely than not' to be tortured in the State requesting extradition.  In each case in which allegations relating to torture are made or the issue is otherwise brought to the Department's attention, appropriate policy and legal offices review and analyze information relevant to the case in preparing a recommendation to the Secretary or Deputy Secretary as to whether or not to sign the surrender warrant.  Based upon the analysis of the relevant information, surrender may be conditioned on the requesting State's provision of specific assurances relating to torture or aspects of the requesting State's criminal justice system that protect against mistreatment.  In addition to assurances related to torture, such assurances may include, for example, that the fugitive will have regular access to counsel and the full protections afforded under that state's constitution or laws.  Assurances specifically against torture have been sought in only a small number of extradition cases. In this regard it is important to note that prior to negotiating new extradition treaties the United States undertakes a review of the potential treaty partner's human rights record to determine if they will respect both the rule of law and an extradited individuals human rights, including protections against torture. Consequently, extradition cases

9

Appx.127

generally do not pose legitimate concerns about torture and such claims are rare. The use of assurances, however, is part of a longstanding and effective international practice in the extradition context, and assurances are often directly referenced in extradition treaties themselves.

In the immigration context, regulations codified at 8 C.F.R. 208.18(c) and 8 C.F.R. 1208.18(c) provide that the Secretary of State may forward to the Secretary of Homeland Security assurances that the Secretary of State has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country. In practice, the Department of State seeks assurances upon the request of the Department of Homeland Security and exercises discretion in deciding in particular cases whether or not to seek assurances upon receiving such a request. Under these regulations, if the Secretary of State obtains and forwards such assurances to the Secretary of Homeland Security, the Secretary of Homeland Security shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention. If the Secretary of Homeland Security determines that the assurances are sufficiently reliable, he or she may then terminate any deferral of removal the alien had been granted as to that country and the alien's torture claim

may not be considered further by an immigration judge, the Board of Immigration appeals or an asylum officer.

Section 2242(c) of the 1998 Foreign Affairs Reform and Restructuring Act, the statute pursuant to which these regulations were promulgated, expressed Congress' concern with the possibility that terrorists, persecutors, and serious criminals will be released on our streets, and mandated that the regulations issued by the Executive Branch to implement the Convention against Torture provide for the removal of such aliens to the maximum extent possible consistent with our Art 3 obligations. The regulations regarding the use of diplomatic assurances in the immigration context are a reasonable and permissible response to this congressional mandate.

Since these regulations were promulgated in 1999, they have been used in less than a handful of cases. This is in contrast to the approximately five thousand individuals who have enjoyed protection in immigration proceedings through the withholding or deferral of removal on grounds that it was more likely than not that they would be tortured. This is in addition to the approximately 300,000 individuals who were granted asylum, either affirmatively or defensively during that same time period. This latter number includes individuals who may have been eligible for Article 3

11

Appx.129

protection, but whose claims for protection on that basis were never reached because they were granted asylum.  This is a point worthy of some emphasis: in the vast majority of immigration cases where our obligations under Article 3 of the CAT are implicated, diplomatic assurances are never even considered, let alone pursued.

The issue of diplomatic assurances also arises in the context of the transfer of enemy combatants from detention at the Department of Defense detention facility at Guantanamo Bay, Cuba.  Although Article 3 of the CAT does not as a matter of treaty law apply to Guantanamo transfers, the United States government nevertheless adheres to a policy that we will not transfer individuals from Guantanamo to countries where we determine that it is more likely than not that they would be tortured.  With regard to Guantanamo transfers, the Department of State is also involved in seeking diplomatic assurances from a potential receiving government as to the treatment the individual will receive if transferred or returned to that country. Specifically, the Department of State's Office of War Crimes Issues (which generally has responsibility to communicate on transfer-related matters, in the Guantanamo context, as between the United States and foreign governments) seeks those diplomatic assurances, including assurances that they will be treated humanely and in accordance with the

12

receiving country's international obligations when detention by the receiving government is foreseen.

In all contexts, evaluations as to the likelihood of torture require a particularized determination in each individual case. Generalizations about the overall human rights situation in a country or even a country's record with respect to torture do not necessarily provide a clear or obvious answer. Likewise, evaluations as to whether assurances should be sought and whether any assurances that are obtained are sufficiently reliable such that with such assurances it is more likely than not that the individual would not be tortured are also made on a case-by-case basis. When evaluating assurances provided by another country, Department officials may consider many factors including, but not limited to, the identity, position or other relevant information concerning the official relaying the assurances; information concerning the judicial and penal conditions and practices of the country providing assurances; political or legal developments in that country that would provide context for the assurances provided; that country's track record in complying with similar assurances previously provided to the U.S. or another country; and that country's capacity and incentives to fulfill its assurances to the United States.

13

As part of an assurance we receive from a foreign government, the Department may obtain arrangements by which U.S. officials or an agreed upon third party will have physical access to the individual during any period in which he or she is in the custody of the foreign State for purposes of verifying the treatment he or she is receiving. In addition, in instances in which the United States extradites, removes, returns, or transfers an individual to another country subject to assurances, we have and will continue to pursue any credible report and take appropriate action if we have reason to believe that those assurances will not be, or have not been, honored.

In many cases, the Department's ability to seek and obtain assurances from a foreign government depends in part on the Department's ability to treat dealings with the foreign government with discretion. The very fact that the United States would not consider removing an individual in the absence of an assurance on torture can itself be an embarrassment to the country in question. The delicate diplomatic exchange that is often required in these contexts typically cannot occur effectively except in a confidential setting. In such cases, consistent with the sensitivities that surround the Department's official diplomatic communications, the Department typically does not make public the details of the communications involved. If such

14

Appx.132

details were regularly divulged, countries would likely prove far less willing to provide reliable assurances. In addition, making the details of these communications public would be inconsistent with the expectations of the government that have provided us assurances in the past, and would seriously undermine our ability to obtain similar assurances in the future.

**Criticisms**

Several criticisms have been made of our practice of obtaining assurances. Some have claimed that the confidentiality of assurances renders them suspect, or that assurances are inherently unreliable. Such challenges, to assurances *as such*, have been rejected by courts in the both the United States and in Europe. Rather, courts have found that, in appropriate circumstances, diplomatic assurances may be sufficient to enable a State to return an alien to a country, in compliance with its Article 3 obligations, even if that country has a recent history of human rights abuses. In this regard it should be noted that Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms subjects State Parties to a much broader non-refoulement obligation than the

15

Convention Against Torture.[4]   Faced with the additional challenges this broader obligation imposes, governments in Europe have utilized diplomatic assurances to reduce the risk that aliens will face not only torture but other abuses and conditions as well.

Another criticism often leveled against the practice of utilizing diplomatic assurances is that the practice undermines the international human rights framework.  We find the opposite to be true.  Seeking assurances does not mean ignoring or condoning torture.  On the contrary, when they seek assurances, countries signal the importance of, and their commitment to, their international human rights obligations and directly confront the country in question with their concerns.  These discussions serve to bolster, not undermine, the international human rights framework. If successful, they lead to renewed commitments to and compliance with international human rights obligations by the country from which assurances are sought.  In some cases, interest in reinforcing bilateral law enforcement relationships may serve as an incentive for receiving countries to improve their practices.  Bilateral discussions regarding assurances may also lead to improved access to detention facilities in the receiving country on the part of

[4] As interpreted by the European Court of Human Rights, State Parties are prohibited under Article 3 of the European Convention from sending an individual to a country where he or she would face a "real risk" of being subjected to torture or to inhuman or degrading treatment or punishment.  The scope of risks protected against under this non-refoulement obligation is greater than those protected against under the Convention Against Torture, and the standard of 'real risk' is substantively lower than 'more likely than not.'

16

Appx.134

the requesting state, or to a greater role for a particular domestic human rights institution and/or independent human rights group in the receiving country.

**Conclusion**

Diplomatically these are not easy discussions, but they are sometimes necessary and valuable in our efforts to protect our citizens from criminal and terrorist threats and, at the same time, to comply with our international human rights obligations. Assurances, if properly used, are a means of fulfilling, not avoiding, non-refoulement obligations. As such, those who categorically oppose the practice need to consider if they are content with the idea of dangerous criminals or unlawful aliens being released onto the streets of the United States, even though, with appropriate assurances, they could be sent to face justice in another country or otherwise expelled or removed consistent with U.S. treaty obligations. For its part, the Department of State is not content with that idea. Thus, the Department will continue to seek to utilize, where appropriate, assurances to assist in ensuring that we both protect our citizens and uphold our international legal obligations.

I thank the Committee for its interest in this issue and am happy to discuss with you any additional questions you may have.

Appx.135

## DECLARATION OF PAIGE AUSTIN

I, Paige Austin, hereby affirm under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true, except those made on information and belief, which I believe to be true:

1. I am an attorney at Make the Road New York (MRNY), located at 301 Grove St. Brooklyn, NY 11237. MRNY is a nonprofit legal service provider with five offices in and around New York City. Since 2019, MRNY has been a part of a collaborative of organizations providing services to New Yorkers with final orders of removal who are either in ICE custody or at imminent risk of ICE enforcement action. The collaborative is called the Rapid Response Legal Collaborative (RRLC). I supervise our team that works under the auspices of RRLC in representing and providing legal advice to individuals with orders of removal.

2. Through this work, I have represented or supervised the representation of hundreds of individuals with final orders of removal, often although not always in seeking reopening.

3. The vast majority of individuals referred to RRLC are pro se. A large number of those referred by another service provider do not understand that they have a removal order; do not understand the implications of their removal order; and/or do not know how to reopen the removal order before the immigration court. For instance, many individuals are confused about the distinction between U.S. Immigration and Customs Enforcement (ICE) and the immigration court (e.g. believing they have attended their immigration court dates when in fact they were attending ICE check-ins) or believe that actions subsequent to a removal order have the effect of cancelling or undoing it (e.g. filing an asylum application or applying for employment authorization).

4. Preparation of a motion to reopen requires significant work by counsel that is nearly impossible for pro se clients to undertake on their own, particularly if they are detained. Motions to reopen require a sworn statement of new and relevant facts in English, often with reference to the person's prior removal proceedings; supporting evidence, which individuals in custody do not have access to; a relief application, completed in English; and proof of prima facie eligibility for relief, such as country conditions evidence, which is also unattainable in custody due to lack of consistent (or any) access to the internet, printers, copiers, and translation services.

5. This evidence takes time to gather, translate, and prepare for submission. Many clients and prospective clients do not have copies of relevant immigration-related documents. As a result, our first step in preparing motions to reopen is generally to request a complete Record of Proceeding from Executive Office of Immigration Review (EOIR), which is comprised of the immigration courts and the Board of Immigration Appeals, so that we can understand the procedural history of the case, see whether an application is on file, and identify any lack of notice claim. Individuals in custody have no way to access their Record of Proceeding.

6. Even when someone is not detained, preparation of a meritorious motion to reopen is extremely difficult to complete pro se. RRLC has received a large volume of referrals for individuals who attempted to do a pro se motion to reopen—often after being handed a pro se form at the window in immigration court—and had that motion denied. It is common for people to omit crucial details they do not know are relevant; omit supporting evidence; and/or face difficulty translating a statement into English.

7. Motions to reopen can be legally complex. Pro se individuals (like many attorneys) generally are not familiar with the relevant filing deadlines or the concept of equitable tolling for filing deadlines or the number bar; do not have the experience or knowledge to analyze and present certain legal claims, including lack of notice and changed-country-condition claims; and may fail to recognize relevant information to include. To the extent motions seek reopening sua sponte, these also may face additional legal barriers including the regulatory departure bar and a limitation on federal court review. A sua sponte filing also triggers the number bar on reopening—which may create an additional obstacle.

8. For motions to reopen, including requests to reopen *sua sponte*, that do not carry an automatic stay of removal, a movant generally can be deported during the pendency of that motion. The same is true during the appeal of a denied motion to reopen. A motion for a stay of removal requires legal argument and familiarity with stays from other legal contexts, as there are no published standards for the adjudication of motions to stay removal by immigration courts or the Board of Immigration Appeals.

9. Although counsel can generally file motions to reopen electronically, pro se individuals are forced to rely on paper filing. My team at MRNY files some motions to reopen by mail for nondetained clients for whom we are using a notice of limited appearance, and whose orders of removal are outside New York City, and we often see significant delays in delivery and docketing of those motions in immigration court. For instance, in recent years, we have seen delays of several weeks in docketing motions in the immigration courts in Orlando, Dallas, and Chicago. For someone in custody who faces imminent removal, it is unlikely based on my experience that they could even get a motion to reopen and/or motion for a stay filed and docketed prior to removal if relying on paper filing by mail to do so.

10. Communication with clients in ICE detention facing imminent removal is extremely difficult. Particularly since January 2025, we regularly see clients transferred between facilities repeatedly and within days of arrival in ICE custody. On multiple occasions, we have been unable to hold a legal call or obtain client signatures prior to a detained client's slated removal. This obstructs our ability to identify and document clients' reasons for seeking reopening and their claims to relief.

11. ICE ERO does not provide counsel or, in most cases, individuals with information about removal. For instance, on or about March 26, 2025, a post-order MRNY client from Venezuela was transferred from an ICE detention facility without prior notice and prior to a scheduled legal call to complete his intake. I repeatedly asked ICE ERO to confirm

whether ICE intended to remove him to Venezuela or El Salvador. Despite confirming our client was in the process of being transferred, ICE ERO would not provide this information.

12. Similarly, we have another post-order client from Venezuela who was in custody for several months and repeatedly faced near-removal in March 2025—including even being transported to the airport—without reliable notice or information on where he would be removed to.

13. Logistically, it would be impossible for legal service providers to prepare motions to reopen with respect to every possible country to which an individual may be removed— and certainly that is not possible for pro se individuals. For instance, MRNY currently represents a detained post-order client who is gay. He could theoretically assert a fear of removal to an enormous number of countries. We have also represented two detained, indigenous land rights activists from Honduras, both of them post-order. Latin America is widely considered to be the deadliest region in the world for land-rights activists, with several other countries including Colombia, Brazil, Guatemala and Mexico also posing lethal risks. In these types of cases, where individuals have fear-based claims to multiple countries, preparing and filing motions to reopen based on fears of deportation to multiple countries on the off-chance DHS might intend to deport a person to one of those countries is simply not feasible. Instead of a single motion and application, each client could now need the equivalent of potentially a dozen or more motions and applications— with no attorney capacity left to assist anyone else. It would also impose an extreme burden on the immigration court system, with judges asked to review and rule on numerous potentially unnecessary motions and claims.

14. It is difficult to substantiate fear claims to countries which clients know nothing about. MRNY represents another post-order client whose motion to reopen, filed while he was detained, was denied with respect to a possible third country of removal (El Salvador) with the IJ finding "the new claim advanced of a fear of removal to a country other than that designated as a country of removal in [the client's] case is too generalized and vague to establish prima facie eligibility for asylum or related relief absent further evidentiary support." Notably, our client's filing had included several articles and reports about the dangers posed by removal and incarceration in El Salvador—far more than a pro se individual in custody, particularly one who does not speak English, could possibly adduce. Yet his fear claim was still denied as "too generalized and vague."

15. Moreover, RRLC represents some clients who once detained *want* to be removed to their country of origin. A motion to reopen and stay interrupts this process and prolongs their detention. For instance, in the case of the MRNY for whom ICE ERO refused to provide information on *where* he would be removed, we filed a motion to reopen with respect to El Salvador, only to withdraw it after a TRO was issued in the instant litigation. In the interim, our client was returned to a detention facility where he now remains (despite the withdrawal of his motion) nearly two weeks after he could have been removed.

16. The only workable means of providing an opportunity to seek fear relief to a third country, in my view and based on my experience, would be to provide notice of an intended third country of removal with a concomitant and documented opportunity to express a fear of removal there. That expression of fear of removal to a third country should trigger a reopening of the removal proceeding, such that the full panoply of rights under Section 240 of the Immigration and Nationality Act is available.

17. In particular, I note that the use of a fear interview, along the lines of a credible or reasonable fear interview, as a gatekeeping mechanism to determine if the noncitizen merits the opportunity to present a full fear claim before an IJ would be grossly unfair. In my experience representing detained clients in reasonable fear interviews and reviewing such interviews, asylum officers seek to elicit detailed explanations of the interviewee's fear and reasons for believing the foreign government would not provide protection (or would acquiesce in torture). A lack of detailed information or knowledge, particularly as regards the government's role in any persecution or torture, is often fatal to the fear claim. Obviously, for a third country where the interviewee has never set foot, that information would be impossible for the noncitizen to provide on an accelerated timeline and while in detention.

DATED: April 8, 2025

_____

Paige Austin, Esq.
Make the Road New York
301 Grove St.
Brooklyn, NY 11237
Tel: (718) 565-8500 ext. 4139

Appx.139

## DECLARATION OF AIMEE L. MAYER-SALINS

I, Aimee L. Mayer-Salins, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I make this affidavit based upon my own personal knowledge in support of the Plaintiffs in *D.V.D. v. DHS*, No. 1:25-cv-10676-BEM (D. Mass), and would be competent to testify thereto.

2. I am an attorney licensed to practice law in the state of Massachusetts. I am also an associate member of the Virginia State Bar. In addition, I am admitted to practice before the United States Courts of Appeals for the First, Fourth, and Eleventh Circuits, as well as the United States Supreme Court. I was first admitted to the Virginia State Bar in 2013. I was admitted to the bar in Massachusetts in 2016.

3. I have practiced immigration law for my entire career. I began my career at the United States Department of Justice (DOJ), entering on duty through the Attorney General's Honors Program in 2013. At DOJ, I served at the Board of Immigration Appeals within the Executive Office for Immigration for Review. I then completed a fellowship at the Post-Deportation Human Rights Project at Boston College. After that, I was an associate attorney at Rubin Pomerleau, P.C. and then at Fragomen, Del Rey, Bernsen, & Loewy, LLP. I then worked at the Catholic Legal Immigration Network, Inc. (CLINIC) from 2019 through 2022, first as a staff attorney and then as a supervisory senior attorney. Since September of 2022, I have served as the managing appeals attorney at the Amica Center for Immigrant Rights.

4. As part of my responsibilities at CLINIC, I led a Remote Motions to Reopen Project. Through that project, I mentored attorneys across the country representing noncitizens with final order of removal who sought to reopen their proceedings. In addition, I created webinars, practice advisories, and other training materials for attorneys on complex issues surrounding motions to reopen. I also had my own caseload of motions to reopen cases, focusing on motions on behalf of people subjected to the Remain in Mexico and the Zero Tolerance Family Separation policies, as well as detained individuals who had been subjected to egregious harm in ICE detention, including victims of nonconsensual gynecological procedures.

5. The Amica Center for Immigrant Rights—formerly known as Capital Area Immigrants' Rights (CAIR) Coalition—engages in unwavering legal defense and strategic litigation for immigrant children and adults facing detention and deportation. The majority of our clients are currently detained in the custody of U.S. Immigration and Customs Enforcement (ICE).

1

6.  Since joining the Amica Center for Immigrant Rights, I have trained attorneys on motion to reopen practice, supervised staff filing motions to reopen, and mentored staff handling complex motions.

*Most Noncitizens Are Unaware That a Motion to Reopen Is a Viable Option*

7.  According to the Vera Institute the majority of noncitizens facing deportation are pro se. *See, e.g.,* Vera Immigration Court Legal Representation Dashboard, available at https://www.vera.org/ending-mass-incarceration/reducing-incarceration/detention-of-immigrants/advancing-universal-representation-initiative/immigration-court-legal-representation-dashboard. Even though removal may mean permanent family separation, persecution, torture, or even death, noncitizens in removal proceedings have no right to appointed counsel. Instead, noncitizens are only representation "at no expense to the government." 8 U.S.C. § 1229a(b)(4)(A); 8 C.F.R. § 1240.10(a)(1).

8.  Pro se noncitizens usually are wholly unaware of the complicated procedural mechanisms that may allow a judge to consider new evidence after they have been ordered removed. *E.g., Lugo-Resendez v. Lynch,* 831 F.3d 337, 345 (5th Cir. 2016) (explaining that many noncitizens "are poor, uneducated, unskilled in the English language, and effectively unable to follow developments in the American legal system—much less read and digest complicated legal decisions.").

9.  Even those pro se noncitizens savvy enough to figure out that a motion to reopen is available to present new evidence are unlikely to be able to present an approvable motion to reopen to the adjudicator. For most people, there are simply too many barriers placed in their way. A motion must be presented in English and, as further explained below, must address timeliness, prima facie eligibility for relief, and explain why evidence is material and previously unavailable. The evidence must be attached with the motion, along with any application for relief. For a detained noncitizen without an attorney, putting together such a motion is nearly impossible. This is especially true for those noncitizens with limited formal education, limited English proficiency, or mental health disabilities.

*General Legal Landscape Applicable to Motions to Reopen*

10. To understand why filing a motion to reopen is so difficult for a pro se noncitizen, and frankly, even for a noncitizen with counsel, it is important to understand the legal framework governing motions to reopen. After a final removal order has issued, a person can present evidence that is new and was unavailable at the prior removal hearing through a motion to reopen.  Through 8 U.S.C. § 1229a(c)(7)(C)(i), Congress authorized the filing of motions within 90 days of a final administrative removal order, and courts of appeals have affirmed this deadline may be equitably tolled.  *See, e.g., Mata-Reyes v. Lynch*, 576 U.S. 143, 147 n.1 (2015) (citing cases); *Lugo-Resendez v. Lynch*, 831 F.3d 337 (5th Cir. 2016). The 90-day deadline does not apply to individuals seeking protection from persecution and torture and whose motion is based on changed conditions *in the country to which removal was ordered.*  8 U.S.C. § 1229a(c)(7)(C)(ii).  If an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) grants reopening, the noncitizen is

2

not automatically granted protection from removal.  Rather, the person still must demonstrate eligibility for such protection in an individual merits hearing before an immigration judge.

11. In general, the venue and process for filing motions to reopen is as follows:
    a.  If the final order was issued by an IJ, and the noncitizen did not previously appeal that final order, then any motion to reopen must be filed with the immigration court that issued the order.  If the IJ denies reopening, the noncitizen may appeal the denial to the BIA.  If the BIA affirms the IJ's decision, the noncitizen may file a petition for review of the BIA's decision with the appropriate court of appeals.
    b.  If the final order was issued by an IJ, the noncitizen previously appealed the IJ's decision to the BIA, and the BIA was the agency adjudicator to rule substantively in the case, then any motion to reopen must be filed with the BIA.  This is true even if the person previously filed a petition for review of the BIA's decision to the court of appeals and the court of appeals ruled on the petition.  However, if the BIA dismissed the appeal for lack of jurisdiction or untimeliness, the motion must be filed with the IJ. If the BIA denies reopening, the person may file a petition for review of the BIA's decision with the appropriate court of appeals. However, if the motion to reopen is based on the IJ's or BIA's *sua sponte* authority under the regulations, judicial review is either entirely unavailable or limited to legal and constitutional questions. If the BIA denies the motion solely in an exercise of discretion, no review is available, regardless of the basis of the individual's claim.

12. A motion to reopen must include "the appropriate application for relief and all supporting documentation." 8 C.F.R. § 1003.2(c)(1), 1003.23(b)(3). Additionally, to prevail on a motion to reopen, the individual must show prima facie eligibility for relief. *Matter of L-O-G-*, 21 I&N Dec. 413 (BIA 1996). In practical terms, this means that the pro se individual or an attorney must fill out a lengthy and detailed application form. Additionally, counsel usually will need to work with the client to draft a declaration as such declarations play a critical role in adjudicating fear-based claims. The individual or attorney will also need to gather other supporting evidence, which may include corroborating declarations from other individuals, medical records, psychological evaluations, newspaper articles, and reports from human rights organizations. Where relief is based on fear of persecution and/or torture, the application and evidence must be specific to the country to which the noncitizen may be removed.

*Competent preparation of a motion to reopen is a time-consuming task.*

13. Investigating the viability of a claim for reopening can be a complicated endeavor for a pro se individual or for an attorney, including gathering new and previously unavailable evidence.

14. For an attorney, the process must comply with the ethical obligation to fully and competently assess the merits of a claim which, for clients facing persecution and torture,

3

may make the difference between being sent to one's death and safety in this country. For example, where counsel did not represent the person previously, counsel needs to obtain the complete record of proceedings. Moreover, by statute and regulations, motions to reopen require substantial new evidence, which takes time to gather and assemble. *See generally* 8 U.S.C. § 1229a(c)(7)(B); 8 C.F.R. § 1003.2(c)(1). Additionally, the practical realities of representing people in ICE custody—including frequent transfers between distant facilities and communication barriers— make it substantially more difficult to gather necessary information and evidence.

15. Simply communicating with a person in ICE custody is a complex task. Attorneys must reach out to the facility where the person is detained to schedule privileged calls or virtual video visits. At some facilities, there is a process just to have an attorney's phone number listed as privileged that can take several days. Due to the overcrowding of most facilities housing ICE detainees and the limited space available for confidential communication, there is often a lengthy wait to be scheduled for a timeslot for a privileged call or video visit. Plus, the staff assigned to schedule such calls are often overwhelmed with requests and it can take a few days for them to even respond to the attorney's request for a call. Alternatively, an attorney might go visit the client in person, but that typically involves driving very long distances. Most ICE facilities are in rural areas far from most attorneys. For example, most clients served by the Amica Center for Immigrant Rights are housed in detention facilities that are between 2 and 5 hours driving from our office in Washington, DC. Attorneys also face significant delays communicating with detained clients by mail.

16. These steps to communicate with the client are necessary before an attorney can even really begin work on a case and start the process for obtaining the client's immigration file through the Freedom of Information Act, which requires a client's signature. All of these delays are exacerbated when ICE transfers individuals from one facility to another which happens frequently, in my experience.

17. Gathering evidence can also be a time-consuming endeavor when a client is detained. For example, working with a detained client to draft a declaration or obtaining a psychological evaluation on their behalf requires hours and hours of work. In addition to the time needed to actually do the declaration or psychological evaluation, often it takes many hours just to coordinate the logistics of getting interpreters, psychologists, or others approved by the facility and travel to the facility.

18. Every case is different, but it would not be unreasonable for obtaining and reviewing a client's record to require between 15-30 hours of work, even before research and writing can begin. Additional time also would be needed in circumstances where it is difficult for the attorney and client to communicate, for example, if the client is detained far from the attorney, is transferred multiple times, has a mental health disability or physical disability that makes communicating more challenging, or is not proficient in English.

19. Where a noncitizen is pro se, especially if they are detained, they must try to obtain evidence and connect with potential witnesses despite even more barriers. Even making a

4

Appx.143

simple phone call to a potential witness can be an unachievable task for a detained person. In overcrowded detention facilities, it can be difficult to have any privacy to discuss sensitive matters relevant to a person's fear of removal. Jail calls can be prohibitively expensive. *See, e.g.,* Wendy Fry, *ICE Detention: Where a day's work might buy you a 14-minute phone call,* CAL MATTERS, July 26, 2024, available at https://calmatters.org/newsletter/ice-detention-where-a-days-work-might-buy-you-one-14-minute-phone-call/#:~:text=According%20to%20the%20California%20Collaborative,a%20minute%20for%20international%20calls. Plus, detainees typically lack internet access and therefore cannot easily research country conditions in an unfamiliar country themselves. .

*Generally there is no automatic stay when a motion to reopen is filed.*

20. Despite all of the time-consuming work necessary to competently prepare a motion to reopen, attorneys and their clients also must race against the clock to get a motion to reopen filed as quickly as possible. This is not simply because there is a 90-day filing deadline applicable to most motions; it is also because a client with a final order of removal is at risk of being deported at any time.

21. Even the filing of the motion to reopen does not automatically stay removal in most instances. (Indeed, removal is *only* automatically stayed for motions to rescind and reopen in absentia orders. *See* 8 U.S.C. § 1229a(b)(5)(C); 8 C.F.R. § 1003.23(b)(4)(ii)). Instead, an attorney must also prepare a stay motion, often addressing the likelihood of success on the merits, irreparable harm, and the public interest / harm to government, although the BIA does not have a precedential decision indicating what factors it considers. The IJ or BIA has the sole discretion to decide whether to grant such a stay.

*Motions to Reopen are Not a Realistic Option Where ICE is Attempting to Remove Someone to a Third Country.*

22. As detailed above, preparing a motion to reopen is a complex and time-consuming process even in the normal course. Putting together a motion to reopen any time a person fears he might be removed to a random third country selected by the government with no notice whatsoever to the noncitizen is utterly unworkable. In addition to the practical difficulties of preparing a motion discussed above, the noncitizen or their representative would have the added burden of researching country conditions and the treatment of similarly situated individuals in a country that might be wholly unfamiliar to the noncitizen, even assuming that the noncitizen is informed of what country to which they may be removed. For example, a gay noncitizen may have no idea how people who are gay are treated in an unfamiliar country. But of course, their lack of familiarity does not mean that they would not be at risk. Similarly, a person belonging to a religious or ethnic minority group may have no idea how people belonging to that group are treated in an unfamiliar country, but again this lack of familiarity does not equate to lack of risk. Thus, the noncitizen or their counsel would need to do in depth research into country conditions on a totally unfamiliar country.

5

23. Moreover, requiring motions to reopen to multiple countries, without notice, or on a condensed timeline turns the process into motion to reopen whack-a-mole and is directly at odds with the motion to reopen statute, which generally permits the filing of only one motion to reopen. 8 U.S.C. § 1229a(c)(7)(A). Under this framework, the noncitizen may have to file a new motion to reopen every time the government suggests another country where they might be removed, necessarily exceeding the one motion limit.

24. In short, motions to reopen are not realistic where ICE is attempting to remove someone to a third country, especially where ICE does so without even providing notice of which country a person might be removed to and without an automatic stay.

Signed under penalty of perjury this 7th day of April, 2025 at Newton, Massachusetts.

_____
Aimee L. Mayer-Salins

6

## Declaration of Kelsey Morales

I, Kelsey Morales, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge:

1. I am an immigration attorney with the Immigration Representation Unit of the Alameda County Public Defender's Office, the first deportation defense unit to be housed in a county public defender office in California and anywhere outside of New York State. I have practiced federal litigation and removal defense for over eight years, with the last five years focused on representing noncitizens detained by the Department of Homeland Security ("DHS").

2. Our immigration unit represents indigent individuals, including detained individuals, who are facing removal from the United States. We have limited resources for *pro bono* representation and focus on cases of indigent noncitizens detained in California who have viable claims for relief.

3. I have represented noncitizens detained by DHS in immigration and custody proceedings before the Executive Office for Immigration Review ("EOIR"), on writs of habeas corpus before the U.S. District Court for the Northern District of California, and on petitions for review before the U.S. Court of Appeals for the Ninth Circuit. My representation before EOIR includes representing noncitizens detained by DHS in removal and withholding-only proceedings, including before immigration judges and on direct appeal before the Board of Immigration Appeals ("BIA"), and on motions to reopen ("MTR") before the BIA.

4. MTRs are a legal vehicle by which noncitizens can seek to reopen completed immigration proceedings. *See* 8 U.S.C. § 1229a(c)(7). Successful MTRs must include new facts that are supported by affidavits or other evidence, such as expert reports or country conditions. *See* 8 U.S.C. § 1229a(c)(7)(B). MTRs seeking the opportunity to pursue relief, including relief based on a fear of persecution or torture, must include a completed copy of the relevant application and evidence demonstrating *prima* facie eligibility for relief. *See* 8 C.F.R. §§ 1003.2(c)(1), 1003.23(b)(3).

5. Pursuing MTRs for noncitizens is a difficult and time-consuming process in the best of circumstances. Such motions involve gathering supporting evidence, preparing applications for relief (if relevant), and research and drafting the motion itself, which may include statutory and constitutional arguments. In addition, these motions require familiarity with the client's prior immigration proceedings and generally must be completed on an expedited timeline of 90 days or sooner if the movant is seeking to establish timeliness for the purposes of a statutory MTR. The statute only provides noncitizens with the opportunity to file one MTR, with a limited exception. *See* 8 U.S.C. § 1229a(c)(7)(A), (c)(iv). Failure to make an argument or present relevant evidence may be prejudicial to the client. As such, it is imperative that all arguments and evidence challenging the initial removal order and preserving all potential immigration relief be included in the MTR.

1

EXHIBIT 146  Appx.146

6. This is also the case for *sua sponte* MTRs filed more than 90 days after a final removal order. *Sua sponte* MTRs similarly require knowledge of the client's prior immigration history and must contain supporting evidence and comply with agency filing requirements to have a chance of success. Moreover, *sua sponte* motions require gathering additional equity documents, because the standard for *sua sponte* motions is highly discretionary.

7.  MTRs are even more challenging and time-consuming when the noncitizen is detained by DHS. This is because it is difficult to obtain timely access to noncitizens detained by DHS.

8. In my experience, the likelihood of promptly obtaining confidential legal calls is highly dependent on the detention facility. For instance, I recently submitted requests for legal calls with several clients who are detained at the Golden State Annex in McFarland, California and the soonest the facility would schedule a legal call was 10 days after I had submitted my requests; no earlier calls were available. Moreover, detained clients may not make it to scheduled legal calls for reasons outside of their control. For example, last week, one of my clients was unable to appear at a scheduled legal video call because the facility did not transport him to the legal visit room. Delays in timely processing requests for legal calls can also make it difficult to coordinate with expert witnesses who interview the client in order to prepare their report or evaluation.

9. Another challenge I frequently face is reliance on postal mail to obtain the evidence necessary for any MTR. In my experience, many detention centers do not have a reliable or transparent mechanism for attorneys to obtain electronic signatures from detained clients. This is a big hurdle in representation because executed release forms are necessary before I can request a copy of a client's immigration records via EOIR or a Freedom of Information Act ("FOIA") request. It is generally not feasible to obtain client signatures or other case documents in person due to the remote nature of the detention facilities. The closest facility at which one of my clients is detained is over 250 miles away from my office, which is over a four-hour drive one way.

10. Another obstacle is the DHS's practice of transferring noncitizens between detention facilities, without any prior warning to them or their counsel. I have had a client transferred without my knowledge as recently as February 2025. Another coworker had two clients transferred without prior warning within the past year, with one client transferred out of state. Such transfers generally cause further delay in obtaining necessary information, as they often necessitate resending documents and scheduling new confidential calls. For example, in the case of my colleague's client who was transferred out of state, the unannounced transfer interfered with a previously scheduled psychological evaluation.

11. To determine whether a client has a viable MTR, I need to do a consultation with the client and review their immigration records. Many noncitizens may not know that they can file MTRs or be aware of the statutory or constitutional arguments that can be raised

2

in such motions. This is particularly true for noncitizens who are unrepresented and detained. Moreover, MTRs are highly technical motions and subject to both agency and federal court case law. Even if a detained noncitizen has heard of the existence of MTRs as a vehicle for reopening, in my experience, they are typically unaware of the many specific requirements they entail, such as submitting the relevant application for relief, presenting new or previously unavailable evidence, and complying with the statutory deadline (or establishing equitable tolling of such deadline). Additionally, EOIR has various practice manuals and regulations that impose rules on page counts, presentation of evidence, and service that filers must follow or the motion will be rejected.

12. In my opinion, it is difficult for detained, *pro se* noncitizens to comply with these legal and technical requirements. Based on my experience working with detained clients for the past five years, it is particularly difficult for noncitizens detained by DHS to obtain the evidence they need to support reopening from outside of custody. This includes documentation to support any fear-based claim because, again, the motion must establish *prima facie* eligibility for relief to be successful.

13. In addition, limited English proficiency will pose a major obstacle to *pro se* filings of MTRs, as all motions filed before EOIR must be filed in English (or accompanied by a certified English translation). *Pro se* noncitizens who do not understand English, or do not know how to write in English, will find it nearly impossible to file MTRs without counsel.

14. MTRs for detained noncitizens are usually urgent endeavors. That is because, generally, not only must the noncitizen establish timeliness in filing their motion, but they are also under a final order of removal which DHS may execute at any moment. While reserving direct appeal to the BIA of an Immigration Judge's initial removal order automatically stays removal, no such mechanism exists with respect to MTRs except in very narrow circumstances. *See* 8 U.S.C § 1229a(c)(7)(C)(iv). This means that DHS may remove a noncitizen while they are preparing to file a MTR, while the MTR is pending before EOIR, or even while an appeal of the Immigration Judge's denial of the MTR is pending with the Board of Immigration Appeals. That is because the stay process before the agency is discretionary and there is no published decision on setting forth stay factors. This is problematic because it means that noncitizens with viable MTRs may be removed before their motion can be adjudicated on the merits, even if they are seeking protection from persecution or torture in the country to which they are removed.

Signed under penalty of perjury this 8th day of April 2025 at Oakland, California.

_____
Kelsey Morales

3

# DECLARATION OF KATHARINE MARGARET GORDON

I, Katharine Margaret Gordon, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  I am a practicing attorney licensed to practice in New York, I regularly practice before the Executive Office of Immigration Review. Since February 2020, I have been employed at Amica Center for Immigrant Rights (Amica Center). I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I am a Senior Attorney with the Detained Adult Program (DAP) at Amica Center. Amica Center is a Washington, DC-based nonprofit organization dedicated to providing legal services to indigent immigrant men, women, and children who are detained by Immigration and Customs Enforcement (ICE) in Maryland, Pennsylvania, Virginia and other states. At Amica Center, a large part of my work consists of representing Maryland residents who have been detained by ICE or who are otherwise undergoing proceedings before the Executive Office of Immigration Review, at both the Immigration Court and Board of Immigration Appeals levels.

3.  In my position, I frequently represent non-citizens with final removal orders issued by an Immigration Judge (IJ) in removal proceedings under 8 U.S.C. § 1229a and non-citizens with reinstated removal orders issued by the Department of Homeland Security (DHS) pursuant to 8 U.S.C. § 1231(a)(5).

4.  I currently represent a Venezuelan citizen with a final removal designating only Venezuela as the country of removal. No alternate country was designated. I will refer to him as Guillermo. Guillermo is a young Venezuelan man with several tattoos, and he fears removal to El Salvador, a country he has never set foot in. He fears that if he is removed to El Salvador, he will be imprisoned and tortured, and will have no way to contact his family, his attorney, or diplomatic representatives of Venezuela.

5.  Guillermo entered the United States in July 2022 by crossing the Rio Grande River from Mexico to the United States and he immediately turned himself in to U.S. Customs and Border Patrol (CBP). After being held for a few days, he was paroled into the United States pursuant to 8 U.S.C. § 1182 (d)(3). At that time, he was not issued a Notice to Appear (NTA).

6.  He traveled from Texas to Virginia, and in approximately September 2022, checked in with ICE and provided ICE with a valid Virginia mailing address.

7.  In March 2023, ICE filed an NTA, placing him in proceedings under 8 U.S.C. § 1229a (Section 240 proceedings) with the Annandale Immigration Court, and ICE indicated that it mailed a copy of his NTA to his Virginia mailing address. Guillermo has no recollection of receiving this NTA or a subsequent hearing notice sent to this address.

EXHIBIT 49 / Appx.1149

8. On November 14, 2023, Guillermo was ordered removed *in absentia*. He did not become aware of this removal order until approximately 2025.

9. On March 4, 2025, in the U.S. District Court for the Western District of Texas, a criminal complaint was filed against Guillermo under 8 U.S.C. § 1325(a)(1), charging him with a misdemeanor count of improper entry into the United States based on his July 2022 entry.

10. A warrant was issued for his arrest, and, on March 10, 2025, CBP agents arrested him at his current home in College Park, Maryland. On March 12, 2025, he was brought before a Magistrate Judge at the US District Court for Maryland and ordered to be sent to the Western District of Texas to face the 8 U.S.C. § 1325(a)(1) criminal charge. From March 12 until approximately April 1, 2025, he was held at the Chesapeake Detention Facility in Baltimore, Maryland under the custody of the US Marshals Service.

11. On March 18, 2025, I was retained by Guillermo to represent him in his immigration matter, specifically to seek to reopen his case before the Immigration Court. Upon speaking with him, he indicated that he was afraid of removal to El Salvador and being confined at the CECOT (Centro de Confinamiento de Terrorismo) prison. He was afraid of this because of the news of Venezuelans with tattoos being sent to this prison several days before.

12. On March 25, 2025, I filed online a Motion to Rescind *in Absentia* Removal Order and Reopen Proceedings with the Annandale Immigration Court on several grounds including:

    a. Rescission of the *in absentia* order due to lack of notice and reopening of proceedings;

    b. Reopening proceedings due to changed country conditions in Venezuela after the 2024 presidential elections;

    c. Reopening proceedings due to changed country conditions as a Venezuelan with fear of removal to El Salvador based on the removals of Venezuelans to El Salvador beginning on or about March 15, 2025; especially in light of *D.V.D. v. DHS*, Case No. 25-cv-10676 (D. Mass March 23, 2025) (case filed against DHS challenging the policy of third country removal without providing notice or opportunity to contest removal).

    d. *Sua sponte* reopening to protect due process rights, especially considering ongoing federal litigation.

13. Along with my 18-page motion, I included a new I-589 Application for Asylum, Withholding of Removal and Protection under the Convention Against Torture articulating fear of removal to both Venezuela and El Salvador, and 207 pages of supplemental evidence.

14. On March 26, 2025, I received an order denying the Motion to Rescind *In Absentia* Removal Order and Reopen Proceedings. The order indicated that the IJ had denied the motion on March 25.

Appx.150

15. This March 25 order only made reference to the request for rescission of the removal order, and did not make any reference to the other three grounds for reopening proceedings.

16. On March 26, 2025, I emailed the immigration court clerk to request clarification as to whether I should expect a ruling on the other grounds for reopening which I had presented in the motion. The clerk indicated a further decision would be forthcoming.

17. On March 28, 2025, the IJ issued another order, denying on all grounds. In regard to the grounds based on a new fear of removal to El Salvador, which I have attached to this declaration, the IJ provided the following reasoning, provided here in its entirety:

> First, country conditions in El Salvador are not relevant to Respondent's case. Respondent was ordered removed by this court to his country of origin, Venezuela - not El Salvador.
>
> Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is tentative and speculative, at best. Respondent has been ordered removed to Venezuela by this Court, not El Salvador. If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue became ripe for review.

18. I have informed my client of this decision and, specifically, that the IJ found that she did not have jurisdiction to consider his claim of persecution and torture in El Salvador. However, my client continues to express fear of persecution and torture in El Salvador.

19. On April 2, 2025, I notified the Chief Counsel of the Washington Field Office of the Office of the Principal Legal Advisor that my client is afraid of persecution and torture if removed to El Salvador, and that the Temporary Restraining Order issued in *D.V.D. v. DHS*, Case No. 25-cv-10676-BEM (D. Mass March 28, 2025) is applicable to my client.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 7th day of April 2025 at Takoma Park, Maryland

_____

Katharine Margaret Gordon



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ANNANDALE IMMIGRATION COURT**

Respondent Name:

██████████████

To:

Gordon, Katharine Margaret
1025 Connecticut Avenue NW
Suite 701
Washington, DC 20036

A-Number:

██████████

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
03/28/2025

### ORDER OF THE IMMIGRATION JUDGE

☑ Respondent ☐ the Department of Homeland Security has filed a motion to reopen these proceedings. Upon reading and considering the motion, and any opposition from the non-moving party, the motion is ☐ granted ☑ denied for the following reason(s):

☐ The motion is untimely and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).

☐ The motion is numerically barred and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).

☐ The moving party failed to provide evidence demonstrating changed circumstances that is material and that was unavailable or could not have been discovered or presented at the previous proceedings. *See* 8 C.F.R. § 1003.23(b)(4)(i).

☐ The moving party failed to submit the appropriate application for relief and any accompanying documents. *See* 8 C.F.R. § 1003.23(b)(3).

☐ The Respondent has been removed or otherwise departed from the United States. *See* 8 C.F.R. § 1003.23(b)(1).

☑ Other:

Respondent has provided two additional bases to reopen his case in addition to notice failure of the scheduling order resulting in the in absentia order; They are: 1) change in country conditions in Venezuela and/or El Salvador and 2) fear of removal to El Salvador.

First, country conditions in El Salvador are not relevant to Respondent's case. Respondent was ordered removed by this court to his country of origin, Venezuela - not El Salvador.

Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is tentative and speculative, at best. Respondent has been ordered removed to Venezuela by this Court, not El Salvador. If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and / or analyze. Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue became ripe for review.

Lastly, Respondent left Venezuela in ████. ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Appx.152

Respondent left his country and remains in power. Respondent has not met his burden to demonstrated that conditions have materially or substantively changed such that his case should be reopened based on new or changed conditions.



Immigration Judge: Campanella, Lorianne 03/28/2025

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ██████████████████████████ | A-Number : ████████

Riders:

Date: 03/28/2025 By: ████████████ , Court Staff

Appx.153

**Declaration of Mich P. Gonzalez**

I, Mich P. Gonzalez, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. My name is Mich P. Gonzalez and I am an immigration and civil rights attorney licensed to practice by the State of New York. I am a co-founding partner of Sanctuary of the South, LLC and our business address is 251 Valencia Avenue, Ste. 140, Coral Gables, FL 33134.

2. On February 20, 2025, an Immigration Judge ("IJ") sitting in the Immigration Court at the Krome Service Processing Center ("Krome") in Miami, Florida granted my client protection in the form of withholding of removal to Guatemala due to severe past persecution and threat of future persecution on account of her identity as a transgender woman and sexual minority. On this same date, our office contacted the relevant Department of Homeland Security ("DHS") Enforcement and Removal Operations ("ERO") officers overseeing her custody at the Krome facility to urge her release, attaching the IJ's order.

3. On February 24, 2025, DHS Supervisory Detention and Deportation Officer Jahmal Ervin ("SDDO Ervin") responded via electronic correspondence stating, "[y]our client is not being released at this time as his case is still being processed for removal efforts."

4. Our office immediately replied requesting the names of the country or countries to which DHS was seeking to remove our client.

5. Neither Officer Jahmal Ervin, nor the Miami ERO Acting Field Office Director nor the Acting Krome Assistant Field Office Director (collectively "ICE") ever responded substantively to this request.

EXHIBIT 5 / Appx154

6. Concerned about ICE's stated intention to remove our client and refusal to provide the names of any third country to which they were seeking removal, we filed a motion to reopen removal proceedings with the sitting IJ at Krome who had granted withholding on February 20, 2025. We filed the motion to reopen on February 25, 2025 and on March 1, 2025, the IJ denied on the grounds that it was premature as Respondent was not seeking protection from removal to any particular country. Please see attached order.

7. Our office followed up over a dozen times in the weeks that followed with emails to ICE seeking answers to ensure due process for our client. We informed ICE of the ongoing danger to our client by remaining in detention due to her status as a transgender woman and repeatedly requested information regarding ICE's intentions to remove her to a third country. These emails received no substantive response.

8. On or about March 24, 2025, our client informed us that the risks to her safety became a reality when she was sexually assaulted in the showers at Krome–an assault reportedly witnessed by officers at Krome in or about mid-March 2025.

9. We again contacted ICE, informing them of this assault and requesting information about ICE's investigation and responsibilities under the Prison Rape Elimination Act. We have yet to receive any substantive response to these requests.

10. On or about March 29, 2025, our client disappeared from Krome and could not be found on the ICE Locator for nearly three days. We again contacted ICE, requesting information as to our client's whereabouts. Again, these emails were ignored until finally her assigned deportation officer Kristy Zamir wrote back simply stating that "[client's name and immigration number] is located at Eloy, AZ, Service Processing Center."

11. We were finally able to make contact with our client, who confirmed that she had inexplicably been transferred to the Eloy Service Processing Center ("Eloy") in Arizona. She also informed us that she was not provided any information about her transfer or any attempts ICE is making to remove her to a third country.

12. We contacted ICE once again, by email, requesting they please confirm the reason for her transfer and whether ICE was attempting to deport her to a third country. This information, once again, was not provided.

13. As of today, our client allegedly remains at Eloy. However, she is no longer reflected in the ICE detainee locator website and we fear for her imminent and unlawful deportation to a third country without notice or opportunity to present arguments that such deportation places her at risk.

I affirm under penalty of perjury that the aforementioned is true and correct to the best of my knowledge.

Dated: April 3, 2025

Mich P. Gonzalez, Esq.



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**MIAMI KROME IMMIGRATION COURT**

Respondent Name:

████████████████████████

To:

Blankenship, Katherine Holloway
6355 NW 36th Street
Suit 609
Virginia Gardens, FL 33166

A-Number:

████████████

Riders:
In Withholding Only Proceedings
Initiated by the Department of Homeland Security
Date:
03/01/2025

**ORDER OF THE IMMIGRATION JUDGE**

Respondent's Motion to Reopen

**Order:**

The motion to reopen is denied as premature. At this time, Respondent is not seeking protection from removal to any particular country.

Appx.157

Immigration Judge: LERNER, ROMY 03/01/2025

Appeal:   Department of Homeland Security:  ☑  waived   ☐  reserved

Respondent:   ☐  waived   ☑  reserved

Appeal Due: 04/02/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ███████████████  | A-Number : ███████

Riders:

Date: 03/02/2025 By: Murgado, Letty, Court Staff

Appx.158

**Declaration of Zoe Bowman**

1.  My name is Zoe Bowman and I am an attorney at Las Americas Immigrant Advocacy Center ("Las Americas"), a non-profit organization in El Paso, Texas.

2.  Las Americas first met with Maiker Alejandro Espinoza Escalona ("Mr. Espinoza Escalona") on August 27, 2024. I represented him for purposes of requesting his release from custody in front of Immigration and Customs Enforcement ("ICE"). Mr. Espinoza Escalona was in ICE detention since May 22, 2024, shortly after arriving to the United States to seek asylum. He was detained at the El Paso Service Processing Center until recently.

3.  From meetings with myself and other Las Americas staff, I learned that Mr. Espinoza Escalona is a citizen of Venezuela and he came to the U.S. with his partner and their young child. I believe Mr. Espinoza Escalona was ordered removed to Venezuela on July 8, 2024 because that is his country of origin. I did not represent him in immigration court, but after I received a copy of his A-file, it confirmed that the immigration judge had designated Venezuela as the country of removal in July 2024.

4.  On Monday, March 10, 2025, at 12:43 a.m.ET I received an email from Pedro Perez, Acting Supervisory Detention and Deportation Officer, alerting me that ICE was about to transfer Mr. Espinoza Escalona to the El Valle Detention Facility. Shortly thereafter he was transferred to that facility.

5.  On Saturday, March 29, 2025, I received a message from Mr. Espinoza Escalona's sister. She informed me that Mr. Espinoza Escalona had called her Friday night at 11:44 p.m. ET to tell her officers told him to collect his belongings. He believed he would imminently be transferred to a different facility, but was not told where.

6.  On Monday, March 31, 2025, I received another call from Mr. Espinoza Escalona's sister. She told me that she recognized her brother in images that were posted on social media by Salvadoran President Nayib Bukele of men who were sent to El Salvador from the U.S. via the naval base at Guantánamo Bay, Cuba, and imprisoned there. When I checked the ICE detainee locator website that Monday morning, it listed his location as Camp 6 in Florida, indicating that he had recently been detained in Guantánamo Bay, Cuba.

7.  Based on this information, it is now clear to me that when Mr. Espinoza Escalona called his sister on the night of March 29th to tell her that he was being imminently transferred, that transfer was to Guantánamo Bay, Cuba, and must have occurred that night or the following morning.  Also, based on Secretary of State Rubio's statement that a flight left Guantanamo for El Salvador Sunday night March 30, this must have been the flight that Mr. Espinoza Escalona was on.  This is further confirmed by the fact that when I checked the ICE detainee locator Monday morning, his location was still listed as Guantánamo Bay.

8.  I never received notification from ICE that they transferred or intended to transfer Mr. Espinoza Escalona from the El Valle Detention Facility.

1

9. In the evening of April 6, 2025, I spoke with Mr. Espinoza Escalona's sister. She said that she and her family have not been able to speak with him since Friday, March 28, when he was transferred out of El Valle Detention Facility and eventually removed to El Salvador.

I, Zoe Bowman, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746(1), that the foregoing is true and correct to the best of my knowledge.

_____
Signature

4/8/2025
_____
Date

2

## DECLARATION OF KATHLEEN MALIA GLYNN

I, Kathleen Malia Glynn, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  I am a practicing attorney licensed to practice before the State of Colorado. My business address is 12596 W. Bayaud Ave., Ste. 390, Lakewood, CO 80228. I have been employed as a Senior Associate Attorney at Grob & Eirich, LLC since February 1, 2015. Prior to joining Grob & Eirich, LLC, I was a staff and managing attorney in the Children's Program at the Rocky Mountain Immigrant Advocacy Network (RMIAN) during the years 2008-2010 and 2011-2014. I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I have practiced in immigration law since October of 2007, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and the Board of Immigration Appeals (BIA), as well as noncitizens with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS). Since 2015, my practice has also included the representation of immigrant children and their caregivers in Colorado state guardianship, custody, and adoption proceedings. My areas of expertise include Special Immigrant Juvenile Status (SIJS), removal (deportation) defense of children, children's asylum claims, and the intersection of immigration law and adoption.

3.  Since 2007, I have represented dozens of noncitizens with final removal orders in removal proceedings pursuant to Immigration and Nationality Act (INA) § 240, 8 U.S.C. § 1229a (Section 240 proceedings).

4.  In October 2024, a local non-profit organization approached me about representing, on a *pro bono* basis, the mother of four children in her petition for custody and her motion for Special Immigrant Juvenile Status (SIJS) findings as to her children. After an initial consultation with the mother, I agreed to file her custody petition and SIJS motion as to the younger three children (the fourth, oldest child being too old to benefit). All of the children suffered extreme abuse, neglect, and abandonment from their father. The custody petition and motion for SIJS findings were filed with the Denver County District Court in December 2024. This case remains pending. The mother is set for an initial status conference in May 2025.

5.  One of the children included in the custody petition and SIJS motion is Nixon Jose Azuaje Perez. Nixon is a 20-year-old native and citizen of Venezuela.

6.  Nixon, his mother, his older brother, and his two younger brothers left Venezuela in May of 2018. Nixon has not lived in Venezuela since May of 2018, when he was thirteen (13) years of age.

1

EXHIBIT 161

7. Nixon resided with his mother and siblings in Peru before entering the United States in August 2023. Nixon and his family members were paroled into the United States after having made an appointment to request asylum through the "CBP One" application. The entire family was placed in removal proceedings.

8. Nixon's mother filed for asylum on June 25, 2024, with Nixon and his brothers included as derivative beneficiaries. The asylum application expresses and documents the family's fear of return to Venezuela and to Peru.

9. Nixon and his older brother were arrested in Aurora, Colorado in or around late July 2024, in relation to a shooting at the apartment complex in which they then resided. After the shooting, in which Nixon and his brother deny any involvement, they swept up shell casings outside their apartment door. Nixon and his brother were charged with tampering with evidence. They were released from Adams County jail after paying minimal bonds and placed on ankle monitors. Nixon's criminal case, as well as his brother's, remain pending in Adams County District Court.

10. On or around September 6, 2024, Nixon and his brother went to have their ankle monitors adjusted. At that appointment, U.S. Immigration and Customs Enforcement (ICE) agents took Nixon and his brother into immigration custody and detained both at the GEO/ICE Aurora Detention Center in Aurora, Colorado. Section 240 removal proceedings continued on the Aurora Immigration Court's detained docket.

11. From approximately September 6, 2024 until March 11, 2025, Nixon remained detained at the GEO/ICE Detention Center in Aurora, Colorado. Nixon was *pro se* throughout his Section 240 removal proceedings. His family could not afford an immigration attorney, and the local non-profit organization was not successful in locating *pro bono* counsel for him.

12. On February 13, 2025, Nixon was ordered deported by an Immigration Judge at the Aurora Immigration Court. Nixon reported to his mother that the Immigration Judge said something to the effect that "SIJS will take too long." Nixon, already struggling emotionally with being detained, stated to his mother that he could not wait in detention, and thus chose not to appeal. Because the Immigration Judge designated Venezuela as the country of removal, he assumed that, if removed, it would be to Venezuela.

13. Nixon was moved by ICE from the GEO/ICE Detention Center in Aurora, Colorado to the Rio Grande Processing Center in Laredo, Texas on March 11, 2025. Nixon was able to call his mother to inform her of his transfer.

14. On March 14, 2025, Nixon called his mother and told her that ICE agents said he was going to Mexico. No one has heard from Nixon since that March 14, 2025 call.

15. On March 18, 2025, Nixon's mother called and texted me asking for help in locating Nixon. On that date, I searched the online ICE Detainee locator. Nixon did not appear.

Appx.162

16. On March 19, 2025, Nixon's mother reached by telephone an ICE official at the local Denver Field Office who confirmed that Nixon was on one of the March 15, 2025 flights to El Salvador.

17. On March 20, 2025, Nixon's name appeared on the list of Venezuelans sent to CECOT in El Salvador as reported by CBS news. *See* https://www.cbsnews.com/news/venezuelans-deported-el-salvador-names/ (last visited April 7, 2025). I saw Nixon's name on this list on the date of publication.

18. Nixon's mother believes she has seen Nixon on the videos released from CECOT. He is easily distinguished because of his unique hair.

19. Nixon has no criminal history in Venezuela or Peru. His mother has obtained criminal clearance reports from both countries. Nixon's sole contact with law enforcement in the United States is the still pending tampering with evidence charge. He now has an arrest warrant for failing to appear at his March 11, 2025 criminal hearing, a hearing he was unable to attend because, on that date, he was in ICE detention, being moved by ICE from Aurora, Colorado to Texas.

20. Nixon is not, and has never been, a member of Tren de Aragua or any other criminal organization.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 8th day of April, 2025 in Lakewood, Colorado, by:

Kathleen M. Glynn

3

Appx.163

# DECLARATION OF MICHELLE BRANE

I, Michelle Brané, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a non-resident migration and human rights fellow at Cornell Law and the Executive Director of Together and Free. I hold a J.D. from Georgetown University Law Center.  I am over the age of 18 and am competent to testify regarding the matters described below.

2.      I have more than 25 years of experience working on immigration and human rights issues. Prior to my work at Together and Free, I served for three years as the Executive Director for the Department of Homeland Security's Family Reunification Task Force, and then as DHS's Ombudsman for Immigration Detention. Before that, I was the Director of the Migrant Rights and Justice program at the Women's Refugee Commission for almost 15 years, where I worked on projects related to immigration custody, family detention and separation, and access to asylum at the U.S. border.

3.      I have authored and overseen numerous landmark reports on migration and asylum issues, including *Locking Up Family Values*, on family detention; *Halfway Home*, on unaccompanied migrant children; *Forced From Home: The Lost Boys and Girls of Central America*; *Prison for Survivors: The Detention of Women Seeking Asylum in the United States*; *Detained or Deported: What About My Children?*, a guide for detained and deported immigrant and undocumented parents; and *Betraying Family Values: How Immigration Policy at the United States Border is Separating Families*.

4.      I have testified before Congress and the Inter-American Commission for Human Rights, and I present regularly as an expert at conferences, briefings, and professional trainings, including before the Human Rights Council and the United Nations High Commission for Refugees in Geneva.

5.      Together and Free is a nonprofit organization that provides emergency and ongoing support services to asylum seeking families impacted by federal immigration policies.

6.      My staff and I have received outreach from families of individuals removed to El Salvador by the United States government, including the families of 5 Venezuelan citizens believed to have been removed to El Salvador on Sunday, March 30, 2025.

7.      I first learned of the March 30 flight when it was announced on social media by Secretary of State Marco Rubio on Monday, March 31, 2025. On Monday March 31, I was contacted by an attorney who believed her client was on the flight based on a family member who had seen him in a video posted by Secretary of State Rubio. Over the next week, four additional families reached out to Together and Free with concerns that a family member had been removed on the March 30th flight.

1

8.  On April 2, 2025, an article in the Orinoco Tribune entitled "Seven More Venezuelans Migrants Abducted in El Salvador" included the names of 7 Venezuelan nationals who were removed on the March 30, flight to El Salvador. All 5 of the names that had been provided to us by family members appeared on that list.

9.  The first of these cases involves Victor Andres Ortega Burbano, a 24-year-old Venezuelan citizen with muscular dystrophy which affects his right arm. His wife reported to Together and Free that he arrived in the United States in 2022. We are not aware of any criminal record. Victor applied for Temporary Protective Status (TPS) on December 28, 2023 and was granted this status on June 20, 2024.

10.  Records reflect that an immigration judge ordered Victor removed to Venezuela on October 22, 2024.

11.  Victor was released from detention following his removal order. His family told us that on March 11, 2025, while checking his mailbox at his home at 11:30 a.m., he was surrounded by Immigration and Customs Enforcement (ICE) agents and arrested. His family was able to track his detention locations thereafter through the on-line ICE detainee tracker and by occasionally speaking to him by phone. He was first taken to and detained at a facility in Alvarado, Texas. The following day he was removed to the El Valle ICE detention facility in Raymondville, Texas, where he was detained for a little over two weeks.

12.  On Friday, March 28, at about 11 p.m., his wife spoke to him while he was still detained in El Valle, Texas. He told her that ICE agents had informed him that he was to be deported to Venezuela. He then called her on Sunday, March 30, 2025, indicating that he was now detained at Guantanamo. He told her that he did not know where he was to be taken next, or if he would be kept at Guantanamo. That was the last contact that his wife had with him. On March 31, 2025, his family learned that he was on the March 30 flight to El Salvador through a social media post.

13.  Together and Free is currently investigating the cases of an additional 3 Venezuelan men, all of whom we believe had final removal orders to Venezuela and we have reason to suspect were removed to Guantanamo and then El Salvador on the evening of March 30, 2025.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 8th day of April 2025 at Ithaca, NY.

Michelle Brané

2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| D.V.D., *et al.*, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| U.S. Department of Homeland Security, *et al.*, | ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No.
25-10676-BEM

**MEMORANDUM AND ORDER ON PLAINTIFFS'**
**MOTIONS FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION**

**MURPHY, J.**

This case presents a simple question: before the United States forcibly sends someone to a country other than their country of origin, must that person be told where they are going and be given a chance to tell the United States that they might be killed if sent there? Defendants argue that the United States may send a deportable alien to a country not of their origin, not where an immigration judge has ordered, where they may be immediately tortured and killed, without providing that person any opportunity to tell the deporting authorities that they face grave danger or death because of such a deportation. All nine sitting justices of the Supreme Court of the United

States,[1] the Assistant Solicitor General of the United States,[2] Congress,[3] common sense,[4] basic decency, and this Court all disagree.  Plaintiffs are seeking a limited and measured remedy—one Defendants have conceded in other proceedings is the minimum that comports with due process.[5]  Plaintiffs are simply asking to be told they are going to be deported to a new country before they are taken to such a country, and be given an opportunity to explain why such a deportation will likely result in their persecution, torture, and/or death.  This small modicum of process is mandated by the Constitution of the United States, and for this reason, the motion for class certification is GRANTED, and the motion for preliminary injunction is GRANTED in part.

---

[1] *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) ("[N]otice must be afforded within a reasonable time and in such a manner as will allow [deportable aliens] to actually seek . . . relief in the proper venue before such removal occurs."); *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review is available.").

[2] Transcript of Oral Argument at 32–33, *Bondi v. Riley*, No. 23-1270 (S. Ct. Mar. 24, 2025) ("JUSTICE KAGAN: . . . [W]hen you have the order of removal but the [Convention Against Torture] proceedings have not yet been concluded, what does the government feel itself free to do with the alien? . . . [ASSISTANT TO THE SOLICITOR GENERAL]: We do think we have the legal authority to [send the non-citizen to some other country, assuming no pending claim under the Convention Against Torture as to that other country], with the following caveat: We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country."); Transcript of Oral Argument at 20–21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) ("JUSTICE KAGAN: So that's what it would depend on, right?  That -- that you would have to provide [an individual being removed] notice [of what country he is being sent to], and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country.  Isn't that right?  ASSISTANT TO THE SOLICITOR GENERAL: Yes, that's right.").

[3] *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment"); Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231) (codifying protections under the Convention Against Torture and prohibiting the removal of an alien to any country where they would likely be tortured); 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–18, 238.1, 241.8, 1208.16–18, 1240.11; 28 C.F.R. § 200.1 ("A removal order under Title V of the Act shall not be executed in circumstances that would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.").

[4] "[C]ommon sense often makes good law." *Peak v. United States*, 353 U.S. 43, 46 (1957).

[5] *Supra* note 2.

2

## I.  Background

### A.  Legal Background

#### 1.  Removal Proceedings

When the Government wants to remove an individual, the normal path is through removal proceedings, requiring an evidentiary hearing before an Immigration Judge ("IJ").  8 U.S.C. § 1229a.  Removal proceedings determine not only *whether* an individual may be removed from the United States but also to *where* he may be removed.  In the first instance, the alien is entitled to select a country of removal.  *Id.*; 8 U.S.C. § 1231(b)(2)(A); 8 C.F.R. § 1240.10(f).  If the alien does not do so, the IJ will designate the country of removal and may also designate alternative countries.  8 C.F.R. § 1240.10(f).

Meanwhile, the alien is also entitled to seek various protections, including asylum, withholding of removal, and Convention Against Torture ("CAT") protections.  8 C.F.R. § 1240.11(c)(1).[6]  Some of these protections are discretionary.[7]  Others are mandatory, meaning that protection must be given if the conditions are met.  Withholding of removal is a mandatory form of protection preventing deportation to the country or countries where an IJ finds that the individual is more than likely to be persecuted.  *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16; *see also Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) ("[T]he Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility [for withholding of removal or CAT protections].").  CAT protection is a mandatory protection against deportation to a country where the IJ finds that the individual is likely to be tortured.  *See* Foreign Affairs Reform and

---

[6] Technically, CAT protections can be a form of withholding.  *See Guzman Chavez*, 594 U.S. at 530.  The Court uses the phrase "withholding of removal" to refer to what has been called "statutory withholding."  *Id.*

[7] For example, asylum, which protects against deportation generally to any country, is discretionary absent certain exceptions.  *See generally* 8 U.S.C. § 1158; 8 C.F.R § 208.2.

Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16–18, 1208.16–18; 28 C.F.R. § 200.1; *see also Moncrieffe*, 569 U.S. at 187 n.1.

### 2. Reinstatement or Withholding-Only Proceedings

Alternatively, the U.S. Department of Homeland Security ("DHS") may reinstate a prior order of removal for an alien it finds "has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal." 8 U.S.C. § 1231(a)(5). When DHS reinstates a removal order, the "prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." *Id.* DHS may also issue administrative removal orders to individuals whom DHS determines are not lawful permanent residents and who have an aggravated felony conviction. *See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1.

While in both processes aliens are barred from pursuing nearly all avenues of relief from removal, aliens may still seek protection through withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT. 8 C.F.R. §§ 238.1(f)(3), 241.8(e). If the alien demonstrates a reasonable fear of persecution or torture, the alien is placed in "withholding-only proceedings" before an IJ where they can only seek withholding of removal and/or CAT protection. 8 C.F.R. §§ 208.31(b), (e); *see also* 8 U.S.C. § 1231(a)(5) (providing that an alien subject to reinstatement "is not eligible and may not apply for any relief under [the Immigration and Nationality Act ("INA")]"); 8 C.F.R. § 1208.2(c)(3)(i) ("The scope of review in [withholding-only] proceedings . . . shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal."[8]).

---

[8] Deferral of removal provides CAT protections to aliens who are mandatorily ineligible for withholding of removal. *See* 8 C.F.R. § 208.17(a).

Appx.169

Withholding of removal and CAT protection only affect to *where* the alien may be removed, rather than *whether* the alien may be removed; thus, even if an alien prevails on his withholding or CAT claim, the removal order remains valid and enforceable, albeit not executable to the specific country as to which the alien has demonstrated a likelihood of persecution or death. *See* 8 U.S.C. § 1231(b)(2)(E); 8 C.F.R. § 1208.16(f); *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021); *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (stating that a grant of withholding "only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country").

### 3. <u>Third-Country Removals</u>

Because the removal proceedings happen on one track, while withholding and CAT proceedings happen on another track, a situation may arise where the Government has an order of removal but no country that an IJ has authorized for that removal.

In certain circumstances, where the Government may not remove an alien to any country covered by that alien's order of removal, the Government may still remove the alien to any "country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). These are called "third-country removals." As relevant here, a specific carve-out prohibits deportation to countries in which the alien would face persecution or torture:

> Notwithstanding paragraphs [b](1) and [b](2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1231(b)(3)(A). Similarly, under FARRA,[9] which codified CAT protections, an alien may not be removed to any country where they would be tortured. *See* 28 C.F.R. § 200.1; 8 C.F.R.

---

[9] *See supra* note 3.

§§ 208.16–18, 1208.16–18. In other words, third-country removals are subject to the same mandatory protections that exist in removal or withholding-only proceedings.

### B. Factual Background

#### 1. The February 18, 2025 Directive and March 30, 2025 Guidance

On January 20, 2025, President Donald J. Trump issued Executive Order 14165, entitled "Securing our Borders." 90 Fed. Reg. 8467. As relevant here, on or about February 18, 2025, DHS issued a directive to the Enforcement and Removal Operations ("ERO") division of Immigration and Customs Enforcement ("ICE"). Dkt. 1-4 (the "February Directive"). The February Directive instructs ERO officers to review the cases of aliens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the alien should be re-detained" and, in case of persons who previously could not be removed because the designated countries were unwilling to receive them, "review for re-detention . . . in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third country removals." *Id.* at 2.

On March 23, 2025, Plaintiffs filed this lawsuit challenging, in part, the February Directive. Dkt. 1 ("Compl."). Plaintiffs seek an order guaranteeing them the opportunity to show—before being removed to countries not included on their removal orders—that they will suffer persecution, torture, and/or death in those countries. They are challenging Defendants' policy or practice of designating aliens for removal to any country other than the country or alternative country of removal designated and identified in writing in their prior immigration proceedings without first providing notice and an opportunity to apply for protection from removal to that "third" country.

Appx.171

On March 28, 2025, the Court entered a temporary restraining order after hearing oral arguments from both parties.[10]  Dkt. 34.

On March 30, 2025, DHS issued an updated guidance (the "March Guidance") on removals to third countries.  Dkt. 43-1.  This guidance dictates that aliens may be removed to a third country without notice if the United States has received assurances from that country that aliens removed from the United States will not be persecuted or tortured.  *Id.* at 2–3.  Importantly, these assurances are not individualized, and the March Guidance provides for no review, meaning that deportations to a third country can occur without any consideration of the individual risks facing a particular alien.  *Id.*  According to the March Guidance, DHS will provide the alien with notice of the third country (and an opportunity to affirmatively assert a fear of return to that third country) only if the United States has not received assurances, or if the Department of State does not believe those assurances to be credible.  *Id.* at 3.

### 2.    **Plaintiffs' Cases**

Plaintiffs are individuals subject to final orders of removal, allegedly at imminent risk of deportation to countries other than those authorized by their respective orders.  Compl. ¶ 1.[11]

Plaintiff D.V.D.[12] is a citizen of Cuba who entered the United States from Mexico.  *Id.* ¶¶ 10, 62.  In February 2017, in removal proceedings, he was ordered removed.  *Id.* ¶ 62.  His removal order specified only Cuba as the country of removal.  *Id.*  He was released from detention on an Order of Supervision in May of 2017.  *Id.*  Plaintiffs allege that on March 10, 2025, ICE instructed D.V.D.'s attorney that D.V.D. needed to report for an in-person check-in on March 28,

---

[10] The Court extended the temporary restraining order after hearing further oral arguments from both parties on April 10, 2025.  Dkt. 62.

[11] Except where indicated, the relevant facts are largely undisputed.

[12] The Court has allowed Plaintiffs to proceed under pseudonyms.  Dkt. 13.

7

2025, and that the ICE officer later explained that ICE was requiring all people to report in person and more frequently on a case-by-case basis. *Id.* ¶¶ 64–66. If deported to a third country, D.V.D. alleges that he is at risk of persecution due to his mental health conditions or possible imprisonment in certain countries. *Id.* ¶ 67. At oral argument on March 28, 2025, counsel indicated that D.V.D. had not been detained at that day's check-in and had been given another check-in date in September 2025. Dkt. 44 ("March 28, 2025 Tr.") at 4:24–25.

Plaintiff M.M. is a citizen of Honduras who fled due to severe domestic violence. Compl. ¶¶ 11, 68. In 2014, because she had previously been ordered removed from the United States, DHS issued a reinstatement order. *Id.* ¶ 69. In withholding-only proceedings before an IJ in 2021, she was granted withholding of removal to Honduras. *Id.* ¶¶ 69–70. M.M. is not in ICE custody, but she alleges that on March 7, 2025, an ICE officer informed her that she was on a list of people who would be deported imminently. *Id.* ¶ 71. If deported to a third country, M.M. alleges that she is at risk of being sent back to Honduras or another country where she would again face severe domestic violence. *Id.* ¶ 73. At oral argument on April 10, 2025, counsel indicated that M.M.'s check-in had been cancelled by ICE after the initiation of this suit. April 10, 2025 Rough Tr. at 1:19–21.

Plaintiff E.F.D. is a citizen of Ecuador. Compl. ¶¶ 12, 74. In October 2015, he was placed in removal proceedings after entering the United States and raising a credible fear of return. *Id.* In 2018, in removal proceedings, an IJ granted E.F.D.'s application for CAT protection. *Id.* ¶ 75. On March 18, 2025, ICE re-detained him. *Id.* ¶¶ 12, 76. He has not yet been told when his removal might happen or to where. *Id.* ¶¶ 76–77. E.F.D. alleges that he will be deported to a third country without the opportunity to apply for protection, which could include countries that will deport him

8

back to Ecuador, from which he was awarded CAT protection, or to countries where he has had prior dangerous experiences. *Id.* ¶ 77.

Plaintiff O.C.G. is a native of Guatemala who was issued an expedited removal order pursuant to 8 U.S.C. § 1225(b) and deported to Guatemala in March 2024, without a credible fear interview. *Id.* ¶¶ 13, 78. In May of 2024, he reentered the United States, through Mexico, after experiencing violence in Mexico. *Id.* ¶¶ 79–80. His removal order was reinstated by DHS, but he was referred to an asylum officer based on his expressed fear of returning to Guatemala. *Id.* ¶ 80. He was then placed in withholding-only proceedings before an IJ and was granted withholding of removal to Guatemala under 8 U.S.C. § 1231(b)(3). *Id.* ¶¶ 80–82. Plaintiffs allege that the IJ did not designate Mexico as a country of removal and that, when DHS tried to add Mexico during the withholding-only proceedings, the IJ told DHS that it was "too late" to do so. *Id.* ¶¶ 81–83. DHS waived appeal. *Id.* ¶ 84. Despite this success, O.C.G. remained in detention and was quickly deported to Mexico. *Id.* ¶¶ 85–86. The parties dispute whether he was provided an opportunity to express fear prior to being deported to Mexico. *Compare id.* ¶¶ 85–86 (complaint alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of ICE's ERO Phoenix Field Office, asserting that notice was provided on the day of his removal, and fear of removal to Mexico was expressly denied). Plaintiffs allege that O.C.G. was taken to Mexico by bus and that, once he was placed in detention in Mexico, he was informed by Mexican authorities that he could apply for asylum in Mexico—and remain incarcerated for an unknown period of time while that application was pending—or be returned to Guatemala. Compl. ¶¶ 87–88. Plaintiffs allege that, on February 25, 2025, O.C.G. returned to Guatemala, where he remains in hiding today. *Id.* ¶ 89.

9

Each Plaintiff alleges that he or she has valid reasons to fear removal to specific countries that were not included in their removal orders. *Id.* ¶¶ 67, 73, 77, 88. Plaintiffs challenge Defendants' policy or practice of failing to provide notice and an opportunity to be heard prior to removal to a country that was not designated in their removal orders, which Plaintiffs allege violates the INA, FARRA, regulations implementing the two statutes, and the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 99–138.

### 3. Current Motions

Before the Court now are Plaintiffs' Motion for Class Certification, Dkt. 4, and Motion for a Preliminary Injunction, Dkt. 6,[13] through which Plaintiffs seek: (1) to prevent Defendants from removing certain of the named Plaintiffs to a "third" country without notice and an opportunity to assert fear of persecution or torture; (2) to prevent Defendants from removing any class member to a "third" country without notice and an opportunity to assert fear of torture; and (3) an order directing Defendants to facilitate the immediate return of O.C.G. to the United States. For the reasons set forth below, Plaintiffs' motion for class certification is GRANTED, and Plaintiffs' motion for a preliminary injunction is GRANTED in part.

---

[13] The Court has already ruled on the motion to the extent it sought a temporary restraining order, and as stated on the record in the March 28, 2025 hearing, the Court denies the motion to the extent it seeks an administrative stay of the February Guidance.

## II.     Jurisdiction

Several subsections of 8 U.S.C. § 1252 limit judicial review of claims and questions that relate to removal proceedings or existing orders of removal. Defendants argue that sections 1252(a), (b), and (g) strip this Court of jurisdiction.[14]

### A.     Sections 1252(a) and (b)

In the REAL ID Act of 2005, Congress amended the INA to limit the ways by which an individual might challenge his order of removal. *Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007) (citing 8 U.S.C. § 1252(a)(5)).[15] In turn, section 1252(b)(9) limits the forum for those challenges to courts of appeals. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).[16]

Accordingly, actions that do not challenge final orders of removal are not subject to this channeling scheme. *J.E.F.M.*, 837 F.3d at 1032. "[A] suit brought against immigration authorities

---

[14] Defendants also argue that section 1252(f)(1) limits this Court's jurisdiction with respect to class-wide relief. However, in *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court explicitly confirmed that section 1252(f)(1) concerns the availability of relief, not subject matter jurisdiction. *Id.* at 800–01. As the Court explained, "the question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims." *Id.* at 801. While the provision may "withdraw[ ] a district court's 'jurisdiction or authority' to grant a particular form of relief[,] [i]t does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA." *Id.* at 798; *see also Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief"). As discussed below, the Court has jurisdiction to grant both the class-wide declaratory and injunctive relief sought in this case. *See infra* at 23–27.

[15] In pertinent part, section 1252(a)(5) states:

[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter[.]

[16] Section 1252(b)(9) states:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

11

is not *per se* a challenge to a removal order." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011).

The Supreme Court has expressly affirmed this proposition, explaining that the phrase "arising from" in section 1252(b)(9) does not encompass all claims that merely result from the fact of or potential for removal, which reading the Court said would have "staggering results." *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018). Because the respondents in *Jennings* were "not asking for review of an order of removal," "not challenging the decision to detain them in the first place or to seek removal," and "not even challenging any part of the process by which their removability will be determined," the Court concluded that the restriction in section 1252(b)(9) did not apply. *Id.* Notably, under *Jennings*, an individual is not required to "cram[]" claims into the judicial review of a removal order where doing so would be unnatural.[17] *Id.*

The First Circuit has had further opportunity to clarify that the scope of section 1252(b)(9) is limited to claims that specifically arise out of what happens in the removal proceeding:

> [R]emoval proceedings are confined to determining whether a particular alien should be deported. *See* [8 U.S.C.] § 1229a(c)(1)(A). While legal and factual issues relating to that question can be raised in removal proceedings and eventually brought to the court of appeals for judicial review, certain claims, by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA. *See, e.g.*, *McNary* [*v. Haitian Refugee Ctr., Inc.*], 498 U.S. [479,] 496, 111 S.Ct. 888 [(1991)]; *Jupiter v. Ashcroft*, 396 F.3d 487, 492 (1st Cir. 2005). Requiring the exhaustion of those claims would foreclose them from any meaningful judicial review. Given Congress's clear intention to channel, rather than bar, judicial review through the mechanism of

---

[17] Even if an individual raised claims related to the risk of torture in a third country, the IJ would not normally consider or address such claims unless that country had already been designated as a country of removal. *See infra* at 16–17 & note 24; *see also, e.g.*, Compl. ¶¶ 81–83 (alleging that, when DHS sought to add Mexico during O.C.G.'s withholding-only proceedings, the IJ told DHS that it was "too late" to do so); Dkt. 8-4 ¶¶ 5–7 (declaration of O.C.G. that the IJ did not designate Mexico as a country of removal and that the IJ informed DHS that Mexico was not a country for removal during the withholding-only proceedings); Dkt. 8-11 at 5–6 (motion to reopen denied despite third country identified for removal); Dkt. 59-12 at 4 (motion to reopen denied where removal to third country was speculative, and indicating that even if third country were identified for removal, relief would need to be sought in federal court rather than in immigration proceedings); Dkt. 59-13 at 4 (motion to reopen denied as premature where "Respondent was not seeking protection from removal to any particular country").

section 1252(b)(9), reading "arising from" as used in that statute to encompass those claims would be perverse.

*Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11 (1st Cir. 2007).  As such, "claims which cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition for review are 'independent of, or wholly collateral to, the removal process,' not 'arising from' it." *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020) (quoting *Aguilar*, 510 F.3d at 11).[18]

In examining Plaintiffs' requested relief, the issues in this case extend beyond those that could have been raised in their removal proceedings.  This largely follows from the simple fact that Plaintiffs are no longer in removal proceedings and complain only of actions that post-date their removal proceedings.  Plaintiffs neither challenge the IJs' determinations that they are removable nor claim any deficiency in the removal orders themselves.  *Cf. Delgado*, 643 F.3d at 55 (challenging adjustment of status, which would necessarily render removal order "invalid"); *Aguilar*, 510 F.3d at 13–14 (challenging right to counsel in removal proceedings).  Rather, Plaintiffs' claims do quite the opposite of challenge their orders of removal—they seek to hold Defendants to the terms of those orders and to receive notice and an opportunity to be heard before Defendants explicitly exceed those orders.  *See Aden v. Nielsen*, 409 F. Supp. 3d 998, 1006 (W.D. Wash. 2019) (finding claims that "challenge[d] DHS's attempts, *outside* of removal proceedings, to designate [a third country] without reopening his proceedings so that an IJ could make the designation in the first instance and/or determine whether petitioner's life or freedom would be

---

[18] In reaching its decision in *Aguilar*, the First Circuit cited and relied upon decades of Supreme Court precedent that is "hostil[e] toward requiring exhaustion when adequate relief could not feasibly be obtained through the prescribed administrative proceedings." *Aguilar*, 510 F.3d at 12 (citing *Leedom v. Kyne*, 358 U.S. 184, 190 (1958), *Matthews v. Eldridge*, 424 U.S. 319, 330–31 (1976), *Bowen v. City of New York*, 476 U.S. 467, 482–83 (1986), and *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).

13

threatened in that country" independent of removal order and thus not barred by section 1252(a)(5)).[19]

Defendants propose that Plaintiffs can "cram," *Jennings*, 583 U.S. at 294, their fear-based claims into the removal proceedings (thereby placing those claims into section 1252's jurisdictional funneling scheme) by filing motions to reopen their immigration proceedings. Dkt. 51 ("PI Opp.") at 8–9. But this Court finds that remedy to be both legally insufficient and logistically impossible, effectively "foreclos[ing] all meaningful judicial review." *See Aguilar*, 510 F.3d at 12 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).[20]

For most aliens, directly moving to reopen is simply not an option. "With a few narrow exceptions, the Immigration and Nationality Act limits petitioners to a single motion to reopen

---

[19] Although this case involves sensitive subject matter and complex statutory schemes, its underlying principles are surprisingly familiar. Courts routinely consider whether jurisdiction is barred based on a prior court's order. *See, e.g.*, *Verogna v. Johnstone*, 583 F. Supp. 3d 331, 336–37 (D.N.H. 2022), *aff'd*, 2022 WL 19795808 (1st Cir. Nov. 14, 2022). Under sections 1252(a)(5) and (b)(9), district courts are precluded from revisiting orders made by immigration judges. It would not make sense, however, to offer that same protection for acts that go beyond those orders' preclusive scope.

[20] Defendants claim that an alien can raise fear-based concerns through reopening IJ proceedings or petitioning the court of appeals for review. *E.g.*, April 10, 2025 Rough Tr. at 9:24–10:5 ("MR. ENSIGN: Your Honor, they would have needed to raise it earlier or -- and if we were in the second part of the [March] guidance, they also could manifest fear at that point and then it would go to screening. So there's that potentially available as well. But, you know, to the extent they have awareness of that now, they should go back before the IJ and BIA."); *id.* at 10:19–22 ("MR. ENSIGN: Your Honor, they would have needed to go to the BIA before [they are notified of third-country removal plans]. There's nothing under the [March] guidance that would require additional notice or an opportunity to challenge it at that moment."); *id.* at 27:10–13 ("[MR. ENSIGN:] There is -- the typical way it . . . would be raised is a motion to reopen if you haven't raised it already, and then you can raise it to the Court of Appeals."); *id.* at 44:2–11 ("THE COURT: So it happens Saturday morning, the person raises a fear that department disagrees -- they make it through the first screening, the department disagrees. That person is then going to be deported on Sunday morning. As a practical matter, there's no judicial review of that decision, right? MR. ENSIGN: There would be administrative review potentially in the IJ. THE COURT: How would they do that? It's Saturday. MR. ENSIGN: Your Honor, I don't know the specifics of the IJ proceedings."). This claim is either an effort to prevaricate or is deeply disingenuous. The suggestion that an alien must—or even can—reopen an immigration proceeding at 6:00 a.m. on a Saturday prior to being removed that same weekend is preposterous on its face. *See, e.g.*, Exec. Office for Immigr. Rev., *Boston Immigration Court*, U.S. Dep't of Just., https://www.justice.gov/eoir/boston-immigration-court (last updated Apr. 9, 2025) ("The immigration court is open Monday to Friday except for federal holidays."). Further, Defendants have provided no evidence or authority—only their own argument—that there is a way for Plaintiffs to *successfully* reopen their immigration proceedings as of right and do not address Plaintiffs' well-supported contention that motions to reopen to assert fear of removal to a country not designated in their removal order are routinely denied as speculative. *See* PI Opp. at 8–9 (discussing only sua sponte motions to reopen process). Defendants' contention is belied by both the evidence in the record and clear case law on the limits of sua sponte motions to reopen. *See infra* at 14–18.

14

filed within ninety days of a removal order." *Charles v. Garland*, 113 F.4th 20, 23 (1st Cir. 2024) (citing 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2)). In the absence of any right to reopen the underlying immigration case, the petitioner can only ask the immigration court to reopen "sua sponte." *Id.* Immigration courts have nearly unfettered "discretion to decide whether to grant or deny sua sponte reopening." *Id.*; *see also Phimmady v. Bondi*, 128 F.4th 18, 23 (1st Cir. 2025) (holding that judicial review of immigration court's decision not to reopen sua sponte is limited and that there is no legal error in declining to reopen where plaintiff could not establish settled practice of reopening cases sua sponte in similar circumstances). Consistent with this, Plaintiffs have provided sworn declarations indicating that their various attempts at reopening proceedings to seek CAT protections have been denied by IJs. *See* Dkt. 8-8 ¶ 9 (explaining that an IJ denied motion to reopen); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (IJ order denying motion to reopen and noting that neither "Immigration Judges nor the Board of Immigration Appeals ha[s] jurisdiction to review any determination by officers of the DHS under 8 C.F.R. § 241.15 regarding the country of removal. Nothing in this order forbids DHS from acting on its own authority to designate a country, or forbids the parties from litigating that issue in any forum outside of the Executive Office of Immigration Review" (citations omitted)); Dkt. 59-12 ¶¶ 12–18 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be

Appx.180

sought in Federal court, not Immigration Court.");[21] Dkt. 59-13 at 4 (IJ order denying motion to reopen as premature where "Respondent was not seeking protection from removal to any particular country").[22] *But see* Dkt. 8-14 ¶ 7 (noting that an IJ granted a motion to reopen proceedings for an alien currently in detention).[23]

Even where an alien may move as of right, or in the unlikely event that the immigration court reopens the case sua sponte, there is no reason to believe that the court will entertain such preemptive CAT and withholding claims. "[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" *Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) (quoting *She v. Holder*, 629 F.3d 958, 965 (9th Cir. 2010), *superseded on other grounds by statute as stated in Dai v. Sessions*, 884 F.3d

---

[21] The full reasoning for the IJ's denial states:

First, country conditions in El Salvador are not relevant to Respondent's case. Respondent was ordered removed by this court to his country of origin, Venezuela - not El Salvador.

Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is tentative and speculative, at best. Respondent has been ordered removed to Venezuela by this Court, not El Salvador. If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue became ripe for review.

Dkt. 59-12 at 4.

[22] There are further substantive and logistical barriers to filing motions to reopen, especially for pro se and detained aliens and those with limited English proficiency, and particularly where removals are executed unexpectedly and with great haste. *See* Dkt. 59-9 (describing procedural, evidentiary, and substantive barriers to filing motions to reopen, especially for pro se and detained noncitizens given limitations on communication and mail access in immigration detention, as well as the impossibility of seeking reopening without knowledge of the country to which someone will be deported); Dkt. 59-10 (same, and highlighting that pro se individuals are unlikely to be aware of the availability of motions to reopen as a procedural mechanism); Dkt. 59-11 (same, and highlighting difficulties for detained individuals with limited English proficiency and the likelihood of deportation while a motion to reopen is pending).

[23] Moreover, as a practical matter, even if Plaintiffs could viably seek to reopen their immigration proceedings without knowing where the Government intends to send them, Plaintiffs would then need to make separate cases for each and every potential country for which they might have a fear-based claim to avoid removal. It is hard to imagine that this solution, which would dramatically clog the immigration courts—and would seem to pose an even greater hindrance to Defendants' removal efforts than providing the sought-after notice in the first place—is what Congress intended.

16

858, 867 n.8 (9th Cir. 2018)) (explaining that "should circumstances change such that Azerbaijan is the designated country of removal, the agency must provide [plaintiff] with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan"). Until an individual receives notice of the country to which he is being deported, he has no basis for reopening his immigration case and no merits basis to seek withholding from a hypothetical third country.[24]

The inability to effectively raise preemptive CAT and/or withholdings claims before an IJ precludes meaningful review in courts of appeals. That is so because courts of appeals are limited to the administrative record, 8 U.S.C. § 1252(b)(4)(A), and are thus, at most, able to review the IJ's discretionary decision not to reopen the case or adjudicate hypothetical claims, which—when the motion or request concerns "a country that nobody is trying to send them to," *Sadychov*, 565 F. App'x at 651—is not wrongly decided. *See id.* But even that may overstate the review available to petitioners. Multiple circuits have held that courts of appeals lack *any* jurisdiction to review discretionary decisions to reopen. *See, e.g.*, *Manyary v. Bondi*, 129 F.4th 473, 479 (8th Cir. 2025) (calling due-process argument raised through request to reopen sua sponte "'an abuse of discretion argument in constitutional garb'" (quoting *Tamenut v. Mukasey*, 521 F.3d 1000, 1005 (8th Cir. 2008))); *Mosere v. Mukasey*, 552 F.3d 397, 400 (4th Cir. 2009); *see also Tamenut*, 521 F.3d at

---

[24] For this reason, the Court has declined to distinguish between those whose removal or withholding-only proceedings conclude before versus after entrance of this Court's Order. *See* April 10, 2025 Rough Tr. at 16:5–23 (considering the idea). Whichever countries or fear-based claims an alien may attempt to raise during proceedings, IJs are under no obligation to make findings about countries not previously identified as "proposed countr[ies] of removal." *See* 8 C.F.R. § 1208.16(b) (defining eligibility with respect to that limited subset); *id.* § 1240.11(c)(1) (instructing IJs to advise aliens that they may apply to that subset (citing 8 C.F.R. § 1240.10)). Imposing a before-and-after distinction would require crafting a new, burdensome system for how immigration courts identify countries of removal and adjudicate related claims.

1004 (citing cases from ten circuits).[25]  Indeed, just over two months ago, the First Circuit openly

doubted (and declined to resolve) whether it had jurisdiction to review the denial of a request to

reopen involving consideration of factual circumstances.  *Phimmady*, 128 F.4th at 22 & n.2

(highlighting that the "Supreme Court has 'express[ed] no opinion on whether federal courts may

review [a] decision not to reopen removal proceedings.'" (quoting *Kucana v. Holder*, 558 U.S.

233, 251 n.18 (2010)) (first alteration in *Phimmady*)).[26]  Accordingly, such preemptive CAT and/or

withholding claims, including the due-process issues raised in this case, are precisely the type of

"claims which cannot be raised in removal proceedings and eventually brought to the court of

appeals on a petition for review" that the First Circuit has held are "'independent of, or wholly

collateral to, the removal process,' not 'arising from' it."  *See Gicharu*, 983 F.3d at 16 (quoting

*Aguilar*, 510 F.3d at 11).

Finally, Defendants argue that "Congress, in its discretion, implemented [CAT] by

directing the issuance of regulations, expressly depriving courts of jurisdiction to review those

regulations, and channeling all review of individual CAT claims into review of final orders of

---

[25] Several of these cases appear to have since been superseded, *see, e.g.*, *Thompson v. Barr*, 959 F.3d 476 (1st Cir. 2020), or qualified in later decisions, *see, e.g.*, *Arzu-Robledo v. Garland*, 2023 WL 6532649, at *2 (5th Cir. Oct. 6, 2023).

[26] Even assuming jurisdiction, *Phimmady* gives a strong sense of just how unreviewable, on the merits, these motions to reopen really are.  In *Phimmady*, an alien sought to reopen his immigration case after the conviction that had rendered him removable was overturned.  128 F.4th at 20.  The Board of Immigration Appeals ("BIA") denied the motion to reopen, and the First Circuit affirmed.  *Id.* at 25.  Although prior BIA decisions had established that reopening was "'an extraordinary remedy reserved for truly exceptional situations,'" *id.* at 22 (quoting *In re G-D-*, 22 I. & N. Dec. 1132, 1133-34 (BIA 1999)), nothing required reopening, "[e]ven in truly exceptional situations," *id.* (citing *Charles*, 113 F.4th at 23).  As such, the First Circuit held that there is no legal error in the denial of a sua sponte motion to reopen unless a plaintiff shows that the BIA violated an established practice of granting similar sua sponte motions.  *Id.* at 23.

18

removal."[27]  PI Opp. at 10 (citing FARRA § 2242(d); 8 U.S.C. § 1252(a)(4)).  But this argument runs squarely up against the overall problem with Defendants' reading of the statute—there can be no meaningful "review" of an issue that was not *and could not* have been raised in the first place.  As the Supreme Court held in *Jennings* and the First Circuit confirmed in *Aguilar*, section 1252(a)(4) cannot be read to strip jurisdiction over claims that could not have been raised in the removal proceedings.  *See also E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 188–90 (3d Cir. 2020) (holding that section 1252(a)(4) does not bar review "[w]hen a detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal").  As Defendants initiated the third-country-removal process at issue *after* the conclusion of removal proceedings—and because Plaintiffs have no opportunity to raise these issues before an IJ without some type of advance notice—there can be no judicial review as contemplated in the channeling provisions of section 1252(a)(4).  *See also Compere v. Nielsen*, 358 F. Supp. 3d 170, 177 n.8 (D.N.H. 2019) (finding section 1252(a)(4) "plainly inapplicable" where the petitioner was not seeking review of CAT claim's denial).  As such, neither section 1252(a) nor section 1252(b) bars this Court's jurisdiction.

---

[27] Defendants also highlight that CAT "is not self-executing."  PI Opp. at 10.  But CAT "has been implemented in the United States through FARRA and the subsequent regulations."  *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003) (explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005); *see also Nasrallah v. Barr*, 590 U.S. 573, 580 (2020).  As courts do, this Court uses "CAT" to refer to the processes and protections as embodied in the law.  *See, e.g., Guzman Chavez*, 594 U.S. at 530–31.

19

B.      **Section 1252(g)**

The Supreme Court has explained that 8 U.S.C. § 1252(g)[28] is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) [hereinafter *AADC*] ("Section 1252(g) seems clearly designed to give some measure of protection to . . . discretionary determinations.").   In *AADC*, the Supreme Court emphasized that the provision does not encompass the universe of all possible acts and events arising from removal proceedings, but rather instructs courts to read it as a narrow provision that "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482 (emphases in original) (quoting section 1252(g) and declining to read it so expansively as to say, "no judicial review in deportation cases unless this section provides judicial review"). Accordingly, section 1252(g) does not refer to "all claims arising from deportation proceedings." *Id.*

Following *AADC*, the First Circuit has held that section 1252(g) does not bar review of the "lawfulness" of a removal-related action because such claims are "collateral" to the discretionary decisions immunized by section 1252(g). *Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023); *accord United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (*en banc*) ("The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question—a description of the relevant law—forms the backdrop against which the Attorney General later will exercise discretionary

---

[28] 8 U.S.C. § 1252(g) states, in pertinent part:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

20

authority.”); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) (“While this provision bars courts from reviewing certain exercises of discretion by the attorney general, it does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions.”); *Bowrin v. U.S. INS*, 194 F.3d 483, 488 (4th Cir. 1999) (holding that section 1252 “does not apply” to Government's interpretations of law); *see also Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (“The [Supreme] Court [in *AADC*] emphasized that § 1252(g) is not ‘a general jurisdictional limitation,’ but rather ‘applies only to three discrete actions.’” (quoting *AADC*, 525 U.S. at 482)), *affirmed by an equally divided court sub nom. United States v. Texas*, 579 U.S. 547 (2016); *cf. Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1271, 1272–73 & n.2 (11th Cir. 2021) (confirming its narrow reading of section 1252(g) in *Madu*, based on *AADC*, but finding that section 1252(g) barred review of decision to remove pending *discretionary* waiver process).

Hewing close to the Supreme Court's guidance in *AADC* and the First Circuit's holding in *Kong*, this Court will not construe section 1252(g) to immunize an unlawful practice from judicial review. *See also Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 671–72 (1986) (“[O]nly upon a showing of ‘clear and convincing evidence’ of a contrary legislative intent should the courts restrict access to judicial review.”). Here, Plaintiffs' claims do not arise from Defendants' discretionary decisions to execute their removal orders. Nor do Plaintiffs challenge their removability. What Plaintiffs challenge is Defendants' authority to effectively depart from the removal orders by designating new countries for removal outside of the immigration proceedings and, in doing so, circumvent Plaintiffs' due-process rights and the carefully crafted

21

scheme that Congress has set forth.[29] *See Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 298 (3d Cir. 2020) ("[W]hen the Act deprives the Attorney General of the discretion to act, a challenge to that lack of statutory authority is not barred as a challenge to the exercise of discretion."). These assertions are collateral to Defendants' decision to execute Plaintiffs' removal, and thus not subject to section 1252(g)'s jurisdictional bar. *See Kong*, 62 F.4th at 617.

This Court's decision is in accord with numerous sister courts around the country that have recognized that section 1252(g) shields only discretionary decisions concerning the three stages of the deportation process. *See, e.g.*, *Abrego Garcia v. Noem*, — F. Supp. 3d —, 2025 WL 1014261, at *7–8 (D. Md. Apr. 6, 2025), *aff'd*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) [hereinafter *Abrego Garcia II*], *aff'd in relevant part sub nom. Noem v. Abrego Garcia*, 604 U.S. —, 2025 WL 1077101 (Apr. 10, 2025) (*per curiam*) [hereinafter *Abrego Garcia III*]; *Gondal v. U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1339–41 (N.D. Ga. 2017); *Hovsepian*, 359 F.3d at 1155; *Bowrin*, 194 F.3d at 488. *But see Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017) (openly disagreeing with the Supreme Court's reading of the statute, as articulated in *AADC*). This Court may review the purely

---

[29] During the March 28, 2025 oral argument, Defendants agreed that, in designating additional countries of removal, the Government drew its authority from statute. March 28, 2025 Tr. at 6:12–7:4. That implies something beyond mere "execut[ion]" of an order. *Cf.* 8 U.S.C. 1252(g). This plain reading of the statute is supported by the relevant regulations, which state that "the order of the immigration judge *does not limit* the authority of the Department of Homeland Security to remove [an] alien to any other country as permitted by section 241(b) of the Act." 8 C.F.R. § 1240.12(d) (emphasis added). That such authority is not "limit[ed]" by an order does not suggest that the authority is still *pursuant to* that order.

legal question of whether the Constitution and relevant statutes require notice and an opportunity to be heard prior to removal of an alien to a third country.[30]

There is no question that, if eligibility is demonstrated, withholding of removal and CAT protections are mandatory and removal to that country cannot occur. *See* 8 C.F.R. §§ 1208.16(c) (withholding under CAT), 1208.17(a) (deferral of removal under CAT). The only question is what right individuals have, under the Constitution and relevant statutes, to make that showing. This Court has jurisdiction to hear that question.

## III.   Motion for Class Certification

Plaintiffs seek to certify a class, which they define as:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

Dkt. 4 at 1.

As a threshold matter, limitations on certain class-wide injunctive relief under 8 U.S.C. § 1252(f)(1) do not preclude class certification or otherwise limit the Court's ability to grant Plaintiffs' requested class-wide relief. *See* Dkt. 52 ("Class Cert. Opp.") at 7–10.

---

[30] Defendants' out-of-circuit citations stand, at most, for the proposition that courts cannot indefinitely guarantee the pre-removal completion of certain review processes. *See Rauda v. Jennings*, 55 F.4th 773, 777–78 (9th Cir. 2022) (finding no jurisdiction to halt removal pending appeal of motion to reopen removal proceedings); *Camarena*, 988 F.3d at 1273 (finding no jurisdiction to halt removal pending adjudication of discretionary applications for provisional unlawful presence waivers); *E.F.L. v. Prim*, 986 F.3d 959, 964–65 (7th Cir. 2021) (finding no jurisdiction to halt removal pending adjudication of a petition under the Violence Against Women Act, for which there was no mandate, statutory or otherwise, that adjudication occur prior to removal). Defendants also cite *Foster v. Townsley*, in which the Fifth Circuit held that that section 1252(g) extends to non-discretionary decisions. PI Opp. at 6 (citing *Foster v. Townsley*, 243 F.3d 210, 214 (5th Cir. 2001)). But as Plaintiffs correctly note, the Fifth Circuit subsequently decided *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 380 (5th Cir. 2005), in which the court held that section 1252(g) does not preclude jurisdiction over a challenge to the constitutionality of the statutory scheme, as opposed to a discretionary determination. Insofar as *Tsering v. U.S. Immigr. & Customs Enf't*, 403 F. App'x. 339, 342–43 (10th Cir. 2010), an unpublished decision, relies on *Foster* and its interpretation of *AADC*, this Court views it as an outlier among the circuit courts and will not follow its reasoning.

23

Plaintiffs seek, among other relief, declaratory judgment. Compl. ¶¶ 118–22. "[S]ection 1252(f)(1) does not strip the lower courts of the power to grant declaratory relief." *Brito v. Garland*, 22 F.4th 240, 250 n.7 (1st Cir. 2021) (citing *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief")); *accord Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625 (9th Cir. 2024); *Make The Road New York v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020); *Alli v. Decker*, 650 F.3d 1007, 1010–13 (3d Cir. 2011); *Gonzalez v. Sessions*, 325 F.R.D. 616, 626 (N.D. Cal. 2018); *Reid v. Donelan*, 297 F.R.D. 185, 193 (D. Mass. 2014), *rev'd on other grounds*, 819 F.3d 486 (1st Cir. 2016), *opinion withdrawn on reconsideration*, 2018 WL 4000993, at *1 (1st Cir. May 11, 2018) (citing *Jennings*, 583 U.S. 281). *But see Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018) (treating the issue as unsettled but suggesting that declaratory relief might be unavailable). Accordingly, certification is proper at least toward that relief.

As to the requested injunctive relief, section 1252(f)(1) simply does not apply. Section 1252(f)(1) generally prohibits lower courts from ordering federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out "the specified statutory provisions," other than on a case-by-case basis. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–50 (2022). But the class-wide injunctive relief Plaintiffs seek—concerning the availability of CAT protection, *see* Dkt. 6-1—is based on a different statute, the Foreign Affairs Reform and Restructuring Act ("FARRA"). *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003)

24

(explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).[31]

Defendants would have the Court go beyond the plain meaning of the statute to imply a bar to actions that collaterally impact covered parts of the INA. PI Opp. at 5–6. However, section 1252(f)(1) cannot be read so broadly. Starting from first principles, "[t]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Yates v. United States*, 574 U.S. 528, 540 (2015) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)). Here, the title of the section is "Judicial Review of Orders of Removal." 110 Stat. 3009–607 (codified in 8 U.S.C. § 1252). Thus, the text of the statute itself implies that the limitation applies only to cases arising out of such review. *Texas v. United States*, 524 F. Supp. 3d 598, 640–41, 667–68 (S.D. Tex. 2021) ("Section 1252 concerns '[j]udicial review of orders of removal.'" (quoting the title of 8 U.S.C. § 1252)) (reading section 1252 as a whole as "deal[ing] with . . . judicial review of orders of removal" and rejecting the argument that the INA's various limiting provisions collectively "establish Congress's overall intent to preclude judicial review of *most if not all* of DHS's policy decisions with respect to immigration enforcement") (enjoining pause of removals). Other subsections of 1252 concerning review of removal orders are interpreted narrowly to exclude collateral claims. *See Jennings*, 583 U.S. at 294; *Aguilar*, 510 F.3d at 11. The Court sees no basis to graft on Defendants' proposed, additional meaning.

---

[31] It is admittedly confusing that FARRA's provisions are intermingled with the INA's in the U.S. Code. *See generally* 8 U.S.C. § 1231. However, the Ninth Circuit has helpfully clarified that section 1252(f)(1), in its authoritative Statutes at Large version, refers only to "the provisions of chapter 4 of title II [of the INA], as amended by" the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022). Further, because CAT protections were codified in FARRA in 1998, CAT protections are not covered by section 1252(f)(1)'s bar related only to INA provisions as amended in 1996. *See* FARRA, § 2242(a); *Galvez*, 52 F.4th at 830.

25

Defendants cite *Aleman Gonzalez* for the proposition that section 1252(f)(1) applies not just to the explicitly covered parts of the statute but to "*the way that [those parts] [are] being carried out.*" PI Opp. at 5 (quoting *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added)) (brackets added). But this puts words into the Supreme Court's mouth—that part of the *Aleman Gonzalez* opinion dealt with an entirely different issue.[32] Indeed, the *Aleman Gonzalez* Court not only explicitly limited its discussion to the "covered immigration provisions," *Aleman Gonzalez*, 596 U.S. at 552,[33] but suggested in dicta that "a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." *Id.* at 553 n.4 (emphasis removed) (citing *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)).

The Fifth Circuit put it well and plainly in *Texas v. United States Department of Homeland Security*, 123 F.4th 186, 209–10 (5th Cir. 2024):

> Texas does not seek to enjoin the operation of any of the provisions listed in § 1252(f)(1). It seeks an injunction only against conduct—namely, cutting or other destruction of its c-wire—unauthorized by § 1357(a)(3). Accordingly, because § 1357(a)(3) is not one of the statutes referenced in § 1252(f)(1), the injunction Texas seeks is not barred. Such an injunction would, at most, have only a "collateral effect on the operation" of the covered statutes (specifically, §§ 1225 and 1226). *Aleman Gonzalez*, 596 U.S. at 553 n.4, 142 S.Ct. 2057. That is especially the case here, where the district court found Defendants were cutting c-wire neither to detain aliens nor to respond to emergencies.
>
> Defendants respond that, in essence, they are the ultimate judges of whether § 1252(f)(1)'s bar applies. They argue *Aleman Gonzalez* prohibits injunctions of *uncovered* statutes that "in the Government's view" impact its ability to enforce the *covered* sections listed in § 1252(f)(1). That is badly mistaken. Congress legislated which sections are covered by § 1252(f)(1). The Executive Branch does not get to

---

[32] *See Aleman Gonzalez*, 596 U.S. 543, 551–52 (2022) (considering whether section 1252(f)(1) applies only to "the covered immigration provisions . . . 'as properly interpreted'" or as "operat[ed]" in practice by the Government).

[33] *See also id.* at 551 ("The respondents in both cases were detained pursuant to § 1231(a)(6), and no one disputes that § 1231(a)(6) is among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1).").

propose additions. *See* U.S. Const. art. I, § 1 (vesting "All legislative Powers" in Congress).

*See also Gonzalez v. ICE*, 975 F.3d 788, 814 (9th Cir. 2020) (holding that "§ 1357(d) is not located in Part IV [of the INA], and thus § 1252(f)(1)'s limitations do not apply"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 158 (D.D.C. 2019) (holding that section 1252(f)(1) does not bar an injunction based on 8 U.S.C. § 1158(b)(1) since it is not a covered provision); *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1044–45 (S.D. Cal. 2020) (finding that section 1252(f)(1) did not bar class-wide injunctive relief with regards to access to counsel during non-refoulement interviews because the relief was not governed by sections 1221–32); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, — F. Supp. 3d —, 2025 WL 585768, at *13 (D. Md. Feb. 24, 2025) ("Moreover, § 1252(f)(1) does not bar injunctions affecting DHS's authority pursuant to provisions of the INA outside of §§ 1221–1232 'simply because of collateral effects on a covered provision.'" (quoting *Al Otro Lado*, 120 F.4th at 627)). Thus, the requested class-wide relief, limited only to otherwise removable aliens with potential CAT protection claims, falls outside of section 1252(f)(1)'s bar.

## A. **Legal Standard**

Class actions serve as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation and internal quotations omitted). A court may certify a class only if it finds that the proposed class satisfies all the requirements of Fed R. Civ. P. 23(a) ("Rule 23(a)") and that class-wide adjudication is appropriate for one of the reasons set forth in the relevant subsection of Fed. R. Civ. P. 23(b) ("Rule 23(b)"). *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003). "Rule 23(a) requires that (1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative's

representation of the class be adequate." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008) (citing Fed. R. Civ. P. 23(a)). Plaintiffs seek certification under Rule 23(b)(2), Dkt. 4, which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed R. Civ. P. 23(b)(2). For both Rule 23(a) and 23(b), Plaintiffs must establish each of the elements; failure to establish any element will defeat class certification. *See Smilow*, 323 F.3d at 38.

### B. Discussion

#### 1. 23(a)(1) Numerosity

To satisfy the numerosity requirement, a plaintiff must demonstrate that the class is so numerous that joinder would be "impracticable." Fed. R. Civ. P. 23(a)(1). The requirement presents a "low hurdle," *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 87 (D. Mass. 2007), but "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)," *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 258 (D. Mass. 2005). "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (citation omitted); *see also Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011). The numerosity requirement imposes only a "low threshold," *Garcia-Rubiera*, 570 F.3d at 460, particularly where, as here, Plaintiffs seek only injunctive or declaratory relief, *Reid*, 297 F.R.D. at 189 ("[T]he threshold may be relaxed when a party seeks only declaratory or injunctive relief, since the inclusion of future members increases the impracticability of joinder." (citation omitted)); *see also Gomes v. Acting Sec'y, U.S. Dep't of Homeland Sec.*, 561 F. Supp. 3d 93, 99 (D.N.H. 2021) (certifying a class where "the number of current *and future members* of the putative class exceeds 40 persons" (emphasis added)).

28

Defendants do not dispute that Plaintiffs have met the numerosity requirement, *see generally* Class. Cert. Opp., and the Court finds this requirement met by Plaintiffs' identification of hundreds of potential class members, Dkts. 8-4, 8-8–23 (identifying individuals with final removal orders who were removed under the challenged policies and practices or are similarly at risk of unnoticed removal).

### 2. 23(a)(2) Commonality

Satisfying the commonality requirement in the instant case is simple and straightforward: Plaintiffs seek a single, common order that Defendants comply with the strictures of due process before deporting them to a county not covered by their final orders of removal. Defendants' arguments to the contrary are uncompelling.

The commonality requirement is met when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, a plaintiff must demonstrate that the proposed class's claims "depend upon a common contention," the resolution of which is "central to the validity" of each of the class's claims. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28–29 (1st Cir. 2019). The commonality requirement is a "low bar." *In Re New Motor Vehicles*, 522 F.3d at 19. Courts have found that "a single common question is sufficient to satisfy the requirements of Rule 23(a)(2)." *Gomes*, 561 F. Supp. 3d at 99; *see also Reid*, 297 F.R.D. at 189.

Defendants argue that the proposed class is overly broad, includes "clear dissimilarities between the proposed class and its proposed representatives," and includes aliens with "different processes and pathways for relief." Class. Cert. Opp. at 11–14. As such, Defendants argue class certification is not appropriate. *Id.*

Appx.194

The commonality requirement is met, notwithstanding purported or actual dissimilarities among named and potential class members, based on the common due-process issue. Due process adheres regardless of the removal context. *See Khouzam v. Att'y Gen.*, 549 F.3d 235, 256–57 (3d Cir. 2008) ("In fact, the basic dictates of due process must be met whether an alien facing removal overstayed a visa, . . . entered the country undetected, . . . or became a legal resident but then committed an enumerated crime." (citations omitted)). That specific circumstances may differ among the various putative class members does not undermine that they all seek notice and an opportunity to be heard, and the opportunity to challenge a policy or practice which allegedly denies it. *See, e.g.*, *Gomes*, 561 F. Supp. 3d at 101 ("[T]he existence of individual differences among putative class members does not foreclose a finding of commonality so long as least one common issue is raised.").

Likewise, that some members may present additional, individualized issues, *e.g.*, return to the United States if unlawfully removed,[34] does not affect commonality. *See Tassinari v. Salvation Army*, — F.R.D. —, 2025 WL 972724, at *7 n.12 (D. Mass. Mar. 26, 2025) ("Defendant's

---

[34] Defendants acknowledge that there are procedures to compel the return of illegally removal individuals. *See* March 28, 2025 Tr. at 17:12–13 ("Yes, Your Honor. There are procedures for that."); *see also* ICE Policy Directive No. 11061.1, § 1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012), perma.cc/95AT-VN72 (describing process for facilitating return of certain lawfully removed aliens whose petitions for review are granted after their removal). Courts regularly order the return of wrongfully removed individuals. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009) (discussing how removed individuals "can be afforded effective relief by facilitation of their return"); *Abrego Garcia III*, 2025 WL 1077101, at *1 (denying application to stay requirement that the Government "facilitate" plaintiff's return after wrongful removal); *Abrego Garcia II*, 2025 WL 1021113, at *2–3 (Thacker, J., concurring) (holding that the court retained jurisdiction because the decision to remove plaintiff to a country for which he had withholding of removal "was not one that was within [the Attorney General's] lawful discretion" and "was not the enforcement of a valid order of removal"); *id.* at *6 ("Nor can the Government be permitted to disclaim any ability to return those it has wrongfully removed by citing their physical presence in a foreign jurisdiction."); *Ramirez v. Sessions*, 887 F.3d 693, 707 (4th Cir. 2018) (directing the Government "to facilitate [plaintiff's] return to the United States" from El Salvador); *Gordon v. Barr*, 965 F.3d 252, 261 (4th Cir. 2020) (similar); *Nunez-Vasquez v. Barr*, 965 F.3d 272, 287 (4th Cir. 2020) (directing the Government "to return [plaintiff] to the United States"); *Orabi v. Att'y Gen.*, 738 F.3d 535, 543 (3d Cir. 2014) (similar). Here, the putative class members *already* have been awarded withholding of removal, and as discussed below, *infra* Section IV(B)(1), Plaintiffs are likely to succeed on the merits that they are and were entitled to due process in order to assert their statutory rights to seek CAT protections prior to removal, making such removals without due process wrongful.

30

identified individualized issues really boil down to one common question.").  "Ultimately, the

gravamen of Defendant[s'] challenges on commonality really goes not to whether common issues

exist but rather to whether common issues predominate over individual ones; this is not a concern

for a 23(b)(2) class [seeking injunctive or declaratory relief], as predominance is a requirement for

certifying a class only under 23(b)(3)."  *Id.* at *7 (citing *Donovan v. Philip Morris USA, Inc.*, 268

F.R.D. 1, 11 (D. Mass. 2010) (reviewing First Circuit case law)).

"Plaintiffs in this case have identified a single alleged practice"—Defendants' system-wide

policy or practice of designating aliens for removal to a third country without first providing those

aliens notice and an opportunity to apply for protection from removal to that country—"that

provides the basis for every class member's injury."  *Ramirez v. ICE*, 338 F. Supp. 3d 1, 42–50

(D.D.C. 2018) (certifying class of immigrant teens challenging transfers to ICE custody).

Regardless of differences in the removal procedures applicable to each class member, they all seek

to establish their right to due process.[35]  *See Savino v. Souza*, 453 F. Supp. 3d 441, 451 (D. Mass.

2020) (determining "that the admittedly significant variation among the Detainees does not defeat

commonality"); *Quadrelli v. Moniz*, 2020 WL 3051778, at *5 (D. Mass. June 8, 2020) (following

courts that have certified classes of individuals "who have alleged a general risk of harm due to a

---

[35] The Court rejects Defendants' implicit argument that allegations of due-process violations cannot ever sustain a class action.  Class. Cert. Opp. at 14.  While "due process is flexible" and can vary depending on the situation, *Matthews*, 424 U.S. at 321, the basics are clear: "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *id.* at 333; *see also id.* at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").  As such, courts have certified classes asserting due-process claims under Rule 23(b), without raising commonality concerns.  *See* Charles Alan Wright & Arthur R. Miller, 7AA *Federal Practice and Procedure* § 1776.1 (3d ed.) (collecting cases); *Garcia-Rubiera*, 570 F.3d at 456–58, 461 (remanding with instructions to certify, under Rule 23(b)(2), a class challenging, among other things, a lack of notice under the Due Process Clause).

31

policy or practice, even if there might additionally be a unique or distinct impact as to an individual putative class member").

Since Plaintiffs have identified a single, common question at the heart of the claims, commonality has been satisfied. *See Gomes*, 561 F. Supp. 3d at 99 ("[A] single common question is sufficient to satisfy the requirements of Rule 23(a)(2)."). Answering the common legal question of whether Defendants must afford aliens with due process (and of what that due process consists) prior to removal to a third country will "drive the resolution of the litigation." *Ramirez*, 338 F. Supp. 3d at 45 (cleaned up).

Thus, the Court finds that Plaintiffs have satisfied the commonality requirement under Rule 23(a)(2).

### 3.    23(a)(3) Typicality

The typicality requirement mandates that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality does not require that all putative class members share identical claims or defenses. *In re Credit Suisse-AOL Secs. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) (citing *Swack*, 230 F.R.D. at 260); *see also DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 405 (D. Mass. 2017) ("Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." (quotation omitted)). Instead, typicality is established if the claims of the class representative "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members, and . . . are based on the same legal theory." *Garcia-Rubiera*, 570 F.3d at 460 (citation omitted).

Defendants argue that "[t]he proposed class lacks typicality for the same reasons it lacks commonality" and that "the class representatives are *not* part of the proposed class and do *not*

32

possess the same interest or suffer the same injury as the proposed class members because they cannot demonstrate they will be removed absent any notice or opportunity to assert a fear-based claim." Class Cert. Opp. at 15–16 (emphases in original).[36]

Typicality is satisfied here for largely the same reasons that commonality is satisfied. The named Plaintiffs and putative class members all share an identical interest in an injunction mandating due-process protections prior to their removal to a third country. Defendants have taken the position that there is *no* due process entitled to any alien, under any method of removal, prior to removal to a third country regardless of any potentiality that such an alien will be tortured or murdered upon arrival. *See* March 28, 2025 Tr. at 10:17–11:1 ("THE COURT: In this posture, where it is the discretionary decision of the department that's changing the third-party designation, does the person who's going to be deported have a right to be informed and be given an opportunity to be heard as to the dangerousness of that third country designation? MS. LARAKERS: DHS's position is no. THE COURT: They don't have to be told anything and given no opportunity to be heard? MS. LARAKERS: DHS's position is no."). Between Defendants' representations to the Court and the Court's ultimate finding that the procedures outlined in the March Guidance do not provide adequate due process, *see infra* at 42–43, the Court finds that the named and unnamed Plaintiffs alike share an identical interest in challenging Defendants' alleged practice of removing individuals to third countries without notice and an opportunity to be heard, and, as such, satisfy the typicality requirement under Rule 23(a)(2).

---

[36] Defendants also argue that "Plaintiffs[] attempt to meet typicality by expanding the description of their class" to apply the class to "to any alien with a final order of removal under the three named removal statutes regardless of what procedures DHS applied to their removal to a third country." Class. Cert. Opp. at 15. However, Plaintiffs have asserted a consistent class definition throughout this case, and by its plain language, the class definition applies only to those aliens who have been or will be attempted removed to a third country *without meaningful notice and opportunity to contest the removal*. Thus, whether an alien is a part of the class inherently depends on whether the alien received said notice and opportunity to be heard, *i.e.*, on the Government's own inaction and inaction.

### 4.      23(a)(4) Adequacy of Representation

The adequacy requirement is met when the representative parties will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy is satisfied if (1) there is no conflict between the interest of the named Plaintiffs and the class members and (2) counsel chosen by the named Plaintiffs are qualified and able to litigate the claims vigorously.[37] *S. States Police*, 241 F.R.D. at 88 (citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). Merely lacking identical interest, however, is not enough for a representative party to be found inadequate. *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345–46 (1st Cir. 2022) (citing *Cohen v. Brown Univ.*, 16 F.4th 935, 945 (1st Cir. 2021)).

Defendants argue that "Plaintiffs fail to meet the adequacy requirement for the same reasons Plaintiffs fail to meet the commonality and typicality requirements." Class Cert. Opp. at 16. But the adequacy requirement looks to whether the named Plaintiffs will fairly and adequately protect the interests of the proposed class. *See S. States Police*, 241 F.R.D. at 88. There is nothing in the record to suggest that the named Plaintiffs seek any unique or additional benefit from this litigation that may make their interests different from or adverse to those of absent class members. *Cf. Amchem*, 521 U.S. at 626–27 (holding that adequacy requirement was not met where named plaintiffs stood to benefit disproportionately and at the expense of other potential class members). Thus, the Court finds that Plaintiffs have satisfied the adequacy requirement under Rule 23(a)(2).

---

[37] Defendants do not contest the adequacy of Plaintiffs' counsel. *See* Class Cert. Opp. at 16.

34

## 5.     23(b)(2) Injunctive or Declaratory Class

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). "[C]ivil rights actions . . . where a party charges that another has engaged in unlawful behavior towards a defined group, are prime examples of Rule 23(b)(2) classes." *Reid*, 297 F.R.D. at 193 (quotation omitted).

Defendants' first set of arguments goes mainly to whether the named Plaintiffs have valid claims. *See* Class Cert. Opp. at 17 (arguing that O.C.G. received notice of his removal and had an opportunity to assert fear-based claims); *id.* (arguing that E.F.D. and M.M. have an adequate remedy in a motion to reopen); *id.* at 17–18 (arguing that the claims of D.V.D. and M.M. are speculative and unripe). But these arguments, which go to the merits of the individual claims, are inappropriate to consider on a motion for class certification. "Although . . . a court's class-certification analysis . . . may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal-Mart Stores*, 564 U.S. at 351). To the extent Defendants' implied argument is that these individual infirmities bespeak some sort of "fatal similarity" common to the whole

proposed class, "[s]uch a contention is properly addressed at trial or in a ruling on a summary-judgment motion." *Id.* at 470.[38]

More broadly, Defendants argue that, "[t]o the extent Plaintiffs are entitled to some additional procedures under the Due Process Clause, those procedures would be different for each alien depending on the underlying facts and circumstances of their case." Class Cert. Opp. at 18. But Defendants have not provided the Court with a single example of how an "underlying fact" and/or "circumstance" might lead to different procedural minima for one individual versus another. *Cf. Reid v. Donelan*, 17 F.4th 1, 9 (1st Cir. 2021) (finding certification improper where district court recognized that "relief must be adjudicated on an individual basis"). Defendants' own contention that—if due process applies to third-country removals—the March Guidance is sufficient, PI Opp. at 8, recognizes that it is possible to establish a baseline for all putative class members. The Court does not find that the claims here "hinge on the individual circumstances of each class member." *Reid*, 17 F.4th at 11. Rather, Defendants have taken a broad position, subject to class-wide challenge.

In sum, Plaintiffs challenge a policy or practice that impacts all putative class members: failing to provide meaningful notice and opportunity to present a fear-based claim before executing removal to a third country. In doing so, Plaintiffs seek injunctive and declaratory relief that applies to the class as a whole, satisfying Rule 23(b)(2).

---

[38] The Court instead addresses these arguments in its analysis of Plaintiffs' motion for a preliminary injunction. *See infra* Section IV(B)(1).

36

## IV.     Preliminary Injunction

### A.     Legal Standard

"[T]he issuance of preliminary injunctive relief is 'an extraordinary and drastic remedy that is never awarded as of right.'"  *Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT*, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Of the four factors, likelihood of success "weighs most heavily" in the analysis.  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

In deciding a motion for preliminary injunction, "[t]he court may accept as true 'well-pleaded allegations [in the complaint] and uncontroverted affidavits.'"  *C&W Facility Servs. Inc. v. Mercado*, 2018 WL 4854630, at *2 (D. Mass. Oct. 5, 2018) (quoting *Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010)).  "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction."  *Bos. Taxi Owners Ass'n, Inc. v. City of Bos.*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

### B.     Discussion

#### 1.     Likelihood of Success

Plaintiffs have established that they are likely to succeed in showing that Defendants have a policy or practice of executing third-country removals without providing notice and a meaningful

opportunity to present fear-based claims, and that such policy or practice constitutes a deprivation of procedural due process.

"To establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.'" *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (quoting *Aponte–Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)). "The basic purport of the constitutional requirement is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Congress clearly established the right to deferral or withholding of removal based on a legitimate fear-based claim. *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment").

More generally speaking, "'[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) [hereinafter *J.G.G. III*] (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). As all nine Supreme Court justices agreed less than two weeks ago, this means that "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek . . . relief in the proper venue before such removal occurs." *Id.*; *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review

38

is available."); *id.* at *6 (Sotomayor, J., dissenting) ("That means, of course, that the Government cannot usher any detainees . . . onto planes in a shroud of secrecy.").

Likewise, there can be no disagreement that the same constitutional guarantees apply to withholding-only relief. *Guzman Chavez*, 594 U.S. at 557 (Breyer, J., dissenting) ("And all here agree that the aliens are legally entitled to seek . . . withholding-only relief." (citing *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 35 n. 4 (2006))); *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (explaining that the Government has an "obligation to provide [the plaintiff who was subject to an order of removal] . . . notice and an opportunity to be heard" and ensure compliance with its "obligations under [CAT]" prior to removal); *see also Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999) (finding that "last minute designation" of removal country during formal proceedings "violated a basic tenet of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence"); *Kossov v. INS*, 132 F.3d 405 (7th Cir. 1998) (due-process violation to order deportation to Russia after a claim of asylum as to Latvia where uncounseled noncitizen was provided insufficient notice of Russia possibility).

The Court rejects Defendants' argument that aliens have already received, during their initial removal proceedings, all the process to which they are entitled, so as to justify providing no additional process prior to third-country removal. *See* April 10, 2025 Rough Tr. at 11:1–4 ("MR. ENSIGN: Your Honor, where they could have raised it previously and did not do so, the Due Process Clause does not require an additional procedural opportunity to raise [it] in . . . that context."). Defendants argue that aliens could have brought up, during their initial removal proceedings, all the countries where they have concerns that they will be tortured. *See, e.g.*,

April 10, 2025 Rough Tr. at 4:13–16 ("[MR. ENSIGN:] They also previously would have had an opportunity to raise it during their initial removal proceedings and they would be asked on their [I-589] form if they have fear of returning anywhere."). This is both impossible as a practical matter, since the immigration court does not normally consider claims about countries not proposed as a country of removal,[39] and fails to consider that conditions change in countries change over time.[40] Listing all the countries in the world as to which an individual might have a reasonable fear is also impractical: doing so would potentially require, for example, a person with a same-sex sexual orientation to list, at least, all 64 countries where such an orientation is illegal such that the individual fears torture. *See Homosexuality: The countries where it is illegal to be gay*, BBC (Mar. 31, 2023), https://perma.cc/32KN-RH6Q. Indeed, the Assistant to the Solicitor General, arguing before the Supreme Court on the topic of third-country removals less than a month ago, affirmatively stated that "[w]e would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country," even where that individual was already subject to an order of removal.[41]

Even without that statement, the claims at issue concern removal to countries that were *not ruled upon* in the initial proceedings and are therefore not covered by the removal order. As discussed above, the Court disagrees with Defendants' assertion that the theoretical option of a motion to reopen provides a sufficient remedy. *See supra* at 14–18; *see also Sadychov*, 565 F.

---

[39] *See supra* at 16–17 & notes 17, 24 (discussing the non-viability of preemptive claims).

[40] An alien can remain in the United States on an Order of Supervision for decades after being granted withholding. *See* April 10, 2025 Rough Tr. at 15:24–16:1 ("THE COURT: But some people have been granted withholding for 20 years, right? MS. REALMUTO: Exactly."); *see also* Compl. ¶¶ 75–76 (alleging that E.F.D. was granted CAT protection in 2018 and had been released from immigration custody until he was re-detained in March 2025). Country conditions can change dramatically, especially over decades. *See, e.g.*, Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30976 (May 20, 2022) (providing Temporary Protected Status designation to Afghanistan in May 2022, after Taliban returned to power in August 2021).

[41] *Supra* note 2.

Appx.205

App'x at 651 ("[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" (quoting *She*, 629 F.3d at 962)); Dkt. 59-12 at 4–5 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court.").[42]

The Court finds it likely that Defendants have applied and will continue to apply the alleged policy of removing aliens to third countries without notice and an opportunity to be heard on fear-based claims—in other words, without due process. Defendants have repeatedly argued that they have no obligation to provide any process whatsoever when newly designating a third country for removal. *See, e.g.*, March 28, 2025 Tr. at 10:17–11:1; April 10, 2025 Rough Tr. at 9:5–8, 10:19–11:4. Defendants' own avowed position and the numerous declarations Plaintiffs have

---

[42] *See also* Dkt. 8-8 ¶ 9 (motion to reopen denied); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (same); Dkt. 59-12 ¶¶ 12–18 (same); Dkt. 59-13 at 4 (same).

provided[43] substantiate both the prior and future use of Defendants' policy of providing no notice prior to third-country removal.[44]

Nor do the procedures outlined in DHS's March Guidance satisfy due process. The March Guidance provides no process whatsoever to individuals whom DHS plans to remove to a country from which the United States has received blanket diplomatic assurances. Dkt. 43-1 at 1–2. Defendants are, of course, correct that the Court may not question the substance of diplomatic assurances endorsed by the Executive. *See* PI Opp. at 11. However, the Court may inquire into the overall process and whether such assurances, on their own terms, satisfy the Constitution. *See Khouzam*, 549 F.3d at 259 (finding that lack of individualized determination violated due process, notwithstanding diplomatic assurance).

Blanket diplomatic assurances do not address DHS's obligation to undertake an individualized assessment as to the sufficiency of the assurances, as required under the statutory

---

[43] Notably, the parties contest whether O.C.G. received any substantial notice or a meaningful opportunity to present a fear-based claim prior to his removal to Mexico. *Compare* Compl. ¶¶ 85–86 (alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of the ICE ERO Phoenix Field Office, asserting based on hearsay that notice was provided on February 21, 2025, by "ERO" and that O.C.G. denied fear of removal). Given O.C.G.'s sworn declaration—rebutted only by a hearsay declaration—the Court finds it likely that O.C.G. was not provided sufficient process prior to removal.

[44] Defendants argue that the claims of D.V.D. and M.M. are speculative and unripe because D.V.D. and M.M. have not yet been detained or notified of any impending third-country removal. Class. Cert. Opp. at 17–18. *But see* Compl. ¶ 71 (alleging that M.M. was informed by an ICE official that she would be deported in the immediate future). There, so to speak, lies the rub—according to Defendants, an individual must await notice of removal before his claim is ripe, even where the claim is that there is no notice. But once an individual is removed, Defendants argue, there is no jurisdiction. *See* Class Cert. Opp. at 11–12.

Having granted class certification, the individual cases of D.V.D. and M.M. are less dispositive as to the issue of likelihood of success. Nevertheless, insofar as they may represent some portion of the class, the Court notes that it does not find such cases unripe. Ripeness concerns both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (citing *Texas v. United States*, 523 U.S. 296, 300–01 (1998)). Here, both tests indicate justiciability. As Plaintiffs challenge Defendants' policy and practices, rather than the putative class members' individual removability, no further facts are necessary for judicial review. *See Pustell v. Lynn Pub. Scs.*, 18 F.3d 50, 52 (1st. Cir. 1994) (finding claim ripe where "[n]o further factual development is necessary for us to resolve the question at issue, namely, whether the policy . . . is constitutional"). Likewise, Plaintiffs "suffer the harm of substantial uncertainty if we put off resolving their constitutional claims." *Id.*

and regulatory framework. *See* 8 C.F.R. § 1208.18(c)(1) ("The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that ***an*** alien would not be tortured there if ***the*** alien were removed to that country." (emphases added));[45] *see also Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (examining the "ordinary meaning" of statutory text and finding that "[t]o an ordinary reader—both in 1996 and today—'a' notice would seem to suggest just that: 'a' single document").

Moreover, blanket assurances offer no protection against either torture by non-state actors or chain refoulement, whereby the third country proceeds to return an individual to his country of origin. *See, e.g.*, Compl. ¶¶ 68–69 (detailing domestic violence concerns that led to withholding of removal designation); Dkt. 8-2 ¶¶ 3–4, 7–8, 13 (same). Yet these circumstances can trigger protections under CAT no less than threats coming from state actors. 8 C.F.R. § 1208.18(a)(1); *see also Murillo Morocho v. Garland*, 80 F.4th 61, 71 (1st Cir. 2023) (vacating decision denying CAT protection where the Board of Immigration Appeals failed to properly consider risk of torture by non-state actors).

Even if such blanket assurances might, in some individual cases, satisfy due process, the March Guidance precludes any further review prior to removal. Dkt. 43-1 at 1–2 (providing noncitizens "will be removed without the need for further procedures"). There can be no right without a remedy. *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Without meaningful review, the rights Congress has provided are little more than dead letter.

---

[45] The Department of Justice has previously recognized its obligation to provide a case-by-case, individualized process for seeking and assessing the reliability of diplomatic assurance determinations. *See Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 10 (2005) ("LEAHY: What do you think that the assurances we get from countries that are known to be torturers, when they say, 'Well, we won't torture this person you're sending back' – do you really think those assurances are credible? GONZALES: I think, Senator, that's a difficult question that requires, sort of, a case-by-case analysis. . . . Well, again, Senator, we take this obligation very, very seriously. And we know what our legal obligations are. We know what the directive of the president is. And each case is very fact-specific.").

It simply cannot be, as Defendants contend, that the Government can "decide right now that someone who is in [] custody is getting deported to a third country, give them no notice and no opportunity to say, 'I will be killed the moment I arrive there,' and, as long as the [Government] doesn't already know that there's someone standing there waiting to shoot him, that's [] fine." *See* March 28, 2025 Tr. at 29:12–18 ("In short, yes."). Defendants' obligations under CAT and the Due Process Clause require more. Plaintiffs have demonstrated a likelihood of success on the merits.

### 2.     <u>Irreparable Harm</u>

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). "It 'most often exists where a party has no adequate remedy at law.'" *Id.* (quoting *Charlesbank Equity Fund II*, 370 F.3d at 162).

The irreparable harm factor likewise weighs in Plaintiffs' favor. Here, the threatened harm is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable.

Defendants' argument that this Court has no jurisdiction over already-removed aliens only bolsters Plaintiffs' argument toward finding irreparable harm. *See* Class Cert. Opp. at 11–12. Defendants contend that they may remove aliens to third countries with no possibility for review. *Id.* It is undoubtedly "irreparable injury to reduce to a shell game the basic lifeline of due process

44

before an unprecedented and potentially irreversible removal occurs." *J.G.G. II*, 2025 WL 914682, at *30 (Millett, J., concurring).

Thus, Plaintiffs have demonstrated a likelihood of irreparable harm.

### 3.    Balance of Equities and Public Interest

Finally, the Court considers the balance of the equities and the public interest.  "These two inquiries merge in a case like this one, where the Government is the party opposing the preliminary injunction."  *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  In cases implicating removal, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Nken*, 556 U.S. at 436.  However, there is also "a public interest in prompt execution of removal orders."  *Id.*

"To begin with, the Plaintiffs' likelihood of success on the merits lightens [Defendants'] stated interests."  *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022).  The Supreme Court has confirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends."  *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021); *see also NFIB v. Dep't of Labor*, 595 U.S. 109, 120–21 (2022) (staying an illegal vaccine mandate even though the Government said the mandate would save more than 6,500 lives); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming district court's preliminary injunction of an illegal executive order even though a wartime president said his order was "necessary to avert a national catastrophe").

Here, the Court has found it likely that these deportations have or will be wrongfully executed and that there has at least been no opportunity for Plaintiffs to demonstrate the substantial harms they might face.  The Court finds that these circumstances countervail the public's normal

and meaningful "interest in prompt execution."  *See Nken*, 556 U.S. at 436.  Thus, the final two factors support issuance of relief.

### 4.    Limitations of Relief

"[An] injunction should issue only where [it is] essential in order effectually to protect . . . rights against injuries otherwise irremediable."  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)).  Here, the "irremediable" injury would be deportation without meaningful opportunity to present a claim based on fear of persecution, torture, or death.

Accordingly, the Court circumscribes its remedy and declines, at this time, to require the full extent of process Plaintiffs propose.  Instead, the Court orders that, prior to removing any alien to a third country, *i.e.*, any country not explicitly provided for on the alien's order of removal, Defendants must: (1) provide written notice[46] to the alien—and the alien's immigration counsel, if any[47]—of the third country to which the alien may be removed, in a language the alien can understand; (2) provide meaningful opportunity for the alien to raise a fear of return for eligibility

---

[46] Written notice comports with the traditional standards of due process.  *See Matthews*, 424 U.S. at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane*, 339 U.S. at 313, 315 ("Personal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding. . . . [W]hen notice is a person's due, process which is a mere gesture is not due process.  The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.  The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected.").  The Court's sense of what fairness requires is further supported by the Government's own internal documents.  *See* Dkts. 1-2 (2001 draft Form 1-913 that would provide written notice prior to third-country removal and require motion to reopen to be filed within fifteen days of being served with notice), 1-3 (2020 draft model notice that would provide written notice prior to removal to country other than designated country of removal and that provided that "DHS w[ould] not oppose [the alien's] filing of a motion to reopen with the Immigration Court" within fifteen days of being served with such notice).

[47] *See* 8 C.F.R. § 292.5 ("Whenever a person is required by any of the provisions of this chapter to give or be given notice; to serve or be served with any paper other than a warrant of arrest or a subpoena; to make a motion; to file or submit an application or other document; or to perform or waive the performance of any act, such notice, service, motion, filing, submission, performance, or waiver shall be given by or to, served by or upon, made by, or requested of the attorney or representative of record, or the person himself if unrepresented.").

for CAT protections; (3) move to reopen the proceedings if the alien demonstrates "reasonable fear";[48] and (4) if the alien is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days,[49] for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

With respect to the return of O.C.G.,[50] the Court recognizes that whether he received notice at all, let alone meaningful notice, is hotly contested. Until the factual dispute of whether he received notice is resolved, the Court will not order the return of O.C.G. A mandatory injunction, as would be required, "alters rather than preserves the status quo," and is thus subject to an even more heightened level of legal and factual scrutiny. *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (citing *Massachusetts Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Mass.*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)). Instead, Plaintiffs may renew their motion with regards to the return of O.C.G.

---

[48] "Reasonable fear" is the most stringent standard for screenings applied in the initial removal context, meaning the alien must show the highest and most credible level of fear required at the screening stage to garner relief. *Compare* 8 CFR § 208.31 (using "reasonable fear" as the screening standard for aliens removeable under certain INA provisions), *with* 8 CFR § 208.16 (using "credible fear" as the screening standard for aliens removeable under other INA provisions); *see also Reasonable Fear Screenings*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/reasonable-fear-screenings (last updated Jan. 24, 2025) ("Those who are found to have a reasonable fear of persecution or torture are then given an opportunity to seek withholding of removal or deferral of removal before an Immigration Judge."). While Defendants propose applying the "more likely than not" standard, *see* April 10, 2025 Rough Tr. at 33:2–4, that would require an alien to demonstrate full entitlement to CAT protections at merely the screening stage. *See* 8 C.F.R. § 208.17(a).

[49] The Court has been forced to decide on an appropriate time limit because Defendants were unable, unwilling, or incapable of meaningfully engaging in a discussion about what process was required to provide aliens with a meaningful opportunity to contest finding that their fear was reasonable. *See* April 10, 2025 Rough Tr. at 48:10–13 ("THE COURT: What's an appropriate number of days? MR. ENSIGN: Your Honor, our -- we think it should be shorter than [21 days]. I'm not prepared to say exactly what that period is."). To tailor its preliminary injunction as narrowly as possible, the Court has chosen to use the timeframe that Defendants proposed when developing their own forms for this scenario. *Supra* note 46. Though these forms may never have been formally adopted, they would appear to, at a minimum, reflect the agencies' determination—on two separate occasions spanning a period of nearly 20 years—of an appropriate period of time during which an alien should be permitted to object to an adverse determination.

[50] It is clear that courts can still "grant relief once a deportee crosses the border." *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (citing *Rumsfeld v. Padilla*, 542 U. S. 426, 447, n. 16 (2004); *Boumediene v. Bush*, 553 U. S. 723, 732 (2008)).

after discovery. The Court orders the parties to conduct expedited discovery on this issue and file a status update addressing a proposed discovery plan by April 25, 2025.[51]

## C.    Bond

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c). *See, e.g.*, *Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond"); *see also da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020) (waiving the bond requirement where it would pose a hardship on petitioners and unduly restrict the federal rights at issue); *Pineda v. Skinner Services, Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (concluding that district court did not abuse its discretion when it did not require low-wage laborers to post a bond).

## V.    Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification (Dkt. 4) is GRANTED and motion for a preliminary injunction (Dkt. 6) is GRANTED in part.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  April 18, 2025                                       Judge, United States District Court

---

[51] The Court notes that Plaintiffs have not requested injunctive relief based on the right to make claims under 8 U.S.C. § 1231(b)(3)(A) beyond the named Plaintiffs. This is consistent with the limitation on certain relief under 8 U.S.C. § 1252(f)(1). *See Galvez*, 52 F.4th at 829–30. The Court thus limits its Order as to statutory claims to apply only to the named Plaintiffs while ensuring CAT protection to all similarly situated individuals.

48

## DECLARATION OF JOHNNY SINODIS

I, Johnny Sinodis, hereby declare as follows:

1.  I am a partner at Van Der Hout LLP, which is located at 360 Post Street, Suite 800, San Francisco, CA 94108. I have personal knowledge of the matters stated herein.

2.  I represent the person identified in the email correspondence filed on May 7, 2025, with the Court. Dkt. 90-4. I can confirm that my client has a final order of removal to the Philippines, which was issued on March 11, 2025.

3.  The information in this declaration is based on (1) notes that I took during two phone calls with my client on May 7, 2025, at approximately 1:00 p.m. Pacific Standard Time (the first call lasted about ten minutes before the call ended due to time limits, and my client called me back a few minutes later) and (2) calls I have had with various U.S. Immigration and Customs Enforcement (ICE) officers.

4.  As background, my client is currently detained at the South Texas ICE Processing Center, a facility run by The GEO Group. He was previously detained at the Northwest ICE Processing Center (NWIPC) in Tacoma, Washington. While at NWIPC, he was issued an order of removal on March 11, 2025. He thereafter was told by his deportation officer (DO) that he was scheduled to be on a removal flight to the Philippines on either April 27 or 28, 2025.

5.  Approximately two weeks before April 27, my client was transferred to Texas. He was told by an ICE officer in Tacoma that the decision to transfer him came from "headquarters." He has been detained at the South Texas ICE Processing Center for about three weeks, and he spent some amount of time (he is unsure as to the total number of days) in another facility in Texas prior to being transferred to the South Texas ICE Processing Center. Contrary to what he was told by the ICE officer in Tacoma, he was not put on a flight to the Philippines on April 27 or

Declaration of Johnny Sinodis        1        Case No. 1:25-cv-10676-BEM

April 28.

6. On May 5, 2025, my client called me in the middle of the day to say that he was scheduled to be interviewed by ICE. That night, around 7:00 p.m. Pacific Standard Time, my client called me and said that two ICE officers informed him during his interview that he would be removed to Libya. The officers at some point showed him a one-page document saying he would be removed to Libya, which shocked my client. The officers said it would be the quickest way for him to get out of custody. My client asked whether he had a choice, and the officers told him that he did not. The officers then took the one-page document and said it would be in my client's possessions, which would be returned to him once removed from the United States.

7. To date, I have not received any notification from ICE regarding the decision to send my client to Libya.

8. On May 6, 2025, my client called me in the middle of the day to say that the money in his commissary account had been "zeroed out," which usually occurs before someone is transferred from the facility and/or prior to removal from the United States.

9. On the evening of May 6, 2025, at around 6:00 p.m., I, along with another attorney at my office, contacted the South Texas ICE Processing Facility by phone to request a copy of the notice that my client had received informing him he would be removed to Libya and to request that he be provided a reasonable fear interview. We were told by a front-line ICE officer that my client's assigned DO was not present at the facility, and that he was unable to access complete information about him on the computer system. He informed us, however, that there was no notation that my client was scheduled to be removed to Libya. The officer claimed to be surprised to hear that my client had been informed he would be removed to Libya and repeatedly stressed that, because my client is Filipino, he should be removed to the Philippines. The officer

Declaration of Johnny Sinodis                    2                    Case No. 1:25-cv-10676-BEM

assured me that my client would not be removed to Libya or anywhere else before the following day (May 7), and said he was not scheduled for any "commercial" or "chartered" flight. He used the words "commercial" and "chartered."

10. Before and after this phone call on May 6, 2025, I sent a series of emails to ICE, which were filed with the Court on May 7, 2025.

11. On May 7, 2025, in the morning, I along with my colleague again contacted the South Texas ICE Processing Center. The officer we spoke with said that the South Texas facility had no control over my client's removal, and that those decisions were made by ICE in Tacoma. He stated that we needed to contact ICE in Tacoma to request a reasonable fear interview. He further informed me that my client was not scheduled for removal on May 7, 2025. He stated several times that he had no idea why our client was informed he would be removed to Libya, and that he was Filipino and set to be removed to the Philippines.

12. At this point, I emailed counsel in the instant matter to provide them an update as to my communications with ICE.

13. I, along with my colleague, then contacted the Tacoma ICE Processing Center and requested to speak to the officers assigned to my client's case. The officer we spoke with was not the officer assigned to my client. This officer was also shocked to hear that our client had been informed he would be removed to Libya. When we requested to speak to a supervisor and the officer assigned to my client given the emergency situation, the officer replied "I can assure you this is not an emergency because that emergency does not exist," referring to the potential of a flight to Libya. The officer then transferred the call to the officer assigned to my client, who did not answer the phone. We repeatedly attempted to contact the officer assigned to my client and the supervisor at the facility between 9:00 a.m. and 12:30 p.m. Pacific Standard Time but

Declaration of Johnny Sinodis                3                Case No. 1:25-cv-10676-BEM

received no response.

14. During this period of time, I emailed the Office of the Principal Legal Advisor in Tacoma, Washington, and asked (1) that my client be provided with a reasonable fear interview and (2) that I be provided notice of the decision to remove him to Libya. A true and correct copy of that email is attached hereto.

15. Just before 12:30 p.m. Pacific Standard Time on May 7, 2025, Supervisory Deportation and Detention Officer Garza from San Antonio ICE called me. He told me that he had received my emails and was looking into the situation. He stated that he had "no explanation" for what my client had been told and said something along the lines of "I cannot guarantee that did not happen" but that it "is not right and it makes no sense." Officer Garza then told me that he would give me another call, hopefully by the end of the day. I have not heard from Officer Garza since that time.

16. Several minutes before 1:00 p.m. on May 7, 2025, my client called me from the South Texas ICE Processing Center. He stated that he was woken up by officers at around 2 a.m. on May 7, 2025. Shortly thereafter, GEO Group Correctional Emergency Response Team (CERT) members dressed in full riot gear entered his pod and told him that he would be leaving in five minutes.

17. Between 2:40-2:50 a.m., the CERT Team members returned to transfer him and twelve other individuals out of his pod.

18. At one point, my client heard a GEO employee say, out loud, "Really, CERT?," as if in disbelief of the display of force.

19. The CERT Team took my client to the facility's intake space, where he was held for around thirty minutes to an hour.

Declaration of Johnny Sinodis  4  Case No. 1:25-cv-10676-BEM

20. The facility did not allow him to change into his regular clothes, which they normally would do when removing someone from the facility for any reason, including for a deportation flight. Instead, he and the twelve other individuals were processed out of the facility in jumpsuits.

21. My client states that one other individual is Mexican, and another is Bolivian. My client informed me that both of these individuals have removal orders to their home countries and had been told that their countries will accept them.

22. As to the Mexican national, my client told me that, after he was informed that he would be removed to Libya, he called the Mexican Consulate to explain what was happening. The Mexican consul responded that ICE could not send him to Libya.

23. During the process of being processed out of the facility, my client recognized that the two ICE officers who had interviewed him on Monday were present for his transfer.

24. My client's belongings were packed for him, as if the CERT Team and ICE officers were trying to move him out of the facility quickly.

25. My client asked one of the ICE officers if the group was still going to Libya and the officer said yes.

26. While being processed out of the facility, my client and the rest of the group were placed in shackles. The shackles were fixed around their ankles and waist.

27. My client was then placed on to a bus outside the facility with the twelve other members of the group. The bus resembled a school bus. It was all white and had an image of a bird on it.

28. My client observed that two people on the bus had logos that read "G4S." One of the characters in the logo is red. On information and belief, G4S is a British multinational private security firm.

Declaration of Johnny Sinodis 5 Case No. 1:25-cv-10676-BEM

29. When my client and the other individuals asked these G4S employees for information as to what was happening, the G4S employees said that they did not know and did not have any information.

30. On the bus, my client and the rest of the group remained shackled at the ankles and waist.

31. ICE officers did not board the bus with my client. Instead, ICE vehicles served as an escort for the bus.

32. My client states that the bus was driven to what appeared to be a military airport where a large military plane was waiting.

33. My client and the rest of the group were never taken off the bus. They remained on the bus, sitting next to the large military plane, for approximately three to four hours.

34. At some point in the morning, rather than being shuffled off the bus and onto the large military plane, the bus drove back to the South Texas ICE Processing Facility. My client says that they arrived back at the facility around 11:00 a.m. Central Standard Time on May 7.

35. My client and the rest of the group were taken off the bus and placed into the Special Housing Unit (SHU—also known as solitary confinement). Officers informed the group that they were not in trouble but that they could be held in SHU for twenty-four hours.

36. My client added that, if he had to interpret how the officers were acting once the bus returned to the facility, he would say they looked "peeved," as if they were disappointed by what was occurring.

37. My client has since been returned to the dorm where he was housed prior to being woken up abruptly and transferred out of the facility in the early morning hours of May 7. Nobody at the facility has communicated to my client whether they will attempt to remove him to Libya again or at any point in the future. I also have not received any further correspondence from ICE.

Declaration of Johnny Sinodis          6          Case No. 1:25-cv-10676-BEM

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 12th day of May 2025 at San Francisco, California.

_____
Johnny Sinodis
Declarant

## DECLARATION OF TIN THANH NGUYEN

I, Tin Thanh Nguyen, hereby declare as follows:

1. I am an attorney in private practice at the Law Office of Tin Thanh Nguyen, PLLC, which is located at 6769 Albermarle Rd, Suite B, Charlotte, NC 28212. I have personal knowledge of the matters stated herein.

2. I represent a person identified in the email correspondence filed on May 7, 2025, with the Court. Dkt. 90-2. I can confirm that my client has a final order of removal to Vietnam, which was issued by the San Francisco Immigration Court in May 2014. He has been reporting regularly to U.S. Immigration and Customs Enforcement (ICE) on an Order of Supervision since about July 2014.

3. The information in this declaration is based on telephone calls I had with my client on May 8 and May 9, 2025, in which he informed me about what had happened to him earlier in the week and also confirmed information I learned from attorneys and advocates who spoke to my client's partner on or about May 6 and May 7. I also directly spoke to his partner on May 7, 2025.

4. As background, my client is currently detained at the South Texas ICE Processing Center, a facility run by GEO Group. Immigration officers took him into custody when he appeared at a yearly ICE check-in in Los Angeles, California, on March 20, 2025. He spent a night in Los Angeles and then ICE transferred him to Adelanto Detention Center where he was detained for about three weeks. ICE then transferred him to Phoenix, Arizona via a van where he then took a flight to Seattle, WA so that ICE could pick up other detainees. Then ICE flew him to Texas and detained him in a county jail for 3-4 days before transporting him to San Antonio, Texas before finally arriving at the South Texas ICE Processing Center on or about April 18, 2025.

5. On Monday, May 5, 2025, ICE officers brought my client and approximately 22 other men to an office area within the South Texas ICE Processing Center, and then the men were brought into an office one by one to meet with approximately three immigration officers. My client believes he was the first of the men to be brought into the office. My client speaks some

EXHIBIT 21
App. 220

English but does not understand technical and legal jargon and is not comfortable reading or writing in English. He was given a document, written only in English, which the officers told him would allow him to become a free man, but then they told him that he would be free in Libya. My client did not understand the form itself or how he could be free in a country that he knew nothing about and had no permission to reside in. As a result, he refused to sign the document. The ICE officers kept trying to convince him to sign the paper and told him that he would be deported to Libya no matter what he did. However, he never signed the paper. He still has the document. He was forced by ICE officers to sign another paper, which had his photograph and fingerprints on it, while he was handcuffed. They grabbed his hand and moved it with the pen so that he would sign the document. The officers never told him that he could raise a claim that he was afraid to go to Libya because he would be tortured there. He did not have a lawyer at this time.

6. After he continued to refuse to sign the document referencing deportation to Libya, the ICE officers handcuffed him and brought him into a different room, which appeared to be a medical office. He believes that they checked his blood pressure at this point. After all of the men had been interviewed, he was placed in solitary confinement for approximately 24 hours. He believes that some of the other men who did not sign the paperwork were also placed in solitary confinement after their interviews.

7. My client called his partner to inform her what had occurred. I learned about the situation after my client's partner contacted a community organization who contacted attorneys, including me. One of the attorneys attempted to schedule a time to meet with my client on May 7, 2025, at 7 pm CST, but was told by an administrator at 6 am on May 7 that he was no longer at the detention facility.

8. At approximately 2:30 am on May 7, 2025, my client was abruptly woken up by guards in camouflage tactical gear, who told him to put his hands through the food slot in the cell door and handcuffed him. The guards had on their backpacks and client said that they appeared like they were going to war. He, along with 12 other men, were placed in a containment cell together. They all remained in the detention center jumpsuits and their feet were shackled and hands

Declaration of Tin Thanh Nguyen          2          Case No. 1:25-cv-10676-BEM

Appx.222

cuffed. My client believes he saw between 20 to 30 guards in riot gear, and there were about four officers involved with moving each person. He stated that the guards treated him roughly, like he was a military enemy or an animal. If any of the men spoke, the guards yelled aggressively at them to shut up.

9. My client and the other men were moved from the containment cell to a white bus with metal screens on the windows. There was a bus driver and one other individual on the bus with the men, neither of whom appeared to be wearing DHS uniforms.

10. Soon after they boarded the bus, the bus left the detention center and drove for what he believes was more than one hour. They arrived at a military base, which my client believes was Lackland Air Force Base in San Antonio. Throughout the base, there were people in military uniform and military vehicles. My client and the other men on the bus were silent; my client was extremely scared and unsure of what was happening.

11. The bus stopped next to a large airplane, which appeared large enough to transport tanks and military vehicles. The hatch or cargo door of the C-17 airplane was open so he could see military personnel loading the airplane. At some point, the bus moved to a different side of the airplane, and my client saw what appeared to be a military vehicle fueling up the airplane. In addition to the military personnel, my client also saw people, who he thinks were ICE officers, standing outside of the airplane and bus. Additionally, he saw someone setting up to take pictures near the plane.

12. Approximately 3 or 4 hours later, the bus left the military base and returned to the South Texas ICE Processing Center. My client and the other men were released from the bus in the same way that they boarded: with approximately 20 to 30 military soldiers in riot gear removing them from the bus. My client and the other men were brought to segregated cells in the detention center and left there for approximately 24 hours; while in the cells they could not talk to each other, make telephone calls, or shower. Subsequently, all of the men were released into another housing unit at the detention. At this point, they could again make telephone calls, and he contacted his partner to inform her what had happened to him.

Appx.223

13. On May 7, 2025, I submitted a notice of entry of appearance as counsel (Form G-28) electronically on behalf of my client and was able to speak with him about his experiences by telephone both after he returned to the detention facility on May 8 and 9 and via video conference on May 12.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 13th day of May 2025 at Charlotte, North Carolina.

_____
Tin Thanh Nguyen
Declarant

Appx.224

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **D.V.D**, *et al.* | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | CIVIL NO.: 2:25-cv-10676-BEM |
| | : | |
| **U.S. Department of Homeland** | : | |
| **Security**, *et al.* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**DECLARATION OF BRIAN ORTEGA**

I, Brian Ortega, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am employed by U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), as the Assistant Field Office Director (AFOD) for the ERO Phoenix Field Office. I have held this position since January 2022. Included in my official duties as an AFOD in the ERO Phoenix Field Office is the responsibility of assisting in and the managing, monitoring, scheduling, and executing removal orders for aliens in ICE custody at the Eloy Detention Center in Eloy, Arizona.

1

Appx.225

2. I provide this declaration based on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

3. I am aware of the above captioned litigation. While preparing this declaration, I reviewed information contained in the official records and databases maintained by ICE regarding the immigration and custody status of the named Plaintiff (O.C.G.).

4. On March 25, 2025, I signed a declaration that stated: "On or about February 21, 2025, prior to O.C.G being removed to Mexico, ERO verbally asked O.C.G. if he was afraid of being returned to Mexico. At this time, O.C.G. stated he was not afraid of returning to Mexico." ECF No. 31-1 at ¶ 13.

5. This statement was based on ICE's ENFORCE Alien Removal Module[1] entries indicating that O.C.G. did not fear return to Mexico. *See* Ex. 1.

6. Upon further investigation conducted pursuant to the Court's discovery order, ICE was unable to identify an officer or officers who asked O.C.G. if he feared a return to Mexico.

7. At the time I signed my declaration on May 25, 2025, I believed the EARM

---

[1] ICE's ENFORCE Alien Removal Module (EARM) is a software tool that provides an integrated and comprehensive view of an alien's detention and removal status. The software permits staff to place comments into each alien's record regarding the status of their case, any court updates, or other relevant case information.

Appx.226

entries to be accurate.

I declare, under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

Executed this 16th day of May, 2025.

BRIAN A ORTEGA

Digitally signed by BRIAN A ORTEGA
Date: 2025.05.16 14:40:40 -07'00'

Brian Ortega
Assistant Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

3

# Exhibit 1



**Comments**

| FILTER BY COMMENT TYPE | SHOW / HIDE DELETED COMMENTS |
|---|---|
| ☑ EARM | ☑ Show Deleted Comments |
| ☑ EADM | |
| ☑ ATD | |

FILTER BY ENTERED DATE

-- All Dates -- ▼

All of the following comments are related to Case # ███████
Results: 25 total

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

ICE O.C. App. 000229

| Date Entered | Entered By | Type | Comments |
|---|---|---|---|
| 02/21/2025 09:44 AM | ▮ | EARM | Non citizen was positively identified for removal; 2 print via a biometric capturing device, face to photo comparison, and verbal confirmation of various I 213 biographical data points  Subject does not have fear of returning to Mexico |
| 02/20/2025 05:17 PM | ▮ | EARM | SDDO  Subject is a Final Order  No pending appeals  No pending stays or filings with 9th CCA  No impediments to removal  Concur with Officers departure checks  Subject meets criteria for Mexico and will be asked about fear prior to transport |
| 02/20/2025 05:10 PM | ▮ | EARM | WHO GRANTED FOR GUATEMALA  SUBJECT MEETS CRITERIA FOR OTM TO MEXICO |
| 02/20/2025 05:09 PM | ▮ | EARM | Per the mandatory EAZ pre departure checklist the following checks were completed prior to removal  SQ11, NN13, NN16, PCQS, BIA, EARM, PACER, PLANET, CIS, CLAIMS, DACA, KST Query, and medical  BIA cleared no pending appeals  A file forwarded to SDDO for review and concurrence of pre departure checks |
| 02/20/2025 04 26 PM | ▮ | EARM | WHO granted to Guatemala  Both parties waived  Removal packet created  Subject to be considered for OTM to Mexico |
| 02/12/2025 03 36 PM | ▮ | EARM | Attorney Mario Alvarez successfully filed an electronic G 28 through ERO eFile on 2025 02 12 15 35 00 on behalf of subject  Contact info is  602 345 1305 malvarez@firrp org  The G 28 is available in the Supporting Information tab for download and placement in the A file |
| 01/21/2025 11 00 AM | ▮ | EARM | Case follow up merits 02/19/2025 |
| NON-RESPONSIVE | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |

**Comment Type Legend**

EARM: Case comments entered in the EARM system.

EADM: Detention comments entered in the EADM system.

ATD: Alternatives to Detention comments entered in the EARM system.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

ICE O.C. App 000286

## DECLARATION OF JACQUELINE BROWN

I, Jaqueline Brown, hereby declare as follows:

1.      I am the Director & Associate Professor Immigration & Deportation Defense Clinic University of San Francisco School of Law in San Francisco, CA as well as the Legal Director of the Sonoma Secure Families Collaborative in Healdsburg, CA. I make this declaration in support of Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction. I have personal knowledge of the matters stated herein.

2.      I represent N.M., who is the person identified in the email correspondence attached hereto. N.M. is from Myanmar. He has a final removal order from Omaha, Nebraska issued in August 2023. N.M. is a member of the certified class in *D.V.D. v. DHS*, No. 1:25-cv-10676-BEM (D. Mass). He was one of the men whom the Department of Homeland Security (DHS) previously attempted to deport to Libya on May 7, 2025.

3.      My representation of N.M. began after he was initially informed by DHS that we would be deported to Libya. I, along with a group of other attorneys agreed to take on representation of the Libya group. Because one of those attorneys, Jonathan Ryan, is based in Texas, he filed a Notice of Appearance (Form G-28) on behalf of the men so that he could meet with them in person.

4.      Mr. Ryan met with N.M. on Friday May 16, 2025. At that meeting, Mr. Ryan explained to N.M. my willingness to represent him pro bono and he agreed. Mr. Ryan has told me that N.M. has limited English proficiency and that his best language is Karen. Mr. Ryan also told me that he explained to the group that they had the right to express a fear of return to a third country.

5.      On May 17, 2025 at 4:49 PM CT, Mr. Ryan received a notification via ICE's e-File Portal that N.M. had been transferred from the South Texas Detention Center to the Port Isabel

Appx.231

Detention Center, in Port Isabel, Texas. On May 19, 2025 at 4:44 CT, Mr. Ryan received an email from a Supervisory Detention and Deportation Officer at the Harlingen Field Office, Port Isabel Detention Center providing a document that the officer alleged had been served on N.M. The document stated that it was a "Notice of Removal" to inform N.M. that ICE intended to remove him to South Africa. The certificate of service stated that the contents of the notice were read to N.M. in English without an interpreter at 10:59 and that N.M. refused to sign the document.

6.      Mr. Ryan has informed me that, approximately ten minutes later he received a notification that the sender sought to recall the email message attaching the notice of removal to South Africa.

7.      Later that day, at 6:35 PM CT, Mr. Ryan received a second email from the Supervisory Detention and Deportation Officer, with a document that the officer alleged had been served on N.M. The attachment, utilizing the same form as was used for the notice to South Africa, stated that it was a "Notice of Removal" to inform N.M. that ICE intended to remove him to *South Sudan*. The certificate of service stated that the contents of the notice were read to N.M. in English without an interpreter at "1748" and that N.M. refused to sign the document.

8.      On the evening of May 19, 2025, I contacted Plaintiffs' counsel to inform them that N.M. received the notice of removal to South Sudan. At that point, I had scheduled a video meeting with N.M. at 9 a.m. CT the next day (May 20).

9.      Today, I checked the online ICE detainee locator and saw that N.M. was no longer in the ICE detainee locator. I then emailed the Port Isabel Detention Center Law Visit email address to confirm whether N.M. was located at the facility.

Appx.232

10.     At 8:27 AM PT, a Port Isabel Detention Center Detention Officer responded that N.M. had been removed "this morning." I emailed to ask to which country N.M. was removed, and the officer responded, at 8:36 AM PT, "South Sudan."

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge.  Executed this 20th day of May 2025 at San Francisco, California.

                                 Jaqueline Brown
                                   Declarant

| From: | Jonathan Ryan |
|---|---|
| To: | Kristin Macleod-Ball |
| Subject: | Fwd: Service of Documents |
| Date: | Tuesday, May 20, 2025 12:22:10 PM |
| Attachments: | Notice of Removal to Third Country.pdf |

FYI

From: ██████████  < ██████████ @ice.dhs.gov>
Date: Mon, May 19, 2025 at 4:44 PM
Subject: Service of Documents
To: jdr@jonathandryanlaw.com <jdr@jonathandryanlaw.com>
Cc: ██████████  < ██████████ @ice.dhs.gov>, ██████████
< ██████████ @ice.dhs.gov>

Good afternoon,

This email is intended to notify to the Law Office of Jonathan Ryan of the attached document served to your client ██████████ .

Thank you,

██████████

Supervisory Detention and Deportation Officer

Harlingen Field Office, Port Isabel Detention Center

Enforcement Removal Operations

U.S. Immigration and Customs Enforcement
Office: ██████████ Cell: ██████████

Appx.234

## U.S. DEPARTMENT OF HOMELAND SECURITY
### U.S. Immigration and Customs Enforcement

Alien Name: ██████████

Alien Number (A #): ██████████

Date: **May 19, 2025**

### NOTICE OF REMOVAL

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) intends to

remove you to _South Africa_

---

### CERTIFICATE OF SERVICE

I certify that, on today's date, the contents of this notice were read to

██████ in the _English_ language, and I served the alien a copy of this notice in person.

_Refused to Sign_
Signature of Alien

_5-19-25_
Date of Service

_[signature]_
Title and Signature of ICE Official

_1059_
Time of Service

_N/A_
Name or Number of Interpreter (if applicable)

Appx.235

| From: | Jonathan Ryan |
|---|---|
| To: | Kristin Macleod-Ball |
| Subject: | Fwd: Recall: Service of Documents |
| Date: | Tuesday, May 20, 2025 12:21:42 PM |

FYI

---------- Forwarded message ---------
From: █████████████ <█████████████@ice.dhs.gov>
Date: Mon, May 19, 2025 at 4:55 PM
Subject: Recall: Service of Documents
To: jdr@jonathandryanlaw.com <jdr@jonathandryanlaw.com>
Cc: ███████████ <███████████@ice.dhs.gov>, ███████████
<███████████@ice.dhs.gov>

█████████████ would like to recall the message, "Service of Documents".

| | |
|---|---|
| **From:** | Jonathan Ryan |
| **To:** | Kristin Macleod-Ball |
| **Subject:** | Fwd: Service of Documents |
| **Date:** | Tuesday, May 20, 2025 12:22:16 PM |
| **Attachments:** | Notice of Third Country Removal.pdf |

FYI

---------- Forwarded message ---------
From: ██████████████ <██████████████@ice.dhs.gov>
Date: Mon, May 19, 2025 at 6:35 PM
Subject: Service of Documents
To: jdr@jonathandryanlaw.com <jdr@jonathandryanlaw.com>
Cc: ██████████ <██████████@ice.dhs.gov>, ██████████
<██████████@ice.dhs.gov>

Good afternoon,

This email is intended to notify to the Law Office of Jonathan Ryan of the attached document served to your client ██████████.

Any questions/concerns please email or call me.

Thank you,

██████████████
Supervisory Detention and Deportation Officer

Harlingen Field Office, Port Isabel Detention Center

Enforcement Removal Operations

U.S. Immigration and Customs Enforcement
Office: ██████████ Cell: ██████████

Appx.237

**U.S. DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**

Alien Name: ███████████

Alien Number (A #): ███████████

Date: **May 19, 2025**

## NOTICE OF REMOVAL

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) intends to

remove you to **South Sudan**_____.

---

### CERTIFICATE OF SERVICE

I certify that, on today's date, the contents of this notice were read to

███████_____ in the English_____ language, and I served
the alien a copy of this notice in person.

REFUSED TO SIGN_____          **5/19/2025**
Signature of Alien                       Date of Service

SDPO                                     1748
Title and Signature of ICE Official      Time of Service

N/A
Name or Number of Interpreter (if applicable)

| From: | Jacqueline Brown |
|---|---|
| To: | matt@nwirp.org |
| Cc: | Kristin Macleod-Ball; Trina Realmuto |
| Subject: | Re: Libya now South Sudan (Libya 13) |
| Date: | Tuesday, May 20, 2025 11:39:38 AM |

Yes



**From:** Jacqueline Brown <jmbrown@usfca.edu>
**Sent:** Tuesday, May 20, 2025 10:33 AM

**To:** PIDC, LawVisit <lawvisit.pidc@akimaip.com>
**Subject:** Re: [EXTERNAL] VTC/VAV meeting with client ████████

To which country?

On Tue, May 20, 2025 at 8:27 AM PIDC, LawVisit <LawVisit.PIDC@akimaip.com> wrote:

> He was removed this monrning
>
> **Thank you,**

On Tue, May 20, 2025 at 8:35 AM Matt Adams <matt@nwirp.org> wrote:
  Do we have your permission to include this email chain to opposing counsel?

  On Tue, May 20, 2025 at 8:34 AM Jacqueline Brown <jmbrown@usfca.edu> wrote:
    Yes I already did

    On Tue, May 20, 2025 at 8:33 AM Matt Adams <matt@nwirp.org> wrote:
      Can you respond and ask for confirmation to where he was removed to?

      On Tue, May 20, 2025 at 8:31 AM Jacqueline Brown <jmbrown@usfca.edu> wrote:
        Replied to the email, did not receive a response and I learned that ████ was removed this morning!

Appx.240



## Re: [EXTERNAL] VTC/VAV meeting with client ☆

[REDACTED] **External** Inbox

**P** **PIDC, LawVisit** 8:27 AM ↩ ⋯
to me ⌄

He was removed this monrning

**Thank you,**
[REDACTED]
**Detention Officer**
**Port Isabel Detention Center**
1-[REDACTED]

**From:** Jacqueline Brown <jmbrown@usfca.edu>
**Sent:** Tuesday, May 20, 2025 10:19 AM
**To:** PIDC, LawVisit
<LawVisit.PIDC@akimaip.com>
**Subject:** Re: [EXTERNAL] VTC/VAV meeting with
client [REDACTED]

Can you confirm that Mr. [REDACTED] is still in
Port Isabel? He is no longer in the detainee
locator system.
Jacqueline M. Brown
Director & Associate Professor
Immigration & Deportation Defense Clinic
University of San Francisco School of Law
2130 Fulton Street | San Francisco, CA 94117

On Mon, May 19, 2025 at 6:43 PM Matt Adams <matt@nwirp.org> wrote:



On Mon, May 19, 2025 at 6:36 PM Jacqueline Brown <jmbrown@usfca.edu> wrote:

Good evening,
Wanted to let you all know that ████████ received a notice today (which he refused to sign and is attached) that he would be sent to South Sudan. Email was sent to Jonathan Ryan because he had filed his G28 first and visited the whole group in person last week. ████ was moved this weekend to Port Isabel. I am meeting with him on Wednesday 9am video. Notice came from:



I will respond to the email requesting an RFI, but is there anything else I should be stating at this point?

Thank you-
Jacqueline
Jacqueline M. Brown
Director & Associate Professor
Immigration & Deportation Defense Clinic
University of San Francisco School of Law
2130 Fulton Street | San Francisco, CA 94117
Legal Director, Sonoma Secure Families Collaborative
449 Hudson Street | Healdsburg, CA 95448
direct phs. 415-422-3330 | 707-473-8932

--
Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611
(206) 587-4025 fax

--
Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611
(206) 587-4025 fax

--
Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611
(206) 587-4025 fax

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity,<br><br>Defendants. | Civil Action No. 25-cv-10676-BEM |

## AUTHENTICATING DECLARATION OF GLENDA M. ALDANA MADRID

Appx.244

I, Glenda M. Aldana Madrid, declare under penalty of perjury that the statements that follow are true and correct to the best of my knowledge and belief:

1.      I am a staff attorney at the Northwest Immigrant Rights Project. I am one of the counsel for Plaintiffs and class members in the above-captioned case. I submit this declaration in support of Plaintiffs' Emergency Motion for a Temporary Restraining Order on behalf of class members removed to South Sudan.

2.      I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would testify completely as set forth below.

3.      Enclosed as Exhibit A is a true and correct copy of an email I received from class member T.T.P.'s partner seeking help regarding T.T.P.'s removal to a third country.


        Executed this 20th day of May 2025, in Seattle, Washington.


                                        s/ *Glenda M. Aldana Madrid*
                                        Glenda M. Aldana Madrid

1

Appx.245

**EXHIBIT A**

Case 26-1212 Document 1076-8 42095 Page 251 2-3 Date Filed 05/2026/2026 Page 4 Entry ID: 6798915



Glenda Aldana Madrid <glenda@nwirp.org>

---

**█ █ █ P█ - Removal to Third Country**
1 message

---

█ K█ █@gmail.com>                                Tue, May 20, 2025 at 11:52 AM
To: glenda@nwirp.com

Hi Glenda,

I believe my husband, █ █ P█, and 10 other individuals that were sent to the Port Isabel Detention Center in Los Fresnos, TX were deported to South Africa or Sudan early this morning. Yesterday ICE gathered them together and told them that they (ICE) intended to send them all to South Africa and everyone refused to sign the document presented. Later, ICE came back and said they were going to send them to Sudan instead. I checked the ICE detainee locator and my husband and another person from his group are no longer in the system. I called my husband's ICE officer and was told that he's been "booked out" but the officer didn't know where he was sent.

The order of removal signed by a judge is to deport my husband back to his country of origin, Vietnam, not to any other third country. The detention centers are overcrowded with inhumane conditions, and ICE is sending people anywhere they can to combat the overcrowding. This is not right! I fear that my husband and his group, which consist of people from Laos, Thailand, Pakistan, Korea, and Mexico are being sent to South Africa or Sudan against their will. Please help! They cannot be allowed to do this, this is not the first and won't be the last if they keep getting away with it! I am begging for your assistance.. 🥺🥺

N█

Appx.247

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **D.V.D., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **25-10676-BEM** |
| | ) | |
| **U.S. DEPARTMENT OF HOMELAND** | ) | |
| **SECURITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM ON PRELIMINARY INJUNCTION**

**MURPHY, J.**

At today's hearing, the Court found that Defendants violated the Preliminary Injunction entered in this case by failing to provide six non-citizen class members a "meaningful opportunity" to assert claims for protection under the Convention Against Torture before initiating removal to a third country. *See* Dkt. 64 at 46–47.

Defendants maintain that ambiguity in the phrase "meaningful opportunity" precipitated this controversy. Indeed, when the Court issued the Preliminary Injunction, it declined to elaborate on what constitutes a "meaningful opportunity," preferring instead to let experience show through hard cases the finer points of what is required under the Due Process Clause.

To be clear, this is not one of those hard cases. Giving every credit to Defendants' account, the non-citizens at issue had fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane and sent to a country as to which the U.S. Department of State issues the following warning: "Do not travel to South Sudan due to **crime**, **kidnapping**, and **armed conflict**." *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphasis in original). As detailed on the record during today's

Appx.248

hearing, further facts regarding the unavailability of information, the hurried and confused notice that the individuals received, language barriers, and attorney access compound and confirm this Court's finding that no reasonable interpretation of the Court's Preliminary Injunction could endorse yesterday's events.

Nevertheless, given Defendants' position that further detail would help Defendants comply, the Court offers the following summary and clarification of its Preliminary Injunction:

All removals to third countries, *i.e.*, removal to a country other than the country or countries designated during immigration proceedings as the country of removal on the non-citizen's order of removal, *see* 8 U.S.C. § 1231(b)(1)(C), must be preceded by written notice to both the non-citizen and the non-citizen's counsel in a language the non-citizen can understand. Dkt. 64 at 46–47. Following notice, the individual must be given a meaningful opportunity, **and a minimum of ten days**, to raise a fear-based claim for CAT protection prior to removal. *See id.* If the non-citizen demonstrates "reasonable fear" of removal to the third country, Defendants must move to reopen the non-citizen's immigration proceedings. *Id.* If the non-citizen is not found to have demonstrated a "reasonable fear" of removal to the third country, Defendants must provide a meaningful opportunity, and a minimum of fifteen days, for the non-citizen to seek reopening of their immigration proceedings. *Id.*

This Preliminary Injunction applies to the Defendants, including the Department of Homeland Security, as well as their officers, agents, servants, employees, attorneys, any person acting in concert, and any person with notice of the Preliminary Injunction. Fed. R. Civ. P. 65(d)(2); *see also* Dkts. 86, 91. Accordingly, no Defendant may avoid their duty to follow the Preliminary Injunction by involving or ceding responsibility to any other person. *See* Dkt. 86.

**So Ordered.**

/s/ Brian E. Murphy

Brian E. Murphy

Dated: May 21, 2025        Judge, United States District Court

Appx.250

## DECLARATION OF O███ C███████ G████████

I, O███ C███████ G████████, make the following declaration based on my personal knowledge and declare under the penalty of perjury that the following is true and correct:

1. My name is O███ C███████ G████████. I am over the age of 18 and am competent to testify regarding the matters described below.

2. Right now I am living in ███████ Guatemala. Since I arrived here, I have been living in hiding, in constant panic and constant fear. I've been here living this way for over two months.

3. I am living alone in a house my sister owns. I don't stay in any of the places I used to stay because the story is the same as ever here: gay people like me are targeted simply for who we are. This produces constant fear and panic. My mother and cousins and other relatives have been helping me out so that I don't have to go outside very much, because this situation is so dangerous for me.

4. I feel fear and the danger any time I go out. For me, it's not easy. The people who targeted me before know who I am and they have shown me twice before what they're capable of. I don't want to get attacked a third time. The first days when I got back, I had to go out and get groceries because I had nothing. And just then, one of those who had threatened me before passed on a motorcycle. I was out with a hat on and I do not think they spotted me, but I saw them. They are out here, and I don't feel safe. In any moment, I could go out and they could be walking there and they would recognize me. I have so much panic because of this.

5. When I leave, I wear hats and try to camouflage myself so that no one recognizes me and sees that I have returned. But living a normal life is impossible here, and I live in fear because of the past hateful incidences I experienced.

6. I can't be gay here, which means I cannot be myself. I cannot express myself and I am not free. I feel so vulnerable for many reasons – I can't be a person who can walk in the streets, who gets a coffee, or who buys groceries because someone might hit me or threaten me. Anything could happen to me in the street. My family is always warning me to be careful, be careful. The situation here has been so difficult for me here. Since I've been back, I've had to be more private. I can't be the same me as I was before, because I am constantly afraid. I am the smallest version of myself because I have so much more fear.

7. My experiences the last times that I was targeted and threatened demonstrate that the police here don't do anything. They do not support our community—that is, people who are not heterosexual and who are gay like me. There is so much discrimination: the police whisper and joke behind our backs. They do not ever support us the way we need. I don't want to be another number, another statistic,

Appx.251

and I do not want this to happen to me again. There is no justice for me here.

8. I never go to visit my mom because people know she is my mom and I don't want to expose either of us to the risk, I don't want people to continue to associate us. So I see her as little as possible, and only when she can come to me. My niece and others come and drop off things to me. My mother doesn't want me to expose myself too much or to be out in the streets too much. This situation is not easy for me nor for my family.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in ▮▮▮▮▮▮▮▮ Guatemala on May 22 , 2025.

By: ▮▮▮▮▮▮▮▮▮▮

I, _____Sydney Maltese___, hereby certify that I am fully competent in both English and Spanish languages, that I have read the above English document to O▮▮ C▮▮▮ G▮▮▮▮ in true and accurate Spanish to the best of my ability, and that he has signed his name with full understanding of its contents.

Dated this _22_ day of May, 2025.

Sydney Maltese

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

s/ *Aaron Korthuis*
Aaron Korthuis
Northwest Immigrant Rights Project
615 2nd Ave, Ste 400
Seattle, WA 98104
aaron@nwirp.org

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | ) |
|---|---|
| **D.V.D, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **U.S. DEPARTMENT OF HOMELAND** | ) |
| **SECURITY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

Civil Action No.
25-10676-BEM

**MEMORANDUM AND ORDER**
**ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**MURPHY, J.**

Plaintiff O.C.G. has no known criminal history. After suffering multiple violent attacks, O.C.G. sought protection in the United States, where an immigration judge granted him withholding of removal from his native country, Guatemala. This means that the immigration judge found it more likely than not that O.C.G. would suffer serious harm if sent back to Guatemala. Two days later, and without any notice, O.C.G. was placed on a bus and sent to *Mexico*, a country where he was previously held for ransom and raped. O.C.G. had said during his immigration proceedings that he was afraid of being sent to Mexico, and even presented evidence of the violence he had experienced there. But the immigration judge told O.C.G.—consistent with this Court's understanding of the law—that he could not be removed to a country other than his native Guatemala, at least not without some additional steps in the process. Those necessary steps, and O.C.G.'s pleas for help, were ignored. As a result, O.C.G. was given up to Mexico, which then sent him back to Guatemala, where he remains in hiding today.

This is the second time Plaintiffs have asked this Court to order the return of O.C.G. The first time, the Court declined to do so because the facts were in dispute—Defendants had submitted a declaration, made under oath, that O.C.G., prior to removal, affirmatively stated that he had no fear of being sent to Mexico. Dkt. 31-1 ¶ 3. O.C.G. adamantly contested this fact, submitting his own declaration stating that he was only told about Mexico essentially as it was happening and that he begged to speak to his attorney but was denied. Dkt. 8-4 ¶ 9. Because of this factual disagreement, the Court declined to conclusively credit O.C.G.'s account and instead ordered discovery of additional evidence. Dkt. 64 at 47–48; Dkt. 80.

Last week, on May 16, 2025, Defendants acknowledged an "error" in their previous filings and statements to the Court. Dkt. 103 at 2. Defendants admitted, hours before the scheduled deposition of the witness who could allegedly verify the facts included in the prior declaration made under oath, that, in fact, there was no such witness and therefore no reliable basis for the statements put forward by Defendants. Defendants apparently cannot find a witness to support their claim that O.C.G. ever said that he was unafraid of being sent to Mexico. The only evidence before the Court therefore is O.C.G.'s uncontroverted assertion that he was given no notice of his transfer to Mexico and no opportunity to explain why it would be dangerous to send him there. Defendants' retraction of their prior sworn statement makes inexorable the already-strong conclusion that O.C.G. is likely to succeed in showing that his removal lacked any semblance of due process, *see* Dkt. 40 at 6; Dkt. 64 at 42 n.43, and it otherwise alleviates concern about the appropriateness of relief. Accordingly, Plaintiffs' motion for a preliminary injunction is GRANTED.

Although a preliminary injunction is always an exceptional remedy, never awarded as of right, *Peoples Federal Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012), the

Court notes that this result is not otherwise so extraordinary. Courts, including district courts, regularly find that return is the appropriate remedy when a removal is found to be unlawful. *See, e.g., Grace v. Whitaker*, 344 F. Supp. 3d 96, 144–45 (D.D.C. 2018) (ordering return of non-citizen plaintiffs entitled to further process prior to removal), *aff'd in relevant part, rev'd in part and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020); *L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 860–61, 863–68 (S.D. Cal. 2019) (ordering government to allow return of parents wrongfully prevented from petitioning for asylum); *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (denying stay of district court order to facilitate return of non-citizen wrongfully removed); *J.O.P. v. United States Dep't of Homeland Sec.*, 2025 WL 1431263, at *1 (4th Cir. May 19, 2025) (denying stay of district court order to facilitate return of non-citizens removed in violation of a settlement agreement). Defendants acknowledge that there are procedures in place for facilitating return upon a court's order. *See* Dkt. 64 at 30 n.34. No one has ever suggested that O.C.G. poses any sort of security threat. In general, this case presents no special facts or legal circumstances, only the banal horror of a man being wrongfully loaded onto a bus and sent back to a country where he was allegedly just raped and kidnapped.

Finally, it must be said that, while mistakes obviously happen, the events leading up to this decision are troubling. The Court was given false information, upon which it relied, twice, to the detriment of a party at risk of serious and irreparable harm. Defendants then exacerbated that risk by placing O.C.G.'s full name on the public docket, in violation of this Court's Order, Dkt. 13.[1] *See* Dkt. 105 at 8. The Court has ordered discovery, including depositions of the individuals involved in the false declaration and underlying data entries, to better understand how this happened.

---

[1] The Court accepts Defendants' apology, Dkt. 113 at 1 n.1, and finds no further action necessary.

Appx.256

## I.   **Factual Background**

O.C.G. is a native and citizen of Guatemala.[2]  Dkt. 31-1 ¶ 4.  In March 2024, O.C.G. entered the United States without prior authorization.  *Id.* ¶ 5.  O.C.G. alleges that he presented himself for asylum at the border and was denied an interview.  Dkt. 8-4 ¶ 2.  In any event, he was deported shortly thereafter to Guatemala.  *Id.*

In April 2024, O.C.G. decided to try again and crossed Mexico on his way to the United States.  *Id.* ¶ 3.  There, he was raped and held hostage until a family member paid ransom.  *Id.*  In May 2024, O.C.G. again arrived at the United States and was arrested by Border Patrol.  Dkt. 31-1 ¶ 5.  This time, however, he was referred to an asylum officer after expressing fear of return to Guatemala.  *Id.* ¶¶ 8–9.  That officer determined that O.C.G. had a credible fear of persecution or torture and initiated withholding-only proceedings, *id.* ¶ 10, where an immigration judge agreed and determined that it was more likely than not that O.C.G. would be persecuted or tortured if sent back to Guatemala, *see id.* ¶ 11.[3]  Accordingly, O.C.G. was granted withholding of removal from Guatemala.  *Id.*

During the withholding-only proceedings, O.C.G. asked if he might be sent to Mexico—because he was afraid of being sent to Mexico—and the immigration judge told him, "we cannot send you back to Mexico, sir, because you're a native of Guatemala."  Tr. of June 17, 2024 H'rg at 10:37–13:12.[4]  During another hearing before the immigration court, O.C.G. described in detail the violence he experienced while in Mexico.  Tr. of Feb. 19, 2025 H'rg at

---

[2] The Court has "broad discretion in deciding what evidence to consider in connection with a motion for preliminary injunction."  *Rice v. Wells Fargo Bank, N.A.*, 2 F. Supp. 3d 25, 31 (D. Mass. 2014).  Generally speaking, the relevant facts here do not appear to substantially be in dispute.

[3] *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16.

[4] The Court has been provided with audio and partial transcripts of O.C.G.'s hearings in immigration court.

4

28:48–33:40. At the close of that hearing, the government's attorney clarified with the immigration judge that, because Guatemala was the country of removal designated on O.C.G.'s order of removal, that was the only relevant country for purposes of the withholding-only proceedings, and the immigration judge agreed. *Id.* at 1:23:37–1:25:07.

Two days after being granted withholding of removal, and with no advanced warning, O.C.G. was put on a bus and sent to Mexico. Dkt. 8-1 ¶¶ 8–9. According to O.C.G., he begged the officers to let him call his attorney but was refused. *Id.* ¶ 9. Until one week ago, Defendants maintained that O.C.G. verbally stated that he was not afraid of being sent to Mexico, based on data entries made by immigration officers. *See* Dkt. 31 at 4. However, after speaking with those officers, Defendants no longer make that claim. Dkt. 103 at 2.

In Mexico, O.C.G. was given the option of being detained indefinitely while trying to obtain asylum there—a country where he has consistently maintained that he faces a significant risk of violence—or of being sent back to Guatemala—the very country from which an immigration judge awarded him withholding from removal due to the risk of persecution that he faced. Dkt. 8-1 ¶ 10. O.C.G. chose Guatemala. *Id.* He remains there today. *Id.* ¶ 1.

Just yesterday, O.C.G. submitted a declaration informing the Court of his current status. Dkt. 123. He reports living in constant fear of his attackers, *id.* ¶ 4, being unable to leave the place where he is staying, *id.* ¶ 6, not being able to rely on the police to protect him, *id.* ¶ 7, and not being able to see his mother for fear of exposing her to violence, *id.* ¶ 8, among other hardships.

## II.     **Legal Background**

On March 23, 2025, Plaintiffs filed this action and sought a temporary restraining order and preliminary injunction, in part, for the return of Plaintiff O.C.G. Dkts. 1, 6–8. The Court

denied this part of Plaintiffs' request, recognizing that there was a factual dispute as to the circumstances surrounding O.C.G.'s removal, Dkt. 64 at 47–48, and ordering discovery, Dkt. 80.

On May 18, 2025, in the course of that discovery, Defendants filed their "Notice of Errata," "correcting" their previous declaration, Dkt. 31-1, regarding the removal of O.C.G. Dkt. 103 at 2. The original version of the Errata filing included an exhibit that publicly revealed O.C.G.'s full name and other identifying information, *see* Dkt. 105 at 8, contrary to this Court's prior order concerning the use of pseudonyms, Dkt. 13.

Shortly thereafter, Plaintiffs moved again for a temporary restraining order and preliminary injunction. Dkt. 104. Following briefing by both parties, Dkts. 105, 113, the Court heard oral argument, Dkt. 117, and took the motion under advisement.

## III.   Legal Standard

"[A] preliminary injunction preserve[s] the status quo during the pendency of trial-court proceedings." *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 (1st Cir. 2024). The "status quo" refers to "the last uncontested status which preceded the pending controversy." *Baillargeon v. CSX Transportation Corp.*, 463 F. Supp. 3d 76, 82–83 (D. Mass. 2020) (quoting *United Steelworkers of Am., ALF-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987)). Here, the "status quo" is properly viewed as the pre-February 21, 2025 status, before O.C.G.'s removal, *i.e.*, "the last uncontested status . . . preced[ing] the pending controversy." *Id.*[5]

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together*

---

[5] Accordingly, as a purely academic matter, the Court corrects itself and agrees with Plaintiffs that this is not technically a "mandatory" injunction. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010). Nevertheless, for the reasons stated below, the Court has applied heightened scrutiny.

*Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The last two factors "merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Likelihood of success "weighs most heavily" in the preliminary injunction analysis. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

"[T]he more drastic the effect of the injunction, the more carefully the district court should consider staying its hand." *A-Copy, Inc. v. Michaelson*, 599 F.2d 450, 451 (1st Cir. 1978); *see also Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995) (requiring the movant to meet a higher standard where "an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits"). "But the denial of preliminary relief may in some situations be as fraught with adverse consequences to plaintiff as the granting of relief is fraught with consequences to defendant. In such cases, a court may have no choice but to act even though its decision has the effect of providing most or even all of the ultimate relief in dispute." *A-Copy*, 599 F.2d at 451. Here, the preliminary injunction grants "most or even all," *id.*, of the ultimate relief sought by O.C.G. individually. It is not obvious that this relief could be undone. *See Tom Doherty*, 60 F.3d at 33–34. Accordingly, the Court has exercised caution and held Plaintiffs to a stringent standard, as appropriate under the circumstances. *See* Dkt. 40 at 6, 8; Dkt. 64 at 9, 47–48.

## IV.    Discussion

### A.    Likelihood of Success

O.C.G. is likely to succeed in showing that his due-process rights were violated. This Court has jurisdiction to hear those claims, and the appropriate remedy is return.

7

### 1.    Jurisdiction

The Court has already addressed most of Defendants' jurisdictional arguments in the context of Plaintiffs' first motion for a preliminary injunction. *See* Dkt. 64 at 10–27. The Court finds the remainder unpersuasive.

Defendants argue that O.C.G.'s case defies the underlying motivation behind 8 U.S.C. § 1252(g), apparently more so than the class claims. Dkt. 113 at 2 (quoting *Reno v. American-Arab Anti-Discrimination*, 525 U.S. 471, 482 (1999) [hereinafter, "*AADC*"]). The Court reads *AADC* differently, *see* Dkt. 64 at 20 (quoting *AADC* at 485 & n.9), but in any event, Defendants' gestalt argument cannot supersede the plain text of the statute as interpreted by authority binding on this Court. *See id.* at 20–21 (citing *Kong v. United States*, 62 F.4th 608 (1st Cir. 2023)).

Next, Defendants claim that O.C.G. received "specific warning[s]" of the possibility of third-country removal during his withholding-only proceedings. Dkt. 113 at 3–4. According to Defendants, these warnings were sufficient to effectively push any claims O.C.G. might have regarding third-country removal into the claim-channeling function of 8 U.S.C. §§ 1252(a)(5) and (b)(9). But the Court has already found that such general warnings are meaningless when the non-citizen has not received notice of removal as to any particular third country. Dkt. 64 at 17 & n.24. O.C.G. is, in fact, the perfect example of why this is correct—he *did* present evidence of his fear of return to Mexico during his withholding-only proceedings, Tr. of Feb. 19, 2025 H'rg at 28:48–33:40, and even asked the immigration court whether he needed to seek protection from Mexico as well, Tr. of June 17, 2024 H'rg at 10:37–13:12. To that, the immigration judge told him—correctly in this Court's estimation—that he only needed to worry about the country of removal already identified on his removal order. *Id.*

Still looking toward sections 1252(a)(5) and (b)(9), Defendants' next argument does highlight one difference between O.C.G.'s circumstances and those of class members not yet

8

removed—once O.C.G. was removed, he obviously had notice of his third-country removal. Dkt. 113 at 4–5. With that notice, Defendants argue, O.C.G. could have moved to reopen his administrative case. *Id.*; *see also* Dkt. 64 at 14–17 (explaining motions to reopen).[6] This would, according to Defendants, make O.C.G.'s claim subject to the channeling provisions.

In reality, O.C.G.'s post factum notice is a distinction without a difference. As an initial matter, O.C.G. could not have moved to reopen his immigration case, as he was subject to a reinstated order of removal. *See Garcia Sarmiento v. Garland*, 45 F.4th 560, 564 (1st Cir. 2022) ("[P]ersons subject to reinstated removal orders following unlawful reentry are barred from reopening their orders of removal." (citing *Cuenca v. Barr*, 956 F.3d 1079, 1088 (9th Cir. 2020))). Even if O.C.G. could have moved to reopen, it is unclear what precisely that motion would have said—motions to reopen must be based on evidence that was "not available and could not have been discovered or presented at the former hearing," *Escobar v. Garland*, 122 F.4th 465, 472 (1st Cir. 2024) (quoting *Rivera-Medrano v. Garland*, 47 F.4th 29, 35 (1st Cir. 2022)). Here, there was no new evidence to discover or present; O.C.G. had already testified about the violence he experienced in Mexico. The awkwardness of trying to imagine how this issue might theoretically be shoehorned into a motion to reopen only confirms that this is not the type of claim one is expected to "cram[]" into judicial review of a final order of removal. *See Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018).

More fundamentally, Defendants confuse O.C.G.'s claim for the remedy he seeks. As with every other Plaintiff in this case, O.C.G.'s claim arose the moment he was denied notice and a meaningful opportunity to present his fear-based claim. For the same reasons as every other

---

[6] Defendants also point out that O.C.G. could still ask the immigration court to reopen sua sponte. Dkt. 113 at 4–5. However, the Court has explained how the theoretical possibility of sua sponte reopening provides no meaningful relief. Dkt. 64 at 14–16.

Appx.262

plaintiff, that claim could not have been raised in the immigration proceedings, substantially because it occurred outside of, and following the conclusion of, those proceedings. Defendants seem to say that O.C.G. might be able to get his fear-based claims adjudicated some other way. The Court thinks that is dead wrong, but, *even if he could*, that would not alter the fact that his rights were violated in the first place. That wrong calls for a remedy, and the most obvious remedy is to go back and do it over, with proper notice and an opportunity to be heard.

Finally, Defendants argue that the Court implicitly "review[s]" the regulations implementing the Convention Against Torture through its due-process finding. Dkt. 113 at 5 (quoting FARRA § 2242(d)). Defendants point to no regulation that they contend this Court contradicts, nor do they cite any authority for their expansive understanding of what it means to "review" regulations. *Cf. Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 258–59 & n.14 (3d Cir. 2008) (finding FARRA § 2242(d) inapplicable where the regulation itself is non-problematic); *Harrington v. Chao*, 372 F.3d 52, 59 (1st Cir. 2004) (in agency context, holding that inconsistency does not arise where a regulation is silent as to a particular issue).

### 2. <u>Merits</u>

The Court has already found it likely that O.C.G.'s removal lacked due process. *See* Dkt. 40 at 6; Dkt. 64 at 42 n.43. Indeed, at no point in this litigation have Defendants put forth an account of O.C.G.'s removal that would comport with what this Court has found due process requires. *Compare* Dkt. 31-1 (March 25, 2025 Declaration of Brian Ortega) ¶ 13 (indicating that O.C.G. was verbally notified on the day of his removal), *with* Dkt. 64 (requiring written notice to both non-citizen and counsel); *see also A. A. R. P. v. Trump*, 605 U.S. —, 2025 WL 1417281, at *2 (May 16, 2025) ("Under these circumstances, notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not

10

pass muster."). Accordingly, the likelihood that O.C.G. is correct in asserting that his due-process rights were violated, in this Court's view, has long hovered near certainty.

It is therefore somewhat of a misnomer to say that O.C.G.'s likelihood of success has "increased" on account of Defendants' new admission of "error" in its Notice of Errata, Dkt. 103 at 2. Due process is, in some sense, a binary—one either receives what the Constitution requires, or one does not. It has been clear that O.C.G. did not receive what the Constitution requires.

Nevertheless, O.C.G. seeks injunctive relief, and injunctions require consideration of equity and prudence. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Until recently, Defendants have maintained that O.C.G. verbally "stated he was not afraid of returning to Mexico" on the day of his removal. *See* Dkt. 31-1 ¶ 13. Of course, Plaintiffs have always disputed this fact.[7] Nevertheless, the Court felt that the possibility that O.C.G. acquiesced in his own third-country removal warranted further factfinding before the Court engaged its equitable powers. Dkt. 64 at 47–48.

Now, Defendants admit that they "cannot identify any officer who asked O.C.G. whether he had a fear of return to Mexico." Dkt. 103 at 2 ("advis[ing] the Court of an error in the March 25, 2025, declaration of Brian Ortega" and submitting a "correct[ed]" declaration). Setting aside concerns about how this "error," *id.*, came to be a central tenet of Defendants' case, its renunciation relieves the Court of fear that it might be overextending itself in granting this remedy.

---

[7] Dkt. 8-4 ¶ 9 (Declaration of O.C.G.):

> After I was taken out of the prison the immigration officer told me that I was being deported to Mexico. I was so scared and surprised. I told him that I had won my case and showed him the order the judge gave me. But the immigration officer said the order had expired. I begged him to let me call my attorney but he said it was too late to call anyone now.

*See also Grace*, 344 F. Supp. 3d at 144–45; *L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d at 860–61, 863–68; *Abrego Garcia*, 145 S. Ct. at 1018; *J.O.P.*, 2025 WL 1431263, at \*1.

### B.   Irreparable Harm

The Court has no reason to doubt the immigration judge's finding that O.C.G. is more likely than not to be persecuted if he stays in Guatemala.[8]  Nor does the Court question the sincerity of O.C.G.'s sworn declarations, endorsed by counsel.  *See* Dkts. 8-4, 123.

Defendants make no specific argument regarding irreparable harm in their brief.  Dkt. 113 at 6–7.  At oral argument, in response to inquiry from the Court, Defendants stated only that this case calls for heightened scrutiny and that the Court should consider O.C.G.'s "choice" to go back to Guatemala over indefinite detention in Mexico, a country where he has consistently maintained that he faces a significant risk of violence, *see* Dkt. 8-4 ¶¶ 3, 9–10.  The Court does take this fact into account but finds that it likely says more about O.C.G.'s options than his preferences.

O.C.G. daily risks not only loss of life but "of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (J., Brandeis).  This factor militates strongly in favor of granting the injunction.

### C.   Balance of Equities and Public Interest

The Court recognizes that the public has an interest both in preventing wrongful removals, *Nken v. Holder*, 556 U.S. 418, 436 (2009), and in the prompt execution of removal orders, *id.* "There is, of course, a strong public interest in the protection of constitutional rights." *Harris v. Adams*, 757 F. Supp. 3d 111, 144 (D. Mass. 2024).

---

[8] Defendants' inadvertent exposure of O.C.G.'s identity, while now remedied on the docket, only heightens concern as a bell that perhaps cannot be un-rung given the permanent nature of the internet.  It is of little comfort that Plaintiffs appear to have done a thorough and diligent job of getting the information removed as fast as possible from major sources. *See* Dkt. 105 at 3, 8, 17–18 & n.8.

As with irreparable harm, Defendants make no argument that an injunction would go against the public interest or otherwise be unduly burdensome. Dkt. 113 at 6–7. On balance, the Court finds that the public benefits from living in a country where rules are followed and where promises are kept. Rules are tedious and frustrating, but they also keep us fair and honest. At oral argument, Defendants' counsel confirmed that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." FARRA § 2242(a). The return of O.C.G. poses a vanishingly small cost to make sure we can still claim to live up to that ideal.

## V. Conclusion

The Court finds that all four preliminary injunction factors weigh in favor of granting the injunction. Accordingly, Plaintiffs' motion for preliminary injunction is GRANTED.[9]

Defendants are hereby ORDERED to take all immediate steps, including coordinating with Plaintiffs' counsel, to facilitate[10] the return of O.C.G. to the United States. Defendants shall file a status report within five days of this Order updating the Court as to the status of O.C.G.'s return.

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c). *See, e.g., Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not

---

[9] Plaintiffs' motion for a temporary restraining order is therefore denied as moot.

[10] The Court notes that "facilitate" in this context should carry less baggage than in several other notable cases. O.C.G. is not held by any foreign government. Defendants have declined to make any argument that facilitating his return would be costly, burdensome, or otherwise impede the government's objectives. The Court anticipates that Defendants will take at least the same level of action as is routine to return *lawfully* removed aliens. *See* ICE Policy Directive No. 11061.1, § 3.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012). Given that this Court has found that Plaintiffs are likely to succeed in showing that O.C.G.'s removal was *not* lawful, there is no reason for Defendants to take *less* action than they would when returning a lawfully removed alien.

mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond").

**So Ordered.**

|                        | /s/ Brian E. Murphy                      |
| ---------------------- | ---------------------------------------- |
|                        | Brian E. Murphy                          |
| Dated:  May 23, 2025   | Judge, United States District Court      |

## DECLARATION OF SIMON SANDOVAL-MOSHENBERG

I, Simon Sandoval-Moshenberg, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the statements that follow are true and correct to the best of my knowledge and belief:

1.  I am a partner with the law firm Murray Osorio PLLC. I am one of the counsel for the plaintiff in *Abrego Garcia v. Noem*, No. 8:25-cv-00951 (D. Md.).

2.  In the *Abrego Garcia* case, during an in-court evidentiary hearing on July 10-11, 2025, Defendants provided the plaintiff and the Court with the attached document, dated July 9, 2025, from Todd M. Lyons, Acting Director, U.S. Immigration and Customs Enforcement (ICE), to all ICE employees, with the subject "Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)."

3.  Counsel for the plaintiff then moved the attached document into evidence as an exhibit during the in-court evidentiary hearing on July 10-11, 2025, and it was accepted into evidence by the presiding judge.

Executed this 14th day of July 2025 at Fairfax, Va.

Simon Sandoval-Moshenberg

1

PLAINTIFFS' EXHIBIT NO. ___2

CASE NO. ____ PX 25-951

IDENTIFICATION: ____ JUL 10 2025

ADMITTED: _____ JUL 10 2025

**To All ICE Employees**
**July 9, 2025**

**Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)**

On June 23, 2025, the U.S. Supreme Court granted the Government's application to stay the district court's nationwide preliminary injunction in *D.V.D. v. Department of Homeland Security*, No. 25-10676, 2025 WL 1142968 (D. Mass. Apr. 18, 2025), which required certain procedures related to providing a "meaningful opportunity" to assert claims for protection under the Convention Against Torture (CAT) before initiating removal to a third country. Accordingly, all previous guidance implementing the district court's preliminary injunction related the third country removals issued in *D.V.D.* is hereby rescinded. Absent additional action by the Supreme Court, the stay will remain in place until any writ of certiorari is denied or a judgment following any decision issues.

Effective immediately, when seeking to remove an alien with a final order of removal—other than an expedited removal order under section 235(b) of the Immigration and Nationality Act (INA)—to an alternative country as identified in section 241(b)(1)(C) of the INA, ICE must adhere to Secretary of Homeland Security Kristi Noem's March 30, 2025 memorandum, *Guidance Regarding Third Country Removals*, as detailed below. A "third country" or "alternative country" refers to a country other than that specifically referenced in the order of removal.

If the United States has received diplomatic assurances from the country of removal that aliens removed from the United States will not be persecuted or tortured, and if the Department of State believes those assurances to be credible, the alien may be removed without the need for further procedures. ICE will seek written confirmation from the Department of State that such diplomatic assurances were received and determined to be credible. HSI and ERO will be made aware of any such assurances. In all other cases, ICE must comply with the following procedures:

- An ERO officer will serve on the alien the attached Notice of Removal. The notice includes the intended country of removal and will be read to the alien in a language he or she understands.
- ERO will <u>not</u> affirmatively ask whether the alien is afraid of being removed to the country of removal.
- ERO will generally wait at least 24 hours following service of the Notice of Removal before effectuating removal. In exigent circumstances, ERO may execute a removal order six (6) or more hours after service of the Notice of Removal as long as the alien is provided reasonable means and opportunity to speak with an attorney prior to removal.
  - Any determination to execute a removal order under exigent circumstances less than 24 hours following service of the Notice of Removal must be approved by the DHS General Counsel, or the Principal Legal Advisor where the DHS General Counsel is not available.

Appx.269

- If the alien <u>does not</u> affirmatively state a fear of persecution or torture if removed to the country of removal listed on the Notice of Removal within 24 hours, ERO may proceed with removal to the country identified on the notice. ERO should check all systems for motions as close in time as possible to removal.
- If the alien <u>does affirmatively state</u> a fear if removed to the country of removal listed on the Notice of Removal, ERO will refer the case to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under section 241(b)(3) of the INA and the Convention Against Torture (CAT). USCIS will generally screen the alien within 24 hours of referral.
    - USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal.
    - If USCIS determines that the alien has not met this standard, the alien will be removed.
    - If USCIS determines that the alien has met this standard and the alien was not previously in proceedings before the immigration court, USCIS will refer the matter to the immigration court for further proceedings. In cases where the alien was previously in proceedings before the immigration court, USCIS will notify the referring immigration officer of its finding, and the immigration officer will inform ICE. In such cases, ERO will alert their local Office of the Principal Legal Advisor (OPLA) Field Location to file a motion to reopen with the immigration court or the Board of Immigration Appeals, as appropriate, for further proceedings for the sole purpose of determining eligibility for protection under section 241(b)(3) of the INA and CAT for the country of removal. Alternatively, ICE may choose to designate another country for removal.

Notably, the Supreme Court's stay of removal does not alter any decisions issued by any other courts as to individual aliens regarding the process that must be provided before removing that alien to a third country.

Please direct any questions about this guidance to your OPLA field location.

Thank you for all you continue to do for the agency.


Todd M. Lyons
Acting Director
U.S. Immigration and Customs Enforcement


Attachments:

- U.S. Supreme Court Order
- Secretary Noem's Memorandum
- Notice of Removal

Appx.270

# EXHIBIT B

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **D.V.D**, *et al.* | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | CIVIL NO.: 2:25-cv-10676-BEM |
| | : | |
| **U.S. Department of Homeland** | : | |
| **Security**, *et al.* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### DECLARATION OF BRIAN ORTEGA

I, Brian Ortega, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am employed by U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), as the Assistant Field Office Director (AFOD) for the ERO Phoenix Field Office. I have held this position since January 2022. Included in my official duties as an AFOD in the ERO Phoenix Field Office is the responsibility of assisting in and the managing, monitoring, scheduling, and executing removal orders for aliens in ICE custody at the Eloy Detention Center in Eloy, Arizona.

1

Appx.272

2. I provide this declaration based on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

3. I am aware of the above captioned litigation. While preparing this declaration, I reviewed information contained in the official records and databases maintained by ICE regarding the immigration and custody status of the named Plaintiff (O.C.G.). I also spoke with the officers who made the EARM entries and served O.C.G. the removal paperwork.

4. On March 25, 2025, I signed a declaration that stated: "On or about February 21, 2025, prior to O.C.G being removed to Mexico, ERO verbally asked O.C.G. if he was afraid of being returned to Mexico. At this time, O.C.G. stated he was not afraid of returning to Mexico." ECF No. 31-1 at ¶ 13.

5. This statement was based on ICE's ENFORCE Alien Removal Module[1] entries indicating that O.C.G. did not fear return to Mexico. *See* Ex. 1.

6. ERO training dictates that entries made into EARM should be reliable and accurate.

7. On or about May 14, 2025, I became aware that the February 21, 2025,

---

[1] ICE's ENFORCE Alien Removal Module (EARM) is a software tool that provides an integrated and comprehensive view of an alien's detention and removal status. The software permits staff to place comments into each alien's record regarding the status of their case, any court updates, or other relevant case information.

2

EARM entry may have been erroneous.

8. I understand that Deportation Officer (DO) ███████ S███ who served the removal paperwork to O.C.G. does not recall if he asked O.C.G. if he had a fear of being removed to Mexico.

9. I understand that DO ████████ Z███ who entered the February 21, 2025 EARM entry assumed that DO ███████ S███ asked O.C.G. if he had a fear of being removed to Mexico because that was the practice of DO ████████ Z███ at that time and DO ████████ Z███ believed that was the practice of other deportation officers also.

10. DO ████████ Z███ did not confirm with DO ████████ S███ that DO S███ had, in fact, asked O.C.G. if he had a fear of being removed to Mexico.

11. I have reminded DO ████████ Z███ about the importance of ensuring the information entered into EARM is correct and instructed him that he should not make entries in EARM that are based on assumption alone.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

Executed this 17th day of July, 2025.

BRIAN A ORTEGA
Digitally signed by BRIAN A ORTEGA
Date: 2025.07.17 15:15:32 -07'00'

Brian Ortega
Assistant Field Office Director
Enforcement and Removal Operations

3

Appx.274

U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Appx.275



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BALTIMORE IMMIGRATION COURT**

Respondent Name:

<br>

To:

A-Number:

Riders:
In Withholding Only Proceedings
Initiated by the Department of Homeland Security
Date:

## ORDER OF THE IMMIGRATION JUDGE

Respondent's Motion to Reopen

**Order:**

On ▮▮▮▮▮▮▮, 2019, the Department of Homeland Security (DHS) filed an I-863 with the Baltimore Immigration Court placing the applicant into withholding only proceedings. The applicant subsequently filed an application for withholding of removal which was granted on ▮▮▮▮▮▮▮, 2020. Appeal was waived by both parties.

The applicant filed a motion to reopen with the Court on July ▮, 2025. The DHS filed an opposition on July ▮▮, 2025. The respondent, through counsel, states that applicant was presented with a form indicating he will be removed to Mexico. The applicant now expresses a fear of being removed to Mexico.

The applicant argues that time and numerical bars do not apply to this motion, and DHS should have initiated reopening these proceedings to designate a new country of removal to then give the applicant notice and opportunity to apply for protection from said third country. The Court disagrees. Here, the applicant was placed into withholding only proceedings. The applicant is not being removed to the country which he was granted withholding of removal, Guatemala. Rather, DHS has named a third country of removal as authorized. INA Sec. 241(b)(2)(E).

The Court is not persuaded that an individual granted withholding of removal is entitled to a potentially endless series of applications and full hearings before immigration judges with respect to a fear of torture in any and all potential alternate or third countries for removal.

The Court notes that litigation is underway throughout the federal court system over the issue of third-country removals and the process due to individuals who fear torture in a third, non-designated country. See, e.g., Department of Homeland Security v. D.V.D., No. 24A1153 (S.Ct.

Appx 276

<span style="color:red">**EXHIBIT A**</span>

June 23, 2025) (granting application for stay of district court injunction that prohibited third country removals without certain process).

For these reasons, the motion to reopen is DENIED.

Further, the motion to stay removal is also DENIED.

Immigration Judge: Shirole, Pallavi █████████

Appeal:    Department of Homeland Security: ☐ waived  ☐ reserved

             Respondent: ☐ waived  ☐ reserved

Appeal Due:

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ███████████████████████████████ | A-Number : █████████

Riders:

Date: ████████ By: ███████████████, Court Staff

Appx.277

Case 1:25-cv-10676-BEM     Document 188     Filed 06/25/25     Page 1 of 4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity,<br><br>Defendants. | Civil Action No. 25-cv-10676-BEM |

## INDEX OF EXHIBITS IN SUPPORT OF
## PLAINTIFFS' REPLY IN SUPPORT OF PARTIAL SUMMARY JUDGMENT
## AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Appx.278

| Exhibit | Description |
|---------|-------------|
| A | Second Declaration of Tin Thanh Nguyen, dated November 13, 2025 |
| B | Declaration of Alma Leonie David, dated December 5, 2025 |
| C | Declaration of Sibusiso Magnificent Nhlabatsi, dated November 14, 2025, and Attachment (*Sibusiso Magnificent Nhlabatsi v. The Commissioner of Correctional Services & Another* [1623/2025] [2025] SZHC 224 (Oct. 27, 2025) (Decision of High Court of Eswatini)) |
| D | Declaration of Jacqueline M. Brown, dated November 12, 2025 |
| E | Declaration of Anwen Hughes, dated December 7, 2025 |
| F | Declaration of Mia Unger, dated November 14, 2025 |
| G | Declaration of Patrick Taurel, dated December 5, 2025, and Attachments (Declarations of K.S., E.A., and D.A., submitted in *D.A. v. Noem*, No. 1:25-cv-03135 (D.D.C.)) |
| H | Declaration of Hannah Bridges, dated December 4, 2025 |
| I | Declaration of Juanita Goebertus, dated December 5, 2025 |
| J | Second Declaration of Guadalupe Perez, dated November 28, 2025 |
| K | Declaration of Ana Dionne-Lanier, dated November 13, 2025 |
| L | Declaration of Derrick J. Hensley, dated November 10, 2025 |
| M | Declaration of Jessica A. Dawgert, dated October 8, 2025 |

1

| | |
|---|---|
| N | Declaration of Florence Weinberg, dated December 5, 2025 |
| O | Letter re: Coercive Third Country Deportations and Abusive Conditions of Confinement in Immigration Detention at Fort Bliss, TX (Camp East Montana), dated December 8, 2025, and Attachments (Exhs. A – D, Declarations of "Isaac," "Benjamin," "Abel," and "Eduardo"), available at https://www.aclu.org/documents/ice-letter-re-fort-bliss and https://www.aclu.org/documents/fort-bliss-declarations-december-2025 |
| P | Declaration of Laura Belous, dated December 8, 2025, and Attachments (Plaintiff O.C.G.'s release order and Order of Supervision) |
| Q | Declaration of ███████████, dated November 19, 2025 |
| R | Declaration of █████████, dated November 28, 2025, and Attachments (copies of electronic tickets for flights from Nicaragua to Caracas, Venezuela and from Caracas, Venezuela to Tehran, Iran) |
| S | Declaration of ██████████████, dated November 14, 2025 |
| T | Declaration of ███████, dated November 13, 2025 |
| U | Declaration of █████████████, dated November 26, 2025 |
| V | Declaration of ███████████████, dated November 14, 2025 |
| W | Declaration of ████████, dated November 11, 2025 |
| X | Declaration of ██████████, dated November 7, 2025 |
| Y | Declaration of ████████████, dated October 28, 2025 |

2

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF).


<u>s/ *Trina Realmuto*</u>
Trina Realmuto
National Immigration Litigation Alliance


Dated: December 8, 2025

3

## SECOND DECLARATION OF TIN THANH NGUYEN

I, Tin Thanh Nguyen, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.        I am an attorney in private practice at the Law Office of Tin Thanh Nguyen, PLLC, which is located at 6769 Albermarle Rd., Suite B, Charlotte, NC 28212. I also have an office in Viet Nam. I am over the age of 18, and I am competent to testify regarding the matters described below.

2.        I have practiced immigration law since 2007, representing hundreds of noncitizens in their immigration proceedings, both before U.S. Citizenship and Immigration Services as well as the Executive Office for Immigration Review.

3.        I also represent clients before the National Visa Center, Embassies, and U.S. Consulates around the world, mainly in Ho Chi Minh City, Viet Nam; Phnom Penh, Cambodia; and Vientiane, Laos.

4.        I am a member of the Federal Bars of the Eastern and Western Districts of North Carolina where I regularly file petitions for Writs of Mandamus.  I have represented different Vietnamese nationals in the U.S. District Court for the Northern District of Alabama in Birmingham, AL and in the U.S. Middle District of Georgia in Columbus, GA on petitions for Writ of Habeas Corpus.

5.        For nearly twenty years, I have specialized in immigration and deportation cases involving Vietnamese, Cambodian and Laotian nationals. I have represented hundreds of Southeast Asians in the diaspora who are subject to final orders of removal and were released from immigration custody on an Order of Supervision (OSUP) because the Governments of Viet Nam, Cambodia, and Laos did not issue travel documents for their nationals.

6.        I currently represent eight clients who have been subjected to third-country removal by the U.S. government: two are in South Sudan and the other six are in Eswatini. Since their removal to South Sudan and Eswatini, I have been working to get them repatriated to Viet Nam, Cambodia, and Laos. The process has been slow and difficult, and so far, no one has been successfully repatriated yet. I make this declaration based on my conversations with my clients and their families, my communications with counsel who are also representing them or have represented

Second Declaration of Tin Thanh Nguyen                                                          1

them, my review of immigration-related documents for these clients, and my outreach to various governments and international actors and organizations.

## South Sudan - July 5, 2025

7.        I represent TTP, a Vietnamese national, and TN, a Laotian national, who were both removed to South Sudan over the Fourth of July weekend. TTP is forty-three years old. He was born in Viet Nam in 1982. He entered the United States in 1991 when he was nine years old. He had been living in the United States for thirty-four years. After completing his criminal sentence in March 2025, he immediately went into Immigration Customs Enforcement (ICE) custody because he had been ordered removed to Viet Nam in 2009. He remained in ICE custody until the end of May when he was deported from the United States.

8.        TN is forty-eight years old. He was born in Laos in 1976. He entered the United States in 1980 when he was three years old. He had been living in the United States for forty-five years. He was ordered removed in 2005 while serving time for a criminal conviction for which he served his full sentence. He was released on an order of supervision in 2023 and re-detained by ICE in March 2025.

9.        I began my representation of TTP and TN after they were deported to South Sudan. Since their deportation, I have made repeated outreach efforts to the governments of Viet Nam and Laos about their cases, with little success. I've also contacted the government of South Sudan, requesting they reach out to their home countries. On or around October 20, 2025, I learned that the United Nations International Organization for Migration (IOM), which has an Assisted Voluntary Return (AVR) program to help repatriate individuals and is involved in the repatriation efforts for two of my clients in Eswatini, is not involved in the repatriations of the men in South Sudan. I have learned through my conversations with IOM officials that their organization can only get involved if the government where the men are located officially requests its assistance with repatriation, and that the agency then liaises with the home countries to obtain the necessary paperwork to facilitate the return. For that reason, in my outreach to the South Sudanese government, I have requested that they directly reach out to IOM for assistance and support. On November 7th, I received confirmation from the South Sudanese Ambassador in Washington, D.C., Dr. Santino Fardol W. Dicken, that his government has formally asked IOM for help.

10.        I have spoken to TTP and TN only once for fifteen minutes on September 6th when I received a WhatsApp call from an unknown number from South Sudan.

However, I am able to relay messages to them through their relatives who speak to them more frequently.

11.     TTP's wife has shared with me that he is very anxious to finally be free. He has completed his criminal sentence but continues to be confined. He is frustrated about not getting any information about his situation since he does not have access to in-person legal counsel or any international humanitarian agencies. This uncertainty has taken a severe mental, emotional, and physical toll on him. His wife reports that he has lost a lot of weight since his deportation from the United States. The fear of not knowing what his future holds is deeply distressing and weighs heavily on his spirit.

12.     TN has reported to his sister that he is extremely frustrated, isolated, bored, and lonely from his situation in South Sudan. He deeply misses his family in the United States, and the separation is taking a toll on him mentally. He is ready to be released and repatriated to Laos.

### Eswatini (1st Group - July 16, 2025)

13.     My first two clients who were deported to Eswatini are DTN, a Vietnamese national, and PC, a Laotian national. They were deported to Eswatini along with nationals from Cuba, Yemen, and Jamaica around July 16, 2025. Both clients explained to me that they were not told that they were being deported to Eswatini until their plane was about to land in the country, and that all five men aboard the plane refused to sign the third-country removal notice to Eswatini they were belatedly given on the plane.

14.     At the time of their apprehension and removal, both DTN and PC had been living in the United States for a long time. DTN is thirty-four years old. He was born in Viet Nam in 1991. He came to the United States when he was fourteen months old and had been living in the United States for thirty-three years since 1992. He was ordered removed in 2018 because of a criminal conviction for which he served his full sentence and had been out on supervised release for two years when Immigration and Customs Enforcement (ICE) took him back into custody in May 2025.

15.     PC is forty-five years old. His family fled Laos in the late 1970s and sought protection in a refugee camp in Thailand where he was born in 1980. He entered the United States in 1987 when he was seven years old. He had been living in the United States for thirty-eight years. He was ordered removed in 2015 because of a

criminal conviction for which he served his full sentence and had been out on supervised release for about ten years when ICE arrested him in June 2025.

16.     I began representing DTN upon his deportation to Eswatini and request by his wife. Community organizers in the Vietnamese diaspora had been in contact with DTN since his detention in May 2025. On July 13, 2025, DTN informed the organizer and his wife that he was going to be transferred from El Paso to Louisiana, and then finally deported to Viet Nam. DTN's wife, however, did not hear from him for over twenty-four hours and learned from the ICE hotline that he had been deported, but did not know where. She only learned of his deportation to Eswatini when she saw Tricia Mclaughlin's, Assistant Secretary for Public Affairs for the Department of Homeland Security (DHS), post on X (formerly Twitter) on July 16, 2025, announcing that ICE had deported five men to Eswatini, which included a photo of her husband. After verifying his identity, I spoke to DTN's wife and mother on the phone.

17.     I started representing PC a couple of weeks after his deportation to Eswatini. The post on X did not include names, but only a photograph with criminal convictions and nationality.  On July 29, 2025, I shared the photograph of PC to different social media group pages for the Lao community in the United States, asking if anyone recognized him. Within 24 hours, I located his family, and spoke with his sister and she requested that I represent him.

18.     Being able to actually speak to the men directly to help them with their repatriation has been an ordeal. Another US lawyer, Alma David, who is representing other deported men in Eswatini, introduced me to an American attorney licensed and based in Eswatini. He learned that the five men were being held at the Matsapha Correctional Complex outside of Mbabane.

19.     On or around July 18, 2025, I asked him to visit in-person DTN and make contact with the other four men so that I can learn their identities, contact their family members in the United States, and find counsel for them. Generally, attorneys are allowed to visit prisoners from Monday through Friday. On Monday, July 21, 2025, the Attorney attempted to visit DTN and the others at Matsapha Correction Complex but correctional staff refused him access. He spoke with prison officials who assured him that the men were in good care. He then followed up with WhatsApp calls and messages to a prison official.  However, he never received a response or permission for an in-person visit at the prison.

20.     Since the Attorney was leaving the country to visit his family in the United States, he referred us to his trusted colleague, Sibusiso Magnificent Nhlabatsi,

Second Declaration of Tin Thanh Nguyen                                          4

a well-respected human rights attorney in Eswatini. Attorney Nhlabatsi made his first attempt to visit the five men on July 25, 2025. On that day, he waited from 8 am until 1 pm before the prison officials refused him access. The prison officials said that the normal prison rules do not apply to the five men because they are in a "special situation."

21.        Attorney Nhlabatsi filed a petition for Habeas Corpus with the High Court of Eswatini seeking access to the men on July 31, 2025.  Despite multiple, subsequent assurances by the government that he would be permitted to visit our clients, every time he has shown up to the prison to see the men, he has been denied access and given various reasons for the refusal. On August 5th, Attorney Nhlabatsi attempted to visit the men in prison for a second time. The prison officials told him that he was allowed to see them virtually, but not in person. On August 12th, Attorney Nhlabatsi attempted his third in-person visit. Again, he was made to wait for a long time and told that the men reportedly did not wish to see him. The prison officials eventually refused him access.

22.        When I've spoken to my clients, DTN and PC, they have told me they have never refused Attorney Nhlabatsi access and, in fact, desire to speak to him. On October 3, 2025, the High Court granted Attorney Nhlabatsi's Habeas Corpus petition seeking access to the men. However, the government of Eswatini appealed that decision to the Supreme Court of Eswatini and the matter is pending. As a result, Attorney Nhlabatsi has not been able to meet with DTN, PC, or any of the other men.

23.        About three weeks after this group of men arrived in Eswatini, my clients were finally able to make WhatsApp calls to their relatives. These calls were short video calls that were monitored and would occur weekly. Shortly after they first began calling their families, I messaged the number they called from in order to advise that I was the attorney for DTN and PC and asked that my clients be permitted to call me. However, neither of my clients was allowed to call me until late September. Now, DTN and PC call me about once a week, or every other week, usually together. They are in a room where the video from the call is projected onto a larger screen for a guard to be able to monitor what is happening.

24.        During our calls, my clients have told me that the uncertainty of what will happen to them and the monotony of being in a maximum-security prison have really been wearing them down mentally and physically. Both DTN and PC have been feeling depressed, losing weight and losing their hair. PC has been particularly distressed by his arbitrary imprisonment. On his WhatsApp calls, he appears agitated,

Second Declaration of Tin Thanh Nguyen                                                                 5

and frustrated, and is often frowning and holding his head down. He has shared that he feels like a caged animal with no end in sight. He feels hopeless.

25.  DTN and PC have both expressed frustration over being in government custody when they have already served their sentences and have not committed any offenses in Eswatini. They don't understand why they are being held in a high security prison.

26.  DTN and PC are both eager to be released. I have been working to get DTN and PC repatriated. I've made numerous outreach requests to the governments of Vietnam and Laos, both through their embassies in the United States and South Africa as well as to their respective Ministries of Foreign Affairs in Hanoi and Vientiane. Both men have local sponsors willing to host them once they arrive and I have shared their information with their governments.

27.  When I was first retained to represent DTN, I also contacted IOM immediately to let them know what was happening, but I did not receive a response. Eventually, after many messages, IOM has recognized my role as legal counsel for both DTN and PC and informed me it has accepted both men into its AVR program. From my conversation with IOM, I know that the government of Eswatini has reached out to the governments of Vietnam and Laos and is waiting to hear back from them regarding next steps for repatriating DTN and PC.

**Eswatini (2nd Group - October 6, 2025)**

28.  I also represent three other Vietnamese nationals—KVV, CCP, and TTL—and a Cambodian national—PR—who were removed to Eswatini on October 6, 2025. Two of the Vietnamese nationals' families had contacted me as their family members were in the air. They both told me that their family member had been given only about an hour's notice before being removed, and that the group appeared to be comprised of about 10 men. One of my clients had told ICE that he was afraid of being deported to Eswatini, but the officers ignored him.

29.  When they landed, DTN and PC surprisingly were able to call me and let me know about the arrival of that second batch of deported men. On that same day, the men were able to contact their families. And over the next few days, I was able to speak to all four of my clients in this new group.

30.  KVV is forty-nine years old. He was born in Viet Nam in 1976. He entered the United States in 1984 when he was eight years old. He had been living in

Second Declaration of Tin Thanh Nguyen

6

the United States for forty-one years. He was ordered removed in 2007 because of a criminal conviction for which he completed his sentence and had been out on supervised release for eighteen years when ICE arrested him in March 2025.

31.     CCP is forty-nine years old. He was born in Viet Nam in 1976. He entered the United States in 1984 when he was eight years old. He had been living in the United States for forty-one years. He was ordered removed in 2022 because of a criminal conviction for which he served his full sentence. He had been out on supervised release for three years when ICE re-detained him in June 2025.

32.     TTL is fifty-three years old. He was born in Viet Nam in 1972. He entered the United States in 1990 when he was eighteen years old. He had been living in the United States for thirty-five years. After completing his criminal sentence, he immediately went into ICE custody and was placed in removal proceedings. An immigration judge ordered him removed to Viet Nam in May 2025. He remained in immigration custody until he was deported to Eswatini.

33.     PR is forty-two years old. His family fled the genocide in Cambodia and lived in a refugee camp in Thailand, where he was born in 1982. In 1985, at the age of three, he entered the United States and had resided there for forty years. After completing his criminal sentence in January 2025, he was immediately transferred to ICE custody, where he remained until his deportation to Eswatini. While serving his sentence, he was ordered removed in 2010 to the designated country of Thailand—a country of which he is neither a citizen nor national.

34.     On October 16th and 29th, I reached out to IOM with my clients' information—including refugee documents, birth certificates, and sponsors' information—to explain their situation and get the repatriation process started. IOM advised me that the government of Eswatini had not yet requested its involvement, and that it could do nothing to help until it heard from the government first.

35.     On October 27, 2025, I called the Embassy of Eswatini to the United States in Washington, D.C.. The Embassy staff advised me to write an E-mail to Ambassador Groening requesting that he directly communicate with IOM to help individuals in the second group.

36.     I also contacted the governments of Viet Nam and Cambodia, again via their Embassies and Ministries of Foreign Affairs, and informed them of the situation. Last I heard, the government of Cambodia was working to schedule an interview with

Second Declaration of Tin Thanh Nguyen

PR in Eswatini to confirm his identity and nationality to begin the process of repatriation.

37.     On November 12, 2025, I received a WhatsApp call from PC. He informed me that an IOM official visited him and the others. It was the first time that IOM had met with anyone from the second group. I later received confirmation from PR, KVV, CCP, and TLL's relatives that they had met with IOM and signed documents requesting AVR.

38.     While this process is ongoing, I am assessing all available options to secure my clients' release from custody and, at a minimum, to ensure they have access to legal counsel in Eswatini.

39.     My clients from the second group deported to Eswatini have now been imprisoned for over a month. It is the beginning of summer and the rainy season in Eswatini. It's very hot and humid, and the prison does not have air conditioning. All of my clients are feeling miserable because of their situation, and the heat and humidity make the conditions of their indefinite imprisonment even more unbearable.

40.     According to KVV's fiancée, he appears older and skinnier from his one month in Eswatini. He is not doing well mentally and physically. He misses his loved ones in the United States and wants to be released from the prison and repatriated. His biggest fear is that he will not be able to return to Viet Nam and remain exiled in Eswatini.

41.     PR's sister says that he is extremely frustrated by his arbitrary imprisonment in Eswatini. After completing his criminal sentence, he remained in ICE custody for an additional nine months before being deported to Eswatini. The uncertainty surrounding his situation has taken a toll on his mental health, and he is eager to be released from custody and finally repatriated.

42.     CCP has been complaining to his sister that mosquitoes have become increasingly bothersome. He is constantly bitten throughout the day and night, and neither he nor the others have been provided with mosquito repellent or nets. Sleeping at night is miserable, as he covers himself completely with a blanket to avoid bites despite the heat of the summer season. In addition to these physical discomforts, the uncertainty surrounding the length of his imprisonment in Eswatini has caused significant mental exhaustion and distress.

43.     TTL is terrified that he will be imprisoned in Eswatini forever. He has repeatedly told me that the prison there never lets people go, but he is trying to stay calm by exercising daily. TTL reports that resources in the prison are scarce, particularly medication. He has dentures that require adhesive cream to eat comfortably, but it has not been provided to him. The doctor and medical staff occasionally visit, and he requests medicine to ease the pain in his mouth, but his requests remain unmet.

## Notice and Travel Documents

44.     I don't have any indication that the U.S. government had requested travel documents for any of my clients. In TTP's case, I have seen text messages showing that the deportation officer in that case had not submitted a request to Viet Nam for travel documents when the government put him on a plane to South Sudan. In DTN, KKV, CCP, and TLL's cases, it's unclear and highly improbable that ICE requested a travel document from Viet Nam prior to their deportation. Their family members in Viet Nam have confirmed to me that they were never interviewed or contacted by local police, which is the final step to verify a Vietnamese national's identity before the Ministry of Public Safety decides to issue a travel document.

45.     In PR's case, I know that ICE did not request a travel document from Cambodia, but may have requested one from Thailand, where he is not a citizen or national. PR's refugee documents from the United Nations High Commission for Refugees (UNHCR) clearly shows that he is from "Kampuchea" (now Cambodia) -- and not from Thailand.

46.     The U.S. government deported TN despite having a travel document to repatriate him to Laos. On June 26, 2025, in an E-mail to his sister that she shared with me, an officer at the Embassy of Laos DR in Washington, D.C. confirmed that he was "sure the Lao Government has agreed to accept him to Laos and his Travel Document was issued." The E-mail clearly disproves the U.S. government's claim that the Government of Laos refused to issue a travel document to TN, and that it had no choice but to deport him to a third-country.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, executed on November 13, 2025 in Charlotte, North Carolina.

Tin Thanh Nguyen

Second Declaration of Tin Thanh Nguyen

9

Appx.290

## DECLARATION OF ALMA LEONIE DAVID

I, Alma Leonie David, make the following declaration based on my personal knowledge and declare under the penalty of perjury under the laws of the United States and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge:

1. I am a practicing attorney licensed to practice by the State of California. My business address is: Novo Legal Group, 4280 Morrison Rd, Denver, CO 80219, USA. I have been of counsel to Novo Legal Group since April 2021. I am over the age of 18, and I am competent to testify regarding the matters described below.

2. I have practiced immigration law exclusively since November 2008. I began my career as an Associate and Partner at several immigration firms in Seattle, Washington, where my practice focused on removal defense and, in particular, on representing individuals seeking protection from persecution and torture before the Executive Office for Immigration Review (Immigration Court and Board of Immigration Appeals) and federal courts of appeal. I have represented hundreds of clients in their removal proceedings, as well as dozens in affirmative applications for asylum, U and T visas, and Adjustment of Status before U.S. Immigration and Citizenship Services (USCIS). From 2015-2019, I served as an EOIR-appointed National Qualified Representative for immigration detainees deemed mentally incompetent to represent themselves in removal proceedings at the Northwest Detention Center in Tacoma. From 2018-2021, I was the immigration appellate attorney for Prisoner Legal Services New York (PLS) with a focus on appeals for detained clients. I also provided litigation mentorship and training to the staff attorneys in PLS' immigration unit. Since 2021, I have been of counsel to Novo Legal Group, which has offices in Washington and Colorado, and I provide legal writing services to private attorneys on a contract basis. Throughout my career, I have dedicated time and energy to pro bono work with various nongovernmental organizations (NGOs).

3. I currently represent eight (8) clients who were deported from the United States to third countries. One (1) of those clients was deported to South Sudan; the other seven (7) were deported to Eswatini.

### SOUTH SUDAN - EAH

4. I represent EAH, who was born in Cuba and ordered removed to Cuba. I began representing EAH on a pro bono basis on July 2, 2025, when his prior counsel took a leave from work.

5. EAH entered the United States with his parents in 1980 when he was one year old. He came into legacy Immigration and Naturalization Service (INS) custody in 1999 after he completed serving a criminal sentence. He was a lawful permanent resident (LPR) and was ordered removed to Cuba by an Immigration Judge in Miami, Florida on September 16, 1999. He was released from INS custody in 2001. The U.S. Department of Homeland Security (DHS) took EAH back into custody in 2025. He was transferred to several immigration detention centers and eventually to the one in Port Isabel, Texas.

1

6. The following information about EAH was reported to me by EAH during telephone and video calls that I have had with him since I took on representation as well as from his prior counsel.

7. On May 19, 2025, DHS notified EAH that they intended to deport him to South Africa. They presented him with a document stating this, and he refused to sign it. Later that same day, DHS told him that he would be deported to South Sudan instead, and he refused to sign that document, as well. On the night of May 19, 2025, DHS presented EAH with a document stating he would be transferred to Louisiana, and he signed this form to indicate his consent. He and the other men with him were told to get ready to leave. The following morning, May 20, DHS took EAH and the men with him to the airport. A DHS supervisor with the last name Chavez told the men they were going to Ireland. EAH asked if that was where they would be dropped off, and Supervisor Chavez answered affirmatively. The flight did stop in Ireland, but only to refuel. EAH and the other men were then flown to Djibouti where they arrived at the U.S. military base. When they arrived there, his impression was that the base personnel were both surprised and displeased about their arrival.

8. On June 24, 2025, while still in Djibouti, EAH had an interview with a DHS officer about his fear of torture in South Sudan. This interview had been ordered by the district court in *D.V.D. v. DHS*. Prior to the conclusion of the interview, the DHS officer informed EAH and his counsel that they had received an order to discontinue the interview immediately. The interview was never completed, and neither EAH nor his prior attorney were provided with a decision.

9. On July 2, 2025, I took over representation of EAH and entered a Notice of Appearance (Form G28) with DHS. I spoke with him for the first time on July 2, 202 and then several more times prior to the evening of July 4, 2025, when EAH's removal to South Sudan was imminent. Throughout the day on July 4, each time I spoke to EAH, he sounded increasingly frantic, and he reiterated to me several times his fear that he would be jailed in South Sudan and would never see freedom again. The last time I spoke with him from Djibouti was shortly after 5 pm Eastern Time on July 4, 2025. I found out later that evening that a military plane carrying EAH and the other men departed Djibouti and landed in Juba, South Sudan in the early morning hours of July 5, 2025 Central Africa Time.

10. In the days leading up to EAH's deportation to South Sudan, I had reached out to a number of individuals for advice on what I could do for him once he arrived there. Beginning on July 5, 2025, I attempted to obtain information on EAH's whereabouts and what I could do to advocate for his release from government custody from various sources. I communicated with academics who study South Sudan, a South Sudanese civil society organization representative, a local human rights attorney, a journalist/writer with many years of experience working in South Sudan, as well as representatives of the International Committee of the Red Cross (ICRC), Amnesty International, the Commission on Human Rights in South Sudan, and the International Organization on

2

Migration (IOM). I also filed a report with the United Nations Working Group on Enforced or Involuntary Disappearances and informed representatives of the Cuban government in Washington, D.C. and in Addis Ababa, Ethiopia, of EAH's situation. I also sent letters to the Director of Legal Affairs of the South Sudanese National Security Service (NSS) to request information on and access to my client.

11. Neither the Director of Legal Affairs of NSS nor anyone from the Cuban government has responded to my communications about EAH. IOM responded to me in July and October to say it was not involved in the situation with EAH, that South Sudan had not requested its involvement, and that – should South Sudan request their involvement – that request would be evaluated in line with its mandate. ICRC responded in July to confirm that it had been informed EAH and the other deportees were in South Sudanese government custody and referred me to the American Society of the Red Cross. Once EAH contacted me, his case fell outside of the Red Cross' mandate for tracing requests.

12. EAH called me for the first time from South Sudan around 3:00 am Eastern Time on August 12, 2025. Since that time, I have spoken to him nine times, each time for between two and 12 minutes. With the exception of one short call, all of my communication with EAH has taken place in the presence and earshot of guards, whom I believe to be armed, as well as of other detainees. I can hear and see others in EAH's immediate vicinity when speaking to him.

13. This is what I have learned from those calls: Since arriving in Juba on July 5, 2025, EAH has been detained in a building that is neither a prison nor a residence. He does not know where this building is, other than that it is in Juba. He has not been informed why he is detained. The building has multiple rooms and a common area, bathroom, and kitchen. Each of the men sleeps in their own room, which is locked at night. During the day, they are permitted to be in the common area. They are guarded, depending on the day, by 5-10 officers armed with AK-47 rifles. There is no tv, radio, books or paper and nothing for the men to do in the house. In late August, the guards provided a chess board for the men, which is now their only form of entertainment/activity. Also starting in August, the men were occasionally allowed to go into the courtyard while guarded, but because there are so many mosquitos, they do not go outside frequently. Until early September, the men only had electricity for 3 hours per day, from 6-9 pm. Some days they had no electricity. At night, it was very hot, and they were bitten by many mosquitos. Then, in late August, EAH and another man contracted malaria. EAH became so sick that he had to be taken to the hospital. After that, the men had electricity from 6 pm until daybreak for a couple of weeks and could run an air conditioner to avoid being stung by as many mosquitos.

14. Since mid-September, conditions have deteriorated. While the men still have electricity from 6 pm until 2:30 am most nights, there are stretches of several days at a time where they have no electricity at all. EAH's phone access has been more restricted – since September 15, he has been allowed three short phone calls. On at least two occasions, EAH has become so frustrated about the conditions of his detention that he has voiced his anger to the guards. On both occasions, he was met with threats of harm by the guards. He is feeling depressed and hopeless about the fact that there is no sign of change or

3

progress in terms of his release from detention or relocation to another country. During our latest call he told me that he had asked the guard if he could please have a radio for Christmas because he is so bored that his mental health is declining. The guard told him he did not think this was allowed. I also wrote a message to the guard at the WhatsApp number from which EAH calls me to ask if I could arrange for someone in Juba to meet him to provide books or paper and pens for the men, and the guard responded to say this was not allowed.

15. Godfrey Bulla, a human rights attorney in South Sudan, who has agreed to be my co-counsel on an attempt to obtain confidential/unmonitored access to counsel for EAH, has on multiple occasions attempted to obtain permission from the Ministry of Foreign Affairs and International Cooperation (which is where he was told his requests must be directed) to meet with EAH for a legal visit, but his requests have all been denied.

16. One of the other deportees, NM, is represented by Jacqueline Brown, an immigration attorney who directs the immigration clinic at USF School of Law. As a result of Ms. Brown's and my communication with Amnesty International, on September 9, 2025, Amnesty International released an "urgent action" about EAH and NM, requesting its members write to the South Sudanese Minister of Foreign Affairs and International Cooperation to urge him to disclose the whereabouts of EAH and NM; to grant them consistent and unmonitored access to their legal representatives, including their lawyer in Juba; to immediately clarify the legal grounds for their detention; and to not violate the principles of non-refoulement by forcibly sending them to a country where they are at real risk of persecution or serious human rights violations.

17. Since October 9, I have been informed on more than one occasion by South Sudan's ambassador to the United States, Dr. Santino Fardol Dicken, that – despite the efforts of South Sudan's Minister of Foreign Affairs and International Cooperation to engage the Cuban Ministry of Foreign Affairs in negotiations about EAH's repatriation to Cuba – no progress has been made in that regard.

18. In mid-November, because I had heard from attorney Tin Nguyen, who represents two of the men detained in South Sudan, that Ambassador Dickens had confirmed to him that South Sudan had requested IOM's assistance with regard to the deportees, I asked Ambassador Dickens whether IOM had agreed to provide support, and he responded that they had not. I have written to various contacts at IOM, including their country director for South Sudan, since that time to inquire myself whether IOM can assist my client or if there is any information that would be useful for me to provide to IOM about my client, but I have not received any response.

19. I have been attempting to obtain EAH's signature on a legal document. I have asked the guard from whose number EAH calls me, both via WhatsApp text message and via message relayed orally to him during calls with EAH, how I can get a two-page document to EAH for his signature and then have someone scan or fax the signed document back to me. The guard has informed me on multiple occasions that this transaction will have to go through the Ministry of Foreign Affairs, and that he will

4

Appx.294

provide me the email address or other contact information to which I can send the document once the Ministry has provided that information to him.

20. As of today, EAH remains detained in South Sudan in an unknown location and without having been informed of the legal basis for his detention.

## ESWATINI - KSW

21. I represent KSW, who was born in Yemen and ordered removed to Yemen. I began representing KSW in July 2025, although I did not speak to him until August 28, 2025. I was retained on his behalf on a pro bono basis by a close family member of his and have spoken with him and his family members several times since

22. KSW entered the United States on an immigrant visa around 1977 when he was 12 years old. He was an LPR and was ordered removed to Yemen by an Immigration Judge in Detroit, MI in 2002, while he was in criminal custody. Following completion of his criminal sentence in 2019, he came into DHS custody. As DHS was unable to obtain a travel document for him and once his detention became prolonged, he was released from DHS custody in 2020. He reported to U.S. Immigration and Customs Enforcement (ICE) regularly under an Order of Supervision (OSUP). In June 2025, DHS agents arrested him outside his home in Dearborn, MI.

23. KSW was moved to various DHS detention facilities before being flown to Eswatini. He did not know where he was being taken until he was on the flight to Eswatini around July 15, 2025. DHS presented him with a document allegedly about his destination on the plane, but he did not sign it. His family did not know where he was after he disappeared from the ICE detainee locator around July 13, 2025 until July 31, 2025, when I informed them that he had been deported to Eswatini after having identified him from the photo Assistant Secretary of DHS, Tricia McLaughlin, posted on X. KSW was finally permitted to call his family on August 1, 2025.

24. On July 16, 2025, when I saw the news of the third country removals to Eswatini, I communicated with some trusted colleagues, including Tin Nguyen, who was already in touch with the family of one of the deportees. We also were put in touch with Mia Unger, who had been retained by the family of another deportee.

25. I connected us with an American attorney who lives in and has practiced law in Eswatini and he has informed me of his actions. He had determined that the men were all being held at the maximum security prison housed at Matsapha Correctional Centre in Mbabane Eswatini. This attorney reached out to the U.S. Embassy in Mbabane to inquire about the process for requesting a legal visit with the five deportees. On July 18, the Political and Economic Officer for the U.S. Embassy informed him that all conditions of confinement, as well as any questions regarding access, communication, and visitation by family members or legal counsel, were the responsibility of the government of Eswatini. On July 21, he attempted to visit the men at Matsapha Correctional Centre, where he met with Officer-in-Charge Kunene and Deputy Officer-in-Charge Dlamini. Attorney visits are

permitted at the prison Monday through Friday. His in-person attempt for a legal visit was on a Monday. The prison officials informed him that the deportees were well cared for but explained that he could not visit them because they were out exercising. When pressed, the officials later stated that they needed permission for in-person visitation and would request it from the Commissioner General at His Majesty's Correctional Services, Phindile Dlamini, who was visiting the prison that afternoon. The attorney subsequently followed up with Officer Kunene via phone calls and WhatsApp messages on July 22, 23, and 24th. He never received permission for a legal visit. As the attorney was leaving Eswatini for an extended period, he connected us with his trusted colleague, attorney Sibusiso Magnificent Nhlabatsi, a human rights lawyer, who runs the Legal Clinic at the University of Eswatini and is the founding director of the Institute for Democracy and Leadership (IDEAL) and the Eswatini Litigation Centre. Mr. Nhlabatsi agreed to be our co-counsel in Eswatini.

26. Mr. Nhlabatsi has informed me of his efforts and kept me advised of the ensuing litigation. He first attempted to visit the five men on July 25, 2025, but was told by senior prison administration officers that the prison was not following regular visitation procedures for these inmates, that he could not visit the men that day, and that the prison would inform him on a later date if he could visit them.

27. On July 31, 2025, Mr. Nhlabatsi filed a petition for habeas corpus in the High Court of Eswatini, requesting that he be granted access to the men, for purposes of a legal consultation, either at the prison or in court. The habeas litigation has been cumbersome, and although the Constitution of Eswatini is clear on a detainee's right to counsel, the government of Eswatini has fought hard to keep Mr. Nhlabatsi from visiting our mutual clients. Even though the Commissioner of Correctional Services and Attorney General represented in court that Mr. Nhlabatsi would be permitted to visit with the men at Matsapha Correctional Centre on August 5 and then again on August 12, on each occasion, Mr. Nhlabatsi was made to wait for a long time and then presented with a pretext for denying him access. At various points in the litigation, the government opposed Mr. Nhlabatsi's request to hold a legal consult with the men, including by alleging that our clients refused to meet with Mr. Nhlabatsi (which our clients' families confirmed with our clients is patently untrue), that Mr. Nguyen was not actually an attorney but one of the detainees, that the men have U.S. attorneys who are not us. I filed a declaration in the case confirming that my clients wished to consult with Mr. Nhlabatsi After numerous delays, the judge of the High Court - on October 3, 2025, granted Mr. Nhlabatsi's request to visit the men at Matsapha Correctional Centre for purposes of a legal consultation. The government immediately appealed to the Supreme Court of Eswatini, which stayed the High Court's judgment. While on October 3, 2025, the judge had issued a short form order, on October 27, 2025, he issued a full written opinion. As far as I am aware, the appeal remains pending before the Supreme Court of Eswatini. The record of proceedings must be filed within three months of the October 3 decision, and then a briefing schedule will issue and so the appeal will not be decided until the first months of 2026. Meanwhile, the men remain without access to an in-person legal consultation from counsel in Eswatini about their rights there.

6

28. On August 11, 2025, I began sending messages to the WhatsApp number from which my clients' family members had received a call from Eswatini (which turned out to be the personal number of the Chief Officer of the prison, Jabulani Kunene) to request a call with my clients. My messages went unanswered. When I spoke with KSW for the first time on or around August 28, 2025, he called me on speakerphone on a WhatsApp video call from that same number. I asked him if he was somewhere private where we could have a confidential conversation, and he panned the camera so that I could see that he was sitting at a table with the other detainees, the Chief Officer, and another guard. I asked KSW if he could go somewhere where we could have a private conversation, and the Chief Officer said loudly in the background that this was not allowed, and that "this is not like in America." I responded that he could surely understand that it was important for me to be able to speak with my client in private and asked how that could happen. The Chief Officer told me only attorneys who come to meet with inmates in person can have conversations that are observed but not listened to by a guard. I reminded him that Mr. Nhlabatsi had indeed tried on multiple occasions to meet in person with my client and the other men and had been turned away, and the Chief Officer told me that this had occurred because Mr. Nhlabatsi had not applied for permission to visit the men from the U.S. Embassy in Eswatini. He stated this twice: that Mr. Nhlabatsi had to obtain authorization from the U.S. Embassy in order to visit the detainees.

29. Since that time, I have spoken via WhatsApp with KSW on multiple occasions. Each time, the call has taken place in the presence and earshot of at least one guard. Beginning at the end of September or beginning of October, KSW calls me from a small room in which some type of conferencing equipment is affixed to the wall, and the client sits on a chair, several feet away. The sound quality in the room is terrible, and the door of the room is left open so that a guard can stand in the doorway to observe and listen to the call. As a result, in order to hear each other, KSW and I have to speak very loudly and even so, I only understand about half of what KSW is saying. The calls last about five minutes, and then the guard tells KSW that his time is up. The calls with him and my other clients are not scheduled, and the time difference between Eastern Time and South Africa Standard Time is substantial, so he calls me anytime between 6 am and 11:30 am my time, depending on the day. He has once called on a weekend. I always answer the phone when I see that the call is coming from Eswatini, because I know the detainees are only provided with limited access to calls.

30. Since I first spoke with KSW, he has lost quite a lot of weight and his face looks gaunt. He is 70 years old, and when I first spoke with him, he was quite energetic. Now when I speak with him, he appears tired and low-energy. He has told his family and me that he is not given much food, and the food he gets is usually rice with a vegetable. If the men want to eat meat, they have to buy it with their own money, which requires their relative to send money to Mr. Nhlabatsi and Mr. Nhlabatsi to travel to Mbabane (a 30-40 minute drive from his office) to collect the money and deposit it in his bank account so that he can deposit it on the men's account via a mobile money service.

31. Around the same time that KSW was permitted to call his family for the first time, he reported to them that representatives from the International Organization on Migration

7

(IOM) had come to visit him and had brought him some clothes. I knew that IOM was likely providing the men with access to Assisted Voluntary Returns (AVR) to their countries of origin, so I tried to engage with IOM about KSW's case, as his family had told me that they feared it was not safe for him to return to Yemen. Eventually, IOM was willing to talk with me about his case and informed me it does not currently perform AVRs to Yemen. While IOM occasionally assists individuals who opt into their AVR program but cannot actually be returned to their countries of origin with relocation to a third country, that requires the individual to have legal authorization to enter and remain long-term in that third country. KSW's sister and her husband, who live in a country that is not Yemen or the United States or Eswatini, have informed me that they would be willing to have KSW come and live with them if he could obtain the right to legally enter and live in that country. In mid-October, I provided their contact information to IOM, so that IOM can support them in the processes of applying for legal status for KSW in that country and also of applying for a Yemeni national identity document for KSW, as KSW's sister and her husband, both of whom are elderly, informed me that they have no idea how to even begin either process. So far, IOM has not contacted KSW's sister or her husband. Even should IOM support the family in applying for legal status in this other country, based on my cursory review of its very restrictive immigration requirements, I have very little hope that KSW will be granted legal immigration status there. While IOM was briefly responsive to my emails about KSW's case, since the end of October, it has not responded to my multiple attempts to communicate about his case, including my email saying that I have received a copy of KSW's expired Yemeni passport, which would likely be useful in any attempt to obtain an identity or travel document for him from the Yemeni authorities.

32. The last two times I spoke with KSW, within the past week, he let me know that it did not appear IOM was still willing to support his sister's application for a visa and that she would have to hire a lawyer to help her. He also reported that he asked the IOM officer who visited him to call me and that the officer said he could not but would pass that request on to his boss.

33. Mr. Nguyen, Ms. Unger and I also connected with an individual at Amnesty International whose area of focus includes Eswatini. On September 19, 2025, Amnesty International released an "urgent action" calling on Eswatini's Minister of Justice and Constitutional Affairs to officially disclose the five men's whereabouts, immediately grant them regular and confidential access to their lawyers, and provide the legal grounds for their detention.

34. Since arriving at Matsapha Correctional Centre, KSW has not been informed by anyone why he is detained, what his current legal status is in Eswatini, how long he should expect to be detained, what must happen in order for him to be released from the prison, or what will happen to him if IOM cannot relocate him.

8

**ESWATINI - RMDP**

35. I represent RMDP, who was born in Cuba and ordered removed to Cuba. I began representing RMDP at the end of July. I have spoken to him and his family members and friends on multiple occasions.

36. RMDP came to the United States in 1980 at the age of 12. He came into legacy INS custody in 1996 after serving a criminal sentence. He was ordered removed to Cuba in 1996 by an Immigration Judge in Miami, Florida. INS was unable to effectuate his removal to Cuba, and he remained in INS detention for five years. He was released from INS custody in 2001 and placed under an OSUP. He came into DHS custody again briefly in 2012 following completion of a criminal sentence but was released again under his OSUP. He attended his ICE check-ins and had work authorization. At his check-in in June 2025, he was taken into DHS custody in Miami. He was moved to various detention centers until he was deported to Eswatini. He was not informed he was being deported to Eswatini until he was already on the plane, when DHS presented him a document about his destination. He refused to sign it. The plane stopped in Puerto Rico and then at another location. The flight to Eswatini was on a military plane.

37. RMDP is afraid to return to Cuba. His mother was politically engaged against the Castro regime and was imprisoned there for 18 months as a result. RMDP believes that that he is at risk of harm in Cuba as a result of his mother's political activity, his own opposition to communist ideology, and his own criminal history and former gang (Latin Kings) affiliation, which DHS has broadcast (inaccurately) on X with his photo.

38. RMDP has a large circle of family members and close friends in the United States, including United States citizen children, and I am in frequent communication with many of them.

39. Because RMDP informed IOM that he cannot return to Cuba, he is not in IOM's AVR program. As such, IOM can only provide him with limited assistance, such as humanitarian aid in the form of clothes, personal hygiene products, and so forth, as well as psychosocial support, should he request it. No other international agency, including UNHCR, has had access to him or the other detainees.

40. On October 15, 2025, feeling increasingly desperate about his illegal and indefinite imprisonment in Eswatini and frustrated by the fact that his basic human rights were not being respected, RMDP began a hunger strike demanding an end to his arbitrary detention and a chance to see his children again.

41. I was deeply concerned about this development from the outset, because Mr. Nhlabatsi informed me that the prison authorities in Eswatini are entirely unaccustomed to hunger strikes and will not know how to handle the situation of a prisoner who refuses to eat and whose health begins to decline as a result.

9

Appx.299

42. Of course, his children, other family members, and close friends have been extremely concerned as well. In an effort to draw attention to RDMP's plight and to obtain accountability from his legal custodians, RMDP's close family friend and I reached out to three trusted journalists at the Associated Press, Reuters, and Agence France Presse news agencies and informed them of the hunger strike. The news agencies contacted the government of Eswatini for a position, and on October 22, 2025, the government released a press statement claiming that RDMP was fasting as part of a religious practice and that the government, in the interest of upholding religious freedom, would not intervene.

43. I also spoke with our contact at Amnesty International to inform him of the hunger strike.

44. When I spoke briefly with RMDP on October 22, he informed me that he had not seen a doctor or any kind of medical professional since he had stopped eating on October 15. He also informed me that the prison authorities had told him they would involve the U.S. Embassy in his situation. He told me that representatives of the government of Eswatini had visited him in prison.

45. On October 24, Amnesty International released a statement about RDMP's hunger strike, which said that it exposes the human cost of the unlawful transfer agreement between the United States and Eswatini and of RDMP's unlawful detention without due process. Amnesty International urged the government of Eswatini to ensure confidential access to lawyers and families of all detainees and to disclose the legal basis for their detention. It further urged the Eswatini authorities to promptly release RMDP and the other deportees or establish lawful grounds for their detention before a competent court.

46. I sought to obtain regular updates on RMDP's condition from the Correctional Services. I reached out to the Legal Officer at Matsapha Correctional Centre, to request such updates and that RMDP be provided with a visit by a medical and a mental health professional. The Legal Officer provided what I can only characterize as a dismissive response, stating that my concern that my client was on hunger strike was unfounded but that he would forward my request to head of the department. When I reiterated my requests, the Legal Officer informed me that only the governments of the United States and of Eswatini could help me, and that he was not a government spokesperson and thus could not answer my requests and had only responded as a matter of courtesy.

47. I also reached out to IOM to request that the organization bring a medical professional to Matsapha to examine RMDP and asked them to raise concerns about his health to their counterparts in the government of Eswatini. IOM informed me they would raise my concerns and then, on October 29, reported that they had been informed that RMDP was being attended to by health professionals within the facility and that he would be transported to a medical and mental health provider outside the prison on November 3.

48. I subsequently contacted the Legal Officer again to reiterate my request for a medical update, to which he responded that he recommended that I contact RMDP or his family directly or request that the government of Eswatini invite me to its weekly briefings with IOM.

10

49. I contacted the Assistant Commissioner of Correctional Services to ask him for copies of any medical reports about RMDP, to permit me to have scheduled, confidential conversations with RMDP, and to permit an in-person visit between RMDP and his attorney in Eswatini, and he referred me to the same Legal Officer with whom I had already been in contact.

50. IOM reported to me that they had been informed that I should direct any further requests for access to RMDP to the same Legal Officer and had been assured that all communication between detainees and their lawyers were private and confidential. I inquired with IOM about who would be able to invite me to the weekly briefings the Legal Officer had mentioned and was informed it would likely have to the Prime Minister's office.

51. On November 6, I contacted the Legal Officer again to reiterate a request for a scheduled, confidential phone call with RMDP, permission for an in-person visit with a lawyer, and an update on his health, including copies of any reports from health professionals he had seen in the past week. The Legal Officer responded to say that I must communicate these requests, including any requests for health reports and physical visits by anyone (whether by me or someone at my instruction) to the United States and Eswatini governments through the appropriate diplomatic channels. He agreed to relay my message regarding my request for private phone calls to the head of the department but assured me that calls were already private. He agreed to request senior management to inform the IT team to make a headset available for future calls. I responded to let the Legal Officer know that the United States government had already disavowed all responsibility for the men deported to Eswatini and asked him to clarify if his position was that RMDP and the other men were not actually in the legal custody of the Correctional Services. I also let him know that I have seen and heard the guards sitting in the room with my client during calls and that a guard had previously participated in my conversation with a client.

52. The Legal Officer responded to say that I had "the wrong narrative" about the detained men, who were not prisoners. He urged me to contact the Ministry of Foreign Affairs and Home Affairs through the Embassy of Eswatini in the United States to get all of the answers about the status of RMDP and the other men and how Correctional Services fit into the picture.

53. I spoke with RMDP on November 7. He informed me that, about two weeks prior, a psychologist had met with him and had conducted a detailed interview, which she also recorded on her cell phone. The psychologist had come on behalf of the U.S. Embassy, though she had not informed him of that at the time; he was later told this by an official at the prison. On November 3, he had been taken to see a doctor and a psychologist outside of the prison for an evaluation, and the security officer who had accompanied him had reported that the psychologist's report would also be forwarded to the U.S. Embassy. RMDP further reported that he had developed some lumps under his skin on his abdomen, which he had been told were indicative of liver disfunction and that a prison

Appx.301

official had told him he would be taken to the hospital for a medical check-up on November 10.

54. That same day, I called the Embassy of Eswatini in Washington D.C., where I was connected to a woman who was identified to me as the secretary to the Ambassador, though she refused to spell her name for me when I asked her to. I informed her that I was very concerned about my client RMDP, who was currently on hunger strike at the Matsapha Correctional Centre in Eswatini, and that I had been informed by the Correctional Services that I had to direct my request for health information and access to my client to the Embassy. She advised me to send an email to embassy@eswatini-usa.com explaining my concerns, and that the Ambassador would see my email when he returned to the office on November 12. I asked her if there was a way to get a message to him sooner than that, and she reiterated her recommendation that I send an email to the above listed address. I sent an email explaining my concerns and requesting that RMDP be provided with medical care in a timely manner; that I be provided with copies of the psychologist's report taken at the prison, as well as of the doctor's and psychologist's report from the visits on November 3; that I be provided with regular updates on his condition; and that he be permitted an in-person visit with his attorney in Eswatini, as I am not currently able to visit him in person.

55. I also reached out to the political advisor at the U. S. Embassy in Eswatini, introducing myself and explaining my concerns and requesting a copy of the psychologist's report commissioned by the U.S. Embassy and requesting a brief phone call to discuss my concerns, as I had not been able to reach anyone who was taking responsibility for my client's well-being. The political advisor responded to me to acknowledge my message and recommend I contact the government of the Kingdom of Eswatini about the matter referenced therein.

56. I spoke with RMDP again briefly on November 10, 2025. He let me know that he was suffering from pain in his abdomen and back and that he had not been taken to the hospital after all. When he had asked the prison staff about a hospital visit, they had told him they did not know anything about this.

57. I reached out to the Legal Officer of the Correctional Services to inform him that RMDP was in pain and requesting him to ensure he receive timely medical attention for what could potentially be a symptom of organ failure. He responded to say that he would forward my message to his superiors.

58. I also reached out again to the political advisor at the U. S. Embassy in Eswatini to inform him that my client was in pain and had not seen a doctor and to request that he intervene. He did not respond.

59. I called the Embassy of Eswatini in Washington, D.C. again, where I was transferred to a different woman, who identified herself as the Assistant to the Ambassador. I relayed my concerns to her, and she told me she had written them down and that I should also send another email to the same email address as before to summarize my concerns. She told

12

Appx.302

me that the Ambassador was returning from official business in Brazil and reiterated that he would be in the office on November 13 and would be presented with all of his emails printed out, as well as the messages that had been left for him by callers.

60. On November 11, RMDP called me briefly to inform me that he had been taken to see a doctor, who had taken his blood and examined him and told him that he was healthy and that the skin lumps were caused by drinking a lot of water and that his abdominal pain was caused by being hungry. When RMDP asked if his liver could be the cause of his pain, he was told he would need an ultrasound of his liver. RMDP reported he continued to suffer from abdominal pain.

61. On November 14, I called the Embassy of Eswatini and was told by the Counselor/Deputy Chief of Mission that the Ambassador had "called the capital" and was told that the governments of Eswatini and Cuba have begun a conversation about the Cuban nationals deported to Eswatini through the appropriate diplomatic channels, so I should refer any questions about RMDP to the Embassy of Cuba in South Africa. I informed the Counselor that this was potentially good news for one of my Cuban clients, but not for RMDP, who is afraid to return to Cuba. I let her know that it would be very helpful if I could speak with the Ambassador to provide him with the full picture of RMDP's situation and that of my other clients, and she said she would relay that message to the Ambassador. I have not received any communication from the Embassy since.

62. Also on November 14, RMDP called me to let me know that he was scheduled to go for an ultrasound of his abdomen on November 17, as he continued to be in pain.

63. On November 17, having not heard from RMDP, I wrote to the Legal Officer to inquire about RMDP's condition. The Legal Officer let me know that he was not at the facility, but that RMDP had been seen at the hospital and that he would send me an update the following day.

64. On November 17, the Legal Officer wrote to me to inform me that, as of November 15, RMDP had begun gradually eating again and was eating a diet prescribed by a doctor. The next day I spoke with RMDP, and he confirmed that he had begun eating.

65. IOM is the only non-governmental body that has access to the men, and intervening in any manner in RDMP's hunger strike did not fall within their mandate. Similarly, while I have not directly reached out to the International Committee for the Red Cross (ICRC) office in South Africa that covers Eswatini, contacts at two other organizations, with whom I had unofficial conversations about RMDP's case, did reach out to trusted contacts at ICRC and also the Red Cross Society in Eswatini and were informed that neither organization conducts detention visits.

66. I was and remain deeply concerned about RMDP's well-being and safety. He has communicated to me on multiple occasions that he feels anguish over his detention, as there is no obvious resolution in sight – he cannot safely return to Cuba, there is no current pathway for him to return to the United States to reunite with his family, and he

13

remains imprisoned in Eswatini without a justification for his detention or any insight or suggestion as to how and when it might end. He understands that the United States government is paying a lot of money to the Eswatini government to have received him, but he does not understand, nor does he accept that this means his basic human rights must be violated. What his hunger strike exposed was that the prison staff do not know how to cope with an inmate on hunger strike and will likely not intervene until it is too late. It exposed that the United States government will not intervene or do anything to prevent one of the deportees' severe health decline or death. And it highlighted that the government of Eswatini at the highest level, where decisions about anything related to the agreement between the two countries regarding third country nationals appear to be made, was either not being informed of RMDP's hunger strike or did not wish to jeopardize its agreement or any future agreements with the United States by responding to RMDP's hunger strike, lest they give the impression that a hunger strike is an effective way for other third country nationals to avoid detention upon deportation to Eswatini.

67. Since he has concluded his hunger strike, I have spoken with RDMP several times. He is slowly gaining back the weight he lost, which his family members estimate to have been about 30 lbs, based on his appearance. During our last call on December 2, he told me that the prison officials have organized a type of excursion for the detainees, which RMDP characterized as a propaganda tour: apparently the men will be taken to a tourist site, which is a cultural installation where one can watch local tribe members perform traditional dances. The deportees were told that they will take photos at the site with the performers, which they can then send to their family members to show them that they are having a good time in Eswatini and that there is nothing to worry about. RMDP expressed to me that he felt very conflicted about this trip because on the one hand, he did not want to participate in what he understands to clearly be propaganda; on the other hand, he is desperate to get out of the prison, even if just for a day.

68. On December 2, along with Cornell Law School's Transnational Disputes Clinic and the Global Strategic Litigation Council, I filed a complaint with the African Commission on Human and People's Rights (ACHPR) against the Kingdom of Eswatini on behalf of KSW, RMDP, and another man (OE), who had also been deported to Eswatini before being repatriated to Jamaica, his country of origin. Among other things, the complaint challenges Eswatini's unlawful and prolonged detention of the 14 current so-called third country deportees detained there and alleges that their arbitrary and indefinite detention violates the Kingdom of Eswatini's obligations to safeguard basic rights, including the rights to liberty, due process, and meaningful access to legal counsel.

**ESWATINI - EW**

69. I represent EW, who was born in the Philippines and ordered removed to the Philippines. I began representing EW in mid-October 2025. I was retained on his behalf, on a pro bono basis, by his family. I spoke with EW for the first time on November 4, 2025.

70. EW came into DHS custody in 2024 after serving a criminal sentence. He was ordered removed to the Philippines by an Immigration Judge in Tacoma, WA. However, the

14

government of the Philippines does not recognize him as a Filipino citizen, and DHS was unable to obtain a travel document for him. Although his father is a U.S. citizen who served in the U.S. Armed Forces in the Philippines – as were his grandfather and great grandfather – EW does not appear to have derived U.S. citizenship from his father.

71. EW was transferred from DHS custody in Tacoma to the Adelanto Detention Center in California. There, he filed a pro se petition for habeas corpus to secure release from his prolonged immigration detention. Soon thereafter, he was deported to Eswatini.

72. I have been in contact with EW's family members, an immigration attorney with whom he previously consulted, as well as a lawyer who understands Filipino citizenship law. It appears that EW is stateless.

73. I have tried to engage IOM on EW's case. So far, IOM has not responded to me about EW.

74. I have sought the technical guidance of UNHCR, owed to their mandate on the 1951 Refugee Convention, the 1967 Protocol, and the 1954 and 1961 Statelessness Conventions.

75. I have also reached out to the Embassy of the Philippines in Pretoria, South Africa, to alert them of EW's situation and to request assistance. On December 4, I received a response from the Consular Officer, who provides assistance to nationals of the Philippines, acknowledging my request, reiterating that EW is not a citizen of the Philippines, but requesting a variety of documents, including the order of the Immigration Judge ordering EW removed, in order to assess whether the Embassy might be able to build a case for his repatriation to the Department of Justice under the framework of Statelessness and Humanitarian Assistance, as the Philippines is a signatory to the 1954 Convention Relating to the Status of Stateless Persons.

**ESWATINI - JFCA**

76. I represent JCFA, who was born in Cuba and ordered removed to Cuba. I began representing him in October 2025.

77. JCFA came to the United States in 2003 and was ordered removed to Cuba by an immigration judge in Miami, Florida in 2018 while he was in criminal custody. He finished serving his criminal sentence in 2022. In 2025, he was detained by DHS. He was transferred to various DHS detention centers. He was told by DHS that Cuba had refused his repatriation and that he would be deported to a different country. He requested to be deported to Mexico, as he had heard that Cubans were being deported there. Instead, he said that shortly after he filed a petition for habeas corpus to challenge his prolonged detention, he was deported to Eswatini.

78. I am in contact with JCFA's family members both in Cuba and in the United States. His family members in Cuba have informed me that they requested help in securing his

15

release from prison in Eswatini and repatriation to Cuba from the Cuban Ministry of Foreign Affairs and the Directorate of Immigration and were told that because he has been absent from Cuba for 20 years, he had lost his right to return.

79. JCFA suffers from problems with his prostate and, upon arrival to Eswatini, had blood in his urine. It is unclear to me currently whether he has received appropriate medical attention for this issue.

80. JCFA wishes to be repatriated to Cuba, and I have requested that IOM assist him with an AVR process and have indicated that I can provide a copy of his Cuban birth certificate and identification document to IOM. On or about October 17, I was told that because the government of Eswatini has not requested support from IOM regarding the deportees who arrived in October, IOM could not assist JCFA. I asked IOM to confirm that this is true, as the agreement between the United States and Eswatini states that it is the United States that will engage IOM to assist with relocation of the deportees to Eswatini; I was initially informed that it is the government of Eswatini that must request support and provide IOM with authorization to operate in its territory. In mid-November, IOM met with JCFA for the first time, and I believe they have met with him again since then, but I have not spoken to JCFA since early November. I have written to IOM multiple times to reiterate his request for its assistance with an AVR process and that I remain ready to provide a copy of his birth certificate and ID document. IOM has not responded to me.

81. JCFA's family in Cuba has told me that in his phone calls with them, he has become increasingly agitated because he feels trapped. He does not understand how he can be imprisoned in a country where he has done nothing wrong and why he is being kept so far away from his family and everything that is familiar to him.

### ESWATINI - FBP

82. I represent FBP, who was born in Cuba and ordered removed to Cuba. I began representing FBP in late October. I am in contact with FBP's long-time partner in the United States.

83. FBP came to the United States in 1980 alone, at the age of 16. He came into DHS custody following his completion of a criminal sentence and was ordered removed to Cuba in 1998 by an Immigration Judge in Oakdale, Louisiana. He was in DHS custody for several years until he was released under an OSUP, pursuant to which he attended regular check-in appointments with DHS and had valid employment authorization. He came into criminal custody again around 2017 but was not taken back into immigration custody following completion of his sentence.

84. In 2025, FBP was arrested by DHS at his check-in appointment. He was transferred to various detention centers, including Pine Prairie and Angola Prison. He was informed by DHS that Cuba refused his repatriation several times. Shortly after he filed a pro se petition for habeas corpus, FBP was deported to Eswatini.

16

85. FBP suffers from high blood pressure and takes medication for his condition. He has received some medication from the doctor at Matsapha. FBP is upset because he feels that his rights are being violated and that he is illegally imprisoned. He told me that he had asked the prison authorities to give him access to the law library, as he wanted to research what his rights are and how he can demand to be released from prison. He told me that the prison authorities appeared confused and told him they would have to inquire if the prison had such a facility.

86. IOM has come to visit FBP; the first time they came was on November 12. FBP has told me that because IOM appears to believe that it is unlikely that Cuba will accept his repatriation, it has asked him if there is another country where he may be able to live. FBP told IOM that he has a friend who, along with his wife, live in Mexico. FBP reported to me that IOM asked him to contact his friend in Mexico to inquire whether this friend can help FBP apply for and obtain a visa to live in Mexico, and that if so, IOM may assist him in arranging for and paying for his travel there. So far, FBP has been unable to reach his friend. Based on my limited knowledge of Mexican immigration law and the current public sentiment in Mexico about Cubans deported there, I believe it is unlikely that FBP will be able to obtain long-term legal status in Mexico.

87. I have written to IOM multiple times since late October to engage on FBP's case, but I have not received a response.

88. FBP's long-time partner is emotionally devastated by her partner's disappearance. While he was detained in Louisiana, she drove to each detention center to either visit him or to try to speak with DHS officers in person to understand why he had been detained and how she could secure his release. He was an integral part of her everyday life and of her family, and she reported to me that her grandchildren do not understand where the man they consider their grandfather went and that they have stopped wanting to visit her because they find the situation so upsetting. She is seeking mental health treatment because she does not know how to cope with the situation.

### ESWATINI - CM

89. I represent CM, who was born to a Haitian mother and Gabonese father in Haiti and ordered removed to Haiti. I began representing CM in November 2025.

90. CM fled Haiti when he was about ten years old and lived in the Bahamas until he came to the United States alone at the age of 13 in 1976 using what he believes was a Haitian passport with a visa that allowed him to work as a mess boy on a ship. He believes that he was granted asylum in the United States in 1984. He came into ICE custody following completion of a criminal sentence around 2003 and was ordered removed to Haiti in 2003 by an Immigration Judge in Orlando, Florida. He reported that he believed he was a citizen of both Haiti and Gabon, but that he did not have any documentation to substantiate citizenship in Gabon. ICE informed him that they had tried to obtain a travel document for him from Haiti but had been told that because he had been absent for too long, Haiti would not issue one. He was under an OSUP beginning in 2006 but was taken

17

into criminal custody in at the very end of 2018, and was returned to DHS custody in 2025. DHS attempted to remove him to Congo but was not able to do so. He was in DHS custody until he was deported to Eswatini.

91. CM does not have any family members in the United States, and he has not spoken to his relatives in Haiti since he left when he was a child. He was diagnosed with cancer while in criminal custody in Pennsylvania and had to have surgery to remove a kidney; as a result of having only one kidney, he must eat a special and restrictive diet. Because the food he is provided with at Matsapha does not conform to this diet, he has been ill and had to be taken to a medical facility as he lost the ability to control his bowels. He reports that he was unable to eat for four days and then was able to tolerate plain rice. He is not in contact with anyone who could send money to put on his commissary account so that he could purchase some food from the commissary, such as chicken.

92. I also wrote to the Legal Officer at Matsapha to inform him of CM's medical condition and to request that they accommodate his dietary needs. The Legal Officer responded to tell me I was making false statements aimed at damaging Eswatini's good reputation, and that the medical problems CM was suffering had resulted from a complication stemming from the operation he had in the United States to remove his kidney. He asked me to avoid creating false narratives and instead help my clients to get back to their families so they could live a normal life like he and I.

93. CM was treated at the prison's medical unit for numerous days due to his kidney condition, and when I spoke with him on November 24, after he had returned from the medical unit, he was in a lot of pain. He was wearing a urine bag and reported that urinating was excruciatingly painful. I wrote to the Legal Officer again to request that CM be provided with pain medication, and he responded to say that he would investigate the situation. I spoke with CM again on December 3, at which point he appeared to be in less pain physically. He reported that he was taking medication.

94. I have written to IOM on multiple occasions to inform them of CM's medical condition and to request that they speak with him about accepting him into the AVR program if IOM is currently conducting AVRs to Haiti. I have not received a response from IOM. CM reported to me that IOM visited with him, but he appeared unsure what they would be able to do for him.

**ESWATINI - AAM**

95. I represent AAM, who was born in Ethiopia and I believe was ordered removed to Ethiopia. I have only spoken with AAM twice so far, and due to a language barrier and the fact that he is a soft-spoken person and that in order to hear each other via the prison's communication system, one must speak at high volume, our communication has been labored. I have been able to confirm that he wants me to represent him, along with some basic biographical facts. He asked me to do whatever I can to get him out of Matsapha Correctional Centre. I was able to get a copy of his Notice to Appear (NTA) scanned to me by the Legal Officer, as AAM did not know his Alien Number (A Number), which I

18

required in order to request his file from EOIR. According to his NTA, AAM was admitted to the United States as a refugee in 2011. I believe he came into ICE custody in early 2025 following completion of a criminal sentence that began in 2013. I have written to the Legal Officer at Matsapha multiple times to request that he make a headset available to the detainees for their calls, as the inability to hear and understand each other on the very short calls with my clients, including AAM, renders it extremely difficult to have any kind of substantive exchange. The Legal Officer has responded to say that he has relayed my request to "those in charge." On December 3, I also requested that I be permitted to schedule a phone call with AAM (currently, the detainees call whenever they are given permission to use the phone, but there is not a way to schedule a call) with a telephonic interpreter, so that I can obtain more information from him.

96. AAM has confirmed that IOM has come to meet with him. I have written to IOM to engage on his case, but IOM has not responded to me.

Executed this 5th day of December 2025 at Red Hook, New York.

_____
Alma Leonie David

## DECLARATION OF SIBUSISO MAGNIFICENT NHLABATSI

I, Sibusiso Magnificent Nhlabatsi, make the following declaration based on my personal knowledge and declare under the penalty of perjury under the laws of the United States, and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.  I am a practicing attorney licensed to practice before the Superior Courts of Eswatini. My business address is 1st Floor, Riverstone Mall, Nkoseluhlaza Street in Manzini within the Manzini District. I have been employed as Practitioner at Motsa Mavuso Attorneys since January 04, 2018. I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I am one of two named parties in the case the High Court of Eswatini entitled *Sibusiso Magnificent Nhlabatsi v. The Commissioner of Correctional Services & Another* [1623] [2025] SZHC 224 (27 October 2025). A true and correct copy is attached to this declaration.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed on this 14th day of November 2025 at Malkerns, Manzini District, Eswatini.

Sibusiso Magnificent Nhlabatsi

1

EXHIBIT C



# IN THE HIGH COURT OF ESWATINI

HELD AT MBABANE                    CASE NO: 1623/2025

In the matter between:

**SIBUSISO MAGNIFICENT NHLABATSI**          **APPLICANT**

**AND**

**THE COMMISSIONER OF HIS MAJESTY'S**

**CORRECTIONAL SERVICES**                 **FIRST RESPONDENT**

**ATTORNEY GENERAL**                      **SECOND RESPONDENT**

| Neutral citation | :*Sibusiso Magnificent Nhlabatsi v The Commissioner of Correctional Services & Another [1623/2025] [2025] SZHC 224 (27 October 2025)* |
|---|---|

Appx.311

| CORAM: | **B.S DLAMINI J** |
|---|---|
| **DATE HEARD:** | 03 October 2025 |
| **DATE DELIVERED** | 27 October 2025 |

**Summary:**

*Civil Procedure - Applicant, an Attorney of the High Court of Eswatini, seeks to have access to certain individuals who are immigrants from the United States of America in order to be able to consult with them - Applicant having received instructions as a correspondent attorney from the US - Respondents opposing the application on the basis that detainees have informed officers of the First Respondent that they do not wish to consult with Applicant.*

**Held;**

*The basis of the opposition to the application is founded on hearsay - Applicant entitled to consult with the detainees and, if need, to be rejected by*

2

Appx.312

*them directly. Application accordingly granted with costs.*

---

## JUDGMENT

---

## INTRODUCTION

[1] Applicant, an admitted Attorney of this Court, filed an application under a certificate of urgency and sought relief in the following terms;

"1. *That the Rules of the above Honourable Court relating to time limits, forms and manner of service be dispensed with and that the matter be heard as one of urgency provided for by Rule 6 (25) of the High Court Rules.*

2. *Condoning Applicant's non-compliance with the Rules of the Court.*

3. *That the five foreign nationals currently detained at Matsapha Correctional Complex, who were transferred to Eswatini from the United States of America on or around July 16. 2025 be*

3

Appx.313

produced before the above Honourable Court for purposes of consultations with Applicant.

4. Alternative to prayer 3 above, the First Respondent and/or any officer or official acting on her command be hereby restrained from refusing the Applicant access to the five foreign nationals referred to above in prayer 3.

5. That the Applicant be hereby granted access at the Correctional Centre for consultation purposes as an attorney to the five foreign nationals currently detained at Matsapha Correctional Complex, who were transferred to Eswatini from the United States of America on or around July 16, 2025.

6. The Respondents should not pay the costs of this application at the Attorney and own client scale, in the event of unsuccessful opposition.

7. Granting the applicant further and/or alternative relief."

4

Appx.314

6.   *Such further and/or alternative relief the above Honourable Court may grant.*"

## THE FACTS AND ARGUMENTS

[2]   On the 3rd October 2025, this Court heard arguments from the parties' legal representatives and proceeded to grant the relief sought by Applicant in an *ex tempore* ruling. The reasons for the *ex tempore* ruling are contained in this judgment.

[3]   Applicant relies on several local and international legal instruments which all embody the fundamental right to legal representation for the relief he seeks. Locally, the Court was referred to section 21 of the Constitution of the Kingdom of Eswatini which provides that;

"**(1)   In the determination of civil rights and obligations or any criminal charge a person shall be given a fair and speedy public hearing within a reasonable time by an independent and impartial court or adjudicating authority established by law.**

**(2)   A person who is charged with a criminal offence shall be-**

5

Appx.315

(a).………

(b).………

(c)    entitled to legal representation at the expense of the government in the case of any offence which carries a sentence of death or imprisonment for life…"

[4]    In motivating his arguments on the fundamental right to legal representation and access to thereto, the Applicant stated that;

"[6.1] The drafters of the Constitution recognized that the right to legal representation serves as a critical safeguard against arbitrary state power and ensures that individuals can effectively challenge unlawful detention or other violations of their fundamental rights. Section 21 must be read expansively to protect the substance of the right, not merely its formal expression, thereby encompassing the right of the detained persons to have meaningful access to legal counsel and the corresponding right of lawyers to reach their clients without unlawful interference."

6

[5]     The essence of Applicant's argument is that the explanation furnished by the First Respondent's officers, namely that the detainees have expressed an unwillingness to consult with him, is in reality, a denial of their fundamental right to legal representation. The conduct of the First Respondent, is, according to Applicant, unconstitutional and unlawful.

[6]     It was further argued by Applicant that being a correspondent attorney of the United States (US) based attorneys creates an attorney and client relationship between himself and the detainees. In this regard, Applicant submitted as follows;

"[6.4] Once the Applicant received the three letters from US attorneys requesting [for] his legal services for the detained individuals, a lawyer-client relationship was established, thereby crystalizing his constitutional right under Section 21 to access these clients and provide the requested legal representation without unlawful state interference."

[7]     In buttressing his point on the importance of the right to legal representation, Applicant referred the Court to a number of

7

Appx.317

international legal instruments including the **UN Basic Principles on the Role of Lawyers**; **Universal Declaration of Human Rights**; **International Covenant on Civil and Political Rights (ICCPR)** and the **African Charter on Human and People's Rights**.

[8] Opposition to the relief sought by Applicant was divided into three parts namely;

    (a)    Lack of *locus standi* by Applicant to act on behalf of the detainees in the absence of clear and proper instructions;

    (b)    Non-applicability of section 21 of the Constitution and;

    (c)    Applicant's contradictory versions in the Founding Affidavit.

[9] On the point relating to Applicant's lack of *locus standi* to represent the detainees, it was argued on First Respondent's behalf that the mere fact that Applicant received instructions from attorneys based in the United States does not, on its own, establish an attorney and client relationship between Applicant and the detainees. The Applicant therefore does not have the right in law to bring the present

8

Appx.318

application and seek to unlawfully consult with the detainees. Put differently, the detainees did not at any stage instruct Applicant to bring the present application to Court in order to consult with them. According to the First Respondent;

"[4.2] **Applicant has failed to establish any authority from the inmates to bring the present proceedings on their behalf. In the case of *Maziya v Commissioner of Police (470/2013) [2014] SZHC 32*, the Court held that a litigant must demonstrate a direct and substantial interest in the relief sought. In the absence of clear instructions from the inmates, Applicant cannot invoke the right to legal representation.**

[4.3] **Section 16 of the Constitution vests the right to legal representation in [on the] detainees themselves, not in third parties. The confirmatory affidavits from the US Attorneys have no probative value in establishing a mandate to institute the present proceedings. Section 16 (2) of the Constitution provides as follows;**

9

> *"A person who is arrested or detained shall be informed of the right of that person to a legal representative <u>chosen by that person</u>."*

[10] According to First Respondent's counsel, Applicant was not appointed by the inmates or detainees and therefore cannot seek reliance on Section 16 (2) of the Constitution. To do so would be equal to undermining the rights of the detainees, who have the right in law to make a choice on the person or persons they wish to legally represent them in the country.

[11] Section 21 of the Constitution of the Kingdom of Eswatini is, according to the First Respondent, not applicable to the facts of the matter. The detainees are, according to the First Respondent, not facing any criminal charge and therefore the right to legal representation does not apply to them. To use the language of the First Respondent so as not to be misunderstood;

> **"[6.5]...The five (5) inmates are neither charged nor arrested for a criminal offence so as to invoke the right to legal representation in terms of section 21 relied upon by**

10

Appx.320

Applicant. Applicant's reliance on Section 21 of the Constitution is misplaced."

[12] On the contradictory statements allegedly made by Applicant, First Respondent contends that Applicant on the one hand, argued that he is being denied access to the detainees, whilst on the other hand, the same Applicant alleges that the inmates called him on his mobile phone and instructed him to represent them. Such contradictions amount to fundamental inaccuracies which are not permissible in litigation. The Court was referred to the case of **Khumalo v Auditor General and Others (132/2013) [2013] SZHC 56 (6 March 2013)** in which the Court held that;

"**The Applicants in law are approbating and reprobating. In other words, they are blowing hot and cold. A litigant is not allowed to do so in law. He is required to then stick to that position.**"

## ANALYSIS AND CONCLUSION

[13] On the first ground of opposition, namely that Applicant lacks the necessary *locus standi* to institute the present application, the Court is

11

Appx.321

of the view that this point is totally is misdirected and misplaced. It appears that the primary component of this ground of opposition is that Applicant has not been properly instructed by the inmates so as to clothe him with the necessary right in law to bring the present application to Court.

[14] In his Founding Affidavit, the Applicant, who is an attorney of the High Court of Eswatini, states that he personally went to the place of detention of the inmates (Matsapha Maximum Correctional Facility) and was there informed by the officers of the First Respondent that the inmates do not wish to see him or consult with him as they have their own attorneys in the United States of America. It is the Applicant who was blocked from seeing or consulting with the inmates. It is him (Applicant) who was denied access to see the inmates and therefore it can only be him to approach this Court in order to claim the right of access to the inmates. The right to consult with the inmates affords Applicant a substantial and direct interest to the relief sought.

[15] What is the source of the right enjoyed by Applicant in meeting and consulting with the inmates? Attorneys all over the world work with

12

Appx.322

correspondent attorneys in matters in which they ordinarily have no jurisdiction. The First Respondent has not disputed the fact that the US based attorneys are indeed the attorneys of record for the inmates kept in the country. The position of the law is that the US based attorneys representing the inmates have no right of audience in our Courts and have no jurisdiction to personally come into the country and represent the inmates.

[16] The globally accepted legal practice is that the US based attorneys must instruct an attorney or a law firm in the country (Eswatini) which has a right of audience in our Courts to carry out the mandate of the US based attorneys. This is how the Applicant enters into the picture. He is executing a mandate or instructions as a correspondent attorney of the US based attorneys. The Applicant need not have been instructed by the inmates or have met with them prior in order to consult with them. If the detainees do not wish to consult with the Applicant, the procedure is for them to give this instruction to their US based attorneys who will in turn terminate the mandate of the Applicant. This can only happen after there has been a meeting between the Applicant and the detainees.

13

[17] In a paper written by **Leoni Inc.** *'Understanding the Role of a Correspondent Attorney in South Africa'* found at www.leoninaudeinc.com the authors state that;

"**A correspondent attorney in South Africa is a lawyer who acts on behalf of another lawyer or law firm that is not based in the same geographical area as where the court proceedings are taking place. Typically, law firms will engage a correspondent attorney when they need to handle a matter in a court that is outside the jurisdiction of where the firm is located. This is particularly common in South Africa due to its vast geographical diversity and the specific local knowledge required for different courts.**"

[18] The authors (above) further state that;

"**The primary role of a correspondent attorney is to provide local representation and assistance to out-of-town law firms. Their responsibilities include:**

- **Filing and handling documents**
- **Attending Court**
- **Providing local expertise**

14

Appx.324

- **Managing logistics."**

[19] The second and third grounds of opposition to the application are also without merit. It was submitted on First Respondent's behalf that the detainees are not facing any criminal charge nor are they engaged in any proceedings of a legal nature. This argument overlooks a primary consideration which is that the affected people are not kept in a hotel but are kept in a detention facility. Their freedom of movement, speech and other rights enjoyed by ordinary human beings are restricted. In these circumstances the inmates are entitled to legal representation as articulated in Section 16 of our Constitution. The other consideration is that if these immigrants are not facing any criminal charge or legal proceedings as argued on behalf of the Attorney General, then the Court is asking itself why the immigrants are being kept in a detention facility.

[21] The officers of the First Respondent are precluded by law from denying Applicant access to the inmates. It is improper and legally incorrect for the officers of the First Respondent to inform Applicant that the detainees do not wish to consult with him. The inmates ought

15

to directly and personally inform the Applicant that they do not wish to be represented by him or consult with him. As indicated herein above, the information must first be communicated to the instructing attorneys in the US who must in turn terminate Applicant's mandate to act in the matter. All of this ought to happen (if need be) after a proper meeting between the parties' i.e Applicant and the detainees.

[21] It is for these reasons that the Court, after hearing arguments on the 3rd October 2025, proceeded to grant prayers 5 and 6 of the notice of motion. Costs (prayer 6) were granted at the ordinary scale.

**B.S DLAMINI J**

**THE HIGH COURT OF ESWATINI**

*For Applicant:*      *Attorney Mr. S. Nhlabatsi*

*(MotsaMavuso Attorneys)*

*For 1st Respondent:*      *Attorney Mr. S. Hlawe*

16

Appx.326

*(Attorney General's Chambers)*

17

## DECLARATION OF JACQUELINE M. BROWN

I, Jacqueline M. Brown, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of California. My business address is 2130 Fulton Street, San Francisco, CA. I have been employed at the Immigration & Deportation Defense Clinic at the University of San Francisco, School of Law, since 2015. I am an Associate Professor and currently the clinic's Director. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since 2005, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts and with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3. I began representing NM, a citizen of Burma, on May 14, 2025, and I have continued to represent him after the U.S. Department of Homeland Security (DHS) deported him to South Sudan, even though that was not previously designated as a country of removal or identified in prior proceedings as a country to which he would be removed.

4. On August 17, 2023, after appearing pro se on an application for protection under the United Nations Convention Against Torture (CAT), NM's CAT application was denied and he was ordered removed to Burma.

5. On May 20, 2025, DHS attempted to deport NM to South Sudan without meaningful notice or an opportunity to apply for fear-based protection. Because of an order issued pursuant to a preliminary injunction in *D.V.D. v. U.S. Department of Homeland Security*, he was detained at a military base in Djibouti until July 5, 2025.

6. NM had a fear of persecution and torture in South Sudan based on his inability to read or write in any language, and his inability to speak English or any other language spoken in South Sudan. He was afraid that he would be a target for violence in South Sudan due to his status as a foreigner or due to the characterizations of his criminal conviction and that he would not be able to obtain protection there. He was more afraid after the publicity regarding third country deportations to South Sudan when his picture was publicized by DHS and subsequently appeared all over the internet. He was equally afraid that the police or other government officials would arbitrarily detain him.

7. While he was in Djibouti, I met with him many times by video-conference with the assistance of a Karen interpreter. NM articulated his fear when we were preparing for a reasonable fear interview with USCIS; he was sent to South Sudan before he had that interview.

1

EXHIBIT 23 Appx.328

8. After the Supreme Court issued decisions in *D.V.D.* staying the preliminary injunction and a remedial order addressing the situation of NM and other men being held in Djibouti, NM was deported to South Sudan without any decision on his eligibility for withholding of removal or protection under CAT regarding that country.

9. Since he arrived in South Sudan on July 4, 2025, I have rarely been able to speak with him. For several weeks, I had no idea where he was or how he was being treated. I often wondered if he was still alive. From our limited conversations, I believe that he is being detained indefinitely and without charge by South Sudanese government officials, as he had feared before he was deported.

10. NM has called me unscheduled a few times, usually in the middle of the night when I do not have access to an interpreter. I have not been able to call him or schedule any calls. He has also occasionally been able to call a family member who has relayed information to me. He has stated that he and the other men he was deported with are being held in some kind of building, with an armed guard watching them, in poor conditions. He has described intense heat and relentless mosquitoes, as well as debilitating boredom. His mental health has deteriorated, and he has had suicidal thoughts. He feels helpless, especially since nobody has provided any information about how long he will be held in that facility. He has not met with any officials of the South Sudanese or the Burmese government about his repatriation or his release, at least as of November 5, 2025, which was the last time he called his relative.

11. I have been working with Godfrey Bulla, a human rights attorney in South Sudan, who has been attempting to obtain unmonitored access to NM and EAH, another man from the group being held with him. I understand that Mr. Bulla has tried on several occasions to obtain permission from the Ministry of Foreign Affairs and International Cooperation to meet with the men, but these requests have all been denied.

12. EAH's attorney, Ms. Alma David, and I have also communicated with Amnesty International about the situation of our clients. On September 9, 2025, Amnesty released an "Urgent Action" about our clients, requesting its members write to the South Sudanese Minister of Foreign Affairs and International Cooperation to urge them to: immediately disclose the whereabouts of NM and EAH, grant them consistent and unmonitored access to their legal representatives, including local counsel, and immediately clarify the legal grounds of their detention. (*See* https://www.amnesty.org/en/documents/afr65/0252/2025/en/).

13. I believe that DHS obtained some type of travel document or passport for NM but never provided it to him. When NM was in Djibouti, he stated that he believed DHS had a passport made for him. At his last check-in with ICE in February 2025, an official showed him what he described as a small book. Since he is illiterate, he was unable to read it, but he stated that it had his picture in it. For several months, he was moved around the country to various detention facilities, and the whole time he was being told that they were going to deport him to Burma. It was not until hours before his removal that he was told he was being sent to South Sudan.

2

Appx.329

3

14. My client expressed a fear of returning to Burma, a country he fled as a child to escape persecution due to his Karen ethnicity.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 12th day of November, 2025 at San Francisco, CA.

                         _____

                         Jacqueline M. Brown

3

**DECLARATION OF ANWEN HUGHES**

I, Anwen Hughes, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney licensed to practice in the State of New Jersey. My business address is Human Rights First, 121 W. 36th St., PMB 520, New York, NY 10018. I have been employed in various capacities as a refugee lawyer at Human Rights First (formerly the Lawyers Committee for Human Rights) since 1999, currently serving as Director of Legal Strategy for Refugee Programs. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration and refugee law since 1999. In that time, I have represented hundreds of noncitizens directly in removal proceedings before the Executive Office for Immigration Review (EOIR), before the federal courts, and in asylum and other applications for immigration benefits and relief filed with U.S. Citizenship and Immigration Services (USCIS). I have overseen the representation of many hundreds more in cases where lawyers in private practice working pro bono through Human Rights First's representation program served as counsel of record.

3. I am also one of the class counsel in *D.V.D. v. DHS*. I undertook to represent two class members, J.M.G. and D.D., after U.S. Immigration and Customs Enforcement (ICE) attempted to deport them and six others to South Sudan at the end of May 2025. J.M.G. is a Mexican national and D.D., is a Sudanese national by birth who had been resettled in the United States as a young child as a refugee from Sudan, and who had been ordered removed to Sudan. This declaration is based on my communications with J.M.G. and D.D. and their families, and with officials of the U.S. and Mexican governments about J.M.G.'s situation.

4. J.M.G. is a citizen of Mexico who was ordered removed by an immigration court in 2005. A Mexican consular official had visited J.M.G. in prison, and it was J.M.G.'s understanding that he would be removed to Mexico upon completing his criminal sentence.

5. On May 20, 2025, ICE attempted to deport J.M.G. to South Sudan. I began representing J.M.G. individually while he was in Djibouti.

6. There is no indication that ICE contacted any Mexican consulate in the United States to request travel documents for J.M.G. or to arrange for his return to Mexico. ICE attempted to deport J.M.G. to South Sudan and later successfully deported him there without any travel documents or identification documents.

7. While J.M.G. was being held in Djibouti, I was in touch with his family, as were Mexican consular officials. Having gathered enough evidence of J.M.G.'s

1

EXHIBIT L App.331

identity and nationality to issue him a travel document to enable his return to Mexico, my understanding is that Mexico's embassy in Washington, D.C. made a request to the Department of Homeland Security (DHS) for the Mexican embassy in Addis Ababa to be given remote consular access to J.M.G. for purposes of conducting an interview that would allow Mexico to process travel documents for him.

8. After the Supreme Court ruled in *D.V.D.* on July 3, 2025, DHS deported both J.M.G. and D.D. from Djibouti to South Sudan. J.M.G. and D.D. and the other men were detained upon arrival by the South Sudanese security services in a house where they and the other men were held under armed guard.

9. After J.M.G. and D.D. were flown to South Sudan neither I nor their family members, with whom I remained in close contact throughout, had any word from them for over a month. The families of both were frantic. On July 28, I filed complaints on behalf of both, at the request of their relatives, with the U.N. Working Group on Enforced and Involuntary Disappearances, based on their incommunicado detention at an unknown location.

10. It was not until August 12 that J.M.G. and D.D. the other detainees were allowed periodic contact with their families. Communication with counsel was more difficult. Local lawyers in South Sudan did not have access to the men. J.M.G. was only able to call me twice, once on August 27, and once on Labor Day, September 1.

11. During the weeks when J.M.G. was being held incommunicado, I remained in contact with the Mexican Foreign Ministry and with Mexico's ambassador to Ethiopia, whose consular district covers both Djibouti and South Sudan, about steps to secure J.M.G.'s release and his prompt extrication from South Sudan.

12. The Mexican embassy in Addis Ababa was not granted a consular interview with J.M.G. until a month after requesting one and after repeated follow-up. After that consular interview was completed, the Mexican Foreign Ministry was able to issue J.M.G. an actual passport, but it took over three more weeks before J.M.G. was finally released on September 6 to the Mexican ambassador to Ethiopia, who traveled to Juba to pick him up and bring him Addis Ababa. He then was flown back to Mexico. Mexican government representatives accompanied him on all the legs of this trip.

13. The South Sudanese authorities detained D.D. until the end of July, despite the fact that D.D., who had never set foot in South Sudan before this and had no criminal charges pending against him anywhere, had acquired South Sudanese citizenship as a result of South Sudan's independence in 2011.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

2

Executed this 7th day of December, 2025 at Ann Arbor, Michigan.

_____

Anwen Hughes

3

Appx.333

**DECLARATION OF MIA UNGER**

I, Mia Unger, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am an attorney licensed to practice in the State of New York, the Southern District of New York, and the Second Circuit Court of Appeals. My business address is 111 Livingston St., 11th Fl., Brooklyn, NY 11201. I have been employed as a Staff Attorney at The Legal Aid Society since 2014. I am over the age of 18 and am competent to testify regarding the matters described below.

2.      I have worked in immigration law for approximately 15 years. I have worked full-time as an immigration attorney with the Legal Aid Society since September 2014. I have represented hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and in applications and petitions for immigration benefits or relief before U.S. Citizenship and Immigration Services (USCIS). In December 2024, I transitioned out of the Immigration Law Unit of the Legal Aid Society's Civil Practice and into the Immigrant Justice Team of the Legal Aid Society's Criminal Defense Practice.

3.      I represent OE, who came to the United States from Jamaica on an immigrant visa as a child nearly 50 years ago. He lived as a lawful permanent resident in the United States for many years but was ordered removed in 2009 because of his criminal record. OE completed his sentence and was released on parole in 2021. U.S. Immigration and Customs Enforcement (ICE) did not deport him. Instead, ICE required him to report under an Order of Supervision, which he complied with until he was taken into ICE custody earlier this year. OE was deported from the United States on July 14, 2025. He was deported to the Kingdom of Eswatini, a country with which he had no ties, despite holding a valid passport from Jamaica, his country of birth.

4.      I was contacted by the New York-based family of OE in mid-July, after he disappeared from the ICE Online Detainee Locator on July 14, 2025, and his family stopped hearing from him. I signed a retainer with OE's son on July 22, 2025 and began representing the family to support them in locating OE and seeking his repatriation to Jamaica, his country of birth and the country from which he had a valid passport.

5.      OE's family and I suspected OE was in Eswatini because of a post on X by U.S. Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin dated July 15, 2025, with his photograph. However, OE never told his family where he was being sent and did not call them from Eswatini until August 1, 2025, the day after a habeas corpus petition was filed in the High Court of Eswatini on behalf of OE and the four other men deported to Eswatini from the United States. OE's family was very distraught since the time he disappeared from the Online Detainee Locator, and particularly during the two and a half weeks before his first phone call. I remember a conversation with OE's son and aunt when they told me they didn't know if he was alive or dead.

1

EXHIBIT 1   Appx334

6.  I made several efforts to contact the Eswatini and U.S. governments to request confirmation that OE was in Eswatini, get information about him, and request communication with him. For example, on July 25, 2025, I called and emailed the Ministry of Justice in Eswatini, but I could not reach anyone, and my email was returned as undeliverable. On July 25, 2025, I also called and emailed the Eswatini Embassy in the United States and was told that my request and contact information would be forwarded to the Capital, but I never heard back. On July 29, 2025, I spoke with Carly Van Orman, a Spokesperson and Public Affairs Officer for the U.S. embassy in Eswatini. She took my name and contact information and said she would forward it to the relevant people, however I never heard back from anyone in the U.S. or Eswatini governments.

7.  Throughout the course of OE's time in Eswatini, I was in regular contact with the Jamaican Embassy in Washington, D.C. and I knew that representatives of the Jamaican government at the embassies in the United States and in South Africa were working towards OE's repatriation.

8.  I was in communication with two attorneys in Eswatini who tried to visit OE and the other four men deported with him at the Matsapha Correctional Complex in Eswatini, where various international news articles said they were being held. The first attorney was an American living in Eswatini and his request to meet with men was denied. The second attorney was Sibusiso Magnificent Nhlabatsi, an Eswatini attorney whose request to meet with the men was also denied multiple times. Along with the U.S.-based attorneys for the other men, I asked Mr. Nhlabatsi to file a petition for habeas corpus with the High Court of Eswatini seeking access to the five men on July 31, 2025.

9.  As noted above, the day after the habeas petition was filed, OE was allowed his first phone call to his family. The call occurred via video on WhatsApp. Over the course of the next few weeks, OE called his family multiple times, at unpredictable days and hours. The family told me the calls were short and were not private. The prison guards could be seen in the background. Through these calls, OE's family learned that OE was not eating well and was losing weight.

10. During their calls, OE's family gave him my name and phone number as well as the name and phone number of Mr. Nhlabatsi, the attorney we were partnering with in Eswatini. However, OE was not allowed to call me or Mr. Nhlabatsi. I only spoke to OE once while he was in Eswatini. On September 5, 2025, the International Organization for Migration (IOM) allowed him to call his family, and he used the opportunity to call me without telling them he was calling his lawyer. He told me that the Eswatini prison guards would not allow him to call me.

11. The Eswatini government opposed the habeas petition filed by Mr. Nhlabatsi. It claimed that OE and the four other men refused to meet with Mr. Nhlabatsi. However, I asked OE's family to ask him if he was told Mr. Nhlabatsi was there to meet with him, and OE told his family that he was never told about any attorney visitor. Since his repatriation, OE has also told me that he was never told about any attorney visitor.

2

Appx.335

12. I sent multiple emails to various people at IOM in the month of September 2025 because I knew IOM was working on coordinating OE's repatriation. The only person who responded to me was Frantz Celestin, Regional Director for IOM East. Mr. Celestin said he could not discuss OE's case with me without "a formal request" from OE or a power of attorney. I explained that it was impossible to get - under the circumstances where OE was being denied access to counsel.

13. OE left Eswatini on September 21, 2025, and was repatriated to Jamaica on September 22, 2025, with the assistance of IOM. He entered Jamaica using the same passport he had throughout his time in ICE custody and throughout his deportation to Eswatini.

14. Since OE's repatriation to Jamaica, we speak regularly, and I have learned more about his deportation to Eswatini. The paragraphs that follow are what I have learned from OE through our conversations over the past few weeks. I write this declaration in lieu of OE because he has had limited access to technology, particularly in the aftermath of Hurricane Melissa.

15. On or about March 14, 2025, OE reported to ICE in New York City under his longstanding Order of Supervision and was asked to obtain a Jamaican passport and return in June. On or about June 12, 2025, OE reported to ICE with a Jamaican passport and was taken into ICE custody, where he remained for about a month, moving between New York, Louisiana, and Texas.

16. On or about June 26, 2025, while in ICE custody in Louisiana, OE was put in a holding cell with many other Jamaican men, which they presumed meant they were about to be deported to Jamaica. After several hours, all the men were called to leave the cell except for OE. An officer showed OE a paper with a list of names, and OE saw that his name was there, but was crossed out. He returned to his dormitory, but the other Jamaican men from the holding cell did not. Eventually, he was transferred to El Paso, TX.

17. On July 14, 2025, OE was taken from the El Paso Processing Center and put on a plane with four other men of different nationalities. There were also Special Response Team (SRT) officers on the flight, but they did not tell OE where he was going. The first flight, on a private jet, made one stop to refuel and eventually landed after several more hours. OE overheard an officer say they were in Djibouti. In Djibouti, he was put on a second plane, this time a military aircraft, with the same four men who had been deported from the United States, the same SRT officers, and also many uniformed military officers. No one told him where he was going, until the second flight was close to landing in Eswatini on or about July 16, at which point one of the SRT officers said where the plane was landing. OE didn't recognize the name and it was loud on the military aircraft, but he said he realized later that he had said "Eswatini." An SRT officer asked OE to sign some paperwork, but he refused. After landing, one of the Eswatini officers said they were in Uganda. The following day, an officer at the prison confirmed that OE was in Eswatini.

18. OE had no prior connection to Eswatini. He was not aware of conditions in Eswatini.

3

Appx.336

19.     OE was held in a maximum-security prison in Eswatini for nine-and-a-half weeks. OE was not told why he was sent to Eswatini or why he was imprisoned. He was never charged with any crime in Eswatini. His mental and physical health suffered during his time there. For example, he was depressed, anxious, and hopeless, and lost a significant amount of weight.

20.     During his time in detention in Eswatini, OE was denied access to legal counsel. He repeatedly asked to call me and Mr. Nhlabatsi, but the prison guards said no. On at least one occasion, the Officer-in-Charge said he would have to get permission from the U.S. Embassy for him to call me. As noted above, the only call OE ever made to me from Eswatini was when IOM gave him a private call to his family and he called me instead, unbeknownst to them.

21.     The High Court of Eswatini granted the habeas petition on October 3, 2025, after OE had already left Eswatini (the four other men deported with him from the United States remain there). However, the Eswatini government appealed, and the decision was stayed.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 14th day of November 2025 in Brooklyn, New York.

_____
Mia Unger

4

## DECLARATION OF PATRICK TAUREL

I am over 18 years of age and am competent to testify. I hereby swear and affirm that the following is based on my own personal knowledge and is true and correct, and that my testimony, under oath and penalty of perjury pursuant to 28 U.S.C. § 1746, is as follows:

1. My name is Patrick Taurel. I am an attorney and am licensed to practice law in the District of Columbia and the state of New York. I am admitted to practice before the United States District Courts for the District of Columbia, Western District of Michigan, and District of Colorado. I am also admitted to practice before the United States Courts of Appeals for the Fourth, Ninth, and Tenth Circuits. I am a Partner at the law firm Grossman Young and Hammond, LLC ("GYH").

2. Together with my colleagues at GYH, I represent eleven individuals before the United Nations Committee Against Torture who were removed, along with three other men and women, from the United States to Ghana on September 5, 2025. I am also one of the attorneys who represented five of the fourteen individuals who were deported that day in litigation before the U.S. District Court for the District of Columbia in an effort to obtain an order compelling the U.S. government to take action preventing Ghana from sending these individuals back to their countries of origin where U.S. immigration judges had already ruled that it is more likely than not that they would be subject to persecution or torture. *See D.A. v. Noem*, No. 1:25-cv-3135 (TSC).

3. I and my colleagues have gathered information on the experiences of all fourteen individuals on that September 5 flight by speaking directly with those individuals, as well as their family members and immigration attorneys (for those who have such counsel). None of the individuals are Ghanaian. Their countries of origin are Nigeria, The Gambia, Togo, Mali, and

1

EXHIBIT 1

Liberia. To the best of my knowledge, at least ten of the fourteen individuals aboard the removal flight on September 5, 2025, had been granted fear-based protection from removal to their countries of origin. I am submitting this declaration to explain how U.S. authorities deported the fourteen individuals without notice or opportunity to contest their removal, describe the conditions our clients faced in Ghana, and explain how Ghanaian authorities removed all but one of the fourteen individuals out of Ghana and, in at least four cases, into countries where they have an established fear of persecution and torture.

4. On September 5, 2025, all fourteen individuals were taken from their immigration detention cells in the United States and were told by officers with U.S. Immigration and Customs Enforcement (ICE) that they were being transferred or deported. They were placed in shackles that bound their ankles, wrists, and waist. At least four of the fourteen also reported being placed in a WRAP restraint, a full-body restraint device.[1] All fourteen individuals were loaded onto a military cargo plane at an airport in Alexandria, Louisiana. At least three of the fourteen were told by U.S. immigration authorities that they were being removed to Ghana only shortly before or while being loaded onto the plane. Others received no notice of their removal to Ghana until after the plane took off. Several of the fourteen individuals expressed fear of removal to Ghana, but U.S. officials simply told them they were following orders to effectuate their deportations to Ghana, and once in Ghana, they would be sent on to their countries of origin. Only one of the fourteen individuals removed, Z.Y.B., had any ties to Ghana. All fourteen individuals were deported without travel documents.

---

[1] Jason Dearen, Jim Mustian, and Dorany Pineda, *Takeaways from the AP's investigation into ICE's use of a full-body restraint device known as the WRAP*, AP (Oct. 22, 2025), https://apnews.com/article/immigration-deportations-trump-administration-civil-rights-takeaways-1dcc225e67c1dafba86b6ec4cc7da50e.

2

5.      Upon arrival at the airport in Accra, Ghana, three of the fourteen individuals, including, K.S., were separated from the rest of the group and taken to holding rooms inside the airport. K.S. is from The Gambia. K.S. was held at the airport for five days, where he repeatedly expressed his fear of being returned to The Gambia, a country from which the United States had previously granted him protection under the United Nations Convention Against Torture (CAT) based on his sexual orientation. But Ghanaian officials told him that his final destination was The Gambia, based on orders from ICE officials and their Ghanaian counterparts. He was refouled to The Gambia on September 10, 2025, and he is currently in hiding in fear for his life. Attached to this declaration as **Exhibit A** is the declaration of K.S. about his experience.

6.      E.A., another of the three individuals separated from the rest of the group, is from Nigeria. She was held at the airport in Accra for approximately 12 hours. During this time, E.A. repeatedly expressed her fear of return to Nigeria and explained that she had been granted deferral of removal to Nigeria under the Convention Against Torture because of her opposition to female genital mutilation. Ghanaian officials told E.A. they could not permit her to stay in Ghana. E.A. was driven by Ghanaian authorities to the Ghana-Togo border. There, Ghanaian authorities gave her the equivalent of approximately $120 and paid a taxi driver to take her through Togo and onward to Nigeria. E.A. is currently in hiding in Nigeria. Attached to this declaration as **Exhibit B** is the declaration of E.A. regarding her experience.

7.      The remaining eleven individuals were taken to a remote military camp known as Bundase Training Camp or Battle Training Camp.[2] Conditions at the camp were deplorable. There was no reliable power, internet, or running water. Food and water quality was poor, and

---

[2] The individuals originally believed the name of the place where they were being held was called Dema Camp.

Appx.340

there were snake and mosquito infestations. They were constantly monitored by armed guards. Attached to this declaration as **Exhibit C** is the declaration of one of our clients, D.A., regarding his experience at the camp.

8. The eleven individuals were held at Bundase Training Camp for nearly two weeks. During this time, Ghanaian authorities reported to media outlets that all fourteen deportees had been or would be deported to their countries of origin.

9. On Thursday, September 18, 2025, Ghanaian officials removed D.A., T.L., I.O, A.A., R.A., and S.O. from Bundase Training Camp and forced them into Togo.

10. On Friday, September 19, 2025, Ghanaian officials removed D.T., B.G., J.K., and D.S. from Bundase Training Camp and drove them to the Togolese border where they were subsequently forced into Togo.

11. R.A. and S.O. are Togolese and both had previously been granted withholding of removal to Togo under the Immigration and Nationality Act (INA) by U.S. immigration judges based on their fear of persecution due to their opposition to female genital mutilation. Both are now in hiding and afraid that they will be persecuted or killed. R.A. has lost access to communication because her phone number had been cloned and she received several threats.

12. D.T. is Malian. An immigration judge previously granted D.T. withholding of removal to Mali under 8 U.S.C. § 1231(b)(3) because she fears persecution due to her opposition to female genital mutilation. After she was forcibly removed to Togo by Ghanaian authorities, she was kidnapped and sexually assaulted in Togo. She was able to escape and is now in hiding in Mali.

4

13. On or about September 20, 2025, Ghanaian authorities released Z.Y.B. into Ghana to a family member after first attempting to send him to Togo, his country of origin, where he fears persecution and torture because of his political opinion and religion.

14. T.L., I.O., and A.A. are Nigerian and are currently in Togo. They are hiding with limited access to funds or other resources. They do not have legal status and are in an extremely precarious situation in Togo. Immigration judges had granted T.L. and I.O. CAT protection to Nigeria, and an immigration judge had granted A.A. withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT protection to Nigeria because of his sexual orientation.

15. D.S., whose country of origin is The Gambia, and J.K., whose country of origin is Liberia, are also in hiding in Togo. An immigration judge had granted D.S. withholding of removal to The Gambia under 8 U.S.C. § 1231(b)(3) because of his sexual orientation. An immigration judge had previously awarded J.K. asylum due to his political opinion.

16. All fourteen individuals are afraid for their safety and well-being in countries to which Ghanaian authorities deported them, after the United States removed them to Ghana.

17. My firm recently learned of another flight that departed the United States on or around November 6, 2025, and subsequently arrived in Accra, Ghana. We learned of this flight through legal advocates of some of the deportees on board. The group of deportees was initially transferred to a hotel in the Greater Accra Region and held under armed guard. On November 11, 2025, one individual on that flight, R.K., was forcibly removed by Ghanaian immigration authorities from the hotel and ultimately deported to her country of origin, Sierra Leone. R.K. repeatedly told Ghanaian officials she had a documented fear of return to Sierra Leone, and an immigration judge had granted her withholding of removal under 8 U.S.C. § 1231(b)(3) because of her political opinion.

5

Appx.342

18.     In the middle of the night on or around November 11, 2025, the remaining eight individuals from the November 6 deportation flight were forcibly removed by armed Ghanaian authorities from the hotel to a detention camp. As of November 14, 2025, one of those individuals, M.M., was removed by Ghanaian authorities and placed on a plane to The Gambia, his country of origin. M.M. repeatedly told Ghanaian authorities that he had won protection from removal to The Gambia. An immigration judge had granted M.M. withholding of removal under 8 U.S.C. § 1231(b)(3). He is now in hiding in The Gambia, afraid for his life. On November 14, 2025, another individual, M.G., was moved from the detention camp to an immigration cell at the airport in Accra. As of November 17, 2025, M.G. was removed to Senegal, his country of origin. He had been granted withholding of removal to Senegal under the Convention Against Torture and had told Ghanaian authorities he had a documented fear of torture in Senegal.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 5, 2025 in Bethesda, Maryland.

_____            12/05/2025
Patrick Taurel                                     Date

6

# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

D.A., T.L., I.O., D.S., and K.S.;

    *Plaintiffs*,

v.

KRISTI NOEM, Secretary of Homeland Security, in her official capacity; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; PAMELA BONDI, Attorney General, in her official capacity; and MARCO RUBIO, Secretary of State, in his official capacity

    *Defendants*.

Civil Action No. _____

## DECLARATION OF PLAINTIFF K.S.

I am over 18 years of age, am currently in The Gambia, and competent to testify. I hereby swear and affirm that the following is based on my own personal knowledge and is true and correct, and that my testimony, under oath and penalty of perjury, is as follows:

1. My name is K.S. I am using a pseudonym for safety reasons. I am over 18 years old. I am currently in The Gambia in hiding, after being deported from the United States to Ghana and then to The Gambia.

2. I have read this declaration and confirmed that everything written here is true and correct to the best of my knowledge. Because I am currently in hiding in The Gambia, I would be unable to go to the court to testify.

3. On March 7, 2025, I won deferral of removal under the Convention Against Torture from my home country of The Gambia due to the specific risks of torture and death I

1

Appx.345

face there on account of my sexuality. On April 7, 2025, that decision was rendered final. U.S. Immigration and Customs Enforcement ("ICE") continued to hold me in detention at the Moshannon Valley Detention Center for five months after my relief became final.

4. On September 4, 2025, I was transferred by ICE to the Alexandria Staging Facility in Louisiana. I was given an ID that consisted of a piece of paper on GEO Group letterhead and titled LaSalle Processing Center Subject Profile, with my name, A number, headshot, and country of origin, with the level "high" and arrival date "9/4/25."

5. Late on September 5, 2025, I was removed from my cell, handcuffed, and told that I was going on a plane. I was denied requests to speak with my lawyer and was not given any travel documents.

6. I was chained at the hands, waist, and ankles and placed on a military cargo plane with none of my belongings, along with 13 other people from West African countries (10 men and 4 women in total). Four of the people were put in straitjackets because they refused to get on the plane without speaking to their attorneys. We were not told where we were going.

7. While on the plane, there were six ICE officers and some military personnel with the 14 of us. The plane stopped in the U.S. Virgin Islands to refuel and then made its final stop in Ghana. While at the fuel stop in the U.S. Virgin Islands, the apparent head ICE official on the plane, a bald Caucasian/Latino man, told me that those on the plane were being sent to Ghana and that Ghana would send us to our home countries.

8. The plane landed in Accra, Ghana, on September 6, 2025. Ghanaian immigration officials asked those of us who were on the plane for our paperwork, but we did not have any paperwork. The Ghanaian officials stated that ICE had not sent any paperwork for us and asked us why we had been deported from the United States. One other man, one woman, and I were

2

then detained by Ghanaian immigration officials in a room at the airport. On that same day, Ghanaian immigration officials told the other man he would be dropped off at the Nigerian border and took him out of the room. The woman was taken the next day, I believe, also to Nigeria. I was held in the room at the airport for five days with no access to phones, no showers, and no change of clothes.

9. During those five days, I spoke repeatedly with two Ghanaian immigration officials, named Ibrahim Liang Hani and A. Amon. I explained to them my fear of returning to the Gambia, the basis for my fear, and the fact that I'd won protection from being returned to The Gambia under the Convention Against Torture. I told them that I wanted to stay in Ghana for my safety. The official Ibrahim just told me that my final destination was The Gambia, based on orders from ICE officials and his Ghanaian superiors.

10. On September 8, 2025, Ghanaian officials wrote up travel documents for me in front of me for me to be sent to The Gambia. On September 10, 2025, I was placed on a Pan African Airlines flight, accompanied by two Ghanaian immigration officials, one male and one female.

11. When we landed in The Gambia, the Ghanaian immigration officials presented the travel documents to Gambian immigration officials, who refused to accept them, believing the documents to be invalid. One Gambian official recognized me and allowed me to enter The Gambia despite the lack of valid documents, telling me that he believed I would just remain detained if I were to return to Ghana.

12. The official asked me to make a written statement about the Ghanaian officials making fake travel documents, which I did. I was then released into The Gambia, without any

3

formal paperwork or processing. I borrowed a phone and called my sister, asking her to pick me up at the airport.

13.     I am now living in hiding with the help of my sister. I am seeking a way out of the country as soon as possible for the sake of my life.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 11, 2025.


*/s/ K.S.*                                                    September 11, 2025
Signature                                                    Date

4

Appx.348

# Exhibit B

## DECLARATION OF E.A.

I, E.A., am over 18 years of age, am currently in Nigeria, and competent to testify. I hereby swear and affirm that the following is based on my own personal knowledge and is true and correct, and that my testimony, under penalty of perjury, is as follows:

1. My name is E.A. I am using a pseudonym for safety reasons. I am currently in Nigeria after being deported from the United States to Ghana, and then on to Nigeria. I am currently in hiding in Nigeria.

2. I have read this declaration and confirmed that everything written here is true and correct to the best of my knowledge.

3. In 2002, an immigration judge granted me deferral of removal to Nigeria under the Convention Against Torture ("CAT") because of my fear of persecution and torture based on my refusal to undergo female genital mutilation.

4. I was released from ICE custody under an Order of Supervision, and I dutifully reported to ICE for annual check-ins for two decades. In 2022, ICE told me I did not have to report anymore.

5. On July 15, 2025, at 9:35 a.m., there was a loud knock on my door. Several ICE officers said they were looking for me. They arrested me and took me to an immigration detention facility in Conroe, Texas for processing. I stayed there for six weeks.

6. While in Conroe, Texas, I continued to tell ICE officers and my ICE case manager that I could not go back to Nigeria. My ICE case manager confirmed they could not send me directly to Nigeria.

7. On August 26, 2025, I was told to pack up my belongings because I was being transferred, but no one told me where I was going. I asked one of the officers where I was going,

1

and the officer responded that I was being sent to Nigeria. I told the officer that I can't be sent there because I have CAT protection, but she said that's the information she has for me. I was then taken from the facility in Texas to a facility in Louisiana.

8. On the way to Louisiana, I asked an officer what was happening, and the officer said that I was being taken to a facility where a flight would be waiting for me. I asked her where I would be going on the flight, and she said Nigeria.

9. I arrived at the detention center in Basile, Louisiana and met a couple of other women who also had protection from Nigeria. I was processed and held at this facility for a little over a week.

10. On September 5, 2025, I was told to pack up my belongings. Around this time I noticed my commissary account was closing, so I knew I would be deported soon. I was picked up by a transport van at 3:00 a.m. along with several others and put on a U.S. military cargo plane at an airport in Alexandria, Louisiana. When I boarded the plane, I was told we were being taken to Ghana. I was shackled at the wrists, waist, and both feet for the entire 18-hour flight to Ghana. The only time I was unshackled was when I had to go to the bathroom, and then I was only allowed to have one hand uncuffed. We stopped at an island to refuel. I continued to tell the ICE officers transporting us that I could not be sent to Nigeria and that I had CAT protection from Nigeria. In response, the ICE officers said they were just following their orders to pick up 14 individuals from Alexandria, Louisiana to be deported. The military crew on the plane said the same thing – that they were just completing their mission. The military members were in a military uniform while ICE agents were in plain clothes.

11. When we arrived early in the morning in Ghana, I was taken to a small room in the airport and given a mat to lie on. Ghanaian authorities did not have travel documents for me.

2

Appx.351

I repeatedly told Ghanaian immigration authorities that I could not be sent back to Nigeria, and in response they would only tell me that they'd worry about that later. I even asked if I could stay in Ghana because I cannot go back to Nigeria, and the Ghanaian officials said that would not be possible because they did not have a visa or any travel document permitting me to stay. I was held at the airport for 12 hours and only fed once.

12. Later that day, Ghanaian officials informed me I would be taken to Nigeria. Ghanaian officials placed me in a van by myself with no other detainees, and I was accompanied by a female Ghanaian official and a driver who drove me to the Ghana-Togo border. At the border, Ghanaian authorities gave me 1500 Cedis, which equates to $120.70. Ghanaian authorities paid a taxi driver to take me through Togo, where I was then transferred to another taxi that dropped me off at the Nigerian border.

13. I am currently afraid for my life and am in hiding in Nigeria. I am trying to leave Nigeria as soon as I can for my safety.

I declare under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

Executed on this 30th day of September, 2025, in Nigeria.

<table>
<tr><td>___/s/ E.A._____</td><td>___09/30/2025_____</td></tr>
<tr><td>E.A.</td><td>Date</td></tr>
</table>

3

Appx.352

**Attestation of Assent**

I, Jaclyn Dennis, hereby certify that I have read the above declaration to E.A. in English, which

is her primary language, and that she has given me permission to sign her initials on her behalf

with full understanding of its contents.

Dated this 30th day of September, 2025, in Alexandria, Virginia.

_____                    ____September 30, 2025___
Jaclyn Dennis                                                        Date

4

# Exhibit C

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| D.A., T.L., I.O., D.S., and K.S.; <br><br> *Plaintiffs,* <br><br> v. <br><br> KRISTI NOEM, Secretary of Homeland Security, in her official capacity; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; PAMELA BONDI, Attorney General, in her official capacity; and MARCO RUBIO, Secretary of State, in his official capacity <br><br> *Defendants.* | Civil Action No. 1:25-cv-03135 |

## DECLARATION OF PLAINTIFF D.A.

I am over 18 years of age, am currently detained in Dema Camp, Ghana and am competent to testify. I hereby swear and affirm that the following is based on my own personal knowledge and is true and correct, and that my testimony, under oath and penalty of perjury, is as follows:

1. I am using a pseudonym, D.A., for safety reasons. I am currently detained in Ghana in Dema Camp after being deported from the United States to Ghana on September 5, 2025.

2. I have read this declaration and confirmed that everything written here is true and correct to the best of my knowledge. Because I am currently detained in Ghana, I would be unable to go to court to testify.

3. I was granted withholding of removal by an immigration judge in the Otero Immigration Court on April 30, 2025 on account of the likelihood that I would be persecuted or killed

1

Appx.355

if removed to Nigeria. My wife is a U.S. citizen. She filed an I-130 petition on my behalf for me to receive a family visa. That petition was approved four months ago.

4. I am currently detained in Dema Camp in Ghana, where myself and other people who were also deported from the United States are being imprisoned. We are constantly surrounded by military guards.

5. I am originally from Nigeria. In Nigeria, I was a member of one of Nigeria's main political parties, the P.D.P. In 2018, I started being violently targeted by members of the ruling political party, the A.P.C. In November 2018, members of the A.P.C. beat me and other party leaders with plank woods, iron rods, and machetes. The attacks escalated from then and happened several times until I left Nigeria.

6. I fled Nigeria in 2019 after being tortured by the military and police officers for the Nigerian Department of State Services. They tortured me and kept me locked in a dog cage for three days until they let me go and told me they would kill me if they ever saw me again. After this incident I had to leave Nigeria to save my life.

7. Nothing in Nigeria has gotten better since I left. The situation in the country has become worse. The political party that targeted me is still in power.

8. On September 5, 2025, I was taken along with several other people in the middle of the night from my cell from the detention center in Alexandria, Louisiana. I did not know where we were going. I asked the officers where we were going, and they only told us that we were being transferred. They shackled us at the waist, hands, and feet. I asked yet again where we were going and said I was afraid for my life, and needed to speak with my lawyers.

2

Appx.356

9. The officer finally told me that we were going to Ghana. I told him that I am afraid of going to Ghana and that I cannot go to Ghana.

10. He told us "whether you like it or not, your ass is getting on that plane." He then straitjacketed me extremely tightly, tying me from my shoulders to my feet.

11. I was put onto a military plane with the other people who were taken from their cells. I remained straitjacketed for several hours until I pleaded with the officers to remove it so that I could use the restroom. I begged the officers over and over again to take off the straitjacket so that I could use the restroom, otherwise I would urinate on myself. They finally removed the restraints on my legs after pleading with them for a long time, but left the restraints on my upper body.

12. Because the straitjacket was so tight on my legs, I now have difficulty walking. My legs are extremely swollen to the point that I can only limp to move around.

13. While on the plane, the leader of the ICE officer who put me into a straitjacket said that he was ordered to make sure we all get to Ghana.

14. I told the officers repeatedly that I was afraid for my life. He told me that he didn't care, and that when we got to Ghana we would then go to our respective countries of origin.

15. I asked this ICE officer and the other officers on the plane for their names, but they refused to tell us. They only told us that they are following orders to deport us to Ghana, and from Ghana to send us to our countries of origin.

16. We eventually arrived in Ghana and were taken to Dema Camp, where I have been detained since then.

17. I fear for my life if I were to go back to Nigeria. If I go back to Nigeria, I will be tortured and possibly killed.

3

Appx.357

18. I have been terrified of returning to Nigeria since government officers a few days ago told us we would be sent back to our home countries imminently.

19. On September 12, 2025, around 8:00PM GMT, a Ghanaian military commander came to Dema Camp and informed me and the other people detained here that government officials from our countries would be coming to the camp to see us tomorrow morning. The commander told us that they gave our governments our names and information. We were told we will be removed the next day, on September 13, 2025.

20. Conditions are horrible at Dema Camp. Since the morning of September 12, there has been no reliable power, Internet, or running water. Ghana is not safe for any of us. But I am even more afraid of returning to Nigeria. I have been wearing the same clothes that I left the United States in over a week ago. We are constantly surrounded by military guards.

21. On September 13, 2025, around 2:30PM GMT, officials from the Nigerian Consulate came to Dema Camp to collect more of our information. We told both the Nigerian and Ghanaian officials that we cannot go back to Nigeria due to our fear of persecution and torture. I told them that I was granted protection from an immigration judge and could not be deported to Nigeria. I told the Ghanaian and Nigerian officials that we are not protected in Ghana, either.

22. Both the Nigerian officials and Ghanaian officials told us that they do not care, and that we will be sent back to Nigeria anyway. Officials told us that no matter what, we would be removed from Dema Camp by Monday.

4

23. We are all afraid for our lives. We are not safe here, and now they are planning to hand us over to our country's government for further persecution and torture. We don't know what our futures hold.

24. We urgently need help. We do not want to meet with government officials of our countries or to be returned to those countries.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 13, 2025.

_/s/_ _____
Signature

September 13, 2025_____
Date

5

**DECLARATION OF HANNAH BRIDGES**

I, Hannah Bridges, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a practicing attorney licensed to practice before the State of Virgina. My business address is 4103 Chain Bridge Road Suite 300 Fairfax, VA 22030. I have been employed as an attorney at Murray Osorio PLLC since November 2024. I am over the age of 18 and am competent to testify regarding the matters described below.

2.      I have practiced exclusively in immigration law since I started practicing in November 2024, representing noncitizens, and especially detained noncitizens, in removal proceedings before the Executive Office for Immigration Review (EOIR).

3.      I make this declaration based on my communications with my client R.K., her son, and other counsel who are also representing them, as well as my own review of her immigration-related documents and outreach to government officials.

4.      I began representing R.K., a citizen of Sierra Leone, in July 2025 when she was unexpectedly detained at a U.S. Immigration and Customs Enforcement (ICE) check-in. Before I began representing her, she was ordered removed to Sierra Leone around 1996. She later reentered the United States and received a reinstatement order in 2010. She has been attending ICE check-ins for nearly two decades.

5.      R.K. was detained at one of her regular ICE check-ins in July 2025. After she was detained in July, she spent several days in an ICE hold room in Baltimore, Maryland. ICE then transferred her to Richwood Correctional Center in Louisiana. She requested a reasonable fear interview (RFI), and after passing this interview she was later placed in withholding only proceedings in front of the Jena, Louisiana Immigration Court. At a hearing on September 17, the immigration judge granted her application for withholding of removal, and both parties waived appeal.

6.      About a week later, I contacted a deportation officer to determine whether she would soon be released from detention. The deportation officer told me by email that R.K. would continue to be detained and that they were actively pursuing third country removal but did not indicate that any country had been designated for a third country removal.

7.      On September 30, 2025, I submitted a request for a fear screening interview regarding R.K.'s fear of deportation to the following countries: Mexico, Belize, Costa Rica, Guatemala, Honduras, Nicaragua, Panama, Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, Venezuela, Cuba, Dominican Republic, Haiti, Ghana, Nigeria, Eswatini, Rwanda, and South Sudan. I also reserved her right to claim fear toward any other country where the U.S. Department of Homeland Security (DHS) may attempt to remove her. I sent the request to the deportation officer I had been in contact with, the New Orleans ICE Enforcement and Removal Operations Field Office, and the U.S. Citizenship and Immigration Services (USCIS) District 3 Asylum Division. I did not

1

EXHIBIT 41   Appx.360

receive any response from the deportation officer nor the New Orleans Field Office. The USCIS District 3 Asylum Division responded to provide that no referral for an interview had been received in their office and that a referral must take place before they can schedule an interview. On October 24, 2025, I also submitted a parole request to the deportation officer by email based on the equities in R.K.'s case, including that she has long worked as a nurse with legal authorization and also provides care for her elderly U.S. citizen parents who are struggling without her assistance. I did not receive any response to this parole request.

8. On or around November 4, 2025, I spoke with R.K. who said she received a regular review of her custody status by ICE that day. During this meeting, ICE told R.K. that DHS had not designated any additional country for removal and did not have travel documents to deport her to any other country. She did not receive or sign any notice relating to third country removal.

9. Also on November 4, 2025, the day before she was deported, R.K. spoke to an ICE employee in the commissary who told her she was on a list of individuals to be released from detention. She called her son, who added me to the call, and reported this news to us. I warned them that I had not received any word on her parole request but sent follow up inquiries to the deportation officer.

10. On November 5, the day R.K. was deported, a supervisory deportation officer responded to my follow up email and stated that ICE's system did not show any scheduled movements or transfers for R.K. No one else responded to my emails or repeated phone calls to the New Orleans Field Office.

11. On November 5, R.K. was deported to Ghana. On November 6, when we tried to reach her at the Richwood Correctional Center, neither R.K.'s son nor I could contact her or find out what had happened to her. Approximately 24 hours later, she called her son and informed him she had been deported to Ghana. She had had no opportunity to raise a fear claim about deportation to Ghana and did not know where she was being sent before being placed on a plane for deportation. On November 7, a deportation officer confirmed R.K. had been removed to Ghana on November 5. R.K. told her son that she was being taken to the Sierra Leonean embassy in Ghana within the next day.

12. On November 11, 2025, at around 8 AM EST, our legal team at Murray Osorio was able to connect her with some other deportees and additional attorneys working on similar cases, including attorneys from the team working on a lawsuit filed in Ghana over the legality of the U.S.-Ghana third country deportation agreement. During that call, immigration officials from Ghana came to the hotel and were trying to remove R.K. Part of the legal team from the Ghana case rushed to the hotel and encountered uniformed military officers, several plain-clothed national security operatives, and about eight uniformed immigration officers attempting to remove R.K. The attorneys requested that they produce any court order, ministerial directive, or legal authority permitting the removal. They were unable to do so but insisted they were acting on instructions. The officers persisted in trying to remove R.K., who resisted by holding on to fixed objects,

2

and on to an attorney's leg for nearly 40 minutes. Eventually, the immigration officers overpowered her, dragged her across the floor, and placed her in their vehicle. Prior to her removal from the hotel, the attorneys on the call were able to get some basic details from her so that she could be added to a petition that was filed with the United Nations Committee Against Torture.

13.   R.K. pleaded with the immigration officials not to send her to Sierra Leone and to allow her to seek protection in Ghana. Just like what happened in the U.S. before her removal to Ghana, she was not given any opportunity to present a case for protection in Ghana despite her pleas. She was held overnight at the airport and then flown to Sierra Leone, where she went into hiding.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 4ᵗʰ day of December 2025 at Fairfax, Virginia.

_____
Hannah Bridges

3

Appx.362

DECLARATION OF JUANITA GOEBERTUS,

I, Juanita Goebertus, declare as follows:

1. I am the Director of the Americas Division of Human Rights Watch and have worked with the organization since 2022. I hold BAs in Law and Political Science from the Universidad de los Andes (Colombia) and an LLM from Harvard Law School. I oversee Human Rights Watch's work on El Salvador and have traveled to the country several times, most recently in 2024. I provide this declaration based on my personal knowledge and experience as well as the information conveyed to me from my staff and colleagues.

2. In November 2025, Human Rights Watch and the Central American human rights group Cristosal published a report titled "You Have Arrived in Hell," documenting systematic torture and other abuses inflicted on the 252 Venezuelans sent by the United States to El Salvador in March and April 2025, where they were detained for approximately four months in the Center for Terrorism Confinement (Centro de Confinamiento del Terrorismo, CECOT) in Tecoluca, El Salvador.[1] Human Rights Watch interviewed 40 of the Venezuelans who were detained in CECOT after the government of El Salvador transferred all of them to Venezuela on July 18, 2025, pursuant to an agreement with the Venezuelan government. Human Rights Watch also interviewed 150 relatives, lawyers, and acquaintances of the Venezuelans detained; reviewed photographs of injuries, criminal records, and judicial documents in El Salvador and the United States; and consulted international forensic experts.

3. The Venezuelans we interviewed said that they were told by an immigration judge or a DHS official that they were going to be sent to Venezuela, but none were informed prior to their removal that they would be sent to El Salvador.

4. As documented in "You Have Arrived in Hell," from the moment the Venezuelans arrived in El Salvador and throughout their detention in CECOT, they were subjected to regular, severe physical and psychological abuse by Salvadoran prison guards and riot police. This included routine beatings, prolonged confinement in cells without mattresses or privacy for toilets, constant illumination, lack of ventilation or natural light, use of the same unsanitary water for drinking and bathing, and deprivation of food and water as a form of punishment. Medical care was limited or denied. The Venezuelans also reported being held in dark isolation cells for extended periods, and the use of restraints combined with physical abuse. Three people reported that they were subjected to sexual violence. Hunger strikes and other protests of ill-treatment were met with excessive force,

---

[1] HUMAN RIGHTS WATCH & CRISTOSAL, "YOU HAVE ARRIVED IN HELL": TORTURE AND OTHER ABUSES AGAINST VENEZUELANS IN EL SALVADOR'S MEGA PRISON (2025), https://www.hrw.org/report/2025/11/12/you-have-arrived-in-hell/torture-and-other-abuses-against-venezuelans-in-el.

EXHIBIT 9
Appx 363

including firing rubber pellets at close range. Interviewees also described routine verbal and psychological abuse, including being told that they would "never leave alive." Four of them said they experienced suicidal thoughts. At least one detainee attempted suicide.

5. One of the Venezuelans we interviewed, a 23-year-old from Caracas, described their arrival to El Salvador, saying that as soon as he was called off the plane, a hooded unidentified officer punched him in the stomach, handcuffed his hands and feet, and pushed him down the stairs toward a bus. When he and others got off the bus at the CECOT entrance, officers made them crouch down and run while handcuffed. He shouted to officers that he couldn't keep running because he was asthmatic and was going to faint. When he fell to the ground, an officer kicked him in the chest and said "Here, we beat those who faint even harder." The officer forced him and others to kneel on the floor as officers punched them in the backs of their necks, calling them "fucking gang members," and ordering them to take off all their clothes.

6. While in CECOT, the Venezuelans were beaten during daily cell searches, for allegedly violating the prison's often arbitrary rules, for requesting medical attention, and for protesting the beatings. Many detainees were also beaten after official visits, including by U.S. Secretary of Homeland Security Kristi Noem in March 2025 and by the International Committee of the Red Cross (ICRC) in May and June 2025. According to the former detainees interviewed by Human Rights Watch, the most severe beatings and abuses took place on the way to or inside the punishment cells known as "the Island." Guards took detainees there to punish or intimidate them, often under the pretext that they had violated prison rules.

7. One of the former detainees, a 24-year-old from Miranda State, Venezuela, described how officers beat him after he spoke with ICRC staff members during their visit to CECOT in May. He said guards took him to "the Island," where they struck him in the face with a baton, causing his nose to bleed. "They kept hitting me, in the stomach, and when I tried to catch my breath, I started to choke on the blood," he said. He shared with Human Rights Watch a photo of his nose, which a forensic expert said was consistent with his description of the beatings.

8. Another former detainee said he was taken to "the Island" 12 times in five days as punishment for one of the detainees' protests. The first time, he said that officers took him and about 24 others to the hallway in front of the punishment cell. "They left us [there], handcuffed behind our backs and kneeling, and then took us one by one to 'the Island,' where they beat us all. I could hear the screams of my cellmates." The following morning, officers took him to "the Island" to beat him again. He said they beat him with a baton on his face, and broke one of his teeth. He shared a photo with Human Rights Watch of his mouth, which a forensic expert said was consistent with his description of

Appx.364

the beatings. He recalled passing out and said that when he regained consciousness, his face was covered in blood.

9. Another Venezuelan, a 25-year-old from Caracas, described one incident when officers beat him for laughing with his cellmates. Four officers took him out of the cell in handcuffs and dragged him across the floor, he said. They punched him, kicked him, and rolled him around. He said a guard took him to the infirmary as he started to vomit blood.

10. Another former detainee, a 27-year-old man from Apure State, Venezuela, described being beaten for requesting medical care to address sharp pain in both of his ears. After asking for medical attention for days, officers took him to the infirmary. Medical staff told him he had an infection and pus in both ears. He was not given any medication or antibiotics, he said. After returning to his cell, he pressed himself against the bars of the cell and continued to ask officers for medication. Four guards took him out of the cell, brought him to the hallway, and beat him for several minutes in the back, stomach, and legs. They hit him with handcuffs and batons and kicked and punched him in the chest, he said. "They beat me until I vomited blood." Officers then locked him in a punishment cell for three days.

11. During their four months in detention, the Venezuelans reported that they were denied access to legal assistance or contact with the outside world. Despite repeated requests from several detainees, guards never allowed them to make phone calls to their relatives or lawyers.

12. El Salvador transferred all 252 Venezuelans held in CECOT to Venezuela on July 18, 2025. At least 19 of them had reportedly fled Venezuela to escape threats, abuses, or persecution by state security forces, as well as threats posed by armed and criminal groups, including Tren de Aragua. After arriving back in Venezuela, two former detainees said that agents of Venezuela's National Intelligence Service (Servicio Bolivariano de Inteligencia Nacional, SEBIN) visited them in their homes. The agents reportedly said that the visits were "part of a monitoring process" and asked the former detainees to record videos about their detention in the United States and the treatment they received. The agents also asked them, among other questions, whether they had connections with U.S. agencies seeking to "destabilize the [Venezuelan] government."

13. Until the Venezuelans were transferred to Venezuela in July 2025, Human Rights Watch was not aware of any detainees who had been released from CECOT, aside from Kilmar Abrego Garcia, a Salvadoran living in the United States who was sent to El

Salvador on March 15 and flown back to the United States on June 6 following a U.S. court order to facilitate his return after he was wrongfully removed.[2]

14. The mistreatment of the Venezuelan detainees at CECOT is in large part similar to what Human Rights Watch had previously documented in other prisons in El Salvador, including Izalco, La Esperanza (Mariona) and Santa Ana prisons. This includes cases of torture, ill-treatment, incommunicado detention, severe violations of due process and inhumane conditions, such as lack of access to adequate healthcare and food.

15. These practices were publicly known prior to March 2025. Human Rights Watch as well as other human rights organizations have reported on human rights abuses in El Salvador's prisons for years. And the U.S. Department of State 2023 report described prison conditions in El Salvador as "harsh and life threatening" and also acknowledged credible reports of "torture or cruel, inhuman, or degrading treatment or punishment by security forces."[3]

16. In December 2022, Human Rights Watch and Cristosal published a joint report, "We Can Arrest Anyone We Want," documenting widespread abuses in the country's prisons.[4] Cristosal has reported that abusive prison conditions have led to the deaths of at least 419 detainees since 2022. In July 2024, Human Rights Watch published a report titled "Your Child Does Not Exist Here," documenting abuses committed against children during the state of emergency, including 66 cases of children subjected to torture, ill-treatment and appalling conditions, including at times extreme overcrowding, unhygienic conditions, and inadequate access to food and medical care while in custody.[5] In a separate Human Rights Watch report from February 2020, titled "Deported to Danger," Human Rights

---

[2] Pet. for Writ of Habeas Corpus at 8-9, *Abrego Garcia v. Noem*, 8:25-cv-02780 (D. Md. filed Aug. 25, 2025).

[3] U.S. DEP'T STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES—2023: EL SALVADOR (2024), https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/.

[4] HUMAN RIGHTS WATCH, "WE CAN ARREST ANYONE WE WANT": WIDESPREAD HUMAN RIGHTS VIOLATIONS UNDER EL SALVADOR'S "STATE OF EMERGENCY" (2022), https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el#3683.

[5] HUMAN RIGHTS WATCH, "YOUR CHILD DOES NOT EXIST HERE": HUMAN RIGHTS ABUSES AGAINST CHILDREN UNDER EL SALVADOR'S "STATE OF EMERGENCY" (2024), https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here/human-rights-abuses-against-children-under-el.

Watch investigated and reported on the conditions in Salvadoran prisons experienced by Salvadoran nationals deported by the United States.[6]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 5th day of December 2025 in Villa de Leyva, Colombia.

*Juanita Goeberty.*

_____

Juanita Goebertus

---

[6] HUMAN RIGHTS WATCH, DEPORTED TO DANGER: UNITED STATES DEPORTATION POLICIES EXPOSE SALVADORANS TO DEATH AND ABUSE (2020), https://www.hrw.org/report/2020/02/05/deported-danger/united-states-deportation-policies-expose-salvadorans-death-and.

**SECOND DECLARATION OF GUADALUPE PEREZ**

I, Guadalupe Perez. make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of Illinois. My business address is 69 W. Washington, Chicago, Il 60602. I have been employed as Assistant Public Defender the Law Office of the Cook County Public Defender since February 2022. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since 2016, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts and/or with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).]

3. I began representing O.G.M. on November 1, 2024. On February 10, 2025, he won protection under the Convention Against Torture (CAT) from El Salvador from an immigration judge on the basis of being kidnapped and tortured by Salvadoran gangs and police. The information in this declaration is based on my conversations with O.G.M.

4. Approximately, on September 18, 2025, the U.S. Department of Homeland Security (DHS) notified O.G.M that they intended to deport him to Mexico. O.G.M. stated he was afraid of deportation to Mexico. On October 30, 2025, O.G.M had a fear interview as to Mexico. Despite testifying about having been kidnapped, beaten and extorted by Mexican police officers on multiple occasions, DHS determined that O.G.M had not established that it is more likely than not that he would be persecuted or tortured in Mexico.

5. On November 5, 2025, DHS attempted to remove O.G.M. to El Salvador, the country to which an immigration judge determined DHS was forbidden from removing him. Fearing future attempts of deportation to El Salvador, O.G.M. accepted his removal to Mexico.

6. On November 17, 2025, O.G.M. was removed from El Valle Detention Center to Mexico. Immigration officers took him and others out of the detention center by bus. The bus stopped at the Hidalgo crossing, but prior to this stopped at another detention center to pick up other individuals.

7. O.G.M. related that when they arrived at the border, O.G.M. informed the officers that he was afraid to return to Mexico and that he was not going to get off the bus. O.G.M. related that, including him, four remained. U.S. immigration officers arrived, and one officer punched O.G.M. in the stomach and pulled him out of the bus. O.G.M. feared them as they beat the other individuals, including dragging one man out of the bus by his feet, causing him to hit his head as they took him down the bus stairs. The officers then kicked this man on the floor, and he ultimately needed a wheelchair to complete the crossing.

1

EXHIBIT 8

8.     O.G.M. told me that when they crossed the border, he felt terror and panic. The U.S. immigration officers told the Mexican immigration officers in Spanish that they needed to fix him. As they were crossing the border, O.G.M. stated he saw a young man sitting on a bench, tattooed with a cell phone. Later, Mexican immigration officials told them that if they did not cooperate, he would turn them over to that young man who belonged to cartel.

9.     O.G.M. related that inside the Mexican immigration institute, he asked if he could receive asylum. The immigration official told him he had 10 days to leave the country. He was also informed that Mexico did not have an asylum treaty with the United States. He was told that he was there illegally and had to leave the country. They didn't offer him any options.

10.     Next, O.G.M. was taken to an immigration station in Reinosa where he and others were able to call family members. He and others were then forced to board a bus to Villahermosa. They were not allowed to have shoelaces, belts or phones. They were escorted by the National Guard on the bus. Although they made a stop at Mexico City, they were not allowed to leave the immigration station. The bus ride lasted approximately twenty-hours.

11.     Upon O.G.M.'s arrival in Villahermosa, he was sent to an immigration station where he was detained for 36 hours. He asked for asylum. However, he was told that was not an option. He was forced to sign documents essentially stating that he entered Mexico irregularly and was there illegally.

12.     O.G.M. is in Mexico, without any valid identity documents. He is isolated in Villahermosa without a way of exiting as he does not have his passport. He states that there are three immigration checkpoints that threaten him with arrest and detention if he tries to leave without proper documentation. He has no resources. He is currently hiding in a hotel in Villahermosa with other similarly situated individuals.

13.     O.G.M. has related that he is afraid for his life. He and his friends' families have received extortion calls. They all called family members at the Mexican immigration stations in Reinosa. Further, O.G.M. managed to get a cell phone but soon after started receiving threatening phone calls. He stated the other men he was staying with also received the phone calls. They told them they were going to be picked up and he presumes that it is the cartel that will do this. O.G.M. is afraid of remaining in Villahermosa and fears he has few options. He has heard of other Salvadoran men who were deported to Mexico and kidnapped.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 28th day of November 2025 at Chicago, Illinois.

2

Guadalupe Perez

**DECLARATION OF ANA DIONNE-LANIER**

I, Ana Dionne-Lanier make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am a practicing attorney licensed to practice in the District of Columbia. My business address is 1025 Connecticut Ave, Washington, DC 20036. I have been employed at the Amica Center for Immigrant Rights (formerly known as CAIR Coalition) (Amica Center) since March of 2018. I am over the age of 18 and am competent to testify regarding the matters described below.

2.    I am a Managing Attorney in the Detained Adults Program at Amica Center. We provide direct representation to detained individuals and assist in providing legal presentations to individuals detained by ICE at facilities in Virginia. I have been practicing removal defense since 2018 in proceedings before the Executive Office for Immigration Review (EOIR); representing, providing consultations, and providing pro se assistance to hundreds of noncitizens in removal proceedings.

3.    Amica Center began representing M.M.[1], on August 26, 2025. M.M. won withholding of removal under the Immigration and Nationality Act on August 1, 2019, from the Gambia on the basis of the clear risk of persecution and torture by Gambian officials due to his activism in support of LGBTQ rights. Evidence showed that he was already being targeted by Gambian officials and would face persecution or torture if returned to the Gambia. He was released from detention and placed on an order of supervision in 2019. He complied with the conditions of the order and attended ICE Check-ins as requested throughout this time. The U.S. Department of Homeland Security (DHS) re-detained and placed him into custody at the Farmville Detention Facility in Virginia in June 2025.

4.    On October 31, 2025, DHS notified M.M. that they intended to deport him to Ghana. Fellow Amica Center counsel immediately emailed local ICE officers articulating M.M.'s fear of removal to Ghana, especially given the risk of chain refoulement.[2] DHS referred M.M. for an interview regarding this fear. On November 3, M.M. had a fear interview with the local asylum office. Counsel was not notified of or present during the interview. Counsel only found out about the interview once M.M. called later in the day to share that it had happened. ICE sent a one-page notice that same afternoon from the Asylum Office indicating that he did not pass the interview.

5.    On November 6, 2025, only three days after his screening, M.M. was deported to Ghana. On November 4, M.M. called paralegal staff in the evening to inform us that he was being moved from the facility. No notice was given to counsel, and he explained that ICE was not telling him where he was being moved. At that time, he had not been personally given any notice about the results of his fear interview. Throughout November 5, he did not

---

[1] To protect my client, given his risk of removal refoulment to his country, I am using his initials.
[2] *See*, Reuters, "West Africans sent by US to Ghana have been deported, lawyer says", (September 23, 2025) available at https://www.reuters.com/world/africa/west-africans-sent-by-us-ghana-have-been-deported-lawyer-says-2025-09-23/

EXHIBIT K

appear at any detention facility in the online detainee locator, and ICE was unable to tell counsel where he was. On November 6, 2025, DHS confirmed that M.M. was removed to Ghana that day.

6. I filed a motion to reopen and an emergency stay of removal the morning of November 6, 2025, to try and prevent M.M.'s deportation. At the time I filed the motion, it was unclear where M.M. was located, but he appeared to still be in the United States. Later that day, once we were notified of a third country removal flight, with the help of local counsel, we filed a habeas petition with the U.S. District Court for the District of Columbia (Case No. 1:25-cv-03880). However, we voluntarily dismissed the petition after we were notified that M.M. had been removed to Ghana.

7. I was able to regain communication with M.M. via WhatsApp on November 7, 2025. He explained that after being moved from the Farmville Detention Facility in Virginia, he was taken to Texas and then Louisiana, where ICE officers told him he was being put on a flight to Ghana. He explained to the officers that he could not go there because he knew Ghana had been sending people back to their countries of origin, and he had been granted protection from his country of origin. He also explained that he has a heart condition and began throwing up and resisting, so ICE officers tackled him. He lost consciousness and was put in a strait jacket and had his face covered. He and others were on the plane for hours before it took off. The other individuals were also restrained at the ankles and wrists. Once the officials on the plane realized they were almost in Africa, M.M. was finally released from the strait jacket.

8. Upon arrival in Ghana, M.M. and the others on the plane were moved to a hotel. The hotel was guarded, and they were told by Ghana immigration officers that they would be sending them all back to their countries of origin. My client explained to the officers that he is unable to return to his country because he fears persecution and torture and that he wouldn't be safe.

9. I last spoke to M.M. on a telephone call on Tuesday, November 11, 2025. On this call, he narrated as another person in his group was being forcibly removed from the hotel to be driven to the airport and presumably returned to their country of origin. He, along with others, took videos of this physical altercation. I reached out to M.M. the next morning to check in but the WhatsApp messages were not delivered, indicating to me that his phone was no longer connected. I was later informed by a local Ghanaian attorney that my client and the group had been moved the night before under heavily-armed guards and that their location was unknown. As of writing this declaration, the location of my client remains unknown, and we fear he has been returned to the Gambia where he is likely to be persecute or tortured.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Appx.372

Executed on this 13th day of November 2025 at Washington, DC.

_____
Ana Dionne-Lanier

## DECLARATION OF DERRICK J. HENSLEY

I, Derrick J. Hensley, make the following declaration based on my personal knowledge, and declare under the penalty of perjury under the laws of the United States, and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am an attorney practicing law in Hillsborough, North Carolina. I have practiced immigration law as a part of my practice since 2012, representing hundreds of noncitizens in matters with the U.S. Citizenship and Immigration Services, removal proceedings before the Executive Office for Immigration Review (EOIR), consular processing with the U.S. Department of State, and in the federal courts.

2. I began representing V.B., a citizen of El Salvador on July 22, 2025, on a *pro bono* basis via a referral from the American Bar Association hotline set up at Naval Station Guantánamo Bay. We established and maintained our attorney-client relationship by phone. I make this declaration based on my phone conversations with V.B. while he was in Guantánamo, as well as based on my communications with him since his deportation to México in September 2025.

3. Proceeding *pro se* in removal proceedings, in March 2025, V.B. won protection under the Convention Against Torture (CAT) from El Salvador. His claim was based having been repeatedly framed and falsely charged as a gangster by Salvadoran police and enduring years of unlawful imprisonment and torture in jail. V.B.'s innocence of the charges for which he was jailed in El Salvador and proven lack of gang affiliation were established in removal proceedings and were factors that lead the immigration judge (IJ) to grant him CAT protection.

4. At the conclusion of the removal hearing, the IJ explained that the reason she could not grant him asylum was due to due to the Circumvention of Lawful Pathways rule, which barred her from granting asylum because V.B. did not use the CBPOne App to schedule his entry. The IJ further explained that V.B. could expect to be released promptly, as he had received CAT protection. V.B. verbally waived appeal. Nevertheless, instead of releasing V.B., the Department of Homeland Security (DHS) maintained V.B. in custody under their then-quite-new 3rd-country removal protocols.

5. V.B. remained at Port Isabel Detention Center in south Texas until he was transferred to Guantánamo Bay Naval Station - JTF Camp 6, around June 2025. That coincided with a bulletin posted to the DHS' website listing him as among "the Worst of the Worst" that falsely claimed that he had committed crimes. Not only had V.B. been exonerated of, or in one case had expunged, all crimes in El Salvador, the crimes listed on the DHS bulletin were not even the

1

EXHIBIT L Appx374

same crimes.

6.  To the best of my knowledge and belief, during V.B.'s time in Guantánamo, he was never provided with either written or verbal notice of DHS' intention to deport him to a third country. As his attorney, I wrote letters and emails, and left voicemails, seeking to contact his deportation officer or anyone making arrangements to deport him. I never received a response from anyone at the Department of Defense or DHS about his case except the bare minimum replies by email at the court-ordered Legal.GTMO email address that had been set up, and that email address only responded about the limited themes of handling documents that I had sent him or scheduling calls with him.

7.  Because nobody would tell either of us what countries they were actually considering, we broadly discussed some of the more 'plausible' options, as we could not cover in depth all of the countries in the world. After I began discussing different countries with V.B., he articulated which countries to which he was afraid of being deported. Some countries that were being discussed in the media or rumored around the base were countries about which he knew nothing, not even the name (for example, Eswatini and South Sudan). So for some of those countries, I attempted to inform him, doing some research on my own about countries of which I myself was unfamiliar.

8.  Based on our preliminary discussions, I submitted to DHS a list of countries to which he was afraid to be deported and countries that he would agree to be deported. I asked DHS to notify me before attempting to effectuate any removal, and to provide V.B. with fear interview before his removal to any country to had not agreed to be deported. I also asked what information about V.B. would be provided to the receiving foreign government, and what assurances about his treatment the foreign government had provided.

9.  Because I knew from other attorneys that México remained a common destination for removals, we specifically discussed México. V.B. was afraid of being deported to México because of fear of the cartels, likelihood of refoulement to El Salvador, and other concerns he had based on his experiences transiting the country twice on his way to the USA. V.B. knew that the Mexican government frequently mistreated Central American migrants like him, extorted them, deported them without process, or else worked with the cartels and other bad actors to traffic migrants into labor or sexually abuse them. Of all the third countries we discussed, V.B. was the most afraid of being sent to México.

10. Aware of the March 30 Memorandum about third-country removals, I informed V.B. that my articulations of fear would probably not be deemed sufficient by DHS and that the burden would stay on him to voice his objections before he

2

would be removed.

11. As time dragged on, with no responses or apparent movement, on September 12, 2025, I filed a Petition for a Writ of *Habeas Corpus* with the U.S. District Court for the District Court of Columbia, seeking to have V.B. released from his excessive detention because we had no reason to believe that his removal was imminent. The case number was 1:25-cv-03136-AHA. We also asked that DHS communicate with us and provide V.B. a process that comported with the law and Constitution before any third country removal.

12. Out of the blue and with no advanced notice to anyone, on or about September 21, 2025, agents at JTF Camp 6, took V.B. to a room known for administering punishments, and held him there for about three hours. Later, they transported him to the airstrip. V.B. was shackled at the hands, feet, and waist. V.B. was put on a flight to Arizona. At the time, he had no idea of why he was being flown or his ultimate destination.

13. V.B. asked repeatedly for information on his destination but was refused any information during the trip. Only after V.B.'s arrival in Florence, Arizona, was he informed of where he was, and then he was informed of DHS' intention to remove him to México. V.B. had been travelling all day in chains and was exhausted.

14. The V.B. expressed fear of going to México and was separated from the rest of the group. Overnight into the wee hours, he was approached more times by officers, and each time he reiterated his fear of México, but they did not refer him for a fear interview with an asylum officer. Instead, the officers threatened him in various ways, including threats to cover his head or blindfold him, beat him, and tear gas him. They also threatened criminal charges for resisting deportation and threatened that he would be sent to a criminal prison in México if he did not walk himself to the bus. V.B. was also told that he simply had no choice but to go because of an order from the U.S. President.

15. V.B. never signed anything agreeing to a removal to México, he was not provided any paperwork about the removal to México, and never at any point verbally agreed to go to México. The only thing V.B. did was, in response to the threats, walk to the bus, rather than suffer further threats and abuse or otherwise be physically forced to the bus. This was some hours before dawn, and they drove to the border once they had him onboard.

16. Early in the morning, DHS deported V.B. to México, a country to which he had no prior connection by family, law, or affinity. He was placed in the custody of the Mexican government, believed to be the INM (Instituto Nacional de Migración).

Appx.376

17. Mexican officials drove him an estimated 33-hours by bus to Villahermosa, Tabasco State, México. The bus only stopped twice to change drivers. The conditions were deleterious due to the bathroom odors. V.B. explained to the guards that he had been granted CAT protection, but they told him he would likely be deported to El Salvador anyway.

18. I found out about V.B.'s deportation on Monday, September 22, 2025, at which point he was just beginning his bus ride southward. We had concerns early in the day because the online ICE Detainee Locator had changed to state that he was not in custody. We made several phone calls – to no avail – but did receive a response from the Legal.GTMO email address confirming that he had been removed earlier that day.

19. I attempted to connect with advocacy and civil society organizations to provide V.B. with potential recourse and try to prevent any potential refoulement to El Salvador.

20. When the bus arrived in Villahermosa, V.B. was detained by the INM. V.B. stated again to those agents that he had CAT protection and feared the Salvadoran government, which had tortured him and would torture him again. Nevertheless, Mexican officials contacted the Salvadoran consulate. V.B. was brought to speak with members of the Salvadoran consulate, and they asked him if he wanted to return to El Salvador, and he answered no.

21. The INM agents stated their intent to deport V.B. to El Salvador; they informed him of a purported agreement between Presidents Sheinbaum (of México) and Trump as to why he had to be sent back to his home country.

22. On September 26, 2025, I filed an Emergency Motion for Temporary Restraining Order and for Issuance of Order to Show Cause. On September 29, 2025, the TRO was denied based on lack of jurisdiction because V.B. was in México and no longer in U.S. custody.

23. On or about September 25, 2025, the nonprofit organization, *Al Otro Lado*, which I had contacted to ask for assistance, took action. By and through attorneys in México City, they filed a civil rights lawsuit called an "*Amparo*" on behalf of V.B., seeking to stop his imminent deportation, in the Tabasco State's Federal Court. Upon information and belief, that *Amparo* lawsuit remains pending, and provides him temporary protection from deportation to El Salvador pending resolution.

24. On September 27, 2025, INM agents released V.B. onto the streets of Villahermosa.

Appx.377

25. V.B. was scared and faced grave difficulties in meeting his basic needs. Thankfully, his fiancée in the United States has been able to send him money so that he could get a phone, food, and a place to sleep. But the dangers for him in Villahermosa are grave.

26. V.B. then also sought assistance from another nonprofit, Asylum Access México, in assisting him with protecting himself from further deportation to El Salvador by applying for Asylum. When he later went to file his case, the officials mocked him and told him what a great president he had in President Nayib Bukele of El Salvador.

27. On Sunday, October 12, there was a shooting in front of the hotel where V.B. was staying, which was filled with many other migrants. A migrant was shot by the gunmen, and an apparent bystander was also hit. The police came and had everyone leave the hotel.

28. At first, the police threatened to call immigration to detain or deport them all; however, instead, they took V.B.'s phone and money. V.B. was too scared to make a report or try to get his possessions back from the police. Again, left with absolutely no money or means of communication, he slept on the floor of someone else's room in another hotel.

29. V.B. obtained another cell phone with money provided by his fiancée and called me on October 13. He told me he is trying to lay low because the area of Tabasco he is in is extremely dangerous, but that is the only place in the country he knows and travel is also dangerous and risks losing his connections to pursue asylum and avoid refoulement to El Salvador. It is an untenable situation.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this the 10th day of November 2025 at México City, México.

Derrick J. Hensley, Esq.

Appx.378

### DECLARATION OF JESSICA A. DAWGERT

I, Jessica A. Dawgert, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of New York and the District of Columbia. My business address is 7389 Route 29, Suite 320, Falls Church, VA 20042. I have been employed as Partner, Federal Litigation at Blessinger Legal PLLC since June 2025. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have spent my career working in immigration law. Prior to joining my current law firm in June 2025, I spent nearly seventeen years working for the Department of Justice, as Associate Deputy Attorney General, Senior Counsel to the Deputy Attorney General, Acting Senior Counsel for the Office of Immigration Litigation, Senior Litigation Counsel, and Trial Attorney. Prior to that time I worked at the United States Court of Appeals for the Second Circuit. During my career, I have litigated hundreds of cases in federal court and, between 2023 and January 2025, worked on oversight of the Department of Justice's immigration portfolio, including overseeing immigration policy and regulatory efforts on behalf of the Department of Justice. Since joining private practice, I have focused on federal litigation but have also appeared to represent noncitizens in removal proceedings before the immigration courts and Board of Immigration Appeals.

3. In August 2025, I was retained to represent H.G., a native and citizen of an African nation who, in November 2024, had received protection from returning to his native country under the regulations implementing the Convention Against Torture. He has been in immigration detention since July 2024. On behalf on this client, I filed an amended petition for a writ of habeas corpus.

4. Between mid-August and early October, DHS transferred my client between several different detention centers, without notice to him or me. DHS often did not update the ICE Detainee Locator for days, making it impossible for me to locate my client. And once I located him, it was often difficult or impossible to arrange for attorney calls to the detention facilities.

5. The habeas corpus petition remains pending. Prior to the resolution of the case, the Department of Homeland Security removed my client to Eswatini, which is not his country of nationality. Upon information and belief, he was not given any notice of his removal to Eswatini until he was in the midst of the removal effort. Upon information and belief, he was instead told that he would be going to Puerto Rico. It is my understanding that, once DHS finally informed my client that he would be sent to Eswatini, he informed DHS that he was afraid to travel to Eswatini. However, DHS refused to provide him any fear-based screenings. Despite the pending petition for a writ

1

EXHIBIT M

of habeas corpus and a G-28 on file with DHS, I have not been officially notified of my client's removal (either before or after his removal).

6.      After his removal, my client was able to call his family in the United States, who informed me of the removal.  Upon information and belief, my client has been told that he will remain in prison in Eswatini until another country will arrange for his transfer. He is afraid that he will be sent to his country of nationality, where he is more likely than not to suffer torture or death.

7.       My client has no connection to Eswatini. He did not know that Eswatini intends to imprison him. My client has a criminal record for which he has served his criminal sentence, and is afraid of what conditions or harm he may face in Eswatini or any other third country based on his history.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 8th day of October 2025 at Denver, Colorado.

_____
Jessica A. Dawgert
Partner, Federal Litigation
Blessinger Legal PLLC

2

Appx.380

## DECLARATION OF FLORENCE WEINBERG

I, Florence Weinberg, make the following declaration based on my personal knowledge and declare under the penalty of perjury under the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. I am a practicing attorney licensed to practice before the State of California. My business address is Av. Mexico 188 Colonia del Carmen, Coyoacan, Mexico City, Mexico, 04100. I have been employed as an immigration attorney at the Institute for Women in Migration (IMUMI) since April 2025. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I represent A.H.D., who is a trans woman from Honduras. I make this declaration based on my experience representing her, including information she has conveyed to me in conversations.

3. In June 2007, an immigration judge in Dallas, Texas granted A.H.D. withholding of removal from Honduras, finding that it was more likely than not that she would be persecuted in Honduras on account of her identity and sexual orientation. The Department of Homeland Security did not appeal the immigration judge's decision.

4. In mid-October 2025, police gave A.H.D. a ticket for drinking in a public park with a friend. Police held A.H.D. until ICE came and arrested her.

5. Between mid-October and November 22, 2025, ICE held A.H.D in custody and transferred her to at least two different detention facilities, one in Louisiana and one in El Paso, Texas.

6. On November 22, 2025, ICE deported A.H.D., who had lived in the United States for over 30 years, to Mexico. On that day, immigration agents forced A.H.D. and others to board a bus. At no point was she told or advised in any way that she was getting deported to Mexico. Thus, she never had a chance to express to ICE that she was afraid to go to Mexico because she did not know she was going to Mexico until she got off the bus and saw Mexican immigration officers. She never received anything in writing informing her that she was getting removed to Mexico.

7. She is afraid to be in Mexico because she has no network here, she is living in a shelter, and she is transgender. Mexico is one of the most dangerous countries in the world to be transgender. Transfemicide, the killing of trans women, has been called a silent epidemic by researchers, and given the that the impunity rate for violent crimes in Mexico is approximately 95%, A.H.D. fears for her life and safety.

Executed this 5th day of December, 2025 in Oaxaca de Juarez, Oaxaca, Mexico.

_____
Florence Weinberg

EXHIBIT 1 Appx.381

   

December 8, 2025

Todd Lyons
Immigration and Customs Enforcement
500 12th St. SW
Washington, DC 20536

Joel D. Garcia
Field Office Director, El Paso
Immigration and Customs Enforcement
999 S. Oregon St.
El Paso, TX 79901

Commanding General, Major General Curtis Taylor
Garrison Commander, Col. Michael V. Soyka
U.S. Army, Fort Bliss
HQ, US Army Garrison, Fort Bliss
ATTN: AMIM-BLG-ZA
1741 Marshall Road
Fort Bliss, Texas 79916

CC: U.S. Senate Armed Forces Committee; U.S. Senate Committee on Homeland Security; U.S. Senate Committee on the Judiciary; U.S. House Committee on Oversight and Government Reform; U.S. House Committee on Armed Services; Department of Homeland Security Office of Inspector General; DHS Office of Civil Rights and Civil Liberties

**VIA EMAIL AND CERTIFIED MAIL**

Re: Coercive Third Country Deportations and Abusive Conditions of Confinement in Immigration Detention at Fort Bliss, TX (Camp East Montana)

Dear Officers:

We write to raise concerns regarding reports of significant abuse against detained immigrants held at the Camp East Montana immigration detention facility at Fort Bliss in El Paso, Texas ("Ft. Bliss"). These reports, based on interviews with over 45 detained immigrants held at the facility, reveal alarming conditions of confinement and repeated instances of coercion, physical force, and threats against immigrants facing third-country deportations, in violation of agency policies and standards, as well as statutory and constitutional protections.

The Ft. Bliss immigration detention facility is a massive tent camp erected only months ago, located in the middle of the desert on a military base that formerly served as a Japanese

1

EXAppx.382



internment camp site during World War II.[1] The facility, which began detaining people on an active construction site, currently holds over 2,700 men and women.[2] Detained immigrants are held for weeks at a time with no access to the outdoors in cramped, squalid soft-sided tents with 72 people per unit, where toilets and showers flood eating areas with raw sewage. Government oversight reports have already identified significant violations of detention standards at the facility: in September 2025, the *Washington Post* reported that ICE's own inspectors found that conditions at Ft. Bliss violated at least 60 federal standards within its first 50 days of operation. These violations included failure to provide basic medical care, inadequate portions of food, failure to ensure that contractors' use of force policy aligned with ICE's policy, and lack of access to counsel.[3]

Since the filing of the report, these conditions have only worsened. As immigrants detained at Ft. Bliss report, officers have beaten detainees and used threats of violence, criminal charges, and imprisonment in attempts to coerce people held at Ft. Bliss to leave the United States and cross the border into Mexico, even if they are not subject to a removal order to Mexico. Abusive and dangerous conditions of confinement persist at the facility months after the issuance of ICE's internal inspection report.

Detained immigrants report that officers have handcuffed and rounded up large groups of non-Mexican detainees at Ft. Bliss, loaded them onto vans, and transported them over an hour away to the U.S.-Mexico border at Santa Teresa, New Mexico. Once at the border, masked officers have instructed detainees to cross the border by "jumping" into Mexico. In some instances, these masked officers have beaten detainees who have refused to cross into Mexico or threatened them with criminal charges and long-term imprisonment. These actions by federal officers are clear violations of statutory, regulatory, and due process protections, including mandatory protections that require meaningful notice and an opportunity to contest a third-country removal on the basis of fear. These actions violate even the Department of Homeland Security's ("DHS") protocol for third-country removals,[4] the legality of which is being challenged in federal court.[5] Even the agency's minimal protocol requires officers to provide written notice of a third country removal and, in the absence of a determination that the third country has reliable diplomatic assurances that removed individuals will not be persecuted or tortured, to refer individuals who state a fear of removal to a third country to U.S. Citizenship and Immigration Services ("USCIS") for an

---

[1] Kimmy Yam, *Japanese American Groups Blast Use of Fort Bliss, Former Internment Camp Site, as ICE Detention Center*, NBC News, Aug. 20, 2025, https://www.nbcnews.com/news/asian-america/fort-bliss-japanese-americans-internment-camp-immigrant-detention-rcna226044.

[2] Immigration and Customs Enforcement, FY 2026 ICE Statistics, https://www.ice.gov/detain/detention-management (last updated Nov. 20, 2025).

[3] Douglas MacMillan, Samuel Oakford, N. Kirkpatrick, and Aaron Schaffer, *60 Violations in 50 Days: Inside ICE's Giant Tent Facility at Ft. Bliss*, Wash. Post, Sept. 16, 2025, https://www.washingtonpost.com/business/2025/09/16/ice-detention-center-immigration-violations/.

[4] A "third country" is a country not previously designated for removal by either an Immigration Judge or DHS in underlying removal proceedings. *See* Northwest Immigrant Rights Project, Nat'l Immigration Litigation Alliance, and Human Rights First, *Third Country Deportations and D.V.D. v. DHS* (June 27, 2025), https://immigrationlitigation.org/wp-content/uploads/2025/06/25.05.27-DVD-Practice-Alert.pdf [https://perma.cc/2QYP-F2F2].

[5] *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355 (D. Mass. 2025).

Appx.383

    

eligibility screening for protection from removal.[6] There is no indication that the United States has received credible diplomatic assurances from Mexico as relevant to this guidance.

In addition, detainee reports reveal shocking conditions of confinement at Ft. Bliss, including multiple incidents of use of force by officers against detainees that involve abusive sexual contact, several of which have required hospitalization. Detained immigrants further report lack of adequate food and the provision of spoiled food, leading to hunger and significant weight loss; inadequate medical care; failure to provide basic hygiene supplies, including soap; squalid conditions, including sewage entering meal areas, and lack of cleaning supplies; prolonged detention in hold rooms; lack of outdoor recreation; and unreasonable barriers to access to counsel.

In light of these abuses, we urge the end to detention of immigrants at Ft. Bliss. We further urge an immediate halt to third-country removals of detained people from Ft. Bliss and a thorough investigation into the circumstances of these removals.

### A. Government Officers Use Physical Abuse and Coercive Threats of Prosecution to Deport Non-Mexican Immigrants Held at Fort Bliss to Mexico.

In the past few months, DHS has escalated its efforts to deport people who have final orders of removal but who cannot be removed to their countries of origin, including those who won withholding or Convention Against Torture (CAT) relief, to third countries—typically a country that is not the person's nation of origin and to which they have no ties. The government must provide meaningful notice and an opportunity to contest removal on the basis of a fear prior to removal to a third country.[7] DHS's policy falls woefully short of providing those protections. However, even under ICE's own guidance, absent credible diplomatic assurances from the receiving country, officers must serve a written Notice of Removal that identifies the intended third country of removal and provide at least six hours for the individual to consult with an attorney. If an individual states a fear of removal to a third country, the officers must refer the case to USCIS for a screening for eligibility for protection from removal.[8]

ICE officers at Ft. Bliss, however, flagrantly violate statutory, regulatory, and due process protections as well as the agency's own policy—engaging in shockingly abusive measures—in deporting non-Mexican immigrants detained at Ft. Bliss to Mexico. As multiple detainees have reported, including in the sworn affidavits provided here, ICE officers have routinely approached non-Mexican individuals held at Ft. Bliss, and, in most cases, informed them orally that they will be deported to Mexico. When detainees state that they fear being removed to Mexico and decline third country deportation, officers have subjected them to physical abuse, and threats of criminal prosecution and lengthy imprisonment.

---

[6] Todd Lyons, *Third Country Removals Following the Supreme Court's Order in Department of Homeland Security v. DVD, No. 24A1153 (U.S. June 23, 2025)*, Jul. 9, 2025, https://immigrationlitigation.org/wp-content/uploads/2025/07/190-1-July-9-Guidance.pdf [https://perma.cc/SBP9-SZUN].

[7] *Trump v. J.G.G.* , 604 U.S. 670, 673 (2025) (explaining that "[i]t is well established that the Fifth Amendment entitles [noncitizens] to due process of law in the context of removal proceedings" and requiring notice and an opportunity to be heard before removal to a third country); *Johnson v. Guzman Chavez*, 594 U.S. 523, 557 (2021); 8 C.F.R. § 1208.18(c)(1).

[8] *Id.*; ICE, Detention and Removal Operations Policy and Procedure Manual, https://www.ice.gov/doclib/foia/dro_policy_memos/09684drofieldpolicymanual.pdf.

Appx.384

    

For example, in September 2025, officers at Ft. Bliss beat "Isaac,"[9] a detained immigrant from Cuba, after he told officials he did not want to be deported to Mexico. Isaac was ordered removed by an Immigration Judge to Cuba, but did not want to be deported to Mexico.[10] As Isaac describes, "[t]he guards came into my housing unit and told me I was going to be deported. When I asked them where, they told me I will be taken to Mexico." After he refused, the officers left, but soon returned with many more guards, who took Isaac out of his cell. As he testified in a sworn declaration, "the guards hit my head" and "slammed it against the wall approximately ten times," "squeezed and twisted my ankles," and "grabbed and crushed my testicles between their fingers, which was very painful and humiliating." As a result of the beating, Isaac "had severe pain behind my ears," and could not touch the left side of my head without pain for approximately a month. Isaac was then taken to a "punishment room," where ICE agents "told me to cooperate," and that "no matter what I am going to be taken to Mexico." Agents then handcuffed Isaac and approximately 20 other people, placed them on a bus, and drove them over an hour to the border. At the border, the detained immigrants were met by approximately 15 masked agents who informed them that they could get off the bus and cross into Mexico. One officer informed the immigrants that "if we don't want to go to Mexico, then we would either be sent to a jail cell in El Salvador or Africa."[11]

Isaac still refused to be deported to Mexico and was returned to Ft. Bliss. However, in October 2025, three ICE representatives again came to his unit and attempted to have him sign a document providing consent to deport him to Mexico. Isaac refused, but he continues to fear that officers will one day "take us on a bus," "put bags over our heads," and "drop us in the middle of the desert to fend for ourselves."[12]

"Benjamin," an immigrant from Cuba who has a final order of removal to Cuba from an Immigration Judge,[13] similarly attests that officers twice attempted to remove him to Mexico from Ft. Bliss, even though he fears deportation to that country. As Benjamin reports, over the course of a week, guards attempted to threaten him into signing a document agreeing to be deported to Mexico. The guards told him that if he did not, that they would handcuff him, put a bag over his head, and send him to Mexico. Benjamin refused to sign the document, stating that he was scared to go to Mexico, because he had heard that migrants are often kidnapped, robbed, or killed there. A week later, two officers informed him that a judge had submitted an order to deport him to Mexico. Benjamin asked for a copy of the order, but the officers told him that they could not show him the document. Officers then cuffed his hands and feet, chained them to a restraint around his waist, and transported him and several other detainees via bus to the border. At the border, seven masked officers without identification badges who "looked like military men" attempted to intimidate Benjamin and five other detainees who had refused deportation by crossing into Mexico. Benjamin and the others continued to refuse, and were eventually transported back to Ft. Bliss. However, upon their return, officers continued to threaten him, in what Benjamin describes as "mental torture." A few weeks later, officers again told Benjamin that if he did not agree to be

---

[9] All detainees are proceeding under pseudonym in light of the threat of retaliation by ICE.

[10] EOIR, https://acis.eoir.justice.gov/en/caseInformation (last checked Dec. 2. 2025).

[11] Exhibit A, Declaration of "Isaac," ¶¶ 18-25, Nov. 2025.

[12] *Id.* ¶ 25.

[13] EOIR, https://acis.eoir.justice.gov/en/caseInformation (last checked Dec. 2. 2025).

4

   

deported to Mexico, that they would send him to a prison in Arizona for several months, and he would then be sent to Mexico.[14]

"Abel," an immigrant from Cuba, also attested that officers twice attempted to remove him to Mexico from Ft. Bliss even after he told guards that he refused to be sent to Mexico. Abel was ordered removed to Cuba by an Immigration Judge, but did not want to be deported to Mexico, because he feared for his safety there.[15] Abel tried to refuse to board the bus the first time, but an officer "grabbed [him] and slammed [him] down," ultimately forcing him onto the bus with approximately thirteen other people. Abel's injuries caused back pain that lasted weeks. When the bus stopped at the border, Abel and the others were met by officers wearing "black masks on their faces with only a hole for their eyes." Abel began to yell that this was a "kidnapping" and that he did not want to be taken to Mexico. Guards placed metal cuffs over the plastic cuffs already on Abel causing his "wrists [to] hurt where the layered cuffs were." Abel was eventually returned to Ft. Bliss, but guards again attempted to take him to Mexico several months later. They told him that if he refused to board the bus, they would send him to jail and then to Africa.[16]

Other detained immigrants at Ft. Bliss provide similar reports of their own experiences. "Francisco," a detained immigrant from Guatemala who was granted withholding of removal,[17] reports that ICE officers took him and approximately 45 other detainees at Ft. Bliss to the U.S.-Mexico border for deportation. Officers cuffed his hands and feet and loaded him and other detainees onto a bus. At the border, masked officers instructed the immigrants to "jump over the wall," because that would be the only way that they would be "free."[18]

"Eduardo," an immigrant from Cuba, described similar attempts by masked officers to coerce detainees at Ft. Bliss to "jump" across the border to Mexico, after officers transported a truckload of detainees to the border. Eduardo was ordered removed to Cuba by an Immigration Judge, but did not want to be deported to Mexico.[19] As Eduardo states, officers "told me they were going to charge me with federal crimes and I would never get out of this detention if I did not jump. The masked people sometimes beat on people to get them to jump the wall even if they don't want to. I have seen other people get beaten up and forced to jump. But I did not jump. I do not want to be deported to Mexico."[20]

These coercive and abusive attempts at third-country removal violate agency guidance and the statutory and constitutional rights of detained immigrants. We urge an immediate halt to third-country removals of detained people from Ft. Bliss, including to Mexico; a thorough investigation into the circumstances of these removals; and specific investigation into the transportation of third-country nationals from Ft. Bliss to the U.S.-Mexico border, including the actions described herein.

---

[14] Exhibit B, Declaration of "Benjamin," ¶¶ 5-8, Nov. 2025.

[15] EOIR, https://acis.eoir.justice.gov/en/caseInformation (last checked Dec. 2. 2025).

[16] Exhibit C, Declaration of "Abel," ¶¶ 7-16, Nov. 2025.

[17] EOIR, https://acis.eoir.justice.gov/en/caseInformation (last checked Dec. 2. 2025).

[18] Interview with "Francisco," Nov. 2025.

[19] EOIR, https://acis.eoir.justice.gov/en/caseInformation (last checked Dec. 2. 2025).

[20] Exhibit D, Declaration of "Eduardo," ¶¶ 20-21, Nov. 2025.

Appx.386

    

**B. Immigrants Detained at Ft. Bliss Face Widespread Abuse and Deprivation.**

    **1.    Officers at Ft. Bliss Subject Detainees to Egregious Use of Force, Including Abusive Sexual Contact.**

Officers at Ft. Bliss have engaged in a widespread and unreasonable pattern and practice of excessive force against detained people, including the use of abusive sexual contact by officers when utilizing force. People detained at Ft. Bliss report that officers have crushed detainees' testicles with their fingers, slammed detained people to the ground, stomped on detained people and punched their faces, and beaten detained people even after they are cuffed and restrained. These instances go far beyond *de minimis* use of force, are objectively unreasonable, and violate common standards of decency. *See Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992); *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Indeed, ICE's own detention standards clearly instruct that "[o]fficers shall use only the force necessary to gain control of the detainee," and prohibit officers from "[s]triking a detainee for failing to obey an order." U.S. Immigration and Customs Enf't, National Detention Standards 2025 § 2.8 ("NDS 2025"). Moreover, officers are prohibited from sexual contact with detainees, including "[i]ntentional touching of the genitalia . . . that is unrelated to official duties." *Id.* § 2.11.

Officers at Ft. Bliss beat "Samuel," a detained teenager, so severely that he sustained injuries across his body, lost consciousness, and had to be taken to a hospital in an ambulance. Officers piled on to him, body slammed him, and began to beat him after he switched off an overhead light in a housing unit. The officers positioned their bodies to block the view of the security camera in the unit. Samuel's right front tooth broke from the force of being slammed to the ground, and as Samuel attests, one officer "grabbed my testicles and firmly crushed them," while another "forced his fingers deep into my ears." Samuel also recalls that officers "pulled my fingers back very painfully, almost to the point that it felt like my fingers might break," after cuffing him, and punched the area around his mouth. Even then, with Samuel already cuffed, officers continued punching Samuel around his mouth. When the beating finally stopped, an officer held Samuel against the wall. While Samuel was feeling "dizzy" and was "fighting to remain conscious," an officer laughed at Samuel for having a chipped tooth after being slammed to the ground and told Samuel he was "like a little girl."[21] Samuel's injuries were so severe that he lost consciousness in the medical tent. When he regained consciousness, he was in an ambulance on the way to the hospital. A month and half after the beating, damage to Samuel's left ear is so severe that he now has trouble hearing, and he continue to feel pain in his testicles.[22] Although all medical care in detention must be provided at no cost to detainees, NDS 2025 § 4.3(II)(A)(2), Samuel received a medical bill charging him for his emergency visit to the hospital on the night that officers beat him.[23]

---

[21] Exhibit E, Declaration of "Samuel," ¶¶ 13-16, Nov. 2025; Exhibit Q, Suppl. Declaration of "Samuel," ¶ 6, Dec. 2025.

[22] *Id.* ¶¶ 13-16.

[23] Exhibit Q, Suppl. Declaration of "Samuel," ¶ 7, Dec. 2025.

Appx.387

    

The practice of crushing detainees' testicles during use of force incidents at Ft. Bliss is not isolated. "Isaac," like Samuel, also reports that officers grabbed and crushed his testicles between their fingers as they beat him while attempting to force him into Mexico.[24]

Detained individuals have also reported guards using force against them for simply requesting basic necessities, such as prescribed medication. After "Eduardo" requested his prescription medications, including for high blood pressure, guards beat him on his ribs, abdomen, and back of his head. He recalls that "guards started stomping on me until I lost consciousness." After the beating, Eduardo was then taken to the hospital, and upon his return to Ft. Bliss, was held in an isolated "punishment cell," in conditions of solitary confinement, for about five days. Eduardo continued requesting his medications after he was released from the punishment cell. In another incident, guards threw him to the ground where his clothes were "torn off" his body and he was left "bruised and bloody." He was again taken to the hospital for the injuries he sustained. Weeks later, guards beat Eduardo for a third time when he requested his medications. They pinned him down on the floor, cuffed him, and hit him in the ribs. He described feeling "humiliated" and like "an animal" for being beaten simply for requesting his medications. He noted that he has witnessed other detained people experience violence and harsh treatment by officers when they ask for basic necessities, including medicine and food. For example, officers have pepper sprayed detained people for making these requests.[25]

Conditions at the facility have grown so dire, and officers have become so unresponsive to requests for basic necessities such as food and medicine, that detained people have resorted to hunger strikes to draw attention to the conditions at the facility. However, officers have responded with excessive, physical force against detained people engaged in hunger strikes. For example, Noah attests that officers beat him during a hunger strike in his unit. Approximately thirty to forty officers arrived and "started cuffing us and threw us against the floor." Although Noah did not resist, he recalled that "guards put their knees behind my neck and pressed down on my neck," leading to severe pain for days following the incident. Noah also witnessed a guard punch another detained person in the face, causing him to bleed profusely. Noah has become despondent, noting that "when we ask for things, even basic things like medicine, the guards treat us so harshly." [26]

Officers also beat "German" for protesting inedible food provided to detained people at Ft. Bliss even after they had already cuffed him. Officers double cuffed German and two others by placing metal cuffs over their plastic cuffs and then "slammed [them] against the wall," causing injury to the side of German's head. His wrists and ankles were also hurt from the cuffs, which officers kept on him for hours even after he was placed in an isolated cell.[27]

Other detained individuals describe officers using force to exacerbate preexisting, visible injuries. "Camilo" witnessed officers stepping on the ankle of a detained man with a preexisting ankle injury. The man was sitting at a shared table and was unable to stand up when guards tried to move the table. Officers then "beat him, stepped on his ankle, and made the injury worse."[28] "Isaac," saw a detained person with blood seemingly coagulating in his arm to the point that "it

---

[24] Exhibit A, Declaration of "Isaac," ¶¶ 18-25, Nov. 2025.
[25] Exhibit D, Declaration of "Eduardo," ¶¶ 14-19, Nov. 2025.
[26] *See* Exhibit F, Declaration of "Noah," ¶ 8-13, Nov. 2025.
[27] *See* Exhibit G, Declaration of "German," ¶ 13, Nov. 2025.
[28] *See* Exhibit H, Declaration of "Camilo," ¶ 17, Nov. 2025.



looked like his arm was going to pop." The person later reported to Isaac that the officers beat his swollen arm after he told them he was feeling too unwell to participate in forced recreation.[29]

The drawings below were created by detained immigrants who marked the areas on their bodies where they had been injured by guards at Ft. Bliss.

**Diagram 1: Marking of Use-of-Force Injuries Against Immigrants Detained at Ft. Bliss**



Injuries (from top left to bottom right) as marked by "Samuel," "Noah," "Isaac," "Eduardo," "Abel," and "German."

### 2. Detainees at Ft. Bliss Are Deprived of Sufficient Food, and Food Provided Is Spoiled and Inedible, Leading to Hunger, Illness, and Significant Weight Loss.

Detainees at Ft. Bliss almost uniformly describe deprivation of sufficient food. Detainees describe meager portion sizes of meals that are "the size of [a] fist," and report that people have gone hungry, because officers do not provide sufficient food for distribution on housing units. In some cases, detainees have eaten only two meals due to insufficient food.[30] Detainees report significant weight loss at Ft. Bliss because of insufficient food. "Jaime" reports that he lost almost ten pounds in less than two months.[31] "Hernan" and "Nelson," also report that they have lost weight because of insufficient food.[32] When food is provided, it is often frozen food that is

---

[29] *See* Exhibit A, Declaration of "Isaac," ¶ 13, Nov. 2025.
[30] Exhibit I, Declaration of "Gershon," ¶¶ 14-15, Nov. 2025; Exhibit P, Declaration of "Hernan," ¶ 13, Dec. 2025.
[31] Interview with "Jaime," Nov. 2025.
[32] Exhibit P, Declaration of "Hernan," ¶ 14-15, Dec. 2025; Interview with "Nelson," Oct. 2025.

8

    

supposed to be defrosted, but is spoiled and inedible.[33] As a result, detainees become ill from the food. Almost every detainee we talked to described widespread diarrhea and vomiting due to the food.[34]

The food provided to detainees at Ft. Bliss falls below ICE Detention Standards and constitutional requirements. ICE Detention Standards require that all facilities "provide detainees with nutritious, attractively presented meals, prepared and served in a sanitary and hygienic food service operation." NDS 2025 § 4.1. Detainees "shall be served three meals every day, at least two of which shall be hot meals." *Id.* Food must be "fit for consumption and appropriately presented." *Id.*; *see also Adams v. Mathis*, 458 F. Supp. 302, 308 (N.D. Ala. 1978), *aff'd* 614 F.2d 42 (5th Cir. 1980); *Ramos v. Lamm*, 639 F.2d 559, 570-71 (10th Cir. 1980) (Food must be "prepared and served under conditions which do not present an immediate danger to the health and well being of the [detainees] who consume it."). Moreover, the lack of sufficient food and the provision of spoiled and rotten food is well known to the agency. Indeed, U.S. Representative Veronica Escobar recently informed Secretary Noem that "drinking water at the facility continues to taste foul, the food quality for detainees has not improved, and some detainees are skipping meals altogether due to a lack of dietary accommodations."[35]

### 3. Detainees at Ft. Bliss are Subject to Dangerous Medical Neglect and Lack of Mental Health Care.

In recent months, internal ICE oversight reports and Congressional letters have outlined widespread and systematic issues with the provision of medical and mental health care to detainees held at Ft. Bliss.[36] Despite these warnings, detainees at Ft. Bliss continue to face dangerous conditions of medical neglect, including denial of necessary medication and dangerously inconsistent medication administration schedules, and severely delayed or complete lack of response to requests for medical, dental, and mental health care. These conditions violate Constitutional requirements for the provision of adequate medical and mental health care to people in government custody, *Brown v. Plata*, 563 U.S. 493, 511 (2011); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and fall far below requirements outlined by ICE detention standards.

**Denial of Necessary Medication and Dangerously Inconsistent Medical Administration Schedules.** People detained at Ft. Bliss report repeated and chronic issues with the facility's failure to provide prescription medication and to ensure consistent delivery of medication, which presents particular danger to patients, such as diabetics, who rely on predictable

---

[33] Exhibit J, Declaration of "Maria," ¶ 9, Nov. 2025; Exhibit D, Declaration of "Eduardo," ¶ 12, Nov. 2025; Exhibit P, Declaration of "Hernan," ¶¶ 14-15, Nov. 2025.

[34] *See, e.g.* Exhibit D, Declaration of "Eduardo," ¶ 12, Nov. 2025; Exhibit E, Declaration of "Samuel," ¶ 9, Nov. 2025; Exhibit J, Declaration of "Maria," ¶ 9, Nov. 2025.

[35] Letter from Rep. Veronica Escobar to DHS Secretary Kristi Noem, Nov. 7, 2015, *available at* https://escobar.house.gov/uploadedfiles/10.27.25follow_up_letter_to_dhs_on_camp_east_montana.pdf.

[36] Douglas MacMillan et al., *60 Violations in 50 Days: Inside ICE's Giant Tent Facility at Ft. Bliss*, Wash. Post, Sept. 16, 2025, (noting that "ICE inspectors also said contractors failed to follow mandatory procedures for medical care"); Letter from Rep. Escobar (noting that "[p]eople have shared concerns regarding Camp East Montana's potentially inadequate medical care: only the most ill detainees are referred to the medical unit and there are inconsistencies as to how soon after arriving detainees are able to undergo initial medical screenings. Detainees have also shared that access to necessary medications has been inconsistent, with some people receiving their medication while others have not.").

   

medication schedules. For example, "Josefina," has diabetes and requires pills and insulin to manage her condition. However, the facility administers insulin at irregular intervals, causing her blood sugar to spike and then drop too low. Josefina is usually woken up at 4:00 a.m. for her first dose of insulin, which disrupts her sleep. She rarely receives her second dose of insulin and the accompanying pill.[37] "Frank" was pre-diabetic before arriving at Ft. Bliss, but his condition has deteriorated while in detention. He has been prescribed medications for his blood sugar and blood pressure; however, he reports serious delays in the distribution of his medication. At the time of his interview, he had gone fifteen days without either of his prescribed pills and had not received any insulin at all, as prescribed.[38]

"Isaac" has hypertension and had a stroke approximately a year ago. He told officers about his condition shortly after arriving; however, approximately a month passed after he arrived at Ft. Bliss before he received his prescribed medication, during which time his vision blurred, a clear indication of dangerously high blood pressure. Even now, his medication is administered on an incorrect schedule.[39]

Other detained people report that they have not received their required medications with any consistency. "Eduardo" has anxiety and hypertension, but does not consistently receive the medication he requires. He described "receiv[ing] it one day and then not for four days." He is supposed to take his medications early in the day, but one of them is not administered to him until approximately 3:00 p.m., and the other is usually provided to him by officers between midnight and 3:00 a.m., causing a rise in blood pressure and anxiety.[40] "Gershon" has Post-Traumatic Stress Disorder, depression, and anxiety, which he treats with prescription medication. However, he has counted at least ten instances where he has not received his medication.[41] "Noah" requires daily medication for allergies; however, at the time of his interview he had not received his required medication for five days.[42]

Ft. Bliss's failure to provide prescribed medication and to ensure a reliable medication management system constitutes deliberate indifference in violation of the Constitution. *See, e.g., Gil v. Reed*, 381 F.3d 649, 661 (7th Cir. 2004); *Hill v. Marshall*, 962 F.2d 1209, 1213-14 (6th Cir. 1992); *Lewis v. Cain*, 701 F. Supp. 3d 361, 391 (M.D. La. 2023), *appeal dismissed sub nom. Parker v. Hooper*, 128 F.4th 691 (5th Cir. 2025). ICE Detention Standards require that "[m]edication will be distributed according to the specific instructions and procedures established by the health care provider." NDS 2025 § 4.3.

**Severely Delayed or Lack of Response to Requests for Medical, Dental, and Mental Health Care.** Detainee requests for medical attention are largely ignored even after multiple requests.[43] "Maria" noted that "[i]f you report that you want to go to the doctor, the guards tell you to sign a list of people, but they won't attend to you on that list for approximately 1-2 weeks after

---

[37] Interview with "Josefina," Oct. 2025.

[38] Exhibit K, Declaration of "Frank," ¶ 7 , Nov. 2025.

[39] Exhibit A, Declaration of "Isaac," ¶ 10, Nov. 2025.

[40] Exhibit D, Declaration of "Eduardo," ¶¶ 7- 8, Nov. 2025.

[41] Exhibit I, Declaration of "Gershon," ¶¶ 9-12, Dec. 2025.

[42] Exhibit F, Declaration of "Noah," ¶¶ 4-5, Nov. 2025.

[43] Exhibit D, Declaration of "Eduardo," ¶ 8, Nov. 2025; *see also* Exhibit L, Declaration of "David," ¶ 7, Nov. 2025 (requested medication for gastritis every day since arrival, but only received it about a month and a half after arriving).






you put your name on it."[44] "Samuel" reported filing about ten requests for care about molar pain, migraines, stomach issues, depression, and anxiety before he was finally seen by medical staff weeks later. However, the medical staff merely gave him a Tylenol and sent him away.[45] "Vincente" suffered from extreme headaches for days in a row and repeatedly submitted requests for medical help that were denied after officers told him that the medical area was full. Officers informed Vincente that "they will not call the doctor unless someone collapses." Vincente also reported that on multiple occasions another young man with heart problems has requested medical assistance before fainting, but has only received attention after actually collapsing.[46] Maria similarly observed that "[t]he guards seem to have to see you lying on the floor" before providing medical attention and that she has "seen people lying on the floor before receiving treatment."[47] "Frank" has requested care by writing medical requests and handing them to the guards and attempting to use the tablets to submit medical requests as his health conditions worsened, but his written and electronic requests have gone unanswered.[48]

Officers do not consistently provide detained people with medical attention even after they faint and experience visible bodily trauma. "German" described an elderly man in his unit with high blood pressure who repeatedly requested medical attention that he did not receive. His condition deteriorated to the point where "he fainted, fell down on the floor, and it looked like he broke his nose." Although the elderly man bled profusely, officers did not respond, despite other detainees' attempts to obtain medical attention. As German witnessed, when officers finally came out to hand out meals, "they ignored the man who was still on the ground in a puddle of his own blood." Officers left the man's meal on his bed.[49]

Detained people also report significant issues with receiving dental care at Ft. Bliss. "Elizabeth" developed a gum infection while in detention and was prescribed an antibiotic to take every eight hours. However, officers have not followed medical instructions, and she is "lucky" if she receives the prescribed antibiotics every other day. When Elizabeth does not receive her antibiotics on time, her gums swell and become very painful, and she has headaches.[50]

Denial and delay of medical care by detention officials constitutes deliberate indifference in violation of the Constitution. *Estelle*, 429 U.S. at 104; *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990). ICE Detention Standards require that the facility provides "medically necessary and appropriate medical, dental and mental health care and pharmaceutical services at no cost to the detainee," "timely responses to medical complaints," and that facility procedures "ensure that all request slips are received and triaged by the medical staff within 24 hours of receipt of the request." NDS 2025 §§ 4.3(II)(A), (II)(I). The Standards also require that "Emergency dental treatment shall be provided for immediate relief of pain, trauma, and acute oral infection." *Id.* § 4.3(II)(H)(1). However, immigrants detained at Ft. Bliss report significant delays in receiving responses to requests for medical, dental, and mental health attention, including the provision of

---

[44] Exhibit J, Declaration of "Maria," ¶ 10, Nov. 2025.
[45] Exhibit E, Declaration of "Samuel," ¶ 7, Nov. 2025.
[46] Exhibit O, Declaration of "Vincente," ¶ 10, Nov. 2025.
[47] Exhibit J, Declaration of "Maria," ¶ 10, Nov. 2025.
[48] Exhibit K, Declaration of "Frank," ¶¶ 7-11, Nov. 2025.
[49] Exhibit G, Declaration of "German," ¶ 9, Nov. 2025.
[50] Exhibit M, Declaration of "Elizabeth," ¶ 8, Nov. 2025.



prescription medication, or report that they have received no response at all, even after repeated requests for care.

### 4. Ft. Bliss Fails to Provide Basic Hygiene Supplies, Clean Clothing, and Cleaning Materials, Leaving Detainees in Squalid Conditions.

Detainees at Ft. Bliss almost uniformly reported squalid conditions, and officers' failure to provide them with basic hygiene materials such as soap, clean clothing, or cleaning supplies. These conditions fall well below constitutional requirements and agency standards.

**Lack of Basic Hygiene Supplies, Including Soap.** Detainees widely report denial of basic hygiene supplies at the facility. "Frank" noted that he lacked soap and that detainees were "only given very small bottles of shampoo that we have to use to wash our body, hair, and sometimes our clothing."[51] "German" reported that "[e]ven when shampoo is handed out, we are given only 15-20 one-time use packets for all of the approximately 72 people in the unit."[52]

The facility's widespread and repeated failure to provide detainees with personal hygiene supplies at Ft. Bliss falls below constitutional and agency standards. ICE's detention standards require that all detainees must be provided with "one bar of bath soap, or equivalent." NDS 2025 § 4.4(II)(F). Moreover, detention standards require that the facility "replenish personal hygiene items at no cost to the detainee on an as needed basis." *Id. See also Chandler v. Baird*, 926 F.2d 1057, 1063-65 (11th Cir. 1991) (allegation of confinement without toilet paper, soap, and toothpaste supported an Eighth Amendment claim); *Carver v. Knox Cty*, 753 F. Supp. 1370, 1389 (E.D. Tenn. 1989) (failure to regularly provide toilet paper and soap, among other things "constitutes a denial of personal hygiene and sanitary living conditions" violative of the Eighth Amendment).

**Lack of Clean Clothing.** Several detainees reported lengthy delays in the provision of clean clothing. "Maria" did not receive clean clothing for 15 days after she arrived at Ft. Bliss, leaving her to wear the same clothes.[53] "Michael" reported that he had been in the same clothes for one month, as his clothing was taken away for laundry several weeks before, and not returned. He never received new clothes, despite filing three complaints about the issue, which received no response.[54] "Ulises" reported that he was informed that laundry is supposed to take place once per week, but the facility will go two to three weeks without being able to do laundry.[55] ICE Detention Standards require that all facilities provide detainees with clean clothing. "Socks and undergarments will be exchanged daily, outer garments at least twice weekly and sheets, towels, and pillowcases at least weekly." NDS 2025 § 4.4(II)(E). *See also Benjamin v. Fraser*, 161 F. Supp. 2d 151, 178 (S.D.N.Y. 2001) (noting that detainees are constitutionally entitled to clean clothing).

**Squalid Tents and Lack of Cleaning Supplies.** Conditions in Ft. Bliss's tent units are squalid and fetid, without the provision of sufficient cleaning materials.

---

[51] Exhibit K, Declaration of "Frank," ¶ 10, Nov. 2025.
[52] Exhibit G, Declaration of "German," ¶ 9, Nov. 2025.
[53] Exhibit J, Declaration of "Maria," ¶ 7, Nov. 2025.
[54] Interview with "Michael," Oct. 2025.
[55] Interview with "Ulises," Oct. 2025.

Appx.393

    

Detained people at Ft. Bliss are held in tent units with bunk beds for 72 people positioned closely together and a bathroom area with toilets and showers, shared by everyone in the unit.[56] Detainees note that the toilets are particularly unsanitary, with urine and fecal matter lining the bowls and the surrounding walls.[57] The area stinks of urine and feces.[58] In some units, individuals are given only one roll of toilet paper per day for all 72 people.[59] Often, across housing units, the excrement blackens the water from the bathroom area, which pools with the water that collects from the shower area, and floods into the area where meals are served each day. Detainees across six different housing units uniformly described water contaminated with sewage flooding the housing unit, including areas where detainees must eat.[60] "David" reported that "the shower drains do not work and constantly cause flooding" with water that is "filled with urine and fecal matter." Detained people have made officers aware of this issue, but officers have not addressed it. While there is a barrier between the bathroom and dining area, it does not successfully block the water from spilling beyond the bathroom into the meals area.[61] The flooring under the shower is made from non-waterproof wooden pallets that emit an "awful smell."[62]

Despite these filthy conditions, and even in the absence of cleaning staff, officers still fail to provide detained people with cleaning products. Detained people must often resort to wiping up the puddles of dirty water with their clothes, such as their underwear and socks, because they are not provided with towels or any other supplies to mop up the dirty water. [63] The fact that they are not provided any sort of cleaning solutions to clean the leakage of contaminated water into their dormitory increases the risk of disease outbreaks. Furthermore, the haphazard and ongoing construction of the detention center has caused sanitation issues. The vents "spit out dust," which can be seen spilling onto the ground.[64]

These conditions fall below constitutional and agency requirements. ICE Detention Standards require that "[f]acility cleanliness and sanitation shall be maintained. All surfaces, fixtures, and equipment shall be kept clean and in good repair. Suitable and sufficient cleaning equipment and supplies shall be available throughout the facility." NDS 2025 § 1.1(II)(I)(2). "A sanitary environment is a basic human need that a penal institution must provide for all inmates." *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1411 (N.D. Cal. 1984); *Gates v. Cook*, 376 F. 3d 323, 338 (5th Cir. 2004); *Ramos v. Lamm*, 639 F.2d 559, 569-70 (10th Cir. 1980) (finding constitutional violation where facility had "lack of routine maintenance and cleaning programs" and inadequate cleaning supplies).

---

[56] Exhibit O, Declaration of "Vincente," ¶ 6, Nov. 2025.
[57] Exhibit D, Declaration of "Eduardo," ¶ 6, Nov. 2025; Exhibit A, Declaration of "Isaac," ¶ 8, Nov. 2025 ("The bathrooms were disgusting. The toilets were like the ones on airplanes that rely on air pressure. There was urine everywhere, including on the rims of the toilets and the floor. There was also fecal matter on the walls and rims of the toilets.").
[58] Exhibit H, Declaration of "Camilo," ¶ 12, Nov. 2025.
[59] Exhibit M, Declaration of "Elizabeth," ¶ 7, Nov. 2025;
[60] Exhibit A, Declaration of "Isaac," ¶ 8, Nov. 2025; Exhibit D, Declaration of "Eduardo," ¶ 6, Nov. 2025; Exhibit G, Declaration of "German," ¶ 5, Nov. 2025;  Exhibit J, Declaration of "Maria" ¶ 4, Nov. 2025; Exhibit L, Declaration of "David," ¶ 5, Nov. 2025; Exhibit N, Declaration of "Xavier," ¶¶ 6-8, Nov. 2025; Exhibit P, Declaration of "Hernan" ¶ 7, Nov. 2025.
[61] Exhibit L, Declaration of "David," ¶ 5, Nov. 2025..
[62] Exhibit A, Declaration of "Isaac," ¶ 8, Nov. 2025.
[63] Exhibit D, Declaration of "Eduardo," ¶ 6, Nov. 2025; Exhibit A, Declaration of "Isaac," ¶ 8, Nov. 2025.
[64] Exhibit D, Declaration of "Eduardo," ¶ 6, Nov. 2025; Exhibit X, Declaration of "Camilo," ¶ 5 Nov. 2025.

Appx.394

    

### 5. Immigrants Are Held for Prolonged Periods in Frigid, Overcrowded Hold Rooms, Without Food.

Detainees at Ft. Bliss further report extended detention in the facility's "hold room" at intake, where they are held in frigid temperatures, without adequate food, for extended periods of time. These conditions violate ICE's detention standards and constitutional protections, as hold rooms are intended to be used only for a short period of time at intake. As ICE's National Detention Standards provide, "[a] detainee may not be held in a hold room for more than 12 hours," "[o]fficers shall provide a meal to any adult in the hold room for more than six hours," "[d]etainees shall be provided with basic personal hygiene items, e.g., potable water, disposable cups,…" and "[s]taff shall ensure that sanitation and temperatures in hold rooms are maintained at acceptable levels." NDS 2025 § 2.5(II)(B), (II)(D)(3). Hold room conditions like those reported at Ft. Bliss can violate those standards and detainees' constitutional rights. *See Mercado v. Noem*, No. 25-CV-6568 (LAK), --- F. Supp. 3d ----, 2025 WL 2658779, at *29–30 (S.D.N.Y. Sept. 17, 2025) (noting unreasonable risk of harm from prolonged, abusive hold room conditions).

Several detainees reported unacceptably prolonged stays in a hold room. "Xavier" was kept in a hold room for three days.[65] "Quentin," and 42 others who arrived at the facility with him, were also detained in the hold room for two days.[66] Several more detainees reported that they were held overnight or for several days.

The frigid, overcrowded conditions in the hold rooms further violate detainees' rights. Several detainees described the hold room as a small room with no beds. One detainee estimated that the room would only have capacity for about 20 people. Detainees consistently reported that the hold room was overcrowded, indicating it was filled with anywhere from 20 to 100 people.[67] "Xavier" reported that the hold room was kept so cold that it exacerbated the pain caused by his suspected kidney stones, and other detainees consistently echoed the concern about the temperature of the room.[68]

The extended detention in Ft. Bliss's hold room also forces those kept overnight or even for multiple nights to attempt to sleep there. Detainees who were held overnight consistently reported that there were no mattresses or beds made available, and they were forced to sleep on the hard floor during their time in the hold room. "Francisco" reported that the lights were always on during the entire three-day period he was held there.[69] The cold and overcrowding only make the conditions during overnight stays worse. "Noah" reported that detainees received only an aluminum blanket to protect them from the cold, and "David" reported sleeping on the floor while held in a single room with about 100 other detainees overnight.[70]

Detainees also reported being cuffed for long periods during the intake process. "Quentin" reported that he was held with both his arms and legs cuffed for about 18 hours during the intake

---

[65] Exhibit N, Declaration of "Xavier," ¶ 5, Nov. 2025.

[66] Interview with "Quentin," Oct. 2025.

[67] *See* Exhibit L, Declaration of "David," ¶ 6, Nov. 2025.

[68] *See* Exhibit N, Declaration of "Xavier," ¶ 5, Nov. 2025.

[69] Interview with "Francisco," Oct. 2025.

[70] Exhibit F, Declaration of "Noah," ¶ 3, Nov. 2025; Exhibit L, Declaration of "David," ¶ 6, Nov. 2025.



process at Ft. Bliss.[71] Before even making it to the hold room, multiple detainees reported being held in the bus that took them to Ft. Bliss while handcuffed. One detainee reported that they were left on the bus waiting for processing for eight hours without air conditioning in the middle of the Texas summer. They remained hand cuffed the whole time.[72]

Finally, detainees held in the holding rooms are not provided sufficient food, a problem that is further exacerbated by their extended detention. Xavier reported receiving only bread and water for the three days he was in the hold room.[73] "Isaac" was held in the room from a Friday to a Sunday, but he was provided food only once during his entire stay: a small bag containing only a sandwich and some fruit.[74] "Quentin," who was held for two days, reported that he received no food or water during that time; all he had to eat were the two small sandwiches that he was given during his 10 hours of travel before his arrival at Ft. Bliss.[75] "David," who was also held overnight, received no food at all. He reported that the only source of water in the room, a water fountain, made people sick when they drank from it, so he avoided it and went without water as well for most of his time in the hold room.[76]

### 6. Detainees at Ft. Bliss Are Held in Tents for Weeks, Without Opportunity for Natural Light or Outdoor Recreation.

Detainees at Ft. Bliss uniformly report that they are denied access to recreation and are held in squalid, cramped tents for up to weeks at a time. Not a single interviewee reported receiving daily recreation as required by the ICE National Detention Standards, and most reported going weeks or even months without seeing the sky. Although Ft. Bliss has an outdoor recreation area, it is not used consistently or according to ICE and facility policy. Several detained people noted that the facility has a posted schedule requiring nearly daily access to outdoor recreation but reported that this policy was not followed.[77] One detained person reported never receiving any outdoor recreation since arriving at Ft. Bliss. She had not seen the sun in over three months, and she was given access to indoor recreation only once. It took place in a room called "a library" that held no books.[78]

Even those who experienced outdoor recreation reported receiving it infrequently, for short periods, and in covered areas. "Benjamin" described the officers only allowing outdoor recreation approximately every seventeen days for only about twenty minutes each time.[79] Multiple interviewees reported that it had been approximately a month since they had seen the sun.[80] Even when detainees are allowed recreation, the area provided is wholly inadequate. The outdoor

---

[71] Interview with "Quentin," Oct. 2025.

[72] Interview with "Ulises," Oct. 2025.

[73] Exhibit N, Declaration of "Xavier," ¶ 5, Nov. 2025.

[74] Exhibit A, Declaration of "Isaac," ¶ 9, Nov. 2025.

[75] Interview with "Quentin," Oct. 2025.

[76] Exhibit L, Declaration of "David," ¶ 6, Nov. 2025.

[77] Exhibit G, Declaration of "German," ¶ 8, Nov. 2025; Exhibit X, Declaration of "Camilo," ¶ 9, Nov. 2025.

[78] Exhibit M, Declaration of "Elizabeth," ¶ 11, Nov. 2025.

[79] Exhibit B, Declaration of "Benjamin," ¶ 10, Nov. 2025.

[80] Exhibit B, Declaration of "Benjamin," ¶ 10, Nov. 2025; Exhibit G, Declaration of "German," ¶ 8, Nov. 2025.

Appx.396



recreation area is essentially an enclosed box. The area is "sometimes very cold" and detained people "do not have long sleeves or warm clothing."[81]

On the rare occasions when recreation is offered, it occurs irregularly and often at night.[82] "Isaac" explained that there is "no consistent schedule for going outside."[83] Detained people described having to beg the guards for access to outdoor recreation.[84] Officers will sometimes instruct detained people to go outside at 9:00 p.m. or 11:00 p.m. at night when it is cold.[85] Some detained people only see the sky when guards walk them from their tent to another tent for attorney visits.[86] The lack of fresh air and sunlight has had adverse psychological impacts. "Vincente" explained the "lack of fresh air and sunlight" was causing him and others to become stressed and anxious.[87] Another detained person said the inability to see the sun, even during outdoor recreation, makes him feel trapped and like he cannot breathe.[88]

As the Supreme Court has held, exercise is a basic human need that must be provided under the Constitution. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). ICE's National Detention Standards further require that "[i]f outdoor recreation is available at the facility, it shall be offered at a reasonable time of day. Weather permitting, each detainee shall have access for at least one hour per day, five days per week; or, six or more hours per week, at least four days per week." NDS 2025 § 5.2.

For those held in isolated housing, or Special Management Units, ICE's National Detention Standards require that "[d]etainees in the SMU shall be offered at least one hour of recreation per day, scheduled at a reasonable time, at least five days per week." NDS 2025 § 2.9. Despite this, "Samuel" attested that when he was placed in the SMU, he was not allowed to see the sky for the entire period of about eight days when he was held in complete isolation in a cold, small room.[89] He had already gone two weeks without seeing the sky prior to his placement in the SMU.[90]

### 7. Officers Deny Detainees Reasonable Access to Counsel and Legal Resources at Ft. Bliss.

Ft. Bliss systematically denies people in its custody reasonable access to counsel, in violation of ICE's own detention standards and in ways that raise grave constitutional concerns. Across the facility, detainees are deprived of a functional law library, blocked from making confidential and reliable legal calls, and subjected to unreasonable limits on legal visitation.

ICE's own standards require facilities to "permit detainees access to a law library, and provide legal materials, facilities, equipment, printing and copying privileges, and the opportunity to prepare legal documents." NDS 2025 § 6.3. The standards further mandate that facilities "devise

---

[81] Exhibit B, Declaration of "Benjamin," ¶ 10, Nov. 2025; Exhibit A, Declaration of "Isaac," ¶ 14, Nov. 2025.

[82] Exhibit D, Declaration of "Eduardo," ¶ 10, Nov. 2025.

[83] Exhibit A, Declaration of "Isaac," ¶ 14, Nov. 2025.

[84] Exhibit G, Declaration of "German," ¶ 8, Nov. 2025; Exhibit O, Declaration of "Vincente," ¶ 13, Nov. 2025.

[85] *Id.*

[86] Exhibit D, Declaration of "Eduardo," ¶ 10, Nov. 2025; Exhibit B, Declaration of "Benjamin," ¶ 10, Nov. 2025.

[87] Exhibit O, Declaration of "Vincente," ¶ 13, Nov. 2025; see also Exhibit A, Declaration of "Isaac," ¶ 14, Nov. 2025 ("The lack of time outdoors hurts the functioning of our internal cycles and how we feel mentally.").

[88] Interview with Yoel, Nov. 2025.

[89] Exhibit E, Declaration of "Samuel," ¶ ¶17-18, Nov. 2025.

[90] *Id.* ¶ 18.

16

   

a flexible schedule to permit all detainees, regardless of housing or classification, to use the law library on a regular basis," guaranteeing each person a minimum of five hours of access per week during reasonable hours. *Id.* Detainees must not be forced to sacrifice their already minimal recreation time to use the library, and requests for additional time, especially when facing court deadlines, must be accommodated whenever possible. *Id.*; *see also Bounds v. Smith*, 430 U.S. 817, 828 (1977).

Ft. Bliss is in full violation of this standard. Detainees uniformly report that no functional law library exists.[91] Moreover, they have no access to printing or copying equipment to prepare legal documents or applications for relief. Detainees have access to tablets, but they contain no legal research tools, and the internet required to make use of tablets is frequently down.[92] In theory, detainees can use the tablets to contact legal service providers. However, detainees are often unable to afford the cost of making calls because they must have available funds on their account to dial out. Moreover, there are usually only approximately six tablets available for the 72 detainees in each tent.[93] The failure to provide even the most basic legal resources denies detainees their right to access counsel and critically undermines their ability to defend themselves in immigration court proceedings.

Similarly, telephone access to attorneys at Fort Bliss is restricted, in direct violation of ICE's own standards. ICE standards require that facilities provide "a sufficient number of telephones" that allow detainees to make legal calls privately and without being overheard. NDS 2025 § 5.4. Instead, detainees must place legal calls from shared tablets inside their tent using a PIN assigned during processing. "Quentin" reported that these tablets are in open areas, surrounded by guards and other detainees, making any legal call inherently non-confidential. Compounding this violation, detainees are often denied access to legal calls altogether because they do not have working PINs. "Vincente" reported that he, along with many others in his unit, never received a working PIN at processing. His request for a replacement went unanswered for over a month, leaving him completely unable to call an attorney during this time.[94]

Attorneys also face unreasonable barriers to meeting with detainees. ICE's detention standards require facilities to allow legal visitation seven days a week, including holidays, with at least eight hours of visitation on regular business days and four hours on weekends and holidays. NDS 2025 § 5.5. Despite this clear requirement, some members of the undersigned organizations have been turned away by guards during business-day visitation hours listed on the ERO website. Additionally, legal service providers offering pro bono representation report wait times of up to four hours to see clients, only to be told that detainees are "unavailable" due to count or lunch. In addition, facility officers have informed legal service providers that detained people often refuse

---

[91] Exhibit J, Declaration of "Maria," ¶ 12, Nov. 2025; Exhibit N, Declaration of "Xavier," ¶ 11, Nov. 2025; Exhibit H, Declaration of "Camilo," ¶ 13, Nov. 2025; Exhibit D, Declaration of "Eduardo," ¶ 13, Nov. 2025; Exhibit G, Declaration of "German," ¶ 12, Nov. 2025; Exhibit A, Declaration of "Isaac," ¶ 17, Nov. 2025; Exhibit B, Declaration of "Benjamin," ¶ 12, Nov. 2025; Exhibit E, Declaration of "Samuel," ¶ 11, Nov. 2025; Exhibit M, Declaration of "Elizabeth," ¶ 11, Nov 2025 ("Elizabeth" noted that a small physical "library" recently opened, but it contains no books or ability to look for information about her case. She was only taken there one time for as a type of "recreation.").

[92] Exhibit H, Declaration of "Camilo," ¶ 13, Nov. 2025; Exhibit L, Declaration of "David," ¶ 13, Nov. 2025, Exhibit E, Declaration of "Samuel," ¶ 12, Nov. 2025.

[93] Exhibit H, Declaration of "Camilo," ¶ 13, Nov. 2025; Exhibit L, Declaration of "David," ¶ 13, Nov. 2025, Exhibit E, Declaration of "Samuel," ¶ 12, Nov. 2025.

[94] Interview with "Quentin," Nov. 2025; Exhibit O, Declaration of "Vincente," ¶¶ 17-18, Nov. 2025.

   

legal visits because they are not provided with food, water, or bathrooms while waiting for an attorney visit and that if they miss a meal or medication distribution while waiting for a visit those meals or medications would not be made up.  In at least one instance, a detained person was not notified by officers that an attorney had scheduled a legal visit with him, but the attorney was told he had refused the visit.[95]

Facility protocols for attorney visitation change frequently, leading to new restrictions that do not accord with detention standards. At times, officers have instructed legal providers that they are limited to ten daily visits per organization. Officers have also informed legal providers that the are limited to only one pre-representational meeting of one hour with a prospective client, and that attorneys must file a Form G-28 for any subsequent meeting. These restrictions not only restrain providers' ability to consult and meet with potential clients, they are also flatly inconsistent with ICE's own rules. Indeed, ICE detention standards explicitly provide that neither attorneys nor legal assistants are required to file a G-28 to visit a detainee for consultation purposes, and it authorizes no numerical limits on pre-representation visits. NDS § 5.5. By imposing these barriers, Fort Bliss arbitrarily restricts attorneys' and legal service providers' ability to assess cases, meet with clients, and establish representation.

Taken together, the lack of legal resources, the absence of confidential phone access for attorney calls, and the improper limits on legal visitation at Fort Bliss show a systemic failure to comply with agency standards, as well as legal and constitutional requirements. Indeed, the Fifth Circuit has long recognized that the First Amendment protects the legal communications of people in detention. *Brewer v. Wilkinson*, 3 F.3d 816, 825-26 (5th Cir. 1993). Courts have likewise held that "conflicting and nearly-impossible-to-follow instructions on the availability of legal visiting hours," alongside other barriers, can have the "cumulative effect of denying [individuals in detention] constitutionally sufficient access to legal assistance" in violation of the Fifth Amendment's Due Process Clause. *Innovation Law Lab v. Nielsen*, 342 F. Supp. 3d 1067, 1080-81 (D. Or. 2018). Similarly, in *Torres*, the court found that a combination of restrictions on immigrant detainees' telephone access, difficulties in accessing legal mail, and interferences with in-person meetings was "tantamount to the denial of counsel." *Torres v. DHS*, 411 F. Supp. 3d 1036, 1060 (C.D. Cal. 2019).

## C.  Recommendations

In light of these abuses, ICE and the Department of Defense should end the detention of immigrants at Ft. Bliss. We further urge an immediate halt to third-country removals of detained people from Ft. Bliss and a thorough investigation into the circumstances of these removals.

We appreciate your prompt attention to these very serious matters, and the opportunity to meet and discuss these issues. For more information, please contact Eunice Cho at echo@aclu.org; Savannah Kumar at skumar@aclutx.og; Angélica César at cesara@hrw.org; and Charlotte Weiss at cweiss@texascivilrightsproject.org.

---

[95] Exhibit D, Declaration of "Eduardo," ¶ 23, Nov. 2025.



Sincerely,

American Civil Liberties Union
American Civil Liberties Union of New Mexico
American Civil Liberties Union of Texas
Estrella del Paso
Human Rights Watch
Las Americas Immigrant Advocacy Center
New Mexico Immigrant Law Center
Texas Civil Rights Project

Appx.400

# EXHIBIT A

"Isaac"

## DECLARATION OF ████████████

I, █████████████, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. My name is ████████████████ I am 43 years old and from Cuba.

3. I am currently detained at the Camp East Montana ICE Detention Center, located at Fort Bliss in El Paso, Texas. I have been detained at this facility since on or about August 17, 2025.

4. Before I was detained by ICE, I lived in █████Florida. I was a subcontractor and made deliveries for Costco and Lowes. I lived with the mother of my daughter and with my daughter. My daughter is five years old. When I lived with her, I enjoyed going to the park and the beach with her. We would watch TV together. I enjoyed doing everything with her.

5. At East Montana, I am held in the D-5 unit currently. I have been in the D-5 unit for approximately six days, since approximately Thursday, November 6, 2025. There are about 35 to 40 people in the D-5 unit. I used to be in the B-3 unit, but I was moved to D-5 unit because I am currently sick with the flu. I have been told that I will be moved back to B-3 when I recover.

6. The D-5 unit is supposed to be for people who are sick and need medications. However, there are people who have been in the D-5 unit for several days who haven't gotten their medications. There are also people in D-5 who are not sick. There are about eight people who seem healthy. I worry that those healthy people might get sick by staying around sick people in D-5. No one comes to clean the unit and it is in a similar dirty condition as B-3.

7. It has been approximately two weeks since I have seen the sky. While being in D-5 we have only been taken out to recreation once and it was for about an hour. Recreation takes place in an enclosed and covered area.

8. There were about 76 or 80 people in the B-3 housing units. The bathrooms were disgusting. The toilets were like the ones on airplanes that rely on air pressure. There was urine everywhere, including on the rims of the toilets and the floor. There was also fecal matter on the walls and the rims of the toilets. The dirty water from the bathroom would get into the dining area. The water was sometimes blackened from the things in the bathroom and that blackened water is carried to the dining area. The flooring for the

bathroom is made of wooden pallets and it emits an awful smell like there is fungus or mold growing. The puddle of dirty water was there every day. There is a barrier between the bathroom and dining area, but it does not block the water. We would often have to wipe the puddles with our clothes because we do not have towels or other supplies to mop up the dirty water.

9. When I was first transferred to East Montana, I arrived by bus with about 40 or 45 people. The bus was full. My legs and hands were cuffed with metal cuffed. We were put in an room with benches. I was there in the room with the benches for over 24 hours. There were no beds and I slept on the floor. It was very, very cold. There were about 20 to 30 people at a time inside that same room. I arrived on or around a Friday and I was held there until around Sunday, which is when I was finally taken to my tent. For the entirety of that time, I was given just one bag with a small sandwich and some fruit to eat.

10. Since I have been detained at Camp East Montana, I have struggled with high blood pressure. I have had high blood pressure since approximately 2021. In approximately 2023, I had a stroke. I was taking a medication called something like Lisinopril before I was detained. The facility should know I have high blood pressure because I told them about it soon after I arrived here. I did not receive medication for high blood pressure for approximately a month after I arrived here. I don't think I received any medication for high blood pressure until approximately September 20, 2025. During that time, my vision would blur and I would get a lot of headaches. I could tell my blood pressure was jumping way too high. Even after they started giving me the medication, Lisinopril, it has not been given to me on the correct schedule. It is supposed to be taken in the morning, but they often give it to me in the afternoon or evening. Right now at this very moment I also feel like I have very high blood pressure and I have not received blood pressure medication. I also have a headache.

11. About two weeks ago, a doctor prescribed me new medication that I believe is called something like diuretic, but they have still not given it to me.

12. I have been to the medical tent, including approximately last Wednesday. I go there because they take me to measure my blood pressure. Every time I go, I see them shredding a lot of paper. I don't know what the documents are, but I see them shredding documents.

13. Other people have also had problems with medical care. I saw one person whose blood was coagulating in his arm and it looked like his arm was going to pop. That person was telling the guards that he was not feeling okay. He told me the guards beat his swollen arm while he was in that condition. In fact, the guards told him that he had two choices, he could either go outside for recreation or go to the SHU. However, he didn't want to go to recreation because he was feeling unwell. In response, he told me that the guards grabbed him by the neck and choked him and the guards hit him in the eyes on his face.

Appx.403

14. This place seems designed to wear you out. There is no consistent schedule for going outside. I have gone multiple weeks at times without going outside. Sometimes, officers will tell us to go outside at 9 p.m or 11 p.m. when is cold outside. The lack of time outdoors hurts the functioning of our internal cycles and how we feel mentally.

15. The schedule for meals is also inconsistent. There are times when we don't get meals for the entire day. We will sometimes just get a random bag at 11 p.m. that is filled with minimal food, like a sandwich and two mandarins. We were also once given rotten juice to drink for a week. There are many people with special dietary needs and it does not seem like they are getting what they need. In the B-3 unit, there are approximately two diabetics, some people who are lactose intolerant, a vegetarian, approximately two who are on low sodium diets for blood pressure reasons, approximately two who require bland diets, and approximately two who are on kosher and halal diets.

16. There is a shortage of hygiene products here. We do not have enough shampoo or soap. There is very little toothpaste and people have to argue over who gets it. No one ever comes to clean the area. We ask for cleaning products to see if we can clean for ourselves, but we are not given the products we need to keep the space clean. These conditions have been so difficult. However, the guards do not respond to our written requests, or our requests when we ask in person. They only seem to respond if we protest.

17. I do not know of any library at this facility or any way to access legal resources. There is also no educational or religious programming that I know of or have had access to.

18. On a day approximately September 15-17, 2025, the guards used force against me because they tried to take me to Mexico and I told them I don't want to be taken there. The guards came into my housing unit and told me I was going to be deported. When I asked them where, they told me I will be taken to Mexico. I told them "no," at which point those guards left. However, they came back with about 30 other guards. Outside in the hallway, the guards started beating on me.

19. The guards hit my head. They slammed it against the wall approximately ten times. Also They squeezed and twisted my ankles. The guards also grabbed and crushed my testicles between their fingers, which was very painful and humiliating. I felt like I was being sexually assaulted. After the guards slammed my head against the wall, I had severe pain behind my ears. I couldn't even touch the left side of my head for about a month because of the pain. The guards seemed to be trying to not leave visible marks on me. Other detained people tried to help me when I was beaten, but one of them was so severely beaten that he ended up in a wheelchair himself.

20. Then they took me to a separate room. It seemed like a punishment room. ICE agents then went into that room and told me to cooperate. They told me I have to be well

Appx.404

behaved and to change clothing. They told me no matter what I am going to be taken to Mexico.

21. From there they took me with about 20 people on a bus to what they said was Mexico. We were all cuffed with plastic cuffs. The cuffs were very tight and they hurt.

22. When we arrived to what I understand to be the Mexican side, there were about 15 to 20 masked people. Only their eyes were visible. One of the masked people came onto the bus and announced to us that people who want to get off the bus could get off the bus and people who want to stay could stay. A guard told us that our countries don't accept us, so Mexico is a good option and that if we don't want to go to Mexico then we would either be sent to a jail cell in El Salvador or to Africa. They tried to pressure us to go to Mexico by threatening us in these ways.

23. Then, after I refused to go to Mexico, they brought me back on the bus. Just two people came back on the bus with me: a Nicaraguan man, and another Cuban man. The rest went to Mexico.

24. Again on or around October 22, 2025, around three ICE representatives came into my unit told me that since I am Cuban and Cuba will not accept me, they will deport me to Mexico. They tried to get me to sign papers that require fingerprints. These papers would give them consent to send me to Mexico. I told them not to bother and that I will never sign them. They put me back in my unit after that.

25. I am scared of being taken to Mexico again. My fear is that one day they will take us on a bus and they will put bags over our heads and they will drop us in the middle of the desert to fend for ourselves.

26. I am attaching a true and correct copy of a picture to this declaration with red markings that I made myself on November 12, 2025. The red markings indicate the places where I was hurt by guards on approximately September 15-17, 2025 when they attempted to take me to Mexico.

Everything in this declaration is true and correct to the best of my knowledge and recollection. This declaration was read back to me in Spanish, a language in which I am fluent.

Executed on the ████th of _NOVEMBER_ , 2025 in El Paso, Texas.

Signature: ████████_____

006

Appx.405



## ATTESTATION AND CERTIFICATE OF TRANSLATION

I, ████████████ certify that I am fluent in both English and _Spanish_. On ████████ I personally spoke with ████████████ and read the foregoing declaration to him, translated into _Spanish_ faithfully and accurately. ████████████ affirmed that s/he understood my translation and that the information in the above declaration is true and accurate.

Due to ████████████ detention, it was not possible to obtain a written signature on the declaration. In addition to confirming the information on the above declaration is true, ████████████ also gave me verbal consent to sign on his/her behalf.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Signed: ████████████

NAME: ████████████

Date: ████ _2025_

Appx.407

# EXHIBIT B

"Benjamin"

**DECLARATION OF** ████████████████████

I, ██████████████████████ hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. My name is ████████████████ I am 49 years old and from Cuba.

3. I am currently detained at the Camp East Montana ICE Detention Center, located at Fort Bliss in El Paso, Texas. I have been detained at this facility since on or about August 16, 2025.

4. Before I was detained by ICE, I lived in Orlando, Florida. I have been living in the U.S. for 32 years. I worked as a hibachi chef for approximately 14 or 15 years. Before that, I worked in construction as frame carpenter. I have one son who is approximately fifteen years old. He is a U.S. citizen.

5. Approximately one week after I arrived at this facility, over the course of a week, guards called me out approximately four times to intimidate me into signing something like a voluntary deportation document. They threatened me by saying I have a bad record and the only solution is to go to Mexico. They said they would handcuff us, put bags over our heads and send us to Mexico. I refused to sign the papers. Approximately all four of the times I was pulled out, the officers told me that if I don't agree to go to Mexico, they will send me to Sudan in Africa, or to El Salvador, or to Guantanamo Bay. I told them I am not a Mexican citizen. I told them my whole family lives here. I am scared to go to Mexico because I am not from there. I also believe that there is kidnapping near the border area and that people could get robbed or killed there.

6. Approximately two weeks after I arrived at this facility, two border patrol officers who were women called me out and told me that a judge had submitted an order for me to be deported to Mexico. When I asked for the document of the order, they told me that they can't show me the document. Regardless, they put us on a bus to take us to the border. Six of us said we don't want to be sent to Mexico and twelve people seemed to say they would go to Mexico. They put the six of us who didn't want to go to Mexico at the back of the bus, but the driver said he still had to take us to Mexico to show the government that they had tried to take us there. My wrists and feet were cuffed and chained to the front of my body with a restraint on my waist.

7. When we got to the border crossing, there was one bus on the U.S. side and one bus on the Mexico side. I was on the bus on the U.S. side. The bus on the Mexican side is for those who go to Mexico to go farther in. The twelve people at the front of the bus got off.

Appx.409

I have not seen them again. Approximately seven masked men who looked like military men, but without badge numbers showed up. They got onto the bus that I was still on. When they couldn't succeed in intimidating me and the others who were still on the bus, they left. I was later brought back to the unit where they continued threatening me about taking me to another country. These threats feel like mental torture.

8. Approximately a week ago, guards told me that Cuba will never accept me, but Mexico will accept me. They told me if I don't sign the document, they would send me to a prison in the heart of Arizona and that I'd have four months in prison and then they would send me to Mexico anyway.

9. I have been here for approximately three months and I have been sick approximately four times already. Approximately a week ago, I got the flu. I had a fever for approximately four days. I couldn't even get out of bed. I was not eating. I could not handle it anymore, so I started knocking on the door and they took me out. Then they moved me from D-1 to D-5. There were about eight people in D-5. Six people in D-5 had the flu and two had COVID. I know this because they gave us tests and told us what we have. They mixed the eight of us together even though we have different sicknesses. It took me two days before they gave me any medication, which was what I believe to be an antivirus.

10. The officers only take us outside approximately every 17 days for only approximately 20 minutes. The outdoor area in an enclosed space, it's like an enclosed box. It is sometimes very cold out there and we do not have long sleeves or warm clothing. We are not able to see the sun from there. It has been approximately a month since I've seen the sun, besides when I saw it just now when I was walking to this attorney visit.

11. There is a lot of dust in the housing areas we are in. From the dust, I wake up each day with a sore throat, phlegm, sinus pains, and I have suffered from bloody noses. This place is still under construction.

12. There is no law library here.

13. They don't seem to have enough food or medication or other basic resources for us here, but I hear they still want to bring more people to be detained here.

Everything in this declaration is true and correct to the best of my knowledge and recollection. This declaration was read back to me in Spanish, a language in which I am fluent.

Executed on the _____th of ___November___, 2025 in El Paso, Texas.



Signature:

Appx.410

## ATTESTATION AND CERTIFICATE OF TRANSLATION

I, ████████████_____, certify that I am fluent in both English and _Spanish_____.

On _November_ █_, 2025_____, I personally spoke with ████████████_____ and

read the foregoing declaration to him, translated into _Spanish_____ faithfully and

accurately. ████████____ affirmed that s/he understood my translation and that the

information in the above declaration is true and accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

Signed: ███████████████
NAME: ███████████████                    Date: 11█/2025_____

# EXHIBIT C

"Abel"

## DECLARATION OF ████

I, ████ hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I, ████ make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. My name is ████ am 51 years old and from Cuba.

3. I am currently detained at the Camp East Montana ICE Detention Center, located at Fort Bliss in El Paso, Texas. I have been detained at this facility since on or about August 17, 2025.

4. Before I was detained by ICE, I lived in Miami, where I lived for about 30 years. I came to this country in 1994. For work in Miami, I was a car tow truck driver. I had been doing that for approximately 20 years. Most of my family is here in the United States. My mother is here and I have two grandchildren.

5. At Fort Bliss, I am held in the D-1 unit right now. The conditions are bad and they are treating all of us like animals. They have us sleeping on very thin mattresses where we are practically sleeping on just the metal frame.

6. About two weeks after I arrived at Ft. Bliss, guards called me out to sign documents and add my fingerprints to them. They told me that I would have to go to Mexico. I refused to sign the papers and told them "no." I told them I am Cuban, not Mexican. In that moment, I was scared for my life because I would be a foreigner in Mexico. The guards took us to the front office and locked us in a room. I did not leave the room because I understood that the guards would put me on a bus and take me to Mexico.

7. When I refused to leave the room, a guard grabbed me and slammed me down and it hurt me so much that I had pain on my back for approximately two weeks. The guard beat me just because I was refusing to be cuffed and taken to Mexico. The guards also beat several other people. The guards threw me against the floor and approximately 4-5 guards came down on me until they cuffed me. This caused pain to the back of my head.

8. I am attaching a true and correct copy of an image of the body depicting the injuries I suffered on the day the guards tried to take me to Mexico this first time. I marked on the outline of the body with red marker to show where I was hurt by the guards. I completed this drawing on or around November 12, 2025.

9. Then, the guards took me on a bus with approximately thirteen people to a part of the border called St. Terasa, which is here in El Paso. My wrists and ankles were cuffed. They put a sort of iron belt around my waist and attached my cuffed wrists to it. I continued to feel a

lot of pain because they had slammed me against the floor. The bus ride took approximately 40 minutes, but approximately an hour and a half or so on the way back because of traffic.

10. When we arrived at what I understand to be St. Tereasa, the guards took off our metal cuffs and put plastic cuffs on us. The area was on what appeared to be a large hill and it seemed high enough that my ears started to clog like when on an airplane. There were other people there who were wearing black masks on their faces with only a hole for their eyes. They told us to walk toward the Mexican bus. There was a bus to Mexico on one side and the bus back to the U.S. on the other. I started feeling very anxious at this point and I started yelling and screaming at the immigration guard in Mexico that this is a kidnapping and I don't want to be taken. The guard from Mexico then said that they don't want anyone who was going to be forced to go to Mexico. If I hadn't started kicking and screaming at that moment, I believe I might have been taken to Mexico. I was doing everything I possibly could to not be taken to Mexico.

11. I am attaching a true and correct copy of a drawing of my memory of the scene at St. Tereasa. It depicts the two busses: one going toward Mexico and the other going toward the U.S. I completed this drawing on or around November 12, 2025.

12. Out of the thirteen people who came with me on the bus, only four people returned with me. They left the plastic cuffs on my wrists, but they also put metal cuffs over them and tightened them even more than on the way to the border. My wrists hurt where the layered cuffs were.

13. I was so scared during that entire experience. Around the area where they brought us is where I believe trafficking of people happens.

14. Last week, the guards tried to take me to Mexico again. An ICE guard stood outside and called us. The guards came with materials for our fingerprints and signatures to consent to go to Mexico. I said "no" and that I was not going to sign. I told the guards that I was afraid for my life to be sent to Mexico and that I didn't want to be in a country of narcotraffickers. The guards told me they would deport me to a third-party country and would press charges against me. I told them I want to stay here. That time, I did not get on the bus. They continued to tell me that they would send me to jail and to a third country, like Africa, but I continued to tell them "no," and they put me back in my housing unit.

15. The experience of the guards trying to trick us to sign documents and trying to force us into Mexico made me very scared. Now, I feel like I don't know who to trust or what to do.

16. I am scared of retaliation for speaking about my experience here, but I believe the whole world should know what is happening here at Camp East Montana in El Paso and what has happened to me.

Everything in this declaration is true and correct to the best of my knowledge and recollection. This declaration was read back to me in Spanish, a language in which I am fluent.

Executed on the ▓▓rd of December , 2025 in El Paso, Texas.

Signature: ▓▓▓▓▓▓▓



Appx.416

# EXHIBIT D

"Eduardo"

## DECLARATION OF ███████████████

I, ███████████████, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. My name is ███████████████. I am approximately 35 years old and my country of origin is Cuba.

3. I am currently detained at the Camp East Montana ICE Detention Center, located at Fort Bliss in El Paso, Texas. I have been detained at this facility since on or about August 17, 2025. However, I was taken to the Otero County Processing Center for about two weeks after that date and then brought back here to Camp East Montana. However, the official bracelet that I wear still says my entry date at this facility was August 17, 2025. Things seem to have gotten increasingly worse here since that date and it keeps getting worse.

4. Before I was detained by ICE, I lived in Miami, Florida. I had lived there for approximately 10 years. I worked as an electrician. I have two companies. I lived with my wife. I have three children, all of whom were born in the United States and are U.S. citizens. I have a baby girl who is just about five months old. I also have two sons. One is about three years old and the other is about thirteen years old.

5. At Camp East Montana, I am held in Unit D-3. There are about 72-76 beds in the tent I am held in. Most of those beds are now filled, but it didn't start out that way.

6. The unit I am in is not clean and we are not usually given cleaning products to clean with. Everything feels dirty. We live in tents and the vents spit out dust and you can see it spill down onto the ground. The toilets are filled with urine and fecal matter. The walls and the floor around the toilets have fecal matter on them. Water from that area and from the shower area collects and that same dirty water leaks over to the area where we have meals. The flooring under the shower is made out of what seems to be a wooden pallet structure rather than something water-proof. There also don't seem to be any measures to prevent a fire from spreading here. For example, I don't see a fire extinguisher or any place for water to be sprayed if there is smoke.

7. Since I have been detained at Fort Bliss, I have faced many problems with medical care. I suffer from anxiety and blood pressure issues. The facility should know that I have this condition because I shared this information with officials when I arrived at this facility and I believe it is documented. I require a medication that sounds like Hydroxicin or Hydrozine for anxiety. I also require a medication that sounds like Enalapril for my blood pressure issues. I receive these medications inconsistently. I'll receive it one day and then not for four days and so on. The one I'm supposed to take in the morning, they

sometimes give it to me at 3pm. Hydorxicin is something I'm supposed to get earlier in the day but they give it to me between midnight and 3am. When I don't get medications on time, I feel bad. My blood pressure rises. I can't sleep because of the anxiety.

8. I don't receive timely medical attention here. For example, I have been having diarrhea since about October 24, 2025. I was supposed to receive medication for it, but I was told I couldn't receive it. I'm also concerned because sometimes they will give us different medications than what we are prescribed. We are supposed to fill out a document to request treatment, but our requests are largely ignored. When they do give us medical attention, it will often be five or six days later, and even then it seems to be just be one time or temporarily and then never again.

9. I did see medical staff at what appeared to be a general hospital after I was beaten by officials at this facility on about October 14, 2025. The hospital was about ten minutes away. I was transported to the hospital in an ambulance. I believe I received x rays and body scans. Though my hands feet were cuffed the entire time and a belt held me down, I felt I was treated properly there at the off-site hospital. Both sides of my ribs and my spinal column still hurt from that beating.

10. Since I have been detained at Fort Bliss, I have rarely had outside recreation. Now they only take us out at night in tents that have no opening on the ceiling. I have only seen the sky when I have come out to talk to you about this declaration. I last saw the sky on October 24, 2025. I saw it again today when I came here to complete this declaration.

11. It is difficult to stay clean and maintain hygiene while detained here at Camp East Montana. We do not receive enough hygiene products. Our clothes become dirty without a routine for washing them. We have no way to clip our nails. We must chew on our nails to shorten them.

12. The food here is so bad I hardly want to talk about it. It seems to just be getting worse and worse with time. Just seeing it might make a person vomit. I would not even feed the food we are given to the dog at my house. The food is frozen. When it defrosts, it becomes very liquidy. The food makes me feel sick almost every day. My stomach hurts. I often have diarrhea and sometimes vomit. Others in my unit also seem to be suffering with diarrhea and vomiting from the food.

13. I don't believe there is a law library at this facility. I do not know of any programs, such as religious or educational programs, that people can participate in here.

14. On or about October 14, 2025, I was beaten by guards here at Ft, Bliss. I was asking for the two medications I need, but the guards were not giving it to me. When I tried to get their attention, about six or seven guards started beating on me. They beat me on my ribs and my abdomen and the back of my head. There is still a large mark on my abdomen from it. I was cuffed and the guards started stomping on me until I lost consciousness. I

Appx.419

believe I was taken to the hospital then. After bringing me back, they took me to SHU, which is a punishment cell. I was left in SHU from about Tuesday, October 14, 2025 to about Sunday, October 19, 2025. I was in there for days without the medicine I had been asking for. When I was released on Sunday, I kept asking for my medication. The guards said "no," and when I kept asking them for it, about ten to twelve guards beat me again while I was cuffed. They threw me to the ground and my clothes were torn off me. I was left bruised and bloody. I was in such bad shape that I was taken to the hospital in an ambulance. I was at the hospital for several hours. I believe they scanned my body while I was there. I still have bruises on my arms, legs, and back, and abdomen. It still hurts.

15. After I was beaten for the first time, I was held in solitary confinement from approximately Tuesday, October 14 to Sunday, October 19, 2025. There was a bunk bed in there, but no other furniture. It was about half the size of the attorney visitation room, which fits just three chairs around a small table. They never seemed to shut the lights off in SHU. If I had to use the bathroom, I had to ask the guards. I was not able to shower the whole time I was in there because I was never let out to shower. I had no communication with anyone the entire time I was in there, since I did not have access to a tablet or any other way to communicate. Supposedly there is supposed to be a panel to evaluate the circumstances of our confinement in SHU, but I had no access to it. I had no opportunity to challenge my confinement in SHU. There is also always the risk of retaliation here for trying to ask for our rights to be respected.

16. I am attaching a true and correct image to this declaration depicting the injuries I received from this first beating by the guards

17. On or around November 3, 2025, I again was requesting my medications, which I was not receiving as I should have. There was a medication cart that was coming around, but they did not come to me. I felt awful and felt that I needed the medications. When I asked for the medications, a group of guards came and started beating me. Two of them held me. They pinned me down on the floor. They cuffed me and started hitting me in the ribs. I felt humiliated that I would get beat like that juts for requesting my medication. Lately, I've been scared to ask for anything because I'll just get beaten. I feel ostracized, like I am an animal. After they beat me, they again put me in SHU for about four or five days, around the 7th of November.

18. I am another two true and correct image to this declaration depicting the injuries I received from this second beating by the guards.

19. I'm not the only one who has experienced violence and harsh treatment by the guards here. I have witnessed other violence and harsh treatment by the guards toward others. When other detained people ask for things like medicine or food, they have gotten pepper sprayed. When people complain about the conditions here, they get sent to SHU.

20. On at least two occasions, sometime in around September 2025 and around October 23, 2025, people working at this facility tried to remove me to Mexico. The guards told me me "We're going to show you your family," but I never saw my family or had a chance to call them. Instead, they tried to remove me from the United States to Mexico. I am Cuban, and do not want to be sent to Mexico. I am scared to go to Mexico. I have never been there. I would fear for my life there.

21. On both occasions, which were around midday on both days, they put me and several other detainees in a truck to a place called St. Teresa. It takes about two hours from the detention center to get to St. Teresa. The first time, in September, there were about 24 to 25 people in the truck with me. On around October 23, 2025, there were about twelve other people with me in the truck: 10 Cubans and 2 Nicaraguans. The guards cuffed our wrists and ankles while we were in the truck. The people who put us on the truck and transported us worked at the detention center, but there were also masked people there when we got near the border wall. I don't think these masked people were from the detention center. They wore black masks with just one large eye hole. There was also one ICE representative. That person did not have his face masked.

22. When the guards took us out of the truck, they replaced the metal cuffs with plastic ones and then told us to jump over into Mexico. They told me they were going to charge me with federal crimes and I would never get out of this detention center if I did not jump. The masked people sometimes beat on people to get them to jump the wall even if they don't want to. I have seen other people get beaten up and forced to jump. But I did not jump. I do not want to be deported to Mexico. A lot of people, however, did end up jumping.

23. Yesterday, an attorney had a legal visit scheduled with me. I know this because she told me she scheduled a legal visit with me. No one told me I had a legal visit scheduled or that an attorney was here to visit with me. I was not asked to go out to a legal visit. I would not want to turn down a legal visit.

24. Whenever I am allowed to leave this place, I will be leaving it with a great deal of trauma from my experience here.

Everything in this declaration is true and correct to the best of my knowledge and recollection. This declaration was read back to me in Spanish, a language in which I am fluent.

Executed on the ___th of _November_____, 2025 in El Paso, Texas.

Signature: _____

024                                                                                          Appx.421



Appx.422

Appx.423

## ATTESTATION AND CERTIFICATE OF TRANSLATION

I, ███████ certify that I am fluent in both English and Spanish. On ___November___ ██ _2025_ ,

I personally spoke with _____████████████_____ and read the foregoing

declaration to him, translated into Spanish faithfully and accurately.

████████████_____ affirmed that s/he understood my translation and that the

information in the above declaration is true and accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true
and correct.

Signed: ___████████████___ Date: _11-██-2025_

NAME: ████████████████████████

027                                                            Appx.424

**DECLARATION OF LAURA BELOUS**

I, Laura Belous, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1. I am an attorney at the Florence Immigrant & Refugee Rights Project (FIRRP). My business address is P.O. Box 86299 Tucson, AZ 85754. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I am an attorney for O.C.G., one of the named Plaintiffs in *D.V.D. v. DHS*, No. 1:25-cv-10676-BEM (D. Mass.).

3. On September 30, 2025, after O.C.G. was returned to the United States, an immigration judge ordered him released on bond. A redacted copy of the decision ordering his release is attached to this declaration as Attachment 1.

4. On October 8, 2025, U.S. Immigration and Customs Enforcement issued O.C.G. an order of supervision, requiring that he be subject to electronic monitoring as a condition of release from immigration detention. A redacted copy of the order of supervision is attached to this declaration as Attachment 2.

Executed this 8th day of December 2025 at Tucson, Arizona.

*Laura Belous*
Signer ID: QQJHFNZ815...

Laura Belous

# ATTACHMENT 1



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ELOY IMMIGRATION COURT**

Respondent Name:

C▬▬▬▬▬ G▬▬▬▬▬, C▬▬▬▬▬
▬▬▬▬▬

To:

Alvarez, Mario Alfredo
PO Box 86299
Tucson, AZ 85754

A-Number:

▬▬▬▬▬

Riders:

In Custody Redetermination Proceedings

Date:

09/30/2025

## ORDER OF THE IMMIGRATION JUDGE

The respondent requested a custody redetermination pursuant to 8 C.F.R. § 1236. After full consideration of the evidence presented, the respondent's request for a change in custody status is hereby ordered:

☐ Denied, because

☑ Granted. It is ordered that Respondent be:
    ☐ released from custody on his own recognizance.
    ☑ released from custody under bond of $ 5,000.00
    ☐ other:

☐ Other:

Appx.427



Immigration Judge: DeAngelis, Kathryn 09/30/2025

Appeal:    Department of Homeland Security: ☐ waived ☑ reserved

          Respondent: ☑ waived ☐ reserved

Appeal Due: 10/30/2025

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Alien | [ ] Alien c/o custodial officer | [ E ] Alien atty/rep. | [ E ] DHS

Respondent Name : C█████████ G█████████ , O█████████ | A-Number : ██████████

Riders:

Date: 09/30/2025 By: Ordonez, Caroline, Court Staff

# ATTACHMENT 2

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# ORDER OF SUPERVISION

File No.: ▮▮▮▮▮▮▮

Name: ▮▮▮▮▮ ▮▮▮▮▮, ▮▮▮▮▮▮

Date: **October 8, 2025**

On **February 19, 2025**, you were ordered
(Date of Final Order)

☐ Excluded or deported pursuant to proceedings commenced prior to April 1, 1997.

☑ Removed pursuant to proceedings commenced on or after April 1, 1997.

Because the agency has not effected your deportation or removal during the period prescribed by law, it is ordered that you be placed under supervision and permitted to be at large under the following conditions.

☑ That you appear in person at the time and place specified, upon each and every request of the agency, for identification and for deportation or removal.

☑ That upon request of the agency, you appear for medical or psychiatric examination at the expense of the United States Government.

☑ That you provide information under oath about your nationality, circumstances, habits, associations and activities and such other information as the agency considers appropriate.

☑ That you do not travel outside _____ **California** _____ for more than 48 hours without first having notified this
(Specify geographic limits, if any)
agency office of the dates and places, and obtaining approval from this agency office of such proposed travel.

☑ That you furnish written notice to this agency office of any change of residence or employment 48 hours prior to such change.

☑ That you report in person on _____ 02/▮▮ 2026 8:00 AM _____ to this agency office at:
(Date/Time)

**See I-831**

(Reporting Address)

☑ That you assist U.S. Immigration and Customs Enforcement in obtaining any necessary travel documents.

☑ Other: Your release is contingent upon your enrollment and successful participation in an Alternatives to Detention (ATD) program as designated by the U.S. Department of Homeland Security. As part of the ATD program, you will be subject to electronic monitoring and may be subject to a curfew. Failure to comply with the requirements of the ATD program will result in a redetermination of your release conditions or your arrest and detention.

If fitted with a U.S. Immigration and Customs Enforcement GPS tracking ankle bracelet, do not tamper with or remove the device. Under federal law, it is a crime to willfully damage or attempt to damage property of the United States. Damaging or attempting to damage the GPS tracking ankle bracelet or any of its associated equipment (including, but not limited to, the charging station, batteries, power cords, etc.) may result in your arrest, detention, and prosecution under 18 U.S.C. § 1361 and/or 18 U.S.C. § 641, each punishable by a fine, up to ten years imprisonment, or both.

☐ See attached sheet containing other specified conditions (Continue on separate sheet if required)

_____
(Signature of ICE Official)

**VEGA, E 3609 - SDDO**
(Print Name and Title of ICE Official)

## Alien's Acknowledgement of Conditions of Release under an Order of Supervision

I hereby acknowledge that I have (read) (had interpreted and explained to me in the _____ **Spanish** _____ language) the contents of this order, a copy of which has been given to me. I understand that failure to comply with the terms of this order may subject me to a fine, detention, or prosecution.

VILLA, R

Immigration Officer
_____
(Signature of ICE Official Serving Order)

10/08/2025
(Date)

ICE Form I-220B (10/20)

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## ORDER OF SUPERVISION (ADDENDUM)

File No.: ▮▮▮▮▮▮

Date: **October 8, 2025**

Name: ▮▮▮▮▮▮▮

☑ That you do not associate with know gang members, criminal associates, or be associated with any such activity.

☐ That you register in a substance abuse program within 14 days and provide ICE with written proof of such within 30 days. The proof must include the name, address, duration, and objectives of the program as well as the name of a counselor.

☐ That you register in a sexual deviancy counseling program within 14 days and provide ICE with written proof of such within 30 days. You must provide ICE with the name of the program, the address of the program, duration and objectives of the program as well as the name of a counselor.

☐ That you register as a sex offender, if applicable, within 7 days of being released, with the appropriate agency(s) and provide ICE with written proof of such within 10 days.

☑ That you do not commit any crimes while on this Order of Supervision.

☐ That you report to any parole or probation officer as required within 5 business days and provide ICE with written verification of the officer's name, address, telephone number, and reporting requirements.

☐ That you continue to follow any prescribed doctor's orders whether medical or psychological including taking prescribed medication.

☑ That you provide ICE with written copies of requests to Embassies or Consulates requesting the issuance of a travel document.

☑ That you provide ICE with written responses from the Embassy or Consulate regarding your request.

☑ Any violation of the above conditions will result in revocation of your employment authorization document.

☑ Any violation of these conditions may result in you being taken into Service custody and you being criminally prosecuted.

☐ Other:



ICE Form I-220B (10/20)

Appx.431

## DECLARATION OF ███████████

I, ███████████ make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. My name is ███████████ I am over the age of 18 and am competent to testify regarding the matters described below.

2. I am a citizen of the United States. I am originally from Chad.

3. Our family came to the United States legally when my son H.G. was five years old. We were all granted asylum for political reasons that arose after our arrival here and then received permanent residence. The rest of us naturalized, but H.G. was unable to do so due to arrests and convictions.

4. On July 3rd, 2024, U.S. Immigration and Customs Enforcement (ICE) detained my son, (after he had received his renewed green card, in February 2024), and began removal proceedings against him. H.G. was detained throughout his immigration court proceedings.

5. In an order dated November 22, 2024, following a hearing that my wife, myself and all our family members attended, an immigration judge ordered my son removed to Chad but granted him protection under the Convention Against Torture (CAT), based on the same reasons that had led to our family being granted asylum as well as reasons specific to him. This grant of CAT protection prohibited his removal to Chad, and my son understood that.

6. My son remained in ICE custody for months after being granted protection under CAT. In July 2025, he filed a habeas petition by himself. His lawyer later amended the habeas petition on his behalf challenging his continued detention after being issued an order of removal.

7. In the following weeks, ICE transferred my son through at least four different detention centers in different states. He was finally transferred to a detention facility inside an airport in Alexandria, Louisiana, where he was held for over a week. My son called me during this time and told me about these transfers.

8. On or around October 4, 2025, ICE deported my son to Eswatini. All of the information in this paragraph and the ones below are based on telephone calls that I have had with my son. He told me later that ICE officers in Alexandria, Louisiana, told him that he and the other men in the airport detention facility would be making a short flight to Puerto Rico. Up until that point, ICE officers had never told my son that they had identified any third country to which they thought they could remove him. At the airport, my son saw a paper that indicated that Puerto Rico was not the plane's final destination and that they were going to Eswatini. He and others refused to get on the plane.

1

EXHIBIT Appx.432

9. He told the officers he had CAT protection against removal to Chad and wanted a fear screening, which was something the lawyer representing him in his habeas petition had told him about. My son had no connection whatsoever to Eswatini but feared harm in Eswatini for some of the same reasons as in Chad, in addition to the fear that Eswatini would turn around and send him to Chad. He was not given an interview with an asylum officer before being deported to Eswatini.

10. When my son and the other men in the group refused to get on the plane, armed men he described as military officers came and forced my son onto the plane, along with about ten other men.

11. Since his arrival in Eswatini on October 6, 2025, my son has been held in a maximum-security prison. He has never been in Eswatini before in his life, and there are no criminal charges pending against him in Eswatini or anywhere else in the world as far as I am aware.

12. Since his arrival in Eswatini, my son has been able to call me or his mother every two days, but always with a prison guard next to him. On October 8, 2025, when my son called me for the first time from Eswatini and said that the officers in Eswatini were putting pressure on him to go to Chad and telling him that if he refused or resisted, he would face 4 to 5 years in jail in Eswatini for refusing to cooperate. When he told them that he had been granted protection from deportation to Chad in the United States, they accused him of lying.

13. My son has also told me and his mother that the food provided to him and the other men in the prison is bad and insufficient, consisting only of a small amount of rice with cabbage or a small amount of porridge. We transferred money to a lawyer in Eswatini to deposit with the prison for our son's use, which took days to become available to him.

14. The prison officers in Eswatini told my son that no one—not lawyers and not international organizations—could visit him and the other people deported with him at that prison and that only the U.S. embassy in Eswatini could order his release.

Executed on this day 19th of November 2025 at Silver Spring, Maryland (USA)

2

**DECLARATION OF** ███████████

I, ███████████, declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that the statements that follow are true and correct to the best of my knowledge and belief:

1. I am a citizen of Iran. I applied for asylum in the United States last year and was granted withholding of removal to Iran in April 2025. Despite this, on October 16, 2025, U.S. Immigration and Customs Enforcement (ICE) deported me to Nicaragua, where Nicaraguan immigration officers deported me to Venezuela, with a stop in Cuba. Venezuelan authorities then put me on a plane to Tehran, Iran against my will. The flight had a transit in Istanbul, Turkey where I succeeded in leaving the airport. I am currently living in a rented room in Istanbul, trying to find a way to safety and to reunite with my wife, an asylum seeker in the United States, and our baby daughter who is a U.S. citizen.

2. Last summer, I fled Iran for the United States, arriving in this country in October 2024. I was fleeing political persecution in Iran. I had been detained and tortured in Iran, and my wife had been beaten by government agents while she was pregnant, causing her to miscarry. I crossed the U.S. southern border and asked for asylum.

3. My wife, then pregnant with our first child, had fled to the United States for the same reasons, a few months before I did, on a visa, and had applied for asylum with the Asylum Office, where her case was (and is) pending. I hoped to join her and our baby and that we could find protection here as a family.

4. I was detained throughout my immigration court proceedings, as ICE denied my requests for parole. As a result of the abuse that my wife and I suffered and the oppression we saw all around us in Iran, led us both to renounce Islam. We were drawn to Christianity. My wife and our baby were baptized in the church they now belong to in the United States, which supported my parole application. Throughout my detention in the United States, I was never allowed to hold my child.

5. On April 24, 2025, the immigration judge granted me withholding of removal to Iran. The judge did not grant me asylum only because I crossed the border without inspection. ICE did not appeal the grant of withholding of removal.

6. Around a month after the immigration judge granted me withholding of removal, and while I was still detained, an ICE officer told me that ICE was going to send me to Nicaragua. I asked the officer for a document showing that Nicaragua was prepared to accept me, and to consult with my lawyer, but ICE denied that. I told the ICE officer at that time that I was afraid to go to Nicaragua because Nicaragua has a very strong diplomatic relationship with Iran.

EXHIBIT 4
Appx.434

7. Some weeks later, I had a "reasonable fear interview" about my fears of being sent to Nicaragua. I told the interviewer that I was afraid of Nicaragua because the Nicaraguan government has a very strong diplomatic relationship with Iran, that Iranian President Ebrahim Raisi had visited Nicaragua, that each of these two countries has an embassy in the other, and that as a result Nicaragua would deport me to Iran. (I also told the officer that the two countries where I had been robbed by armed groups on my way to the United States were Nicaragua and Mexico.)

8. The interviewer told me that first, this was not a fear interview but a torture interview, and second, the Nicaraguan government was not going to jeopardize its relationship with the United States by deporting me to Iran.

9. In August 2025, I was still detained at the South Texas Detention Center in Pearsall, Texas and I still had not received a decision on my fear interview. I filed a habeas petition with the local federal court.

10. On October 15, guards at the detention center came to me and told me that my detention was over and that I was going to be released. At intake, I was allowed to change back into the clothes I had when I was detained, but then they put handcuffs and shackles on me. I asked the guards why, and they told me I had no choice.

11. I was placed in a van and driven for about 15 hours. On October 16 in the morning, I arrived in what I later learned was Louisiana, where I was taken to what looked like a military airport.

12. ICE put me on a plane that was full of citizens of Nicaragua; I was the only Iranian on the plane. I told the ICE officers that my family was here in the United States and that my child was born here, and I asked them to give me documents showing that they were going to take me to Nicaragua. They did not answer me.

13. There were nine or ten agents of the U.S. government on the plane, some of whom had the letters "ERO" on their uniforms.  While the plane was still on the ground in Louisiana, with the doors closed and waiting for takeoff, they changed from their uniforms into plain clothes. One of them took off my handcuffs for about a brief period during the flight, but I was otherwise handcuffed and shackled all the way to Nicaragua, as were the Nicaraguan passengers.

14. When the plane landed in Nicaragua, Nicaraguan immigration officers came on board and the first name they called was mine. They took me to a rundown building at the airport that they used as an immigration office. They had me sitting there in handcuffs for three or four hours, with a Nicaraguan immigration officer in front of me staring at me in an intimidating way. Then another Nicaraguan officer came, who told me that I needed to leave Nicaraguan territory that day. I told them that I had been in the United States with

2

withholding of removal, that the United States had sent me to their country, and that I wanted to stay there. I asked them to let me talk with ICE while the plane was still there.

15. The Nicaraguan immigration officer told me that I could not speak with ICE, and that the Nicaraguan government had already agreed with the U.S. government that I would be sent to Nicaragua so that Nicaragua could send me back to Iran.

16. I showed Nicaraguan immigration all the documents I had on me, including the order from the U.S. immigration judge granting me withholding of removal to Iran. The immigration officers ignored me. One of the officers there spoke good English. I speak basic English, and there were some moments when we used phone translation.

17. They told me to sign a form saying that I was willingly accepting deportation to another country. I refused to sign, so one of the officers who was assigned to me and was with me a lot of the time kicked the chair out from under me, causing me to fall to the floor. Another officer kicked me in the stomach. Because of this abuse, I signed the form, and they photographed me as I signed it. Nicaraguan immigration officers photographed me at several points while I was under their control; I could hear the click of the camera.

18. They held me at the airport in Nicaragua from late morning until around 10 o'clock that night. During all that time they unlocked my handcuffs three times: once to get my signature the form they forced me to sign saying I was willing to be deported to another country, once to let me use the bathroom, and once when they said they were giving me between $250 and $300 U.S. in cash in $20 and $50 bills, saying that this was for me to feed myself and make sure I didn't die on the way to Iran. They said that I had about a 15- or 16- hour flight to Iran, and that I would be stopping at several airports in different countries. I refused the money, but they put the cash on the table in front of me, with a piece of paper of some kind that I did not sign. They took a picture of me with the money on the table in front of me and they uncuffed my hands for this photograph.

19. At around 10 p.m., the Nicaraguan officers took off my handcuffs, put me in a car with a Nicaraguan officer on either side, and drove me to the gate where the officers stayed next to me until I got onto the next plane. I was not handcuffed on the plane.

20. From Nicaragua, the plane flew to Caracas, Venezuela, with a stop in Havana, Cuba. In Havana, I was not allowed off the plane. I was the only passenger on the plane as f23 Havana. There, more passengers got on, and we continued to Caracas. Attached to this declaration is a copy of the electronic ticket Nicaraguan immigration gave me for the flight from Managua, Nicaragua to Caracas, Venezuela.

21. When I got to Venezuela, I thought I would be able to get off the plane to call my family, because that was the end destination of my ticket. I got in line for passport control, but there were flight attendants from the flight from Nicaragua who had left the plane after

3

me, and when I was standing in line to get to passport control, I saw one of them go talk to one of the agents at Venezuelan passport control, and that person sent two Venezuelan officers to pull me out of line. The Nicaraguans had some documents about me that they gave to the Venezuelan officers.

22. Two Venezuelan immigration officials took me to Turkish Airlines. There was a security gate before we got to the Turkish Airlines departure area, and one of the flight attendants from the flight from Nicaragua photographed me when the Venezuelan officials took me to that one-way gate into the secure area where I would be boarding the Turkish Airlines flight. The Venezuelan officers put me on a Turkish Airlines flight to Tehran, Iran, with transit in Istanbul, Turkey.

23. Also attached to this declaration is a copy of the electronic ticket I was given for the flight from Caracas to Tehran, which departed on October 18. The upper righthand corner shows the date of issuance of the ticket, which was October 15. When I saw that, I realized that my deportation to Tehran had been arranged while I was still in ICE custody in the United States.

24. By the time the plane got to Istanbul, I had decided that no matter what anyone did to me, I was not going to let myself be sent back to Iran. But when I got off the plane, I was able to follow the other passengers to passport control and leave the airport.

25. I was able to contact the U.N. High Commissioner for Refugees, which has been trying to assist me. I am desperate to be reunited with my wife and child in the United States, not only because my child was born in the United States, but also because Turkey has a strong political relationship with Iran and has over the last couple of years sent Iranians back to Iran against their will. These cases have been documented by the international media and by human rights organizations whose reports I have seen. As a result, I do not feel very safe in Turkey.

Executed on this 28 day of November 2025 at Istanbul, Turkey.

4

## Certificate of Interpretation

I, Shawn Wise Akbari, hereby certify that I am fluent in English and Persian and that I translated the above English-language declaration orally to ███████████ and that he has signed his name with full understanding of its contents.

Dated this 30 day of November 2025

_Shawn Akbari_
Shawn Wise Akbari

Shawn Wise Akbari
655 S. Fair Oaks Ave
Sunnyvale, CA 94086
(713) 265-8196

1



El placer de volar

ELECTRONIC TICKET

PASSENGER ITINERARY RECEIPT      TICKET NBR: **3080250420383**
RECIBO DE ITINERARIO DE PASAJEROS      BOLETO NRO:

**MANAGUA OFICINA COMERCIAL AERO** ISSUE DATE/FECHA DE EMISION: 16 OCT 2025 16:08
AEROP INTER A.SANDINO CARRETER    ISSUE AGENT/AGENTE EMISOR: MGA00VOLJ
MANAGUA
MANAGUA, NICARAGUA
OFFICE ID: NI-19601-0
TELEPHONE/TELEFONO: +50522769180 / +50558457325
MAIL INFO:

ISSUING AIRLINE/LINEA AEREA EMISORA    : CONVIASA
ADDRESS/DIRECCION                 : AV. INTERCOMUNAL AEROPUERTO INTERNACIONAL DE
MAIQUETIA EDO. LA GUAIRA VENEZUELA TELF +58 0500 266 8427

RIF                                   :
TICKET NUMBER/NRO DE BOLETO   :
NAME: ▓▓▓▓▓▓▓
FOID: ▓▓▓▓▓▓▓

BOOKING REF./CODIGO DE RESERVA: C1/**KRKAMZ**

| FROM/TO DESDE/HACIA | FLIGHT VUELO | CL CL | DATE FECHA | DEP HORA | ARR HORA | FARE BASIS BASE TARIFARIA | NVB | NVA | BAG EQP. | ST ESTATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| **MANAGUA HAVANA** | V05945 | R | **16OCT** | 2215 | 0215 | RMGAPOW | | | 23K | OK |
| x **HAVANA CARACAS** | V03497 | R | **17OCT** | 0415 | 0715 | RMGAPOW | | | 23K | OK |

PARA MAYOR INFORMACION INGRESAR AL SIGUIENTE LINK
HTTP://WWW.CONVIASA.AERO/ES/GUIAPASAJERO/CONDICIONES

ENDORSEMENTS/ENDOSOS-RESTRICCIONES : NON END NON TRANSF NON REF VALIDO 12 MESES APLICA
PENALIDAD POR CAMBIO
TOUR CODE                       :
FORM OF PAYMENT/FORMA DE PAGO     : CASH

FARE CALC./CALCULO DE TARIFA: MGA VO X/HAV VO CCS 202.00NUC202.00END ROE1.000000
(ADT)

| AIR FARE/TARIFA | : USD | 202.00 | | |
|---|---|---|---|---|
| TAX/IMPUESTOS | : USD | 2.006B | 3.006S | 1.25C2 |
| | | 2.02EU | 30.30NI | 60.60YQ |
| TOTAL | : USD | 301.17 | | |

Appx.439



**15 Octubre 2025**

Appx.440



## mes 17 Octubre 2025

**Turkish Airlines TK 224**

| | | |
|---|---|---|
| Salida | 17 Octubre 10:00 AM | Caracas, (Simon Bolívar Intl) (+) |
| Llegada | 18 Octubre 04:50 AM | Istanbul, (Istanbul Airport) (+) |
| Duración | | 11:50 (Sin paradas) |
| Estatus de la reserva | | Confirmado |
| Clase | | Económico (Y) |
| Equipaje permitido | | 2 Piece(s) para ████ |
| Equipo | | BOEING 787-9 |
| Flight meal | | Comida |

Check-in

## xado 18 Octubre 2025



**Turkish Airlines TK 876**

| | | |
|---|---|---|
| Salida | 18 Octubre 03:55 PM | Istanbul, (Istanbul Airport) (+) |
| Llegada | 18 Octubre 07:35 PM | Tehran, (Imam Khomeini Intl) (+) |
| Duración | | 03:10 (Sin paradas) |
| Estatus de la reserva | | Confirmado |
| Clase | | Económico (Y) |
| Equipaje permitido | | 2 Piece(s) para ████ |
| Equipo | | BOEING 737-800 (WINGLETS) |
| Flight meal | | Comida |

Check-in

### Detalles de billete ████

Billete electrónico ████ ████ para ████

### Información ecológica

El cálculo de la emisión promedio de $CO_2$ es 673,73 kg/persona

Fuente: Calculadora de emisiones de carbono de la OACI

http://www.icao.int/environmental-protection/CarbonOffset/Pages/default.aspx

### Localizador(es) de reserva de la aerolínea

TK (Turkish Airlines): TVJ565

o de protección de datos: sus datos personales se procesarán de acuerdo con la política de privacidad del proveedor correspondiente y, si se reseliza a través de un proveedor del sistema de reservas ("GDS"), con su política de privacidad. Estas políticas se pueden consultar en http://datatravelcenter.com/privacy o desde el operador o GDS directamente. Debe leer esta documentación, que se aplica a su reserva y describe, por plo, cómo se recopilan, almacenan, usan, publican y transfieren sus datos personales. (También aplicable para ...en múltiples

**DECLARATION OF** ████████████████

I, ████████████████████, make the following declaration based on my personal knowledge and declare under the penalty of perjury under the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1.    My name is ████████████████████. I am over the age of 18 and am competent to testify regarding the matters described below.

2.    I am a citizen of El Salvador. I live in El Salvador.

3.    I am the brother of C.O., who is also from El Salvador. My brother used to live in the United States. I know that he was detained by U.S. immigration in the 2010's. On or around 2015, he was released from immigration detention because the U.S. immigration court had granted him protection under the Convention Against Torture (CAT) saying that he could not be sent back to El Salvador.

4.    On October 9, 2025, I met with my brother from a jail in El Salvador. What follows is what he told me during that conversation.

5.    My brother told me that immigration officers detained him in mid-May 2025 in North Carolina. After he was detained, he was moved to several different immigration detention centers.

6.    He said that in early October 2025, immigration officers drove him to the Mexican border and handed him over to Mexican officers. He did not know he was going to be deported to Mexico. The Mexican officers then drove him to the Guatemalan border and handed him over to Guatemalan officers. Guatemalan officers then drove him to the border with El Salvador. Throughout this entire trip, his hands were handcuffed, and his feet were shackled.

7.    He told me that the Guatemalan officers who were transporting him handed him over to Salvadoran government officers in El Salvador. When I talked with him on October 9, he was in a lock-up in Sonsonate. The police in that jail told him that he was going to be sent to CECOT, a maximum-security prison in El Salvador.

8.    Since October 9, I have not been able to communicate with my brother at all. I am afraid that he is in CECOT, and I am afraid for my brother's safety because I have heard reports about how dangerous CECOT is.

1

EXHIBIT 3    Appx441

2

Executed on this 14th day of November 2025.



Certification of Translation

I, Olivia Callan, hereby certify that I am fully competent in both English and Spanish languages, that on November 11 , 2025, I read the above declaration to ██████████████████ in Spanish to the best of my ability, and that he has signed his name with full understanding of its contents.

Olivia Callan

2

**DECLARATION OF** █████████████

I, ███████████, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     My name is ████████████. I am over the age of 18 and am competent to testify regarding the matters described below.

2.     I am a citizen of the United States. I live in Winston-Salem, North Carolina. I have been married to C.O. since 2021.

3.     In or around September 2015, my husband won protection under the Convention Against Torture (CAT) from El Salvador based on his fear of gangs. He was released from immigration detention after proceedings in front of an immigration judge.

4.     In mid-May 2025, officers from U.S. Immigration and Customs Enforcement (ICE) came to the state probation office in Winston-Salem, North Carolina when my husband had an appointment. On that day, I accompanied my husband to the appointment and waited for him in the car. After a few hours of waiting, I went into the building to check on him and that is when I learned that ICE officers had taken him.

5.     Immigration officers moved my husband between different immigration detention centers in North Carolina, Louisiana, Guantanamo Bay, and Arizona. I talked with my husband on the phone while he was detained. He had tried to contact his lawyer while he was detained, but immigration officers would move him between detention facilities before she could contact him. Immigration officers in the detention centers repeatedly tried to get him to sign deportation papers to Mexico, but he refused to sign.

6.     On or around October 8, 2025, my husband called me from Mexico, using a phone that I believe officers let him use. He told me that U.S. immigration officers drove him from a U.S. detention center to the Mexico border and handed him over to Mexican authorities. When we spoke, he told me he was scared and that he did not know what was going to happen to him.

7.     On October 9, 2025, in the morning, he called me from a jail in El Salvador. He told me that Mexican officers drove him to the Guatemalan border and handed him over to Guatemalan officers. Guatemalan officers then drove him to the border with El Salvador.

8.     Later that same day, around 8 PM ET, he called me again and told me that the Salvadoran officers told him they were going to send him to CECOT, a maximum-security prison. He was terrified and crying. He said he told the officers he had protection from the United States and he didn't understand why he ended up there. He begged me to contact his lawyer to bring him back to the United States. He said the officers told him that he was going to spend the rest of his life in prison.

1

EXHIBIT 8   Appx1443

2

9.    I have not heard from my husband since that phone call on October 9, 2025. I know his family in El Salvador has not heard from him either.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed on this 13th day of November 2025 at Winston-Salem, North Carolina.

2

**DECLARATION OF** ██████████████████

I, ████████████████████, make the following declaration based on my personal knowledge and declare under the penalty of perjury under the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. My name is ██████████████████. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I am a citizen of Cuba. Before I was deported, I lived in Miami, Florida.

3. I first arrived in the United States in 2022. I fled Cuba because I disagreed with Cuban politics and refused to join a youth communist organization. After I arrived in the United States, I applied for political asylum soon after. I had an immigration court date scheduled for around August 2026. I later received a work permit and a commercial license to drive trucks.

4. In early October 2025, when I was driving a commercial truck on the way back to Florida, I had to stop at a checkpoint in Texas. When the U.S. Customs and Border Protection officer asked me if I was a citizen or resident, I said no, and the officers detained me. A few days later, I was taken to El Valle Detention Center.

5. When I was at El Valle, my girlfriend told me that the immigration court set a hearing for November 4, 2025. I told an officer at El Valle that I had a court date scheduled that day. The officer told me that he could not take me to immigration court because I was not on their list, so I missed my court hearing. About three days later, I received papers saying that the immigration judge had ordered me deported to Cuba because I did not attend my court hearing.

6. The only reason I did not attend my court hearing is because immigration officers did not take me to the hearing or allow me to appear by video. I wanted to go to immigration court and explain my asylum application to the immigration judge.

7. On or around November 11, 2025, I was trying to use a computer tablet in El Valle, but I could not access any information about my case. Around 11pm that same day, an officer told me to get ready because I was leaving.

8. Along with some other people, I was then put on a bus from El Valle to the border of Mexico and Texas. When immigration officers were asked about where we were going, they refused to tell us. We realized we had arrived at the U.S.-Mexico border when we saw the border wall. I had not received any kind of advance notice of deportation to Mexico. I have seen on social media news about the crime and gangs in Mexico, and I have heard about the treatment of Cubans in Mexico, including being extorted and threatened. The other people on the bus and I told the U.S. immigration officers that we

1

were afraid of going to Mexico because we have heard people are kidnapped and extorted there. Immigration officers just forced us off the bus.

9.     The U.S. immigration officers handed us over to Mexican officers. Mexican officers then drove us about 36 hours from Reynosa to Chiapas, on the southern border of Mexico. When they let us off the bus in Chiapas, I did not have any identification or immigration documents. The Mexican officers dropped us off in the street and told us to fend for ourselves.

10.     I am afraid for my safety in Mexico. I do not have identification documents or a work permit. I do not know how long I will be permitted to stay in Mexico, and I am afraid that Mexican authorities might send me back to Cuba.

Executed this 26th day of November 2025 at Tapachula, Chiapas, Mexico.



Certification of Translation

I, Olivia Callan, hereby certify that I am fully competent in both English and Spanish languages, that on November 26, 2025, I read the above declaration to ▉▉▉▉▉▉▉▉▉▉▉ in Spanish to the best of my ability, and that he has signed his name with full understanding of its contents.

Olivia Callan

2

Appx.446

## DECLARATION OF ███████████████

I, ███████████████████████, make the following declaration based on my personal knowledge and declare under the penalty of perjury under the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. My name is ██████████████████████. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I am a citizen of El Salvador. Before I was deported, I lived in Annapolis, Maryland.

3. In 2022, I fled El Salvador because the Salvadoran police falsely accused me of belonging to a criminal organization. I entered the United States in or around July 2022.

4. In June 2022, during my journey to the United States, I traveled through Mexico where I was stopped by Mexican police and robbed. Near the U.S.-Mexico border, I was kidnapped and held for ransom by drug cartel members.

5. When I entered the United States, I was detained by immigration for 18 months. In December 2023, I won protection from an immigration judge under the Convention Against Torture (CAT) from removal to El Salvador. I was released from immigration detention in January 2024. As a condition of my release, I had to regularly report to U.S. Immigration and Customs Enforcement (ICE), which I did.

6. In early September 2025, immigration officers detained me at my ICE check-in in Baltimore, Maryland. An ICE officer told me I was going to be deported to Mexico, and I said that I was afraid of being deported to Mexico because I was kidnapped and robbed there in 2022. I also was afraid that Mexico might deport me to El Salvador because I had heard that this had happened to another Salvadoran who had won CAT protection. I told the officers about the immigration judge's order in my case.

7. After that, I spoke with an immigration officer about my fear of deportation to Mexico. I told the officer I was afraid to go to Mexico and about all the terrible things that had happened to me there in June 2022. I also told the officer that I was afraid that Mexico would send me back to El Salvador and that I had won CAT protection from deportation there.

8. ICE tried to deport me to Mexico four times. The first time was in late September 2025 in the morning. ICE officers told me I was going to be deported to Mexico. I told them that I was afraid of being sent there and had told an officer about my fear. I also told ICE officers that Mexico was going to deport me back to El Salvador and that I was scared. When they insisted that I was going to be deported to Mexico, I grabbed my Bible and laid face up on the floor. ICE officers grabbed me, broke my finger, tied me up, and hit me all over. They put me in a body constraint that I think they called the "wrap" and drove me about four hours from Florence, where I was detained at the time, to Nogales,

1

EXHIBIT 44 Appx.447

Arizona. When I arrived, I was crying from the pain. A Mexican immigration officer refused to accept me into the country. The ICE officers then drove me back to the detention center in Florence.

9. The next day, ICE tried to deport me to Mexico again, but the Mexican immigration officers again refused to accept me. The ICE officers again drove me back to Florence. I kept telling the officers that I was afraid of going to Mexico, but they ignored me and took me by force. When I asked them about my fear screening, they told me it was negative.

10. A few days later, they tried to deport me again, but a Mexican immigration officer again refused to accept me into the country.

11. In early October 2025, ICE again brought me to Mexico. I tried to resist by tying myself up with seatbelts, but the ICE officers beat me, sprayed gas, and cut the seatbelts. This time Mexican officers accepted me.

12. The Mexican officers transported me to Tenosique, an area in southern Mexico near the border with Guatemala, where I am currently in hiding. I am afraid that I will be kidnapped if I leave the building, just like I was before. My hand is broken, and the doctors in Mexico told me that I need to have surgery for my hand. I am terrified for my safety. I only have temporary status in Mexico while I apply for refugee status. I cannot work because my hand is broken. So, I am in hiding.

Executed on this 14th day of November 2025 at Tenosique, Tabasco, Mexico.

Certification of Translation

I, Olivia Callan, hereby certify that I am fully competent in both English and Spanish languages, that on November 14, 2025, I read the above declaration to ▮▮▮▮▮▮▮▮▮▮ in Spanish to the best of my ability, and that he has signed his name with full understanding of its contents.



Olivia Callan

2

**DECLARATION OF** ███████████

I, ████████████, make the following declaration based on my personal knowledge and declare under the penalty of perjury under the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is ████████████. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I am a citizen of Haiti. Before I was deported, I lived in Phoenix, Arizona.

3. I first arrived in the United States in 1992 when I was 14. I fled Haiti that year out of fear for my safety. My father worked for the former president of Haiti, and after the 1992 coup overthrowing this president, people shot up our house and kidnapped my father. That was the last time my brother or I saw him. My brother and I traveled on a boat to the United States to seek safety. The U.S. Coast Guard took us to Guantanamo Bay for questioning, and we entered the United States.

4. In November 2015, I won withholding of removal from Haiti. I was released from immigration detention on or around November 13, 2015.

5. After my release, I married my wife, ████████████, a U.S. citizen. We have 3 children.

6. The U.S. Department of Homeland Security detained me again on or around July 9, 2025, in a detention center in Florence.

7. After about three weeks in detention, U.S. Immigration and Customs Enforcement (ICE) agents took about 19 of us—about two Haitians and about 17 Cubans— from our beds around 2:30 AM to the immigration office across the street. They put us in a cage and called us up one by one to sign papers agreeing to deportation to Mexico. The paper I saw was in English, and it said that if I signed, I would be deported for 10 years. Some of the other detained people objected to signing the documents. A man who said he was a supervisor responded. I understood him to say that they would send us to Mexico anyway. An officer pulled me aside, and I told him that I did not want to sign the papers because I heard that there was a lot of crime with the cartels in Mexico. The officers deported about 7 of the Cubans who signed the deportation papers that day, and the rest of us went back to detention.

8. I continued to be detained after that. While there, based on advice my wife got from a lawyer, I requested an immigration custody review. A deportation officer sent me a packet to fill out for the immigration custody review. I filled out the packet, and my wife obtained documents for the packet. We submitted it on August 19. I never heard anything more about this request and never was interviewed about my fear of going to Mexico.

1

9. On or around September 5, 2025, around 4:30 PM, officers told me to pack my stuff up and that I was going to Louisiana. I was fingerprinted, and then officers took me and a number of other detained people to the immigration office across the street. We all stayed there overnight.

10. The next morning the officers handcuffed us, put us in van, and drove us to Nogales, Arizona. I knew then that we were going to Mexico, not Louisiana. After the van stopped, a U.S. officer started spraying us with pepper spray to make us leave the van. I was screaming, and officers grabbed me, dragged me out of the van, and pushed me into the Mexican officers' van. I was choking. I have asthma, and I couldn't breathe. Finally, a Mexican immigration officer located my inhaler, and I took several puffs, but I still couldn't breathe and then passed out. A man who had been detained with me started pumping my chest. He asked for medical for me, but I never got medical attention.

11. Mexican officers drove us to Tabasco, Mexico, where we were released. All I had with me was 5 U.S. dollars, my inhaler, eye drops for glaucoma, and the clothes I wore when I detained. Another deported person and I stayed in a hotel for several days. While we were there, three people were murdered on the hotel grounds. I felt extremely unsafe in Tabasco. If we went out, strangers told us we did not belong and to leave Mexico.

12. We then went to Cancún. There I met another Haitian man who warned me not to speak Creole because some Mexicans are looking for Haitian people to kill. I remain very afraid and constantly watch my surroundings.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed on this 11th day of November 2025 at Cancún, Quintana Roo, Mexico.



2

## DECLARATION OF ███████████

I, ███████████, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. My name is ███████████. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I am a citizen of the United States. I live in Phoenix, Arizona.

3. G.B., my husband, is Haitian and won withholding of removal to Haiti on or about November 13, 2015. He was arrested and detained by ICE on or around July 9, 2025. Without prior notice or an opportunity to contact a lawyer, he was deported to Mexico on or around September 6, 2025. He has no connection to Mexico and had never been there before.

4. I have a deep fear and worry I live with every day regarding my husband's situation. He was deported to Mexico, a country that is not his home and where he has no family, community, or strong support system. He regularly tells me how afraid he is living there. He tries to hide the fact that he is Haitian because of the prejudice and potential violence he would face from Mexicans if they learned he was Haitian. He speaks only English with a Haitian he knows there because he is afraid that speaking Creole would alert Mexicans to his Haitian identity.

5. Knowing that he is there, alone and vulnerable, fills me with constant anxiety and uncertainty. His safety is always on my mind. I fear for his safety, for his ability to find work, and for his stability in a place that is unfamiliar and where he faces risks simply for being Haitian in Mexico. I worry about his health, his safety, and his emotional state being so far away from his family and our children.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 7 day of November 2025 at Phoenix, Arizona.



**DECLARATION OF** ██████████████████

I, ██████████████████████, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. My name is ████████████████████████. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I am a citizen of Guatemala. Before I was deported, I lived in Phoenix, Arizona.

3. I first arrived in the United States in 1990. I left Guatemala because my father was kidnapped in front of me, and my family and I were threatened that we would be killed if we did not turn him in.

4. In spring 2021, I won protection under the Convention Against Torture (CAT) from Guatemala. I was released from immigration detention about a month later.

5. The U.S. Department of Homeland Security detained me again on or around July 29, 2025. My brother tried to hire an attorney to stop my deportation, but I only met with the attorney my brother paid one time, and I do not think he ever filed anything on my behalf.

6. One night, officers at the detention center told me to get out of bed and forced me to the rec field. The officers told me for the first time that they might deport me Mexico. I did not know before this that they were thinking of deporting me to Mexico. They told me to sign a deportation paper, but I refused. One officer said I was going to be deported no matter what I said. Another officer threatened to send me to Alligator Alcatraz or spend the rest of my life detained if I did not sign. I tried to express my fear of being deported to Mexico.

7. Another night, officers made me get out of bed in the middle of the night and told me that I was going to be deported to Guatemala. I had a piece of paper from an immigration website that my brother gave me that said I had CAT protection. Eventually, officers put me back in the detention center.

8. I did not get an interview where I could tell an asylum officer why I was afraid before I was deported, although I put in two requests to speak with a deportation officer about a credible fear interview. Other than briefly crossing through Mexico when my family fled Guatemala in 1990, I have no connection to Mexico and, at the time I was deported, I did not know anything about the current conditions here.

9. On about September 5, 2025, I was deported by van from Florence, Arizona to Nogales, Mexico. The night before, about four other men and I were moved into cells in the center of the Florence ICE Detention Center. They held us there all night. One officer told me that he knew that I got CAT from Guatemala but that they were still going to deport me

1

EXHIBIT 1

anyway. He said they were going to move us to Louisiana because it was closer to the border, but I thought that was a lie. They did not tell me I was going to be deported to Mexico. They forced us, with our hands and ankles handcuffed, into a van. I only realized I was being deported to Mexico when I saw the signs that I was in Nogales, Arizona, which is right on the border of Nogales, Mexico.

10. After we arrived in Nogales, the U.S. Border Patrol officers transporting us pepper sprayed us to force us out of the van. Then, the Mexican National Guard transported us to Hermosillo, Sonora, then to Janos, Chihuahua, and finally Villahermosa, Tabasco. Some other recently deported people that we picked up in Janos told me Guatemalans were going to be deported to Guatemala because the United States and Mexico had made a deal. I was terrified.

11. I feel totally unsafe in Mexico. I feel hopeless and tried to take my life three weeks ago. My anxiety and depression are at their lowest. I am terrified to go outside because I heard that Mexican cartels are kidnapping foreigners in Mexico. I have no money or income. It's like I'm starving to death. All of my family and loved ones live in the United States. I want to return home.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 28.00 day of October 2025 at Villahermosa, Tabasco, Mexico.



2

Appx.453

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| D.V.D., *et al.*, | ) | |
| | ) | |
| Individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:25-cv-10676-BEM |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. Department of Homeland Security, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' EXHIBITS FILED WITH THEIR REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Appx.454

**INTRODUCTION**

Plaintiffs' twenty-five exhibits filed with their reply in support of their motion for partial summary judgment and opposition to Defendants' motion to dismiss are procedurally improper and a clear instance of gamesmanship. This Court should strike them.

Less than a month ago, Plaintiffs tried to file twelve of these same exhibits in support of their motion for summary judgment mere days before Defendants' opposition to summary judgment was due. After Defendants pointed out the impropriety of these exhibits, Plaintiffs withdrew them. *See* Ex. A; ECF No. 228. Plaintiffs have now—despite Defendants' willingness to negotiate a longer briefing schedule—once again filed these same twelve exhibits, along with an additional thirteen exhibits.[1] Plaintiffs offer no substantive argument as to why these exhibits, raising a myriad of factual issues, are proper. Their standard of review merely parrots case law that is inapplicable to the present situation. These exhibits are procedurally improper, work an unfair surprise on Defendants, and this Court should immediately strike them ahead of the hearing scheduled to occur on December 16, 2025. Alternatively, this Court should vacate the upcoming hearing until it decides this motion to strike.

**STANDARD OF REVIEW**

"The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The court may do so on its own or on the motion of either party. *Id.* "'In resolving motions to strike, trial courts are empowered with broad discretion.'" *Soni v. Boston Medical Center Corp.*, 683 F.Supp.2d 74, 92 (D. Mass. 2009) (quoting

---

[1] Plaintiffs' newly filed Exhibits C, D, F, K, L, M, T, V, W, X, and Y are identical to Plaintiffs' withdrawn Exhibits B, G, D, E, I, L, F, C, H, J, and K, respectively. *Compare* ECF No. 227 *with* ECF No. 233. Newly filed Exhibit B is a revised version of withdrawn Exhibit A. Newly filed Exhibits A, E, G-J, N-S, and U are brand new.

1

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 182 F.R.D. 386, 398 (D.R.I. 1998)); *see also*

*Alvarado-Morales v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988). Motions to strike

are "not typically granted without a showing of prejudice to the moving party." *Sheffield v. City of*

*Boston*, 319 F.R.D. 52, 54 (D. Mass. 2016).

**ARGUMENT**

The Court should strike Plaintiffs' declarations and other exhibits submitted with their

reply for two primary reasons. ECF No. 133. *First*, these exhibits are procedurally improper in the

context of Plaintiffs' reply in support of their motion for summary judgment and their opposition

to Defendants' motion to dismiss. *Second*, consideration of these exhibits at this stage in the

proceedings would work a manifest injustice against Defendants who have not had an opportunity

to respond to them. Alternatively, should this Court be inclined to consider the exhibits, it should

do so only after Defendants have had a fair opportunity to respond and reschedule the December

16, 2025 hearing.

**A. The Exhibits are Procedurally Improper.**

These exhibits are procedurally improper in the context of Plaintiffs' reply in support of

their motion for summary judgment. To the extent that Plaintiffs wanted to submit affidavits or

other evidence in support of their motion for partial summary judgment, they should have filed

them with their motion (which was filed five months ago). This would have given Defendants the

opportunity to respond, as necessary, in Defendants' opposition brief. Instead, Plaintiffs chose to

wait five months and then raise this evidence for the first time with their reply. But new factual

allegations are not proper reply material. It is well-settled that "it is generally inappropriate for a

moving party to advance new arguments and supporting facts in a reply brief." *United States v.*

*Tsarnaev*, No. CRIM. 13-10200-GAO, 2015 WL 45879, at *2 (D. Mass. Jan. 2, 2015); *see also*

2

*Hilsinger Co. v. Kleen Concepts, LLC*, No. CV 14-14714-FDS, 2017 WL 3841468, at *7 (D. Mass. Sept. 1, 2017) ("The question of whether the facts in defendant's newly-submitted declaration are disputed or not highlights the need for a prohibition against the submission of new facts and argument in a reply brief. Defendant should not have waited to introduce that argument and its supporting facts until filing a reply, leaving plaintiff without recourse to dispute it.").

Moreover, Plaintiffs' submission of new factual allegations at this late stage undermines their request for partial summary judgment, which is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The exhibits are full of factual allegations that Defendants have not previously seen, let alone had an opportunity to investigate or respond to. To the extent Plaintiffs claim these are uncontroverted facts that are material to summary judgment, the federal and local rules require that they be submitted *with the motion*—not with the reply. L.R. 7.1(b)(1), 56.1. The First Circuit has recognized that while this time can be enlarged in certain circumstances, it is the party *adverse* to the summary judgment motion that "has a more extensive period for filing affidavits." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 409 (1st Cir. 1985). Indeed, "there is a substantial difference between accepting matters at the hearing which show that an issue of fact exists, and taking evidence in support of the motion at the last minute when there is no opportunity to rebut." *Id.* In all cases, an enlargement of time to submit affidavits "must not be exercised in a manner that prejudices the other party's substantial rights." *Id.* Here, for the reasons discussed *infra,* these exhibits have already prejudiced Defendants and this Court should strike them.

Nor are Plaintiffs' exhibits proper as part of their opposition to Defendants' motion to dismiss. Factual assertions outside the complaint are not properly considered under Federal Rule

of Civil Procedure 12(b)(6). *Trans-Spec Truck Serv. v. Caterpillar Inc.,* 524 F.3d 315, 321 (1st Cir. 2008). If a Court wishes to consider material outside the complaint, it must convert the motion into a motion for summary judgment. Fed. R. Civ. P 12(d). But, as discussed *supra,* Plaintiffs' exhibits have not been properly presented in their motion for summary judgment either.

Under Rule 12(b)(1), the Court may consider facts outside the complaint only when relevant to determining the Court's subject matter jurisdiction. *Gonzalez v. United States,* 284 F.3d 281, 288 (1st Cir. 2002). But there is no connection between the arguments advanced in Defendants' motion to dismiss under Rule 12(b)(1) and the factual assertions leveled in their newly filed exhibits. This Court is capable, as it has been in the past, of determining the jurisdictional questions before it without any facts. *See* ECF Nos. 34, 64. To the extent that Plaintiffs contend that facts are both material and necessary to determine the jurisdictional issues before this Court, that undermines their claim to summary judgment which requires there be *no* material dispute of fact. Defendants are entitled to "a full and fair opportunity to present relevant facts and arguments," and "jurisdictional facts and proffering materials" must be "of evidentiary quality." *Velentin v. Hosp. Bella Vista,* 254 F.3d 358, 363-64 (2001).

Plaintiffs offer no affirmative argument as to why these exhibits are procedurally proper. Their standard of review hints at their theory regarding the propriety of the exhibits, but the case law they cite does nothing to support an argument that this Court should consider these twenty-five exhibits. These exhibits do not "merely respond[] to matters placed in issue by the opposition brief" as illustrated by Plaintiffs' attempt to file half of these exhibits *before* Defendants' brief was due. And, in any case, Defendants are *entitled* to a fair opportunity to respond to the numerous and new factual allegations made in these exhibits. Plaintiffs' citation to an out of circuit *footnote* is wholly inapposite. *See* ECF No. 232 at 3 (citing *Beck v. Univ. of Wis. Bd. Of Regents,* 75 F.3d

4

1130, 1134 n1 (7th Cir. 1996)). There, the party submitted a *single* affidavit responding to two discrete factual allegations raised for the first time in an opposition brief. *Beck,* 75 F.3d at 1134 n1. Here, Plaintiffs submitted twenty-five exhibits full of numerous factual allegations that go well beyond merely responding to Defendant's jurisdictional arguments as Plaintiffs suggest. For example, many of the exhibits offer new arguments regarding the likelihood of chain refoulment, which Plaintiffs have previously scarcely addressed. *See* ECF No. 1 (no reference to "chain refoulement"); ECF No. 194 (mentioning "chain refoulement" once in passing).[2] The other case Plaintiffs cite actually supports Defendants' argument. *See* ECF No. 232 at 3 (citing *Alifax Holding Spa v. Alco Sci. Inc.,* No. 14-440 S, 2018 WL 11371589, at *2 (D. R.I. Oct. 16, 2018)). There, the opposing party had *months* to assess *two* declarations prior to the summary judgment hearing, articulated no prejudice caused by the declarations, and did not—as Defendants do here—seek timely leave to respond. *Id.* at *8. Accordingly, Plaintiffs' half-hearted attempt to justify their late-filed exhibits fails and the Court should strike the exhibits.

## B. The Court's Consideration of These Exhibits Would Work a Manifest Injustice on Defendants.

Consideration of these exhibits would work a manifest injustice against Defendants especially when viewed in light of Plaintiffs' display of gamesmanship. Plaintiffs had ample opportunity to submit documents with their motion for summary judgment, which they chose to file in July before Defendants had even responded to the Complaint. Timely submission of exhibits with their motion would have given Defendants the opportunity to respond, as necessary, in their opposition brief. Instead, Plaintiffs chose to wait five months and file now, *after* briefing is complete and with the scheduled hearing mere days away. Moreover, many of the exhibits raise

---

[2] Nor was the issue of chain refoulement raised by Defendants in their opposition to summary judgment and motion to dismiss. *See* ECF No. 231.

specific factual and legal issues that have not been addressed by the parties in prior briefing.[3] This gambit clearly works an unfair surprise and prejudices Defendants by advancing new factual assertions after briefing is complete and depriving Defendants of any meaningful opportunity to examine, investigate, and respond to the allegations before the hearing.

Compounding this gamesmanship are the fact that Plaintiffs withdrew many of these exhibits a few weeks ago without informing Defendants that they intended to re-file them with their reply brief and the fact that many of the declarations are dated days, weeks, or even months ago. Had Plaintiffs informed Defendants of their intention, the parties could have either (1) negotiated an extension of the briefing schedule or (2) made a plan for orderly litigation of a motion to strike. Instead, these exhibits have caught Defendants, and this Court, completely by surprise and have already worked an injustice on Defendants by requiring them to draft and file a motion to strike so close to the scheduled hearing. There is no explanation but gamesmanship for waiting to file declarations dated as early as October 8 until the filing of a reply brief days before a hearing. The declarations were untimely filed, raise new issues, and are not proper reply or opposition material. Plaintiffs could have filed the declarations earlier—and they in fact *did* file many of them earlier, before withdrawing them just to re-file at an even more prejudicial and inexplicable time. This Court should strike them.

---

[3] To name just one example, several of the declarations appear to raise factual allegations related to constructive United States custody of individuals detained abroad, which is a factual and legal issue that has never been addressed by either party in prior briefing. *See, e.g.*, ECF No. 233 Exh. Q at ¶ 14; *id.* at Exh. G at 3, 9-10; *id.* at Exh. I.

6

## CONCLUSION

For the foregoing reasons, this Court should strike Plaintiffs' exhibits filed with their

reply and opposition (ECF No. 233).


Respectfully submitted,

| | /s/*Matthew P. Seamon* |
|---|---|
| BRETT A. SHUMATE | MATTHEW P. SEAMON |
| Assistant Attorney General | Senior Litigation Counsel |
| | U.S. Department of Justice, Civil Division |
| ELIANIS N. PEREZ | Office of Immigration Litigation |
| Assistant Director | P.O. Box 868, Ben Franklin Station |
| | Washington, DC 20044 |
| MARY L. LARAKERS | (202) 598-2648 |
| Senior Litigation Counsel | (202) 305-7000 (facsimile) |
| | Matthew.Seamon2@usdoj.gov |

Appx.461

## LOCAL RULE 7.1 CERTIFICATION

I, Matthew Seamon, certify that pursuant to L.R. 7.1(a)(2), counsel for Defendants conferred with counsel for Plaintiffs, who oppose this motion.

<table>
<tr><td></td><td>/s/ <em>Matthew P. Seamon</em></td></tr>
<tr><td></td><td>MATTHEW P. SEAMON</td></tr>
<tr><td>Dated: December 10, 2025</td><td>Senior Litigation Counsel</td></tr>
</table>

## CERTIFICATE OF SERVICE

I, Matthew P. Seamon, Senior Litigation Counsel, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<table>
<tr><td></td><td>/s/ <em>Matthew P. Seamon</em></td></tr>
<tr><td></td><td>Matthew P. Seamon</td></tr>
<tr><td>Dated: December 10, 2025</td><td>Senior Litigation Counsel</td></tr>
</table>

8

Appx.462

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity, <br><br> Defendants. | Civil Action No. 25-cv-10676-BEM |

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs bring to the Court's attention a recent report by the U.S. Senate Committee on Foreign Relations concluding that the expanded use of third country deportations comes "at great taxpayer cost," reflects "questionable deals" with "corrupt and unstable foreign governments," and lacks transparency. S. Comm. on Foreign Relations, Minority Report (Report), *At What Cost? Inside the Trump Administration's Secret Deportation Deals* 1 (Feb. 13, 2026). The Report finds: "many people could have been sent to back their home country if the Administration had followed typical U.S. removal proceedings, saving U.S. taxpayers unnecessary costs," *id.* at 9; the State Department, "does not appear to be monitoring whether foreign governments are complying with their obligations under third country deportation agreements nor seeking to hold foreign governments accountable for violating agreement obligations," *id.* at 19; with respect to blanket diplomatic assurances, there is "no evidence of systematic monitoring, follow-up or enforcement, raising serious concerns that the assurances

1

made by foreign governments exist only on paper and that the United States is turning a blind eye to what happens to migrants in third countries," *id.*; and that noncitizens who have won protection from removal to their countries of origin have been chain refouled from third countries—specifically Ghana and Equatorial Guinea—to their countries of origin, with the United States' knowledge, *id.* at 27-28.

The Report supports Plaintiffs' arguments that Defendants are failing to follow the statutory sequence for removal under 8 U.S.C. § 1231(b)(2)(A)-(E), and that Defendants third-country removal policy is unlawful, including because it does not protect class members against chain refoulement. *See* Plaintiffs' Motion for Partial Summary Judgment, Dkt. 194 at 8-9, 15-20; Plaintiffs' Reply in Support of Partial Summary Judgment and Opposition to Defendants' Motion to Dismiss, Dkt. 232 at 11-15.

Respectfully submitted,

s/ *Trina Realmuto*

| | |
|---|---|
| Trina Realmuto | Matt Adams |
| Kristin Macleod-Ball | Leila Kang |
| Mary Kenney | Aaron Korthuis |
| NATIONAL IMMIGRATION | Glenda M. Aldana Madrid |
|   LITIGATION ALLIANCE | NORTHWEST IMMIGRANT |
| 10 Griggs Terrace |   RIGHTS PROJECT |
| Brookline, MA, 02446 | 615 Second Avenue, Suite 400 |
| (617) 819-4447 | Seattle, WA 98104 |
| trina@immigrationlitigation.org | (206) 957-8611 |
| | matt@nwirp.org |

Anwen Hughes
Inyoung Hwang
HUMAN RIGHTS FIRST
121 W. 36th St., PMB 520
New York, NY 10018
hughesa@humanrightsfirst.org

*Attorneys for Plaintiffs-Appellants*

February 24, 2026

2

Appx.464

# AT WHAT COST?

Inside the Trump Administration's
Secret Deportation Deals

SENATE FOREIGN RELATIONS COMMITTEE
MINORITY REPORT | FEBRUARY 2026



UNITED STATES SENATE

COMMITTEE ON
FOREIGN
RELATIONS

Appx.465

# Letter of Transmittal



*February 13, 2026*

<span style="color:red">Dear Reader:</span>

For decades, the enforcement of U.S. immigration law has required coordination with foreign governments. But it has never before played such a central and transactional role in American foreign policy.

This report finds that the Trump Administration has expanded and institutionalized a system in which the United States urges or coerces countries to accept migrants who are not their citizens, often through arrangements that are costly, wasteful and poorly monitored. Deporting migrants to countries they have no connection to—once a rare tool used only in exceptional circumstances—has become a routine instrument of diplomacy. This report finds that this shift has had three central consequences:

First, the Administration's use of third country deportations is coming at great taxpayer cost. The United States has spent tens of millions of dollars to move a relatively small number of individuals to third countries, some of whom, after being flown thousands of miles, are then flown back to their home country, again on U.S.-funded flights. In many cases, migrants could have been returned directly to their countries of origin, avoiding unnecessary flights and additional costs. Instead, taxpayers are funding a global deportation network that is little more than an expensive deterrent with no measurable benefit.

Second, the Administration is conducting questionable deals by making direct payments primarily to corrupt and unstable foreign governments with track records of public corruption, human rights abuses and human trafficking, relying on assurances that these countries will comply with certain obligations. Yet there is no evidence the State Department is monitoring how U.S. funds are used, tracking the treatment of deportees or enforcing the terms of these agreements. In some cases, U.S. officials have been instructed not to follow up at all. This is not disciplined enforcement; it is outsourcing responsibility to governments the United States itself does not trust.

Third, the Administration is not being transparent with Congress or the American people about the extent of its deal-making with foreign governments that agree to take in migrants, including what additional pressures and sweeteners it may be applying or offering up. Even where there are formal agreements with countries, questions remain about whether the Administration has made side deals or is providing other forms of U.S. assistance or favorable treatment. While distinct from third country deportations, the Administration has shown that in pursuit of its deportation agenda, it is even willing to cut deals with adversarial

governments like Iran. Under secretive arrangements, the Administration has forcibly deported Iranians, including vulnerable individuals such as religious minorities and political dissidents. There is no transparency around the full terms of these arrangements with foreign governments and whether these deals have come at the expense of advancing more pressing U.S. national security interests.

Taken together, these practices reflect a troubling shift in how the United States is exercising power. Deportation is being used as a bargaining chip. U.S. diplomacy is being conducted through secret cash payments and quiet concessions. Countries are being pressured with threats of tariffs, visa bans or cuts to assistance. Millions of taxpayer dollars are being spent without meaningful oversight or accountability. And speed and deterrence are being prioritized over due process and respect for human rights.

At a time when the Administration is already straining its relationships with longstanding allies, it is building transactional relationships with corrupt and adversarial regimes—not around shared interests or strategic goals, but opaque deals that do not serve American taxpayers or American security.

As Members of the Senate Foreign Relations Committee, we believe Congress has a responsibility to understand how U.S. foreign policy is being conducted, how taxpayer funds are being used and whether the Administration's actions strengthen or undermine American interests.

This report documents a growing system of third country deportations that is expensive, wasteful and increasingly detached from the principles of transparency and accountability that should govern U.S. diplomacy.

We hope this report will prompt serious scrutiny of a policy that now operates largely in the dark, and that it will serve as a basis for restoring basic standards of oversight, discipline and responsibility to an area of U.S. foreign policy that currently lacks all three.

Sincerely,

**Jeanne Shaheen**
*Ranking Member, Senate Committee on Foreign Relations*

**Chris Coons**
*United States Senator*

**Chris Murphy**
*United States Senator*

**Tim Kaine**
*United States Senator*

**Cory Booker**
*United States Senator*

**Chris Van Hollen**
*United States Senator*

**Tammy Duckworth**
*United States Senator*

**Jacky Rosen**
*United States Senator*

# Table of Contents

Executive Summary ..................................................................................4

Costly Operations with No Measurable Impact ...................................6

Unnecessary Use of Third Country Deportations at Taxpayer Expense .................9

No Oversight of U.S Funds to Foreign Governments ..........................15

*Equatorial Guinea* ...........................................................................*16*

*El Salvador* .......................................................................................*18*

Failure to Monitor and Enforce Agreements with Foreign Governments ............19

Secret Deal-Making that Does Not Serve American Interests.............................22

Circumventing U.S. Immigration Law .............................................27

Conclusion....................................................................................29

# Executive Summary

Over the past year, the Trump Administration has dramatically expanded the use of third country deportations—in which it deports migrants to countries that are not their own—transforming a narrow and rarely used practice into a standing system of global removals.

Through a growing web of bilateral arrangements, the United States is convincing foreign governments to take in people with no connection to their country, largely through financial payments or pressure. In some cases, the Administration is sending migrants thousands of miles only for them to later be returned to their home country at additional taxpayer expense. The Administration justifies these deals as necessary because home countries refuse to accept their nationals, but evidence contradicts these claims. In practice, third country deportations have produced little measurable benefit while imposing significant financial and diplomatic costs on the United States.

The Administration has pursued these arrangements through opaque negotiations, including with corrupt governments, without meaningful oversight or accountability. Tens of millions of dollars in taxpayer funds have been sent to foreign governments, yet Congress and the public have few details on the terms of these deals, how funds are being used or what the United States is offering in return.

This Senate Foreign Relations Committee Minority report documents the Trump Administration's expanding use of third country deportations. It is based on a review of agreements through January 2026, staff travel to relevant countries and meetings and communication with current U.S. officials, foreign government officials, human rights organizations, deportees and attorneys.[1]

---

1   This report covers agreements and reported third country deportations through January 31, 2026. The State Department is actively pressing dozens of other countries to enter into similar agreements.

Appx.469

This report identifies six central ways in which the Administration's use of third country deportations has undermined U.S. interests:

- **EXPENSIVE AND INEFFECTIVE OPERATIONS:** The Administration has spent tens of millions of dollars to move a relatively small number of migrants to third countries, in some cases paying more than one million dollars per person, with little measurable impact on its deportation agenda.

- **NEEDLESSLY WASTING TAXPAYER FUNDS:** In many cases, migrants could have been returned directly to their home countries, avoiding costly third country deportations. As of January 2026, more than eighty percent of the migrants sent to third countries paid by the United States to take them in have already returned to their country of origin or are in the process of doing so. In some cases, the U.S. paid to fly migrants to third countries only to later pay again for them to fly to their home country.

- **PROVIDING MONEY TO CORRUPT GOVERNMENTS WITHOUT OVERSIGHT:** The United States has sent more than thirty-two million dollars to foreign governments in direct connection with third country deportation deals, including those with records of corruption, human rights abuses and human trafficking, without monitoring how the money is used or whether taxpayer funds are being used to facilitate corruption, human rights abuses or human trafficking. It is unclear how much additional U.S. funding is being redirected to indirectly support these deals.

- **FAILURE TO MONITOR AND ENFORCE AGREEMENTS:** The State Department is not tracking foreign government compliance with diplomatic assurances or enforcing agreement terms, even where evidence suggests foreign governments are violating their commitments. In at least one country, U.S. officials told Committee Minority staff that Trump Administration officials instructed them not to follow up on how deportees were being treated.

- **SECRET DEALS THAT DO NOT SERVE AMERICAN INTERESTS:** Third country deportation agreements have become a central feature of U.S. bilateral relations, involving cash payments, political concessions and coercion, without transparency about the full extent of what the United States is giving in return or the pressures it is exerting. In addition, the Administration is making secret deals with adversarial regimes such as Iran, to accept their nationals back.

- **CIRCUMVENTING U.S. IMMIGRATION LAW:** Evidence suggests the Trump Administration is using third countries to carry out removals that U.S. law would otherwise prohibit, such as sending protected individuals onward to countries where they may face persecution or torture.

Appx.470

# Costly Operations with No Measurable Impact

The total costs of the Trump Administration's third country deportations through January 2026 are unknown but are likely upward of $40 million.[2] To incentivize countries to enter into third country deportation deals with the United States, the Trump Administration has provided more than $32 million directly to five countries:

**Equatorial Guinea** ($7.5 million), **Rwanda** ($7.5 million), **El Salvador** ($4.76 million), **Eswatini** ($5.1 million) and **Palau** ($7.5 million).[3] Much of the funds were provided as lump sum payments, often before any third country nationals arrived.[4]

The Trump Administration has paid high costs to fly migrants from the United States to third countries, frequently using military aircraft that can cost more than $32,000 per hour, even for flights carrying only a small number of migrants.[5] For example, flights carrying the 51 individuals sent to Rwanda, Eswatini and Equatorial Guinea over the past seven months cost an estimated $2.5 million.[6] In total, the Trump Administration spent an estimated more than $7.2 million on third country deportation flights as of January 2026 to at least ten countries, with actual costs likely far higher.[7]

---

2    The United States has provided at least $32.3 million to five foreign governments in direct connection to agreements to accept third country nationals, spent at least $7.2 million on flights to move migrants to at least ten third countries and spent $307,000 to house deportees on a U.S. military base in Djibouti. The $40 million does not include costs of hours spent on the tarmac for aircraft, costs of aircraft refueling, funding provided to pay to repatriate individuals from a third country, financial support to house some third country nationals in hotels or funding to organizations that may provide short-term assistance to deportees. For additional details on costs, *see infra* notes 3, 7 and 25.

3    Data for Equatorial Guinea, Fiscal Year 2026, USASpending.gov; Press Release, Senator Shaheen, "Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals," Nov. 10, 2025; Memorandum of Understanding Between the Government of the United States of America and the Government of the Republic of Rwanda Concerning the Removal of Third Country Nationals, Signed June 2025, available through the State Department's FOIA Library on Qualifying Non-Binding Instruments; Agreement Between the Government of the United States of America and the Government of El Salvador, Ex. 1, No. 1:25-cv-01774-JEB (D.D.C., Mar. 22, 2025); Memorandum of Understanding Between the Government of the United States of America and the Government of Eswatini Concerning the Removal of Third Country Nationals, U.S.-Eswatini, May, 2025, available through the State Department's FOIA Library on Qualifying Non-Binding Instruments; Ephrat Livni, "Palau Agrees to Take Up to 75 Migrants from the U.S.," *The New York Times*, Dec. 24, 2025; Minority Committee staff meetings with foreign officials, July to Dec. 2025.

4    *See* Data for Equatorial Guinea, Fiscal Year 2026, USASpending.gov; Press Release, Senator Shaheen, "Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals," Nov. 10, 2025; Ephrat Livni, "Palau Agrees to Take Up to 75 Migrants from the U.S.," The New York Times, Dec. 24, 2025; Agreement Between the Government of the United States of America and the Government of El Salvador, Ex. 1, No. 1:25-cv-01774-JEB (D.D.C., Mar. 22, 2025); Minority Committee staff communication and meetings with U.S. and foreign officials, July to Dec. 2025.

5    Human Rights First, ICE Flight Monitor: November 2025 Monthly Report, at 11 (Dec. 2025); U.S. Transportation Command and Air Mobility Command, FY26, Charter Guidance and Rates for Special Assignment Airlift Missions, Joint Exercise Transportation Program, and Contingency Missions for the Transportation Working Capital Fund, at 14, Table 2, "Non-DoD U.S. Government, Charter Hourly Rates and Minimum Activity Rates for Aircraft on TWCF Missions."

6    *See infra* notes 7 and 10. This estimated cost is only for the third country deportation flights to Rwanda, Eswatini and Equatorial Guinea.

7    This cost encapsulates third country deportation flights to more than 10 countries throughout 2025 and Jan. 2026. Estimated flight costs based on calculations using roundtrip in-air flight times and publicly available cost per hour data for the type of aircraft. Estimated costs do not include time charged for aircraft while on the tarmac, refueling costs or crew costs. Type of aircraft used and estimated length of in-air flight times based on analysis of Human Rights First ICE Flight Monitor data available at https://humanrightsfirst.org/ice-flight-monitor/ and on X, *see e.g.*, ICE Flight Monitor, @ICEFlightM, "ICE Flight Monitor tracked the deportation flight on a military plane that took 14 third-country nationals to Ghana. The flight left Alexandria, LA on Friday, Sept. 5, refueled in St. Croix before landing in Accra, Ghana. Individuals on board were in straitjackets for 16 straight hours and were not told where they were going until several hours into the flight," Sept. 18, 2025, https://x.com/ICEFlightM/status/1968682997042778172. Costs for military aircraft found at: U.S. Transportation Command and Air Mobility Command, FY26, Charter Guidance and Rates for Special Assignment Airlift Missions, Joint Exercise Transportation Program, and Contingency Missions for the Transportation Working Capital Fund, at 14, Table 2, "Non-DoD U.S. Government, Charter Hourly Rates and Minimum Activity Rates for Aircraft on TWCF Missions." Cost for non-military aircraft found at: U.S. General Services Administration,

Appx.471

Despite spending tens of millions in taxpayer dollars, to date, the United States has moved relatively small numbers of third country nationals. As of January 2026, the five countries that the Trump Administration collectively paid more than $32 million to take in migrants have only received approximately 300 third country nationals from the United States,[8] the majority of whom have already been returned or are set to return to their home country.[9] Of the 300 third country nationals, approximately 250 were Venezuelans sent to El Salvador in March 2025; the total number of third country nationals received by the other four countries was just 51. As of January 2026, the numbers of third country nationals received by the countries the United States had paid were: Rwanda (7), Eswatini (15) Equatorial Guinea (29), Palau (0) and El Salvador (approx. 250).[10] This means that, to date, the Trump Administration has paid at least one country more than $1 million per third country national received.

> *To date, the Trump Administration has paid at least one country **more than $1 million per third country national** received.*

---

"Federal Supply Service Authorized Federal Supply Schedule Price List," (Nov. 20, 2022 to Nov. 19, 2027), available at: https://www.gsaadvantage.gov/ref_text/GS33F017AA/0ZAHLF.3V0UG3_GS-33F-017AA_GS33F017AA.PDF.

8    See breakdown of number of third country nationals at bottom of paragraph; *see infra* note 10.

9    *See* Julie Turkewitz and Hamed Aleaziz, "Prisoner Swap Frees Americans in Venezuela for Migrants in El Salvador," *The New York Times*, Jul. 18, 2025; Isa Cardona and Max Saltman, "South Sudan Repatriates Mexican Man Deported From US," *CNN*, Sept. 7, 2025; Natasha Booty, "Eswatini Says It Has Repatriated US Deportee to Jamaica," Sept. 23, 2025; Press Release, Government of the Kingdom of Eswatini, "More Third Country Nationals Expected to Arrive in the Country From the United States of America," Oct. 5, 2025, available at: https://x.com/EswatiniGovern1/status/1974909942466593081/photo/1; Daphne Psaledakis and George Obulutsa, "Rwanda Received Migrants Deported From the US Earlier This Month," *Reuters*, Aug. 28, 2025; Minority Committee staff communication with current U.S. officials and outside experts, Aug. 2025 to Jan. 2026.

10    Daphne Psaledakis and George Obulutsa, "Rwanda Received Migrants Deported from the US Earlier This Month," Reuters, Aug, 28, 2025; "Eswatini Receives 10 Third-Country Nationals from US," *CNN*, Oct. 6, 2025; Robbie Corey-Boulet and Emmanuel Bruce, "Ghana Took in Trump's Deported West Africans. Then It Forced Them Home," *Reuters*, Jan. 17, 2026; ICE Flight Monitor, @ICEFlightM, "UPDATE: The ICE deportation flight (OAE3991) just landed in Equatorial Guinea, likely removing third-country nationals. The flight originated in Alexandria, LA and stopped in Senegal (likely to refuel), Liberia, Ghana, and Nigeria.," Jan. 22, 2026, https://x.com/iceflightm/status/2014382068508037375?s=43; Prianka Srinivasan, "Palau Lawmakers Vote to Block Controversial Trump Deal to Resettle Migrants From US," *The Guardian*, Jan. 29, 2026; Luke Garrett, "U.S. Deports Hundreds of Venezuelans to El Salvador, Despite Court Order," *NPR*, Mar. 16, 2025. Confirmed through Minority Committee communication with advocates, human rights organizations, and foreign officials, Aug. 2025 to Jan. 2026.

Appx.472

The below chart details the cost of third country deportations as of January 2026 to the five countries the Trump Administration has provided payments to in exchange for agreeing to accept third country nationals:

| Country | Payment to Foreign Government | Estimated Cost of Flights[11] | Number of Third Country Nationals[12] | Estimated Cost Per Migrant |
|---|---|---|---|---|
| El Salvador | $4.76M | $428,821 | ~ 250 | $20,755 |
| Rwanda | $7.5M | $601,864 | 7 | $1.1M |
| Eswatini | $5.1M | $1.1 M | 15 | $413,333 |
| Equatorial Guinea | $7.5M | $681,670 | 29 | $282,126 |
| Palau | $7.5M | No flights | 0 | N/A |

---

11    See *supra* note 7 for method of cost calculations and resources used.

12    As of January 31, 2026.

Appx.473

# Unnecessary Use of Third Country Deportations at Taxpayer Expense

The Trump Administration has insisted it must take the extraordinary measure of sending migrants to third countries because their home countries will not take them back.

The Department of Homeland Security has repeatedly stated that third country deportations allow them to remove individuals "so uniquely barbaric that their own countries won't take them back."[13] Yet, a review of third country deportations through January 2026 contradicts the Administration's claims, revealing that many people could have been sent to back their home country if the Administration had followed typical U.S. removal proceedings, saving U.S. taxpayers unnecessary costs.



### The U.S. Government Paid for This

The Trump Administration sent a Jamaican national to Eswatini—at an estimated cost of more than $181,000. Weeks later, that individual was flown more than 7,000 miles back to Jamaica on a series of U.S.-funded flights.

---

13   *See e.g.,* Press Release, Department of Homeland Security, DHS Releases Statement on Major Victory for Trump Administration and the American People on Deporting Criminal Illegal Aliens to Third Countries, June 23, 2025.; Tricia McLaughlin, @TriciaOhio, "NEW: a safe third country deportation flight to Eswatini in Southern Africa has landed— This flight took individuals so uniquely barbaric that their home countries refused to take them back," July 15, 2025, https://x.com/TriciaOhio/status/1945274627976200206.

The home governments of several migrants sent to third countries accepted them back within weeks or months of them being flown to a third country.[14]

Migrants have been removed from the United States to a third country despite having final removal orders to be sent back to their country of origin.[15] Many could have been sent directly to their country of origin, but the Trump Administration did not contact their home government or give governments sufficient notice to process documentation for their nationals.[16] Instead, the Trump Administration is often flying these migrants thousands of miles away on costly flights.

As a result, the Trump Administration has, in some cases, paid twice for migrants' travel—once to remove them to a third country and then again to fly them to their home country.[17] As a current U.S. official privately told Committee Minority staff: "The Trump Administration is sometimes paying the country to take people, flying them there and then paying to take them to their home country. It doesn't make sense."[18] The Administration will likely pay for additional migrants in third countries to return to their home countries.[19]

> " *The Trump Administration is sometimes paying the country to take people, flying them there and then paying to take them to their home country. It doesn't make sense."*
>
> – Current U.S. Official, Communication with Committee Minority staff, Dec. 2025

---

14   *See, e.g.,* Isa Cardona and Max Saltman, "South Sudan Repatriates Mexican Man Deported From US," CNN, Sept. 7, 2025; Natasha Booty, "Eswatini Says It Has Repatriated US Deportee to Jamaica," BBC, Sept. 23, 2025; Minority Committee staff communication with advocates and outside experts, Sept. 2025 to Jan. 2026.

15   A "removal order" is a determination made by an immigration judge or DHS officer authorizing a noncitizen's removal from the United States. Generally, a "final order of removal" refers to an order of removal issued by an immigration judge that has become final based on a decision made by a Board of Immigration Appeals or upon other specified circumstances as set forth in federal regulations. *See, e.g. Decl. of Anwen Hughes at 1 and 3, D.V.D. v. U.S. Department of Homeland Security (DHS)*, No. 25-cv-10676, Doc. 233-5 (D. Mass. Sept. 13, 2025); Decl. of Mia Unger, at 1, 3, *D.V.D. v. DHS*, Doc. 233-6 (D. Mass. Dec. 8, 2025) (Unger Declaration); Minority Committee staff communication with advocates, Sept. 2025 to Jan. 2026.

16   *See, e.g.*, Hughes Declaration at 1; Decl. of Tin Thanh Nguyen at 9, *D.V.D. v. DHS*, No. 25-cv-10676, Doc. 233-1 (D. Mass. Nov. 13, 2025) (Nguyen Declaration); "Sheinbaum Addresses Case of Mexican Deported to Africa by US: Thursday's Mañanera Recapped," *Mexico News Daily*, May 22, 2025, https://mexiconewsdaily.com/politics/sheinbaum-addresses-case-of-mexican-deported-to-africa-by-us-thursdays-mananera-recapped/;
Hon. Kamina J Smith, @kaminajsmith, "The Ministry of Foreign Affairs and Foreign Trade is aware of reports in the public domain, of the transfer of individuals purportedly including a Jamaican national, to Eswatini. The Ministry has initiated enquiries with the US authorities to ascertain the veracity of the reported inclusion of a Jamaican in the transfer. The Government has not refused the return of any of our nationals to Jamaica, and accordingly, if the reports are confirmed, will continue its engagements with the US on the arrangements necessary to facilitate the individual's return to Jamaica. We will keep the public updated as soon as further verified information is obtained," July 16, 2025, https://x.com/kaminajsmith/status/1945677928752148770; Minority Committee staff communication with advocates and deportees, Sept. 2025 to Nov. 2025.

17   *See* Andrea Salcedo and Samantha Schmidt, "Trump Deports Hundreds to Third Countries, Leaving Them in Legal Limbo," *The Washington Post,* Feb. 21, 2025; Minority Committee communication with advocates, outside experts and current U.S. officials, July 2025 to Jan. 2026. State Department briefing to Committee Minority staff on July 9, 2025.

18   Current U.S. Official, communication with Committee Minority staff, Dec. 2025.

19   Committee Minority staff communication with advocates, outside experts and current U.S. officials, July 2025 to Jan. 2026. State Department briefing to Committee Minority staff on July 9, 2025.

**The following are instances when the Trump Administration appears to have paid for unnecessary or wasteful third country deportations, and the associated costs, including double payments for flights:**

- **Weeks after the Trump Administration sent a Jamaican national to Eswatini**—at an estimated cost of more than $181,000 per person—he was flown more than 7,000 miles back to Jamaica on a series of U.S.-funded flights.[20] This Jamaican national had been placed in a cell in ICE custody with other Jamaican nationals in the United States. All of the men were called to leave the cell except for this individual who was then placed on a flight with four men of different nationalities and sent to Eswatini despite his deportation orders to be sent to Jamaica.[21] Jamaican officials said it was not true that their country had been unwilling to take their national stating: "The Government has not refused the return of any of our nationals."[22]



© KrasseCheckerlicensed CC BY-SA 3.0), via Wikimedia Commons.

*King Mswati III International Airport in Eswatini.*

---

20   Natasha Booty, "Eswatini Says It Has Repatriated US Deportee to Jamaica," *BBC*, Sept. 23, 2025; Sarah Stillman, "Disappeared to a Foreign Prison," *The New Yorker,* Nov. 24, 2025. Use of U.S. funds according to Minority Committee staff communication with current U.S. officials and outside experts. Estimated round-trip cost for the flight to Eswatini via Djibouti carrying five individuals on or around July 15, 2025, is $906,868. *See supra* note 7 for further details on calculating estimated flight costs.

21   Unger Declaration at 1, 3.

22   Hon. Kamina J Smith, @kaminajsmith, "The Ministry of Foreign Affairs and Foreign Trade is aware of reports in the public domain, of the transfer of individuals purportedly including a Jamaican national, to Eswatini. The Ministry has initiated enquiries with the US authorities to ascertain the veracity of the reported inclusion of a Jamaican in the transfer. The Government has not refused the return of any of our nationals to Jamaica, and accordingly, if the reports are confirmed, will continue its engagements with the US on the arrangements necessary to facilitate the individual's return to Jamaica. We will keep the public updated as soon as further verified information is obtained," July 16, 2025, https://x.com/kaminajsmith/status/1945677928752148770.

- **During a visit to the eight third country nationals detained in South Sudan**, several of the men told Committee Minority staff that the U.S. Government either had not reached out to their home governments or had failed to provide sufficient time to their governments to process travel documents. For example, the Vietnamese national held in South Sudan said ICE officers had prepared his removal documents to Vietnam but were not given enough time to work with the Vietnamese Embassy before he was sent to South Sudan. In court filings, his lawyer reiterated this point claiming that the deportation officer for this



© US NAVY

*Camp Lemonnier is a U.S. Navy military base adjacent to the Djibouti-Ambouli International Airport. Eight third country nationals were held here en route to South Sudan at a cost of $307,000 (see infra note 25).*

case had not submitted a request to Vietnam for the individual to receive his travel documents when the Trump Administration instead put him on a plane to South Sudan.[23] The majority of deportees in South Sudan told Committee Minority staff they wanted to return to their home country.[24] The flights carrying these men to South Sudan cost an estimated $427,000 with another $307,000 to house them on a military base in Djibouti along the way.[25]

- **Weeks after arriving in South Sudan, a Mexican national was flown back to Mexico.**[26] The Trump Administration paid an estimated $91,000 per person to fly him over 8,000 miles to South Sudan instead of returning him to Mexico.[27] Court filings state that prior to his removal to South Sudan: "There is no indication that ICE contacted any Mexican consulate in the United States to request travel documents for [the individual] or to arrange for his return to Mexico."[28] Mexican officials expressed concern over one of their nationals being sent to South Sudan, saying Mexico always accepts its nationals back.[29] Mexico's President Claudia Sheinbaum said her government was not informed of the deportation of the Mexican national.[30]

---

23  Nguyen Declaration at 9.

24  Committee Minority staff travel, Aug. 2025.

25  Senator Warren, Rep. Garamendi, Senator Booker, et al., *Draining Defense: Trump's Immigration Stunts Cost Billions at the Expense of Military Readiness, Morale, and National Security*, at 8 (Dec. 2025). *See supra* note 7 for further details on calculating estimated flight costs.

26  Isa Cardona and Max Saltman, "South Sudan Repatriates Mexican Man Deported From US," *CNN*, Sept. 7, 2025. His return flight was not funded by the U.S. Government.

27  This cost estimate takes into account the cost of the estimated round-trip flights to South Sudan and cost of housing the deportees on a military base in Djibouti, a temporary transit stop. Estimated round-trip costs for the flights carrying eight deportees to South Sudan is $427,008. The cost of housing deportees on a military base in Djibouti was $307,000 *See supra* notes 7, 25.

28  Decl. of Anwen Hughes at 1 (Sept. 13, 2025).

29  Committee Minority staff meeting with Mexican officials, Aug. 2025.

30  "Sheinbaum Addresses Case of Mexican Deported to Africa by US: Thursday's Mañanera Recapped," *Mexico News Daily*, May 22, 2025.

---

- **The Laos government was told it had less than 24 hours to prepare travel documents for a Lao national or he would be sent to Rwanda.**[31] Despite a willingness to produce the travel documents, Laos was unable to do so in time, and this individual was deported to Rwanda at an estimated cost of more than $85,000 per person.[32]

- **After paying an estimated $1.4 million to fly roughly 500 migrants to Panama and Costa Rica,** the Trump Administration then paid again for the majority of these individuals to fly to their home country or another third country— many of which were thousands of miles away.[33]

- **In the case of a Cambodian national sent to Eswatini**, his attorney states: "I know that ICE did not request a travel document from Cambodia but may have requested one from Thailand, where he is not a citizen or national."[34] He was sent to Eswatini at an estimated cost of more than $27,000 per person.[35]

- **An attorney for a Laotian national sent to Eswatini**—at an estimated cost of more than $181,000 per person—stated in court filings that the U.S. Government deported him despite having a travel document to repatriate him to Laos.[36] An officer at the Embassy of Laos in Washington, D.C. said he "was sure the Lao Government has agreed to accept him to Laos and his travel document was issued."[37]

---

31 Committee Minority staff meetings with advocates, Dec. 2025.

32 *Id*. Estimated round-trip cost of the flights carrying seven individuals to Rwanda is $601,864. Estimated round-trip cost of the flights carrying seven individuals to Rwanda is $601,864. *See supra* note 7 for information on calculating estimated flight costs.

33 *See* Andrea Salcedo and Samantha Schmidt, "Trump Deports Hundreds to Third Countries, Leaving Them in Legal Limbo," *The Washington Post,* Feb. 21, 2025; "Costa Rica Grants Special Status to 85 Migrants Deported From the US," *Reuters,* April 23, 2025; Annie Correal and Julie Turkewitz, "170 Migrants Deported From U.S. Agree to Return to Home Countries, Panama Says," Feb. 18, 2025; Human Rights Watch, "*The Strategy Is to Break Us:" The US Expulsion of Third-Country Nationals to Costa Rica*, May 22, 2025. State Department briefing to Minority Committee staff on July 9, 2025.

This represents the estimated cost for the five flights to Costa Rica and Panama, including three military planes (C-17 aircraft). *See supra* note 7 for information on calculating estimated flight costs.

34 Nguyen Declaration at 9.

35 The estimated round-trip cost of the flight carrying ten third country nationals to Eswatini on or around Oct. 6, 2025, is $278,304. *See* Footnote 6 for information on calculating estimated flight costs.

36 Nguyen Declaration at 9. Estimated round-trip cost for the flight to Eswatini via Djibouti carrying five individuals on or around July 15, 2025, is $906,868. *See supra* note 7 for details on flight cost estimations.

37 *Id*.

Rather than deploying an efficient, humane deportation strategy and conducting basic due diligence, the Trump Administration appears to be needlessly spending taxpayer funds—sending individuals across the world and then back again—largely to scare or threaten migrants that the same will happen to them. As Department of Homeland Security spokesperson Tricia McLaughlin stated in August 2025: "If you come to our country illegally and break our laws, you could end up in CECOT, Alligator Alcatraz, Guantanamo Bay, or South Sudan or another third country."[38] A current U.S. official familiar with third country deportation operations privately described the Trump Administration's use of third country deportations as a "scare tactic" and "hugely expensive deterrent" meant to keep migrants from coming to the United States, intimidate them into dropping asylum claims or encourage them to "self deport."[39]

> *A current U.S. official familiar with third country deportation operations privately described the Trump Administration's use of third country deportations as a "scare tactic" and "hugely expensive deterrent" meant to keep migrants from coming to the United States, intimidate them into dropping asylum claims or encourage them to "self deport."*

> " *With countries like Palau or Eswatini, the point is that the Administration can threaten people that they will literally be dropped in the middle of nowhere. The point is to scare people."*
>
> – Current U.S. Official, Communication to Committee Minority staff, Dec. 2025

One current U.S. official said the Trump Administration was intent on pursuing third country deportation deals with the island nation of Palau or the country of Eswatini to use as a threat to migrants, saying: "With countries like Palau or Eswatini, the point is that the Administration can threaten people that they will literally be dropped in the middle of nowhere. The point is to scare people."[40]

---

38  Kristina Cooke and Ted Hesson, "The US Said It Had No Choice But to Deport Them to a Third Country. Then It Sent Them Home," *Reuters*, Aug. 2, 2025, https://www.reuters.com/world/americas/us-said-it-had-no-choice-deport-them-third-country-then-it-sent-them-home-2025-08-02/.

39  Committee Minority staff communication with current U.S. officials, Oct. 2025.

40  Committee Minority staff communication with current U.S. officials, Dec. 2025.

# No Oversight of U.S Funds to Foreign Governments

Despite sending more than $32 million to five foreign governments for third country deportation deals, there is no evidence the State Department is conducting follow-up oversight on the use of taxpayer funds.[41]

In an unusual move, the Trump Administration has provided these funds directly to foreign governments, rather than through trusted third-party implementing partners who conduct regular monitoring and oversight, making it more challenging for the State Department to track the use of funds.[42] The State Department is also not using a third-party auditor to track the use of money; instead, the State Department appears to be relying on the foreign governments themselves (some with a clear history of corruption or mismanagement) to report on the use of U.S. Government funding.[43]

As mentioned, several of the governments receiving U.S. funds have well-documented records of corruption, human rights abuses and human trafficking. Without oversight, it is unknown whether U.S. funds are facilitating corruption or other abuses. These countries include the following:

---

41   *See supra* note 3 for details on costs.

42   *See* Data for Equatorial Guinea in Fiscal Year 2026. USASpending.gov; Press Release, Senator Shaheen, "Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals," Nov. 10, 2025; Ephrat Livni, "Palau Agrees to Take Up to 75 Migrants from the U.S.," *The New York Times*, Dec. 24, 2025; Agreement Between the Government of the United States of America and the Government of El Salvador, March 2025, available at: https://democracyforward.org/wp-content/uploads/2025/09/Dkt-30-1-Ex-1-to-Withdrawal-of-MDD.pdf; Committee Minority staff briefings with State Department officials (Jan. 2026) and communication with current U.S. and foreign officials, Aug. through Nov. 2025.

43   Committee Minority staff also confirmed in communication with current U.S. officials, Nov. to Dec. 2025. In his testimony before the Senate Foreign Relations Committee at a nominations hearing on Dec. 11, 2025, Cart Weiland, the State Department official responsible for signing off on the payment to the El Salvador Government, stated, when asked regarding the tracking of the funds that: "[El Salvador] is under strict obligations to report on how they're using those funds." Committee Minority staff also confirmed in communication with current U.S. officials, Nov. 2025 to Dec. 2025.

# Equatorial Guinea

Equatorial Guinea ranks 172 out of 182 countries for corruption according to Transparency International.[44]

The State Department's *2023 Human Rights Report* states that "the president and members of his inner circle continued to amass personal fortunes from the revenues associated with monopolies on all domestic commercial ventures" and that "corruption at all levels of government was a severe problem" in Equatorial Guinea.[45]

In 2011, the U.S. Department of Justice pursued a civil asset forfeiture case against Teodoro Nguema Obiang Mangue, the President's son, who currently serves as the Vice President of Equatorial Guinea, alleging that he amassed more than $300 million worth of assets through "corruption and money laundering in violation of both U.S. and Equatoguinean law" including through purchasing a jet, a Malibu mansion and Michael Jackson memorabilia.[46] In a settlement with the United States, Obiang Mangue was forced to relinquish assets worth approximately $30 million.[47] In its 2025 Freedom in the World Report, Freedom House assigned Equatorial Guinea 0 out of 4 for whether "safeguards against official corruption [are] strong and effective."[48]



---

44  Transparency International, *2025 Corruption Perceptions Index*, "Equatorial Guinea," (Feb. 2025), https://www.transparency.org/en/cpi/2025/index/gnq.

45  State Department, 2023 Country Reports on Human Rights Practices, "Equatorial Guinea," (April 2024).

46  Press Release, U.S. Department of Justice, "Department of Justice Seeks to Recover More Than $70.8 million in Proceeds of Corruption from Government Minister of Equatorial Guinea," Oct. 25, 2011.

47  Press Release, U.S. Department of Justice, "Second Vice President of Equatorial Guinea Agrees to Relinquish More than $30 Million of Assets Purchased with Corrupt Proceeds," Oct. 10, 2014.

48  Freedom House, "Equatorial Guinea," Freedom in the World 2025, (Feb. 26, 2025), https://freedomhouse.org/country/equatorial-guinea/freedom-world/2025.

There are also concerns about human trafficking in Equatorial Guinea. The State Department's own *2025 Trafficking in Persons Report* raises as a "significant concern" the "corruption and official complicity in trafficking crimes" by government officials in Equatorial Guinea.[49]

Despite this record, the Trump Administration sent $7.5 million to Equatorial Guinea to accept third country nationals—an amount that far exceeds all U.S. foreign assistance provided to the country over the last eight years combined.[50] The money was directly provided to the Equatorial Guinea government, which had never before been done, outside of the United States giving some limited medical supplies.[51] As of January 2026, Equatorial Guinea has received 29 third country nationals, the majority of whom it has quickly sent onward to their country of origin or intends to send onward.[52] This raises the question as to why the money was needed in the first place and what Equatorial Guinea is doing with it.

In November 2025, Ranking Member Shaheen wrote a public letter to Secretary of State Marco Rubio raising alarm over this third country deportation deal and asking how the State Department will ensure none of the money provided by the United States would be used to facilitate corruption or enable human trafficking. As of February 2026, the State Department has not responded.

---

49    State Department, *2025 Trafficking in Persons Report,* "Equatorial Guinea," (Sept. 2025).

50    Press Release, Senate Foreign Relations Committee, Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals, Nov. 10, 2025. State Department briefing to Committee Minority staff, Jan. 2026.

51    Press Release, Senate Foreign Relations Committee, Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals, Nov. 10, 2025. State Department briefing to Committee Minority staff, Jan. 2026.

52    Sheriff Bojang Jr., "Equatorial Guinea Sends Eight of Trump's Nine Deportees Home, Braces For New Arrivals," *The Africa Report,* Jan. 16, 2026, https://www.theafricareport.com/405291/equatorial-guinea-sends-eight-of-trumps-nine-deportees-home-braces-for-new-arrivals/; Committee Minority staff communication with advocates and deportees, Jan. 2026.

# El Salvador

**El Salvador has a documented history of corruption and lack of transparency in government spending.**

According to Transparency International, El Salvador ranks 120 out of 182 countries for corruption.[53] In its 2025 Freedom in the World Report, Freedom House assigned El Salvador 0 out of 4 for whether "safeguards against official corruption [are] strong and effective." Salvadoran government officials also regularly withhold information on how they use funds.[54]

The Trump Administration provided at least $4.76 million to the Salvadoran government in connection with the detention of more than 250 Venezuelans deported from the United States to be used for associated detention costs.[55] The State Department has not made clear whether funds have been used to facilitate government corruption or to house Venezuelan detainees in CECOT—a maximum security prison—where there are credible reports detainees were tortured. [56]

When questioned before the Senate Foreign Relations Committee regarding the use of funds, Cart Weiland, a Trump Administration official responsible for approving the money to El Salvador stated: "The State Department is not in the business of deportations," referring the Committee instead to the Department of Homeland Security. He indicated the State Department is relying on the Salvadoran government to report on how these funds are used and could not definitively state whether any of the funds had been used to detain Venezuelans in the CECOT prison where they were reportedly tortured.[57]

The State Department's lack of financial oversight leaves Congress unable to determine whether U.S. funds were misused including whether they contributed to corruption or facilitated human rights abuses.

---

53 Transparency International, *2025 Corruption Perceptions Index*, "El Salvador," (Feb. 2025), https://www.transparency.org/en/countries/el-salvador.

54 Freedom House, "El Salvador," Freedom in the World 2025, (Feb. 26, 2025).

55 Agreement Between the Government of the United States of America and the Government of El Salvador, March 2025, available at: https://democracyforward.org/wp-content/uploads/2025/09/Dkt-30-1-Ex-1-to-Withdrawal-of-MDD.pdf.

56 Human Rights Watch, "You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison, (Nov. 12, 2025).

57 Testimony of Cart Weiland, Nominee to be Assistant Secretary of International Narcotics and Law Enforcement, Senate Foreign Relations Committee, Nomination Hearing, Dec. 11, 2025.

# Failure to Monitor and Enforce Agreements with Foreign Governments

The Trump Administration does not appear to be monitoring whether foreign governments are complying with their obligations under third country deportation agreements nor seeking to hold foreign governments accountable for violating agreement obligations.

Many of the third country deportation agreements include blanket language on upholding international human rights laws like ensuring migrants are not tortured, arbitrarily detained or sent to another country where they could be harmed or killed. When negotiating these deportation agreements, the State Department is responsible for assessing whether a foreign government's diplomatic assurances are "credible" that they will uphold these obligations.[58]

Yet the Trump Administration has provided no evidence of systematic monitoring, follow-up or enforcement, raising serious concerns that the assurances made by foreign governments exist only on paper and that the United States is turning a blind eye to what happens to migrants in third countries. This also undermines the credibility of the Administration's assessments of diplomatic assurances in future third country deportation agreements.



*In South Sudan, deportees were kept in a gated house with armed guards. U.S. Embassy officials had not visited the deportees.*

Several countries selected for third country deportations had well-known records of human rights abuses before agreements were signed. In El Salvador, for example, its CECOT prison, where more than 250 Venezuelans from the United States were later held, was known for its harsh conditions with reports of deaths, torture and enforced disappearances.[59] In South Sudan, the State Department's *2025 Human Rights Report* stated that the country had "significant human rights issues includ[ing] credible reports of arbitrary or unlawful

---

58    *See* ICE Memo, Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.,* No. 24A1153 (U.S. June 23, 2025)," filed in *D.V.D. v. DHS*, No. 25-cv-10676, Doc. 190-1 (D. Mass. (July 15, 2025).

59    Press Release, United Nations Office of the High Commissioner for Human Rights, "UN experts alarmed at illegal deportations from the United States to El Salvador," April 30, 2025.

killings; disappearances; torture or cruel, inhuman, or degrading treatment or punishment [and] arbitrary arrest or detention."[60]

External reporting and court filings have documented human rights abuses occurring under third country agreements including claims of torture in a maximum-security prison in El Salvador, detainees held incommunicado in Eswatini and deportees removed to Ghana sent onward to countries where they are likely to face persecution or torture.[61]

Despite these concerns, the State Department is not monitoring what foreign governments do once third country nationals arrive in another country, appearing to rely solely on diplomatic assurances. When questioned before the Senate Foreign Relations Committee about allegations of torture against third country nationals in a Salvadoran prison, Cart Weiland, a Trump Administration official who helped establish the third country deportation agreement, could not articulate whether any oversight on their treatment had been conducted. Instead, he reiterated that "the agreement has a provision that explicitly mandates adherence to international human rights treaties and conventions.[62] While traveling, Committee Minority staff heard from U.S. officials in one country that had received third country nationals that they were instructed by Administration officials not to follow up on the treatment of deportees. In South Sudan, Committee Minority staff were the first people other than South Sudanese officials to visit third country nationals deported to the country.

Trump Administration officials have acknowledged that foreign governments are not upholding the assurances they provided to the United States and that the Administration is not taking steps to address these violations. In a U.S. federal court case regarding third country deportations to Ghana, a Trump Administration attorney agreed that it appeared Ghana was violating assurances it had provided the United States, including that it would comply with the Convention Against Torture, after sending a migrant onward to a country where they would likely be tortured.[63] The Federal District Court Judge required the Trump Administration to file a declaration describing its efforts to keep third country nationals from being sent to a country where they fear persecution or torture. In the Administration's September 2025

---

60  U.S. State Department, "South Sudan," 2024 Country Reports on Human Rights Practices, (Aug. 12, 2025).

61  *See* Human Rights Watch, "You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison, (Nov. 12, 2025), https://www.hrw.org/report/2025/11/12/you-have-arrived-in-hell/torture-and-other-abuses-against-venezuelans-in-el; Geral Imray, "3 deported by U.S. held in African prison despite completing sentences, lawyers say," Associated Press, Sept. 2, 2025, https://www.pbs.org/newshour/nation/3-deported-by-u-s-held-in-african-prison-despite-completing-sentences-lawyers-say; Edward Acquah, Wilson McMakin and Rebecca Santana, "Immigrants deported from U.S. to Ghana are sent home, where lawyers say some could face torture," Associated Press, Sept. 15, 2025, https://www.pbs.org/newshour/world/immigrants-deported-from-u-s-to-ghana-are-sent-home-where-lawyers-say-some-could-face-torture.

62  Testimony of Cart Weiland, Nominee to be Assistant Secretary of International Narcotics and Law Enforcement, Senate Foreign Relations Committee, Nomination Hearing, Dec. 11, 2025.

63  Mem. Op., *D.A. et al. v. Noem et al.*, No. 1:25-cv-03135 Doc. 41 at 3 (D.D.C. Sept. 15, 2025).

Appx.485

declaration, the then-acting head of the State Department's Africa Bureau said the Administration was not taking any action, stating:

> *"Prior to these removals, the U.S. government received diplomatic assurances from the Government of Ghana, communicated to the U.S. government by diplomatic note. As of the time of this filing, I am not aware that the Department of State, including through the U.S. Embassy in Ghana, has made any additional efforts to keep Plaintiffs from being removed from Ghana to their country of origin or other countries where they fear persecution or torture."[64]*

The Trump Administration's defense is that the United States "does not have the power to tell Ghana what to do."[65] The Administration has used similar claims regarding Venezuelans sent from the United States to El Salvador where there are credible reports that deportees were tortured.[66]

The Trump Administration's lack of oversight on agreements, as well as documented non-compliance with agreements by foreign governments, calls into question the State Department's assessment of credible diplomatic assurances related to future third country deportation agreements.

---

64  Decl. of Jonathan G. Pratt at 3, *D.A. et al. v. Noem et al.*, No. 1:25-cv-03135 (D.D.C. Sept. 13, 2025) (Pratt Declaration).

65  Mem. Op., *D.A. et al. v. Noem et al.*, No. 1:25-cv-03135, Doc. 41 at 3 (D.D.C. Sept. 15, 2025).

66  *See* Julie Turkewitz, Tibisay Romero, Sheyla Urdaneta and Isayen Herrera, "'You Are All Terrorists': Four Months in a Salvadoran Prison," *The New York Times*, Nov. 8, 2025; Human Rights Watch, "You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison, (Nov. 12, 2025), https://www.hrw.org/report/2025/11/12/you-have-arrived-in-hell/torture-and-other-abuses-against-venezuelans-in-el.

# Secret Deal-Making that Does Not Serve American Interests

In its effort to establish third country deportation agreements with dozens of countries, the Trump Administration has struck deals with or pressured foreign governments, with no transparency. Faced with increased tariffs, travel bans and cuts to U.S. foreign aid, some countries have been pressured into these deals. Other countries have sought to leverage negotiations for their own interests, that may not benefit the American people.[67] The Trump Administration is expending political capital in its bilateral relationships that could instead be used to advance more pressing U.S. national security interests, while not being transparent about the full extent of its deal-making including what is being offered to foreign governments.

*Countries With Third Country Deportation Agreements or That Have Received Third Country Nationals*



| | | | | |
|---|---|---|---|---|
| ANTIGUA & BARBUDA | DOMINICA | GHANA | LIBERIA | RWANDA |
| BELIZE | ECUADOR | GUATEMALA | MEXICO | SAINT KITTS & NEVIS |
| CABO VERDE | EL SALVADOR | GUYANA | PALAU | SOUTH SUDAN |
| CAMEROON | EQUATORIAL GUINEA | HONDURAS | PANAMA | UGANDA |
| COSTA RICA | ESWATINI | KOSOVO | PARAGUAY | UZBEKISTAN |

*As of January 31, 2026.*

---

67    *See* Joseph Falzetta, "After Accepting US Deportees, South Sudan Wanted Sanctions Relief For Top Officials, Documents Show," *AP News,* Jan. 24, 2026; Committee Minority staff meetings with foreign government officials.

Appx.487

One country the Trump Administration worked with was South Sudan, a war-torn country ranked 181 out of the 182 countries for government corruption by Transparency International.[68]

In exchange for taking in just eight third country nationals, South Sudan asked the United States to consider lifting targeted U.S. sanctions on government officials, support the prosecution of the leader of the president's political opposition and consider investing in South Sudanese oil, gas and mineral industries.[69]

In the case of Equatorial Guinea, the Trump Administration's payment to the government was a stark departure from prior U.S. foreign assistance provided to the country. Over the past two administrations, the U.S. Government has not provided more than $2 million annually in foreign assistance for Equatorial Guinea; the highest the first Trump Administration provided was $780,000. The provision of $7.5 million represents an increase of 275 percent and far exceeds the amount of U.S. foreign assistance provided over the last eight years combined.[70]

With the government of El Salvador, the Trump Administration's deal was not limited to money. The Administration also committed to providing an undisclosed amount of additional "in-kind and financial support to the Government of El Salvador."[71] At request of the El Salvador President, the Trump Administration also returned several high-profile MS-13 leaders who had been serving as U.S. informants, undermining a long-running federal investigation into MS-13 and its links to the government of the country.[72]

## Some countries have felt there is no choice but to enter into these deals.

According to former and current government officials for Panama and Costa Rica, their governments felt pressure from the Trump Administration to receive third country nationals.[73] At the time, both countries had recently seen President Trump threaten to impose tariffs on Colombia in retaliation for initially refusing to accept deportees from the U.S. arriving in shackles and expressed concern that the same

---

68 Transparency International, 2025 Corruption Perceptions Index, "South Sudan," (Feb. 2025), https://www.transparency.org/en/cpi/2025/index/ssd.

69 Felicia Schwartz and Myah Ward, "South Sudan took 8 migrants from the US. It wants something in return." Politico, July 30, 2025, https://www.politico.com/news/2025/07/30/south-sudan-might-take-more-us-migrant-deportees-it-has-a-few-asks-00482793.

70 Press Release, Senator Shaheen, "Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals," Nov. 10, 2025.

71 Exchange of Diplomatic Notes Between the Government of the United States and the Government of El Salvador, Mar. 31, 2025, available through the State Department's FOIA Library on Qualifying Non-Binding Instruments, May 2025.

72 "Why Is Trump Returning MS-13 Leaders to El Salvador? 5 Takeaways From the Times Investigation," *The New York Times*, June 30, 2025.

73 Committee Minority staff meetings with current and former foreign government officials, Jun. to Nov. 2025. *See also* Gabe Gutierrez et al., "White House says Colombia agreed to Trump's deportation terms after tariff standoff," *NBC News*, Jan. 27, 2025.

---

Appx.488

could happen to their governments.[74] Panamanian officials also felt pressure over the Trump Administration's stated interest in seizing the Panama Canal.

In addition to directly paying foreign governments to receive third country nationals, the Trump Administration appears to be providing money to "cooperative" countries. Following a Memorandum of Understanding between Costa Rica and the Trump Administration in support of deportation efforts, the State Department provided Costa Rica with $9.5 million in deportation assistance.[75] State Department officials said Costa Rica's willingness to collaborate with the United States on deportation efforts, including on receiving third country nationals, was a factor in providing this support.[76]

In certain countries, citizens and governments have protested against these deals. After the United States made a third country deportation deal with Eswatini, civil society and opposition groups expressed outrage. When deportees arrived, Eswatini activists protested outside the U.S. embassy.[77] A coalition of civil society groups released a statement saying:

> *"This situation sets a dangerous precedent whereby powerful nations may use smaller, economically weaker states as dumping grounds for unwanted individuals…Eswatini's sovereignty and dignity must not be traded off for unclear deals or political expediency."* [78]

Eswatini's largest political opposition party said of the deal: "this is not diplomacy but human trafficking disguised as a deportation deal."[79] Eswatini human rights groups are mounting legal action, including the Southern African Litigation Centre, which calls the deal "executive over-reach" made without parliamentary consent.[80]

In December 2025, the Trump administration reached a third country deportation agreement with the Republic of Palau.[81] The United States has a unique and vital relationship with Palau through the Compacts of Free Association (COFA), demonstrated by the fact that Palauan citizens serve in the U.S. military. For years, Palau has supported U.S. strategic and national security interests across the region.

---

74    "Why Is Trump Returning MS-13 Leaders to El Salvador? 5 Takeaways From the Times Investigation," *The New York Times*, June 30, 2025.

75    Documents on file with the Democratic Staff of the Senate Foreign Relations Committee.

76    State Department briefing to Committee Minority staff, July 2025.

77    Savior Kakama and Pumza Fihlani, "Eswatini accepts 10 US deportees despite legal challenge," *BBC News*, Oct. 6, 2025, https://www.bbc.com/news/articles/cn5qdx260lzo.

78    Swaziland Multi-Stakeholder Forum, "Multi Stakeholder Forum Swaziland (MSF) Statement on the U.S. Deportation of Convicted Criminals to Eswatini," Facebook post, July 16, 2025.

79    Rachel Savage, "Eswatini Opposition Attacks US Deal As 'Human Trafficking Disguised as Deportation,'" *The Guardian,* July 23, 2025.

80    Savior Kakama and Pumza Fihlani, "Eswatini accepts 10 US deportees despite legal challenge," *BBC News*, Oct. 6, 2025.

81    Ephrat Livni, "Palau Agrees to Take Up to 75 Migrants From the U.S.," *The New York Times,* Dec. 24, 2025.

Appx.489

By pursuing a third country deportation agreement with Palau, the Administration risks undermining domestic support for the United States from a critical U.S. ally.[82]

In November 2025, the U.S. Embassy in Palau released a video of U.S. Deputy Secretary of State Chris Landau on the Administration's third country deportation proposal and calling on Palau to continue to consider the deal, saying:

> "*The U.S. helps Palau where we can, and Palau helps the U.S. where it can. One area where we've recently asked for Palau's help is immigration…Our administration would greatly appreciate Palau's help on this issue, even with respect to a very small number of people, and we look forward to continuing the conversation with the government of Palau and its people."'*
>
> – U.S. Deputy Secretary of State, Chris Landau, U.S. Embassy Koror Facebook Video, Nov. 17, 2025



### The Trump Administration's deportation deal-making also extends to U.S. adversaries, including Iran, a country with one of the worst human rights records in the world.

Last year, the Trump Administration reportedly struck a mass deportation deal with the Iranian regime to deport 400 Iranians over the coming months.[83] The Administration has sent at least three plane-loads of Iranians back to Iran, including Christian converts, ethnic minorities and political dissidents who could face persecution or torture. At least eight people from the first flight begged not to be sent to Iran because they were scared for their lives.[84] One man says he attempted suicide at a U.S. detention facility in an attempt to avoid being sent back to Iran but was still

---

[82] *See* Bernadette Carreon, "A Country That Said No: Palauans Nix US Proposal to Send Deportees to Palau," *Pacific Island Times,* Nov. 9, 2025; Kristy Needham, "Palau Lawmakers Reject US Request to Accept Third Country Refugees," *Reuters,* July 28, 2025.

[83] Farnaz Fassihi and Hamed Aleaziz, "U.S. Deports Planeload of Iranians After Deal with Tehran, Officials Say," *The New York Times,* Sept. 30, 2025.

[84] Farnaz Fassihi, "U.S. Deports Second Planeload of Iranians, Officials Say," *The New York Times,* Dec. 7, 2025.

Appx.490

deported.[85] An Iranian official said some Iranians accepted deportation because the alternative would have been deportation to a country like Sudan or Somalia.[86] In January 2026, after thousands of Iranian protestors had been killed by the regime, the Trump Administration still moved forward with a deportation flight to Iran, including attempting to deport LGBTQI+ individuals who would be killed if returned.[87]

<span style="color:#8B2500">While the deal with Iran is distinct from the Administration's third country deportation agreements, it demonstrates that the Administration is willing to cut deals with any country, including U.S. adversaries, with no transparency about what the United States is offering foreign governments.</span>

To date, the State Department has refused to brief Congress on the deal with Iran, despite requests. The State Department claims it had no role in working with Iran on this deal, however, public reporting contradicts these claims.[88]

---

85 Farnaz Fassihi and Hamed Aleaziz, "'It Feels Like I'm in a Nightmare': Inside the First Deportation Flight to Iran," *The New York Times,* Nov. 11, 2025.

86 Farnaz Fassihi and Hamed Aleaziz, "U.S. Deports Planeload of Iranians After Deal with Tehran, Officials Say," *The New York Times,* Sept. 30, 2025.

87 Jennifer Hansler, "Trump Admin Deports Iranians For First Time Since Brutal Crackdown on Protests," *CNN*, Jan. 26, 2026.

88 According to *The New York Times,* "the State Department approached Iran's interest section in Washington about three months ago about coordinating the deportation of Iranian migrants." *See* Farnaz Fassihi and Hamed Aleaziz, "U.S. Deports Planeload of Iranians After Deal with Tehran, Officials Say," *The New York Times,* Sept. 30, 2025.

# Circumventing U.S. Immigration Law

Since September 2025, the majority of migrants flown to third countries from the United States have had U.S. court-ordered protections, meaning the United States could not return them to their home country due to the likelihood they would be persecuted or tortured.[89]

Yet within days of arriving in third countries—specifically Ghana and Equatorial Guinea—many were sent back to their home countries. According to court filings, U.S. officials allegedly knew this was the plan when it came to Ghana.[90] A federal district judge said of these removals: "These actions also appear to be part of a pattern and widespread effort to evade the government's legal obligations by doing indirectly what it cannot do directly."[91]

> " *These actions also appear to be part of a pattern and widespread effort to evade the government's legal obligations by doing indirectly what it cannot do directly."*
>
> – U.S. Federal District Judge Tanya S. Chutkan, U.S. District Court for the District of Columbia, *D.A. et al. v. Noem*, (Sept. 15, 2025).

According to court filings, U.S. officials told migrants headed to Ghana they would be sent onward to their home countries despite having protections.[92] One migrant with protective orders stated: "While at the fuel stop in the U.S. Virgin Islands, the apparent head ICE official on the plane . . . told me that those on the plane were being sent to Ghana and that Ghana would send us to our home countries."[93] Another migrant with protective orders said that when he told Ghanaian officials he wanted to stay in Ghana for his own safety, he was told that he would be sent to his home country "based on orders from ICE officials and his Ghanaian superiors."[94] Advocates say Ghanian authorities are not providing deportees an opportunity to seek protection in Ghana.[95] Instead, most individuals have been sent onward to their countries of origin where some are now in hiding.[96]

---

89    *See* Robbie Corey-Boulet and Emmanuel Bruce, "Ghana Took in Trump's Deported West Africans. Then It Forced Them Home," Reuters, Jan. 17, 2026; Human Rights First and Refugees International, *Banished by Bargain: Third Country Deportation Watch,* "Ghana," available at: https://www.thirdcountrydeportationwatch.org/ghana (last visited Feb. 9, 2026); Human Rights First and Refugees International, *Banished by Bargain: Third Country Deportation Watch,* "Equatorial Guinea," available at: https://www.thirdcountrydeportationwatch.org/equatorial-guinea, (last visited Feb. 9, 2026). Minority Committee staff communication with advocates, Nov. 2025 to Jan. 2026.

90    Plaintiffs' Emergency Motion for Interim Relief at 6, *D.A. et al. v. Noem et al.,* No. 1:25-cv-03135, Doc. 18 (D.D.C., Sept. 12, 2025).

91    Id. at 4.

92    Id. at 5, 6.

93    Id. at 12.

94    Id. at 8.

95    Committee Minority staff communication with advocates, Nov. 2025. *See also* Robbie Corey-Boulet and Emmanuel Bruce, "Ghana Took in Trump's Deported West Africans. Then It Forced Them Home," *Reuters*, Jan. 17, 2026

96    *See* Robbie Corey-Boulet and Emmanuel Bruce, "Ghana Took in Trump's Deported West Africans. Then It Forced Them Home," Reuters, Jan. 17, 2026; Tracee Wilkinds and Rick Yarborough, "Women Deported From Maryland Shown On Video Being Dragged in Ghana," *NBC News,* Nov. 24, 2025.

---

In public court filings, Trump Administration officials acknowledged that Ghana appeared to be violating its assurances against refoulement.[97] A State Department official later confirmed the U.S. Government had taken no corrective action.[98] The Trump Administration has continued to send third country nationals there, where Ghana has refouled many individuals.[99]

In Equatorial Guinea, Committee Minority staff understands from advocates that all twenty-nine third country nationals removed from the United States to Equatorial Guinea had U.S. court-ordered protections from being sent back to their home countries due to the likelihood they would be tortured or killed. However, upon arrival, deportees say they were discouraged by Equatorial Guinean officials from applying for asylum in the country and later were told they could not apply and would instead be sent to their home countries.[100] As of January 2026, at least eight individuals have been sent to their country of origin and virtually all have been told they will be sent back despite fear of return.[101] It appears the Trump Administration may have paid a highly corrupt foreign government $7.5 million to do what the United States could not legally do itself.

---

[97] Mem. Op., *D.A. et al. v. Noem et al.,* No. 1:25-cv-03135 Doc. 41 at 3 (D.D.C. Sept. 15, 2025).

[98] Mem. Op., *D.A. et al. v. Noem et al.,* No. 1:25-cv-03135-TSC Doc. 41 at 3 (D.D.C. Sept. 15, 2025); Pratt Declaration at 3.

[99] Sarah Stillman, "Disappeared to a Foreign Prison," *The New Yorker,* Nov. 24, 2025.

[100] Committee Minority staff communication with advocates and deportees, Dec. 2025 and Jan. 2026.

[101] Sheriff Bojang Jr., "Equatorial Guinea Sends Eight of Trump's Nine Deportees Home, Braces For New Arrivals," *The Africa Report,* Jan. 16, 2026. Committee Minority staff communication with advocates and deportees, Jan. 2026.

Appx.493

# Conclusion

The Trump Administration's use of third country deportations has been costly and ineffective, with no measurable impact toward its stated goals.

These deportation deals have transferred more than $32 million in taxpayer funds to foreign governments with credible histories of corruption, human rights abuses and mismanagement, without meaningful oversight or accountability. The Trump Administration's failure to monitor compliance with these agreements raises serious concerns that the United States may be indirectly facilitating torture, arbitrary detention or other human rights abuses. By bypassing standard U.S. immigration procedures and, in some cases, using third countries to circumvent U.S. laws, the Administration has wasted public resources while undermining basic principles of accountability and the rule of law.

Despite these factors, the State Department continues to pursue additional third country deportation agreements at an accelerated pace, with dozens of additional agreements expected in the coming months. As the Administration aggressively strips hundreds of thousands of migrants of legal status in the United States (through the ending of temporary protected status and humanitarian parole, among other avenues) more migrants will be at risk of being removed to a far-off country where they are not from. Without transparency, oversight or clear evidence of necessity and effectiveness, this approach amounts to an expensive and dangerous form of shadow diplomacy that prioritizes the appearance of toughness over the security of Americans, the responsible use of taxpayer funds and the integrity of U.S. foreign policy.

The Senate Foreign Relations Committee Democrats will continue to conduct rigorous oversight of these agreements, demand full transparency and accountability of the Administration and foreign governments and push for monitoring mechanisms on the use of funds and treatment of deportees. In the interim, the Trump Administration should cease its use of these third country deportation deals, which are putting millions of taxpayer dollars into the hands of foreign governments without oversight while turning a blind eye to the potential human cost.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| D.V.D., et al., | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| | ) **Civil Action No.** |
| **v.** | ) **25-10676-BEM** |
| | ) |
| **U.S. DEPARTMENT OF HOMELAND** | ) |
| **SECURITY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

<u>**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**
**AND ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

**MURPHY, J.**

This case is about whether the Government may, without notice, deport a person to the wrong country, or a country where he is likely to be persecuted, or tortured, thereby depriving that person of the opportunity to seek protections to which he would be undisputedly entitled. The Department of Homeland Security has adopted a policy whereby it may take people and drop them off in parts unknown—in so-called "third countries"—and, "as long as the Department doesn't already know that there's someone standing there waiting to shoot . . . that's fine."[1]

It is not fine, nor is it legal. Congress made it "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country" where that "person would be in danger of being subjected to torture."[2] Congress decided that the Government "may not remove" someone to a country where her "life or freedom would be threatened" on account of

---

[1] Dkt. 44 at 29:12–18 (March 28, 2025 Hr'g Tr.) ("DEFENSE COUNSEL: In short, yes.").

[2] Pub. L. No. 105–277, § 2242(a), 112 Stat. 2681, 2681–822 (1998).

her "race, religion, nationality, membership in a particular social group, or political opinion."[3] These are our laws, and it is with profound gratitude for the unbelievable luck of being born in the United States of America that this Court affirms these and our nation's bedrock principle: that no "person" in this country may be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

It may surprise the reader to learn that, in its more candid moments, the Government agrees. As recently as March 24, 2025, during the pendency of this very litigation, the Department of Justice told the Supreme Court: "We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country."[4] This was not a remarkable admission but rather a well-established, decades-old application of due process principles. In 1998, the Seventh Circuit held that it was a "fundamental failure of due process" not to give sufficient notice of a country of removal. *Kossov v. INS*, 132 F.3d 405, 408 (7th Cir. 1998). A year later, the Ninth Circuit followed suit and held that the "last minute designation" of a country of removal "violated a basic tenet of constitutional due process." *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999). These were not, even then, controversial decisions, *id.* ("On this point, the INS has advised us that it is now in agreement."), and the Government thereafter memorialized in official policy its recognition that the individuals in those cases "were not afforded the opportunity to apply for protection as appropriate."[5]

But less than a week after the above-quoted comments to the Supreme Court, the Department of Homeland Security changed its position. According to its new policy, issued on

---

[3] 8 U.S.C. § 1231(b)(3)(A).

[4] Transcript of Oral Argument at 33, *Riley v. Bondi*, 606 U.S. 259 (2025) (No. 23-1270).

[5] *Execution of Removal Orders; Countries to Which Aliens May Be Removed*, 70 Fed. Reg. 661, 671 (Jan. 5, 2005) (citing, inter alia, *Kossov*, 132 F.3d at 405, and *Andriasian*, 180 F.3d at 1041).

2

March 30, 2025, immigration officers need *not* give notice or any opportunity to object before removing someone to an unfamiliar and potentially dangerous country, as long as the Government has generally received "assurances" that no persecution or torture will happen there.[6]

This new policy—which purports to stand in for the protections Congress has mandated—fails to satisfy due process for a raft of reasons, not least of which is that nobody really knows anything about these purported "assurances." Whom do they cover? What do they cover? Why has the Government deemed them credible? How can anyone even know for certain that they exist? These are basic questions that the Constitution permits a person to ask before the Government takes away their last and only lifeline.

For these reasons and those stated below, the Court will grant in part and deny in part Defendants' motion to dismiss, dismiss other claims, and grant the remainder of Plaintiffs' motion for summary judgment. Under the extraordinary circumstances presented by this case—both its importance and its unusual history—the Court will stay its judgment for up to fifteen days, allowing Defendants to move for stay in the First Circuit.

## I.   **Procedural History**

This case began on March 23, 2025, when four noncitizens—D.V.D., M.M., E.F.D., and O.C.G.—filed a class-action lawsuit challenging a then-alleged Department of Homeland Security ("DHS") policy of removing noncitizens to so-called "third" countries—countries not designated as countries of removal on the individuals' orders of removal—without first providing notice or an opportunity to assert claims challenging removal to that country.[7] *See generally* Dkt. 1

---

[6] Dkt. 43-1 at 2–3.

[7] Defendants in this case are DHS; Kristi Noem, in her role as DHS Secretary; Pamela Bondi, in her role as Attorney General; and Antone Moniz, in his role as Superintendent of the Plymouth County Correctional Facility. Dkt. 1 ¶¶ 14–17.

Appx.497

("Compl."). Central to Plaintiffs' allegations was a February 18, 2025 DHS memorandum (the "February Directive") directing officers to "review for removal" cases where an individual had been granted protection against removal to one or more specific countries, based on risk of persecution or torture in those countries, to "determine the viability of removal to a third country and accordingly whether the alien should be re-detained." *See* Dkt. 1-4 at 2.

Along with their complaint, Plaintiffs moved for class certification, Dkt. 4, and for preliminary relief, Dkt. 6. Following an initial round of briefing and an expedited hearing, Dkts. 31, 33, the Court issued a temporary restraining order on March 28, 2025, Dkts. 34, 40, which Defendants promptly appealed, Dkts. 35, 39 (noticing *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1311 (1st Cir.)).

While that appeal was pending, on March 30, 2025, DHS issued new "Guidance Regarding Third Country Removal." *See* Dkt. 43-1 (the "March Guidance"). Under the March Guidance, prior to any third-country removal:

DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured. If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien may be removed without the need for further procedures. If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.

DHS will first inform the alien of removal to that country. Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country. . . .

In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer. This screening may be done remotely. USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal. If USCIS determines that the alien has not met this standard, the alien will be removed.

If USCIS determines that the alien has met this standard . . . , USCIS will refer the matter to the Immigration Court [either in the first instance or through a motion to reopen, as appropriate]. . . . Alternatively, ICE may choose to designate another country for removal.

*Id.* at 2–3.

On the same day that DHS released the March Guidance, Defendants moved for an indicative ruling that, given the procedures set forth in the March Guidance, the Court would dissolve its temporary restraining order. Dkt. 43. Before the Court could rule on that motion, the First Circuit denied Defendants' emergency motion for stay pending appeal, citing "concerns about whether the underlying temporary restraining order . . . [was] appealable" and stating that Defendants had "made a moving target of their removal policy" through their issuance of the March Guidance. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1029774, at *1 (1st Cir. Apr. 7, 2025). The Court therefore denied the motion for an indicative ruling as moot. Dkt. 66. Meanwhile, the parties continued to brief the motions for class certification and for preliminary injunction, Dkts. 51–52, 57–60, and the Court held another hearing, Dkt. 62.

On April 18, 2025, the Court granted Plaintiffs' motion for class certification and granted

in part their motion for a preliminary injunction. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778

F. Supp. 3d 355, 394 (D. Mass. 2025) [hereinafter *D.V.D. I*]. The Court certified the following

class:

> All individuals who have a final removal order issued in proceedings under Section
> 240, 241(a)(5), or 238(b) of the [Immigration and Nationality Act ("INA")]
> (including withholding-only proceedings) whom DHS has deported or will deport
> on or after February 18, 2025, to a country (a) not previously designated as the
> country or alternative country of removal, and (b) not identified in writing in the
> prior proceedings as a country to which the individual would be removed.

*Id.* at 378.[8] As to that class, after finding a likelihood of success on Plaintiffs' due process claims,

the Court ordered that, prior to any third-country removal, Defendants provide class members with

"written notice" and a "meaningful opportunity" to raise claims for protection under the United

Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment ("CAT" or the "Convention Against Torture"), as provided by the Foreign Affairs

Reform and Restructuring Act of 1998 ("FARRA") and its implementing regulations.[9] *Id.* at 392.

Where such a claim was deemed "reasonable," the Court further ordered that Defendants move to

reopen the class member's immigration proceedings.[10] *Id.* at 392–93. Where a claim was found

---

[8] Sections 240, 241(a)(5), and 238(b) of the INA, as referenced in the class definition, are codified at 8 U.S.C. §§ 1229a, 1231(a)(5), and 1228(b). Those provisions, respectively, address removal proceedings, reinstated orders of removal, and removal based on an aggravated felony conviction. The class does not include individuals subject to removal based on an expedited removal order under 8 U.S.C. § 1225(b).

[9] *See* CAT, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85; FARRA, Pub. L. No. 105–277, § 2242, 112 Stat. 2681, 2681–822 to 2681–823 (1998); *see also See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003) (explaining how FARRA implements CAT), *superseded in part by statute on other grounds as stated in*, *Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).

[10] *Cf.* Dkt. 43-1 at 3. Under the March Guidance, USCIS would screen out fear-based claims where the individual failed to show that she would "more likely than not" be persecuted or tortured in the removal country. *Id.* That is the same standard as ultimately required for final relief in immigration proceedings. *See* 8 C.F.R. § 1208.16(b)–(c). In other words, "within 24 hours" of an individual's learning to where she is being removed, the March Guidance would require her to make a full merits showing as a prerequisite to her receiving a proper hearing. *See* Dkt. 43-1 at 2–3. For a mere preliminary screening, the Court found a "reasonable fear" threshold showing more appropriate. 778 F. Supp. 3d at 393 n.48.

6

not to be reasonable, the Court ordered that the class member be given at least fifteen days to move to reopen their own immigration proceedings. *Id.* at 393. The Court declined to grant other relief at that time, including a stay of the February Directive, *id.* at 370 n.13, or the return of Plaintiff O.C.G, who was removed before the initiation of the lawsuit, *id.* at 393.

Four days later, Defendants appealed the preliminary injunction and moved the First Circuit for a stay pending appeal. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. May 16, 2025). The First Circuit denied Defendants' motion, highlighting several "merits-related issues" concerning the availability of injunctive relief under 8 U.S.C. § 1252(f)(1), which the parties were instructed to brief. *Id.*

Throughout this time, the Government repeatedly violated, or attempted to violate, this Court's orders. First, in March 2025, the Department of Defense removed at least six class members to El Salvador and Mexico without providing the process required under the temporary restraining order. *See* Dkt. 72. "At a subsequent hearing, an attorney for the Government claimed DHS had not violated the TRO because the Department of Defense," rather than DHS, "had conducted the removals." *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2156 (2025) (Sotomayor, J., dissenting) [hereinafter *D.V.D. II*]. As Justice Sotomayor further explained,

7

> According to the agreement that governs the relationship between DHS and the Department of Defense at Guantanamo Bay, however, DHS "has legal custody" of noncitizens detained at Guantanamo Bay "and is responsible for the custody of detained aliens for administrative purposes related to immigration law violations." DHS also remains "responsible for the [noncitizens'] physical custody" at Guantanamo Bay, and for any immigration-related "transfers, releases, and removals." By contrast, the Department of Defense merely provides security and logistical support consistent with DHS's "guidance."
>
> The Government was unable to reconcile its representations to this evidence. Nor could it explain "[w]hat authority" the Department had "to effectuate a deportation."[11]

*Id.* (alterations in original) (internal record citations omitted). Notwithstanding Defendants' asserted loophole, the Court ordered discovery on the violation and, for the time being, modified the preliminary injunction, which by then had superseded the temporary restraining order, clarifying that Defendants could not "cede custody or control" to another agency to avoid the order's effect.[12] Dkt. 86.

Next, on May 7, 2025, it was widely reported that a group of apparent class members were on the verge of being removed to Libya without having received notice of their removal or an opportunity to raise CAT claims, as required under the preliminary injunction. *See* Dkt. 90-1. Based on these reports, as well as on individual class members' corroborating accounts, Plaintiffs moved for an emergency temporary restraining order to prevent the removals. Dkt. 89. Agreeing with Plaintiffs "that this motion should not [have been] required," given the preliminary injunction, the Court construed Plaintiffs' motion as one for clarification and stated that "the allegedly imminent removals . . . would clearly violate this Court's Order."[13] Dkt. 91 at 1–2.

---

[11] The Court considered whether these events warranted joining the Department of Defense. *See* Dkt. 93. Ultimately, the Court declined to do so sua sponte. Dkt. 117. Plaintiffs did not thereafter amend.

[12] At Plaintiffs' request, the Court has temporarily stayed discovery to focus on the merits. Dkts. 195, 211.

[13] The Court does not know what happened to these individuals, whether any of them were among those removed to South Sudan on May 20, 2025, or were part of any subsequent removal effort.

Appx.502

Next, the Court learned that Defendants had misrepresented material facts concerning the removal of Plaintiff O.C.G. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d 401, 405 (D. Mass. 2025). In opposing Plaintiffs' motions for a temporary restraining order and preliminary injunction, Defendants submitted to the Court an affidavit stating that, "[p]rior to O.C.G. being removed to Mexico, [Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO")] verbally asked O.C.G. if he was afraid of being returned to Mexico" and that, "[a]t this time, O.C.G. stated he was not afraid of returning to Mexico." Dkt. 31-1 ¶ 13. Defendants' claim was surprising because, during his withholding-only proceedings, O.C.G. had testified that he was raped and held hostage in Mexico and thus afraid of being returned there:

> During the withholding-only proceedings, O.C.G. asked if he might be sent to Mexico—because he was afraid of being sent to Mexico—and the immigration judge told him, "we cannot send you back to Mexico, sir, because you're a native of Guatemala."

*D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 407 (quoting the withholding-only transcript). Nevertheless, in light of the competing sworn statements, the Court "declined to conclusively credit O.C.G.'s account," when ruling on Plaintiffs' initial motions, "and instead ordered discovery of additional evidence." *Id.* at 405.

That discovery process led Defendants, on May 16, 2025, to acknowledge an "error" in their previous filing. *Id.* (quoting Dkt. 103 at 2). "Defendants admitted, hours before the scheduled deposition of the witness who could allegedly verify the facts included in the prior declaration made under oath, that, in fact, there was no such witness and therefore no reliable basis for the statements." *Id.* While the Court appreciates that "mistakes obviously happen, the events leading up to this decision [were and] are troubling. The Court was given false information, upon which it relied, twice, to the detriment of a party at risk of serious and irreparable harm." *Id.* at 406. The

Appx.503

Court therefore affirmed its previous conclusion that O.C.G.'s removal lacked due process and, this time, ordered his return, *id.* at 410–12, which the Government later facilitated, Dkt. 143.

Next, on May 20, 2025—before the Court could even resolve the O.C.G. revelation—Defendants placed at least six class members on a flight to South Sudan, "a nascent, unstable country to which the United States [had] recently told its citizens not to travel because of '**crime**, **kidnapping**, and **armed conflict**,'" without any meaningful notice or opportunity to raise a CAT claim, in what could only be described as a "flagrant," willful violation of this Court's order. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 786 F. Supp. 3d 223, 229–34 (D. Mass. 2025) (quoting *South Sudan Travel Advisory*, U.S. Dep't of State, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphases in original)). Plaintiffs moved again for an emergency order to prevent Defendants from effectuating these removals, and the Court quickly called a remote conference, where Defense counsel claimed to have very little information about the status or location of the impacted class members, except that they were then somewhere in transit.[14] *Id.* at 229. At the conclusion of that conference, the Court ordered Defendants to maintain custody of the class members "while everybody figured out what was happening." *Id.*; *see also D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1449032, at *1 (D. Mass. May 20, 2025).

Defendants later told the Supreme Court that, because of the Court's order, DHS had to "slam[] on the brakes while these aliens were literally mid-flight" and was "thus forc[ed] . . . to detain [the class members] at a military base in Djibouti." Application for a Stay at 3, *D.V.D. II* (May 27, 2025) (24A1153). However, on May 21, 2025, the day after the supposedly interrupted

---

[14] After stating that she did not know where the plane was, Dkt. 126 at 6:25–7:1 (May 20, 2025 Hr'g Tr.), Defense counsel stated that its location and final destination were both classified, *id.* at 17:3–6. Later, an attorney for DHS said that he was "not aware if it was classified" but that "it is sensitive information and it could be classified." *Id.* at 38:2–8.

10

flight, ICE ERO Acting Assistant Director for Field Operations, Marcos Charles, testified differently:

> THE COURT: And they ended up in Djibouti because of my order last night?
>
> MARCOS CHARLES: No, Your Honor. The plan was to go to Djibouti and then from Djibouti continue on to South Sudan and go from there, sir.

Dkt. 144 at 12:1–5 (May 21, 2025 Hr'g Tr.).[15] Indeed, publicly available flight-tracking data shows that the class members were likely still in U.S. airspace—possibly within 100 miles of the Boston courthouse—at the beginning of the May 20, 2025 conference and that their plane rested in Ireland for several hours afterward before continuing to Djibouti.[16]

At the May 21, 2025 hearing, the Court further learned that the impacted class members had "received fewer than 16 hours' notice before being removed, most of which were non-waking hours, none within the business day." *D.V.D. v. U.S. Dep't of Homeland Sec.*, 786 F. Supp. 3d at 230. Moreover, the class members had "limited, if any, ability to communicate with family or legal representatives," and "little, if any, opportunity to access information that would have allowed them to determine for themselves the repercussions of being removed to South Sudan." *Id.* Defendants claimed that they had not intended to violate the preliminary injunction and that "any misunderstanding . . . from [DHS] may have had to do with the fact that the Court's preliminary injunction motion wasn't specific enough." *Id.* (quoting Dkt. 145 at 14:9–22 (May 21, 2025 Hr'g Tr.)). The Court then asked Defendants to weigh in on what specific

---

[15] At Defendants' request, the Court took this testimony under seal. *See* Dkt. 144 at 7:10–8:24. However, Chief Magistrate Judge Cabell later granted in relevant part an intervenor's motion to unseal. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 3124132, at *9–10, 12 (D. Mass. Nov. 7, 2025).

[16] *See* Alan Feuer et al., *Judge Finds U.S. Violated Court Order With Sudden Deportation Flight to Africa*, N.Y. Times (May 21, 2025), https://www.nytimes.com/2025/05/21/us/politics/south-sudan-deportation.html [https://perma.cc/64NW-EDG3]; *see also* Dkt. 144 at 16:13–17:7, 18:25–19:5 (corroborating the report); *Playback*, Flightradar24, https://www.flightradar24.com/2025-05-20/20:25/100x/3a6bfb10 [https://perma.cc/TH49-L7CB] (last visited February 20, 2026) (showing the aircraft located over the Gulf of Maine at 4:25:44 EDT / 20:25:44 UTC).

11

procedures the Court could order, consistent with its legal conclusions, and even invited Defendants, after the hearing, to submit a written proposal.[17] *Id.* at 232–33 & n.14. Defendants declined. *Id.* at 233 n.14. As a result, the Court clarified the preliminary injunction to specify that class members must be given "a minimum of ten days[] to raise a fear-based claim for CAT protection prior to removal." *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1453640, at *1 (D. Mass. May 21, 2025) (emphasis removed).

As to the class members directly impacted by Defendants' violation, the Court did not order their immediate return, despite Plaintiffs' requests. *D.V.D. v. U.S. Dep't. of Homeland Sec.*, 786 F. Supp. 3d at 227. Rather, following Defendants' suggestion, and out of respect for the Executive's "prerogative in the sensitive and political areas of immigration and foreign policy," the Court "offered Defendants complete discretion to provide [the requisite process] in the time and manner they deemed best." *Id.* at 235. Accordingly, as a "remedy for Defendants' violations of the Preliminary Injunction," the Court ordered Defendants to follow certain procedures when screening the impacted class members for CAT claims but stated that "DHS, in its discretion, [could] elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad." *D.V.D. v. U.S. Dep't. of Homeland Sec.*, 2025 WL 1453604, at *1 (D. Mass. May 21, 2025).

Defendants chose to keep the class members in Djibouti and, following this turn of events, applied to the Supreme Court for a stay of the preliminary injunction. *See generally* Application

---

[17] From the beginning of this case, the Court has recognized that the Government is in a superior position to propose specific, workable measures, consistent with its immigration operation and class members' legal rights. *See D.V.D. v. U.S. Dep't. of Homeland Sec.*, 786 F. Supp. 3d at 232 (citing the Mar. 28, 2025 hearing transcript). Defendants, however, have consistently been "unable, unwilling, or incapable of meaningfully engaging in [that] discussion." *Id.* at 233 (quoting *D.V.D. I*, 778 F. Supp. 3d at 393 n.49). As a result, the Court based the preliminary injunction's specific procedures on, among other things, Defendants' previous statements and draft documents. *See id.* at 392–93 & nn.46, 49; *see also* 70 Fed. Reg. at 671 ("In appropriate circumstances, DHS may agree to join motions to reopen that would otherwise be barred by time and number limitations [before removing to a third country].").

Appx.506

for a Stay, *D.V.D. II*, (U.S. May 27, 2025) (24A1153).  On June 23, 2025, Defendants' application

was granted, and the preliminary injunction was stayed pending appeal:

> The application for stay presented to Justice JACKSON and by her referred to the Court is granted.  The April 18, 2025, preliminary injunction of the United States District Court for the District of Massachusetts, case No. 25–cv–10676, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such writ is timely sought.  Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of the Court.

*D.V.D. II*, 145 S. Ct. at 2153.

In response, Plaintiffs moved for a new temporary restraining order and preliminary

injunction specifically as to the class members Plaintiffs had taken to Djibouti, en route to South

Sudan, in violation of the preliminary injunction.  Dkt. 174.

The Court denied Plaintiffs' request.  Believing the Supreme Court to have stayed only the

"April 18, 2025, preliminary injunction," *D.V.D. II*, 145 S. Ct. at 2153, the Court understood the

May 21, 2025 remedial order to still be in effect and thus found Plaintiffs' motion "unnecessary,"

Dkt. 176.  The next day, Defendants moved the Supreme Court to clarify.  Motion to Clarify,

*D.V.D. II* (U.S. June 24, 2025) (24A1153).  A week later, on July 3, 2025, the Supreme Court

granted Defendants' motion, stating that its June 23, 2025 order "divest[ed] the May 21 remedial

order of enforceability."[18]  *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2627, 2629 (2025).

---

[18] Defendants seize upon this episode to suggest that the Court must "dismiss this case in its entirety" or else fail to "follow the Supreme Court's lead."  *See* Dkt. 231 at 2.  In doing so, they gloss over the case's many unsettled issues and the material differences between last year's preliminary injunction and the ultimate relief now sought. Plaintiffs no longer ask for an injunction, which moots Defendants' "lead argument" on appeal.  *See D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. Feb. 20, 2026).  Plaintiffs also now advance statutory claims that this Court has not previously addressed.  *See infra* Section III(B)(1).  What difference these will make to higher courts is yet unknowable.  *See D.V.D. II*, 145 S. Ct. at 2160 (Sotomayor, J., dissenting) (stating that Defendants' "only . . . jurisdictional objection . . . with any force" is their argument, under 8 U.S.C. § 1252(f)(1), against class-wide injunctive relief).  *But see Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. at 2629 (noting that "[t]he only authority [this Court] cited" for its understanding of the stay order's scope "was the dissent from the stay order").  Ultimately, this Court has a "duty," in the first instance, "to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

13

Subsequently, on July 9, 2025, DHS effectively reissued its third-country removal policy in a memorandum titled, "Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)," stating that "ICE must adhere to Secretary of Homeland Security Kristi Noem's [March Guidance]."[19] Dkt. 190-1 (the "July Guidance").

Thereafter, the parties advanced competing views for what should happen next in this litigation. On July 15, 2025, Plaintiffs moved for partial summary judgment, asking the Court to vacate DHS's third-country removal policy, as embodied in the March and July Guidances, and to declare the parties' rights and obligations with respect to third-country removal, Dkts. 193–94, simultaneously asking the Court to indicate that it would dissolve the preliminary injunction if the First Circuit remanded for that purpose, Dkts. 191–92. Defendants conversely moved to stay the proceedings in this Court pending appeal of the preliminary injunction. Dkt. 206.

The Court granted Plaintiffs' motion for an indicative ruling, stating that it would dissolve the preliminary injunction if given jurisdiction to do so, concluding that the Supreme Court's stay decision would have to govern, "at least, . . . the precise relief at issue in the very same litigation." *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 2673195, at *1 (D. Mass. Aug. 28, 2025). Even so, the Court highlighted that this conclusion would not necessarily bring about Plaintiffs' desired result because "the decision to remand is left to the discretion of the appellate court." *Id.* at *2 (quoting *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 505 (7th Cir. 2024),

---

[19] Defendants do not appear to dispute Plaintiffs' characterization of the July Guidance as "identical" to the March Guidance. *See* Dkt. 194 at 8. Nevertheless, it does add several details. For example, under the July Guidance, "[ICE] will generally wait at least 24 hours following service of the Notice of Removal before effectuating removal," except in "exigent circumstances." Dkt. 190-1 at 1. That being said, Defendants generally refer to the March Guidance as the embodiment of DHS's third-country removal policy. *See, e.g.*, Dkt. 231 at 31–34. The Court thus treats it as the relevant agency action for purposes of Plaintiffs' challenge under the Administrative Procedure Act and treats the July Guidance as an implementation or extension of that March Guidance.

14

*reh'g and reh'g in banc dismissed*, 2024 WL 4416886 (7th Cir. Oct. 4, 2024), *cert. denied*, 145 S. Ct. 1182 (2025)).  To that end, the Court held Defendants' motion to stay in abeyance pending the First Circuit's decision on Plaintiffs' motion to remand.[20]  *See* Motion to Remand, *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. Aug. 29, 2025).

On October 20, 2025, the First Circuit denied remand but stated that the Court was "'free to carry forward'" and, "if appropriate, 'order permanent relief after the merits are resolved.'"  *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. Oct. 20, 2025) (quoting *Contour Design, Inc. v. Chance Mold Steel Co.*, 649 F.3d 31, 34 (1st Cir. 2011)).[21]  As a result, this Court denied Defendants' motion to stay and ordered Defendants to respond to the motion for partial summary judgment.  Dkt. 218.

On November 24, 2025, Defendants opposed Plaintiffs' motion for partial summary judgment and moved to dismiss the complaint.  Dkt. 231.  Plaintiffs replied to Defendants' summary judgment opposition and opposed the motion to dismiss.[22]  Dkt. 232.  The Court then held a hearing on December 16, 2025, and took the matter under advisement.  Dkt. 236.

---

[20] In the interim, the Court allowed Defendants to delay their response to the motion for partial summary judgment until 21 days after their motion for stay was decided.  Dkt. 208.

[21] In *Contour Design, Inc. v. Chance Mold Steel Co.*, 649 F.3d 31 (1st Cir. 2011), the defendant appealed a preliminary injunction issued against it.  *Id.* at 32.  Despite preliminarily concluding that it would affirm the injunction, the First Circuit made no announcement "because a trial was scheduled to be held" and so "expect[ed] that the preliminary injunction would be supplanted by a final injunction and other possible relief."  *Id.* at 33.  Later, a jury found in the plaintiff's favor, but judgment had not yet issued.  *Id.*  Recognizing that "the district court may be awaiting disposition of [the] appeal before entering final judgment," the First Circuit summarily affirmed the (by then, almost obsolete) preliminary injunction and further clarified that "the district court was free, and would remain free even without this affirmance or leave from us, to enter a permanent injunction based on the trial record while the original appeal remained pending," which the court described as "standard practice."  *Id.* at 34.

[22] To their combined filing, Plaintiffs attached 25 exhibits, Dkt. 233, which Defendants moved to strike, Dkt. 235.  For the sake of clarity, and to avoid any prejudice to Defendants with respect to the motion for partial summary judgment, the Court has chosen not to rely on any of Plaintiffs' newly filed exhibits for either motion.  Accordingly, Defendants' motion to strike is DENIED as moot.

15

While these motions were pending, on February 20, 2026, the First Circuit granted Plaintiffs' request, renewed at oral argument, to remand the preliminary injunction back to this Court for dissolution, finding it "the most expeditious and efficient path forward . . . so that [the case] may proceed to judgment." *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. Feb. 20, 2026). Accordingly, the Court will dissolve the April 18, 2025 preliminary injunction.

## II.     Motion to Dismiss

Defendants move to dismiss Plaintiffs' core policy challenge under the Administrative Procedure Act ("APA"), Counts I–IV, under Federal Rule 12(b)(1) for lack of subject matter jurisdiction. Dkt. 231 at 8–16. Ultimately, the Court concludes that it has jurisdiction over the challenge and so denies the motion. Simultaneously, however, the Court finds that Counts II and III are duplicative of Count I and so will dismiss those claims.

Defendants also move to dismiss Plaintiffs' claims based on detention, Count V, and under the Freedom of Information Act ("FOIA"), Count VI, under Federal Rules 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim. Dkt. 231 at 17–21. As to Count V, the Court concludes that any detention-based claim is unripe as to D.V.D., M.M., and O.C.G. and is moot as to E.F.D. and so will dismiss those claims. As to Count VI, the Court concludes that the named Plaintiffs lack standing as to the February Guidance and have otherwise failed to state a claim and so will dismiss that claim.

### A.     Legal Standards

With respect to a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden. *Justiniano v. Soc. Sec. Admin.*, 876 F.3d 14, 21 (1st Cir. 2017). In deciding the motion, "the court may consider materials outside the pleadings." *Groden v. N&D Transp. Co., Inc.*, 866 F.3d 22, 24 n.3 (1st Cir. 2017).

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, disregarding all "conclusory" statements, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The inquiry is usually limited to the facts alleged in the complaint, incorporated into the complaint, or susceptible to judicial notice," *Whelden v. U.S. Bank Nat'l Ass'n*, 494 F. Supp. 3d 68, 73 (D. Mass. 2020) (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)), "but the court may also consider other documents the authenticity of which is not disputed by the parties, documents central to the plaintiff's claim, and documents sufficiently referred to in the complaint," *id.* (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

"When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." *Katz v. Pershing, LLC*, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) (quoting *Ne. Erectors Ass'n of BTEA v. Sec'y of Lab.*, 62 F.3d 37, 39 (1st Cir. 1995)), *aff'd*, 672 F.3d 64 (1st Cir. 2012).

17

B.      **Discussion**

1.      **APA Policy Challenges (Counts I–IV)**

Plaintiffs allege, under the APA and Declaratory Judgment Act, that Defendants'

third-country removal policy violates the INA, FARRA, their implementing regulations, and the

Due Process Clause of the Fifth Amendment.  Compl. ¶¶ 99–122.[23]

Defendants move to dismiss these core policy claims for lack of subject matter jurisdiction,

relying variously on the jurisdiction-stripping provisions of the INA, 8 U.S.C. § 1252 ("section

1252"), and on a like FARRA provision, Pub. L. No. 105–277, § 2242(d) ("section 2242(d)")

(codified as 8 U.S.C. § 1231 ("section 1231") note).  Dkt. 231 at 8–16.  The Court has already

addressed and rejected several of these arguments.[24]  *See D.V.D. I*, 778 F. Supp. 3d at 370–78;

*D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 409–10.  Below, the Court expands on

its reasoning in light of Defendants' renewed arguments.

a.      **Section 1252(g)**

Defendants argue that "Plaintiffs' claims arise entirely from actions taken to 'execute

removal orders'—namely, to remove them to third countries without the additional process they

demand—and thus those claims 'fall[] squarely within' the INA's jurisdictional bar," section

1252(g).  Dkt. 231 at 9 (internal citation omitted) (first quoting 8 U.S.C. § 1252(g); and then

---

[23] More precisely, in Count I, Plaintiffs allege that Defendants' policy or practice of failing to provide notice and an opportunity to challenge third-country removals is arbitrary and capricious and contrary to law.  Compl. ¶¶ 99–107.  In Count II, Plaintiffs allege that Defendants are unlawfully withholding notice and a meaningful opportunity to challenge third-country removal.  *Id.* ¶¶ 108–11.  In Count III, Plaintiffs allege that Defendants' third-country removal policy violates Plaintiffs' procedural rights.  *Id.* ¶¶ 112–17.  In Count IV, Plaintiffs seek a declaration of their rights.  *Id.* ¶¶ 118–22.  Given the substantial overlap in Counts I–III, the Court will ultimately dismiss Counts II and III.  *See infra* Section II(B)(4).  The Court further notes that Counts I–III include various detention-related allegations.  *See, e.g.*, Compl. ¶¶ 104, 107, 114–17, 120.  Ultimately, the Court finds that these allegations properly sound in habeas, not the APA, *see Trump v. J.G.G.*, 604 U.S. 670, 672 (2025), and confines its analysis accordingly, *see infra* Section II(B)(2).

[24] The Court has likewise already laid out much of the relevant legal background.  *See D.V.D. I*, 778 F. Supp. 3d at 365–67.

18

quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487 (1999) [hereinafter *AADC*]).

The Court rejected this argument in *D.V.D. I*, largely based on the conclusion that section 1252(g) "does not bar review of the 'lawfulness' of a removal-related action because such claims are 'collateral' to the discretionary decisions immunized by section 1252(g)." 778 F. Supp. 3d at 376–78 (quoting *Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023)). Put more simply, section 1252(g) prohibits claims based on the exercise of "prosecutorial discretion," *AADC*, 525 U.S. at 489, but it is not within the "discretion" of the Executive to exceed the scope of its authority or otherwise violate the law, *see Ibarra-Perez v. United States*, 154 F.4th 989, 997 (9th Cir. 2025) (holding that claim based on third-country removal without notice "raise[d] purely legal arguments in challenging [the] removal," including whether the plaintiff "had a right to meaningful notice and an opportunity to present a fear-based claim," and thus that the action was not barred by section 1252(g)); *see also id.* ("The government's reading of § 1252(g) would entirely insulate from judicial review any post-hearing decision by ICE to remove noncitizens to third countries where they would be in danger of persecution, torture, and even death.").[25]

Now, the Court would take a further step back to add that Plaintiffs' claims are policy challenges and that the adoption of policy is simply not among the "discrete" set of actions covered by section 1252(g). *See AADC*, 525 U.S. at 482. In *AADC*, the Supreme Court explained that section 1252(g) "applies only to three discrete actions . . . : [the] 'decision or action' to '*commence*

---

[25] At the December 16, 2025 hearing, Defendants argued that *Kong* (like *Ibarra-Perez*) concerned a claim under the Federal Tort Claims Act and thus was inapposite. But in *Kong* itself, the First Circuit squarely rejected that idea: "the text of § 1252(g) cannot be interpreted differently depending on" a plaintiff's cause of action. *Kong*, 62 F.4th at 617 (citing *Clark v. Martinez*, 543 U.S. 371, 382 (2005)).

19

proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482 (emphases in original) (quoting 8 U.S.C. § 1252(g)). The *AADC* Court provided further context by way of history:

> There was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the . . . discrete acts of "commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—which represent the initiation or prosecution of various stages in the deportation process. At each stage the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience.
>
> . . .
>
> Since no generous act goes unpunished, however, the INS's exercise of this discretion opened the door to litigation in instances where the INS chose *not* to exercise it.

*Id.* at 483–84 (emphasis in original) (quoting 8 U.S.C. § 1252(g)).[26]

The facts of *AADC*—which the Supreme Court said "precisely" reflect the type of claim that the drafters of section 1252(g) intended to prevent, *id.* at 487—are further instructive, as they bear no resemblance to the policy challenge at issue here. The *AADC* plaintiffs alleged that the Government "target[ed] them for deportation because of their affiliation with a politically unpopular group." *Id*. at 472. Analogizing these claims to a "selective prosecution" defense in the criminal context, *id.* at 489, the Supreme Court held that the district court lacked jurisdiction under section 1252(g) to "subject[] the prosecutor's motives and decisionmaking to outside inquiry," *id.* at 490 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).[27]

---

[26] "IIRIRA" refers to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *See AADC*, 525 U.S. at 498 (Stevens, J., concurring). "INS" refers to the Immigration and Naturalization Service, which previously exercised immigration-related authority through the Department of Justice, which powers now largely reside within the Department of Homeland Security. *See Martinez*, 543 U.S. at 374 n.1.

[27] The Supreme Court notably carved out a possible exception for allegations of "outrageous" discrimination, *AADC*, 525 U.S. at 491, presumably because the unlawfulness of such discrimination would be obvious on its face and so would require only a nominal "inquiry" into the prosecutor's motives, *see id.* at 490 (quoting *Wayte*, 470 U.S. at 607). The *AADC* Court's recognition of this exception lends supports to the idea that section 1252(g) does not bar review of an action's "lawfulness," *see Kong*, 62 F.4th at 617, where review requires *no* motive-based inquiry.

20

Plaintiffs' claims here do not require any subjective inquiry. The Court need not probe anyone's intentions to determine the meanings of statutes, regulations, or the Constitution. And the process noncitizens receive before removal does not follow from ad hoc decision-making that is "particularly ill-suited to judicial review," *cf. id.* at 490 (quoting *Wayte*, 470 U.S. at 607), but rather from those objective authorities.

If anything, the claims at issue here resemble the policy challenge upheld in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), except that Plaintiffs' case presents an even easier call. In *Regents*, the Supreme Court considered an APA policy challenge to DHS's rescission of DACA—Deferred Action for Childhood Arrivals—easily dismissing the Government's argument that section 1252(g) barred district court review.[28] *Id.* at 19. This is especially notable because, unlike with Plaintiffs' challenge, the policy at issue in *Regents* directly implicated the Executive's "exercise [of] prosecutorial discretion." *Id.* at 10 (quoting the DACA Memorandum). Indeed, DACA had as its "defining feature . . . the decision to defer removal," *id.* at 27, and the discretionary decision to grant or deny "deferred action" is squarely within the scope of section 1252(g), *AADC*, 525 U.S. at 484. Yet the *Regents* Court held that section 1252(g) did not apply:

---

[28] The *Regents* Court spilled somewhat more ink analyzing the related but distinct question of whether DACA's rescission was "agency action . . . committed to agency discretion by law" under the APA. *See* 591 U.S. at 16–19 (quoting 5 U.S.C. § 701(a)(2)); *see also id.* at 63–64 (Alito, J., concurring in the judgment in part and dissenting in part) (arguing that the rescission of DACA was unreviewable under 5 U.S.C. § 701(a)(2) but not making that argument as to section 1252(g)). Tellingly, Defendants here do not bother suggesting that the process an individual is due before removal has been committed to agency discretion by law, an easily refutable claim. *See generally, e.g.*, 8 C.F.R. pt. 240.

Section 1252(g) is similarly narrow.  That provision limits review of cases "arising from" decisions "to commence proceedings, adjudicate cases, or execute removal orders."  § 1252(g).  We have previously rejected as "implausible" the Government's suggestion that § 1252(g) covers "all claims arising from deportation proceedings" or imposes "a general jurisdictional limitation."  [*AADC*, 525 U.S. at 482].  The rescission, which revokes a deferred action program with associated benefits, is not a decision to "commence proceedings," much less to "adjudicate" a case or "execute" a removal order.

*Regents*, 590 U.S. at 19; *see also Ibarra-Perez*, 154 F.4th at 997 ("[Section] 1252(g) does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders.").  It is that much easier to conclude that section 1252(g) does not apply to Plaintiffs' policy challenge concerning mandatory, rather than discretionary, relief.

In sum, section 1252(g) is a "narrow" provision, *AADC*, 525 U.S. at 487, applicable only to a specific set of "discretionary determinations," *id.* at 485.  The actions at issue here are neither discretionary nor within that limited set.  Accordingly, section 1252(g) does not apply.

### b.  Sections 1252(a)(5), (b)(9)

In the alternative, Defendants argue that Plaintiffs' claims fall within the "channeling provisions," *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 11 (1st Cir. 2007), of sections 1252(a)(5) and (b)(9).[29]  Dkt. 231 at 11–14.  Those provisions, typically read in tandem, create a vehicle for "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States," 8 U.S.C.

---

[29] To be clear, this argument is mutually exclusive with Defendants' previous one: a claim cannot both be barred under section 1252(g) and subject to channeling under sections 1252(a)(5) and (b)(9).  *See Aguilar*, 510 F.3d at 11 & n.2.  In general, Defendants have sometimes described the jurisdictional provisions of the INA and FARRA as if each additional one were merely an emphatic redundancy, rather than targeted at a specific (and often distinct) type of claim.  *See, e.g.*, Brief for Appellants at 23, *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. July 10, 2025) ("The district court's injunction ran roughshod over *three* independent sets of jurisdictional bars." (emphasis in original)).  But these shotgun arguments tend to betray that Defendants have no consistent, working model for how the statutes operate.

§ 1252(b)(9), and then require that such "petition[s] for review [be] filed with an appropriate court of appeals," *id.* § 1252(a)(5).

The question of what claims "aris[e] from" removal, 8 U.S.C. § 1252(b)(9), is subject to both a functional and categorical analysis. Functionally, both the First Circuit and Supreme Court have interpreted section 1252(b)(9) to exclude claims that cannot be "raised efficaciously within the administrative proceedings delineated in the INA," such that they might eventually be heard by an appropriate court of appeals. *See Aguilar*, 510 F.3d at 11; *see also Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018) ("eschew[ing]" an "extreme" interpretation of section 1252(b)(9) that would make certain claims "effectively unreviewable"). More categorically, and more recently, the Supreme Court has held that section 1252(b)(9) "is certainly not a bar where . . . the parties are not challenging any removal proceedings." *Regents*, 591 U.S. at 19.

Beginning with the functional, Defendants claim that Plaintiffs "fail to grapple with the real paths to administrative relief available to them." Dkt. 231 at 12. However, that argument is either dangerously uninformed or blatantly dishonest. The Court has grappled with Defendants' supposed paths to relief, *D.V.D. I*, 778 F. Supp. 3d at 372–75, and continues to find them illusory.

"From the outset," Defendants argue, noncitizens "can seek withholding of removal or other protections from removal to those [third] countries during their removal proceedings." *Id.* at 13. For support, they point to a pair of questions on USCIS's Application for Asylum and for Withholding of Removal. *Id.* But before turning to that form, and Defendants' misreading of it, it must be understood that this entire argument is a red herring. Even if an applicant *were* to raise, during his initial removal proceedings, every country as to which he might have a fear-based claim—impossible, in reality, because of changing country conditions and relevant personal characteristics—it would only matter if he could actually receive *relief*, or any adjudication, as to

23

each of those countries.  But "an applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'"  *Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) (quoting *She v. Holder*, 629 F.3d 958, 965 (9th Cir. 2010), *superseded on other grounds by statute as stated in*, *Ming Dai v. Sessions*, 884 F.3d 858, 867 n.8 (9th Cir. 2018)) ("However, should circumstances change such that Azerbaijan is the designated country of removal, the agency must provide Sadychov with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan.").  This is not only intuitively obvious but clear from the Department of Justice's own regulations, which require noncitizen applicants in immigration proceedings to establish risk of persecution or torture in the "proposed country of removal."   8 C.F.R. § 1208.16(b) (establishing, in removal proceedings, that the "burden of proof is on the applicant for withholding of removal . . . to establish that his or her life or freedom would be threatened ***in the proposed country of removal***." (emphasis added)); *id.* § 1208.16(c) (likewise establishing that an applicant seeking CAT protections must "establish that it is more likely than not that he or she would be tortured if removed ***to the proposed country of removal***." (emphasis added)).  A noncitizen cannot bear his burden as to a "proposed country of removal," *id.*, that has not been proposed as a country of removal.  Defendants are thus wrong to suggest that "an alien need not await any DHS designation before seeking protection." *See* Dkt. 231 at 13.

To illustrate this point, one need only consider the case of Plaintiff O.C.G., who tried to raise a fear-based claim as to an undesignated country during his withholding-only proceedings but was told by an immigration judge—correctly, in this Court's view—that he could not:

24

During the withholding-only proceedings, O.C.G. asked if he might be sent to Mexico—because he was afraid of being sent to Mexico—and the immigration judge told him, "we cannot send you back to Mexico, sir, because you're a native of Guatemala." During another hearing before the immigration court, O.C.G. described in detail the violence he experienced while in Mexico. At the close of that hearing, the government's attorney clarified with the immigration judge that, because Guatemala was the country of removal designated on O.C.G.'s order of removal, that was the only relevant country for purposes of the withholding-only proceedings, and the immigration judge agreed.

Two days after being granted withholding of removal, and with no advanced warning, O.C.G. was put on a bus and sent to Mexico.

*D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 407 (footnote and internal citations to the withholding-only transcript omitted).

Given the legal impossibility of raising hypothetical claims as to undesignated countries of removal, the inherent practical difficulty in doing so is technically irrelevant but nonetheless worth mentioning. Defendants argue that "an alien knows to which specific countries they fear removal" and "can seek withholding of removal or other protections from removal to those countries during their removal proceedings." Dkt. 231 at 13. In some instances, however, this is a literal impossibility. Take, for example, class-member D.D., who was removed by Defendants to South Sudan but whose removal proceedings concluded when South Sudan had only been a country for ten days.[30] Indeed, of the eight class members whom Defendants removed in violation of the preliminary injunction, an additional three appear to have been ordered removed before South

---

[30] *See* Dkt. 175-1 ¶ 4.

Sudan was recognized as a country.[31]  What evidence were they supposed to present "during their removal proceedings"?  *Cf. id.*

In other cases, the problem of indirect refoulement (sometimes called "chain refoulement") and ever-shifting diplomatic relations makes a person's risk of persecution or torture less obvious than one might first imagine.  For example, imagine a Chinese-national Uyghur-rights activist who fears removal to China.  Of course, he would be aware of the immediate risk he faces on account of his political beliefs and would likely seek protection from removal directly to China.[32]  But he is equally at risk in any country that would—either by "willful acceptance" or by simply "'turn[ing] a blind eye'"—hand him over to China, such that the ultimate likely result remains the same.[33]  *See H.H. v. Garland*, 52 F.4th 8, 15 (1st Cir. 2022) (quoting *Cruz-Quintanilla v. Whitaker*, 914 F.3d 884, 886–87 (4th Cir. 2019)).[34]

Indeed, this is what nearly happened in the case of Idris Hasan, a Uyghur-rights activist arrested at a Moroccan airport based on an Interpol red notice accusing him of terrorism in China.[35]

---

[31] *Compare* Press Release, U.S. Dep't of Homeland Sec., DHS Reacts to Activist Judge Ruling to Halt the Deportation of Barbaric Criminal Illegal Aliens Including Murderers, Rapists, and Pedophiles (May 21, 2025), https://www.dhs.gov/news/2025/05/21/dhs-reacts-activist-judge-ruling-halt-deportation-barbaric-criminal-illegal-aliens [https://perma.cc/R5P9-425G], *with A Guide to the United States' History of Recognition, Diplomatic, and Consular Relations, by Country, since 1776: South Sudan*, U.S. Dep't of State: Off. of the Historian, https://history.state.gov/countries/south-sudan [https://perma.cc/SGD6-WQYN] (last visited Feb. 24, 2026).

[32] Indeed, he may have a strong claim.  *See* Amy Qin, *Dissident Who Daringly Documented Uyghurs' Repression Wins Asylum*, N.Y. Times (Jan. 28, 2026), https://www.nytimes.com/2026/01/28/us/politics/heng-guan-china-uyghurs-asylum.html [https://perma.cc/8SA4-CS7G].

[33] *See Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972–73 (4th Cir. 2019) (discussing how risk is analyzed when based on a causal chain of events).

[34] *H.H. v. Garland*, 52 F.4th 8 (1st Cir. 2022), concerned the risk of acquiescence to torture for purposes of a CAT claim.  *Id.* at 16–19.  An applicant may likewise show that a country of removal is likely to "countenance [his persecution], or at least prove itself unable or unwilling to combat it" for a statutory withholding claim under section 1231(b)(3).  *Lopez Perez v. Holder*, 587 F.3d 456, 462 (1st Cir. 2009).

[35] *See* Amnesty Int'l, Can., *Morocco: Uyghur Activist Freed After Over Three Years in Prison*, (Mar. 18, 2025), https://amnesty.ca/urgent-actions/morocco-uyghur-activist-freed-after-over-three-years-in-prison/ [https://perma.cc/7EAX-AYSB].

Ironically, Hasan was only in Morocco "after seeing his name on a publicly disclosed Turkish government document about China's wanted Uyghurs in Turkey," where he had previously been granted humanitarian legal status.[36] After Hasan's arrest, Interpol quickly canceled the notice, but Morocco still ordered him to be extradited.[37] Ultimately, after almost four years' detention and an international campaign calling attention to his situation, Hasan was released and has since been resettled in the United States.[38] But his case readily demonstrates a conundrum Defendants ignore: which countries might *acquiesce* to a given instance of persecution or torture is a tremendously complicated and dynamic inquiry that bears little relation to an individual's personal experience and the immediate harm he knows himself to face.

A myriad of examples make the absurdity of Defendants' argument apparent. Should an Ecuadorian woman have to know her risk of female genital mutilation in Somalia?[39] Should a gay man keep himself apprised of buggery laws in the too-long and ever-changing list of countries that enforce them?[40] No person could reasonably be expected to make detailed, prophylactic claims about every country on Earth to which she might have a valid claim against removal. Nor would it make sense to burden our overburdened immigration courts with their adjudication.

It is thus unsurprising that our immigration system does not expect noncitizens to raise such speculative claims. As mentioned above, Defendants have repeatedly cited USCIS's

---

[36] Asim Kashgarian, *Uyghur Man's Long Journey to Freedom May End With Return to China*, VOA News (Jan. 13, 2022, 3:32 PM), https://www.voanews.com/a/uyghur-man-s-long-journey-to-freedom-may-end-with-return-to-china/6395787.html [https://perma.cc/X5U6-9XFL].

[37] *Id.*

[38] *See* Amnesty Int'l Can., *supra* note 35.

[39] *See Female Genital Mutilation: A Global Concern*, U.N. Children's Fund (UNICEF) (Mar. 7, 2024), https://data.unicef.org/wp-content/uploads/2024/03/FGM-Data-Brochure-v13.4.pdf [https://perma.cc/V3PV-SKUP] (documenting 99% rate of female genital mutilation).

[40] *See generally* Matthew M. Kavanagh et al., *Global Legal Environment for LGBTQ+ Sexuality and Public Health*, 53 J.L. Med & Ethics 115 (2025) (describing a complex and dynamic legal landscape).

Application for Asylum and for Withholding of Removal (Form I-589) to argue that noncitizens have a fair opportunity to present any claim they might have.[41] Again, such an opportunity is meaningless unless it is accompanied by adjudication of those claims. Nonetheless, even the form Defendants cite does not support their argument. The form asks, with a Yes/No checkbox: "Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?"[42] And then, open-endedly, "If 'Yes,' explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted."[43]

4. Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No     ☐ Yes

If "Yes," explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted.

Thus, contrary to Defendants' repeated statement, as a literal matter, the form does not ask an applicant to "list" anything. *Cf.* Dkt. 231 at 13 (characterizing these two questions as "asking [an] alien to list and explain 'any' country 'to which [he] may be returned' where he fears 'torture.'"). Moreover, as an interpretive matter, Defendants' reading of these questions makes little sense: the inclusion of the phrase "to which you may be returned," modifying "any other country," implies that "any other country" cannot mean *every* other country on Earth because then there would be no reason to include the relative clause ("to which you may be removed").[44] Rather, a more natural

---

[41] *See, e.g.*, Dkt. 231 at 13; *D.V.D. I*, 778 F. Supp. 3d at 388 (citing the hearing transcript).

[42] U.S. Citizenship & Immig. Servs., Form I-589, *Application for Asylum and for Withholding of Removal* (2025), https://www.uscis.gov/sites/default/files/document/forms/i-589.pdf [https://perma.cc/J6YL-5XKS]

[43] *Id.*

[44] *See id.*

reading of "or any other country to which you may be returned" would be any country to which the applicant has a *reasonable* expectation of removal.[45]  Indeed, given that the form refers only to a singular "*country* to which you may be removed," the most natural reading of the question, particularly given the scope of any withholding inquiry to follow, would simply be the "proposed country of removal." *Cf.* 8 C.F.R. § 1208.16(b).

After the close of removal proceedings, Defendants posit that "Plaintiffs may—at any time—move to reopen proceedings to assert new fear claims regarding removal to a third country."[46]  Dkt. 231 at 13.  As a matter of law, this is a misstatement: under most circumstances, a person may file only one motion to reopen their immigration proceedings, and that motion must be filed within 90 days of their order of removal's becoming final.[47]  8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i).

Of course, even if an individual fearing removal to an undesignated third country is procedurally able to file a motion, that motion will still necessarily fail because, "[i]n order for a motion to reopen to succeed, it must," among other requirements, "establish a prima facie case for the underlying substantive relief sought."  *See Pandit v. Lynch*, 824 F.3d 1, 3 (1st Cir. 2016) (quoting *Shah v. Holder*, 758 F.3d 32, 36 (1st Cir. 2014)).  Again, "an applicant is not entitled to have the agency adjudicate claims of relief that relate to a country that nobody is trying to send

---

[45] *See id.*

[46] To be clear, a "motion to reopen" seeking only withholding of removal or CAT relief does not disturb the underlying order of removal itself because "the finality of [an] order of removal does not depend in any way on the outcome of the withholding-only proceedings."  *See Johnson v. Guzman Chavez*, 594 U.S. 523, 539 (2021).

[47] There is notably an exception for motions to reopen seeking withholding of removal or CAT protections. 8 C.F.R. § 1003.23(b)(4)(i).  But that exception applies only where the motion is "based on changed country conditions arising in the country of nationality or the country *to which removal has been ordered*," *i.e.*, not with respect to undesignated third countries.  *Id.* (emphasis added).

them to."[48]  *Sadychov*, 565 F. App'x at 651–52 (internal quotation omitted).  Whether pre- or

post-removal order, the standard for relief continues to be based on the risk of persecution or

torture "***in the proposed country of removal***."   8 C.F.R. § 1208.16(b)–(c) (emphasis added).

Accordingly, despite Defendants' repeated contention, a noncitizen cannot properly raise a

fear-based claim regarding a third country before receiving notice of removal to that country.  Until

then, such claims are purely hypothetical and cannot be raised either in the original immigration

proceedings or on a motion to reopen.[49]

Turning to the categorical, the Supreme Court has held that section 1252(b)(9)'s reference

to "'action[s]' or 'proceeding[s] brought to remove an alien'" is "targeted language" that "'does

not present a jurisdictional bar' where those bringing suit 'are not asking for review of an order of

removal,' 'the decision . . . to seek removal,' or 'the process by which . . . removability will be

determined.'"  *Regents*, 591 U.S. at 19 (alterations in original) (first quoting 8 U.S.C. § 1252(b)(9);

and then quoting *Jennings*, 583 U.S. at 294) ("And it is certainly not a bar where, as here, the

parties are not challenging any removal proceedings.").  Defendants do not attempt to explain how

Plaintiffs' claims—which do not "challeng[e] any removal proceedings," *id.*—fall within any of

section 1252(b)(9)'s subject-matter categories as laid out in the statute or as explicated by the

---

[48] This applies with even greater force to so-called sua sponte re-openings, which immigration courts may grant at their discretion, largely without any review. *See D.V.D. I*, 778 F. Supp. 3d at 373–74.

[49] Surprisingly, Defendants seemed to agree with this point during oral argument before the First Circuit, although their candor may have been only an unintentional slip of the truth. *See* Oral Argument at 28:00, *D.V.D. v. U.S. Dep't of Homeland Sec.*, Nos. 25-1393, 25-1631 (1st Cir. Feb. 3, 2026), https://www.ca1.uscourts.gov/sites/ca1/files/oralargs/25-1393_20260203.mp3.        [https://perma.cc/R3NT-DBYJ] ("DEFENSE COUNSEL: Your Honor, the way to get back into the [petition for review] process that [section] 2242(d) is referencing is by filing a motion to reopen, or by the government filing a motion. JUDGE AFRAME: What would you say in this motion to reopen? I mean, my order says I'm going to Guatemala, and now I'm not. I'm going to Sudan that has nothing to do with my final order. What am I saying to the immigration judge? DEFENSE COUNSEL: I think the motion to reopen would say: ***the government has now designated Country X*** as my country of removal. I fear torture ***in that country***. Please let me bring a CAT claim. And the IJ ***can then*** grant that motion and reopen the removal." (emphases added)).

Supreme Court, instead stating, without explanation, that "the allegations here . . . inescapably—indeed, exclusively—target an 'action taken . . . to remove an alien from the United States.'" *See* Dkt. 231 at 11 (quoting 8 U.S.C. § 1252(b)(9)). But this summary statement makes sense only if one adopts an expansive reading of "action," which the Supreme Court has explicitly rejected.[50] In reality, Plaintiffs challenge neither their removal orders nor the processes that produced those orders. Accordingly, their claims fall outside section 1252(b)(9)'s claim-channeling mechanism.

### c.     Section 1252(a)(4)

Defendants next argue that section 1252(a)(4) bars Plaintiffs' claims in district court insofar as they constitute a "cause or claim under [CAT]." Dkt. 231 at 14–16 (alteration in original) (quoting 8 U.S.C. § 1252(a)(4)).

"A suit arises under the law that creates the cause of action." *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). Accordingly, courts have uncontroversially interpreted section 1252(a)(4) to provide federal courts of appeal with exclusive "jurisdiction to review a noncitizen's factual and legal challenges to a denial of relief pursuant to the CAT, or 'CAT order.'" *See, e.g.*, *Ali v. Garland*, 33 F.4th 47, 54 (1st Cir. 2022) (citing *Nasrallah v. Barr*, 590 U.S. 573, 581 (2020)); *see also Nasrallah*, 590 U.S. at 585 ("[Section] 1252(a)(4) now provides for direct review of CAT orders in the courts of appeals."); *see also, e.g.*, *Suradi v. Sessions*, 701 F. App'x 633, 634 (9th Cir. 2017) ("We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(4), which 'encompasses legal and constitutional issues arising from claims for deferral of removal under CAT.'" (quoting *Maldonado v. Lynch*, 786 F.3d 1155, 1160 (9th Cir. 2015) (en banc))); *Subrata*

---

[50] The Supreme Court has likewise confirmed a narrow reading of what constitutes an "order of removal," excluding, for example, CAT orders because they "'do[] not disturb' or 'affect the validity' of . . . final order[s] of removal." *Riley*, 606 U.S. at 268 (quoting *Nasrallah v. Barr*, 590 U.S. 573, 582 (2020)).

*v. Att'y Gen. of U.S.*, 378 F. App'x 226, 228 n.1 (3d Cir. 2010) ("Section 1252(a)(4) provides us with exclusive jurisdiction over claims under the CAT."). Section 1252(a)(4) does not, as Defendants seem to suggest, apply to any claim that simply *relates* to CAT. *Cf. Aguilar*, 510 F.3d at 10 (in discussing section 1252(b)(9), noting that, "if Congress had intended to accomplish so far-reaching a result, it . . . would have used the term 'related to'").[51]

Because Plaintiffs do not challenge any "CAT orders," *Nasrallah*, 590 U.S. at 585, and because the APA, not CAT, "creates [their] cause of action," *Am. Well Works*, 241 U.S. at 260, Plaintiffs present no "cause or claim under [CAT]," 8 U.S.C. § 1252(a)(4).[52] Indeed, the entire thrust of this litigation is that Defendants have foreclosed Plaintiffs' ability to create an administrative record on which CAT claims might be based. *Cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) (finding it "most unlikely" that Congress intended to foreclose a systemic challenge to immigration procedures "based on the claim that such procedures do not allow applicants to assemble adequate records"). Accordingly, section 1252(a)(4) does not apply to Plaintiffs' claims.

### d.    FARRA, Section 2242(d)

Finally, Defendants turn to FARRA section 2242(d), which states that:

---

[51] Section 1252(b)(9) employs "arising from" as its nexus language, words that "do not lend themselves to precise application." *Aguilar*, 510 F.3d at 10. By contrast, what claims arise "under" certain law has been relatively clear and settled for more than 100 years. *See Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908). It follows that the functional limitations of section 1252(b)(9)—excluding claims that, "by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA," *Aguilar*, 510 F.3d at 11—apply even more so to section 1252(a)(4).

[52] Even taking a broader view of what it means to arise "under" certain law produces the same result. In *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), the Supreme Court distilled the complex question of whether a claim arises under federal law: "does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities[?]" *Id.* at 314. Applying the same logic to reason whether a claim arises "under [CAT]," 8 U.S.C. § 1252(a)(4), one would then first ask: "does [the] . . . claim necessarily raise a stated . . . issue" concerning the application or interpretation of CAT, *cf. Grable*, 545 U.S. at 314. That test settles the question at the start because Plaintiffs' claims raise no such CAT issue. CAT is not FARRA, much less FARRA's regulations, much less the executive policy implementing those regulations.

> Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), no court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252).

Pub. L. No. 105–277, § 2242(d).

The First Circuit has interpreted section 2242(d)'s two independent clauses separately.[53] *See Saint Fort v. Ashcroft*, 329 F.3d 191, 201 (1st Cir. 2003), *superseded by statute on other grounds as stated in*, *Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).[54] The first "jurisdiction-limiting provision refers only to review of regulations." *Saint Fort*, 393 F.3d at 191. The second, "by its literal terms, . . . says it 'does not provide' jurisdiction, not that it repeals jurisdiction," *id.*, and is therefore not a bar to this Court's jurisdiction.

"Since no challenge is made in this case to the FARRA regulations," section 2242(d)'s "jurisdiction-limiting provision" does not apply. *Id.* at 201; *see also Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 258–59 & n.14 (3d Cir. 2008) ("Since we find no reason to question the validity of the regulations, section 2242 neither applies nor is itself drawn into constitutional scrutiny."). Defendants imply that any consideration of the "procedures that the Executive Branch has crafted for CAT claims," constitutes "review" of FARRA's regulations. *See* Dkt. 231 at 14–15. But this

---

[53] Defendants conflate the two. *See* Dkt. 231 at 14–15 ("FARRA confirms that 'no court shall have jurisdiction to review . . . any . . . determination made with respect to the application of [CAT] . . . except as part of the review of a final order of removal.'" (alterations in original) (quoting Pub. L. No. 105–277, § 2242(d))).

[54] In *Saint Fort v. Ashcroft*, 329 F.3d 191 (1st Cir. 2003), the First Circuit held that district courts retained habeas jurisdiction to review the denial of CAT relief because section 2242(d) lacked a clear statement of congressional intent to repeal such jurisdiction. *See id.* at 200–02. Two years after *Saint Fort*, "Congress enacted . . . [section] 1252(a)(4)," which some courts have found fills that clear-statement gap. *See Kapoor v. DeMarco*, 132 F.4th 595, 598 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 325 (2025). *But see Trinidad y Garcia v. Thomas*, 683 F.3d 952, 956 (9th Cir. 2012) ("Neither [section 1252(a)(4)] nor FARRA . . . repeals all federal habeas jurisdiction over [the petitioner's] [CAT] claims."). Regardless, section 2242(d) has not changed. Thus, its interpretation in *Saint Fort* remains binding on this Court.

33

expansive reading of section 2242(d) cannot be squared with the First Circuit's decision in *Saint Fort*, which considered the adequacy of executive process in determining a CAT claim but constituted "no challenge . . . to the FARRA regulations."  *See* 329 F.3d at 201–04; *accord Khouzam*, 549 F.3d at 258–59 ("The process . . . in the regulations is not problematic.  It is . . . an issue not covered in the regulations[] that gives us pause from the standpoint of due process. . . . Instead, the Executive, without relying on any statutory or regulatory provision, reached too far by failing to provide Khouzam constitutionally adequate process." (internal citations omitted)).  Accordingly, section 2242(d) presents no bar to Plaintiffs' claims.

### 2.   Detention-Related Claims (Count V)

Plaintiffs assert, under 8 U.S.C. § 1231(a) and the Due Process Clause, that the named Plaintiffs have a right to be free from immigration-related detention insofar as their removals are not reasonably foreseeable.[55]  *See* Compl. ¶¶ 123–30; Dkt. 232 at 26–27.  Defendants counter that "none of the named Plaintiffs are currently in custody and therefore their claims challenging the legality of their detention . . . are unripe."  Dkt. 231 at 17.

The Court substantially agrees with Defendants.  Because Plaintiffs' detention-related claims "'necessarily imply the invalidity' of their [future] confinement . . . their claims fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas."  *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (internal quotation marks omitted) (quoting *Nance v. Ward*, 597 U.S. 159, 167 (2022)).  To bring a habeas petition, an individual must be "'in custody' . . . at the time his petition is filed."[56]  *Maleng v. Cook*, 490 U.S. 488, 490–91 (1989) (quoting 28 U.S.C. § 2241(c)).

---

[55] Plaintiff O.C.G. was not originally included in Count V.  *See* Compl. ¶¶ 123–30.  In their opposition to the motion to dismiss, Plaintiffs state that, "now that [O.C.G.] has been returned [to the United States] and released, Count V is equally applicable to him."  Dkt. 232 at 26.  The Court finds this approach procedurally dubious.  Still, for the sake of completeness, the Court analyzes O.C.G.'s asserted habeas claim.

[56] The custodial requirement is jurisdictional in nature.  *See Maleng v. Cook*, 490 U.S. 488, 490 (1989).

34

To the extent an individual relies on any "future restraint on liberty," such restraint "may provide a basis for habeas jurisdiction [only] if it is imminent and inevitable," which is not the case where detention is "a matter of executive discretion," even if "the odds are great" that the expected detention will occur. *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 874 n.8 (1st Cir. 2010).

Here, at time of filing, neither D.V.D., M.M., nor O.C.G. were 'in custody' within the meaning of the habeas statute.[57] *See* Compl. ¶¶ 10–11, 13. Any hypothetical future detention would, moreover, be subject to "executive discretion." *Cf. Gonzalez-Fuentes*, 607 F.3d at 874 n.8. In other words, even if it appears likely that DHS will detain these Plaintiffs, the fact is that they might decline to do so. Thus, these Plaintiffs' claims are unripe.

Conversely, E.F.D. *was* in custody at time of filing, Compl. ¶ 12, which satisfies the statute's jurisdictional requirement. *See Leitao v. Reno*, 311 F.3d 453, 455 (1st Cir. 2002). However, E.F.D. has since been released. Dkt. 232 at 26 n.20. Typically, "[a] habeas petition will become moot once the prisoner is released from custody unless the petitioner can show some sufficient collateral consequence of the underlying proceeding." *Leitao*, 311 F.3d at 455. Alternatively, a petitioner may be able to claim "the exception to the mootness doctrine for cases that are capable of repetition, yet evading review." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (internal quotation marks omitted). But that exception does not apply where the factual circumstances "have changed so completely [between filing and hypothetical, future judgment] . . . that any decision . . . would be essentially irrelevant." *United States v. Reid*, 369 F.3d 619, 627 (1st Cir. 2004).

---

[57] As stated previously, O.C.G. was not originally included in Count V. *See* Dkt. 232 at 26. His claim fails, however, even if the Court treats Plaintiffs' opposition as functionally amending the complaint (and thus the relevant time of filing).

Appx.529

Such is the case here: the factors relevant to E.F.D.'s March 2025 detention will bear only an attenuated relation to the "set of particular circumstances" that might establish or disprove the reasonableness of any possible future detention. *See Zadvydas v. Davis*, 533 U.S. 678, 699 (2001). Accordingly, the Court will dismiss Count V without prejudice for lack of subject matter jurisdiction.[58]

### 3. FOIA Claim (Count VI)

Plaintiffs allege that Defendants have violated FOIA, 5 U.S.C. § 552(a)(2) ("section 552(a)(2)"), by failing to affirmatively publish the February Directive, as well as "other statements of policy or instruction or guidance."[59] Compl. ¶¶ 131–38. In their prayer for relief, Plaintiffs ask for an injunction precluding Defendants' reliance on any of these documents, absent their publication. *See id.* at Prayer for Relief ¶ (m).

Defendants chiefly argue that dismissal is appropriate because "the type of relief Plaintiffs seek . . . is not available under FOIA" or else is prohibited by section 1252(f)(1). Dkt. 231 at 18–20. However, these objections are largely premature. Generally, "a motion to dismiss is not a proper vehicle for addressing a prayer for relief." *Bureau of Consumer Fin. Prot. v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 59 (D.R.I. 2020) (quoting *Reininger v. Oklahoma*, 292 F. Supp. 3d 1254, 1266 (W.D. Okla. 2017)). "[T]he only issue on a motion to dismiss is 'whether the claim as stated would give the plaintiff a right to *any* relief, rather than to the particular relief demanded.'" *Johnson v. Rapid Sheet Metal, LLC*, 560 F. Supp. 3d 623, 629 (D.N.H. 2020) (emphasis added) (quoting *Douglas v. Miller*, 864 F. Supp. 2d 1205, 1220 (W.D. Okla. 2012)).

---

[58] Because these are the only claims seeming to implicate Defendant Antone Moniz, *see* Dkt. 1 ¶ 17, the Court will dismiss him from the action.

[59] Plaintiffs state that these "other statements" now include "the March 30 Memo, July 9 Guidance, and [the] list of countries that allegedly have provided diplomatic assurances." Dkt. 232 at 29.

36

Here, Plaintiffs clear that relatively low bar. At a minimum, the Court has authority to order "the production of any agency records improperly withheld," 5 U.S.C. § 552(a)(4)(B), which possibility raises no obvious concern under section 1252(f)(1). Moreover, while the First Circuit is yet to decide whether FOIA itself grants additional, separate authority to "enjoin [an] agency from withholding agency records," *id.*, it has previously stated that district courts retain their usual, broad equitable powers to issue "collateral injunctive relief" after finding a FOIA violation. *Columbia Packing Co. v. U.S. Dep't of Agric.*, 563 F.2d 495, 500 (1st Cir. 1977); *see also Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 20 (1974) ("[T]here is little to suggest, despite [FOIA's] primary purpose, that Congress sought to limit the inherent powers of an equity court.").[60] Given this apparent flexibility, the Court does not find relief so impracticable as to warrant dismissal of the claim.

Defendants next argue that the February Directive "does not fall within the categories of documents [that FOIA] directs agencies to affirmatively publish." Dkt. 231 at 20–21. However, the Court need not reach this argument because, at least as to the February Directive, the Court finds that the named Plaintiffs lack standing.[61]

At the outset, the Court notes that Plaintiffs have not established FOIA standing in the usual manner, by showing "that they sought and were denied specific agency records." *See*

---

[60] Defendants point to the D.C. Circuit's decision in *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191 (D.C. Cir. 1996), to argue that production is the *only* remedy available under FOIA. Dkt. 231 at 18–19. *But see N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 224 (2d Cir. 2021) (holding that FOIA "grants district courts the authority to order injunctive relief to enforce [its publication requirements], including an order requiring the agency to make records available for public inspection in an electronic reading room"). As the Second Circuit pointed out, it is difficult to square *Kennecott*'s narrow reading of section 552 with the Supreme Court's decision in *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974), which "supports an expansive rather than restricted view of the remedies available to a FOIA plaintiff." *See N.Y. Legal Assistance*, 987 F.3d at 218 n.20.

[61] Although framed as a matter of remedy, Defendants do argue that "[p]roviding documents to the individual fully relieves whatever informational injury may have been suffered by that particular complainant." Dkt. 231 at 19 (quoting *Kennecott*, 88 F.3d at 1203).

37

*Campaign for Accountability v. U.S. Dep't of Just.*, 155 F.4th 724, 733 (D.C. Cir. 2025) (quoting

*Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989)); *cf.* Compl. ¶¶ 131–38.[62]   In the

absence of any request's denial, the Court is left to search for some other sign of a "concrete and

particularized informational injury."  *See Nat'l Sec. Archive v. Cent. Intel. Agency*, 104 F.4th 267,

272 (D.C. Cir. 2024) (quoting *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election

Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017)).  To that end, "plaintiff[s] must show that '(1) [they]

ha[ve] been deprived of information that . . . a statute requires the government . . . to disclose to

[them], and (2) [they] suffer[], by being denied access to that information, the type of harm

Congress sought to prevent by requiring disclosure.'"  *Id*. (ellipses in original) (quoting *Elec. Priv.

Info. Ctr.*, 878 F.3d at 378).[63]

The Court struggles to see how any of the named Plaintiffs "suffers . . . the type of harm

Congress sought to prevent by requiring disclosure."  *See Nat'l Sec. Archive*, 104 F.4th at 272.

Section 552(a)(2), has "as its 'primary objective [ ] the elimination of secret law.'"  *Campaign for

Accountability v. U.S. Dep't of Just.*, 486 F. Supp. 3d 424, 427 (D.D.C. 2020) (Jackson, J.)

(alteration in original) (quoting *U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*,

489 U.S. 749, 772 n.20 (1989)), *aff'd in part*, 155 F.4th 724 (D.C. Cir. 2025).  Indeed, as Plaintiffs

---

[62] For purposes of this motion, the Court assumes in Plaintiffs' favor that a formal request is not absolutely necessary since the provision at issue, 5 U.S.C. § 552(a)(2), "require[s] agencies to act *proactively* with respect to the publication of certain types of records and information; *i.e.*, the agency must disclose the records without waiting for a request."  *Campaign for Accountability v. U.S. Dep't of Just.*, 278 F. Supp. 3d 303, 307 (D.D.C. 2017) (Jackson, J.) (emphasis in original).  *But see Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017) ("As to FOIA § 552(a)(2), our decisions dealing with the enforcement of this subsection have not discussed standing.  But in each such case the plaintiff made a request of the agency and the agency denied the request."); *Campaign for Accountability*, 155 F.4th at 734–35 ("Because the plaintiff in [*Prisology*] 'made no request . . . before bringing suit and therefore received no denial from [the] agency,' he had not suffered the type of 'informational injury' that is necessary to establish standing." (quoting *Prisology*, 852 F.3d at 1117)).

[63] Again, in Plaintiffs' favor, the Court assumes that DHS's failure to publish could constitute a "depriv[ation] of information," *Nat'l Sec. Archive*, 104 F.4th at 272, even where "the documents are already publicly available," *Morley v. Cent. Intel. Agency*, 894 F.3d 389, 394 (D.C. Cir. 2018).

recognize, section 552(a)(2) itself contemplates no injury where "the party has actual and timely notice of the terms thereof." *See* Compl. ¶ 133 (quoting 5 U.S.C. § 552(a)(2)(E)). Here, Plaintiffs' attachment of the February Directive to their complaint, Dkt. 1-4, belies any allegation that DHS's reliance on it constitutes harmful use of a "secret" law against *them*. Thus, even if DHS has failed in its procedural FOIA publication requirement, the named Plaintiffs have failed to show any particularized harm.

"In a class action, 'federal courts lack jurisdiction if no named plaintiff has standing.'" *Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021) (quoting *Frank v. Gaos*, 586 U.S. 485, 492 (2019)). Accordingly, the Court finds that it lacks jurisdiction over Count VI with respect to the February Directive and will dismiss that part of the claim.

Defendants further argue that Plaintiffs' remaining allegations as to "other statements of policy or instruction or guidance" are too non-specific to meet the Rule 12(b)(6) pleading standard. Dkt. 231 at 21 (quoting Compl. ¶ 136). The Court agrees.

Here, again, the fact that Plaintiffs have not made an actual FOIA request muddies the waters. FOIA requests must "reasonably describe[]" the records sought. 5 U.S.C. § 552(a)(3)(A). That provides a standard for courts to assess whether a given request triggered an agency's disclosure duties and thus whether the agency's failure to act upon it was a violation. In that posture, "a request fails to 'reasonably describe[ ]' a record if it is 'too vague' to allow the 'requested record to be reasonably identified.'" *Leopold v. U.S. Immigr. & Customs Enf't*, 560 F. Supp. 3d 189, 198 (D.D.C. 2021) (alteration in original) (quoting *Krohn v. U.S. Dep't of Just.*, 628 F.2d 195, 198 (D.C. Cir. 1980)). In the absence of any formal request, assuming in Plaintiffs' favor that a claim under section 552(a)(2) can still be stated, the Court defaults to the usual rule that allegations must contain "sufficient detail to provide the defendants with fair notice of a

plaintiff's claims and the bases for them." *See Mazzarino v. Mass. State Lottery Comm'n*, 616 F. Supp. 3d 118, 127 (D. Mass. 2022) (citing *Twombly*, 550 U.S. at 555). Under that standard, the Court finds Plaintiffs' "other statements" allegation insufficient. *See* Compl. ¶ 136.

Although Plaintiffs attempt to provide more detail in their opposition, *see* Dkt. 232 at 29 (stating that the "other statements" now include "the March 30 Memo, July 9 Guidance, and list of countries that allegedly have provided diplomatic assurances"), "a plaintiff cannot amend his complaint by adding new allegations or theories in an opposition to a motion to dismiss," *Caldwell v. Cambra*, 802 F. Supp. 3d 8, 41 n.10 (D. Mass. Sept. 10, 2025) (citing *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 7 n.2 (1st Cir. 2005)). Accordingly, the Court will dismiss the remainder of Count VI without prejudice for failure to state a claim.

### 4. Duplicative Claims (Counts II and III)

As a matter of housekeeping, the Court will dismiss Counts II and III for failing to state a distinct claim for relief, *see Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 237 (1st Cir. 2013) (affirming dismissal of "duplicative claim" that "provide[d] [the plaintiff] with no further remedy"), or as otherwise improperly pled. Dismissal of these claims does not substantively limit Plaintiffs' action. Plaintiffs' statutory and constitutional challenges to Defendants' third-country removal policy, based on Plaintiffs' asserted right to notice and an opportunity to challenge third-country removals, properly sound in the APA's requirement that an agency act "in accordance with law."[64] *See* 5 U.S.C. § 706(2)(A). As such, those theories and that relief are fully captured in Count I. *See* Compl. ¶¶ 99–107.

---

[64] Paragraph (A) has been described as the APA's "catchall" cause of action. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984). Ultimately, because this case turns entirely on legal issues, the Court views the choice between APA paragraphs to be, at most, academic.

Appx.534

Review of Counts II and III demonstrates why dismissal is appropriate.[65]   In Count II, Plaintiffs ask the Court to "compel agency action unlawfully withheld"—*i.e.*, the provision of notice and an opportunity to challenge third-country removals.   Compl. ¶¶ 108–11 (quoting 5 U.S.C. § 706(1)).   This is both functionally the same relief sought in Count I and, moreover, fails the requirement that claims under 5 U.S.C. § 706(1) target "*discrete* agency action that [the agency] is *required to take*" rather than pose a "broad programmatic attack."   *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases in original).

Likewise, in Count III, Plaintiffs allege that Defendants have violated 5 U.S.C. § 706(2)(D), which proscribes "agency action . . . without observance of procedure required by law,"—*i.e.*, notice and an opportunity to challenge third-country removal.   *See* Compl. ¶¶ 112–17. This is functionally the same relief sought in Count I.   Moreover, Plaintiffs' claim of an unlawful, systemic lack of procedure does not align with this Court's understanding of what it would mean to review whether "prescribed procedures have been followed.'"   *Cf. Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 116 (1st Cir. 2002) (quoting *Nat. Res. Def. Council, Inc. v. Sec. & Exch. Comm'n*, 606 F.2d 1031, 1045 (D.C. Cir. 1979)).   Accordingly, the Court will dismiss Counts II and III.

## III.   <u>Motion for Summary Judgment</u>

Having found dismissal appropriate as to Counts II, III, V, and VI, Plaintiffs' motion for partial summary judgment now encompasses all remaining claims, Counts I and IV, under the APA and Declaratory Judgment Act.   *See* Dkt. 193.   As explained below, the Court concludes that Defendants' third-country removal policy, as embodied in the March Guidance, is contrary to

---

[65] The Court recognizes that sua sponte dismissals are generally disfavored. *See Gonzalez-Gonzalez v. United States*, 257 F.3d 31, 36 (1st Cir. 2001).   Here, however, the issue is straightforward; the parties have had ample opportunity to make clear the scope of their dispute, and Plaintiffs are not prejudiced where the same relief remains available (and, in this case, is ultimately granted) through the remaining count.

section 1231(b)(2)–(3) and the Due Process Clause.  Accordingly, the Court will grant the surviving part of Plaintiffs' motion.

### A.    Legal Standard

"[I]n cases involving review of agency action under the APA, the traditional Rule 56 standard does not apply [at summary judgment] due to the limited role of a court in reviewing the administrative record."  *Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174, 189 (D. Mass. 2018) (citing *Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015)).  Rather, "[i]n the administrative law context, a motion for summary judgment is 'simply a vehicle to tee up a case for judicial review.'"  *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 121 (D. Mass. 2025) (quoting *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016)).  Thus, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violated the APA.  *Bos. Redevelopment*, 838 F.3d at 47; *see also Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (explaining that a court's task on motion for summary judgment "is only to determine" whether the agency's action "was consonant with [its] statutory powers, reasoned, and supported by substantial evidence in the record").

### B.    Discussion

#### 1.    Section 1231(b)(2)

The parties dispute whether DHS must "first seek removal to the . . . country of removal (or alternative country of removal)" as designated during a noncitizen's removal proceedings.[66]

---

[66] In their memorandum, as compared to their motion, Plaintiffs refer less precisely only to the "country selected by the noncitizen during removal proceedings," excluding mention of the alternate. *Compare* Dkt. 194 at 9, *with* Dkt. 193-1 at 1.

42

*See* Dkt. 193-1 at 1. Defendants call this a "clear misinterpretation of the statutory text" and argue that "the statute permits Defendants to remove individuals to any other 'country whose government will accept the alien into that country' when removal to other countries (including, inter alia, the country in which the alien was born) is 'impracticable, inadvisable, or impossible.'" Dkt. 231 at 37 (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)).[67] However, Defendants' gloss elides much detail.

In the first instance, section 1231(b)(2) governs the sequence of countries to which a noncitizen subject to a final order of removal may be removed. *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 338 (2005). The Supreme Court has explained that section 1231(b)(2) "provides four consecutive removal commands." *Id.* at 341.

At step one, the noncitizen "shall be removed to the country of his choice," unless one of several conditions is met, including where the noncitizen: "'fails to designate a country promptly'"; where the designated country fails to accept him; or where "'[DHS] decides that removing the alien to the country is prejudicial to the United States.'" *Id.* at 339, 341 (quoting 8 U.S.C. § 1231(b)(2)(C)(i)–(iv)).

"[O]therwise," at step two, "he shall be removed to the country of which he is a citizen," unless his government fails to accept him. *Id.* at 341 (citing 8 U.S.C. § 1231(b)(2)(D)).

"[O]therwise," at step three, "he shall be removed to one of [several listed] countries with which he has a lesser connection," *id.* (citing 8 U.S.C. § 1231(b)(2)(E)(i)–(vi)), unless all of those options are found to be "'impracticable, inadvisable, or impossible,'" *id.* (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)).

---

[67] Defendants further highlight that "the statute permits Defendants . . . to disregard the alien's designated country in various circumstances, including if the alien does not make a prompt designation, if the designated country does not timely inform the United States whether it will accept the alien, or if the Attorney General concludes that removal to the designated country 'is prejudicial to the United States.'" Dkt. 231 at 37 (quoting 8 U.S.C. § 1231(b)(2)(C)). Given the totalizing nature of Defendants' argument in the first half, it is difficult to see the separate import of the second. This is perhaps the first signal that Defendants are ignoring swaths of the statute's text.

43

As a last resort, at step four, the noncitizen "shall be removed to 'another country whose government will accept the alien into that country.'" *Id.* (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)).

These "consecutive removal commands," *id.*, dovetail with the regulations governing removal proceedings, which require the immigration judge to notify a noncitizen in proceedings "that if he or she is finally ordered removed, the country of removal will in the first instance be the country designated by the respondent, except as otherwise provided under [section 1231(b)(2)]," and further require the immigration judge to "afford him or her an opportunity then and there to make such designation," 8 C.F.R. § 1240.10(f). Following that designation, the regulations require the immigration judge to "identify for the record a country, or countries in the alternative, to which the alien's removal may be made pursuant to [section 1231(b)(2)]." *Id.* Thus, the process results in a country of removal designated by the noncitizen and an alternate country or countries of removal designated by the immigration judge.[68]

The immigration judge's designation of an alternate country of removal is governed by section 1231(b)(2)'s four "steps." *See Jama*, 543 U.S. at 344. To illustrate, if an Irish citizen is ordered removed and has properly designated France as his preferred country of removal, then the record should reflect that, "in the first instance," he will be removed to France. *See* 8 C.F.R. § 1240.10(f). This is step one. *See* 8 U.S.C. § 1231(b)(2)(C). Next, the immigration judge should designate Ireland as the country to which he may be removed "in the alternative," Ireland being his country of citizenship.[69] *See* 8 C.F.R. § 1240.10(f). This is step two. *See* 8 U.S.C.

---

[68] At least in practice, it appears not uncommon for immigration judges to leave undesignated the alternate country of removal where removal to the noncitizen's preferred country of removal seems unproblematic, as this can alleviate the need to adjudicate additional country-specific relief. *See, e.g.*, *Matter of Maccaud*, 14 I. & N. Dec. 429, 430 (BIA 1973) (appearing to approve of this practice).

[69] If he were a dual citizen, then the immigration judge could designate both "*countries* in the alternative." 8 C.F.R. § 1240.10(f) (emphasis added).

§ 1231(b)(2)(D).  The immigration judge could not, however, skip Ireland at step two without violating section 1231(b)(2)(D) and, by extension, 8 C.F.R. § 1240.10(f).

The situation becomes somewhat more complicated where an individual is stateless or where the country of citizenship is otherwise unclear.  *See, e.g.*, *Hadera v. Gonzales*, 494 F.3d 1154, 1156–59 (9th Cir. 2007).  In *Hadera*, a noncitizen, Hadera, declined to designate a country of removal (at step one).  *Id.* at 1157.  At step two, there was a question as to whether Hadera was a citizen of Ethiopia or, as he argued, stateless.  *Id.* at 1156.  The immigration judge found that it was "not likely that Ethiopia would recognize [Hadera] as being a citizen" but nevertheless designated Ethiopia as the country of removal.  *Id.* at 1157.  The Ninth Circuit confirmed that this was error, holding that the immigration judge "should have continued on to Step 3 and designated 'one of the countries with which [Hadera] ha[d] a lesser connection,'" which in that case appeared to be Italy.  *Id.* at 1157 (first alteration in original) (quoting *Jama*, 543 U.S. at 341) (citing 8 U.S.C. § 1231(b)(2)(E)(i)–(vi)).

The same general rules apply to DHS in its *execution* of removal orders, with one additional layer.  Ultimately, DHS is not limited, in executing an order of removal, to the countries specifically identified in the order of removal.  8 C.F.R. § 1240.12(d).  However, "in the first instance," DHS must effect removal "to the specified or alternative country or countries," except "[i]n the event that [DHS] is unable" to do so.  *Id.*  For example, using the facts of *Hadera*, assuming the immigration judge, upon remand, were to designate Italy as Hadera's step-three, alternate country of removal, *see* 494 F.3d at 1158, DHS would not be able to effect removal to any other country, pursuant to the order of removal, unless it were "unable" to remove to Italy, 8 C.F.R. § 1240.12(d).

DHS is further directly constrained by section 1231(b)(2)'s "four consecutive removal commands." *Jama*, 543 U.S. at 341. For example, if a German citizen were to designate Germany as his preferred country of removal (and if no alternate country of removal were designated in his immigration proceedings), DHS could technically "disregard [the] designation," including if it were to deem such removal "prejudicial to the United States." *See* 8 U.S.C. § 1231(b)(2)(C)(iv). However, section 1231(b)(2) would then "command[]" DHS, *Jama*, 543 U.S. at 341, to attempt removal to the "country of which the alien is a . . . citizen," in that case, to Germany.[70] *See* 8 U.S.C. § 1231(b)(2)(D); *see also, e.g.*, *Enwonwu v. Gonzales*, 438 F.3d 22, 29 n.7 (1st Cir. 2006) ("As a practical matter, . . . if [an] alien does not designate a country, the Attorney General has little choice but to remove him to the country of which he is a subject, national, or citizen.").

Defendants are thus wrong to suggest that removal to "any" country is permitted whenever other options are deemed "'impracticable, inadvisable, or impossible.'" Dkt. 231 at 37 (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)). Section 1231(b)(2) provides no discretion between steps two and three. 8 U.S.C. § 1231(b)(2)(D)–(E). And by regulation, DHS must execute removal to the immigration judge's "specified or alternative country or countries" unless it is "unable" to do so. 8 C.F.R. § 1240.12(d).

### 2. Section 1231(b)(3)

The entire scheme outlined in the previous section—which provides DHS with its command and authority to remove noncitizens upon their final orders of removal—must be exercised "[s]ubject to" section 1231(b)(3). 8 U.S.C. § 1231(b)(2)(1). Section 1231(b)(3) provides for mandatory withholding of removal (sometimes called "statutory withholding") based

---

[70] *Jama* makes clear that it does not matter that countries identified in successive steps are "the same country." *See* 543 U.S. at 345–46. Thus, the statutory lack of discretion between steps two and three holds even where the countries identified at steps one and two are the same.

Appx.540

on a likelihood of persecution. *See Johnson v. Guzman Chavez*, 594 U.S. 523, 530 (2021). As such, DHS "may not remove an alien to a country if [the Government] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."[71] 8 U.S.C. § 1231(b)(3)(A). Section 1231(b)(3) further provides that the determination of "whether an alien has demonstrated that the alien's life or freedom would be threatened" shall be made by a "trier of fact" and pursuant to a formal process. *Id.* § 1231(b)(3)(C); *see also* 8 C.F.R. §§ 208.16, 1208.16 (establishing standards and procedures for adjudication).[72]

### 3.     **FARRA**

Apart from the INA, FARRA also makes available country-specific relief from removal, under CAT. Pub. L. No. 105–277, § 2242. To obtain CAT relief, an individual must demonstrate "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Like statutory withholding, CAT relief is mandatory, rather than discretionary, which is to say that the Government "has no discretion to deny relief to a noncitizen who establishes his eligibility." *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

### 4.     **Due Process**

"A court presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional question." *Califano v. Yamasaki*, 442 U.S. 682, 692 (1979). "'[I]f 'a construction of [a] statute is

---

[71] *See supra* note 26 (citing *Martinez*, 543 U.S. at 374 n.1).

[72] "The process for applying for withholding of removal [or CAT relief] depends on whether the alien is subject to the standard removal proceedings or a reinstated order of removal. . . . [A]n alien subject to the standard removal process typically applies for withholding [or CAT relief] during the course of his removal proceedings. But because an alien subject to a reinstated order of removal will not have any removal proceedings," the process begins with a screening interview before an asylum officer, who may then refer the individual for "withholding-only proceedings" before an immigration judge. *Guzman Chavez*, 594 U.S. at 531 (internal citation omitted).

Appx.541

fairly possible by which [a serious doubt of constitutionality] may be avoided,' a court should adopt that construction." *Id.* at 693 (last alteration in original) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

### a.   **Statutory**

As a matter of statute, the Court construes section 1231(b)(2) to require notice and an opportunity to present claims for statutory withholding of removal under section 1231(b)(3). *See* 8 U.S.C. § 1231(b)(2)(1) (making removal authority "[s]ubject to paragraph (3)").

"On its face, [section 1231(b)(3)] requires that [the Government] make a pre-[removal] decision, and that the decision . . . be accurate." *Cf. Califano*, 442 U.S. at 693. "In the imperative voice," *cf. id.*, it says that DHS "may not remove an alien to a country if [the Government] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1231(b)(3)(A), and further sets the terms for how that decision is to be made, *id.* § 1231(b)(3)(C).

Defendants do not seem to believe that section 1231(b)(3) requires any pre-removal decision about a noncitizen's risk of persecution (or worse):

Appx.542

THE COURT: I want to make sure that I understand your position correctly, that, if the Government is saying, We can deport people to any country that is not prohibited on the notice of removal, and we are not obligated to listen to anything that the deportee has to say about the danger of torture or death that they may face there -- if that's your position, okay. Great. I understand your position.

But I don't want to mischaracterize your position; so that's why I'm saying it back to you, to make sure.

Is your position that the Government can decide right now that someone who is in their custody is getting deported to a third country, give them no notice and no opportunity to say, I will be killed the moment I arrive there, and, as long as the Department doesn't already know that there's someone standing there waiting to shoot him, that that's fine?

DEFENSE COUNSEL: In short, yes.

Dkt. 44 at 29:12–18 (March 28, 2025 Hr'g Tr.).

But even assuming—for no particularly good reason—that there *is* someone, somewhere within the Government evaluating a noncitizen's risk of persecution before he is removed to a third country, the Court "do[es] not see how [risk of persecution] can be evaluated absent" the noncitizen's involvement, or at least his meaningful abstention. *Cf. Califano*, 442 U.S. at 697. Risk of persecution depends, among other things, on an individual's religion, social group membership, and political opinions. 8 U.S.C. § 1231(b)(3)(A). It is unrealistic to imagine that an officer could conceivably have enough information about those personal characteristics, which genuinely change over time, to make that decision, absent some kind of input from the individual.

Accordingly, given the substantial constitutional issues borne out by a contrary reading, discussed in greater detail below, as well as the proper assumption of "congressional solicitude for fair procedure, absent explicit statutory language to the contrary," *Califano*, 442 U.S. at 693, the Court concludes that Defendants' third-country removal policy is unlawful, at a minimum, because it is contrary to sections 1231(b)(2) and 1231(b)(3).

Vacatur of the policy is therefore appropriate. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) ("When a reviewing court determines that agency [actions] are unlawful, the ordinary result is that the [actions] are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).

However, not every class member is eligible for statutory withholding under section 1231(b)(3).[73] For those class members, for purposes of declaratory judgment, the right to notice and an opportunity to challenge third-country removal must be predicated either on the right to be removed to the correct country or countries, pursuant to section 1231(b)(2), its regulations, and their orders of removal, or on the right to seek CAT relief. Although an argument could be made that the same constitutional-avoidance logic should apply to those bases, "absent explicit . . . language to the contrary," *Califano*, 442 U.S. at 693, there is less direct, affirmative textual support for it. The Court is further mindful that the avoidance canon cannot be used to "rewrite a statute." *Jennings*, 583 U.S. at 298. Accordingly, the Court proceeds to the constitutional analysis.

**b.** <u>**Constitutional**</u>

To the extent any class members' entitlement to notice and an opportunity to challenge their third-country removal is not established directly by statute or regulation, Plaintiffs assert that such procedures are guaranteed by the Due Process Clause of the Fifth Amendment. Dkt. 194 at 10–16. As a result, Plaintiffs argue, Defendants' third-country removal policy, as embodied in the March Guidance, is unlawful. *Id.* at 16–20.

---

[73] *See* 8 U.S.C. § 1231(b)(3)(B) (excluding, for example, those who have previously been convicted of a "particularly serious crime").

Courts analyze procedural due process claims in two steps: first, courts "ask whether there exists a liberty or property interest"; if so, courts "ask whether the procedures followed by the [Government] were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by . . . laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Once the existence of a protected interest is established, the sufficiency of governmental process related to that interest is analyzed according to the "three-part balancing test articulated in *Mathews v. Eldridge*." *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

### i.          Liberty Interests

Plaintiffs have identified two distinct liberty interests, both arising out of statute. First, they claim an interest in being removed to the countries of removal designated on their orders of removal or otherwise pursuant to the sequencing requirements of section 1231(b)(2). Dkt. 194 at 9–10.[74] Second, Plaintiffs claim an interest under FARRA and the INA in being able to assert fear-based claims against third-country removal. *Id.* at 10–16. Because the Court has already concluded that the right to notice and an opportunity to raise withholding claims under section 1231(b)(3) inures by statute, the Court limits its constitutional analysis to Plaintiffs' interest in bringing CAT claims under FARRA.

Defendants do not dispute that such liberty interests may generally arise out of these statutes and regulations. However, they do dispute whether every class member can claim

---

[74] *See also* Dkt. 194 at 17 (arguing that Defendants' reliance on diplomatic assurances "deprives a person of any meaningful opportunity to challenge the removal on the grounds that, inter alia, DHS has an obligation to remove the person to the country designated in the removal order") (citing, inter alia, *J.R. v. Bostock*, 796 F. Supp. 3d 684, 690 (W.D. Wash. 2025) (restraining third-country removal where the plaintiff's country of citizenship had allegedly accepted repatriation, leaving "no grounds upon which the Government [could] designate an alternative country")).

51

entitlement to them. In particular, Defendants argue that the Due Process Clause provides no additional protection to those "aliens who have never been admitted," a group which Defendants posit, "undoubtedly includes many members of the certified class." Dkt. 231 at 28.

At the outset, it is worth noting what Defendants' argument does not, and cannot, suggest: that the Due Process Clause simply does not apply to individuals present without admission in the United States. Rather, the Supreme Court has repeatedly held that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693 (quoting, inter alia, *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)). It is beyond argument that "[t]he Fifth Amendment . . . protects every one of ['literally millions of aliens within the jurisdiction of the United States'] from deprivation of life, liberty, or property without due process of law" and that, "[e]ven one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). "'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *J.G.G.*, 604 U.S. at 673 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "No one can claim, nor since the time of slavery has anyone . . . successfully claimed, that persons held within the United States are totally without constitutional protection." *Jennings v. Rodriguez*, 583 U.S. 281, 332 (2018) (Breyer, J., dissenting).[75] This conclusion is particularly obvious when one considers the implications of any contrary statement: "would the Constitution leave the Government free to starve, beat, or lash those held within our boundaries?" *Id.*

---

[75] Although written in dissent, Justice Breyer's constitutional analysis was not contradicted by the *Jennings* majority, which instead remanded those arguments. *See Jennings*, 583 U.S. at 312.

To counter this baseline rule, Defendants invoke the so-called entry-fiction doctrine. Dkt. 231 at 28. According to that principle, "aliens who arrive at ports of entry . . . are 'treated' for due process purposes 'as if stopped at the border'" and thus "ha[ve] only those rights regarding admission that Congress has provided by statute." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020). To spell out this idea, "[w]hen an alien arrives at a port of entry . . . the alien is on U. S. soil." *Id.* at 139. Thus, he is technically a "'person[]' within the United States." *Zadvydas*, 533 U.S. at 693. As such, a mechanical application of the Due Process Clause might entail that he could be "expelled [from the United States] only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). To avoid this result, and in service of the political branches' "'sovereign prerogative' of governing admission to this country," courts deploy a legal fiction whereby "the alien is not considered to have entered the country for the purposes of this rule." *Thuraissigiam*, 591 U.S. at 139–40 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)).

To illustrate, the *Thuraissigiam* Court provides the apt example of "an international airport." *Id.* at 139. In that context, if due process protections against removal were to attach "as soon as an arriving alien set foot on U.S. soil," *id.*, the Government would be forced to perform inspections and decide the admissibility of every passenger out on the tarmac (or perhaps even in mid-air) or else waive its sovereign right, *see id.* This result would not only be absurd but in direct tension with the "accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty . . . to admit [noncitizens] only in such cases and upon such conditions as it may see fit to prescribe." *See Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Indeed, the Supreme Court has reasoned that this rule of sovereign power over admission would be "meaningless" if it could be overcome by a noncitizen's mere arrival. *Thuraissigiam*, 591 U.S.

at 139.  Thus, to account for the practical realities of international travel, immigration processing, and border management, the entry-fiction doctrine fills the gap by providing the Government with a degree of flexibility in how it treats arriving noncitizens at ports of entry or near the border: for admissions purposes, as if still "at the threshold of initial entry."[76]  *See, e.g.*, *id.* at 107, 140 (holding that an asylum-seeker apprehended "just 25 yards from the border" could not claim that his expedited removal violated the Due Process Clause because he had "only those rights regarding admission that Congress has provided by statute").

However, in such cases, which provide an exception to the otherwise "geographic" scope of the Due Process Clause, *Zadvydas*, 533 U.S. at 693, the due process rights impacted are only those "regarding admission," *Thuraissigiam*, 591 U.S. at 140.  This distinction arises near the very inception of the entry-fiction case law: in *Wong Wing v. United States*, 163 U.S. 228 (1896), the Supreme Court contrasted the case of an immigrant who could not challenge his immigration officer's "exclusive authority to determine whether a particular alien seeking admission into this country" was so entitled, *id.* at 232–33 (quoting *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895)), with another who *could* challenge, on due process grounds, the imposition of an immigration-related term of hard labor, *id.* at 235–38.  And although *Wong Wing* presented the particularly egregious circumstance of an "infamous punishment," *id.* at 237, the Supreme Court expressed its holding in terms of the broader protections afforded by the Due Process Clause:

---

[76] Indeed, the Government may even permit a noncitizen to physically enter the United States in a more substantial way—by "parol[ing]" him into the country, *Thuraissigiam*, 591 U.S. at 139—without necessarily subjecting its admission decision to the strictures of the Fifth Amendment.  *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 229–30 (1925) (holding that a mentally handicapped child's "prison bounds" were merely "enlarged" by her commitment to the custody of an immigrant aid society "until she could be deported safely").

Applying this reasoning to the fifth and sixth amendments, it must be concluded that all persons within the territory of the United States are entitled to the protection guarantied by those amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law.

*Id.* at 238.

It makes sense to distinguish between "rights regarding admission" and other interests that might be protected by the Due Process Clause. *See Thuraissigiam*, 591 U.S. at 140. The Government's countervailing interest, in the entry-fiction context, is its sovereign authority to "admit [noncitizens] only in such cases . . . as it may see fit." *Nishimura Ekiu*, 142 U.S. at 659. Where that sovereign prerogative is not implicated, however, the legal fiction loses its justification. *See Zadvydas*, 533 U.S. at 699 (citing 1 Edward Coke, *Institutes of the Lawes of England* *70b (1628), for the maxim that, "[when] the rationale of a legal rule [is] no longer . . . applicable, that rule itself no longer applies").

Unsurprisingly then, more than a century of Supreme Court case law confirms that the proper application of an entry fiction, where otherwise appropriate, is to preserve the Government's authority over the determination of a noncitizen's *admissibility*.[77] For example, in *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892), which first articulated these principles in U.S. law, the Supreme Court held that a habeas petitioner's "*right to land in the United States*" was not increased by the Government's permitting her to stay in a "mission-house as a more suitable place than the steam-ship, pending [its] decision." *Id.* at 661 (emphasis added). Likewise, in *Kaplan v. Tod*, 267 U.S. 228 (1925), the Supreme Court held that the Government's authority to "*rightly . . . den[y] admission*" to a handicapped child was unaffected by its decision to permit her stay with an immigrant aid society "until she could be deported safely." *Id.* at 229 (emphasis

---

[77] Each of the cases to follow is cited by Defendants. *See* Dkt. 231 at 28–29.

55

added).[78] And in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), the Supreme Court held that a petitioner's liminal presence on Ellis Island did not "transform[] [his case] into something other than an *exclusion proceeding*," *id.* at 213 (emphasis added), which was then "the usual means of proceeding against an alien outside the United States *seeking admission*," *Plasencia*, 459 U.S. at 25 (emphasis added).

Because Plaintiffs challenge neither their orders of removal nor any of the processes that produced those orders, their claims do not implicate, nor even "relate[] to," the issue of their admissibility. *See Guzman Chavez*, 594 U.S. at 536. Withholding of removal and CAT relief cannot issue until *after* the order of removal has been entered and thus *after* any question of admissibility has been resolved. *Id.* at 539–40 (citing *Matter of I-S- & C-S-*, 24 I. & N. Dec. 432, 432–33 (BIA 2008)). "In short, withholding-only relief is country-specific. It relates to *where* an alien may be removed. It says nothing, however, about the antecedent question *whether* an alien is to be removed from the United States." *Id.* (emphases in original). The Supreme Court has indeed explicitly rejected attempts to conflate the two "as a practical matter" based on the mere possibility that withholding relief might lead to continued presence (which is, as Defendants clearly recognize, *not* admission). *See id.* at 537–38 (noting that "withholding-only relief 'does not afford [an alien] any permanent right to remain in the United States'" (alteration in original) (quoting *Matter of I-S- & C-S-*, 24 I. & N. Dec. at 434)).

---

[78] *Kaplan* is somewhat inapposite because, at bottom, it concerned the meanings of statutes rather than the scope of the Due Process Clause. *See* 267 U.S. at 230–31 ("She never has been dwelling in the United States within the meaning of the Act."). Nevertheless, it is useful to illustrate the historic application of entry fictions to practically facilitate admission and exclusion. Defendants' citation to *Landon v. Plasencia*, 459 U.S. 21 (1982), is particularly confounding since, in that case, the Supreme Court upheld the due process rights of a noncitizen *outside* the United States, seeking admission *into* the United States, based on established "ties" to the country. *See id.* at 32–34.

The Court thus rejects Defendants' argument that the Due Process Clause excepts certain class members from asserting due process challenges based on these non-admission interests.[79] Plaintiffs are uniformly "'persons' within the United States." *Zadvydas*, 533 U.S. at 693. Accordingly, the Fifth Amendment "imposes constraints" on any process that deprives them of their liberty interests.[80] *Mathews*, 424 U.S. at 332. Plaintiffs have identified two such legitimate interests falling within that protection.

---

[79] Because Plaintiffs' claims are not within the substantive scope of the entry-fiction doctrine, it is somewhat of a distraction to argue about whether any class members might be (or might have been) impacted by it in other contexts. Nevertheless, the Court would be remiss not to point out that Defendants' misstatement of the law is striking.

Defendants argue that all "applicants for admission," defined as "'alien[s] present in the United States who ha[ve] not been admitted,'" lack a constitutional basis to make "due-process objections to removal." *See* Dkt. 231 at 29–30 (quoting 8 U.S.C. § 1231(a)(1)) ("When an illegal alien has never been admitted to this country by immigration officers, his constitutional status for due-process objections to removal is no different from an alien stopped at the border."). But that argument has been squarely and repeatedly rejected by the Supreme Court for more than 100 years, including in the very case Defendants misleadingly cite to suggest that "the Supreme Court has never held that aliens who have 'entered the country clandestinely' are entitled to such additional rights." Dkt. 231 at 29 (quoting *Yamataya v. Fisher*, 189 U.S. 86, 100 (1903) (*The Japanese Immigrant Case*)). To start, a 123-year-old citation purporting to show what the Supreme Court has "never held" should raise a red flag for any conscientious litigant or close reader. Indeed, in the intervening century-plus, the Supreme Court *has* held that "additional rights and privileges" apply for "those who are within the United States after an ***entry***, irrespective of its legality." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) (emphasis added); *see also Zadvydas*, 533 U.S. at 693 ("[O]nce an alien ***enters*** the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." (emphasis added)); *see also Thuraissigiam*, 591 U.S. at 105 (holding that an asylum-seeker could not raise a due process challenge to his expedited removal because he had not "effected an ***entry***" (emphasis added)); *Matter of Pierre et al.*, 14 I. & N. Dec. 467, 468 (B.I.A. 1973) (defining "entry" into the United States as "(1) a crossing into the territorial limits of the United States, i.e. physical presence; plus (2) inspection and admission by an immigration officer; or (3) actual and intentional evasion of inspection at the nearest inspection point; coupled with (4) freedom from restraint." (internal citations omitted)). And while the *Yamataya* Court did, in 1903, "[l]eav[e] on one side the question whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, *and who has been here for too brief a period to have become, in any real sense, a part of our population*"—a much more cabined construction than Defendants represent—the *Yamataya* Court also stated, in the same paragraph, that an "executive officer" could not "arbitrarily . . . cause an alien who has ***entered*** the country . . . , although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States" because "[n]o such arbitrary power can exist where the principles involved in due process of law are recognized." 189 U.S. at 101 (emphases added). In short, Defendants' suggestion that the entry-fiction doctrine, however conceived, applies to all class members who have never been admitted is wrong.

[80] For this reason, Defendants' repeated analogy to expedited removal continues to be a "red herring." *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 786 F. Supp. 3d at 234; *cf.* Dkt. 231 at 35–36. Expedited removal typically involves individuals "apprehended at or near the border" or who are denied admission at ports of entry, before due process rights attach. *See, e.g., Thuraissigiam*, 591 U.S. at 106–08.

## ii.    *Mathews* Factors

"Once it is determined that due process applies, the question remains what process is due."[81]  *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 66 (1st Cir. 2019) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  "To determine what process is constitutionally due, [courts] generally balance three factors":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (quoting *Mathews*, 424 U.S. at 335).  "Due process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews*, 424 U.S. at 334 (alteration omitted) (quoting *Morrissey*, 408 U.S. at 481).  However, "[n]otice and an opportunity to be heard have traditionally and consistently been held to be the essential requisites of procedural due process."  *Haidak*, 933 F.3d at 66 (quoting *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988)).

### (A)    Private Interest

Defendants do not dispute that the private interests at stake here are weighty.  *See* Dkt. 231 at 31–36.  Plaintiffs state that "[t]he predictability of the country of removal is critical because noncitizens make decisions about whether to fight removal and to seek relief or protection based on where they may be removed."  Dkt. 194 at 10.  As to the importance of fear-based relief, the Court recalls the case of Plaintiff O.C.G., who was denied the opportunity to seek protection from third-country removal and who, as a result, was forced to return to the very place an immigration

---

[81] Although the two liberty interests identified by Plaintiffs are arguably distinct, having different statutory bases, a single *Mathews* analysis is appropriate to test the sufficiency of Defendants' process with respect to third-country removal. *See, e.g.*, *Vitek v. Jones*, 445 U.S. 480, 488–95 (1980).

58

judge found, only days before, that he would likely be persecuted.[82]  *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 405.  O.C.G. has provided a glimpse of the personal toll:

> Just yesterday, O.C.G. submitted a declaration informing the Court of his current status.  He reports living in constant fear of his attackers, being unable to leave the place where he is staying, not being able to rely on the police to protect him, and not being able to see his mother for fear of exposing her to violence, among other hardships.

*Id.* at 407 (internal citations omitted).

For Plaintiffs, the availability of CAT relief can be a matter of life and death, and "of all that makes life worth living."  *See Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).  "To say more would be to paint the lily."  *Rodriguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 783 (1st Cir. 2025).  The Court weighs this factor heavily in Plaintiffs' favor.

### (B)    Risk of Erroneous Deprivation

Notwithstanding the importance of these interests, Defendants argue that "[t]he combination of the March Guidance and the procedures class members received in their prior immigration proceedings substantially eliminate the risk of an erroneous deprivation," which they argue is "further undermined by the high bar that Plaintiffs must meet in order to prevail on their potential fear claims."  Dkt. 231 at 32, 34.  Recognizing that Defendants' argument is essentially cumulative in nature, the Court takes each of these asserted risk-mitigating factors in turn.

---

[82] For an even more recent example of "chain refoulement," see Pranav Baskar & Hamed Aleaziz, *U.S. Deports Nine Migrants in Secret, Ignoring Legal Protections*, N.Y. Times (Feb. 14, 2026), https://www.nytimes.com/2026/02/14/world/africa/us-secret-deportation-cameroon.html  [https://perma.cc/FA6A-L3DP] ("Among those now in the [Cameroonian] compound are people who said they escaped imprisonment for their political beliefs, survived wars and fled countries where their sexual orientations are criminalized. . . . [T]he Cameroonian government has treated their deportation there as a matter of transit, urging them to go back to their home countries.").

**(1)** **Prior Immigration Proceedings**

To begin, "the procedures class members received in their prior immigration proceedings," *id.* at 32, are irrelevant because those proceedings necessarily excluded adjudication of third countries, *see Sadychov*, 565 F. App'x at 651–52 ("[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate to a country that nobody is trying to send them to." (internal quotation marks omitted)).[83] Defendants' argument is essentially that everybody gets their day in court and nothing more, which is fair enough as an aphorism but ignores that the law does not require—and indeed, does not permit—litigants to exhaust hypothetical, "unavailable" claims based on circumstances not yet in existence. *See Ross v. Blake*, 578 U.S. 632, 642–44 (holding that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end" or when "administrators thwart [claimants] from taking advantage of a grievance process through machination").

Defendants' recourse to "prior immigration proceedings" is especially concerning when one thinks prospectively: to avoid litigating CAT claims, DHS need only avoid having the actual country of removal designated during removal proceedings. That way, DHS gets to test the suitability of that country for removal through the less-rigorous March Guidance procedures, if it gets tested at all, while still being able to claim that the individual received "the panoply of procedural safeguards and protections available to them in their prior immigration proceedings." Dkt. 231 at 24. Previously, one could have found some comfort in the idea that the Government would not *intentionally* engage in this kind of gamesmanship because, at least as of

---

[83] *See also supra* pp. 23–25, 29–30.

March 24, 2025, it claimed to believe that late designations could not prevent fear-based claims.[84]

However, given the existence of the March Guidance, it defies logic to imagine that DHS would

not avail itself of this obviously less burdensome, if somewhat furtive, approach.

### (2)    The March Guidance

Turning to the March Guidance itself, it provides that DHS may remove a noncitizen

"without the need for further procedures" if he is to be removed to a "country [that] has provided

diplomatic assurances that aliens removed from the United States will not be persecuted or

tortured" and if the State Department finds such assurances to be credible.  Dkt. 43-1 at 2–3.  If

the noncitizen is to be removed to a country not covered by such assurances, ICE will "generally

wait at least 24 hours following service of the Notice of Removal before effectuating removal,"

except under certain "exigent circumstances."[85]  Dkt. 190-1 at 1.  ICE "will not affirmatively ask

whether the alien is afraid of being removed to the country of removal."  *Id.* (emphasis in original).

However, "[i]f the alien does affirmatively state a fear if removed to the country of removal listed

on the Notice of Removal, [ICE] ERO will refer the case to U.S. Citizenship and Immigration

Services (USCIS)."  *Id.* at 2 (emphasis in original).  USCIS will then "generally screen the alien

within 24 hours" and determine whether he "would more likely than not" be persecuted or tortured

---

[84] Transcript of Oral Argument at 33, *Riley*, 606 U.S. 259 (2025) (No. 23-1270) ("We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country.").

[85] As explained above, the Court treats the July Guidance as an implementation of the March Guidance and will generally refer to DHS's third-country-removal policies and procedures accordingly.  *See supra* note 19.

if sent to that country.[86]  *Id.*  If USCIS determines that there is no such likelihood of persecution or torture, the noncitizen is removed.  *Id.*  If USCIS determines that there is, it may either refer the case to the immigration courts or ICE can designate a new country of removal and start the process over again.  *Id.*

As such, the March Guidance mitigates *no* risk of a person's being unlawfully removed to a country other than as designated on their order of removal, *see* 8 C.F.R. § 1240.12(d) (providing that DHS may do so only where it is "unable" to effect removal to one of the designated countries), or contrary to the "four consecutive removal commands" of section 1231(b)(2), *see Jama*, 543 U.S. at 341.  Insofar as the March Guidance, on its face, not only fails to protect against but appears to contemplate and authorize this type of removal—and particularly given Defendants' insistence that such removal is lawful—the risk of erroneous deprivation of that right appears high.

Similarly, the March Guidance provides little, if any, protection from the erroneous deprivation of CAT claims.  Defendants argue that the March Guidance procedures functionally satisfy the substantive standard for extinguishing CAT claims based on diplomatic assurances, as prescribed by regulation, and thus it makes "no sense to require the government to provide additional process."  Dkt. 231 at 27 & n.4.  Put another way, Defendants argue that when, as a matter of law, they must ultimately win on the merits, Plaintiffs have no enforceable due process right to bring a claim.  Defendants are forced to make this argument categorically because "[t]he

---

[86] The Court focuses on the higher-order problems with the March Guidance.  Nevertheless, it bears mentioning that, even where the Guidance provides some noncitizens (only a subset) with notice and an opportunity to challenge third-country removal, it is still facially inadequate.  *See J.G.G.*, 604 U.S. at 673 (2025) ("[N]otice must be afforded within a reasonable time and in such a manner as will allow them to actually seek . . . relief in the proper venue before such removal occurs.").  On as little as 24 hours' notice (or six hours' notice in "exigent circumstances"), a noncitizen is expected to demonstrate full entitlement to their fear-based claim or, in other words, what would be expected of them in a full hearing on the merits.  *Compare* Dkt. 43-1 at 3, *with* 8 C.F.R. § 1208.16(b)(2), (c)(2) (requiring an applicant to show that she is "more likely than not" entitled to relief).  This is not "notice and opportunity to be heard 'appropriate to the nature of the case.'"  *See J.G.G.*, 604 U.S. at 673 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions." *Gonzalez-Fuentes*, 607 F.3d at 894 (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978)). "A right to seek relief is analytically separate and distinct from a right to the relief itself." *Arevalo v. Ashcroft*, 344 F.3d 1, 15 (1st Cir. 2003) (citing, inter alia, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). Thus, it would be insufficient for Defendants to say that, in the mine-run of cases, the Government will win. Rather, Defendants' position must be that the Government will always win.

But Defendants are wrong on the merits and thus cannot pre-extinguish Plaintiffs' CAT claims by workaround. Read in its proper context, as well as in isolation, the regulation does not permit generalized, country-wide, "blanket" assurances, as provided in the March Guidance.[87] The relevant regulation states that "assurances . . . from the government of a specific country that *an* alien would not be tortured there if *the* alien were removed to that country," 8 C.F.R. § 208.18(c)(1) (emphases added), when found by the Executive to be "sufficiently reliable to allow *the* alien's removal to that country consistent with Article 3 of the Convention Against Torture," *id.* § 208.18(c)(2) (emphasis added), conclude consideration of "*the* alien's" CAT claim, *id.* § 208.18(c)(3) (emphasis added). In turn, Article 3 of the Convention Against Torture states:

---

[87] *Cf.* Dkt. 231 at 27 n.4 (arguing otherwise).

> 1.      No State Party shall expel, return (*refouler*) or extradite *a person* to another State where there are substantial grounds for believing that *he* would be in danger of being subjected to torture.
>
> 2.      For the purpose of determining whether there are such grounds, the competent authorities shall take into account *all relevant considerations* including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 [hereinafter Art. 3] (emphases added).

Beginning with the text of the regulation itself, it repeatedly refers in the singular to "*an* alien" whom the foreign government may assure will not be tortured if "*the* alien" is removed there. 8 C.F.R. § 208.18(c)(1) (emphases added); *cf. Niz-Chavez v. Garland*, 593 U.S. 155, 161–62 (2021) (concluding that the indefinite article "a" indicates "[t]o an ordinary reader" a singular referent). Defendants argue that an assurance that "*an* alien" will not be tortured leaves DHS "free to conclude" that "*no* alien would be treated that way." Dkt. 231 at 27 n.4 (emphases added). However, this reading does not account for the regulation's second use of the singular, paired with a *definite* article. *See* 8 C.F.R. § 208.18(c)(1) (referring to "assurances . . . that an alien would not be tortured there if *the* alien were removed to that country" (emphasis added)). "[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000) (quoting *Brooks v. Zabka*, 168 Colo. 265, 269 (1969) (en banc)); *cf. Corner Post*, 603 U.S. at 817 (linking "*the* plaintiff" with "this particular plaintiff" (emphasis in original) (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016))).

"Nor is this the only contextual clue before us." *Cf. Niz-Chavez*, 593 U.S. at 163. CAT Article 3, with which any assurance must be "consistent," 8 C.F.R. § 208.18(c)(2), likewise refers

in the singular to the duty owed by a state to "*a person*" should "*he*" be in danger, Art. 3 (emphases added).[88]  More fundamentally, Article 3 requires signatories to "take into account all relevant considerations" when evaluating the possibility of torture.  Art. 3.  Importantly, under CAT, torture can include harm "inflicted by private parties," even where the receiving government might not have actual knowledge of the torturous conduct.[89]  *Murillo Morocho v. Garland*, 80 F.4th 61, 67 (1st Cir. 2023).  While a government could theoretically promise, in the abstract, not to commit torture, it cannot plausibly rule out private torture—"tak[ing] into account all relevant considerations," Art. 3—without knowing at least the *name* of the person whom it is purportedly pledging to protect, let alone the individualized risks they might face.  Thus, reading 8 C.F.R. § 208.18(c) as requiring individualized assurances not only follows from the text but saves the regulation from absurdity.

Concomitantly, it follows that there must be an "individualized determination" that the foreign assurances are sufficient.[90]  *Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 258 (3d Cir. 2008).  Starting with the text, the regulation again refers to a singular "alien," alongside the definite article.  *See* 8 C.F.R. § 208.18(c)(2) (providing that the Executive "shall determine . . . whether the assurances are sufficiently reliable to allow *the alien's* removal to that country" (emphasis added)).  Thus, the same textual arguments apply and recommend a similar conclusion.  *See Niz-Chavez*, 593 U.S. at 162; *Am. Bus Ass'n*, 231 F.3d at 4–5.

---

[88] The Supreme Court has instructed that "courts should be most cautious before interpreting . . . domestic legislation in such manner as to violate international agreements," lest the United States lose "the benefits of international accords" and its "role as a trusted partner in multilateral endeavors."  *See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 539 (1995).

[89] In this context, private parties can include third-party foreign state actors, including as a result of "chain refoulement."  *See supra* pp. 26–27 and note 82.

[90] As they have distinct textual and logical bases, one could theoretically imagine a version of the regulation that required an individualized determination but not individualized assurances.  To be clear, the Court reads these as separate requirements, independently mandated.

65

In *Khouzam v. Attorney General*, 549 F.3d 235, the Third Circuit not only held that the regulation required an individualized determination as to the reliability of diplomatic assurances, *see id.* at 254–55, but that a noncitizen has a due process right to challenge the reasoning and evidence behind that determination, *id.* at 259 ("The alien must have an opportunity to present, before a neutral and impartial decisionmaker, evidence and arguments challenging the reliability of diplomatic assurances proffered by the Government, and the Government's compliance with the relevant regulations.").[91] The petitioner, Khouzam, was a Coptic Christian who had been granted CAT relief from Egypt. *Id.* at 238–40. Three years later, Khouzam was detained at an ICE check-in, and his attorney was sent a summary letter stating that DHS had "credited as sufficiently reliable . . . diplomatic assurances received by the Department of State from the Government of Egypt that . . . Mr. Khouzam[] would not be tortured if removed there" and that DHS had therefore terminated Khouzam's CAT relief. *Id.* at 240. DHS confirmed, however, that it would not remove Khouzam before a date certain, roughly four months away. *Id.*

Under these circumstances, the Third Circuit called it "obvious that Khouzam was not afforded notice and a full and fair hearing prior to his imminent removal on the basis of diplomatic assurances" and "conclud[ed] that the Government terminated Khouzam's deferral of removal without constitutionally sufficient process":

> First, the Government failed to make any factfinding based on a record that was disclosed to Khouzam. . . . Second, Khouzam had no opportunity to make arguments on his own behalf. . . . Finally, we also find that Khouzam was denied his right to an individualized determination.

*Id.* at 257–58.

---

[91] It is unsurprising that, aside from *Khouzam*, there is a dearth of case law on diplomatic assurances under FARRA. In 2011, the DHS Inspector General reported that there had only ever been four DHS assurances cases: three Rwandan nationals, whom the DHS Secretary had not yet decided whether to remove, and an Egyptian national, presumably Khouzam. *See* U.S. Dep't of Homeland Sec., Office of Inspector Gen., OIG-11-100, *DHS Detainee Removals and Reliance on Assurances* 14–15 (2011).

It is remarkable to recognize that Khouzam received significantly *more* process in 2007 than he would now under the March Guidance. Khouzam was notified of the circumstances more than *four months* in advance. *Id.* at 240. Indeed, that notice is what gave him the opportunity to properly seek relief in the court of appeals via a petition for review.[92] *See id.* at 245–49.

This Court need not even go as far as did the *Khouzam* court to find the March Guidance procedurally insufficient. The March Guidance provides *no* notice to a noncitizen that his prospective CAT claim has been foreclosed by purported diplomatic assurances. Thus, he is not only cut off from challenging "the Government's reasons for crediting [the] assurances" before a "neutral and impartial decisionmaker," as the *Khouzam* court found was constitutionally required. *Cf. id.* at 257–58. Rather, under the March Guidance, a noncitizen lacks even the chance to clarify whether the purported diplomatic assurances *exist*. Existential challenges to diplomatic assurances could conceivably take several valid forms. For example, a noncitizen might reasonably question whether the purported assurance exists *at all*—*i.e.*, make the Government show at least some valid

---

[92] Defendants argue that *Khouzam* supports their position because the Third Circuit also held that the district court lacked jurisdiction over a parallel habeas petition which made similar arguments (and which was consolidated with the petition for review upon appeal). *See* Dkt. 231 at 26–27 n.3 (citing *Khouzam*, 549 F.3d at 244–45). This misses the point. Plaintiffs cannot file, and have not filed, any "cause or claim under [CAT]," 8 U.S.C. § 1252(a)(4), precisely because Defendants have adopted a policy that blocks the creation of (and thus the review of) an administrative record on which such claims could be based. *Cf.* 549 F.3d at 245 (holding that the district court lacked jurisdiction because the petitioner "challenge[d] the Government's termination of his deferral of removal based on diplomatic assurances"); *see also McNary*, 498 U.S. at 496 (finding a similar result "most unlikely").

To illustrate, imagine if there were a statute that withdrew courts of appeals' jurisdiction to hear challenges to criminal sentences based on the length of the sentence but simultaneously granted criminal defendants a right to appeal any sentence "of more than ten years" directly to the Supreme Court. (To make this constitutional, presumably, any district court sentence could be reviewed by the Supreme Court upon a writ of certiorari.) Now, imagine that a district court sentenced a defendant to prison "until further order of the Court." That defendant would *not* have a right to directly appeal their sentence to the Supreme Court because it is not a sentence "of more than ten years." However, he *would* be able to seek review in a court of appeals based on the district court's procedural failure to assign a duration to his sentence. That appeal would be permissible both because it would not be a challenge based on the length of his sentence and because the district court's action would otherwise deprive him of the opportunity to appeal his sentence to the Supreme Court (if it ultimately meets the durational element). Likewise, here, Defendants have foreclosed noncitizens' ability to seek review of any CAT claim by withholding all of the jurisdictionally relevant information. Review of that deprivation is fundamentally unlike a challenge to the "termination of [CAT relief]," as addressed in *Khouzam*, 549 F.3d at 245, and properly belongs in the district court as review of agency action.

evidence demonstrating that the purported assurance is real (if not the actual assurance itself, reduced to some form of writing).  Alternatively, one might reasonably question whether, as a matter of law, a given assurance is "consistent with Article 3 of the Convention Against Torture," credited or not.[93]  *See* 8 C.F.R. § 208.18(c)(2).

Adjudicating such claims would not require courts to "second-guess" the Executive's judgment.  *Cf. Munaf v. Geren*, 553 U.S. 674 (2008).  Again, Defendants' argument is essentially that, under the March Guidance, the Government is predestined to win on *any* third-country CAT challenge, such that it "makes no sense" to allow noncitizens to raise such claims in the first place. Dkt. 231 at 27.  But it is easy to imagine purely legal challenges that implicate no executive judgment.  For example, if a country were to (reliably, from the Executive's point of view) assure the United States that it would "do no worse to an individual removed there than force him to work in a hard labor camp," the sufficiency of that assurance would present a question of law, not judgment, for an immigration court and, ultimately, for a court of appeals to determine: would forcing the individual to work in a "hard labor camp" constitute "torture" under CAT, such that the assurance, even properly credited, fails to satisfy 8 C.F.R. § 208.18(c)?[94]

The point is sufficiently made because the mere existence of plausible, viable CAT claims defeats Defendants' argument that the March Guidance, in and of itself—absent any way of verifying whether or how that Guidance is being followed—satisfies due process.  Yet, to

---

[93] Of course, as with the pre-removal decision regarding a noncitizen's risk of persecution, required under section 1231(b)(3), it is difficult to imagine how any individualized determination could be meaningful without input from the noncitizen himself.  *Cf. supra* Section III(B)(4)(a).  In *Khouzam*, the petitioner's oppressed religious beliefs were at least already a matter of record.  *See* 549 F.3d at 238–40.  But in many cases, DHS will simply not have the relevant information, either because that information has changed or because it was not part of the original proceedings.

[94] It appears that the answer is generally that it depends.  *See, e.g.*, *Ke Da Fu v. Holder*, 447 F. App'x 780, 782 (9th Cir. 2011) ("The generally harsh and degrading conditions in Chinese prisons and labor reeducation camps do not in and of themselves constitute torture.").

appreciate the very broad swath of claims that would be lost, and thus the weight this factor bears under the *Mathews* analysis, it is necessary to go further and push back on Defendants' claim that, "when the Executive determines a country will not torture a person on his removal, that is conclusive." Dkt. 231 at 26 (first citing *Munaf*, 553 U.S. at 702–03; and then citing *Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009), *cert. denied*, 559 U.S. 1005 (2010)).

To begin, the claim is demonstrably, obviously wrong. The Executive routinely "determines a country will not torture a person on his removal." *See id.* This happens every time an immigration court denies CAT relief. *See* 8 U.S.C. § 1101(b)(4) ("The term 'immigration judge' means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review."). Those decisions are not, as Defendants claim, "conclusive." *See* Dkt. 231 at 26. Rather, they are reviewable, by Congressional mandate, in courts of appeal. 8 U.S.C. § 1252(a)(4). Indeed, there they are routinely reviewed for procedural and substantive errors. *See, e.g.*, *Fleurimond v. Bondi*, 157 F.4th 1, 6 (1st Cir. 2025) (remanding CAT claim for further consideration).

The availability of CAT relief to every member of the class immediately distinguishes their situation from the unsuccessful habeas petitioners in *Munaf* and *Kiyemba*. Neither of those cases involved removal in the immigration context. Indeed, both feature unusual and inapposite facts: *Munaf* concerned American citizens who were detained by a U.S.-led, "international coalition" in Iraq pending Iraqi prosecution for violating Iraqi law, 533 U.S. at 679–80; *Kiyemba* concerned wartime detainees, held at Guantanamo Bay, with "no cognizable interest against being moved . . . to a foreign country," *Doe v. Mattis*, 889 F.3d 745, 762 (D.C. Cir. 2018) (distinguishing *Kiyemba*, 561 F.3d at 515–16). Both the Supreme Court and D.C. Circuit explicitly distinguished circumstances where FARRA might apply. In *Munaf*, the Supreme Court was careful to clarify

69

that no claim had been raised under CAT and expressed "no opinion" as to the hypothetical viability of such claims. 553 U.S. at 703 & n.6. Notably, to the extent the *Munaf* Court expressed any doubt about the facial viability of potential CAT claims, their focus was on whether FARRA applied to "the [intra-country] transfer of an individual located in Iraq to the Government of Iraq" and whether a CAT claim could be asserted in habeas proceedings, rather than on the Executive's supposed predetermination of the issue. *See id.* In *Kiyemba*, the D.C. Circuit focused on the same, concluding that a group of petitioners could not raise CAT claims in habeas. 561 F.3d at 514–15. Of course, Plaintiffs here would not be raising CAT claims in habeas proceedings but, as the *Kiyemba* court said they must, in immigration proceedings, *see id.*, if only Defendants would tell them where they are going.

The Court has lingered on these two cases because Defendants raise them, but that should not be mistaken for affirming their relevance. Neither *Munaf* nor *Kiyemba* supports the argument Defendants are implicitly making, and that the Third Circuit explicitly rejected in *Khouzam*: "that [CAT claims] are non-justiciable under the so-called 'rule of non-inquiry'":

70

When it applies, this doctrine bars courts from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters. *See Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006). However, it has traditionally been applied only in the extradition context. *See, e.g.*, *Mironescu v. Costner*, 480 F.3d 664, 668–70 (4th Cir. 2007); *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005); *Hoxha*, 465 F.3d at 563; *United States v. Kin-Hong*, 110 F.3d 103, 111 (1st Cir. 1997); *In re Smyth*, 61 F.3d 711, 714 (9th Cir. 1995); *In re Howard*, 996 F.2d 1320, 1329 & n. 6 (1st Cir. 1993); *In re Manzi*, 888 F.2d 204, 206 (1st Cir. 1989). In fact, we routinely evaluate the justice systems of other nations in adjudicating petitions for review of removal orders. *See, e.g.*, [*Pierre v. Att'y Gen. of U.S.*, 528 F.3d 180, 186–90 (3d Cir. 2008)]; *Auguste v. Ridge*, 395 F.3d 123, 129, 152–54 (3d Cir. 2005); *Chang v. INS*, 119 F.3d 1055, 1060–68 (3d Cir. 1997). The Second Circuit did as much in 2004 when it found that Khouzam was likely to be arrested and tortured if removed to Egypt. [*Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004)]. Furthermore, we have expressly reserved the possibility that, even in the extradition context, the rule of non-inquiry would not apply if an alien raises a CAT claim. *Hoxha*, 465 F.3d at 564–65. The Fourth Circuit has held that it does not. *Mironescu*, 480 F.3d at 670–73.

549 F.3d at 253–54.

The Executive's own past statements about its obligations under FARRA provide "one more reason yet to question whether [Defendants'] current position represents the best view of the law." *See Bittner v. United States*, 598 U.S. 85, 97 (2023) ("[C]ourts may consider the consistency of an agency's views when . . . weigh[ing] the persuasiveness of any interpretation it proffers in court."). Starting in 1999, when the Department of Justice announced FARRA's regulations, it referred to "rare" "cases" (rather than whole countries) where assurances might be relied upon and stated that such "cases . . . will receive consideration at senior levels within the Department of Justice, which is appropriate to the delicate nature of a diplomatic undertaking to ensure that *an alien* is not tortured in another country."[95] Then, in 2005, then-Attorney General Gonzales was asked by the Senate Judiciary Committee whether he "really" believed that "the assurances we get from countries that are known to be torturers . . . are credible" and answered that it "requires . . . a

---

[95] *Regulations Concerning the Convention Against Torture*, 64 Fed. Reg. 8478, 8484 (Feb. 19, 1999).

case-by-case analysis."[96] Then, in 2011, the DHS Inspector General published a report on the Government's practices with respect to diplomatic assurances under CAT and stated that there "appear[ed] to be a consensus within DHS that assurances need to be fact-specific"; that "[b]y their nature, assurances are fact-dependent and ad hoc"; that "[c]onsequently, DHS approaches them on an ad hoc basis"; and that "the risk analysis as to likelihood of torture in light of assurances depends on various factors," including "the reasons the *particular alien* would be at risk of torture."[97] To put an even finer point on it, the DHS Inspector General reported: "The consensus was that assurances need to be and are case specific, not country specific."[98]

In sum, the March Guidance extinguishes valid challenges to third-country removal by effecting removal before those challenges can be raised.[99] And Defendants' fatalistic argument—that those claims would necessarily fail—is wrong. The March Guidance does nothing to safeguard claims against violations of section 1231(b)(2) and its regulations. And with respect to CAT claims, the best one could say is that it is insufficient.

### (3) The "High Bar" to Relief

More generally, Defendants argue that the risk of erroneous deprivation is "undermined by the high bar that Plaintiffs must meet in order to prevail on their potential fear claims." Dkt. 231 at 34. This is a breathtaking argument—that, because the bullseye is small, there is nothing wrong

---

[96] *Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 10 (2005) (first quoting Senator Patrick Leahy).

[97] *DHS Detainee Removals and Reliance on Assurances*, *supra* note 91, at 1, 5, 20 (emphasis added).

[98] *Id.* at 20. Further demonstrating that the assurances themselves are meant to be specific to the individual, the DHS Inspector General reported that "[t]he Department of State would not approach a country about assurances until the alien ha[d] been granted CAT protection." *Id.* at 14. By contrast, Defendants now assert that they may seek assurances before they even know who will be impacted.

[99] Although the Court has already settled the issue of statutory withholding, *see supra* Section III(B)(4)(a), it bears mentioning that there is no legal basis whatsoever to pre-extinguish those claims with diplomatic assurances. *See* 8 U.S.C. § 1231(b)(3)(C) (requiring that a "trier of fact shall determine whether the alien has sustained the alien's burden . . . in the manner described in [8 U.S.C. § 1158(b)(1)(B)(ii)–(iii), concerning asylum applications]").

with stealing the archer's bow.  While Defendants are undoubtedly correct that the standard for CAT claims is exacting, *see, e.g.*, *Settenda v. Ashcroft*, 377 F.3d 89, 96 (1st Cir. 2004) (affirming denial of CAT relief predicated on "alarming . . . prison conditions in Uganda" because those conditions were the result of "inadequate funding" rather than an "'inten[t] to inflict severe physical or mental pain or suffering'" (quoting 8 C.F.R. § 208.18(a)(5))), "[t]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions," *Gonzalez-Fuentes*, 607 F.3d at 894 (quoting *Carey*, 435 U.S. at 266). "This means that courts should take . . . , 'an *ex ante* perspective on the right to due process hearings.'" *Id.* (quoting *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 944 (10th Cir. 2003)). The simple reality is that nobody knows the merits of any individual class member's claim because Defendants are withholding the predicate fact: the country of removal.

Overall, Defendants' risk-of-erroneous-deprivation arguments favor quantity over quality. Plaintiffs' prior process as to different countries of removal is irrelevant, and it is no defense to a procedural due process claim that the underlying right is difficult to vindicate.  The March Guidance is inadequate as to CAT claims and offers no protection against Defendants' violating Plaintiffs' rights to be removed, in the first instance, pursuant to their order of removal—indeed, it appears to explicitly condone such violations.  Under these circumstances, the Court considers the risk of erroneous deprivation to be high and likewise weighs this factor in Plaintiffs' favor.

### (C)    <u>Government's Interest</u>

Finally, the Court considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *See Mathews*, 424 U.S. at 335.  Defendants correctly highlight that the Government has a "weighty" interest in the "efficient administration of the immigration laws," particularly since "control over matters of immigration is a sovereign prerogative." *Plasencia*, 459 U.S. at 34.

73

Of course, the Government's interest in efficiency is tempered by the stark realities of torture, in which it has no legitimate interest. Indeed, militating somewhat in the opposite direction, Congress has expressed a specific interest in avoiding such results, even where it might not necessarily be convenient:

> It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.

Pub. L. No. 105–277, § 2242(a). Congress has further substantiated its interest in not abetting torture by mandating relief where appropriate. *Moncrieffe*, 569 U.S. at 187 n.1. Defendants admonish that "the Due Process Clause . . . does not extend to impos[e] procedures that merely displace congressional choices of policy." Dkt. 231 at 32 (quoting *Plasencia*, 459 U.S. at 34–35). Yet, it does not honor "congressional choices of policy," *id.*, to exploit a statute's silence to extinguish its purpose.

Admitting these reservations, the Court recognizes that the Government has some interest in streamlining the process by which noncitizens challenge third-country removals. The practical difficulties in facilitating deportation, with which courts have limited experience, are real and, when insurmountable, can lead to a noncitizen's becoming paradoxically "removable-but-unremovable." *Jama*, 543 U.S. at 347. And even where removal is ultimately achieved, prolonged proceedings may strain limited government resources.

"But the Constitution recognizes higher values than speed and efficiency." *Stanley v. Illinois*, 405 U.S. 645, 656 (1972). "Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." *Id.*

74

Accordingly, although the "establishment of prompt efficacious procedures to achieve legitimate . . . ends is a proper [governmental] interest worthy of cognizance in constitutional adjudication," *id.*, the Court finds the liberty interests at stake here too weighty and the risk of their erroneous deprivation too great. On balance, the *Mathews* factors weigh in Plaintiffs' favor.

## IV.    **Remedy**

As judgment, Plaintiffs seek declaratory relief and vacatur of the March Guidance.[100] Dkt. 193. Merits aside, Defendants do not dispute that a declaration of the parties' rights and obligations is generally available as a remedy for this type of claim.[101]  *See* Dkt. 231 at 38.

As to vacatur, Defendants argue that it runs afoul of the remedial limitation in section 1252(f)(1)—which removes courts' "authority to enjoin or restrain" the "operation of" certain immigration statutes "other than with respect to . . . an individual alien," 8 U.S.C. § 1252(f)(1)—because, according to Defendants, vacatur is "still coercive." Dkt. 231 at 38.

---

[100] Plaintiffs requested that the Court enter partial final judgment on Counts I, III, and IV, upon which they moved for summary judgment. Dkt. 193 at 1–2. However, because all claims are now resolved, the Court will enter complete and final judgment. In their complaint, Plaintiffs also request costs and reasonable attorney fees. Compl. at Prayer for Relief ¶ (n). Any such request should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

[101] In a footnote, Defendants state their belief that declaratory relief must be "properly crafted—that is, . . . not compel or purport to compel the government to operate the covered provisions in a particular way." Dkt. 231 at 38 n.7 (citing Supp. Br. For The Petitioners, *Biden v. Texas*, 597 U.S. 785, at 11–13, 22 (May 9, 2022) (No. 21-954)). In general, "arguments raised only in a footnote or in a perfunctory manner are waived." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). In this case, Defendants' implied argument also fails on the merits. In *Biden v. Texas*, the Government took the position (which Defendants now incorporate by reference) that section 1252(f)(1) barred certain "class-wide declaratory relief," including where the class consisted of "noncitizens in removal proceedings." *See* Supplemental Brief for the Petitioners, *Biden v. Texas*, 597 U.S. 785, at 13–14 (May 9, 2022) (No. 21-954). "If such relief were permissible," the Government argued, "'every single member of the class' could, and potentially would, 'immediately seek an injunction grounded on the authority of the declaratory judgment'—even before appellate proceedings had concluded." *Id.* (quoting *Alli v. Decker*, 650 F.3d 1007, 1020 n.2 (3d Cir. 2011) (Fuentes, J., dissenting)). The Supreme Court did not adopt the argument. *See Biden v. Texas*, 597 U.S. at 798 (holding that section 1252(f)(1) applied only to a "specific category of remedies" and stating that the provision's "title—'Limit on injunctive relief'—makes clear the narrowness of its scope"). The First Circuit has, moreover, squarely rejected it. *Brito v. Garland*, 22 F.4th 240, 251–52 (1st Cir. 2021).

Defendants' argument ignores the plain text of the statute, which specifically and exclusively refers to courts' "authority to *enjoin* or *restrain*." 8 U.S.C. § 1252(f)(1) (emphases added). "The most sensible way to give operative effect to both words in this statutory scheme is to treat the word 'enjoin' as referring to permanent injunctions and the word 'restrain' as referring to temporary injunctive relief." *Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003). "Congress . . . included that language in a provision whose title—'Limit on injunctive relief'—makes clear the narrowness of its scope." *Biden v. Texas*, 597 U.S. 785, 798 (2022); *see also Brito*, 22 F.4th at 251–52 (distinguishing more expansive language in the statute) ("In so holding, we reach the unremarkable conclusion that Congress meant only what it said – and not what it did not say.").[102]

Defendants' functional argument fares no better, as it ignores the "meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *See Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). Vacatur "act[s] directly against the challenged agency action," *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring) (quoting J. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018)), whereas "'an injunction is a judicial process or mandate operating *in personam*' . . . directed at someone, and govern[ing] that party's conduct," *Nken v. Holder*, 556 U.S. 418, 428 (2009) (quoting *Black's Law Dictionary* 800 (6th ed. 1990)). "Apart from the constitutional or statutory basis on which the

---

[102] In *Brito v. Garland*, 22 F.4th 240 (1st Cir. 2021), the First Circuit held that 1252(f)(1) does not preclude declaratory relief. *Id.* at 250–52. This is notable because declaratory judgment suits are "essentially an equitable cause of action . . . analogous" to causes of action historically available in chancery courts. *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943). Thus, the *Brito* court found that section 1252(f)(1)—which again is titled "Limit on injunctive relief"—distinguishes among types of *equitable* relief, of which it held "injunctive relief" was the only relevant subset. *See* 22 F.4th at 251 (contrasting section 1252(f)(1) with section 1252(e)(1), which prohibits, with respect to expedited removal orders, "declaratory, injunctive, *or other equitable relief*" (emphasis added) (quoting 8 U.S.C. § 1252(e)(1)). By contrast, vacatur, though also a creature of statute in its modern form, has its roots in the "use of the so-called prerogative writs," *Norton*, 542 U.S. at 63, historically available not in equity but at law, *see* S.A. de Smith, *The Prerogative Writs*, 11 Cambridge L.J. 40, 52 (1951). Thus, even if one were to read section 1252(f)(1) to disallow all equitable remedies—contrary to *Brito*—vacatur would still be permitted.

court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Texas*, 40 F.4th at 220. Thus, it need not inspire the same concern as to separation-of-powers or enforcement.

Accordingly, the Court will issue declaratory relief and vacate the March Guidance as "not in accordance with law." 5 U.S.C. § 706(2)(A).

## V. Stay

Defendants ask the Court to stay judgment pending appeal. Dkt. 231 at 24. The Court will grant Defendants' request in narrow part and stay its judgment for fifteen days. In that time, Defendants will have the opportunity to move for further stay in the First Circuit.

Under normal circumstances, the Court would be hard-pressed to justify granting Defendants' request. "A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result.'" *Nken*, 556 U.S. at 427 (internal citation omitted) (first quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam); and then quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)). The relevant factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The last two factors "merge when the Government is the opposing party." *Id.* at 435.

The Court does not find here that the law favors Defendants, as set forth with exhaustion above. Likelihood of success is the "sine qua non" of the stay standard. *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) (quoting *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)). That might end the inquiry.

Yet, the Court is forced to wrestle with the fact that the Supreme Court did previously stay the preliminary injunction, relying on the same *Nken* factors, presumably weighing likelihood of success, though on different claims and seeking different relief. *See D.V.D. II.*, 145 S. Ct. at 2153. Ultimately, this Court could be missing something in the final analysis. However, at this juncture, the Court cannot say that Defendants have "made a strong showing that [they] [are] likely to succeed on the merits." *Nken*, 556 U.S. at 434.

In some broad sense, one could say that Defendants will be injured absent a stay. "'Any time' that the Government is 'enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 4 (2025) (Kavanaugh, J., concurring) (internal quotation marks omitted) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 835 (2025)).

Of course, in this instance, there is no injunction, so the Government will not be "enjoined." *Cf. id.* And the Government "cannot suffer harm" from "merely end[ing] an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Nevertheless, the Court views this factor with a broad eye, particularly given the Government's "weighty" interest in the "efficient administration of the immigration laws." *See Plasencia*, 459 U.S. at 34.

As to the final two factors, the Supreme Court has recognized a general tension between the public's interests "in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," and, conversely, in the "prompt execution of removal orders." *See Nken*, 556 U.S. at 436. In this litigation, Defendants have argued that this tension breaks in their favor because the case involves "some of the worst of the worst illegal aliens in this country." Brief for Appellants at 2, *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-1393 (1st Cir. July 10, 2025).

But Defendants' incendiary gloss—focused on those class members whose "countries of origin are . . . unwilling to take them back," *id.* at 3—ignores a different subset: those who were previously granted protection from being sent back to their home countries. From the beginning, DHS's third-country removal policy has targeted these individuals, many of whose personal characteristics make them targets of persecution and oppression around the globe. Indeed, the starting point for this entire case was DHS's February Directive, which featured a section titled, "Aliens Granted Withholding of Removal or CAT Protection," and directed officers to determine whether noncitizens "granted such protections . . . should be re-detained" for third-country removal. Dkt. 1-4 at 2.

An account of nine such class members, deported to Cameroon in January, was reported just days ago:

> Among those now in the [Cameroonian] compound are people who said they escaped imprisonment for their political beliefs, survived wars and fled countries where their sexual orientations are criminalized. When officials from the United Nations' International Organization of Migration, which is handling their cases, visited, the deportees say the officials told them there was no support for them to receive asylum in Cameroon. They felt that their sole option was to return to their home countries.
>
> . . .
>
> Many of those deported in Cameroon said going back would be life-threatening. A 32-year-old woman from Ghana who fled persecution for her sexual orientation said she came to the U.S. for protection, because she has faced murder threats from members of her family and community. She added the Cameroonian government has treated their deportation there as a matter of transit, urging them to go back to their home countries.

Pranav Baskar & Hamed Aleaziz, *U.S. Deports Nine Migrants in Secret, Ignoring Legal Protections*, N.Y. Times (Feb. 14, 2026), https://www.nytimes.com/2026/02/14/world/africa/us-secret-deportation-cameroon.html [https://perma.cc/FA6A-L3DP]. "Their lawyers said none of the deportees had any history of violent crime." *Id.*

79

Of course, to witness this point, the Court need have looked no further than Plaintiff O.C.G., who likewise has no known criminal history, and who was granted withholding of removal from Guatemala based on sexual violence he experienced there. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d at 405. In response to his being granted that protection, Defendants threw him on a bus to Mexico, where he had just been raped, and where he was quickly sent back to Guatemala, the place an immigration judge had just found he would likely be persecuted. *Id.* And then Defendants lied about it. *Id.*

Under these extraordinary circumstances, the Court will exercise its discretion and stay the judgment for fifteen days to allow the First Circuit time to decide if a further stay is warranted.

## VI.  <u>Conclusion</u>

For the foregoing reasons, the April 18, 2025 preliminary injunction, Dkt. 64, is DISSOLVED. Defendants' motion to dismiss is GRANTED in part. Counts II and III are DISMISSED. Counts V and VI, including all claims against Defendant Antone Moniz, are DISMISSED without prejudice. Plaintiffs' motion for summary judgment against the remaining Defendants is GRANTED as to Counts I and IV. Judgment will enter for Plaintiffs as follows:

1. The Court DECLARES that 8 C.F.R. § 1240.12(d) requires Defendants, before effecting removal of a class member to any third country, to first seek removal to that class member's designated country of removal or specified alternative country or countries of removal, as provided in that class member's final order of removal.

2. The Court DECLARES that 8 U.S.C. § 1231(b) requires Defendants, before effecting removal of a class member pursuant to 8 U.S.C. § 1231(b)(2)(E), to first seek removal to that class member's designated country of removal or country or countries of citizenship, if any.

Appx.574

3. The Court DECLARES that class members have the right to meaningful notice before removal to any third country.

4. The Court DECLARES that class members have the right to a meaningful opportunity to raise a country-specific claim against removal before removal to any third country.

5. The Court DECLARES that Defendants' third-country removal policy, as embodied in DHS's March 30, 2025 memorandum, titled "Guidance Regarding Third Country Removals," and ICE's July 9, 2025 memorandum, titled "Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)," is unlawful and SETS ASIDE that policy.

6. This JUDGMENT is STAYED until fifteen days from date of issuance or until the First Circuit rules on any motion for an administrative stay or stay pending appeal, whichever occurs first.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated: February 25, 2026                    Judge, United States District Court

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| D.V.D., et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY, et al.,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.
25-10676-BEM

## FINAL JUDGMENT

**MURPHY, J.**

For the reasons stated in the Court's Memorandum and Order on Defendants' Motion to Dismiss and on Plaintiffs' Motion for Partial Summary Judgment, Dkt. 241, it is hereby ORDERED, ADJUDGED, and DECREED:

1. Judgment is ENTERED as to Counts I and IV in favor of Plaintiffs D.V.D., M.M., E.F.D., and O.C.G., individually and on behalf of all individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the Immigration and Nationality Act (including withholding-only proceedings) whom the Department of Homeland Security has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

2. The Court DECLARES that 8 C.F.R. § 1240.12(d) requires Defendants, before effecting removal of a class member to any third country, to first seek removal to that class

Appx.576

member's designated country of removal or specified alternative country or countries of removal, as provided in that class member's final order of removal.

3.    The Court DECLARES that 8 U.S.C. § 1231(b) requires Defendants, before effecting removal of a class member pursuant to 8 U.S.C. § 1231(b)(2)(E), to first seek removal to that class member's designated country of removal or country or countries of citizenship, if any.

4.    The Court DECLARES that class members have the right to meaningful notice before removal to any third country.

5.    The Court DECLARES that class members have the right to a meaningful opportunity to raise a country-specific claim against removal before removal to any third country.

6.    The Court DECLARES that Defendants' third-country removal policy, as embodied in DHS's March 30, 2025 memorandum, titled "Guidance Regarding Third Country Removals," and ICE's July 9, 2025 memorandum, titled "Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)," is unlawful and SETS ASIDE that policy.

7.    This JUDGMENT is STAYED until fifteen days from date of issuance or until the First Circuit rules on any motion for an administrative stay or stay pending appeal, whichever occurs first.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated: February 25, 2026                Judge, United States District Court

2

# Exhibit A

# DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2.     The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of this information.

3.     The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that allowing the District Court's February 25, 2026, order (the "Order") to take effect while the appeal of that Order is pending before the First Circuit will cause significant and irreparable harm to U.S. foreign policy.

4.     The District Court's Order set aside the Department of Homeland Security's March 30, 2025 memorandum, titled "Guidance Regarding Third Country Removals," and Immigration and Customs Enforcement's July 9, 2025 memorandum, titled "Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153 (U.S. June 23, 2025)."

5.     Under these policies, the Department of Homeland Security ("DHS") can remove an alien to a third country without further procedures if the United States has obtained diplomatic

Appx.579

assurances that the aliens will not be persecuted or tortured and if the Department of State determines those assurances to be credible.

6.     The Department of State has already negotiated, and is continuing to negotiate, with third countries to obtain diplomatic assurances pursuant to these policies in arrangements accepting the removals of illegal aliens from the United States. These negotiations often take several weeks or months to conclude because negotiators must carefully consider nuanced diplomatic relations and varied policy objectives specific to each country, including issues beyond migration. If the Order is not stayed, these negotiations will be derailed and any momentum gained will be lost as our negotiators will have to pivot to explain the additional processes and time required to remove illegal aliens to third countries under the Order. Even though the Order itself would not set aside any resulting arrangements or mean that United States cannot send illegal aliens to third countries, allowing the Order to take effect will cause our foreign partners to question the legitimacy of our policies and whether the United States will follow through on its commitments. We cannot simply pause these negotiations while the First Circuit considers the appeal and if the First Circuit overturns the District Court's Order, we may never be able to get our foreign partners back to the negotiating table, even when we are now on the cusp of finalizing arrangements with certain partners to accept third-country nationals from the United States.

7.     Moreover, the State Department has already spent significant time and resources to conclude arrangements intended to meet these policies. The states that have concluded these arrangements are expecting us to work with them to remove third-country aliens from the United States and to collaborate in the fight against illegal migration. Allowing the Order to take effect will irreparably harm our relations with these states because DHS will not be able to follow through on its commitments to conduct removals without undertaking additional processes, causing

Appx.580

significant delays. Our foreign partners, in turn, will have to revise their plans to receive these aliens on a delayed schedule, frustrating their preparations and causing them to question our ability to meet our commitments.

8.     It is therefore critical that these policies be allowed to remain in place while the appeal of the District Court's Order is pending.

Executed this 5th day of March 2026.

Marco Rubio
Secretary of State

# Exhibit B

## UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

D.V.D., *et al.*,
Individually and on behalf of all others
similarly situated,

> *Plaintiffs*,

v.

U.S. Department of Homeland Security,
*et al.*,

> *Defendants*.

## DECLARATION OF JOHN A. SCHULTZ

I, John A. Schultz, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a Deputy Assistant Director (DAD) for the Removal Management Division (RMD) (South) with U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). I have held this position since June 2024. I have been employed in various positions with ICE ERO since April 2003.

2. The RMD is located at ICE Headquarters in Washington, D.C. and provides guidance and assistance to ICE officers working to coordinate the removal of aliens who have been ordered removed. The RMD collaborates with embassies and consulates, as well as with interagency and international networks, to facilitate the efficient removal of aliens from the

Appx.583

United States, provides nationwide post-order custody review (POCR) guidance, implements policy and procedures, and is responsible for providing case management support for aliens subject to a final order of removal. The RMD manages and oversees all aspects of the removal process to more than 170 countries around the world.

3. As the DAD RMD South, I am responsible for the day-to-day operations regarding the removal of individuals from the United States pursuant to ICE's enforcement mission, and for ensuring that this mission is conducted safely and within the Agency's priorities. I advise the ERO field offices on the coordination of removals, including the nationwide management of post-order custody guidance, policy, and procedures. I coordinate efforts between ERO and the U.S. Department of State's (DOS) domestic and international personnel to ensure that all efforts are made to gain compliance from uncooperative countries in ICE's efforts to effectuate the timely removal of those aliens with final orders of removal. I provide this declaration based on my personal knowledge, belief, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information maintained and relied upon by DHS in the regular course of business.

4. ICE effectuates removals pursuant to final orders of removal issued under the Immigration and Nationality Act (INA). In the vast majority of cases, aliens are removed to their country of nationality.  However, in some circumstances ICE removes aliens to a third country pursuant to statutory authority and consistent with applicable law, regulations, and the United States' international obligations—including aliens who have been ordered removed, but received protection under the Convention Against Torture (CAT) or statutory withholding or removal.

Schultz Declaration, pg. 2

Appx.584

**Country-Specific Protection Does Not Confer a Permanent Right of Residence in the United States**

5. Protection under the CAT and statutory withholding of removal are country-specific in nature. These protections prohibit removal to a specific country or countries where the alien faces a cognizable risk of persecution or torture. They do not confer any status and are not a license to remain in the United States permanently or indefinitely. The Government retains the authority and obligation to execute the order of removal to an alternative country. Otherwise, country-specific protection would serve as an effective bar to removal under all circumstances.

6. ICE currently maintains custody of a significant population of aliens who, despite being subject to final orders of removal, have been granted statutory withholding of removal or protection under the CAT, thereby precluding their removal to the country designated by the immigration court. As a direct consequence of that protection, these aliens cannot be lawfully removed to the designated countries, most often their countries of origin, not because those countries refuse to accept them, but because the law of the United States prohibits their return to the country from which they obtained protection. For this population, third country removal is not one option among several--it is the only option that exists to effectuate the removal order and remove the alien, consistent with United States law. Third country removal is the only mechanism by which ICE can simultaneously honor its two key legal obligations: the obligation not to return individuals to a country from which they have been granted protection, and the obligation to enforce a final order of removal. The practical consequence of this legal framework is that an alien who has been granted withholding of removal or protection under the CAT cannot be removed to

Schultz Declaration, pg. 3

Appx.585

their home country by operation of law and therefore can only be removed through a third-country arrangement.

**Recalcitrant Countries and the Operational Necessity of Third-Country Removal Agreements**

7. Another impediment to ICE's enforcement of United States' immigration law is the practical reality of recalcitrant countries: nations that refuse, delay, or obstruct the repatriation of their nationals, particularly criminal aliens, subject to orders of removal.

8. Additionally, for aliens from such recalcitrant countries who have also received country-specific protection barring removal thereto, the Government confronts a compound enforcement barrier: it cannot remove the alien to the designated country of removal by virtue of a withholding or CAT grant, and it faces obstruction or outright refusal from the alien's country of origin. Under such circumstances, third-country removal agreements represent the only lawful, constitutionally sound mechanism to resolve this enforcement impasse.

9. ICE systems and databases indicate that approximately 559 aliens are currently in ICE custody pending removal to a third country. This population includes approximately 139 aliens convicted of serious offenses such as murder, rape, child sexual abuse, armed robbery, and aggravated assault. Systems also indicate that there are approximately 7,620 non-detained aliens with final orders of removal but granted statutory withholding or CAT protection from removal to the designated countries, out of which approximately 1,293 are convicted criminals. Many individuals within this population have already served their criminal sentences.

10. Under legal constraint, the Government may not detain aliens indefinitely where there is no significant likelihood of removal in the reasonably foreseeable future. Accordingly,

Schultz Declaration, pg. 4

Appx.586

absent the availability of third-country removal, ICE is legally compelled to release these individuals into the United States, including the above-mentioned criminals who present identifiable public safety risks. These individuals are not hypothetical or low-level offenders. Many have committed violent, sexual, and other heinous crimes. They are removable and subject to an administratively final order of removal. The sole obstacle to their departure from the United States, and thus the protection of U.S. citizens, is the absence of a country willing to accept them consistent with applicable law, a gap that third-country removal agreements are designed to precisely address.

11. More recently, ICE, in close coordination with the DOS and foreign partner governments, has removed approximately 103 aliens with final orders of removal to countries other than their countries of origin where their home countries refused repatriation or when extraordinary public safety considerations so required. These missions represented some of the most operationally complex and diplomatically significant removal efforts. Through the extraordinary cooperation and utilizing agreements with the governments of South Sudan, Eswatini, Rwanda, Ghana, Cameroon and Equatorial Guinea, ICE has successfully removed from the United States aliens who, absent these agreements, would have remained in the United States indefinitely, not because they were entitled to remain, but because no country would accept them.

12. Among those removed through these third-country missions were individuals whose criminal records included convictions for first-degree murder, the rape of minors, repeated violent sexual assaults, and other violent felonies. Specifically, these missions included twenty-three individuals convicted of murder, attempted murder or manslaughter, six individuals convicted of rape or sexual assault, three individuals convicted of indecent and

Schultz Declaration, pg. 5

lewd acts with children under the age of sixteen, to include rape of a child with force, and four individuals convicted of other violent felonies. These are convictions entered by courts in the United States for crimes committed against people living in communities across the country. These individuals served their criminal sentences and, under ordinary circumstances, would have been released directly back into the United States population with no pathway for removal. The threat and danger posed by these aliens is not theoretical. The worst of the worst offenders removed through these missions include individuals with records of extreme depravity. These are not people who pose some abstract or speculative danger. They are people who already demonstrated through their convictions in the U.S. justice systems that they are willing and capable of committing acts of severe violence against innocent people.

13. ICE has also established a third-country removal pathway to Mexico, the country that has accepted the most third-country removals. These removals take place regularly, and each ICE field office along the southwest border that processes third-country removals to Mexico removes a varying number of aliens each week through the corresponding port-of-entry with Mexico. Since January 21, 2025, ICE has removed 7,257 aliens to Mexico as third-country removals.

14. A judicial ruling that would require more processes that goes beyond Secretary of Homeland Security Kristi Noem's March 30, 2025 memorandum, *Guidance Regarding Third Country Removals*, would greatly hinder DHS's ability to conduct third-country removals. The length of time of Immigration Court proceedings in the Executive Office of Immigration Review, including the appellate process at the Board of Immigration Appeals, is lengthy. Currently, ICE elevates names of potential aliens through the Department of

Schultz Declaration, pg. 6

State to the receiving third-country based on that country's nominating criteria. ICE typically receives final confirmation from the receiving third-country only a short time before the intended removal flight based on the terms of the negotiated agreement. Requiring a reopening of Immigration Court proceedings automatically in the Executive Office of Immigration Review would not be operationally feasible given the time constraints from acceptance by the third-country to the removal mission. Requiring a reopen of Immigration Court proceedings prior to the alien's acceptance by the third-country would also not be operationally feasible and potentially futile as these aliens may not even be accepted by the third-country. The swift and dynamic nature of the third-country removal negotiations mandates the efficient process as developed in the Secretary of Homeland Security Kristi Noem's March 30, 2025 memorandum, *Guidance Regarding Third Country Removals*, which still gives the aliens appropriate process. Such an additional requirement threatens to severely disrupt, and in some cases, altogether foreclose, the ICE's ability to carry out removals. Furthermore, the logistical infrastructure underlying third-country removals is similarly fragile. Removal operations require the coordination of aircraft, detention space, escort personnel, and receiving-country logistics, all of which must be arranged in advance. These resources are not indefinitely available. Additionally, providing individualized process to each alien prior to removal, in addition to the already afforded process under existing statutory and regulatory frameworks, will create an administrative bottleneck that will strain agency resources and impose compounding delays across already complex enforcement priorities. The cumulative effect will be to render the third-country removal program functionally inoperable through the accumulated weight of procedural delay.

Schultz Declaration, pg. 7

15. If ICE's authority to remove aliens to third countries becomes operationally burdensome, approximately 8,179 aliens—including almost 1,432 convicted criminals—would likely remain in the United States, contrary to current immigration law and enforcement priorities. The practical consequence is that the Government will be compelled to release into American communities a population of convicted criminal aliens who cannot be removed to their countries of origin and for whom no third-country option exists. The data in this declaration makes clear the magnitude of that risk. Furthermore, a ruling of this nature would also strip ICE of one of the only remaining enforcement tools available for the most dangerous segment of removable aliens. Third-country removals are, for a critical subset of the most dangerous removable aliens, the only such pathway that exists.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 5th day of March, 2026

JOHN A SCHULTZ

Digitally signed by JOHN A SCHULTZ
Date: 2026.03.05 20:47:26 -05'00'

John A. Schultz
Deputy Assistant Director
Removal Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Schultz Declaration, pg. 8

# Exhibit C



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**CHELMSFORD IMMIGRATION COURT**

| | |
|---|---|
| Respondent Name: <br><br> ██████████████ <br><br> To: <br><br> ██████████ | A-Number: <br> ████████ <br><br> Riders: <br> In Removal Proceedings <br> Initiated by the Department of Homeland Security <br> Date: <br> 02/02/2026 |

## ORDER OF THE IMMIGRATION JUDGE

☑ Respondent ☐ the Department of Homeland Security has filed a motion to reopen these proceedings. Upon reading and considering the motion, and any opposition from the non-moving party, the motion is ☑ granted ☐ denied for the following reason(s):

☐ The motion is untimely and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).

☐ The motion is numerically barred and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).

☐ The moving party failed to provide evidence demonstrating changed circumstances that is material and that was unavailable or could not have been discovered or presented at the previous proceedings. *See* 8 C.F.R. § 1003.23(b)(4)(i).

☐ The moving party failed to submit the appropriate application for relief and any accompanying documents. *See* 8 C.F.R. § 1003.23(b)(3).

☐ The Respondent has been removed or otherwise departed from the United States. *See* 8 C.F.R. § 1003.23(b)(1).

☑ Other:

The Court will find that the Respondent's motion is timely because he has established changed country conditions due to DHS' Notice of Removal to Cameroon. Respondent's Motion to Reopen at 83. In Matter of A-S-M, 28 I&N Dec. 282 (BIA 2021), the BIA held that where the

Department of Homeland Security states that an applicant may be removed to a country pursuant to section 241(b)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(2) (2018), the applicant may seek withholding of removal from that country in withholding-only proceedings, even if that country is different from the country of removal that was originally designated in the reinstated removal order on which the withholding-only proceedings are based.

Similarly, in these removal proceedings in the present case, the Court will find that the Respondent may seek protection from removal to Cameroon. Additionally, the Respondent has filed the appropriate application for relief at page 54, and presented his affidavit at page 82, and an expert affidavit at page 108 of the motion in support of his claim of fear of return to Cameroon. Since the Respondent was only recently given notice of DHS' intent to remove him to Cameroon, the Court finds that this evidence is material and was not previously available at the merits hearing on March 13, 2025, because Cameroon was not designated as a country of removal at that hearing.

Appx.592

Based on the foregoing, the Court will grant the Respondent's Motion to Reopen.

Immigration Judge: Smith, Natalie 02/02/2026

### Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Alien | [ ] Alien c/o custodial officer | [ E ] Alien atty/rep. | [ E ] DHS

Respondent Name : ███████████████████ A-Number : ██-██-█

Riders:

Date: 02/02/2026 By: ████ ████ Court Staff

Appx.593

# Exhibit D



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BOSTON IMMIGRATION COURT**

| Respondent Name: | A-Number: |
|---|---|
| ████████████████ | ████████ |
| To: | Riders: |
| ████████ | In Removal Proceedings |
| | Initiated by the Department of Homeland Security |
| | Date: |
| | 12/18/2025 |

### ORDER OF THE IMMIGRATION JUDGE

☑ Respondent ☐ the Department of Homeland Security has filed a motion to reopen these proceedings. Upon reading and considering the motion, and any opposition from the non-moving party, the motion is ☑ granted ☐ denied for the following reason(s):

☐ The motion is untimely and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).

☐ The motion is numerically barred and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).

☐ The moving party failed to provide evidence demonstrating changed circumstances that is material and that was unavailable or could not have been discovered or presented at the previous proceedings. *See* 8 C.F.R. § 1003.23(b)(4)(i).

☐ The moving party failed to submit the appropriate application for relief and any accompanying documents. *See* 8 C.F.R. § 1003.23(b)(3).

☐ The Respondent has been removed or otherwise departed from the United States. *See* 8 C.F.R. § 1003.23(b)(1).

☑ Other:

The Court will find that the Respondent's motion is timely because he has established changed country conditions due to DHS' Notice of Removal to Mexico. Respondent's Motion to Reopen at 77. In Matter of A-S-M, 28 I&N Dec. 282 (BIA 2021), the BIA held that where the Department of Homeland Security states that an applicant may be removed to a country pursuant to section 241(b)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(2) (2018), the applicant may seek withholding of removal from that country in withholding-only proceedings, even if that country is different from the country of removal that was originally designated in the reinstated removal order on which the withholding-only proceedings are based. Similarly, in these removal proceedings in the present case, the Court will find that the Respondent may seek protection from removal to Mexico. Additionally, the Respondent has presented an expert affidavit at page 97 of the motion in support of his claim of fear of return to Mexico. Since the Respondent was only recently given notice of DHS' intent to remove him to Mexico, the Court finds that this evidence is material and was not previously available at the merits hearing in 2019 because Mexico was not designated as a country of removal at that hearing. Based on the foregoing, the Court will grant the Respondent's Motion to Reopen.



DATE: 12/9/25
INITIALS: NC
REVIEWED
DUTY OFFICER

Appx.595

Immigration Judge: Masters, Todd 12/18/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Alien | [ ] Alien c/o custodial officer | [ M ] Alien atty/rep. | [ M ] DHS

Respondent Name : ███████████████████ | A-Number : ████████

Riders:

Date: 12/19/2025 By: ████████ Court Staff

Appx.596

[DETAINED] A# ███████████

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## BOSTON, MASSACHUSETTS

In the Matter of:                                    )
                                                     )
██████████████████████                               )    A#: ███████████
                                                     )
In Removal Proceedings                               )
                                                     )
                                                     )

## RESPONDENT'S STATUTORY MOTION TO REOPEN AND, IN THE ALTERNATIVE, MOTION FOR SUA SPONTE REOPENING

Upon consideration of Respondent's Motion to Reopen, it is HEREBY ORDERED that the motion be:

__X__ GRANTED    _____ DENIED because:

___ DHS does not oppose the motion
___ Good cause has been established for the motion
___ The court agrees with the reasons stated in the opposition to the motion
___ The motion is untimely per: _____
_X_ Other: See attached order

Dated this 18th day of December, 2025

Signed,

_____
Hon. Judge Todd Masters

Appx.597

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

)
D.V.D.; M.M.; E.F.D.; and      )
O.C.G.,                        )
                               )
          Plaintiffs,          )
                               )        Civil Action
v.                             )        No. 1:25-cv-10676-BEM
                               )        Pages 1 to 71
U.S. Department of Homeland    )
Security; Kristi Noem,         )
Secretary, in her official     )
capacity; Pamela Bondi, U.S.   )
Attorney General, in her       )
official capacity; and         )
Antone Moniz, Superintendent,  )
Plymouth County Correctional   )
Facility, in his official      )
capacity,                      )
                               )
          Defendants.          )
                               )


BEFORE THE HONORABLE BRIAN E. MURPHY
UNITED STATES DISTRICT JUDGE

MOTION HEARING


March 28, 2025
12:00 p.m.



John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts 02210


Jessica M. Leonard, CSR, FCRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
JessicaMichaelLeonard@gmail.com

APPEARANCES:

On Behalf of the Plaintiffs:

    NATIONAL IMMIGRATION LITIGATION ALLIANCE
    By: Trina Realmuto
    10 Griggs Terrace
    Brookline, MA 02446
    617-819-4447
    trina@immigrationlitigation.org

    NATIONAL IMMIGRATION LITIGATION ALLIANCE
    By: Kristin Macleod-Ball
    10 Griggs Terrace
    Brookline, MA 02446
    617-506-3646
    kristin@immigrationlitigation.org

    NORTHWEST IMMIGRANT RIGHTS PROJECT
    By: Matt Adams
    615 Second Avenue
    Suite 400
    Seattle, WA 98104
    206-957-8611
    Matt@nwirp.org

    HUMAN RIGHTS FIRST
    By: Anwen Hughes
    75 Broad Street
    31st Floor
    New York, NY 10004
    212-845-5200
    Hughesa@humanrightsfirst.org


On Behalf of the Defendants:

    U.S. DEPARTMENT OF JUSTICE,
    OFFICE OF IMMIGRATION LITIGATION
    By: Mary Larakers
    PO Box 868
    Washington, DC 20044
    202-353-4419
    mary.l.larakers@usdoj.gov

    U.S. DEPARTMENT OF JUSTICE,
    OFFICE OF IMMIGRATION LITIGATION
    By: Mark Sauters
    One Courthouse Way
    Ste 9200

Boston, MA 02169
617-748-3347
Mark.sauter@usdoj.gov

Proceedings reported and produced
by computer-aided stenography.

Government that to switch the third-party country designation requires that the deportee who is going to be moved be given an opportunity to be told that that third-party designation is going to be changed and an opportunity to be heard as to the dangerousness of that removal -- do you agree that that's the Government's position?

MS. LARAKERS:  I don't agree with their characterization of it.  The statement was made with regard to required in removable proceedings; so when that individual is before the immigration court.  And we're outside of that context here.  We're in post-final order.

THE COURT:  Given that we're -- does that apply at all?  So I understand that they're not asking to go back to immigration.

I don't think you're going to ask me that.

MS. REALMUTO:  We are not.

THE COURT:  In this posture, where it is the discretionary decision of the department that's changing the third-party designation, does the person who's going to be deported have a right to be informed and be given an opportunity to be heard as to the dangerousness of that third country designation?

MS. LARAKERS:  DHS's position is no.

THE COURT:  They don't have to be told anything and given no opportunity to be heard?

MS. LARAKERS:  DHS's position is no.

THE COURT:  Okay.  Thank you.

MS. REALMUTO:  Plaintiff's position is yes.  A strong yes.  Because, in order to afford the protections provided by the statute implied in the Convention Against Torture, a person has to be notified of the country to which they are -- the Government is seeking to deport them.

The State Department recognizes some 197 countries. They cannot be guessing what country the Government is seeking to deport them to.  The Government is not providing them with notice, and it is not providing them with an opportunity to make their fear-based claim before the immigration court.

And what happened, we think, to Plaintiff O.C.G. illustrates the urgency of the situation.  There an immigration judge granted him protection from removal to Guatemala.

He thought he was being released from detention and, two days later, he was put on a bus and deported to Mexico without the Government notifying him or his counsel and without a chance to make his claim of fear of deportation to Mexico based on the fact that he had been raped and held hostage in that country.

THE COURT:  I'm familiar with that.  The one thing I was somewhat unclear on is that -- I forget if it was in the declaration from O.C.G. or in the initial briefing, but there was an indication that in the immigration proceeding -- that

surprising thing to hear the Government say.

And so, if that is your -- I want to make sure that I understand your position correctly, that, if the Government is saying, We can deport people to any country that is not prohibited on the notice of removal, and we are not obligated to listen to anything that the deportee has to say about the danger of torture or death that they may face there -- if that's your position, okay. Great. I understand your position.

But I don't want to mischaracterize your position; so that's why I'm saying it back to you, to make sure.

Is your position that the Government can decide right now that someone who is in their custody is getting deported to a third country, give them no notice and no opportunity to say, I will be killed the moment I arrive there, and, as long as the Department doesn't already know that there's someone standing there waiting to shoot him, that that's fine?

MS. LARAKERS: In short, yes.

THE COURT: Okay.

MS. LARAKERS: And that merits argument about O.C.G. That's alternative arguments down the road.

THE COURT: I didn't want to get too far into that because, obviously, I can't resolve it.

MS. LARAKERS: Right. But I will say -- shortly -- that just because that's, like, the legal position doesn't mean

that's not very long at all.  How about to the 4th?  Would that be enough time for you to file an opposition to the class certification and any additional briefing you'd like on the opposition to the preliminary injunction.

MS. LARAKERS:  I obviously would love more time, Your Honor, but it sounds like it's going to have to be the 4th.

THE COURT:  The 4th, I'm sorry, is only a week.  But that kicks it back to them; they have only a couple of days.

And a reply brief by the 8th?  I recognize that gives you only two work days, but the deadlines are short.

MS. REALMUTO:  We'll make it work.

THE COURT:  In the meantime, I take your point about the Court ordering what "meaningful" means to heart.  And so I would consider a motion to reconsider, if you wanted to narrow what that procedure looked like, or you wanted come to an agreement about what it looked like, or you wanted to tell me, This is what we're defining as meaningful, and I would like you to reconsider and adopt this.

I'm open to all of those things because you raise a very good point.  And so, to the extent that the guidance that the Court is giving you is nothing more than a meaningful opportunity and you want some more direction or you want to narrow that with some more specificity, I would welcome a motion to consider.

If you file a motion to consider, I can hear you. I think you're in D.C.; so I can hear you, even by Zoom, within 24 hours.

MS. LARAKERS: Thank you, Your Honor, for that opportunity.

I do want to highlight that, in that motion to reconsider that we may file, we may raise objections to the issuing of a TRO in a nationwide context without a provisional -- without even any certification of a class.

I just had to make sure I made that point.

THE COURT: That's completely understood and I'm happy to deal with that. This is only for ten days; so if you want me to deal with that in between, I'm happy to.

But if this prevents procedural challenges that I've not anticipated, explain them to me, and I'm happy to try to ameliorate that, to the degree that I can.

MS. LARAKERS: No, thank you, Your Honor.

THE COURT: With that is there anything else I can do for you today?

MS. REALMUTO: No, thank you, Your Honor.

THE COURT: Is there anything else I can do for the Government today?

MS. LARAKERS: No, Your Honor. Thank you.

THE COURT: Thank you both. I appreciated the argument.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

D.V.D.; M.M.; E.F.D.; and    )
O.C.G.,                       )
                              )
          Plaintiffs,         )
                              )
v.                            )    Civil Action
                              )    No. 1:25-cv-10676-BEM
U.S. Department of Homeland   )    Pages 1 to 87
Security; Kristi Noem,        )
Secretary, U.S. Department    )
of Homeland Security, in her  )
official capacity; Pamela     )
Bondi, U.S. Attorney General, )
in her official capacity;     )
and Antone Moniz,             )
Superintendent, Plymouth      )
County Correctional Facility, )
in his official capacity,     )
                              )
          Defendants.         )
                              )

BEFORE THE HONORABLE BRIAN E. MURPHY
UNITED STATES DISTRICT JUDGE

MOTION HEARING

April 10, 2025
11:45 a.m.

John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts 02210

Jessica M. Leonard, CSR, FCRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
jessica@wickedsteno.com

2

APPEARANCES:

On Behalf of the Plaintiffs:

    NORTHWEST IMMIGRANT RIGHTS PROJECT
    By: Matt Adams
    615 Second Avenue
    Suite 400
    Seattle, WA 98104
    206-957-8611
    Matt@nwirp.org


    NATIONAL IMMIGRATION LITIGATION ALLIANCE
    By: Trina Realmuto
    10 Griggs Terrace
    Brookline, MA 02446
    617-819-4447
    trina@immigrationlitigation.org


On Behalf of the Defendants:

    U.S. DEPARTMENT OF JUSTICE
    OFFICE OF IMMIGRATION LITIGATION
    By: Drew Ensign

    U.S. DEPARTMENT OF JUSTICE,
    OFFICE OF IMMIGRATION LITIGATION
    By: Mary Larakers
    PO Box 868
    Washington, DC 20044
    202-353-4419
    mary.l.larakers@usdoj.gov

            Proceedings reported and produced
             by computer-aided stenography.

THE COURT: Okay. So I understand that. I understand that there's some debate about how available this remedy is and whether or not it should be raised at an earlier stage. And I understand both of those things.

But the -- if there is any availability to try to contest, I mean, it would require notice and at least some period of time. So under this memo are they -- is the Department giving any notice and an opportunity for the individual who's being patriated to a different country an opportunity to raise, through any of the mechanisms you've just discussed, an objection to that third country?

MR. ENSIGN: Your Honor, not under this guidance. I mean, our position is that notice has been provided earlier in the removal proceedings and through other means. But this guidance, itself, would not provide notice.

THE COURT: So this guidance, if someone is from El Salvador and the Department is changing their deportation country to Honduras, right now the Department gives no time. They can be picked up at 6:00 a.m., put on a plane, and flown to Honduras at 6:15?

MR. ENSIGN: Your Honor, the guidance would not prohibit that. In individual circumstances, additional notice might be given. But the guidance would not correct that.

THE COURT: So if someone knows, if they were to go to Honduras for an individualized reason -- they have political

MR. ENSIGN: Your Honor, I mean, the -- assuming you're in the second part of the guidance, then --

THE COURT: No. We're in the first part of the guidance.

MR. ENSIGN: Your Honor, they would have needed to go to the BIA before that. There's nothing under the guidance that would require additional notice or an opportunity to challenge it at that moment.

THE COURT: So it's your position that there is no constitutional or statutory infirmity to send someone to a country where they have an individualized uncontroverted fear of death?

MR. ENSIGN: Your Honor, where they could have raised it previously and did not do so, that the Due Process Clause does not require an additional procedural opportunity to raise in the that context.

THE COURT: Okay.

MR. ENSIGN: But to the extent that Your Honor believes that that would be insufficient under the first step of the guidance, relief should be narrowly tailored to, you know, such that the -- the second part -- and there would be an opportunity to manifest fear would be, you know -- would be a possible remedy if this Court thought there was a constitutional infirmity, which we obviously dispute.

THE COURT: I understand that. And so I want to turn

going to let you continue on jurisdiction because it is a complicated and interesting issue.

But as a practical matter, if the person is told at 6:00 a.m., they have no options.  Right?

MR. ENSIGN:  Their options have --

THE COURT:  Right now -- because historically, the practice of, certainly, the Immigration Board is to not list all 60 countries on the 589 and not to bring that up.  And right now if someone is picked up tomorrow morning at 6:00 a.m. and they're taken to a country where they could be killed because of an individualized danger, they have no way to raise them, right?

MR. ENSIGN:  Your Honor, it's our position that they could and should have raised that earlier, but to the extent that you think that raises constitutional issues, any relief should be narrowly targeted to that particular concern and not the sort of blanket relief that the plaintiffs are asking for.

THE COURT:  How do you make it more narrowly targeted?

MR. ENSIGN:  Then, you know --

THE COURT:  Because let me -- I'm new to the bench, as I suspect you know, and so I perhaps share my thoughts more than a more experienced jurist might, to make sure I'm giving you a chance to tell me where I've stepped off the line.

The conclusion that if someone is going to be killed if they are brought back to Country B and they're only told

about going to Country B minutes before they get on the plane -- the fact that the U.S. Government is not required to give them any chance to say, "I'm going to be killed when I get off the plane," is -- that seems very troublesome to me.

And I understand what you're saying as a general matter -- that this -- going forward, this should be done differently. And that's the question I had for the plaintiffs. And I understand that, right? The position could well be "Now you know. Raise all the countries that you're worried about at the time that you're going through the immigration proceeding."

But the people who didn't know -- the people who currently have orders of removal didn't know that at the time. There wasn't a practice at the time.

So if there is more tailored relief to address the concern I just articulated -- the person who knows from an individualized basis when they get off the plane in Country B that they're going to be killed -- what is the more individualized relief you're suggesting I could offer?

MR. ENSIGN: Beginning with, of course, we object to the premises. But I think, you know, if you thought, for example, that the procedures under the first step of the guidance were insufficient, you would then need to analyze are the procedures under the second step, if this Court were to require it, you know, sufficient to satisfy due process? Where someone can manifest fear, and, if so, they're given an

opportunity to explain that.

And then there's a screening process, and, if they satisfy that standard, then they have an opportunity to raise that more fulsomely. You know, and then, if you thought there was some deficiency in that, any relief should be tailored to whatever deficiencies you thought in the guidance. But I think --

THE COURT: Let me turn it back to that.

Do you agree? So make the second part of the guidance -- you're familiar with it. The second part applies to everybody who's getting sent to a third country. Does that address all of your concerns?

MS. REALMUTO: Oh, absolutely not. But -- you know, I worried about the people that are covered by the first part of the guidance, for sure. But when we get to the second part of the guidance, that's extremely problematic.

THE COURT: Okay.

MS. REALMUTO: It simply says the person is informed. We don't know where, when, how, to whom they're informed. The burden is on them to manifest the fear, right? That's -- as we've explained, most noncitizens don't know that. They are supposed to be told of their rights. They have a right to express a fear.

THE COURT: But as I understand the guidance -- and correct me if I'm misunderstanding it. But as I understand the

But I want to give you an opportunity to complete it.

But while we're on this issue of what the remedy would look like, Ms. Larakers the last time we were here correctly brought up that if I was to say "a meaningful opportunity to be heard" -- that those things mean different things to different people. And they certainly mean different things to the people who are in front of me here.

And so if I was inclined to be issuing a preliminary injunction -- but I hear your concern about both the scope of what it would be and perhaps the people that it would include. Because I'm now thinking about whether or not respective relief for people who would be on notice -- that they would have to delineate the full panoply of countries to which they had a fear.

What would a more limited -- what would you have -- and I understand you don't want me to issue it at all, but what would the more limited version look like for you?

Because one answer -- and the answer that I thought you just said -- was part b of the memo. I understand that you don't agree that that's a meaningful opportunity, but is that what you would suggest?

MR. ENSIGN: That's certainly something we would suggest. And we think, also, the prospective/retrospective distinction this Court is drawing is something else that could be considered in terms of narrowly tailoring relief.

We think it's also important to keep in mind that essentially what they're proposing is a whole nother round of judicial proceedings. And, you know, the United States has a very strong interest in the execution of final orders of removal. These are people that have received, you know, quite a lot of process through an IJ, through a BIA, through, potentially, a federal court of appeals, even an opportunity to seek certiorari if that's -- and an extraordinary amount of process has already been provided.

And if anyone can trigger, you know, a whole new round of process, which I -- which is what we think Plaintiffs are anticipating, you know, you're talking about potentially years of delay that can be introduced with relative ease.

And that is really concerning. And, certainly, the Due Process Clause, which is flexible and tailored in the circumstances that we're operating under, necessarily should take account of the fact that people have already received quite a lot of process.

THE COURT: So I am -- that's very persuasive for me. And Ms. Larakers had made the point --

Am I pronouncing your name correctly?

MS. LARAKERS: Almost, Your Honor. Larakers.

THE COURT: Ms. Larakers had made the point last time we were here that it's -- I don't think I should be in the position of defining in the first instance what due process is

for the Department.  I think that's very correctly in your hands.

And that's why even the temporary restraining order was quite vague in terms of what due process was required.  And I was correctly -- it was correctly pointed out to me that vagueness necessarily will engender dispute, which is why I'm --

And I'm not asking you to commit to this, but, if I were to tell you that I'm inclined to issue a preliminary injunction, would your recommendation be to say "issue the preliminary injunction for a subset of people," which is what I'm considering, "and make the process that is due what is delineated in the memo"?

MR. ENSIGN:  Yes, Your Honor.  I think that would be our first-line position if there were -- if this Court found that there was a violation.

THE COURT:  Okay.  I'm sorry that I've taken you a bit off of your direction.  You were speaking to me about on jurisdiction.  If I could redirect you back on that.

MR. ENSIGN:  Thank you, Your Honor.  You know, I think in particular, turning back to 1252(g), I mean, we are just squarely within the text of it.  That provision bars, quote, "any cause or claim...arising from the decision or action by the Attorney General to...execute removal orders."

That is their claim to a T.  Their claim arises from

MS. REALMUTO:  It's something I usually do; so -- happy to help out.

THE COURT:  So here's what I'm left with.  That you'd like the most robust process possible.  I understand that.  The Department would like a more limited amount of due process.  I'm reluctant to demand the most amount of due process as a preliminary injunction matter.  That seems like that would be an overreach on my part.

Take everything that he just said as true.  That you can reopen.  You certainly can reopen once you get an adverse determination.  For that ability to reopen to be real, what would be required?

MS. REALMUTO:  So I assume that we're working on the second part of the memo and that you have disregarded our full-on objections to that.

THE COURT:  I understand we're -- no one's happy.  We're right there in the middle.  Yes.

MS. REALMUTO:  In order to answer your question -- caveat that we don't agree, but, answering this question, I think that the notice has to be more tailored, individualized; it has to be written and documented and in a language the person understands.  So that's the first way to correct the problem.

THE COURT:  Okay.

MS. REALMUTO:  It can't just be "inform the person."

Meaningful notice.

Then, if the person has to have -- be asked, "Are you afraid?", if that answer to that question is yes and the Government wants to go through with this screening mechanism, I think we have to have an automatic stay of, I would request, 21 days.

But even if you look at the Government's form that was attached to the complaint as an exhibit, even in that instance, they were saying 14 days, or I believe, perhaps, it was 21. I'd have to look back.

But as the Austin declaration, the Mayer-Salins declaration, and the Morales declaration all cover, filing a motion to reopen is an intense process. Application required. Have to show prima facie eligible. So a person who is detained -- four business days is simply not enough. Because immigration court closes at 4:00 or 5:00 on a Friday and it doesn't reopen until Monday morning.

THE COURT: So I understand. And those declarations were useful in terms of the mechanics of what is required.

MS. REALMUTO: I'm glad.

THE COURT: That was educational for me.

So your position would be 21 days?

MS. REALMUTO: 21 days. And then the person can seek reopening. That's fair. They have an opportunity to do so. And the Government can do the screening thing as well. But

you've got to lower the standard on screening.  It cannot be the same standard.

THE COURT:  What should the standard be?

MS. REALMUTO:  We would propose a well-founded fear or credible fear.  We feel like that's reasonable for a --

THE COURT:  Credible fear is the lowest, right?

MS. REALMUTO:  Right.  It is the lowest.  But these are detained people who are in a compressed time frame, who don't have access to getting the facts and the corroborating documentation that they need.  And many of them may not have counsel.

THE COURT:  I understand.

Do you want to respond to the 21 days?

MR. ENSIGN:  Certainly, Your Honor.

I mean, 21 days is an awfully long time.  This is a situation where Congress has recognized that the United States has a lot of interest in executing final orders of removal, and they've devised a number of jurisdictional provisions to prevent people from gumming up the system in order to prevent removals.  And the longer the period is, the more that that's going to be problematic.

We don't -- again, we don't think that there's any deficiency in the memo, but, if there are, 21 days would be far too long.

THE COURT:  What's an appropriate number of days?

MR. ENSIGN: Your Honor, our -- we think it should be shorter than that. I'm not prepared to say exactly what that period is. We don't believe there's any deficiencies in the memo, but, you know, 21 days strikes us as quite long.

And, you know, as to the sort of screening point, there's a reason that credible fear is used for asylum. There's at least two different reasons that are fundamentally different here.

One is that the standard for relief under asylum is already lower than both CAT and withholding of removal. And so the fact that it's for a lower standard necessarily means that there's a lower standard that applies.

THE COURT: CAT is the -- I guess it's the highest of the lowest standard that's applied for any type of protection of removal, right?

MR. ENSIGN: It's the most stringent.

THE COURT: You have to show the most.

MR. ENSIGN: Right.

THE COURT: Okay.

MR. ENSIGN: And it's the same for withholding of removal. You have to show more likely than not, whereas asylum is just a well-founded fear. Which I think the Ninth Circuit has said even a 10 percent chance of persecution is enough for a well-founded fear.

And so -- and then, even lower than that would be

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

D.V.D.; M.M.; E.F.D.; and    )
O.C.G.,                      )
                             )
          Plaintiffs,        )
                             )
v.                           )    Civil Action
                             )    No. 1:25-cv-10676-BEM
U.S. Department of Homeland  )    pages 1 to 122
Security; Kristi Noem,       )
Secretary, U.S. Department   )
of Homeland Security, in her )
official capacity; Pamela    )
Bondi, U.S. Attorney General,)
in her official capacity;    )
and Antone Moniz,            )
Superintendent, Plymouth     )
County Correctional Facility,)
in his official capacity,    )
                             )
          Defendants.        )
                             )


BEFORE THE HONORABLE BRIAN E. MURPHY
UNITED STATES DISTRICT JUDGE


MOTION HEARING
(Sealed Portion Included)

May 21, 2025
11:00 a.m.


John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts 02210


Jessica M. Leonard, CSR, FCRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
jessica@wickedsteno.com

APPEARANCES:

On Behalf of the Plaintiffs:

    NATIONAL IMMIGRATION LITIGATION ALLIANCE
    By:  Trina Realmuto
    10 Griggs Terrace
    Brookline, MA 02446
    617-819-4447
    trina@immigrationlitigation.org

On Behalf of the Defendants:

    DEPARTMENT OF JUSTICE
    By:  Matthew Patrick Seamon
    Ben Franklin Station
    Washington, DC 20044
    202-598-2648
    Matthew.seamon2@usdoj.gov


    U.S. DEPARTMENT OF JUSTICE
    OFFICE OF IMMIGRATION LITIGATION
    By:  Drew Ensign

    U.S. DEPARTMENT OF JUSTICE,
    OFFICE OF IMMIGRATION LITIGATION
    By:  Elianis N. Perez
    PO Box 868
    Washington, DC 20044
    202-616-9124
    Elianis.perez@usdoj.gov


    U.S. DEPARTMENT OF JUSTICE,
    OFFICE OF IMMIGRATION LITIGATION
    By:  Mary Larakers
    PO Box 868
    Washington, DC 20044
    202-353-4419
    mary.l.larakers@usdoj.gov

                  Proceedings reported and produced

to be heard is, has a long history in front of this court, in front of the First Circuit, in front of the Supreme Court, a long history that is familiar to every attorney that has appeared in this court, is aware what an opportunity to be heard is.

I also ordered that the notice that was given be done in writing and in the language -- the primary language of the person who received that notice.

What I have learned is that notice was given some time in the evening of May 19. I am not entirely clear on whether that is 5:45 or a later time that was included in the notation given to at least one of the attorneys, but it was provided to these individuals in the evening of May 19.

The next morning they were taken from that locked facility, for which they, obviously, could not leave and seek advice or counsel, and they were taken and transported to the airport and put onto a plane.

The time that they left that facility is again unclear. We're going to get an exact answer on that shortly, but it was, at the latest, sometime in the 10:00 hour and, at the earliest, sometime before 9:00 a.m.

It is plain to me that an opportunity to be heard -- of several hours that were not during business hours, where you could not consult with your attorney, where you could not consult with your family, or where, in this case, if, for

country, to have a meaningful opportunity to object to it, they must be given some opportunity to see how their life conditions would be dealt with in that country.

I don't know a lot about South Sudan. I have reviewed some of the materials that have been submitted, but I'm not familiar with their policy on all sorts of things. I don't know if there is rampant discrimination based on race or gender, or anything else, or sexual orientation. I'm not saying there is, but I don't know.

And if I was in any of those groups and I was going to be deported to South Sudan, I would need an opportunity to investigate that and to be able to articulate a well-founded fear about why being returned to South Sudan would be -- would result in torture or death.

The Department did not do it in this case. They did not offer any opportunity to object. There are protestations to the contrary, where I have been told -- and I will certainly give them an opportunity to speak again here -- that they believe that they complied with my order because they don't know of any of these people yelling at any of the jailers that they were afraid to go to South Sudan.

That's plainly insufficient. I don't think there's any interpretation of the preliminary injunction that I issued that would comport with the behavior that the Department showed here.

THE COURT:  Thank you, Ms. Perez.

I hear your points, I'm familiar with the cases that you've read.  I don't agree.  I find that my preliminary injunction order has been violated.

I now turn to the next stage of the analysis, which is what the Court can do to remedy that violation.

And I'll let Ms. Realmuto begin as to what an appropriate remedy is that you're seeking here and how we would go about effectuating it.

MS. REALMUTO:  Well, Your Honor, I think the remedy that we're seeking is the one that we've continued to seek, which is that we bring these individuals back to the United States and give them the process that's due and that should have been afforded to them in the first instance under the preliminary injunction.

And I would argue that that process can only take place on U.S. soil because it's essential that they have an opportunity to have notice, to investigate the situation in South Sudan, to consult with counsel, and to present their decision about whether or not they're afraid to go to South Sudan -- I think that anyone who investigates the situation in South Sudan would have a fear of being placed in a war-torn country -- and then, for them to have the reasonable fear process that's afforded under this Court's order.

And I think whatever opposing counsel is going to say

finally resolved -- either I get direction from the First Circuit or the Supreme Court or somewhere else -- that for the status quo, to the degree that there is ambiguity about what due process means, I am inclined to delineate it.

I could guess what Ms. Realmuto is going to suggest but -- I'll give her a chance anyway in a moment -- but, Ms. Perez, I'm going to ask you for a suggestion.

So I had -- again, I give great credit to Ms. Larakers for highlighting this point at the very inception of this case: that a meaningful opportunity is subject to different understandings. I didn't think it was subject to understandings as different as they appear to have been today, but, for the sake of clarity, I am going to clarify.

And so what would your suggestion be, Ms. Perez, around -- at a minimum, there will be a period of time between when notice is given and the deportation occurs. What is your suggestion --

Or Mr. Ensign. I'm not sure who's -- either one of you is welcome to speak.

-- what's your suggestion about what comports with due process and is reasonable?

MR. ENSIGN: Your Honor, we don't have a specific suggestion.

I mean, our understanding is from the expedited removal context where we think that would be meaningful

opportunity. We recognize Your Honor disagrees, but that certainly our perspective.

I think the nature of any narrowly tailored remedy would be that, if 24 hours isn't sufficient, that Your Honor would shape it as to whatever your understanding would be that is a minimum to satisfy due process.

I'm not aware of a specific benchmark to propose. Certainly, our position is that 24 hours is sufficient. We recognize you disagree, but we don't have a specific proposal in light of this Court's disagreement with that position.

THE COURT: So I appreciate that, Mr. Ensign, and I know you weren't told to be prepared with this. And so I recognize that I'm asking a lot of you. But let me explain my reasoning.

My reasoning is, generally speaking, Courts analyze whether or not something comports with the constitutional due process on a case-by-case basis, where the Court says, "No, that doesn't comport" and "Yes, that does comport." And you can see this in a variety of contexts.

But that doesn't really work in this scenario and the reason that I had drafted my preliminary injunction in the way that I had is because I had hoped that the Department would exercise its discretion to fashion something that comported with constitutional requirements of due process.

Exactly what that is, though, is very hard to say.

And so I am giving you an opportunity to offer me some advice on that. I suspect that Ms. Realmuto is going to say a month or maybe a month and then a month with an attorney.

There's lots of cases that fall back to 21 days. My order had fallen back to the most conservative limited number of days that I could see any justification for, which was 15 days.

If you could point me to any authority -- and I recognize you're on the spot now, and so -- I'm not resolving this all in the next five minutes; so, if you could point me to any authority or if the Department wants to take a position about what reasonable due process is, I would welcome that input. But, you know, I'd -- I'd welcome that.

So what I intend to do is I will be clarifying my preliminary injunction. I will be --

And don't worry, Ms. Realmuto. I know I haven't given you a chance to speak, but I intend to.

-- I'm going to be clarifying what the minimum amount of time is that the Department has to let go between the time that notice is given and the time that the person is deported.

If the Department wants to take a position on that, I give you until the end of the day today. That -- we will be crafting something. I would give you more time, but I'm in this position where people may currently be getting loaded onto planes with plainly insufficient notice.

So if you want to take me up on that opportunity, you may.  If you don't, you don't have to.  But I'm going to be fashioning something that clarifies this, because what is absolutely clear to me is that not only is 24 hours plainly insufficient, this was only 17.  And this is undeniably insufficient; And to the point where I believe it to be obviously insufficient.

But the exact place where that line should be drawn, I don't know.  And so, if the Department wants to take a position and tell me by the end of the day, I'd welcome that input.

MR. ENSIGN:  Thank you, Your Honor.  We'll certainly run that by our clients and present that option to them and get that back to you if we have a specific proposal.

THE COURT:  Thank you.

And, Mr. Ensign, this needn't be a treatise.  If you say, "We propose 14 days because of x case," that's really -- that would be valuable input.  So feel free to weigh in.  I'm not requiring you to, but I would welcome that input.

MR. ENSIGN:  Thank you, Your Honor.

THE COURT:  Ms. Realmuto, the same question to you is -- we now are forced to modify the order, to specify.  What is the specification that you were suggesting to the Court about?

MS. REALMUTO:  30 days, Your Honor.  We believe that's reasonable because it gives the individual time to locate or

expeditiously.

That's why, in the expedited removal context, the people are given, you know, much less time, measured in hours or perhaps even minutes, to manifest a fear, which we think is the same sort of screening concept that would apply here.

We'd also note that the statute at issue, 8 U.S.C. 1231, does not limit third-country removals to where it is impossible. I believe the statutory language is that it can be done where it's impossible, impractical, or inadvisable. Any of those are sufficient to permit a third-country removal. Impossibility is not a requirement to carry out a third-country removal, and that's in the statutory language of 1231.

THE COURT: I appreciate that clarification, Mr. Ensign. It raises the question that I've not received a satisfactory answer to, which is around N.M. If N.M. was told he was going to be taken to South Sudan on May 19, presumably, he was only told that because it was either impossible, impractical, or -- I can't remember the third word you just used, but -- inadvisable.

So, presumably, on May 19 it's impossible, impractical or inadvisable to take N.M. back to his country of origin. And what we were told is that the position of the Department changed only because he had a lawyer, and then, instead of deporting him to South Sudan, the Department elected to send him to -- back to his home country.

preliminary relief cannot show likelihood of success on the merits, the other factors fall away.  And we believe that's the case here.

We would also point out that, with respect to irreparable harm, Mr. O.C.G. in his declaration concedes that Mexico gave him the choice to seek asylum there or to be returned to Guatemala, and he chose to go to Guatemala.  So to the extent that that is a self-inflicted harm, we don't believe that qualifies as irreparable harm for turn purposes of preliminary relief.

THE COURT:  Thank you.

MS. REALMUTO:  A couple points.

I mean, a self-inflicted harm?  He chose not to stay in a country where horrible things happen to him?  Where he was going to be detained and he'd have to wait months in detention to apply for asylum, when he was scared of the country he was in?

He specifically asked not to be sent to Mexico at his master calendar hearing.  The regulations that the Government is relying on are standard.  They're set by the immigration judge.

But I want to put to bed this issue about the application form, the instructions to the I-589 application form.  They convey an expectation that the country or countries of proposed removal will be known to the applicant at the time

of the application.

And I would direct the Court's attention to page 3 of those instructions, where it says, to qualify for withholding, you must establish as more likely than not that -- blah-blah-blah -- that your freedom would be threatened on account of race, religion, nationality, membership in a particular social group or political opinion, quote, "in the proposed country of removal."  So it's known to the person.

Likewise, the form specifies that the application for asylum is also considered to be an application for withholding under 1231(b)(3) and may also be considered an application for CAT protection or, if the evidence you present indicates that you may be tortured, quote, "in the country of removal."

And so at no point in the history that it's been used has this form to be understood to be an invitation to present protection claims vis-à-vis all the member states in the United Nations and in the world, in the country.  So I really want to put that to bed.

With respect to the Government's point about FARRA, O.C.G. is the named plaintiff in this case.  He is entitled to withholding, not just CAT protections.

With respect to the Government's argument that this is somehow a challenge to the regulations, it is not.  We are seeking the protections for O.C.G. that are due him under withholding statute and the Convention Against Torture.

THE COURT:  Okay.  Great.

So if you want to weigh in further, my -- well, I can't imagine I will have written this up before 5:00 p.m.  So you will certainly have until then --

THE CLERK:  Mr. Charles is back.

THE COURT:  Well, Mr. Charles is back to tell us whether or not any of this is conceivable.

Mr. Charles, are you there?

MARCOS CHARLES:  I am, Your Honor.

THE COURT:  Mr. Charles, what can you share with us about the possibility of a reasonable fear interview where they -- the seven people -- are?

MARCOS CHARLES:  It is possible, sir.

THE COURT:  Okay.  Do you have any confounding details or any other details you could share with us about how it would occur?  Or you just know it's possible and the Department can work it out.

MARCOS CHARLES:  I know it's possible and the Department can work it out.  We've been working on it for the last couple of hours to make sure that we can do it, and it is possible to do it.

I think right now -- I just don't know.  We're going to have to look at how long it would take us to get it done and keeping people there that long with the -- the cooperation with DOD is going to be key.

<span style="color:green">APPEAL</span>

# United States District Court
## District of Massachusetts (Boston)
### CIVIL DOCKET FOR CASE #: 1:25-cv-10676-BEM

D.V.D. et al v. U.S. Department of Homeland Security et al
Assigned to: Judge Brian E. Murphy
Case in other court:  USCA - First Circuit, 25-01311
                                 USCA - First Circuit, 25-01393
                                 USCA - First Circuit, 25-01631
                                 USCA - First Circuit, 26-01212
Cause: 05:551 Administrative Procedure Act

Date Filed: 03/23/2025
Date Terminated: 02/26/2026
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**D.V.D.**                                                         represented by   **Kristin Macleod-Ball**
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA 02446
617-506-3646
Email: kristin@immigrationlitigation.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Kenney**
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA 02446
617-819-4681
Email: mary@immigrationlitigation.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Trina Realmuto**
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA 02446
617-819-4447
Email: trina@immigrationlitigation.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aaron Korthuis**
Northwest Immigrant Rights Project
615 Second Ave
Suite 400
Seattle, WA 98104
206-816-3872

Appx.633

Email: aaron@nwirp.org
*ATTORNEY TO BE NOTICED*

**Anwen Hughes**
Human Rights First
121 W. 36th St. PMB 520
New York, NY 10018
212-845-5244
Email: HughesA@humanrightsfirst.org
*ATTORNEY TO BE NOTICED*

**Glenda M. Aldana Madrid**
Northwest Immigrant Rights Project
615 Second Avenue
Suite 400
Seattle, WA 98104
206-957-8646
Email: glenda@nwirp.org
*ATTORNEY TO BE NOTICED*

**Inyoung Hwang**
Human Rights First
121 West 36th Street
Pmb 520
New York, NY 10018
212-845-5236
Email: HwangS@humanrightsfirst.org
*ATTORNEY TO BE NOTICED*

**Leila Kang**
Northwest Immigrant Rights Project
615 Second Ave.
Suite 400
Seattle, WA 98104
206-816-3847
Email: leila@nwirp.org
*ATTORNEY TO BE NOTICED*

**Matt Adams**
Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA 98104
206-957-8611
Email: matt@nwirp.org
*ATTORNEY TO BE NOTICED*

**Tomas Arango**
301 Broadway #2
Cambridge, MA 02139
713-459-4616
Email: tomas@immigrationlitigation.org
*TERMINATED: 06/16/2025*
*ATTORNEY TO BE NOTICED*

Appx.634

**Plaintiff**

**M.M.**                                    represented by  **Kristin Macleod-Ball**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Mary Kenney**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Trina Realmuto**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Aaron Korthuis**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Anwen Hughes**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Glenda M. Aldana Madrid**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Inyoung Hwang**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Leila Kang**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Matt Adams**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Tomas Arango**
                                                          (See above for address)
                                                          *TERMINATED: 06/16/2025*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**E.F.D.**                                  represented by  **Kristin Macleod-Ball**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*

Appx.635

*ATTORNEY TO BE NOTICED*

**Mary Kenney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Trina Realmuto**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aaron Korthuis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Glenda M. Aldana Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Inyoung Hwang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leila Kang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matt Adams**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tomas Arango**
(See above for address)
*TERMINATED: 06/16/2025*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**O.C.G.**                                          represented by   **Kristin Macleod-Ball**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Kenney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

Appx.636

*ATTORNEY TO BE NOTICED*

**Trina Realmuto**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aaron Korthuis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Glenda M. Aldana Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Inyoung Hwang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leila Kang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matt Adams**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tomas Arango**
(See above for address)
*TERMINATED: 06/16/2025*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **U.S. Department of Homeland Security** | represented by | **Elianis N. Perez**<br>U.S. Department of Justice, Office of<br>Immigration Litigation<br>P.O. Box 868<br>Ben Franklin Station<br>Washington, DC 20044<br>202-616-9124<br>Email: elianis.perez@usdoj.gov<br>*TERMINATED: 02/13/2026*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Mark Sauter** |

Appx.637

DOJ-USAO
Moakley U.S. Courthouse
One Courthouse Way
Ste 9200
Boston, MA 02169
617-748-3347
Email: mark.sauter@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Larakers**
DOJ-Civ
Office of Immigration Litigation-District
Court Section
PO Box 868
Ben Franklin Station
Washington, DC 20044
202-353-0396
Email: mary.l.larakers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Patrick Seamon**
DOJ-Civ
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
202-598-2648
Email: matthew.seamon2@usdoj.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

| | | |
|---|---|---|
| **Secretary Kristi L. Noem**<br>*Secretary of Department of Homeland Security (DHS)* | represented by | **Elianis N. Perez**<br>(See above for address)<br>*TERMINATED: 02/13/2026*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Mark Sauter**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Mary Larakers**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Matthew Patrick Seamon**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

<u>**Defendant**</u>

| | | |
|---|---|---|
| **Pamela Bondi**<br>*United States Attorney General* | represented by | **Elianis N. Perez**<br>(See above for address) |

Appx.638

*TERMINATED: 02/13/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Sauter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Larakers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Patrick Seamon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Superintendent Antone Moniz**<br>*Superintendent of the Plymouth County*<br>*Correctional Facility* | represented by | **Elianis N. Perez**<br>(See above for address)<br>*TERMINATED: 02/13/2026*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Mark Sauter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Larakers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Patrick Seamon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

| | | |
|---|---|---|
| **The New York Times Company** | represented by | **Maxwell Mishkin**<br>Ballard Spahr LLP<br>1909 K Street NW<br>Ste 12th Floor<br>Washington, DC 20006<br>202-508-1140<br>Fax: 202-661-2299<br>Email: mishkinm@ballardspahr.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Christopher A. Hatfield**
Ballard Spahr LLP
1909 K Street NW, 12th Flr.

Appx.639

Washington, DC 20006
202-661-2263
Fax: 202-661-2299
Email: hatfieldc@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**Isabella Salomao Nascimento**
Ballard Spahr LLP
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-371-3281
Email:
salomaonascimentoi@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**Intervenor**

| | | |
|---|---|---|
| **American Broadcasting Companies, Inc.**<br>**d/b/a ABC News** | represented by | **Maxwell Mishkin**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Christopher A. Hatfield**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Isabella Salomao Nascimento**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Intervenor**

| | | |
|---|---|---|
| **Cable News Network, Inc.** | represented by | **Maxwell Mishkin**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Christopher A. Hatfield**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Isabella Salomao Nascimento**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Intervenor**

| | | |
|---|---|---|
| **Dow Jones & Company, Inc.** | represented by | **Maxwell Mishkin**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Christopher A. Hatfield**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

Appx.640

                                                                **Isabella Salomao Nascimento**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

**Intervenor**

**National Public Radio, Inc.**                represented by   **Maxwell Mishkin**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Christopher A. Hatfield**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Isabella Salomao Nascimento**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

**Intervenor**

**Reuters News & Media Inc.**                 represented by    **Maxwell Mishkin**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Christopher A. Hatfield**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Isabella Salomao Nascimento**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

**Intervenor**

**WP Company LLC d/b/a The**                  represented by    **Maxwell Mishkin**
**Washington Post**                                             (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Christopher A. Hatfield**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Isabella Salomao Nascimento**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/23/2025 | 1 | COMPLAINT against All Defendants Filing fee: $ 405, receipt number AMADC-10907462 (Fee Status: Filing Fee paid), filed by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit Attachment A - Draft 2001 Form, # 3 Exhibit Attachment B - Draft 2020 Notice, # 4 Exhibit Attachment C - Feb. 18, 2025 Directive, # 5 Category Form)(Arango, Tomas) (Entered: 03/23/2025) |

Appx.641

| 03/23/2025 | 2 | MOTION for Leave to Appear Under Pseudonyms by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Text of Proposed Order)(Arango, Tomas) (Entered: 03/23/2025) |
|---|---|---|
| 03/23/2025 | 3 | MEMORANDUM in Support re 2 MOTION for Leave to Appear Under Pseudonyms filed by D.V.D., M.M., E.F.D., O.C.G.. (Arango, Tomas) (Entered: 03/23/2025) |
| 03/23/2025 | 4 | MOTION to Certify Class by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Text of Proposed Order)(Arango, Tomas) (Entered: 03/23/2025) |
| 03/23/2025 | 5 | MEMORANDUM in Support re 4 MOTION to Certify Class filed by D.V.D., M.M., E.F.D., O.C.G.. (Arango, Tomas) (Entered: 03/23/2025) |
| 03/23/2025 | 6 | Emergency MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction , MOTION to Stay *Administrative Action* by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Text of Proposed Order)(Arango, Tomas) (Entered: 03/23/2025) |
| 03/23/2025 | 7 | MEMORANDUM in Support re 6 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *Administrative Action* filed by D.V.D., M.M., E.F.D., O.C.G.. (Arango, Tomas) (Entered: 03/23/2025) |
| 03/23/2025 | 8 | EXHIBIT re 5 Memorandum in Support of Motion, 4 MOTION to Certify Class , 6 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *Administrative Action*, 3 Memorandum in Support of Motion, 2 MOTION for Leave to Appear Under Pseudonyms , 7 Memorandum in Support of Motion by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Exhibit A - Declaration of D.V.D. (Redacted), # 2 Exhibit B - Declaration of M.M. (Redacted), # 3 Exhibit C - Declaration of E.F.D. (Redacted), # 4 Exhibit D- Declaration of O.C.G. (Redacted), # 5 Exhibit E - Declaration of Trina Realmuto, # 6 Exhibit F - Declaration of Matt Adams, # 7 Exhibit G - Declaration of Anwen Hughes, # 8 Exhibit H - Declaration of Tiffany Wang, # 9 Exhibit I - Declaration of Marie Vincent, # 10 Exhibit J - Declaration of Ian Austin Rose, # 11 Exhibit K - Declaration of Laura Jones, # 12 Exhibit L - Declaration of Leslie Parra, # 13 Exhibit M - Declaration of Daniela Hernandez Chong Cuy, # 14 Exhibit N - Declaration of Zoey Jones, # 15 Exhibit O - Declaration of Danielle Strandburg-Peshkin, # 16 Exhibit P - Declaration of Denise Acevedo Perez, # 17 Exhibit Q - Declaration of Laura Belous, # 18 Exhibit R - Declaration of Melissa Chua, # 19 Exhibit S - Declaration of Patrick Taurel, # 20 Exhibit T - Declaration of Ambreen Walji, # 21 Exhibit U - Declaration of Deborah Lee, # 22 Exhibit V - Declaration of Elyssa Williams, # 23 Exhibit W - Declaration of Guadalupe Perez, # 24 Exhibit X - Declaration of Paul O'Dwyer)(Arango, Tomas) (Entered: 03/23/2025) |
| 03/23/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice for admission of Trina Realmuto, Kristin Macleod-Ball, and Mary Kenney Filing fee: $ 375, receipt number AMADC-10907475 by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Exhibit Realmuto Declaration, # 2 Exhibit Macleod-Ball Declaration, # 3 Exhibit Kenney Declaration, # 4 Text of Proposed Order)(Arango, Tomas) (Entered: 03/23/2025) |
| 03/23/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Matt Adams, Leila Kang, Aaron Korthuis, Glenda Aldana Madrid, and Anwen Hughes Filing fee: $ 625, receipt number AMADC-10907476 by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Exhibit Adams Declaration, # 2 Exhibit Kang Declaration, # 3 Exhibit Korthuis Declaration, # 4 Exhibit Aldana Madrid Declaration, # 5 Exhibit Hughes Declaration, # 6 Text of Proposed Order)(Arango, Tomas) (Entered: 03/23/2025) |
| 03/23/2025 | 11 | ELECTRONIC NOTICE of Case Assignment. Judge Brian E. Murphy assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (RN) (Entered: 03/23/2025) |

Appx.642

| 03/23/2025 | 12 | Judge Brian E. Murphy: ORDER entered. SERVICE ORDER AND ORDER CONCERNING DETERMINATION OF JURISDICTION(RN) (Entered: 03/23/2025) |
|---|---|---|
| 03/23/2025 | 13 | Judge Brian E. Murphy: ORDER entered granting 2 Motion FOR LEAVE TO APPEAR UNDER PSEUDONYMS and to file a motion **Under Seal** with the names of the plaintiffs so the Government can comply with the Court's order. (RN) (Entered: 03/23/2025) |
| 03/24/2025 | 14 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 9 Motion for Leave to Appear Pro Hac Vice Added Trina Realmuto, Kristin Macleod-Ball, and Mary Kenney.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(MBM) (Entered: 03/24/2025) |
| 03/24/2025 | 15 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 10 Motion for Leave to Appear Pro Hac Vice Added Matt Adams, Leila Kang, Aaron Korthuis, Glenda Aldana Madrid, and Anwen Hughes.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MBM) (Entered: 03/24/2025) |
| 03/24/2025 | 16 | Summons Issued as to Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (CAM) (Entered: 03/24/2025) |
| 03/24/2025 | 18 | **NOTICE OF MOTION HEARING:** Hearing on 6 Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Stay of Administrative Action is SCHEDULED for 3/28/2025 at 12:00 p.m. in Courtroom 12 (In person only) before Judge Brian E. Murphy. (BIB) (Entered: 03/24/2025) |
| 03/24/2025 | 19 | NOTICE of Appearance by Trina Realmuto on behalf of D.V.D., M.M., E.F.D., O.C.G. (Realmuto, Trina) (Entered: 03/24/2025) |
| 03/24/2025 | 20 | NOTICE of Appearance by Mary Larakers on behalf of U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz (Larakers, Mary) (Entered: 03/24/2025) |

Appx.643

| | | |
|---|---|---|
| 03/24/2025 | 21 | NOTICE of Appearance by Kristin Macleod-Ball on behalf of D.V.D., M.M., E.F.D., O.C.G. (Macleod-Ball, Kristin) (Entered: 03/24/2025) |
| 03/24/2025 | 22 | AFFIDAVIT OF SERVICE Executed by E.F.D., M.M., D.V.D., O.C.G.. Acknowledgement filed by E.F.D., M.M., D.V.D., O.C.G.. (Attachments: # 1 Exhibit File-Stamped Copies by US Attys Office)(Realmuto, Trina) (Entered: 03/24/2025) |
| 03/24/2025 | 23 | NOTICE of Appearance by Mary Kenney on behalf of D.V.D., M.M., E.F.D., O.C.G. (Kenney, Mary) (Entered: 03/24/2025) |
| 03/25/2025 | 24 | NOTICE of Appearance by Mark Sauter on behalf of U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz (Sauter, Mark) (Entered: 03/25/2025) |
| 03/25/2025 | 25 | Assented to MOTION for Extension of Time to 12:00 Midnight on March 25, 2025 to File Response/Reply *to Plaintiffs' Emergency Motion for a Temporary Restraining Order and Motion for Preliminary Injunction* by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz.(Sauter, Mark) (Entered: 03/25/2025) |
| 03/25/2025 | 26 | Judge Brian E. Murphy: ELECTRONIC ORDER granting 25 Assented to Motion for Extension of Time to 12:00 Midnight on March 25, 2025 to File Response to Plaintiffs' Emergency Motion for a Temporary Restraining Order, Preliminary Injunction and Stay. (BIB) (Entered: 03/25/2025) |
| 03/25/2025 | 27 | NOTICE of Appearance by Leila Kang on behalf of D.V.D., M.M., E.F.D., O.C.G. (Kang, Leila) (Entered: 03/25/2025) |
| 03/25/2025 | 28 | NOTICE of Appearance by Anwen Hughes on behalf of D.V.D., M.M., E.F.D., O.C.G. (Hughes, Anwen) (Entered: 03/25/2025) |
| 03/25/2025 | 29 | NOTICE of Appearance by Glenda M. Aldana Madrid on behalf of D.V.D., M.M., E.F.D., O.C.G. (Aldana Madrid, Glenda) (Entered: 03/25/2025) |
| 03/25/2025 | 30 | NOTICE of Appearance by Aaron Korthuis on behalf of D.V.D., M.M., E.F.D., O.C.G. (Korthuis, Aaron) (Entered: 03/25/2025) |
| 03/25/2025 | 31 | Opposition re 6 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *Administrative Action* filed by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz. (Attachments: # 1 Exhibit A)(Larakers, Mary) (Entered: 03/25/2025) |
| 03/28/2025 | 32 | NOTICE of Appearance by Matt Adams on behalf of D.V.D., M.M., E.F.D., O.C.G. (Adams, Matt) (Entered: 03/28/2025) |

Appx.644

| 03/28/2025 | 33 | Clerk's Notes for Motion Hearing held in-person before Judge Brian E. Murphy: Argument heard on 6 Emergency Motion for Temporary Restraining Order. Counsel address questions and issues raised by the Court. Motion for Temporary Restraining Order granted in part. Order to follow. Defendants' to respond to Motion for Certify Class and file any additional briefing re Motion for Preliminary Injunction/Stay by 4/4/2025. Plaintiff to reply no later than 4/8/2025. Hearing set.<br><br>**NOTICE OF HEARING:**<br>Hearing on 6 MOTION for Preliminary Injunction/Stay and 4 Motion to Certify Class set for 4/10/2025 at 11:45 a.m. in Courtroom 12 (In person only) before Judge Brian E. Murphy.<br><br>(Court Reporter: Jessica Leonard at jessicamichaelleonard@gmail.com.)(Attorneys present: Realmuto, Macleod-Ball, Hughes, Adams, Larakers, AUSA Sauter) (BIB) (Entered: 03/28/2025) |
|---|---|---|
| 03/28/2025 | 34 | Judge Brian E. Murphy: TEMPORARY RESTRAINING ORDER entered. (BIB) (Entered: 03/28/2025) |
| 03/28/2025 | 35 | NOTICE OF APPEAL as to 34 Order on Motion for TRO, Order on Motion for Preliminary Injunction, Order on Motion to Stay by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 4/17/2025. (Larakers, Mary) (Entered: 03/28/2025)** |
| 03/28/2025 | 36 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 35 Notice of Appeal. (MAP) (Entered: 03/28/2025) |
| 03/29/2025 | 37 | NOTICE of Appearance by Matthew Patrick Seamon on behalf of U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz (Seamon, Matthew) (Entered: 03/29/2025) |
| 03/29/2025 | 38 | MOTION to Stay re 34 Order on Motion for TRO, Order on Motion for Preliminary Injunction, Order on Motion to Stay *(Motion for Partial Stay of the Temporary Restraining Order)* by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz. (Attachments: # 1 Text of Proposed Order)(Seamon, Matthew) (Entered: 03/29/2025) |
| 03/29/2025 | 39 | USCA Case Number 25-1311 for 35 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi. (MAP) (Entered: 03/29/2025) |
| 03/29/2025 | 40 | Judge Brian E. Murphy: MEMORANDUM ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER...For the foregoing reasons, the Court has GRANTED in part Plaintiffs' motion 34 . (BIB) (Entered: 03/29/2025) |
| 03/29/2025 | 41 | Judge Brian E. Murphy: ELECTRONIC ORDER entered denying 38 Defendants' Motion For Partial Stay of the Temporary Restraining Order, for the reasons stated in the 40 Memorandum on Plaintiffs' Motion for Temporary Restraining Order issued this day. (BIB) (Entered: 03/29/2025) |

Appx.645

| 03/29/2025 | 42 | Supplemental Record on Appeal transmitted to US Court of Appeals re 35 Notice of Appeal, Documents included: ECF Nos. 40 and 41 (MAP) (Entered: 03/29/2025) |
|---|---|---|
| 03/30/2025 | 43 | MOTION MOTION FOR AN INDICATIVE RULING re 34 Order on Motion for TRO, Order on Motion for Preliminary Injunction, Order on Motion to Stay by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz. (Attachments: # 1 Exhibit Exh. A)(Larakers, Mary) (Entered: 03/30/2025) |
| 03/31/2025 | 44 | Transcript of Motion Hearing held on March 28, 2025, before Judge Brian E. Murphy. COA Case No. 25-1311. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Jessica Leonard at jessicamichaelleonard@gmail.com. Redaction Request due 4/21/2025. Redacted Transcript Deadline set for 5/1/2025. Release of Transcript Restriction set for 6/30/2025. (DRK) (Entered: 03/31/2025) |
| 03/31/2025 | 45 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 03/31/2025) |
| 03/31/2025 | 46 | Judge Brian E. Murphy: ELECTRONIC PROCEDURAL ORDER: The Plaintiffs shall file a response to 43 Defendants Motion for an Indicative Ruling Under Federal Rule of Civil Procedure 62.1 no later than Friday, April 4, 2025. (BIB) (Entered: 03/31/2025) |
| 03/31/2025 | 47 | AFFIDAVIT OF SERVICE Executed by E.F.D., M.M., D.V.D., O.C.G.. All Defendants. Acknowledgement filed by E.F.D., M.M., D.V.D., O.C.G.. (Attachments: # 1 Exhibit Mail Receipts, # 2 Exhibit DHS, # 3 Exhibit Noem, # 4 Exhibit Moniz, # 5 Exhibit Bondi)(Realmuto, Trina) (Entered: 03/31/2025) |
| 04/01/2025 | 48 | NOTICE of Appearance by Elianis N. Perez on behalf of U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz (Perez, Elianis) (Entered: 04/01/2025) |
| 04/04/2025 | 49 | RESPONSE to Motion re 43 MOTION MOTION FOR AN INDICATIVE RULING re 34 Order on Motion for TRO, Order on Motion for Preliminary Injunction, Order on Motion to Stay filed by D.V.D., M.M., E.F.D., O.C.G.. (Realmuto, Trina) (Entered: 04/04/2025) |
| 04/04/2025 | 50 | EXHIBIT re 49 Response to Motion, *Re: Indicative Ruling under FRCP 62.1* by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Exhibit A - Rubio X Post, # 2 Exhibit B - Bukele X Post, # 3 Exhibit C - Cerna Decl. in JGG, # 4 Exhibit D - El Salvador HR Report, # 5 Exhibit E - Mexico HR Report, # 6 Exhibit F - Honduras HR Report, # 7 Exhibit G - Libya HR Report, # 8 Exhibit H - Rwanda HR Report, # 9 Exhibit I - Bellinger Statement, # 10 Exhibit J - Opp. Br. in Abrego Garcia, # 11 Exhibit K - Counsel Emails)(Realmuto, Trina) (Entered: 04/04/2025) |
| 04/04/2025 | 51 | Opposition re 6 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *Administrative Action Supplemental Memorandum* filed by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz. (Larakers, Mary) (Entered: 04/04/2025) |
| 04/04/2025 | 52 | Opposition re 4 MOTION to Certify Class filed by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz. (Larakers, Mary) (Entered: 04/04/2025) |
| 04/07/2025 | 53 | Assented to MOTION Remote Appearance re 33 Motion Hearing,,,, Set Hearings,,, by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz. (Perez, Elianis) (Entered: 04/07/2025) |

Appx.646

| 04/07/2025 | 54 | Judge Brian E. Murphy: ELECTRONIC ORDER granting 53 Joint Motion for Remote Appearance as to Attorney Elianis N. Perez. (BIB) (Entered: 04/07/2025) |
| 04/07/2025 | 55 | Entered in error. Modified on 4/8/2025 (CAM). (Entered: 04/08/2025) |
| 04/07/2025 | 56 | ORDER of USCA as to 35 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi (MAP) (Entered: 04/08/2025) |
| 04/08/2025 | 57 | REPLY to Response to 6 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *Administrative Action* filed by D.V.D., M.M., E.F.D., O.C.G.. (Realmuto, Trina) (Entered: 04/08/2025) |
| 04/08/2025 | 58 | REPLY to Response to 4 MOTION to Certify Class filed by D.V.D., M.M., E.F.D., O.C.G.. (Realmuto, Trina) (Entered: 04/08/2025) |
| 04/08/2025 | 59 | EXHIBIT re 57 Reply to Response to Motion, 58 Reply to Response to Motion by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Exhibit A - Guerra-Castaneda Orders, # 2 Exhibit B - Paye Order, # 3 Exhibit C - W.G.A. Order, # 4 Exhibit D - Herrera-Meza Order, # 5 Exhibit E - Rodriguez Sutuc Order, # 6 Exhibit F - H.I.L. Order, # 7 Exhibit G - Ramirez-Chavez Order, # 8 Exhibit H - Singh Order, # 9 Exhibit I - Austin Declaration, # 10 Exhibit J - Mayer-Salins Declaration, # 11 Exhibit K - Morales Declaration, # 12 Exhibit L - Gordan Declaration, # 13 Exhibit M - Gonzalez Declaration, # 14 Exhibit N - Bowman Declaration, # 15 Exhibit O - Glynn Declaration, # 16 Exhibit P - Brane Declaration, # 17 Exhibit Q - Turnbull Order)(Realmuto, Trina) (Entered: 04/08/2025) |
| 04/09/2025 | 60 | EXHIBIT re 57 Reply to Response to Motion, 58 Reply to Response to Motion by D.V.D., M.M., E.F.D., O.C.G.. (Attachments: # 1 Exhibit Belous Declaration)(Realmuto, Trina) (Entered: 04/09/2025) |
| 04/10/2025 | 61 | NOTICE of Appearance by Matthew Patrick Seamon on behalf of U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz (Seamon, Matthew) (Entered: 04/10/2025) |
| 04/10/2025 | 62 | Clerk's Notes for Hearing held in-person before Judge Brian E. Murphy: Argument heard on 6 Motion for Preliminary Injunction and Stay and 4 Motion to Certify Class. Plaintiffs to provide names and alien numbers to the Defendants by 5:00 p.m. tomorrow, 4/11/2025. Defendants shall respond to Plaintiffs' latest submissions no later than 4/23/2025. Further conference set. Motions taken under advisement. TRO remains in place and is extended until the Motion for Preliminary Injunction is ruled upon.<br><br>**NOTICE OF HEARING:**<br>Status Conference set for 4/28/2025 at 11:00 a.m. in Courtroom 12 (In person only) before Judge Brian E. Murphy.<br><br>(Court Reporter: Jessica Leonard at jessicamichaelleonard@gmail.com.)(Attorneys present: Realmuto, Macleod-Ball, Hughes, Adams, Larakers, Ensign, Perez (zoom)) (BIB) (Entered: 04/10/2025) |
| 04/15/2025 | 63 | MOTION to Stay *(Provisional Motion for Stay Pending Appeal of Preliminary Injunction Order)* by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz. (Attachments: # 1 Text of Proposed Order)(Seamon, Matthew) (Entered: 04/15/2025) |
| 04/18/2025 | 64 | Judge Brian E. Murphy: MEMORANDUM AND ORDER ON PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION...: For the reasons stated in the accompanying Memorandum and Order, 4 Plaintiffs' Motion for Class Certification is granted and 6 Plaintiffs' Motion for Preliminary Injunction is granted in part. Defendants are ENJOINED from deporting any alien with a final order of removal |

Appx.647

to any country not explicitly provided for on the alien's order of removal without first providing to that alien the due-process guarantees set forth in pages 46-47 of the accompanying Memorandum and Order. Additionally, the Court ORDERS expedited discovery on whether and in what form Plaintiff O.C.G. received notice of his removal to a third country and ORDERS the parties to file a joint status update addressing a proposed discovery plan by April 25, 2025. The parties should be prepared to discuss this issue during the status conference scheduled for April 28, 2025, at 11:00 a.m. (BIB) (Entered: 04/18/2025)

| 04/18/2025 | 65 | Judge Brian E. Murphy: ELECTRONIC ORDER denying 63 Provisional Motion for Stay Pending Appeal of Preliminary Injunction Order, for the reasons stated in the Memorandum and Order on Plaintiffs' Motions for Class Certification and Preliminary Injunction 64 issued this day. (BIB) (Entered: 04/18/2025) |
|---|---|---|
| 04/18/2025 | 66 | Judge Brian E. Murphy: ELECTRONIC ORDER finding as moot 43 Motion for an Indicative Ruling. (BIB) (Entered: 04/18/2025) |
| 04/21/2025 | 67 | MOTION Remote Appearance by D.V.D., M.M., E.F.D., O.C.G..(Adams, Matt) (Entered: 04/21/2025) |
| 04/22/2025 | 68 | Judge Brian E. Murphy: ELECTRONIC ORDER granting 67 Unopposed Motion for Remote Appearance. (BIB) (Entered: 04/22/2025) |
| 04/22/2025 | 69 | NOTICE OF APPEAL as to 64 Memorandum & ORDER,,,, by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 5/12/2025. (Larakers, Mary) (Entered: 04/22/2025)** |
| 04/22/2025 | 70 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 69 Notice of Appeal. (MAP) (Entered: 04/22/2025) |
| 04/22/2025 | 71 | USCA Case Number 25-1393 for 69 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi. (MAP) (Entered: 04/22/2025) |
| 04/23/2025 | 72 | RESPONSE TO COURT ORDER by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz re 62 Order on Motion to Certify Class,,,, Order on Motion for Preliminary Injunction,,,, Order on Motion to Stay,,,, Motion Hearing,,,, Set Hearings,,, . (Attachments: # 1 Exhibit A)(Larakers, Mary) (Additional attachment(s) added on 4/28/2025: # 2 Unredacted Response - SEALED, # 3 Unredacted Declaration - SEALED) (CAM). (Entered: 04/23/2025) |
| 04/24/2025 | 73 | Consent MOTION remote appearance *for Anwen Hughes and Mary Kenney* by D.V.D., M.M., E.F.D., O.C.G..(Hughes, Anwen) (Entered: 04/24/2025) |
| 04/25/2025 | 74 | Transcript of Motion Hearing held on April 10, 2025, before Judge Brian E. Murphy. COA Case No. 25-1393 and 25-1311. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Jessica Leonard at jessica@wickedsteno.com. Redaction Request due 5/16/2025. Redacted Transcript |

Appx.648

| | | Deadline set for 5/27/2025. Release of Transcript Restriction set for 7/24/2025. (DRK) (Entered: 04/25/2025) |
|---|---|---|
| 04/25/2025 | 75 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 04/25/2025) |
| 04/25/2025 | 76 | NOTICE by U.S. Department of Homeland Security, Kristi Noem, Pamela Bondi, Antone Moniz *Appearance Jonathan Guynn On Behalf of Defendants* (Larakers, Mary) (Entered: 04/25/2025) |
| 04/25/2025 | 77 | STATUS REPORT *and Proposed Expedited Discovery Plan Regarding Plaintiff O.C.G. (Joint)* by D.V.D., M.M., E.F.D., O.C.G.. (Realmuto, Trina) (Entered: 04/25/2025) |
| 04/27/2025 | 78 | Judge Brian E. Murphy: ELECTRONIC ORDER granting 73 Unopposed Motion for Remote Appearance. (BIB) (Entered: 04/27/2025) |
| 04/28/2025 | 79 | Clerk's Notes for Status Conference held in-person before Judge Brian E. Murphy: Court discusses the Proposed Expedited Discovery Plan Regarding Plaintiff O.C.G. 77 with counsel and will issue an e-Order outlining the parameters for discovery. Further discussion regarding briefing that is necessary in the upcoming weeks. Orders to issue. (Court Reporter: Jessica Leonard at jessica@wickedsteno.com.)(Attorneys present: Realmuto, Macleod-Ball, Arango, Kenney (zoom), Hughes (zoom), Adams (zoom), Larakers, Guynn) (BIB) (Entered: 04/28/2025) |
| 04/28/2025 | 80 | Judge Brian E. Murphy: ELECTRONIC ORDER - For the reasons discussed in today's hearing, the Court ORDERS that: (1) the parties will conduct expedited discovery limited to the issue of whether, or to what extent, Plaintiff O.C.G. received notice that he would be removed to Mexico and any response he provided to that notice; (2) all responses to requests for production of documents, interrogatories, and admissions shall be completed by May 12, 2025; (3) each side will be limited to 10 total written discovery requests (the requests for interrogatories and admissions); (4) the deposition of the officer who allegedly provided O.C.G. with notice shall be completed by May 19, 2025; (5) the deposition will be limited to 4 hours; and (6) Defendants must produce O.C.G.'s a-file by May 12, 2025, without redactions, aside from those necessary to protect privileged information or as required by a protective order. (BIB) (Entered: 04/28/2025) |
| 04/28/2025 | 81 | Judge Brian E. Murphy: ELECTRONIC ORDER - For the reasons discussed in today's hearing, the Court ORDERS that: (1) by May 12, 2025, Defendants will identify any individuals with a final order of removal that were removed on the two flights that occurred on or around March 31, 2025, and April 13, 2025; and (2) Defendants will identify any additional flights to remove aliens from Guantanamo Bay to third countries that occurred prior to the date that Defendants provide a response to part (1) (BIB)<br><br>Modified to correct (2) on 4/28/2025 (BIB). (Entered: 04/28/2025) |
| 04/28/2025 | 82 | Judge Brian E. Murphy: ELECTRONIC ORDER - For the reasons discussed in today's hearing, the Court ORDERS that each party will submit a memorandum of no more than 2 pages by April 29, 2025, at 5 p.m., addressing whether this Court has authority to modify its preliminary injunction while an appeal is pending. (BIB) (Entered: 04/28/2025) |
| 04/28/2025 | 83 | Judge Brian E. Murphy: ELECTRONIC ORDER - For the reasons discussed in today's hearing, the Court ORDERS that the parties submit a joint discovery plan by May 5, 2025, at 5 p.m. that addresses: (1) the scope and timing of discovery related to the factual circumstances surrounding the removal of the four alleged class members identified in Defendants' April 23, 2025 response (Dkt. 72 ) that occurred after the issuance of this |

Appx.649

| | | |
|---|---|---|
| | | Court's temporary restraining order on March 28, 2025; (2) the relationship between the Department of Homeland Security and the Department of Defense, including, but not limited to, each agency's role with regards to removals, the management of Guantanamo Bay, and the March 7, 2025 memorandum of understanding between the two agencies; and (3) the facts in the declaration of Tracy J. Huettl (Dkt. 72-1). (BIB) (Entered: 04/28/2025) |
| 04/29/2025 | 84 | RESPONSE TO COURT ORDER by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security re 82 Order, . (Larakers, Mary) (Entered: 04/29/2025) |
| 04/29/2025 | 85 | MEMORANDUM OF LAW by D.V.D., E.F.D., M.M., O.C.G. to 64 Memorandum & ORDER,,,,. (Realmuto, Trina) (Entered: 04/29/2025) |
| 04/30/2025 | 86 | Judge Brian E. Murphy: ELECTRONIC ORDER - AMENDED PRELIMINARY INJUNCTION: In light of the issues raised during the April 28, 2025 hearing, this Court modifies a portion of its April 18, 2025 preliminary injunction 64 . This modification preserves the status quo as outlined in this Court's preliminary injunction. *See Sec. & Exch. Comm'n v. Xia,* 2024 WL 3447849, at *6-7 (E.D.N.Y. July 9, 2024) (collecting cases modifying preliminary injunctions pending appeal in order to preserve the status quo). Defendants have represented to this court that that removals from Guantanamo Bay to third countries have been executed by the Department of Defense without the Department of Homeland Security's direction or knowledge, *see* Dkt 72, and the Court makes no finding on the accuracy of this assignment of responsibility but, in an abundance of caution, ORDERS that, prior to removing, or allowing or permitting another agency to remove, an alien from Guantanamo Bay to a third country, Defendants must comport with the terms of the April 18, 2025 preliminary injunction by providing the due-process guarantees set forth in Dkt. 64 at 46-47. At the April 28, 2025 hearing, the status of the Guantanamo Bay Detention Center was debated. The Court declines to resolve if transportation to this base is a deportation to a third country despite the United States' exercise of jurisdiction and control over the base. Given the position taken by the Government that the deportation from Guantanamo to third countries was not at the direction, behest or control of the Department of Homeland Security, a debated issue to be resolved once preliminary discovery has been conducted, this Court ORDERS that, after taking custody of an alien, Defendants may not cede custody or control in any manner that prevents an alien from receiving the due-process guarantees outlined in the April 18, 2025 preliminary injunction.<br>(BIB) (Entered: 04/30/2025) |
| 04/30/2025 | 87 | Supplemental Record on Appeal transmitted to US Court of Appeals re 35 Notice of Appeal, 69 Notice of Appeal, Documents included: ECF No.86 (MAP) (Entered: 04/30/2025) |
| 05/05/2025 | 88 | RESPONSE TO COURT ORDER by D.V.D., E.F.D., M.M., O.C.G. re 83 Order,,, . (Realmuto, Trina) (Entered: 05/05/2025) |
| 05/07/2025 | 89 | Emergency MOTION for Temporary Restraining Order by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Text of Proposed Order)(Realmuto, Trina) (Entered: 05/07/2025) |
| 05/07/2025 | 90 | AFFIDAVIT of Trina Realmuto re 89 Emergency MOTION for Temporary Restraining Order by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit A - Media Articles, # 2 Exhibit B - Dan and Nguyen Emails, # 3 Exhibit C - TRLA Emails, # 4 Exhibit D - Sinodis Emails, # 5 Exhibit E - Counsel Emails, # 6 Exhibit F - X Post)(Realmuto, Trina) (Entered: 05/07/2025) |
| 05/07/2025 | 91 | Judge Brian E. Murphy: MEMORANDUM AND ORDER ON 89 PLAINTIFFS' MOTION FOR EMERGENCY RELIEF...Accordingly, the Court construes Plaintiffs' motion as one for clarification...If there is any doubt - the Court sees none - the allegedly |

Appx.650

| | | imminent removals, as reported by news agencies and as Plaintiffs seek to corroborate with class-member accounts and public information, would clearly violate this Court's Order.<br>(BIB) (Entered: 05/07/2025) |
|---|---|---|
| 05/07/2025 | 92 | Judge Brian E. Murphy: ELECTRONIC ORDER - After reviewing the parties' proposed discovery plans, the Court ORDERS that: (1) the parties will conduct expedited discovery limited to the issues of (a) the scope and timing of discovery related to the factual circumstances surrounding the removal of the four alleged class members identified in Defendants' April 23, 2025 response (Dkt. 72) that occurred after the issuance of this Court's temporary restraining order on March 28, 2025; (b) the relationship between the Department of Homeland Security and the Department of Defense, including, but not limited to, each agency's role with regards to removals, the management of Guantanamo Bay, and the March 7, 2025 memorandum of understanding between the two agencies; and (c) the facts in the declaration of Tracy J. Huettl (Dkt. 72-1); (2) any deposition notices must be served by May 12, 2025; (3) each side will be limited to twenty-five Requests for Admission, twenty-five Interrogatories, and two sets of Requests for Production, issued by May 14, 2025; (4) any objection, motion to quash, or motion for a protective order must be made within fourteen days of receipt of the discovery request or subpoena, and each request and subpoena should reference this time limit; (5) all responses to requests for production of documents, interrogatories, and admissions shall be completed within thirty days of receipt of the request; and (6) depositions shall be completed by June 26, 2025. (Entered: 05/07/2025) |
| 05/07/2025 | 93 | Judge Brian E. Murphy: ELECTRONIC ORDER - Based on DHS's representations that DoD has been conducting third country removals, allegedly without any involvement of DHS, the Court ORDERS that each party will submit a memorandum of no more than ten pages by May 14, 2025, addressing whether DoD should be joined as a party in this case. Any response, or no more than five pages, should be filed by May 19, 2025.<br>(BIB) (Entered: 05/07/2025) |
| 05/12/2025 | 94 | STIPULATION re 80 Order,,, *Stipulated Proposed Protective Order* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Entered: 05/12/2025) |
| 05/12/2025 | 95 | STIPULATION re 80 Order,,, *Stipulated Proposed 502(d) Order* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Entered: 05/12/2025) |
| 05/13/2025 | 96 | **Judge Brian E. Murphy: PROTECTIVE ORDER FOR EXPEDITED DISCOVERY RELATED TO PLAINTIFF O.C.G. (ECF NO. 80 ) (BIB) (Entered: 05/13/2025)** |
| 05/13/2025 | 97 | **Judge Brian E. Murphy: ORDER entered re 95 - STIPULATED CLAWBACK AGREEMENT AND FEDERAL RULE OF EVIDENCE 502(d) ORDER FOR EXPEDITED DISCOVERY RELATED TO PLAINTIFF O.C.G. (ECF NO. 80) (BIB) (Entered: 05/13/2025)** |
| 05/14/2025 | 98 | RESPONSE TO COURT ORDER by D.V.D., E.F.D., M.M., O.C.G. re 93 Order, . (Macleod-Ball, Kristin) (Entered: 05/14/2025) |
| 05/14/2025 | 99 | EXHIBIT re 98 Response to Court Order by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit A - MOU, # 2 Exhibit B - Sinodis Dec., # 3 Exhibit C - Nguyen Dec., # 4 Exhibit D - Macleod-Ball Dec.)(Macleod-Ball, Kristin) (Entered: 05/14/2025) |
| 05/14/2025 | 100 | RESPONSE TO COURT ORDER by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security re 93 Order, . (Seamon, Matthew) (Entered: 05/14/2025) |

Appx.651

| 05/16/2025 | 101 | Transcript of Status Conference held on April 28, 2025, before Judge Brian E. Murphy. COA Case No. 25-1393 and 25-1311. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Jessica Leonard at jessica@wickedsteno.com. Redaction Request due 6/6/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/14/2025. (DRK) (Entered: 05/16/2025) |
|---|---|---|
| 05/16/2025 | 102 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/16/2025) |
| 05/16/2025 | 103 | Defendant's Notice of Errata (Attachments: # 1 Exhibit A)(Larakers, Mary) (Attachment 1 replaced on 5/17/2025) (BIB). (Entered: 05/16/2025) |
| 05/18/2025 | 104 | Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* by O.C.G.. (Attachments: # 1 Text of Proposed Order)(Realmuto, Trina) (Entered: 05/18/2025) |
| 05/18/2025 | 105 | MEMORANDUM in Support re 104 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by O.C.G.. (Attachments: # 1 Exhibit A - Emails, # 2 Exhibit B - Articles)(Realmuto, Trina) (Entered: 05/18/2025) |
| 05/19/2025 | 106 | DECLARATION re 104 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction*, 105 Memorandum in Support of Motion by O.C.G.. (Attachments: # 1 Exhibit A - Dfs.' Amended Discovery Responses)(Realmuto, Trina) (Entered: 05/19/2025) |
| 05/19/2025 | 107 | RESPONSE TO COURT ORDER by D.V.D., E.F.D., M.M., O.C.G. re 93 Order, . (Macleod-Ball, Kristin) (Entered: 05/19/2025) |
| 05/19/2025 | 108 | RESPONSE TO COURT ORDER by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security re 93 Order, . (Seamon, Matthew) (Entered: 05/19/2025) |
| 05/19/2025 | 109 | **NOTICE OF MOTION HEARING:** Hearing on 104 Emergency Motion for Temporary Restraining Order and Preliminary Injunction is SCHEDULED for 5/21/2025 at 1:00 p.m. in Courtroom 12 (In person only) before Judge Brian E. Murphy. Defendants shall file their opposition to the Motion for Temporary Restraining Order no later than 5:00 p.m. on 5/20/2025. (BIB) (Entered: 05/19/2025) |
| 05/20/2025 | 110 | NOTICE OF MANUAL FILING by D.V.D., E.F.D., M.M., O.C.G. re 104 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* (Attachments: # 1 Exhibit A - Cover Sheet)(Macleod-Ball, Kristin) (Additional attachment(s) added on 5/20/2025: # 2 SEALED Declaration of Glenda Aldana Madrid re Transcript of 6/17/24 (and attached transcription), # 3 SEALED Declaration of Anwen Hughes re Transcript of 2/19/25 (and attached transcription)) (CAM). (Entered: 05/20/2025) |
| 05/20/2025 | 111 | Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Text of Proposed Order)(Realmuto, Trina) (Entered: 05/20/2025) |
| 05/20/2025 | 112 | Emergency MEMORANDUM in Support re 111 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit 1 - Brown Declaration, # 2 Exhibit 2 - South Sudan DOS |

Appx.652

| | | Report, # 3 Exhibit 3 - Aldana Madrid Declaration)(Realmuto, Trina) (Entered: 05/20/2025) |
|---|---|---|
| 05/20/2025 | 113 | RESPONSE to Motion re 104 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Additional attachment(s) added on 5/27/2025: # 1 Unredacted Opposition - SEALED) (MBM). (Entered: 05/20/2025) |
| 05/20/2025 | 114 | **NOTICE RE MOTION HEARING - TIME CHANGE:** Hearing on Motion 111 Emergency MOTION for Temporary Restraining Order and Preliminary Injunction and 104 Emergency MOTION for Temporary Restraining Order and Preliminary Injunction is SCHEDULED for 5/21/2025 at 11:00 a.m. in Courtroom 12 (In person with remote access provided) before Judge Brian E. Murphy.<br><br>Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>(BIB) (Entered: 05/20/2025) |
| 05/20/2025 | 115 | Clerk's Notes for Motion Hearing held before Judge Brian E. Murphy: Argument heard re 111 Emergency MOTION for Temporary Restraining Order and Preliminary Injunction and whether the defendants are in violation of the Preliminary Injunction Order previously issued by the Court. Court to issue further Orders as stated during the course of the hearing. Hearing continued until tomorrow 5/21/2025 at 11:00 a.m. (Court Reporter: Debra Kane at debrakane0711@gmail.com.)(Attorneys present: Realmuto, Hughes, Adams, Kenney, Kang, Korthuis, Madrid, Perez, Larakers, AUSA Farquhar, Mazzara) (BIB) (Entered: 05/20/2025) |
| 05/20/2025 | 116 | Judge Brian E. Murphy: ORDER...At today's emergency hearing, the Court ordered Defendants to maintain custody and control of class members currently being removed to South Sudan or to any other third country, to ensure the practical feasibility of return if the Court finds that such removals were unlawful. While the Court leaves the practicalities of compliance to Defendants' discretion, Defendants have ensured, and the Court expects, that class members will be treated humanely.<br><br>The Court has further ordered that Defendants be prepared at tomorrow's prescheduled hearing to identify by name the affected class members and to address: (1) the time and manner of notice each individual received as to their third-country removal; and (2) what opportunity each individual had to raise a fear-based claim. In the event that Defendants determine that N.M. is not a class member, or was otherwise removed to any country other than South Sudan, Defendants must nonetheless be prepared to address the details of his removal, including when and to where he was removed, the names of individuals personally involved in executing his removal, and any information currently in Defendants' possession regarding his current whereabouts. (BIB) (Entered: 05/20/2025) |
| 05/21/2025 | 117 | Clerk's Notes for Motion Hearing held in-person with remote access before Judge Brian E. Murphy: Marcos Charles and Joseph Mazzara placed under oath. At the request of counsel, the Court conducts a sealed hearing with counsel and Marcos Charles. Argument heard in open court on 104 Motion for TRO and 111 Motion for TRO. Court discusses clarifying the Preliminary Injunction currently in place. Defendants to file further declarations addressing the issues raised by the court. Argument heard on the joinder of |

Appx.653

| | | |
|---|---|---|
| | | DoD and if plaintiff decides to pursue the addition of DoD, plaintiff shall file a motion to amend the complaint. Defendants' answer to the complaint extended for 6 weeks (7/2/2025) Court will consider scheduling an evidentiary hearing if necessary re the Affidavit of Brian Ortega and metadata issues. Motions taken under advisement. Orders to be issued.<br>(Court Reporter: Jessica Leonard at jessica@wickedsteno.com.)(Attorneys present: Realmuto, Macleod-Ball, Arango, Hughes, Seamons (in-person) Kang, Adams, Kenney, Korhuis, Madrid, Ryan, Larakers, Perez, Ensign (by zoom)) (BIB) (Entered: 05/21/2025) |
| 05/21/2025 | 118 | Judge Brian E. Murphy: MEMORANDUM ON PRELIMINARY INJUNCTION entered. (BIB) (Entered: 05/21/2025) |
| 05/21/2025 | 119 | Judge Brian E. Murphy: ORDER ON REMEDY FOR VIOLATION OF PRELIMINARY INJUNCTION entered. (BIB) (Entered: 05/21/2025) |
| 05/21/2025 | 120 | Judge Brian E. Murphy: ELECTRONIC ORDER regarding potential additional violation of court order: Defendants must submit by 5:00 p.m. on May 22, 2025, under the pains and penalties of perjury, a declaration as to the facts and circumstances related to the removal of N.M., including, but not limited to: (1) the date and time at which Defendants determined that it would be "impracticable, inadvisable, or impossible," 8 U.S.C. s. 1231(b)(1)(C)(iv), to remove N.M. to Burma; (2) the bases for Defendants' determination that it would be "impracticable, inadvisable, or impossible" to remove N.M. to Burma; (3) whether Defendants still plan to remove N.M. to Burma; (4) the bases for Defendants' determination on May 20, 2025 that it was no longer "impracticable, inadvisable, or impossible" to remove N.M. to Burma; (5) the specific time as to when Defendants determined that it was no longer "impracticable, inadvisable, or impossible" to remove N.M. to Burma; and (6) what changed between the Defendants' initial and new determinations as to the feasibility of removal to Burma.(BIB) (Entered: 05/21/2025) |
| 05/21/2025 | 121 | Judge Brian E. Murphy: ELECTRONIC ORDER regarding chain refoulment: Defendants must submit by 5:00 p.m. on May 22, 2025, under the pains and penalties of perjury, a declaration addressing the news reports regarding statements made by South Sudan's police spokesperson, Maj. Gen. James Monday Enoka, that if migrants arrive in South Sudan, they would be investigated and "redeported to their correct country" if found not to be South Sudanese, and whether this implicates the prohibition against chain refoulement.<br>(BIB) (Entered: 05/21/2025) |
| 05/21/2025 | 122 | Judge Brian E. Murphy: ELECTRONIC ORDER regarding preliminary injunction compliance: Defendants must submit by 5:00 p.m. on May 28, 2025, under the pains and penalties of perjury, a declaration from an attorney of record in this case that certifies: (1) that notice of the clarified preliminary injunction (Dkt. 118) has been provided to all persons involved in the removal process; and (2) that all individuals potentially involved in any removal that may implicate this order have been told that failure to comply with the terms of the preliminary injunction may subject them to civil or criminal contempt. (BIB) (Entered: 05/21/2025) |
| 05/22/2025 | 123 | DECLARATION re 104 Emergency MOTION for Temporary Restraining Order *and Preliminary Injunction* by O.C.G.. (Korthuis, Aaron) (Additional attachment(s) added on 5/23/2025: # 1 Unredacted OCG Decalaration - SEALED) (CAM). (Entered: 05/22/2025) |
| 05/22/2025 | 124 | RESPONSE TO COURT ORDER by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security re 121 Order,, . (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Larakers, Mary) (Additional attachment(s) added on 5/23/2025: # 3 Unredacted Exhibit A - SEALED, # 4 Unredacted Exhibit B - SEALED) (CAM). (Entered: 05/22/2025) |

Appx.654

| 05/22/2025 | 125 | DECLARATION re 120 Order,,,, by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Additional attachment(s) added on 5/23/2025: # 1 Unredacted Declaration - SEALED) (CAM). (Entered: 05/22/2025) |
|---|---|---|
| 05/22/2025 | 126 | Transcript of Hearing via Videoconference held on May 20, 2025, before Judge Brian E. Murphy. COA Case No. 25-1393 and 25-1311. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Debra Kane at debrakane0711@gmail.com. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/23/2025) |
| 05/22/2025 | 127 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/23/2025) |
| 05/23/2025 | 129 | DECLARATION re 124 Response to Court Order, by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Attachments: # 1 Exhibit) (Larakers, Mary) (Additional attachment(s) added on 5/27/2025: # 2 Unredacted Exhibit) (MBM). (Entered: 05/23/2025) |
| 05/23/2025 | 130 | MOTION for Reconsideration re 116 Order,,,,, 118 Order, 119 Order , MOTION to Stay ( Responses due by 6/6/2025) by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Attachments: # 1 Exhibit Rubio Declaration, # 2 Exhibit Ripa Declaration)(Seamon, Matthew) (Additional attachment(s) added on 5/27/2025: # 3 Unredacted Motion to Reconsider SEALED, # 4 Unredacted Ripa Declaration SEALED) (MBM). (Entered: 05/23/2025) |
| 05/23/2025 | 131 | MOTION to Seal *Unopposed* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security.(Larakers, Mary) (Entered: 05/23/2025) |
| 05/23/2025 | 132 | Judge Brian E. Murphy: MEMORANDUM AND ORDER ON 104 PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION...The Court finds that all four preliminary injunction factors weigh in favor of granting the injunction. Accordingly, Plaintiffs' motion for preliminary injunction is GRANTED. Defendants are hereby ORDERED to take all immediate steps, including coordinating with Plaintiff's counsel, to facilitate the return of O.C.G. to the United States. Defendants shall file a status report within five days of this Order updating the Court as to the status of O.C.G.'s return... (BIB) (Entered: 05/23/2025) |
| 05/23/2025 | 133 | Judge Brian E. Murphy: ELECTRONIC ORDER finding as moot 111 Emergency MOTION for Temporary Restraining Order and Preliminary Injunction, in light of the Court's findings, see ECF# 118 and 119 . (BIB) (Entered: 05/23/2025) |
| 05/23/2025 | 134 | Judge Brian E. Murphy: ELECTRONIC ORDER granting 131 Defendants' Unopposed Motion to Seal Declaration. (BIB) (Entered: 05/23/2025) |
| 05/26/2025 | 135 | Judge Brian E. Murphy: MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR RECONSIDERATION AND STAY...For the foregoing reasons, 130 Defendants' motions for reconsideration and for stay pending appeal are DENIED.(BIB) (Entered: 05/26/2025) |
| 05/27/2025 | 140 | Consent MOTION for Extension of Time to May 30, 2025 to File Discovery Motions by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Entered: 05/27/2025) |

Appx.655

| 05/28/2025 | 141 | Judge Brian E. Murphy: ELECTRONIC ORDER granting 140 Consent Motion for Extension of Time to May 30, 2025 to File Discovery Motions. (BIB) (Entered: 05/28/2025) |
| 05/28/2025 | 142 | DECLARATION re 122 Order,, by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Perez, Elianis) (Entered: 05/28/2025) |
| 05/28/2025 | 143 | STATUS REPORT *Regarding O.C.G.* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Seamon, Matthew) (Entered: 05/28/2025) |
| 05/30/2025 | 145 | Transcript of Motion Hearing (Sealed Portion Removed) held on May 21, 2025, before Judge Brian E. Murphy. COA Case No. 25-1393 and 25-1311. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Jessica Leonard at jessica@wickedsteno.com. Redaction Request due 6/20/2025. Redacted Transcript Deadline set for 6/30/2025. Release of Transcript Restriction set for 8/28/2025. (DRK) (Entered: 05/30/2025) |
| 05/30/2025 | 146 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/30/2025) |
| 05/30/2025 | 147 | Proposed Document(s) submitted by D.V.D., E.F.D., M.M., O.C.G.. Document received: Proposed Protective Order. (Kang, Leila) (Entered: 05/30/2025) |
| 05/30/2025 | 148 | MOTION for Protective Order , MOTION to Quash ( Responses due by 6/13/2025) by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Seamon, Matthew) (Additional attachment(s) added on 6/2/2025: # 1 Exhibit A SEALED, # 2 Exhibit B SEALED, # 3 Exhibit C SEALED) (MBM). (Entered: 05/30/2025) |
| 06/02/2025 | 149 | Supplemental Record on Appeal transmitted to US Court of Appeals re 35 Notice of Appeal, 69 Notice of Appeal, Documents included: ECF Nos. 116, 118, 119, 132, and 135 (MAP) (Entered: 06/02/2025) |
| 06/02/2025 | 150 | RESPONSE TO COURT ORDER by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security re 119 Order . (Larakers, Mary) (Entered: 06/02/2025) |
| 06/05/2025 | 151 | DECLARATION re 150 Response to Court Order by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Perez, Elianis) (Entered: 06/05/2025) |
| 06/06/2025 | 152 | STATUS REPORT *Regarding Motion for Protective Order (ECF No. 148)* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Seamon, Matthew) (Entered: 06/06/2025) |
| 06/09/2025 | 153 | RESPONSE TO COURT ORDER by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security re 119 Order . (Seamon, Matthew) (Entered: 06/09/2025) |
| 06/10/2025 | 154 | MOTION for Leave to Appear Pro Hac Vice for admission of Inyoung Hwang Filing fee: $ 125, receipt number AMADC-11059744 by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit A - Hwang Declaration)(Arango, Tomas) (Entered: 06/10/2025) |
| 06/10/2025 | 155 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 154 Motion for Leave to Appear Pro Hac Vice of Inyoung Hwang. |

Appx.656

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions
https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

(CAM) (Entered: 06/10/2025)

| 06/12/2025 | 156 | STIPULATION *for Amended Discovery Schedule* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Seamon, Matthew) (Entered: 06/12/2025) |
| --- | --- | --- |
| 06/13/2025 | 157 | Judge Brian E. Murphy: ELECTRONIC ORDER adopting the 156 Joint Stipulation for Amended Discovery Schedule and withdrawing 148 Defendants' Motion for Protective Order. (BIB) (Entered: 06/13/2025) |
| 06/13/2025 | 158 | NOTICE of Withdrawal of Appearance by Tomas Arango (Arango, Tomas) (Entered: 06/13/2025) |
| 06/13/2025 | 159 | MOTION to Intervene *and Unseal Court Records* by The New York Times Company, American Broadcasting Companies, Inc. d/b/a ABC News, Cable News Network, Inc., Dow Jones & Company, Inc., National Public Radio, Inc., Reuters News & Media Inc., WP Company LLC d/b/a The Washington Post. (Attachments: # 1 Proposed Order) (Hatfield, Christopher) (Entered: 06/13/2025) |
| 06/13/2025 | 160 | CORPORATE DISCLOSURE STATEMENT by American Broadcasting Companies, Inc. d/b/a ABC News, Cable News Network, Inc., Dow Jones & Company, Inc., National Public Radio, Inc., Reuters News & Media Inc., The New York Times Company, WP Company LLC d/b/a The Washington Post identifying Corporate Parent Nash Holdings LLC for WP Company LLC d/b/a The Washington Post; Corporate Parent Ruby Newco, LLC, Corporate Parent News Preferred Holdings, Inc., Corporate Parent News Corporation for Dow Jones & Company, Inc.; Corporate Parent The Walt Disney Company for American Broadcasting Companies, Inc. d/b/a ABC News; Corporate Parent Thomson Reuters U.S. LLC, Corporate Parent Thomson Reuters Corporation for Reuters News & Media Inc.; Corporate Parent Warner Bros. Discovery, Inc. for Cable News Network, Inc... (Hatfield, Christopher) (Entered: 06/13/2025) |
| 06/13/2025 | 161 | MOTION for Leave to Appear Pro Hac Vice for admission of Maxwell S. Mishkin Filing fee: $ 125, receipt number AMADC-11067179 by American Broadcasting Companies, Inc. d/b/a ABC News, Cable News Network, Inc., Dow Jones & Company, Inc., National Public Radio, Inc., Reuters News & Media Inc., The New York Times Company, WP Company LLC d/b/a The Washington Post. (Attachments: # 1 Certifacate of Good Standing)(Hatfield, Christopher) (Entered: 06/13/2025) |
| 06/13/2025 | 162 | MOTION for Leave to Appear Pro Hac Vice for admission of Isabella Salomo Nascimento Filing fee: $ 125, receipt number AMADC-11067201 by American Broadcasting Companies, Inc. d/b/a ABC News, Cable News Network, Inc., Dow Jones & Company, Inc., National Public Radio, Inc., Reuters News & Media Inc., The New York Times Company, WP Company LLC d/b/a The Washington Post. (Attachments: # 1 Certificate of Good Standing)(Hatfield, Christopher) (Entered: 06/13/2025) |

Appx.657

| 06/13/2025 | 163 | MEMORANDUM in Support re 159 MOTION to Intervene *and Unseal Court Records* filed by American Broadcasting Companies, Inc. d/b/a ABC News, Pamela Bondi, Dow Jones & Company, Inc., National Public Radio, Inc., Reuters News & Media Inc., The New York Times Company, U.S. Department of Homeland Security, WP Company LLC d/b/a The Washington Post. (Attachments: # 1 Decl. of C. Hatfield, # 2 Ex. A to Hatfield Decl.)(Hatfield, Christopher) (Entered: 06/13/2025) |
|---|---|---|
| 06/13/2025 | 164 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 161 Motion for Leave to Appear Pro Hac Vice Added Maxwell S. Mishkin.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MBM) (Entered: 06/13/2025) |
| 06/13/2025 | 165 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 162 Motion for Leave to Appear Pro Hac Vice Added Isabella Salomo Nascimento.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MBM) (Entered: 06/13/2025) |
| 06/13/2025 | 166 | STIPULATION re 92 Order,,,,,, *Clawback Agreement and FRE 502(d) Proposed Order* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Entered: 06/13/2025) |
| 06/16/2025 | 167 | RESPONSE to Motion re 159 MOTION to Intervene *and Unseal Court Records* filed by D.V.D., E.F.D., M.M., O.C.G.. (Realmuto, Trina) (Entered: 06/16/2025) |
| 06/16/2025 | 168 | NOTICE of Appearance by Inyoung Hwang on behalf of D.V.D., E.F.D., M.M., O.C.G. (Hwang, Inyoung) (Entered: 06/16/2025) |
| 06/16/2025 | 169 | Judge Brian E. Murphy: ORDER entered. re 166 Stipulated Clawback Agreement and Federal Rule of Evidence 502(d) Order for Expedited Discovery Related to Alleged TRO Violation (ECF No. 92 ) (MBM) (Entered: 06/16/2025) |
| 06/16/2025 | 170 | NOTICE of Appearance by Maxwell Mishkin on behalf of American Broadcasting Companies, Inc. d/b/a ABC News, Cable News Network, Inc., Dow Jones & Company, |

Appx.658

| | | Inc., National Public Radio, Inc., Reuters News & Media Inc., The New York Times Company, WP Company LLC d/b/a The Washington Post (Mishkin, Maxwell) (Entered: 06/16/2025) |
|---|---|---|
| 06/16/2025 | 171 | NOTICE of Appearance by Isabella Salomao Nascimento on behalf of American Broadcasting Companies, Inc. d/b/a ABC News, Cable News Network, Inc., Dow Jones & Company, Inc., National Public Radio, Inc., Reuters News & Media Inc., The New York Times Company, WP Company LLC d/b/a The Washington Post (Salomao Nascimento, Isabella) (Entered: 06/16/2025) |
| 06/16/2025 | 172 | STATUS REPORT by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Entered: 06/16/2025) |
| 06/23/2025 | 173 | STATUS REPORT by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Entered: 06/23/2025) |
| 06/23/2025 | 174 | Emergency MOTION to Enforce Judgment *(Dkt. 119)*, Emergency MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Text of Proposed Order)(Realmuto, Trina) (Entered: 06/23/2025) |
| 06/23/2025 | 175 | MEMORANDUM in Support re 174 Emergency MOTION to Enforce Judgment *(Dkt. 119)*Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit A - Hughes Declaration, # 2 Exhibit B - Newhouse Declaration)(Realmuto, Trina) (Entered: 06/23/2025) |
| 06/23/2025 | 176 | Judge Brian E. Murphy: ELECTRONIC ORDER ENTERED. Plaintiffs' Emergency Motion, Dkt. 174, is DENIED as unnecessary, subject to the below. The Court's May 21, 2025 Order on Remedy, Dkt. 119, remains in full force and effect, notwithstanding today's stay of the Preliminary Injunction. *DHS v. D.V.D.*, No. 24A1153, slip op. at 12 (S. Ct. Jun. 23, 2025) (Sotomayor, J., dissenting) ("[T]he District Court's remedial orders [were] not properly before [the Supreme] Court because the Government has not appealed them, nor sought a stay pending a forthcoming appeal."). For the avoidance of doubt, and to the extent Plaintiffs N.M. and D.D. are indeed subject to third-country removal, *see* Dkt. 175 at 5-7, N.M. and D.D. are included among the individuals referenced in the May 21, 2025 Order. (BAH) Modified on 6/23/2025 (PK). (Entered: 06/23/2025) |
| 06/23/2025 | 183 | UNITED STATES SUPEREME COURT OPINION: The application for stay presented to Justice Jackson and by her referred to the Court is granted. (MAP) (Entered: 07/01/2025) |
| 06/25/2025 | 177 | Joint MOTION for Extension of Time to July 7, 2025 to File Response/Reply as to 163 Memorandum in Support of Motion, 159 MOTION to Intervene *and Unseal Court Records and Intervenors to File Reply by 7/18/25* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security.(Larakers, Mary) (Entered: 06/25/2025) |
| 06/27/2025 | 178 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 177 Joint MOTION for Extension of Time to July 7, 2025 to File Response/Reply as to 163 Memorandum in Support of Motion, 159 MOTION to Intervene and Unseal Court Records and Intervenors to File Reply by 7/18/25. (MBM) (Entered: 06/27/2025) |
| 06/30/2025 | 179 | STATUS REPORT by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Entered: 06/30/2025) |
| 06/30/2025 | 180 | NOTICE OF APPEAL as to 116 Order,,,,, 118 Order, 86 Order,,,,,,,, 64 Memorandum & ORDER,,,, 135 Order on Motion for Reconsideration,, Order on Motion to Stay, 176 Order on Motion to Enforce Judgment,,,, Order on Motion for TRO,,,, Order on Motion for Preliminary Injunction,,, 119 Order, 132 Order on Motion for TRO,, 91 Order on |

Appx.659

Motion for TRO, by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. Fee Status: US Government.

NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US **District Court Clerk to deliver official record to Court of Appeals by 7/21/2025. (Larakers, Mary) (Entered: 06/30/2025)**

| 06/30/2025 | 181 | USCA Judgment as to 35 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi (MAP) (Entered: 07/01/2025) |
| 06/30/2025 | 182 | MANDATE of USCA as to 35 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi. Appeal 35 Terminated (MAP) (Entered: 07/01/2025) |
| 07/01/2025 | 184 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 180 Notice of Appeal (MAP) (Entered: 07/01/2025) |
| 07/01/2025 | 185 | USCA Case Number 25-1631 for 180 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi. (MAP) (Entered: 07/01/2025) |
| 07/02/2025 | 186 | MOTION for Extension of Time to September 5, 2025 to File Answer re 1 Complaint, by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Entered: 07/02/2025) |
| 07/03/2025 | 187 | Judge Brian E. Murphy: ELECTRONIC ORDER - Defendants' motion for an extension of time 186 is GRANTED. The parties shall confer and submit a joint statement regarding discovery and case management, per Local Rule 16.1(d), no later than July 24, 2025. (BIB) (Entered: 07/03/2025) |
| 07/07/2025 | 188 | MOTION to Seal *Ellis Declaration In Support of Opposition to Intervenors' Motion to Unseal* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security.(Larakers, Mary) (Additional attachment(s) added on 7/8/2025: # 1 Exhibit A SEALED) (MBM). (Entered: 07/07/2025) |
| 07/07/2025 | 189 | Opposition re 159 MOTION to Intervene *and Unseal Court Records* filed by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Additional attachment(s) added on 7/8/2025: # 1 Exhibit Exhibit A SEALED, # 2 Exhibit Exhibit B SEALED) (MBM). (Entered: 07/07/2025) |
| 07/15/2025 | 190 | DECLARATION *of Simon Sandoval-Moshenberg* by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit July 9, 2025 Guidance)(Realmuto, Trina) (Entered: 07/15/2025) |
| 07/15/2025 | 191 | MOTION for an Indicative Ruling under Rule 62.1 by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Text of Proposed Order)(Realmuto, Trina) (Entered: 07/15/2025) |
| 07/15/2025 | 192 | MEMORANDUM in Support re 191 MOTION for an Indicative Ruling under Rule 62.1 filed by D.V.D., E.F.D., M.M., O.C.G.. (Realmuto, Trina) (Entered: 07/15/2025) |
| 07/15/2025 | 193 | MOTION for Partial Summary Judgment by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Text of Proposed Order)(Realmuto, Trina) (Entered: 07/15/2025) |

Appx.660

| 07/15/2025 | 194 | MEMORANDUM in Support re 193 MOTION for Partial Summary Judgment filed by D.V.D., E.F.D., M.M., O.C.G.. (Realmuto, Trina) (Entered: 07/15/2025) |
| 07/15/2025 | 195 | MOTION to Stay Discovery Related to TRO Compliance and to Expedite Hearing on Plaintiffs' Motion for Partial Summary Judgment by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Text of Proposed Order)(Realmuto, Trina) (Entered: 07/15/2025) |
| 07/17/2025 | 196 | REPLY to Response to 159 MOTION to Intervene *and Unseal Court Records* filed by American Broadcasting Companies, Inc. d/b/a ABC News, Cable News Network, Inc., Dow Jones & Company, Inc., National Public Radio, Inc., Reuters News & Media Inc., The New York Times Company, WP Company LLC d/b/a The Washington Post. (Hatfield, Christopher) (Entered: 07/17/2025) |
| 07/18/2025 | 197 | MOTION to Quash , MOTION Relief from Discovery Order ( Responses due by 8/1/2025) by Pamela Bondi, Antone Moniz, U.S. Department of Homeland Security. (Attachments: # 1 Exhibit A: Plaintiffs' Discovery Requests, # 2 Exhibit B: Ortega Declaration, # 3 Text of Proposed Order)(Seamon, Matthew) (Entered: 07/18/2025) |
| 07/23/2025 | 198 | Judge Brian E. Murphy: ELECTRONIC ORDER directing the Parties to meet and confer on Plaintiffs' Motion for an Indicative Rule (Dkt. 191 ) and Motion to Stay Discovery (Dkt. 195 ) and submit a joint status report by 3:00 p.m. on Friday, July 25, 2025.  The joint status report should contain a general statement of the parties' positions on each motion, as well as address the impact of a decision on the motion to stay with regards to Defendants' Motion to Quash (Dkt. 197 ). (MBM) (Entered: 07/23/2025) |
| 07/23/2025 | 199 | Judge Brian E. Murphy: ELECTRONIC ORDER entered. REFERRING CASE to Magistrate Judge Donald L. Cabell Referred for: Events Only (e). Motions referred: 159 MOTION to Intervene *and Unseal Court Records*. (MBM) Motions referred to Donald L. Cabell. (Entered: 07/23/2025) |
| 07/23/2025 | 200 | STIPULATION *to Vacate L.R. 16.1(d) Joint Statement Deadline* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Seamon, Matthew) (Entered: 07/23/2025) |
| 07/23/2025 | 201 | Judge Brian E. Murphy: ELECTRONIC ORDER adopting the 200 Joint Stipulation to Vacate L.R. 16.1(d) Joint Statement Deadlines. The parties shall address a new proposed deadline for filing a L.R. 16.1(d) statement in the joint status report to be filed on Friday, July 25, 2025.(BIB) (Entered: 07/23/2025) |
| 07/25/2025 | 202 | STATUS REPORT *(Joint) Pursuant to Dkt. 198* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Seamon, Matthew) (Entered: 07/25/2025) |
| 07/29/2025 | 203 | RESPONSE to Motion re 195 MOTION to Stay Discovery Related to TRO Compliance and to Expedite Hearing on Plaintiffs' Motion for Partial Summary Judgment filed by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Seamon, Matthew) (Entered: 07/29/2025) |
| 07/29/2025 | 204 | Opposition re 191 MOTION for an Indicative Ruling under Rule 62.1 filed by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Seamon, Matthew) (Entered: 07/29/2025) |
| 07/30/2025 | 205 | Opposition re 197 MOTION to Quash MOTION Relief from Discovery Order filed by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit Discovery Responses) (Realmuto, Trina) (Entered: 07/30/2025) |
| 08/01/2025 | 206 | MOTION to Stay *Proceedings Pending Appeal* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Attachments: # 1 Text of Proposed |

Appx.661

| | | Order)(Seamon, Matthew) (Entered: 08/01/2025) |
|---|---|---|
| 08/05/2025 | 207 | MOTION for Extension of Time to 21 days after a ruling on Defendants' Motion to Stay Proceedings 206 to File Response/Reply as to 193 MOTION for Partial Summary Judgment by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Attachments: # 1 Text of Proposed Order)(Seamon, Matthew) (Entered: 08/05/2025) |
| 08/05/2025 | 208 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 207 Motion for Extension of Time to 21 days after a ruling on Defendants' Motion to Stay Proceedings, 206 , to File Response/Reply as to 193 , MOTION for Partial Summary Judgment. (CAM) (Entered: 08/05/2025) |
| 08/12/2025 | 209 | **NOTICE OF MOTION HEARING:** Hearing on 206 Motion to Stay Proceedings Pending Appeal, 197 Motion to Quash and for Relief from Discovery, 195 Motion to Stay Discovery Related to TRO Compliance and to Expedite Hearing on Plaintiffs' Motion for Partial Summary Judgment and 191 Motion for an Indicative Ruling under Rule 62.1 is SCHEDULED for 8/25/2025 at 2:15 p.m. remotely by Zoom before Judge Brian E. Murphy. (BIB) (Entered: 08/12/2025) |
| 08/14/2025 | 210 | RESPONSE to Motion re 206 MOTION to Stay *Proceedings Pending Appeal* filed by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit MTR Denial)(Realmuto, Trina) (Entered: 08/14/2025) |
| 08/25/2025 | 211 | **CLERK'S NOTES** for Motion Hearing held remotely by Zoom before Judge Brian E. Murphy: Court hears brief argument on 195 Motion to Stay Discovery and GRANTS motion and finds 197 Motion to Quash and Relief from Discovery Order MOOT, in light of the ruling on the Motion to Stay Discovery. Further argument heard on 191 Motion for Indicative Ruling and 206 Motion for Stay Pending Appeal. Motions taken under advisement.<br>(Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Realmuto, Macleod-Ball, Kenney, Korthuis, Hughes, Madrid, Hwang, Kang, Adams, Seamon, Larakers) (BIB) (Entered: 08/25/2025) |
| 08/28/2025 | 212 | Judge Brian E. Murphy: ORDER entered. MEMORANDUM AND ORDER on Plaintiff's Motion for an Indicative Ruling.<br><br>Plaintiffs' motion for an indicative ruling is GRANTED. This Court would dissolve the preliminary injunction if the First Circuit remanded its appeal for that purpose.<br><br>(MBM) (Entered: 08/28/2025) |
| 09/02/2025 | 213 | Supplemental Record on Appeal transmitted to US Court of Appeals re 69 Notice of Appeal, 180 Notice of Appeal, Documents included: ECF No. 212 (MAP) (Entered: 09/02/2025) |
| 09/04/2025 | 214 | Consent MOTION for Extension of Time to File Answer re 1 Complaint, by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Attachments: # 1 Text of Proposed Order)(Seamon, Matthew) (Entered: 09/04/2025) |
| 09/04/2025 | 215 | Judge Brian E. Murphy: ORDER entered granting 214 Consent MOTION for Extension of Time to File Answer. Defendants' time to answer or otherwise respond to Plaintiffs' complaint is extended until 21 days after this Court rules on Defendants' Motion to Stay Proceedings Pending Appeal (ECF No. 206 ). (MBM) (Entered: 09/04/2025) |
| 09/19/2025 | 216 | Notice of Supplemental Authorities re 206 MOTION to Stay *Proceedings Pending Appeal (In Support of Plaintiffs' Opposition to Stay Proceedings)* (Attachments: # 1 Exhibit D.A. v. Noem (D.D.C. Sept. 15, 2025))(Realmuto, Trina) (Entered: 09/19/2025) |

Appx.662

| | | |
|---|---|---|
| 10/23/2025 | 217 | NOTICE by D.V.D., E.F.D., M.M., O.C.G. re 210 Response to Motion *Notice of First Circuit Order (Oct. 20, 2025)* (Attachments: # 1 Exhibit First Circuit Order (Oct. 20, 2025))(Realmuto, Trina) (Entered: 10/23/2025) |
| 10/27/2025 | 218 | Judge Brian E. Murphy: ELECTRONIC ORDER entered. 206 Defendants' motion to Stay Proceedings Pending Appeal is DENIED. *See D.V.D., et al v. U.S. Dep't of Homeland Sec., et al*, No. 25-1393, at *1 (1st Cir. Oct. 20, 2025) ("[A]s a general matter[,]... 'the district court is free to carry forward' while an appeal in an earlier phase of the case is pending and, if appropriate, 'order permanent relief after the merits are resolved.'" (quoting *Contour Design, Inc. v. Chance Mold Steel Co.*, 649 F.3d 31, 34 (1st Cir. 2011))).<br><br>Defendants' response to Plaintiffs' Complaint is due by November 17, 2025.<br><br>Defendants' opposition to Plaintiffs' Motion for Partial Summary Judgment is due by November 17, 2025.<br><br>Plaintiffs' reply is due by December 1, 2025.<br><br>(MBM) (Entered: 10/27/2025) |
| 10/28/2025 | 219 | **NOTICE OF MOTION HEARING:** Hearing on 193 Motion for Partial Summary Judgment is set for 12/16/2025 at 2:00 p.m. in Courtroom 12 (In person only) before Judge Brian E. Murphy. (BIB) (Entered: 10/28/2025) |
| 10/28/2025 | 220 | MOTION to Stay re 218 Order on Motion to Stay,,, , MOTION for Extension of Time to December 17, 2025 to File Response to Complaint and Opposition to Partial Motion for Summary Judgment ( Responses due by 11/12/2025) by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security.(Larakers, Mary) (Entered: 10/28/2025) |
| 10/28/2025 | 221 | Judge Brian E. Murphy: ELECTRONIC ORDER entered. Defendants' Motion for Stay of Case is DENIED. Pursuant to the Department of Justice's Fiscal Year 2026 Contingency Plan, the Department retains "express authority" to continue litigation pursuant to a court's order and thus would suffer little, if any, prejudice by continuing the case. *See, e.g., California v. U.S. Dep't of Health & Hum. Servs.,* 2025 WL 2855230, at *1 (D. Mass. Oct. 8, 2025) (citing U.S. Dep't of Just., FY 2026 Contingency Plan 1 (2025), https://www.justice.gov/jmd/media/1377216/dl); *see also People for the Ethical Treatment of Animals v. U.S. Dept Agric.,* 912 F.3d 641, 641 (D.C. Cir. 2019) (denying motion to stay briefing deadlines due to lapse in government appropriations). "Weighing the competing interests in this case, the court finds that the harm to Plaintiffs in staying the proceedings would outweigh the harm of denying the stay, particularly given, per Department of Justice policy, that attorneys may continue to work on this matter following the denial of this Motion." *Doe v. Noem,* 2025 WL 2898122, at *1 (D. Mass. Oct. 9, 2025).<br><br>Should the parties seek to amend the Court's current scheduling order, the parties may submit a joint status report by Friday, October 31, 2025, outlining a proposed case schedule and indicating any areas of disagreement. (BIB) (Entered: 10/28/2025) |
| 10/30/2025 | 222 | STATUS REPORT *Case Schedule* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. (Larakers, Mary) (Entered: 10/30/2025) |
| 10/31/2025 | 223 | Judge Brian E. Murphy: ELECTRONIC ORDER entered. Upon review of the parties' status report, Dkt. 222 , the Court extends the current case schedule as follows: |

Appx.663

| | | Defendants' response to Plaintiffs' Complaint and opposition to Plaintiffs' Motion for Partial Summary Judgment is due by November 24, 2025.

Plaintiffs' opposition to Defendants' Motion to Dismiss and reply in support of their Motion for Partial Summary Judgment is due by December 8, 2025.

(MBM) (Entered: 10/31/2025) |
|---|---|---|
| 11/07/2025 | 224 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 188 MOTION to Seal Ellis Declaration In Support of Opposition to Intervenors' Motion to Unseal.

The defendants move to seal a declaration of Bryan Ellis, a department of defense official. (D. 188). The defendants filed the declaration to support a sealed declaration of Secretary of Defense Pete Hegseth. Two reasons warrant sealing the Ellis declaration.

First, the New York Times and the other news media organizations who moved to unseal the Hegseth declaration (the "movants") waived their ability to object to the motion to seal. To explain, the movants never filed a motion to intervene to file an opposition to the motion to seal, which is on the public docket. In contrast, the movants did file a motion to intervene to unseal the Hegseth declaration. *See generally Desrosiers v. Hartford Life & Acc. Co.*, 515 F.3d 87, 90-91 (1st Cir. 2008) ("[I]f a party does not move to strike an inadmissible affidavit, any objections to its consideration are deemed to have been waived and it may properly be considered by the court."). Further, the movants had ample opportunity to file a motion to intervene. The defendants filed the motion in early July, yet, to date, the movants have taken no action to file a motion to intervene to file an opposition. *See id.* at 91 (noting plaintiff "had ample opportunity to object to Hartford's reply and accompanying affidavit" and finding any objections to consideration of affidavit waived).

Second, the defendants implicitly assert, correctly, that the presumptive common law right of public access to judicial records, such as the Ellis declaration, gives way to compelling national security and foreign policy interests. (D. 188). Here, the Ellis declaration is replete with information anent national security and foreign policy interests. Public disclosure of this information will be damaging and wide-ranging. *See* (D. 189-2, ¶¶ 3, 5) (sealed declaration); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (noting Court's recognition of government's "'compelling interest' in withholding national security information from unauthorized persons in the course of executive business"). Per the foregoing, the declaration should be sealed.

(NR) (Entered: 11/07/2025) |
| 11/07/2025 | 225 | Magistrate Judge Donald L. Cabell: ORDER entered. MEMORANDUM AND ORDER granting in part and denying in part 159 MOTION to Intervene and Unseal Court Records. (NR) (Entered: 11/07/2025) |
| 11/07/2025 | 226 | Case no longer referred to Magistrate Judge Donald L. Cabell. (NR) (Entered: 11/07/2025) |
| 11/14/2025 | 227 | Withdrawn EXHIBIT re 193 MOTION for Partial Summary Judgment , 194 Memorandum in Support of Motion by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit A - David Decl., # 2 Exhibit B - Nhlabatsi Decl., # 3 Exhibit C - Decl., # 4 Exhibit D - Unger Decl., # 5 Exhibit E - Dionne-Lanier Decl., # 6 Exhibit F - Decl., # 7 Exhibit G - Brown Decl., # 8 Exhibit H - Decl., # 9 Exhibit I - Hensley Decl., # 10 Exhibit J - Decl., # 11 Exhibit K - Decl., # 12 Exhibit L - Dawgert Decl.)(Realmuto, Trina) (Additional attachment(s) added on 11/17/2025: # 13 Index SEALED, # 14 |

Appx.664

| | | |
|---|---|---|
| | | Unredacted Exhibit C SEALED, # 15 Unredacted Exhibit F SEALED, # 16 Unredacted Exhibit H SEALED, # 17 Unredacted Exhibit J SEALED, # 18 Unredacted Exhibit K SEALED) (MBM). Modified on 11/19/2025 (MBM). (Entered: 11/14/2025) |
| 11/18/2025 | 228 | NOTICE by D.V.D., E.F.D., M.M., O.C.G. *to Withdraw Declarations (Dkts. 227 to 227-12)* (Realmuto, Trina) (Entered: 11/18/2025) |
| 11/24/2025 | 229 | Joint MOTION for Leave to File Excess Pages *regarding motion to dismiss and motion for partial summary judgment* by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security.(Larakers, Mary) (Entered: 11/24/2025) |
| 11/24/2025 | 230 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 229 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MBM) (Entered: 11/24/2025) |
| 11/24/2025 | 231 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT*, MOTION to Dismiss for Lack of Jurisdiction *(Leave to File Granted November 24, 2025)* ( Responses due by 12/8/2025) by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security.(Seamon, Matthew) (Additional attachment(s) added on 11/25/2025: # 1 Unredacted Motion and Opposition SEALED) (MBM). (Entered: 11/24/2025) |
| 12/08/2025 | 232 | REPLY to Response to 193 MOTION for Partial Summary Judgment *and Opposition to* 231 *Defendants' Motion to Dismiss* filed by D.V.D., E.F.D., M.M., O.C.G.. (Realmuto, Trina) (Entered: 12/08/2025) |
| 12/08/2025 | 233 | EXHIBIT re 232 Reply to Response to Motion by D.V.D., E.F.D., M.M., O.C.G.. (Attachments: # 1 Exhibit A - Nguyen Decl., # 2 Exhibit B - David Decl., # 3 Exhibit C - Nhlabatsi Decl. & Att., # 4 Exhibit D - Brown Decl., # 5 Exhibit E - Hughes Decl., # 6 Exhibit F - Unger Decl., # 7 Exhibit G - Taurel Decl. & Atts., # 8 Exhibit H - Bridges Decl., # 9 Exhibit I - Goebertus Decl., # 10 Exhibit J - Perez Decl., # 11 Exhibit K - Dionne-Lanier Decl., # 12 Exhibit L - Hensley Decl., # 13 Exhibit M - Dawgert Decl., # 14 Exhibit N - Weinberg Decl., # 15 Exhibit O - Fort Bliss Letter & Atts., # 16 Exhibit P - Belous Decl. & Atts., # 17 Exhibit Q - Decl., # 18 Exhibit R - Decl. & Atts., # 19 Exhibit S - Decl., # 20 Exhibit T - Decl., # 21 Exhibit U - Decl., # 22 Exhibit V - Decl., # 23 Exhibit W - Decl., # 24 Exhibit X - Decl., # 25 Exhibit Y - Decl.)(Realmuto, Trina) (Additional attachment(s) added on 12/9/2025: # 26 Unredacted Index SEALED, # 27 Unredacted Exhibit Q SEALED, # 28 Unredacted Exhibit R SEALED, # 29 Unredacted Exhibit S SEALED, # 30 Unredacted Exhibit T SEALED, # 31 Unredacted Exhibit U SEALED, # 32 Unredacted Exhibit V SEALED, # 33 Unredacted Exhibit W SEALED, # 34 Unredacted Exhibit X SEALED, # 35 Unredacted Exhibit Y SEALED) (MBM). (Entered: 12/08/2025) |
| 12/10/2025 | 234 | MOTION to Strike 233 Exhibit,,,,, by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security.(Seamon, Matthew) (Attachments: # 1 Exhibit A) (MBM). (Entered: 12/10/2025) |
| 12/12/2025 | 235 | Opposition re 234 MOTION to Strike 233 Exhibit,,,,, filed by D.V.D., E.F.D., M.M., O.C.G.. (Realmuto, Trina) (Entered: 12/12/2025) |
| 12/16/2025 | 236 | **CLERK'S NOTES** for Motion Hearing held in-person before Judge Brian E. Murphy: Argument heard on all pending motions - 193 Motion for Partial Summary Judgment; 231 Motion to Dismiss; and 234 Motion to Strike. Motions taken under advisement. (Court Reporter: Jessica Bisaillon at jsteno99@gmail.com.)(Attorneys present: Realmuto, Macleod-Ball, Hughes, Adams, Larakers, Seamons) (BIB) (Entered: 12/16/2025) |

Appx.665

| 02/09/2026 | 237 | MOTION to Withdraw as Attorney by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security.(Perez, Elianis) (Entered: 02/09/2026) |
|---|---|---|
| 02/13/2026 | 238 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 237 Motion to Withdraw as Attorney. Attorney Elianis N. Perez terminated. (MBM) (Entered: 02/13/2026) |
| 02/20/2026 | 239 | USCA Judgment as to 69 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi, 180 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi.<br><br>**The appeal is terminated, and the case is remanded.**<br><br>(MAP) (Entered: 02/20/2026) |
| 02/24/2026 | 240 | Notice of Supplemental Authorities re 193 MOTION for Partial Summary Judgment (Attachments: # 1 Supplement SFRC Report - Feb. 13, 2026)(Realmuto, Trina) (Entered: 02/24/2026) |
| 02/25/2026 | 241 | Judge Brian E. Murphy: ORDER entered. MEMORANDUM AND ORDER on Defendants' Motion to Dismiss and Plaintiffs' Motion for Partial Summary Judgment.<br><br>The April 18, 2025 preliminary injunction, Dkt. 64 , is DISSOLVED.  Defendants' motion to dismiss, Dkt. 231 , is GRANTED in part.  Counts II and III are DISMISSED. Counts V and VI, including all claims against Defendant Antone Moniz, are DISMISSED without prejudice.  Plaintiffs' motion for summary judgment against the remaining Defendants, Dkt. 193 , is GRANTED as to Counts I and IV.  Defendants' motion to strike, Dkt. 234 , is DENIED as moot.  Judgment will enter for Plaintiffs.<br><br>(MBM) (Entered: 02/25/2026) |
| 02/25/2026 | 242 | Judge Brian E. Murphy: ORDER entered. FINAL JUDGMENT. (MBM) (Entered: 02/25/2026) |
| 02/27/2026 | 243 | NOTICE OF APPEAL as to 241 Memorandum & ORDER,, 242 Judgment by Pamela Bondi, Antone Moniz, Kristi Noem, U.S. Department of Homeland Security. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 3/19/2026. (Larakers, Mary) (Entered: 02/27/2026) |
| 02/27/2026 | 244 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 243 Notice of Appeal. (MAP) (Entered: 02/27/2026) |
| 02/28/2026 | 245 | USCA Case Number 26-1212 for 243 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi. (MAP) (Entered: 02/28/2026) |
| 03/16/2026 | 246 | ORDER of USCA as to 243 Notice of Appeal, filed by U.S. Department of Homeland Security, Kristi Noem, Antone Moniz, Pamela Bondi. |

Appx.666

| | | |
|---|---|---|
| | | **Defendants' emergency motion for stay pending appeal is granted. Defendants shall file their opening brief within fourteen (14) days of the issuance of this order. Plaintiffs shall file their responsive brief within fourteen (14) days of the filing of Defendants' opening brief. Defendants shall then file any reply brief within seven (7) days of the filing of Plaintiffs' responsive brief. The parties are permitted to file opening and responsive briefs that do not exceed 15,600 words. Defendants may file a reply that does not exceed 7,800 words. Extensions of the briefing deadlines will be granted only for grave cause. The Court intends to hold oral argument soon after briefing is complete.** <br><br> (MAP) (Entered: 03/16/2026) |
| 03/30/2026 | 247 | Transcript of Motion Hearing held on December 16, 2025, before Judge Brian E. Murphy. COA Case No. 26-1212. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Jessica Bisaillon at jsteno99@gmail.com. Redaction Request due 4/20/2026. Redacted Transcript Deadline set for 4/30/2026. Release of Transcript Restriction set for 6/29/2026. (DRK) (Entered: 03/30/2026) |
| 03/30/2026 | 248 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 03/30/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/30/2026 13:44:46 | | | |
| **PACER Login:** | marylarakers | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-10676-BEM |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

Appx.667