No. 26-1212

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

D.V.D.; M.M.; E.F.D.; O.C.G.,
*Plaintiffs-Appellees*,
v.

U.S. DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE
MULLIN, Secretary, U.S. Department of Homeland Security (DHS);
TODD BLANCHE, Acting United States Attorney General, ANTONE
MONIZ, Superintendent of the Plymouth County Correctional Facility,
*Defendants-Appellants*.

_____

On Appeal from the United States District Court for the District of
Massachusetts

## BRIEF OF THE FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, POLITICAL ASYLUM / IMMIGRATION REPRESENTATION (PAIR) PROJECT, AND NATIONAL IMMIGRANT JUSTICE CENTER AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Daniel Bowman
Rachel A. Romaniuk
Esther G. Gold
OSBORN MALEDON, P.A.
2929 N. Central Ave., Ste. 2000
Phoenix, Arizona 85012
(602) 640-9000
dbowman@omlaw.com
rromaniuk@omlaw.com
egold@omlaw.com

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel states and certifies as follows. This brief is filed on behalf of 501(c)(3) nonprofit corporations that have no parent corporation and no stock.

Dated: April 14, 2026.

/s/ Rachel A. Romaniuk
Rachel A. Romaniuk
OSBORN MALEDON, P.A.
Date: April 14, 2026

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No other party's counsel authored this brief in whole or in part; no other party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person, party, or party's counsel contributed money to fund the preparation and submission of the brief. *See* Fed. R. App. P. 29(c)(4)(E).

i

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES ........................................................................ iv

INTEREST OF AMICI CURIAE ....................................................................1

SUMMARY OF ARGUMENT ......................................................................1

ARGUMENT ...............................................................................................2

I.     Background ..........................................................................................3

II.    DHS Removes Class Members to Third Countries Without Providing Any Notice Beforehand or Allowing Them an Opportunity to Seek Protection Against Removal to Those Third Countries. ........................................................................................5

       A.    DHS Removes Class Members to Third Countries Without Providing Any Notice. ..........................................................6

       B.    No-Notice Removals Foster Increased Violence and Deception. ..............................................................................10

       C.    Lack of Notice Increases Risk of Grave Administrative Errors. ....................................................................................12

III.   DHS Often Gives Class Members Less Than a Day's Notice Before Removing Them to Third Countries, Which Does Not Provide Adequate Time to Seek Meaningful Protection from Removal. ....................14

       A.    Mere Hours' Notice Does Not Provide Sufficient Process. ................15

       B.    Language Barriers Complicate Short Notice. ...................................17

IV.   The Mechanics of The March Guidance Violate Class Members' Due Process Rights. ..........................................................................19

A.    Motions to Reopen Do Not Safeguard Against the Harm of Unlawful Removal. ...............................................................20

B.    Class Members Cannot Raise All Fear-Based Claims in Initial Proceedings or Removal Interviews. ......................................22

V.    The March Guidance Impedes Class Members' Right to Counsel. ..............24

CONCLUSION ............................................................................................27

CERTIFICATE OF COMPLIANCE ..................................................................29

APPENDIX: IDENTITIES OF AMICI CURIAE ....................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump*,
    605 U.S. 91 (2025)..................................................................................14

*D.A. v. Noem*,
    800 F. Supp. 3d 43 (D.D.C. 2025)..........................................................6

*I.N.S. v. Cardoza-Fonseca*,
    480 U.S. 421 (1987)..................................................................................3

**Statutes**

8 U.S.C. § 1229a(c)(7)(A) ...........................................................................20

**Other Authorities**

8 C.F.R. § 1240.10(f) ....................................................................................3

8 C.F.R. § 1240.11 ........................................................................................3

Am. Immigr. Council, *Right to Counsel*,
    https://www.americanimmigrationcouncil.org/about-
    immigration/right-to-counsel/.................................................................20

Ariel G. Ruiz Soto, *U.S. Third-Country Deportation Agreements Are
    More About Fear than Numbers*, Migration Policy Institute (March
    2026), https://www.migrationpolicy.org/news/us-third-country-
    deportation-agreements..........................................................................3

José Olivares, *Court Records Reveal Gutting of DHS Oversight:
    "Incredibly Dangerous"*, The Guardian (Mar. 8, 2026),
    https://www.theguardian.com/us-news/2026/mar/08/dhs-oversight-
    court-record-review ...............................................................................4

Monika Pronczuk, *Secretive Deal Leaves Deportees from the US Stuck in Equatorial Guinea with 'No More Hope'*, Associated Press (Mar. 21, 2026), https://apnews.com/article/equatorial-guinea-deportations-trump-asylum-migrants-9d0a623b83288f5c7b1d1a71443d04cd ...................................................................9

Monika Pronczuk, *The US Deported a Gay Asylum-Seeker to a Third Country Where Homosexuality Is Illegal*, Associated Press (Feb. 22, 2026), https://apnews.com/article/trump-deportation-cameroon-morocco-lgbt-interview-1ea278f4c981df798773e26972c5d54f ...............................................................8

Pranav Baskar & Hamed Aleaziz, *U.S. Deports Nine Migrants in Secret, Ignoring Legal Protections*, The New York Times (Feb. 16, 2026), https://www.nytimes.com/2026/02/14/world/africa/us-secret-deportation-cameroon.html ...........................................................9

Sheriff Bojang, Jr., *Equatorial Guinea Sends Eight of Trump's Nine Deportees Home, Braces for New Arrivals*, The Africa Report (Jan. 16, 2026), https://www.theafricareport.com/405291/equatorial-guinea-sends-eight-of-trumps-nine-deportees-home-braces-for-new-arrivals/ ................................................................................9

Uriel J. García, *Department of Justice Cuts Off Federally Funded Legal Aid to Detained Immigrants*, Texas Public Radio (Jan. 28, 2025), https://www.tpr.org/government-politics/2025-01-28/department-of-justice-cuts-off-federally-funded-legal-aid-to-detained-immigrants ........................................................................5

**INTEREST OF AMICI CURIAE**

The Florence Immigrant & Refugee Rights Project ("Florence Project"), Political Asylum / Immigration Representation Project ("PAIR Project"), and National Immigrant Justice Center ("NIJC") are legal services organizations dedicated to empowering and representing detained immigrants throughout the United States. Amici are navigating the chaos that the Department of Homeland Security's ("DHS") third-country removal policy has created for their attorneys and for the many class members Amici serve. DHS's policy has caused immeasurable harm *within* the United States—it empowers government officials to whisk people away from this "land of the free" to dangerous, unknown shores without any notice or opportunity to assert fear-based claims for protection from removal. A more detailed statement of each Amicus Curiae's interest appears in the Appendix.

**SUMMARY OF ARGUMENT**

The procedures outlined in DHS's March 30, 2025 policy regarding third-country removals (the "March Guidance") fail to provide members of the certified class with notice and a meaningful opportunity to challenge a third-country removal. These procedures frustrate every constitutional, statutory, and regulatory avenue through which class members may assert fears of being removed to a dangerous third country (i.e., a country not designated in a noncitizen's removal order). When class members are lucky enough to have representation, they struggle even to

1

communicate with counsel, as they are shifted between facilities without any warning or formal notice and given significant barriers to attorney access in detention. Furthermore, they encounter language barriers, struggle with misinformation provided by officials, and, with alarming regularity, endure violence inflicted by DHS officials as they force the handover of individuals to third countries. These difficulties are worsening, especially against the backdrop of dwindling resources allocated to legal service providers and reduced administrative oversight. These problems and more, as detailed below, animate Amici's request that this Court affirm the District Court's ruling that, at root, simply requires DHS to follow the law.

## ARGUMENT

DHS's third-country removal policy fails to protect class members at every juncture. First, when DHS provides no notice, the due process problem is manifest: People who are not told they are being flown to a third country until they are on the plane cannot meaningfully contest such a removal. Second, when some amount of advance notice is given, DHS's policy does not allow class members to meaningfully challenge their removal to dangerous third countries. Third, DHS's policy dooms all avenues to prevent removal and forecloses class members from successfully asserting fear-based claims. In each scenario, attorneys are unable to provide meaningful representation to their detained clients.

2

## I.    Background

Although United States law prohibits involuntarily returning a noncitizen to a country where he or she is likely to be persecuted or tortured,[1] the March Guidance does not provide class members any process to contest removal to dangerous countries. (*See* J.A. at 495–97.) In 2025, DHS deported an estimated 15,000 people to third countries and used these deportations to discourage people from seeking protection in the United States.[2] The March Guidance does not involve immigration judges, despite on-point regulations. 8 C.F.R. § 1240.11 (authorizing immigration judges to evaluate third country removal issues); 8 C.F.R. § 1240.10(f) (delegating authority to immigration judge to designate countries for removal). Additionally, the March Guidance does not require DHS officers to give class members notice or an opportunity to object before removing them to a third country, as long as the government has received amorphous "assurances" that no persecution or torture will happen there. (J.A. at 555–56.)

This policy invites chaos and, unsurprisingly, has engendered absurd and dangerous results. Under the March Guidance, DHS has removed numerous class

---

[1] *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 429 (1987) (discussing the United States' "mandatory duty . . . not to return [a noncitizen] to a country where his life or freedom would be threatened" (internal citation omitted)).

[2] Ariel G. Ruiz Soto, *U.S. Third-Country Deportation Agreements Are More About Fear than Numbers*, Migration Policy Institute (March 2026), https://www.migrationpolicy.org/news/us-third-country-deportation-agreements.

members to dangerous third countries without first providing them meaningful notice or an opportunity to show that they will be persecuted, tortured, or even killed in the country of removal. Many examples of this conduct are highlighted below, illustrating the real-world anguish that DHS is, by policy, inflicting on the class members.

The grim state of legal services in detention centers and the removal of federal oversight further animates Amici's support for Plaintiffs-Appellees' position. In early 2025, legal services were slashed and several government agencies dedicated to overseeing DHS were gutted, with nearly all staff members employed at its internal oversight agencies fired or reassigned.[3] This lack of oversight means that class members at certain facilities in the United States are frequently not allowed to contact an attorney, given no opportunity to raise fear-based claims against removal to third countries, and are subjected to forcible removal by DHS officers who, under the March Guidance, must ignore class members' due process rights. At the same time, programs providing federally-funded legal services were terminated, slashing federally-funded legal services providers' budgets and restricting their access to detained individuals. This leaves class members without resources to assert claims

---

[3] José Olivares, *Court Records Reveal Gutting of DHS Oversight: "Incredibly Dangerous"*, The Guardian (Mar. 8, 2026), https://www.theguardian.com/us-news/2026/mar/08/dhs-oversight-court-record-review.

for protection against removal or release from detention.[4] Any guardrails that previously bounded DHS are gone.

DHS's policy is severely harming class members nationwide. In Amici's experience representing and providing legal services to thousands of class members over the past year, the March Guidance does not provide any procedural avenues for protection against removal to a dangerous third country and does not place responsibility for third country removal on any particular DHS officer with whom noncitizens may communicate. The real-world harm caused within the United States by the March Guidance is discussed in detail below.

## II.    DHS Removes Class Members to Third Countries Without Providing Any Notice Beforehand or Allowing Them an Opportunity to Seek Protection Against Removal to Those Third Countries.

Under the March Guidance, DHS can remove a class member to a third country without providing any notice, so long as it has received unverifiable, generalized diplomatic assurances that the receiving country does not torture or persecute noncitizens sent there. This policy ignores the constitutional guarantee of due process by depriving class members of any opportunity to raise a fear-based claim against removal to a dangerous third country. Lawyers working day and night

---

[4] Uriel J. García, *Department of Justice Cuts Off Federally Funded Legal Aid to Detained Immigrants*, Texas Public Radio (Jan. 28, 2025), https://www.tpr.org/government-politics/2025-01-28/department-of-justice-cuts-off-federally-funded-legal-aid-to-detained-immigrants.

to assist noncitizens are left in the dark, while their clients suffer significant physical injuries and severe emotional harm. Put bluntly, both noncitizens spirited away to shores unknown and the lawyers and loved ones they leave behind are victims of the precise harm the Due Process Clause was intended to prevent: unaccountable, unchecked government action.

### A.   DHS Removes Class Members to Third Countries Without Providing Any Notice.

On countless occasions over the past year, DHS has removed detained class members to dangerous third countries without providing any notice whatsoever, making it impossible for those class members to raise a fear-based claim against removal. In a notorious example from September 2025, fourteen people from Nigeria and The Gambia were deported to Ghana without notice. *See D.A. v. Noem*, 800 F. Supp. 3d 43, 45–46 (D.D.C. 2025); (*see also* J.A. at 338–43). There, the class members were forcibly loaded on a military cargo plane in Alexandria, Louisiana. They "were awakened from their beds, shackled, and put on a U.S. military cargo plane without being allowed to notify family or legal counsel, and, in at least one case, without identification documents." *D.A.*, 800 F. Supp. 3d at 45. During this removal, "[a]t least four of the fourteen" were "placed in a WRAP restraint, a full-body restraint device." (J.A. at 339.) Because of this treatment, one of the class members now has severe difficulty walking "because his straitjacket was secured so tightly." *D.A.*, 800 F. Supp. 3d at 46.

6

At least three of the fourteen were told by U.S. immigration officials that they were being removed to Ghana only shortly before or while being loaded onto the plane. The others received no notice of their removal to Ghana until they were in the air. Several of the individuals expressed their fear of removal to Ghana, but the DHS officials simply told them they were following orders and deporting them to Ghana. Only one individual had any ties to Ghana. (J.A. at 339 ¶ 4.) And incredibly, the officials told them that once in Ghana, they would be sent on to their countries of origin, a process known as chain refoulement (forcing a refugee or asylum seeker to return to a country where they are likely to face persecution) that is an end-run around withholding of removal protection. (*Id.*)

Deporting class members without providing advance notice ensures that class members have no opportunity to demonstrate they will be harmed in the country of removal. (*See* J.A. at 379–80.) For example, H.G., a citizen of an African nation who had received protection from removal to his home country under the U.N. Convention Against Torture, was not provided notice of removal until removal was in progress. (*Id.*) When he finally learned he was being removed to Eswatini and expressed fear of going there, ICE refused to change course or provide further process. (*Id.*) This denial of due process was compounded by the fact that DHS initially told H.G. that he would be removed to Puerto Rico; he had no opportunity or reason to inquire into conditions in Eswatini before he was on his way there. (*Id.*)

7

Although H.G. has no connection to Eswatini, he is currently imprisoned there. (*Id.* at 380.)

Even when class members have requested a fear-screening interview for a third country, DHS has disregarded those requests. (*See* J.A. at 360–62.) For example, R.K., a citizen of Sierra Leone, was granted withholding of removal as to Sierra Leone in July 2025. (*Id.* at 360.) When her counsel discovered that DHS was pursuing third-country removal efforts for R.K., counsel submitted a request for a fear screening interview regarding R.K.'s fear of deportation to various countries, including Ghana. (*Id.*) In so doing, counsel also specifically reserved R.K.'s right to claim fear toward any other country where DHS may attempt to remove her. (*Id.*) Despite this request and reservation of rights, DHS still removed R.K. to Ghana and then refouled her back to Sierra Leone shortly thereafter. (*Id.* at 362.)

The United States' third-country removal policy flagrantly violates its obligation to non-refoulement under international human rights law. Take the story of a Moroccan citizen who fled Morocco after she was beaten on account of her sexuality.[5] After entering the United States, she won withholding of removal protection from Morocco. Three days before a hearing on her release, she was

---

[5] Monika Pronczuk, *The US Deported a Gay Asylum-Seeker to a Third Country Where Homosexuality Is Illegal*, Associated Press (Feb. 22, 2026), https://apnews.com/article/trump-deportation-cameroon-morocco-lgbt-interview-1ea278f4c981df798773e26972c5d54f.

handcuffed and forced on a plane to Cameroon, a country she had no connection to and a country that criminalizes homosexuality. She felt the dangers she faced in Cameroon were so great that she allowed Cameroonian officials to return her to Morocco, the very country she had won protection from. This unlawful removal is one of dozens of similar stories of migrants being "dropped like U.P.S. packages" in Cameroon, a country that pushes migrants to return to their home countries where they are likely to be persecuted and tortured.[6]

Similar stories permeate the media and the record because of million-dollar deals made by the Trump Administration.[7] Despite Equatorial Guinea being "one of the world's most repressive and corrupt regimes," an East African man was violently removed there after refusing to sign a document stating he wanted to return to his home country voluntarily.[8] While the man remains in limbo, most of his fellow class members were shipped back to their home countries.

---

[6] Pranav Baskar & Hamed Aleaziz, *U.S. Deports Nine Migrants in Secret, Ignoring Legal Protections*, The New York Times (Feb. 16, 2026), https://www.nytimes.com/2026/02/14/world/africa/us-secret-deportation-cameroon.html.

[7] Sheriff Bojang, Jr., *Equatorial Guinea Sends Eight of Trump's Nine Deportees Home, Braces for New Arrivals*, The Africa Report (Jan. 16, 2026), https://www.theafricareport.com/405291/equatorial-guinea-sends-eight-of-trumps-nine-deportees-home-braces-for-new-arrivals/.

[8] Monika Pronczuk, *Secretive Deal Leaves Deportees from the US Stuck in Equatorial Guinea with 'No More Hope'*, Associated Press (Mar. 21, 2026), https://apnews.com/article/equatorial-guinea-deportations-trump-asylum-migrants-9d0a623b83288f5c7b1d1a71443d04cd.

Furthermore, DHS frequently executes no-notice removals while *ignoring* information demonstrating that a person will be in danger of persecution or torture in a third country. For example, consider the story of A.H.D., a transgender woman from Honduras who has lived in the United States for over thirty years and was granted withholding of removal to Honduras in 2007. (J.A. at 381.) The grant of withholding was based on the finding that "it was more likely than not that [A.H.D.] would be persecuted in Honduras on account of her identity and sexual orientation." (*Id.*) Thus, any proposed removal to a country in which people who are transgender are similarly at risk contravenes that same finding—but not according to DHS. In October 2025, A.H.D. was re-detained and, eventually, ICE agents forced A.H.D. on a bus and unexpectedly removed her to Mexico. She was not told she was being removed to Mexico and was unaware of that fact until the bus stopped and she was turned over to Mexican immigration officers. As a result, she was unable to express her fear of removal to Mexico, "one of the most dangerous countries in the world to be transgender." (*Id.*)

In Amici's experience, these examples are not outliers—they are quickly becoming the norm.

## B.     No-Notice Removals Foster Increased Violence and Deception.

DHS's practice of removing class members to third countries without notice fosters government-inflicted violence and deception, as DHS officers force class

members into third countries through unlawful, process-less removals. One example of this conduct hits close to home for Amicus Curiae The Florence Project. (J.A. at 449–50.) In 2025, DHS detained a Haitian immigrant who was previously granted withholding of removal in 2015, is married to a U.S. citizen, and has three U.S. citizen children. Soon after he was detained, DHS attempted to convince him to sign papers consenting to his deportation to Mexico, but he refused because he was afraid of being removed to Mexico. In early September 2025, ICE officers told him he was being transferred to a new detention center in Louisiana, but instead he was taken to Nogales, Arizona, a town bordering Mexico. There, the officers pepper sprayed everyone in the van and then forced them into a van driven by Mexican immigration officials. During this process, this class member passed out due to his severe asthma. (*Id.* at 450.)

These experiences are not anomalies. In El Paso, Texas, DHS officers will drive busloads of class members from the Fort Bliss detention camp to the U.S.– Mexico border in Santa Teresa, New Mexico. (*See* J.A. at 382–424.) Once there, masked officers force the class members into Mexico. (*Id.* at 383.) And when class members refuse to go because they are afraid of persecution or torture in Mexico, DHS officers have beaten and threatened them until they agree to the removal. (*See id.* at 384–86 (collecting stories)).

11

When class members are bold enough to question where they are being taken, DHS officials often refuse to tell them or lie. For example, one Cuban class member who fled to the United States seeking political asylum was detained by ICE while legally working under a work permit; because of that detention, he missed his asylum hearing in immigration court. (J.A. at 445–46.) About a week later, he was placed on a bus near the Texas–Mexico border. When class members in the bus asked the officers where they were going, the officers "refused to tell them." (*Id.* at 445.) The class member did not know he was being removed to Mexico until he saw the border wall, where ICE officers forced everyone off the bus into Mexico. (*Id.* at 446.) He was not given an opportunity to seek protection from removal.

Altogether, DHS's policy of removing class members without notice fosters government-sanctioned violence and deception, as class members resist summary removals that give them no opportunity to assert fear-based claims against removal to countries where they may be persecuted, tortured, or killed.

### C.     Lack of Notice Increases Risk of Grave Administrative Errors.

Effecting third-country removals without notice causes serious administrative errors. Consider the example of a Laotian national who lived in the United States since he was three and who DHS deported without notice to South Sudan in July 2025. (J.A. at 283–84, 290.) Because of the lack of notice, this class member was physically removed to South Sudan despite Laos having issued travel documents for

removal to Laos, evidenced by an email dated several days before his removal from the Laotian embassy confirming that the "Lao[tian] Government has agreed to accept him to Laos and his Travel Document was issued." (J.A. at 290.) The lack of notice regarding third country removal prevented him from informing DHS that he should have been deported to his home country of Laos. (*Id*.) Thus, because of DHS's unconstitutional policy, a person who lived in the United States for most of his life now remains confined in South Sudan, a country he has no connection to and knows nothing about.

*    *    *

These examples are only a handful of instances in which DHS has removed countless people to third countries without providing them any meaningful notice. Such removals impose myriad dangers on class members: they could be persecuted, harmed, or tortured in those countries, or those countries could refoul them to their home countries in violation of international asylum law. By policy, DHS does not ask class members if they are afraid of being removed to third countries. And by removing class members without notice, DHS does not allow them a chance to plead for protection from removal to potentially life-threatening third countries. (*See* J.A. at 499.) Indeed, DHS often uses force and deceptive tactics to prevent class members from doing so. As the District Court correctly ruled, the Constitution requires more

13

before DHS can strip individuals of what may be "their last and only lifeline." (J.A. at 497.)

### III. DHS Often Gives Class Members Less Than a Day's Notice Before Removing Them to Third Countries, Which Does Not Provide Adequate Time to Seek Meaningful Protection from Removal.

The March Guidance allows DHS to remove class members to other countries—that they have not received diplomatic assurances from—so long as they provide as little as six hours' notice before doing so. (*See* J.A. at 499.) This is an incredibly short timeframe: notice provided under these time constraints is little better than no notice at all. *A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025) (providing "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass [constitutional] muster"). This does not provide enough time to consult with counsel, move in immigration court for protection against removal to the third country, or undergo a credible fear interview.

This summary-notice procedure is further complicated by the affirmative requirement in the March Guidance that DHS officers should not ask class members whether they are afraid of persecution or torture in the country of removal. (J.A. at 499). This provision in DHS's policy signals that the agency, by design, is attempting to prevent noncitizens from asserting any claim for protection against removal. Further, qualitative proof is evident in the cases recounted below, in which

14

DHS officials have given class members as little as an hour's notice and baldly ignored their fear of persecution or torture in the country of removal. (*See, e.g.*, *id.* at 287).

### A.    Mere Hours' Notice Does Not Provide Sufficient Process.

Under the March Guidance, DHS can remove someone to a country that has *not* assured the government that it will not persecute or torture people deported there—with six to twenty-four hours' notice. This process for third-country removals gives class members no choice but to stumble in the dark, grasping at straws to assert fear-based claims against removal.

For example, in May 2025 DHS provided only sixteen hours' notice to a group of class members before they were removed to South Sudan, "most of which were non-waking hours, none within the business day." (J.A. at 505.) The class members had no ability to research "the repercussions of being removed to South Sudan," and they had "limited, if any, ability to communicate with family or legal representatives." (*Id.*) Under those conditions, the class members had no chance of contesting their removal to South Sudan.

In another detailed account, a Filipino class member was nearly removed with minimal notice to Libya, a country to which he had no connection and which had affirmatively refused to accept deportees. (J.A. at 214–19; *see also id.* at 7 (noting "Libya's Government of National Unity (GNU) publicly rejected the use of Libyan

15

territory for accepting deportees")). In the evening of May 5, 2025, ICE officers told the class member he was going to Libya. He immediately contacted counsel, who for the next two days attempted to ascertain if his client was, in fact, being deported to Libya and was stonewalled at every turn. (J.A. at 214–220.) At 2:00 AM on May 7, 2025, the class member was awoken, told he was being sent to Libya, placed on a bus with twelve other class members, and driven to an airport, where they sat next to a military plane for three to four hours. (*Id.* at 217.) The class members ultimately were not removed to Libya, but *only* because of an injunction then in effect. (J.A. at 219.)

Unfortunately, most class members who receive scant notice of deportation cannot count on an attentive federal judge to immediately intervene, assuming they are even able to file a habeas petition. Consider the sudden removal to Mexico of a Guatemalan citizen who had been granted withholding of removal. (J.A. at 452–53.) While in detention, he was awoken in the middle of the night by ICE officers, who tried to pressure him and others to sign papers agreeing to removal to Mexico. Another night, when again awoken, officials told a different story, noting he would be sent to Guatemala, despite the withholding order. The class member was afraid of being removed to Mexico and directly asked for a credible fear interview, but he was never given one.

One day, without warning, the class member was driven away from his detention center in Florence, Arizona, without anyone telling him his destination. (*Id.* at 452.) He realized he was being deported to Mexico only when he saw signs outside the vehicle for Nogales; once there, DHS officers pepper sprayed him to force him out of the van and turned him over to Mexican immigration officials. Notably, this declarant "tried to express [his] fear of being deported to Mexico," but DHS officers ignored his requests. (*Id.*.)

Another example is the story of E.A.H., a Cuban man who DHS deported to South Sudan with less than a day's notice. (J.A. at 291–95.) In the 24 hours before his removal, ICE officers first asked him to sign a document consenting to go to South Africa and then asked him to sign a document consenting to go to South Sudan. He refused to sign both. DHS later took him to the airport where a DHS officer told him he was going to Ireland. Although the plane refueled in Ireland, it continued on to a military base in Djibouti, and then to South Sudan soon after. He never got a complete fear interview against removal to South Sudan before being physically removed.

### B.    Language Barriers Complicate Short Notice.

The harm of providing minimal notice of removals is amplified exponentially when DHS provides such notice in English only, even if the class member does not read or speak English. (*See* J.A. at 231–33.) The record is rife with examples of last-

minute notice that is utterly meaningless because it was not provided in the appropriate language. Take the example of N.M., who was removed to South Sudan with less than 24 hours' notice. (*See id.* at 232.) N.M. is from Myanmar, and his best language is Karen. (*Id.* at 231.) He has little proficiency in English. (*Id.*) Even so, he was informed that he was being removed to South Sudan in English in the evening and was summarily removed early the next morning. (*Id.*) DHS's failure to provide notice in a language N.M. understood erected a language barrier that vitiated any chance to contest his removal.

In Amici's experience, DHS officers routinely give oral and written notice of removal in English to non-English-speaking class members, often demanding class members sign forms immediately without any meaningful language access.

*        *        *

DHS's March Guidance effectively requires class members to, on the spot, understand the specific conditions in the country of removal and coherently articulate why they are afraid of being persecuted, tortured, or killed there. In the rare instances that class members can articulate such fears, DHS officials ignore them. As the above stories demonstrate, DHS executes its policy in ways that eliminates class members' ability to even articulate such fears, by waking them in the middle of the night or pepper-spraying them across borders. DHS's actions under "the March Guidance extinguish[] valid challenges to third-country removal by

18

effecting removal before those challenges can be raised." (J.A. at 566.) This policy, in short, flies in the face of due process.

## IV. The Mechanics of The March Guidance Violate Class Members' Due Process Rights.

As the District Court ruled, the March Guidance deprives class members of procedural due process. (J.A. at 544–568.) In so holding, the District Court emphasized "the March Guidance mitigates *no* risk of a person's being unlawfully removed to a country other than as designated on their order of removal" and "provides little, if any, protection from the erroneous deprivation of CAT claims." (*Id.* at 556.) Amici have witnessed firsthand the inadequacy of the March Guidance. It is no answer for class members to file motions to reopen in immigration court seeking protection against removal—those motions are time-consuming, fact-intensive, and are often administratively barred. Nor can class members raise fear-based claims against removal to *every* country in initial removal proceedings or asylum screenings. Altogether, the March Guidance does not provide an iota of process allowing class members to meaningfully raise claims for protection against removal.

### A. Motions to Reopen Do Not Safeguard Against the Harm of Unlawful Removal.

A motion to reopen is not a realistic option for relief when DHS seeks to remove class members to third countries under the March Guidance. (*See* J.A. at 136–48.)

First, class members can generally only file one motion to reopen. *See* 8 U.S.C. § 1229a(c)(7)(A). So, if DHS makes successive attempts to remove a class member to various third countries, motion to reopen procedures quickly become unavailable.

Second, filing a motion to reopen does not guarantee meaningful review of third-country fear claims. (J.A. at 149–51.) For example, an attorney filed a motion to reopen for a client facing removal to a third country (El Salvador), but the immigration court rejected that motion because the client had "been ordered removed to Venezuela . . . , not El Salvador." (*Id.* at 151.) Another attorney-declarant recounted that the court denied her motion to reopen without any reasoning whatsoever. (*Id.* at 93 ¶ 9.) These summary procedures are inadequate.

Third, the March Guidance does not provide sufficient time to litigate a fear-based motion to reopen. (*See* J.A. 136–37; 142–143.) Preparing a motion to reopen is time-consuming and difficult. It requires extensive factual development, legal analysis, and procedural coordination to effectively prepare a full withholding case to file the motion. This is extremely challenging for attorneys to do competently and

20

effectively impossible for pro se individuals[9]—especially those in detention. (J.A. at 136–137.) One must compile a sworn statement in English, gather and translate supporting evidence, complete applications for protection, and establish prima facie eligibility at the time of filing (*Id.* at 136 ¶ 4.) This task demands resources like internet access, document retrieval, and translation services that detained individuals lack. Obtaining and reviewing immigration court records to understand the case history and identify viable claims takes additional time for which the March Guidance does not allow. (*Id.* ¶ 5.) And reliance on paper filing for detained pro se individuals leads to significant delays that can render protection effectively unattainable, particularly for those facing imminent removal, (*id.* at 137 ¶ 9.) Even outside detention, pro se motions to reopen frequently fail due to missing required applications, key facts, evidence, or accurate translations. (*Id.* ¶ 6.) The legal framework itself is complex, involving strict deadlines, equitable tolling, number bars, and nuanced claims such as lack of notice or changed country conditions, as well as additional barriers for sua sponte reopening. (*Id.* ¶ 7.)

Preparing a motion to reopen "is a difficult and time-consuming process in the best of circumstances," especially because "all arguments and evidence

---

[9]    Am. Immigr. Council, *Right to Counsel*, https://www.americanimmigrationcouncil.org/about-immigration/right-to-counsel/ (reporting that roughly 86% of detained immigrants are unrepresented).

challenging the initial removal order and preserving all potential immigration relief [must] be included in the [motion]." (J.A. at 146.) For detained individuals without counsel, especially those with limited education, English proficiency, or mental health challenges, these cumulative barriers make successful filing nearly impossible. (J.A. at 141; *see also* J.A. at 148 ("[I]t is particularly difficult for noncitizens detained by DHS to obtain the evidence they need to support reopening from outside of custody.")).

Moreover, the absence of an automatic stay of removal requires separate, demanding stay requests under unclear standards (J.A. at 147 ¶ 8), meaning people can be physically removed before their motion is decided. Even the most seasoned attorney with ample resources cannot complete this process in the timeframes given to class members before their removals to a third country. (*See* J.A. at 143 (noting it can take 15–30 hours of work to just review a client's record)). It is effectively impossible for unrepresented individuals.

### B. Class Members Cannot Raise All Fear-Based Claims in Initial Proceedings or Removal Interviews.

As the District Court noted, it is impossible for counsel to preemptively prepare withholding claims for every country to which clients could be removed. (J.A. at 517–18.) Thus, class members cannot attempt to prove fear-based claims as to multiple countries in initial removal proceedings.

Similarly, when the March Guidance envisions less than 24 hours to prepare for a fear-based interview with an asylum officer or a hearing before an immigration judge, this does not provide a meaningful opportunity to be heard. (*See* J.A. at 136–39.) Class members are often required to demonstrate *full* entitlement to protection from removal to a third country at fear-based interviews with asylum officers—otherwise, the claim for protection against removal will be denied. This showing requires research about country conditions, affidavits attesting to the harms the applicant has experienced, and sometimes even expert affidavits detailing why the country of removal is unsafe for certain people (e.g., for members of disfavored religions).

It is impossible for unrepresented noncitizens to establish that they would be subject to persecution in a country that they know little, or nothing, about. The assistance of counsel, who can research and provide background knowledge about that country, is crucial. And even with counsel, this process takes time. If class members do not have assistance of counsel, as most do not, their third-country persecution claims are often doomed from the beginning because they are not given sufficient time to prepare such claims. This is especially true given termination of legal service programs, *see supra* Section I, which has reduced or eliminated know-your-rights programming and other legal assistance previously provided.

\*    \*    \*

Altogether, even when DHS provides more than 24 hours' notice of removal, under the March Guidance multiple legal, factual, and systemic barriers make it difficult, if not impossible, for class members to demonstrate their eligibility for protection from removal to a third country even if they are able to articulate their fear of removal. The March Guidance is blind to this issue—indeed, it affirmatively instructs DHS officers not to ask class members if they fear persecution or torture in a third country. As the District Court correctly held, this intentional blindness abridges due process.

## V.    The March Guidance Impedes Class Members' Right to Counsel.

The March Guidance has wreaked havoc on Amici's ability to effectively represent thousands of class members across the United States. There are numerous examples in the record where attorneys have struggled even to speak to their detained clients, let alone effectively represent their interests. (*See, e.g.*, J.A. at 143 ¶ 15; 297 ¶ 29; 308–09 ¶ 95.) When attorneys email DHS and ask for information about whether their clients are going to be removed to a third country—even when asserting that their clients have a fear of being removed to specific third countries—those emails typically go unanswered and their concerns ignored.

DHS relegates counsel to an afterthought and prevents counsel from meaningfully assisting clients by transferring class members to remote detention

centers across the country without notice and then quickly removing them without notice. For instance, in 2025, C.O. won CAT protection from being removed to his home country of El Salvador but was detained after checking in at an ICE interview later that year. (J.A. at 443–44.) C.O. and his wife tried to contact his lawyer, but ICE moved him between detention facilities so frequently that it was impossible to arrange a phone call. (*Id.* at 443.) In early October, C.O. called his wife from Mexico and told her that—without any warning at all—"U.S. immigration officers drove him from a U.S. detention center to the Mexico border and handed him over to Mexican authorities."  (*Id.*) Similarly, one attorney-declarant had to resort to scouring social media to get information about her clients, when all inquiries to DHS officials proved futile. (J.A. at 295.) These clients were removed to Eswatini, were not even aware that they were being deported until they were on the plane, and had no opportunity to contact counsel. Their attorney only discovered where the clients were sent after he recognized one of them in a photo posted online by the Assistant Secretary of DHS.

The March Guidance does not allow class members to access their counsel for advice or assistance regarding these removals. (*See* J.A. at 434–37.) In one example, a noncitizen fled political persecution in Iran and came to the United States seeking asylum. (*Id.* at 434.) He was detained throughout his removal proceedings and was eventually granted withholding of removal to Iran. About a month later, he was told

that he would be removed to Nicaragua. At that time, ICE refused to give him a paper notice of removal or to let him consult with his lawyer. Even so, he told the agency that he was afraid of being removed to Nicaragua because that country had a close relationship with Iran.

He subsequently reiterated these fears in an interview with an asylum officer, but the officer told him Nicaragua would not remove him to Iran and risk "jeopardizing" its relationship with the United States. Without the assistance of counsel—who could have researched whether Nicaragua is refouling deportees and provided counsel during the reasonable fear interview—the class member had no answer. Eventually, guards told him that he would be released, and they had him change into his normal clothes. They then handcuffed him, drove him to an airport in Louisiana, and flew him to Nicaragua. In Nicaragua, he was beaten until he gave in and consented to returning to Iran.

Similarly, the March Guidance does not provide any mechanism to inform class members' attorneys that their clients are being sent to third countries, even when immigration court proceedings to reopen removal proceedings are pending. For example, an attorney whose Venezuelan client was removed to Mexico in February 2025 while an appeal and motion to stay were pending before the Board of Immigration Appeals was not informed before the removal. (J.A. at 92–93.)

These examples illustrate how the March Guidance tramples on class members' right to counsel, even when some quantum of advance notice is provided. Under DHS's policies, attorneys get no notice before their clients are whisked away to different detention centers or different countries. In these common situations, Amici's attorneys must waste countless hours looking for information about their clients' location and intended destination. DHS's administrative confusion is no mistake—it is an agency-created barrier intended to prevent class members from asserting fear-based claims against removal. Put simply, the March Guidance's failure to provide any procedures allowing class members to access counsel is unconstitutional.

## CONCLUSION

Due process before third-country removal matters for everyone involved: immigration attorneys, families, and, most importantly, non-citizens whose lives and liberty are at stake.  Without a policy that provides the bare minimum protection for individuals in custody, DHS's third-country removal policy will continue to sow chaos for attorneys and harm individuals by removing them to countries where they have no connections and in which they may be harmed. Our Constitution requires more, and Amici respectfully request the Court affirm the District Court's order in favor of Plaintiffs-Appellees.

27

RESPECTFULLY SUBMITTED this 14th day of April, 2026.

OSBORN MALEDON, P.A.
By /s/ Rachel A. Romaniuk
Daniel Bowman, First Circuit #1223264
Rachel A. Romaniuk, First Circuit #1223188
Esther G. Gold, First Circuit #1223342
OSBORN MALEDON, P.A.
2929 N. Central Ave., Ste. 2000
Phoenix, Arizona 85012
(602) 640-9000
dbowman@omlaw.com
rromaniuk@omlaw.com
egold@omlaw.com

*Attorneys for Amici Curiae*

28

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that this amicus brief complies with the type-volume limitation because it is an amicus brief and complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5). The amicus brief contains 6,460 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the type-face requirements because it has been prepared using Microsoft Word in proportionally spaced 14-point Times New Roman font. *See* Fed. R. App. P. 32(a)(5)-(6)


 /s/ Rachel A. Romaniuk
Rachel A. Romaniuk
OSBORN MALEDON, P.A.
Date: April 14, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Rachel A. Romaniuk
Rachel A. Romaniuk
OSBORN MALEDON, P.A.
Date: April 14, 2026

**APPENDIX: IDENTITIES OF AMICI CURIAE**

The Florence Immigrant & Refugee Rights Project ("The Florence Project") has been dedicated to empowering and representing detained immigrants in Arizona for nearly 40 years. Each year, the Florence Project provides free legal services to hundreds of noncitizens who are vulnerable to third country removal. The Florence Project has had to navigate the chaos Defendants-Appellants' third country removal policies create for both attorneys and clients. These policies have harmed The Florence Projects' attorney-client relationships with detainees and hindered its informational legal services that empower detainees who represent themselves. The Florence Project cannot effectively represent its clients or provide information to pro se noncitizens when little to no notice occurs before a third-country removal.

The Political Asylum/Immigration Representation (PAIR) Project ("PAIR") is a non-profit organization in Boston and the leading provider of pro bono legal services to indigent asylum-seekers and immigrants detained in Massachusetts. At any given time, PAIR is representing or advising several hundred asylum-seekers and immigration detainees from over 90 countries worldwide. PAIR, through staff attorneys or pro bono lawyers closely mentored by PAIR staff, regularly represents individuals before the Immigration Court, United States Citizenship and Immigration Services (USCIS), and in federal court. PAIR specializes in providing pro bono legal services on fear-based and humanitarian immigration relief cases, and

31

has decades of experience representing clients, in detention and otherwise, who have reinstated removal orders but would face targeted harm if removed from the United States. For this reason, PAIR has a direct interest in ensuring that individuals with fear-based claims are not removed pursuant to the March Guidance without meaningful access to process by which they can assert fear-based claims.

The National Immigrant Justice Center ("NIJC") is a non-profit corporation headquartered in Chicago, Illinois. NIJC is dedicated to ensuring human rights protections and access to justice for all immigrants, refugees, and asylum-seekers. By partnering with more than 2,600 attorneys from the nation's leading law firms, NIJC provides direct legal services to over 10,000 individuals annually. NIJC's experience in representing noncitizens in removal proceedings, and assisting other attorneys in similar representation, informs NIJC's advocacy, litigation, and educational initiatives, as it promotes human rights on a local, regional, national, and international stage. NIJC has a substantial interest in the issue now before the Court, both as an advocate for the rights of asylum seekers generally and as the leader of a network of pro bono attorneys who regularly represent them. In addition to asylum seekers, NIJC and its pro bono network regularly represent individuals granted withholding of removal or relief under the Convention Against Torture, who are particularly vulnerable to third country transfers given that their relief is granted post-removal order.