# United States Court of Appeals
### *for the*
# First Circuit

Case No. 26-1212

D.V.D.; M.M.; E.F.D.; O.C.G.,

*Plaintiff-Appellees,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary of Department of Homeland Security (DHS); TODD BLANCHE, Acting United States Attorney General; ANTONE MONIZ, Superintendent of the Plymouth County Correctional Facility,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:25-cv-10676-BEM, HONORABLE BRIAN E. MURPHY, U.S. DISTRICT JUDGE

**BRIEF FOR *AMICI CURIAE* THE CENTER FOR GENDER & REFUGEE STUDIES, HUMAN RIGHTS WATCH, ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA, AL OTRO LADO, AND AMICA CENTER FOR IMMIGRANT RIGHTS IN SUPPORT OF APPELLEES AND AFFIRMANCE**

ANJALI DHILLON (*Admission Pending*)
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, New York 10004
(646) 357-1100
adhillon@hausfeld.com

AMANDA LEE-DASGUPTA
MARY S. VAN HOUTEN HARPER
  (*Admission Pending*)
MICHAEL D. HAUSFELD (not a member)
HAUSFELD LLP
1200 17th Street N.W., Suite 600
Washington, D.C. 20036
(202) 540-7200
alee@hausfeld.com
mvanhouten@hausfeld.com
mhausfeld@hausfeld.com

*Attorneys for Amici Curiae*
*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS     (800) 4-APPEAL • (391790)

BLAINE M. BOOKEY
CENTER FOR GENDER & REFUGEE
    STUDIES
University of California College of
    Law, San Francisco
200 McAllister Street
San Francisco, California 94102
(415) 703-8202
bookbl@uclawsf.edu

MELISSA CROW
CENTER FOR GENDER & REFUGEE
    STUDIES
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, D.C. 20006
(202) 355-4471
crowmelissa@uclawsf.edu

JOANNE BUI
    *(Admission Pending)*
DOVEL & LUNER LLP
201 Santa Monica Boulevard,
    Suite 600
Santa Monica, California 90401
(310) 656-7066
jbui@dovel.com

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURES STATEMENT

I, Blaine M. Bookey, attorney for *Amici Curiae,* certify that *Amici* are non-profit organizations that do not have any parent corporation or issue stock and consequently there exists no publicly held corporation which owns 10% or more of their stock.

Dated: <u>April 15, 2026</u>                    <u>*/s/ Blaine M. Bookey*          </u>
                                               Blaine M. Bookey
                                               Center for Gender & Refugee Studies


## RULE 29(a)(4)(E) STATEMENT

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, *Amici Curiae* state that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than *Amici Curiae,* their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

Dated: <u>April 15, 2026</u>                    <u>*/s/ Blaine M. Bookey*          </u>
                                               Blaine M. Bookey
                                               Center for Gender & Refugee Studies

i

**TABLE OF CONTENTS**

INTRODUCTION AND STATEMENT OF *AMICI*....................................................1

ARGUMENT ........................................................................................................3

    I.    DHS Removed Class Members to Countries Where They Were Arbitrarily Detained, Disappeared and Tortured. ...................................................................3

    II.   DHS Removed Class Members in Violation of the Prohibition against Chain Refoulement.................................................................................................15

    III.    DHS Removed Class Members to Countries Where They Have Been Subjected to Severe Physical and Psychological Harms.......................................21

CONCLUSION ...................................................................................................29

APPENDIX A: STATEMENT OF *AMICI*

APPENDIX B

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Doe I v. Cisco Sys., Inc.*,
  73 F.4th 700 (9th Cir. 2023) ................................................................. 3

*Forti v. Suarez-Mason*,
  694 F. Supp. 707 (N.D. Cal. 1988).......................................................... 5

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018).............................................................................. 4

*Kumar v. Wamsley*,
  No. C25-2055-KKE, 2025 WL 3204724 (W.D. Wash. Nov. 17, 2025)............... 24

*Yousuf v. Samantar*,
  699 F.3d 763 (4th Cir. 2012) ................................................................. 3

*Zadvydas v. Davis*,
  533 U.S. 678 (2001).............................................................................. 4

**Statutes**

8 U.S.C. § 1231(b)(3)............................................................................. 15

Pub. L. No. 105–277, § 2242(a), 112 Stat. 2681, 2681–822 (1998) ................. 4

**Rules**

Fed. R. App. P. 29(a)(2) ......................................................................... 2

**Regulations**

8 C.F.R. § 1208.16(c)(2) ......................................................................... 4

**Other Authorities**

*Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Dec. 10, 1984, 1465 U.N.T.S. 85 ........................................... 3, 16

*Convention Relating to the Status of Refugees*, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ...................................................................... 15

*International Convention for the Protection of All Persons from Enforced Disappearance*, Dec. 23, 2010, 2716 U.N.T.S. 3 ...................................................... 5

*International Covenant on Civil and Political Rights*, Dec. 16, 1966, 999 U.N.T.S 171................................................................................................... 4

*Protocol relating to the Status of Refugees*, October 4, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ..................................................................... 15

*Rep. of the Working Grp. on Enforced or Involuntary Disappearances*, U.N. Doc. A/HRC/60/35 (July 21, 2025)................................................................ 5

*South Sudan 2023 Human Rights Report*, U.S. Dep't of State (2023)...................... 6

UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol* (Jan. 26, 2007) ............................................. 15

UNHCR, *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Gen. Comment No. 4, U.N. Doc. CAT/C/GC/4 (Sept. 4, 2018) ...................................................................................................... 16

UNHCR, *Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum Seekers* (2013) ............................................................. 15

**INTRODUCTION AND STATEMENT OF *AMICI*[1]**

In 2025, the U.S. Department of Homeland Security ("DHS") began an aggressive campaign to deport noncitizens to third countries—countries not designated in their removal orders—to which they often have no connection and where they face torture, indefinite imprisonment, disappearance, and other grave human rights violations. This *amici* brief addresses the experiences of members of the certified class in this case who have been removed pursuant to DHS's unlawful third-country removal policy. Class members have been put onto planes in shackles, often without being told their destination, and detained upon arrival in South Sudan, Eswatini, Ghana, Equatorial Guinea, and Cameroon. In these locations, noncitizens are held under guard, without charge, and with minimal ability to contact family or counsel. Venezuelan class members were sent by DHS to the notorious maximum-security prison Centro de Confinamiento del Terrorismo (CECOT) in El Salvador and subjected to routine beatings, sexual assault by guards, psychological torment, and inhumane detention conditions. Thousands of non-Mexicans have been deported to Mexico, where many were bused to remote towns rife with gang violence and abandoned to sleep on the streets or left to die. Even U.S. court-ordered protections have been unavailing. DHS deported many noncitizens to third countries that sent them onwards to countries from which they were granted protection due to

---

[1] See the Appendix A for a detailed statement of *amici* organizations.

substantial risk of harm.

These removals are not a matter of mistake or carelessness, but of explicit policy, providing no notice of the destination nor an opportunity to present fear-based claims. Indeed, under the DHS memorandum of March 30, 2025[2], DHS may remove a noncitizen to a third country as long as DHS has received "diplomatic assurances" from foreign governments deemed credible by the U.S. Department of State ("DOS") that noncitizens deported to that country, generally, will not be persecuted or tortured. But these assurances are merely boilerplate. DHS does not monitor, enforce, or uphold human rights through its brutal third-country removal policy; it admits that "as long as the [State] Department doesn't already know that there's someone standing there waiting to shoot . . . that's fine."[3]

DHS's third-country removal policy violates universally accepted human rights norms, U.S. federal law, and bedrock due process guarantees in the U.S. Constitution. Just over a year into this policy, the record is replete with horrific experiences of class members directly removed to dangerous and unfamiliar third countries. *Amici,* the undersigned human rights organizations, who have a direct interest in the proper interpretation of U.S. immigration laws, especially as they pertain to international obligations to uphold human rights,[4] submit this brief to

---

[2] Corrected Joint Appendix ("Appx.") 117.
[3] Appx.603
[4] See *Amici*'s concurrently filed Motion for Leave to File. Fed. R. App. P. 29(a)(2).

illustrate the severe harms that class members have suffered under DHS's third-country removal policy and to emphasize the unacceptable cost of allowing such harms to continue.

## ARGUMENT

Under its third-country removal policy, and in violation of U.S. and international law, DHS has used three related methods to deport and endanger class members. First, in a stated effort to terrorize migrants, DHS removed people to countries willing to detain, disappear, and torture them. Second, DHS sent them to countries that then remove them to places where they face substantial abuse. Finally, DHS removed and abandoned them in countries where they are exposed to a litany of dangers.

## I.    DHS Removed Class Members to Countries Where They Were Arbitrarily Detained, Disappeared and Tortured.

DHS repeatedly sent class members to third countries where they were arbitrarily detained, disappeared, and even tortured, in violation of domestic law and *jus cogens* norms.

Freedom from torture is an absolute and non-derogable right.[5]   Congress

---

[5] See, e.g., *Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 716 n.7 (9th Cir. 2023); *Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012); *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, art. 1(1), Dec. 10, 1984, 1465 U.N.T.S. 85, https://www.ohchr.org/sites/default/files/cat.pdf (torture is the infliction of severe pain or suffering for punishment, coercion, or discrimination).

3

codified the "policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country" where that "person would be in danger of being subjected to torture."[6] Regardless, DHS deported some class members to a notorious prison where they endured various forms of physical and psychological torture.

Further, detention that is indefinite or without a clear legal basis is arbitrary and also strictly prohibited under *jus cogens* norms.[7] As Justice Breyer found, "[f]reedom from arbitrary detention is as ancient and important a right as any found within the [U.S.] Constitution's boundaries[.]"[8] The Supreme Court holds that the Constitution "does not permit indefinite detention" of noncitizens.[9] Lower courts have similarly recognized that enforced disappearance—the deprivation of liberty by a state without acknowledgment or by concealment of the fate or whereabouts of

---

[6] Pub. L. No. 105–277, § 2242(a), 112 Stat. 2681, 2681–822 (1998). Under U.S. law, a person is protected from removal to a country if "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

[7] *International Covenant on Civil and Political Rights*, art. 9(1), Dec. 16, 1966, 999 U.N.T.S. 171, https://www.ohchr.org/sites/default/files/ccpr.pdf; *Rep. of the Working Grp. on Arbitrary Detention, Revised Deliberation No. 5 on Deprivation of Liberty of Migrants*, ¶ 8, U.N. Doc. A/HRC/39/45, annex (Feb. 7, 2018), www.ohchr.org/sites/default/files/Documents/Issues/Detention/RevisedDeliberation_AdvanceEditedVersion.pdf ("The prohibition of arbitrary detention is absolute, meaning that it is a non-derogable norm of customary international law, or *jus cogens*.") (indefinite detention is arbitrary).

[8] *Jennings v. Rodriguez*, 583 U.S. 281, 332 (2018) (Breyer, J., dissenting).

[9] *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

the disappeared person[10]—is subject to a "universal and obligatory international proscription."[11]

Nonetheless, as recounted below, DHS forcibly shuttled individuals to third countries with extensive records of human rights abuses—including in cases where DHS accepted so-called "diplomatic assurances." These class members have been detained indefinitely, *incommunicado*, in squalid conditions, and even tortured.

The transparent purpose of these practices is to terrorize. A U.S. official told the U.S. Senate Committee on Foreign Relations, "With countries like Palau or Eswatini, the point is that the Administration can threaten people that they will literally be dropped in the middle of nowhere. *The point is to scare people*."[12] Another U.S. official described the use of third-country deportations as a "scare tactic."[13] A DHS spokesperson referred to these removals as a threat: "If you come to our country illegally and break our laws, you could end up in CECOT, Alligator

---

[10]*International Convention for the Protection of All Persons from Enforced Disappearance*, art. 2, Dec. 23, 2010, 2716 U.N.T.S. 3, https://treaties.un.org/doc/Publication/UNTS/Volume%202716/v2716.pdf.

[11] *Forti v. Suarez-Mason*, 694 F. Supp. 707, 711 (N.D. Cal. 1988); *see Rep. of the Working Grp. on Enforced or Involuntary Disappearances*, ¶ 43, U.N. Doc. A/HRC/60/35 (July 21, 2025), https://docs.un.org/en/A/HRC/60/35 ("the *jus cogens* nature of the prohibition of enforced disappearance gives rise to obligations for States to adopt all necessary measures to ensure that such violations do not remain unpunished").

[12] Appx.479.

[13] *Id.*

Alcatraz, Guantanamo Bay, or South Sudan or another third country."[14] The United States also intentionally turns a blind eye to human rights abuses abroad; the Administration instructed U.S. officials to *not follow up on the treatment of noncitizens* deported to a third country.[15]

### South Sudan

In 2025, DHS put eight men on a plane bound for South Sudan with less than 24 hours' notice of their deportations. Seven of the men are not South Sudanese; they are from Cuba, Laos, Mexico, Burma, and Vietnam.[16] All had final orders designating other countries for removal.[17] Although DOS subsequently claimed it received credible diplomatic assurances from South Sudan that the men would not be subject to torture,[18] DOS's most recent human rights report for South Sudan prior to the removal found "credible reports of . . . enforced disappearance[,]" "arbitrary arrest or detention," and "torture." [19]

South Sudan has subjected—and continues to subject—these class members to arbitrary detention and disappearance. Upon arrival, the men were immediately

---

[14] *Id.*

[15] *Id.* at 485.

[16] Appx.291, ¶ 4; Appx.331, ¶¶ 3-4; Appx.231, ¶ 3; Appx.282-83, ¶¶ 5-8.

[17] *Id.*

[18] Reply in Supp. of Mot. for Clarification, 4, *Dep't of Homeland Sec. v. D.V.D.*, No. 24A1153 (U.S. June 24, 2025).

[19] *South Sudan 2023 Human Rights Report*, 1, 6, U.S. Dep't of State (2023), https://www.state.gov/wpContent/uploads/2024/02/528267-SOUTH-SUDAN-2023-HUMAN-RIGHTS-REPORT.pdf.

and indefinitely detained *incommunicado* in an unknown location under armed guard.[20] They were not informed of the legal basis for or planned length of their detention.[21] Counsel and family were unable to reach the men for over two months, despite repeated and insistent attempts, including filing reports with the United Nations Working Group on Enforced or Involuntary Disappearances.[22] Any contact since has been restricted and sporadic.[23] At the time the evidence was filed, at least six of the men still remained imprisoned.

This uncertain and indefinite detention has taken a severe psychological and physical toll.[24] *NM,* who fled Burma as a child to escape persecution due to his Karen ethnicity, felt helpless without any information about how long he would be imprisoned and suffered from suicidal ideation.[25] After months imprisoned in South Sudan, *EAH,* who came to the United States from Cuba when he was only a year old, exhibited symptoms of depression and hopelessness with no sign of change or progress toward release.[26] DHS has hailed all of this as "a win," reflecting its

---

[20] Appx.328-29, ¶¶ 3, 9-13; Appx.282-84, ¶¶ 6-11; Appx.292-93, ¶¶ 9-14; Appx.329, ¶¶ 8-10.

[21] Appx.295, ¶ 20; Appx.284, ¶ 11; Appx.332, ¶ 13;  Appx.329, ¶ 9.

[22] Appx.292-93, ¶¶ 10-12; Appx.332, ¶¶ 9-10; Appx.329, ¶¶ 9-10; Appx.283-84, ¶¶ 10-11.

[23] Appx.293, ¶ 12; Appx.328-29, ¶¶ 6, 10.

[24] Appx.293-94, ¶¶ 12-14; Appx.284, ¶¶ 11-12.

[25] Appx.329, ¶ 10.

[26] Appx.293-94, ¶14.

punitive intent.[27]

### *Eswatini*

In 2025, DHS sent at least 14 non-nationals to Eswatini, without notice of the destination until they were *already on the plane*.[28] There, they were immediately detained at the maximum-security prison Matsapha Correctional Complex in Mbabane. Again, Eswatini provided no charge nor any information on the length of their imprisonment.[29] None of the men are from Eswatini or had Eswatini designated in their removal orders.[30] These deportations were rendered under a deal in which the United States paid Eswatini $5.1 million to accept third-country nationals.[31]

Around July 13, 2025, many of these class members disappeared from ICE's detainee locator. Their families learned they were deported to Eswatini from a DHS official's X post, announcing the deportation of five men to Eswatini with their photos.[32] A Swazi attorney retained by the men's families was repeatedly denied

---

[27] *Trump Administration Completes Contentious Deportations to South Sudan*, Al Jazeera (July 5, 2025), https://www.aljazeera.com/news/2025/7/5/trump-administration-completes-contentious-deportations-to-south-sudan.

[28] Appx.295, ¶ 23; Appx.299, ¶ 36; Appx.284, ¶ 13 (all five men on board refused to sign the notice of removal to Eswatini that they were given on the plane).

[29] Appx.295-96, ¶ 25; Appx.304, ¶ 68 (On December 2, 2025, counsel and human rights organizations filed a complaint against Eswatini challenging its unlawful and prolonged detention of 14 third-country deportees).

[30] Appx.284, 287, ¶¶ 13, 28; Appx.295, 299, 304-08, ¶¶ 21, 35, 69, 76, 82, 89, 95.

[31] Appx.473.

[32] Appx.285, ¶ 16; Appx.295, ¶ 23; Appx.334, ¶¶ 4-5.

physical access to them, despite multiple attempts and a habeas petition filed in the local court.[33] After nine months of detention, the Supreme Court of Eswatini ruled on April 9, 2026 that counsel should be allowed to visit the class members—but provided no relief from detention.[34]

The prolonged and indefinite detention has caused serious mental and physical health deterioration among these men. *PC*, a Laotian national, told counsel he *feels like a caged animal with no end in sight.*[35] *RMDP*, who is from Cuba, started a month-long hunger strike to protest his indefinite detention without charge and to demand to see his children again.[36] Many have lost significant weight, fallen extremely ill, and experienced depression, anxiety, and hopelessness.[37] At the time the evidence was filed, many of the men were still indefinitely imprisoned in Eswatini without charge. DHS has nonetheless continued to deport noncitizens to

---

[33] Appx.285-86 ¶¶ 19-22); Appx.296-312, ¶¶ 27-28, 39, 51, 96.

[34] Appendix B, Judgment, *Comm'r Gen. of His Majesty's Correctional Services, et. al. v. S.M. Nhlabatsi*, Case No.102/2025 (Sup. Ct. Eswatini) (Apr. 6, 2026); *Eswatini: Supreme Court Ruling on Legal Access Offers Limited Relief for US Deportees*, Amnesty Int'l (Apr. 10, 2026), https://www.amnesty.org/en/latest/news/2026/04/eswatini-supreme-court-ruling-on-legal-access-offers-limited-relief-for-us-deportees/.

[35] Appx.286-87, ¶ 24.

[36] Appx.299, ¶ 40.

[37] Appx.303-04, ¶ 66; Appx.306, ¶ 79; Appx.307-08, ¶ 90; Appx.286-87, ¶ 24; Appx.289, ¶ 42; Appx.337, ¶ 19.

Eswatini, sending four more noncitizens there on March 11, 2026.[38]

### El Salvador

On March 15, 2025, DHS rendered hundreds of Venezuelans to El Salvador's notoriously brutal maximum-security prison, CECOT, where the men were held *incommunicado* for over four months.[39] Some had final orders of removal to a country other than El Salvador and are class members in this case.[40] They were not informed of their destination before removal to El Salvador.[41] Many had no criminal records.[42] Indeed, they were given no legal basis for their imprisonment in a facility designed to punish terrorists.[43]

The men were disappeared during their time at CECOT, with no legal assistance and no contact with the outside world. Neither the U.S. nor Salvadoran governments disclosed to family or legal counsel that they were detained at

---

[38] *Eswatini: Arrival of Four More Men Under U.S. Unlawful Removal Deal*, Amnesty Int'l (Mar. 13, 2026), https://www.amnesty.org/en/latest/news/2026/03/eswatini-arrival-of-four-more-men-under-us-unlawful-removal-deal/.

[39] Appx.363, ¶ 2.

[40] Laura Romero, *Venezuelan Migrants Deported to El Salvador Despite Order Barring Removal to Third Countries*, ABC News (Apr. 1, 2025), https://abcnews.com/Politics/venezuelan-migrant-recently-deported-el-salvador-final-order/story?id=120353709.

[41] Appx.363, ¶ 3.

[42] *"You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison*, 35-38, Human Rights Watch & Cristosal, (Nov. 12, 2025), https://www.hrw.org/sites/default/files/media_2025/12/elsalvador1125%20web.pdf (hereafter "HRW").

[43] HRW at 48.

CECOT.[44] Guards repeatedly told the men they would "never leave alive" and that "no one knew they were there."[45]

The United States claimed it received credible diplomatic assurances that noncitizens removed to CECOT would not be tortured.[46] But those assurances are contradicted by CECOT's well-documented history of abuse,[47] as statements from U.S. officials and noncitizens' accounts of subsequent torture reflect. During a visit to CECOT, then-DHS Secretary Kristi Noem made clear that DHS wielded CECOT as a threat, stating: "If you do not leave [the United States], we will hunt you down, arrest you, and you could end up in this El Salvadorian prison."[48]

Noncitizens sent to CECOT under DHS's third-country removal policy were subjected to regular beatings and severe physical and psychological abuse. They were beaten upon arrival, beaten during daily cell searches, and subjected to sexual violence. They suffered sensory bombardment and a lack of ventilation or natural light. They had to use the same fetid, unsanitary water for drinking and bathing, and

---

[44] HRW at 41, 72-73.

[45] HRW at 71.

[46] Appl. to Vacate the Inj. Issued by D. Md. and Req. for an Immediate Admin. Stay, 3, *Noem v. Garcia, Supreme Court of the United States*, No. 24A949 (U.S. April 7, 2025), https://www.supremecourt.gov/DocketPDF/24/24A949/354843/202504071033412 48_Kristi%20Noem%20application.pdf (accessed September 17, 2025).

[47] HRW at 29-30.

[48] Kristi Noem (@EnvoyNoem), Post on X (Mar. 26, 2025, 5:03 PM), https://x.com/EnvoyNoem/status/1905034256826408982.

were deprived of food and water as punishment for minor slights.[49] As *Julián G.* entered the prison, he heard men screaming from the beatings and saw blood on the floor and another man convulsing.[50] CECOT's director told them: "The only way out of here [is] in a black bag."[51]

The men endured severe beatings as punishment for protesting, violating prison rules, or requesting medical attention. Many were shot with rubber bullets at close range[52] or taken to punishment cells called "the Island."[53] *Guillermo T.* was taken to the Island for bathing at the wrong time, and hit in the stomach, back, ribs, and thighs, then left to kneel with his hands behind his back in handcuffs for approximately 6 hours.[54] *Carlos J.* was "beat[en] until [he] vomited blood" and locked in a punishment cell for three days for requesting medical attention.[55] *Luis S.* was forced to kneel for about 24 hours and sometimes denied water for up to a day for requesting medical attention.[56]

Four prison guards sexually abused *Mario J.* by sticking batons between his legs and rubbing against his private parts, forcing him to perform oral sex on one of

---

[49] Appx.363-64, ¶ 4.
[50] HRW at 52-53.
[51] *Id.*
[52] HRW at 62-63.
[53] *Id.* at 63.
[54] *Id*. at 66-67.
[55] *Id.* at 69.
[56] *Id*. at 70.

the guards, groping him and calling him "faggot."[57] Prison guards sexually assaulted *Nicolás J.* during the repeat beatings by grabbing his genitals and making sexual comments.[58]

### *Cameroon*

In exchange for Cameroon's acceptance of third-country deportees, the U.S. government paid $30 million to a UN program in Cameroon and stayed silent on Cameroon's deadly crackdown against protesters.[59] Since January 2026, DHS has deported at least 17 non-Cameroonian class members to Cameroon in handcuffs and shackles, where they are imprisoned in Yaoundé, without a legal basis and for an indefinite length.[60] Almost all had U.S. court orders prohibiting return to their countries of origin, yet local officials told them they cannot leave imprisonment unless they return to those countries.[61] These class members have described feeling traumatized and afraid, stuck between seemingly endless detention and the

---

[57] *Id.*

[58] *Id.* at 71.

[59] Hamed Aleaziz & Pranav Baskar, *In Secret Deportation Deal, U.S. Leveraged Favors and Funds*, N.Y. Times (Mar. 25, 2026), https://www.nytimes.com/2026/03/25/world/africa/in-secret-deportation-deal-us-leveraged-favors-and-funds.html. (hereafter "Aleaziz Mar. 25, 2026").

[60] *Id.*

[61] Pranav Baskar & Hamed Aleaziz, *U.S. Deports Nine Migrants in Secret, Ignoring Legal Protections*, N.Y. Times (Feb. 14, 2026), https://www.nytimes.com/2026/02/14/world/africa/us-secret-deportation-cameroon.html.

possibility of being returned to danger.[62]

### *Equatorial Guinea*

Under a deal in which the U.S. paid Equatorial Guinea $7.5 million, DHS has deported at least 29 noncitizens—none of whom are from Equatorial Guinea—to Equatorial Guinea, where they faced either indefinite imprisonment or forced deportation to a country that they fled.[63] Prior to deportation, U.S. immigration judges had granted each noncitizen protection from return to their countries of origin due to risk of persecution or torture.[64] These class members were imprisoned in a decommissioned hotel, where some were hospitalized due to malaria, typhoid, and food poisoning.[65] Many have since been deported to their countries of origin after being told that their only alternative was indefinite detention in Equatorial Guinea.[66] *Diadie Camara*, granted protection from deportation to Mauritania after he escaped hereditary slavery, was nevertheless deported to Mauritania.[67]

---

[62] Aleaziz Mar. 25, 2026.

[63] Monika Pronczuk, *Secretive Deal Leaves Deportees from the U.S. Stuck in Equatorial Guinea with 'No More Hope'*, Associated Press (Mar. 21, 2026), https://apnews.com/article/equatorial-guinea-deportations-trump-asylum-migrants-9d0a623b83288f5c7b1d1a71443d04cd. ("Mednick").

[64] Nicolas Roll & Samuel Obiang, *African Migrants Won Legal Protections – Then Trump Deported Them*, Barron's (Feb. 25, 2026), https://www.barrons.com/news/african-migrants-won-legal-protections-then-trump-deported-them-b8cda499?reflink=desktopwebshare_permalink.

[65] *Id.*

[66] *Id.*

[67] *Id.*

## II.    DHS Removed Class Members in Violation of the Prohibition against Chain Refoulement.

U.S. and international law prohibit refoulement—returning a person "in any manner whatsoever," including by "deportation, expulsion, extradition, informal transfer or 'renditions,' and non-admission at the border," "to the frontiers of territories where his [or her] life or freedom would be threatened." [68]

That customary obligation is reflected, in one strand, in Article 33 of the 1951 Refugee Convention and its 1967 Protocol, which bar returning a person to a territory where their life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. And, in another, in the Convention Against Torture ("CAT"), which forbids expelling, returning ("refouler"), or extraditing a person to a State where there are substantial

---

[68] United Nations High Commissioner for Refugees, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol*, 12, Jan. 26, 2007, https://www.unhcr.org/4d9486929.pdf; see also 8 U.S.C. § 1231(b)(3); *Convention relating to the Status of Refugees*, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150, https://bit.ly/3rRaB55; *Protocol relating to the Status of Refugees*, October 4, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267, https://bit.ly/3pIDf5B; Susan Fratzke, *International Experience Suggests Safe Third-Country Agreement Would Not Solve the U.S.-Mexico Border Crisis*, Migration Policy Institute, June 2019, https://bit.ly/3dDRkLO; UNHCR, *Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum Seekers*, https://www.refworld.org/docid/51af82794.html.

15

grounds for believing they would be in danger of being subjected to torture.[69] In enacting the Refugee Act of 1980 and, later, the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Congress expressly aligned federal law with these international non-refoulement obligations.

The non-refoulement obligation also forbids removal of an individual to a State where they face a risk of onward transfer to another State in which they may be tortured; a practice known as "chain refoulement."[70] A State cannot avoid responsibility for resulting persecution or torture simply by inserting an intermediary State in the removal chain. If a U.S. immigration judge granted a person protection from removal to a designated country, finding they would likely face persecution, torture, or threats to life or freedom, DHS cannot then send them to a State that would return them to the designated country.

DHS nevertheless *systematically* pursued third-country removals in circumstances where chain refoulement was foreseeable or even expected. As the following accounts show, DHS put no meaningful safeguards in place to prevent

---

[69] *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85, https://www.ohchr.org/sites/default/files/cat.pdf art. 3 (effective June 26, 1987).

[70] *See, e.g.*, UNHCR*, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, ¶ 12, General Comment No. 4, U.N. Doc. CAT/C/GC/4 (Sept. 4, 2018), https://www.ohchr.org/sites/default/files/Documents/HRBodies/CAT/CAT-C-GC-4_EN.pdf.

16

chain refoulement. DHS does not transmit to designated countries even the most basic information that U.S. adjudicators have found a credible and legally sufficient basis for a person's fear of persecution or torture in their country of origin.[71] Unsurprisingly, third-country authorities are routinely dismissive of individuals who invoke their protected status in the United States—strongly suggesting that DHS has done nothing to ensure compliance with its non-refoulement obligations.

In fact, accounts of class members suggest something more insidious: third-country officials insist that further removal other countries is *pursuant to agreements with the United States*. Such statements indicate not only a failure to prevent chain refoulement, but affirmative facilitation of it.

***R.K., a woman from Sierra Leone***, was granted withholding of removal based on her political opinion.[72] Less than two months later, DHS deported her to Ghana— without prior notice to her family or counsel and without any opportunity to raise a fear claim regarding Ghana.[73]

Within days, Ghanaian authorities removed her to Sierra Leone. Uniformed officers came to the hotel where she was being held to remove her. Producing no court order or legal authority, they insisted they were "*acting on instructions*."[74] The

---

[71] *See infra* n. 56, 62, 69, 73.
[72] Appx.360, ¶¶ 4–5.
[73] *Id*. at 361, ¶ 11.
[74] *Id*. at 361-62, ¶ 12.

officers refused her pleas to seek protection in Ghana.[75] When she resisted—by holding on to fixed objects and an attorney's leg for nearly 40 minutes—the Ghanian authorities eventually overpowered her, dragged her across the floor, and forced her into a vehicle.[76] She was held overnight and then flown to Sierra Leone, where she immediately went into hiding.[77]

**K.S., a man from Gambia**, had been granted CAT protection as to Gambia because of his sexual orientation.[78] DHS officers placed K.S. in chains at the hands, waist, and ankles and forced him on a military plane—along with 13 other detainees—without his belongings, travel documents, or access to attorneys.[79] Four individuals were put in straightjackets after refusing to board the plane without first speaking to their attorneys. K.S. was not informed of the flight's destination.[80]

Upon arrival, Ghanian authorities separately detained K.S. for five days with no access to phones, showers, or a change of clothes.[81] He repeatedly told Ghanaian officials that he had a documented fear of return, noting his granted CAT protection against removal to Gambia. Officials nonetheless told him that his "final destination"

---

[75] *Id.* at 362, ¶ 13.
[76] *Id.* at 361-62, ¶ 12.
[77] *Id.* at 362, ¶ 13.
[78] Appx.340, ¶ 5.
[79] *Id.*, at 346, ¶ 6.
[80] *Id.*
[81] *Id.*, at 346-47, ¶ 8.

was Gambia, *pursuant to orders from ICE*.[82] Just days after landing in Ghana, K.S. was deported to Gambia where he is now in hiding, afraid for his life.[83]

    **H.G., a man from Chad**, came to the United States as a child with his family; they were granted asylum and later became permanent residents.[84] After being placed in removal proceedings, H.G. was granted protection under CAT, barring removal to Chad based on the same political fear grounds that supported the family's asylum claim.[85] Despite this protection, H.G. remained in custody until DHS officers transferred him to an airport facility and then lied to him, telling him he was headed to Puerto Rico.[86] At the airport, he saw paperwork indicating his true destination was Eswatini, a country to which he had no connection.[87] When he and others refused to board, armed men forced them onto the plane.[88] Upon arrival, Eswatini officials pressured him to agree to go to Chad, threatening him with four to five additional years in prison for noncooperation.[89] When he explained that the United States granted him protection from deportation to Chad, they accused him of lying, indicating DHS took no action to safeguard against chain refoulement.[90]

---

[82] *Id*. at 347, ¶ 9.
[83] *Id*. at 348, ¶ 13.
[84] Appx.432, at ¶ 3.
[85] *Id*. at 432, ¶ 4.
[86] *Id*. at ¶¶ 6–8.
[87] *Id*. at ¶ 8.
[88] *Id*. at 433, ¶ 9.
[89] *Id*. at ¶ 12.
[90] *Id*.

*An Iranian man* and his wife fled to the United States after being detained and tortured by Iranian authorities.[91] His pregnant wife was beaten so severely that she miscarried.[92] After he was detained by DHS, an immigration judge granted him withholding as to Iran.[93] A DHS officer later disclosed he would be removed to Nicaragua. He objected that Nicaragua would deport him to Iran due to their close diplomatic ties.[94] He requested guarantees Nicaragua would accept him and not further remove him to Iran and an opportunity to consult with his lawyer, *but ICE refused*.[95]

He was shackled and flown to Nicaragua. Upon arrival, Nicaraguan authorities kept him handcuffed for hours under guard and informed him of his immediate removal to Iran. When he explained that the United States had granted him withholding as to Iran, even showing the written order, they responded that the Nicaraguan government had *already agreed with the U.S. government* that Nicaragua would send him on to Iran.[96]

When he initially refused to sign a form stating that he was "willing to be deported to another country," a Nicaraguan officer kicked the chair out from under

---

[91] Appx.434, ¶ 2.
[92] *Id*.
[93] *Id*.
[94] *Id*. at 435, ¶ 7.
[95] *Id*. at 434-35, ¶¶ 6, 12.
[96] *Id*. at 436, ¶ 15–16.

him and another kicked him in the stomach until he signed.[97] Officers held him at the airport from late morning until around 10 p.m., unlocking his handcuffs only to force his signature, allow a bathroom visit, and hand him several hundred dollars in cash "to make sure [he] didn't die on the way to Iran."[98] That same night, Nicaraguan officials sent him to Venezuela, where he was forced onto a flight to Iran. He realized that his removal to Tehran had been arranged *while he was in ICE custody* based on the date on his e-ticket.[99] Only because the flight transited through Istanbul was he able to exit the airport and avoid immediate return to Iran.[100] He is now separated from his wife, who is seeking asylum in the United States, and their U.S. citizen infant daughter.

DHS has perpetuated widespread chain refoulement of individuals whom the United States has already recognized as likely facing persecution or torture, underscoring that chain refoulement is a designed feature of DHS policy, not a fluke.

### III.    DHS Removed Class Members to Countries Where They Have Been Subjected to Severe Physical and Psychological Harms.

DHS has deported noncitizens under its third-country removal policy to countries where DHS *knows*—based on its own past reporting of country conditions—that noncitizens are at risk of torture, persecution, or other violence.

---

[97] *Id*. at 436, ¶ 17.
[98] *Id*. at ¶ 18.
[99] *Id*. at 437, ¶ 23.
[100] *Id*. at ¶ 24.

DHS's awareness of the severity of conditions on the ground underscores that these third-country removals are not accidental missteps; they are punitive and violate U.S. and international law *by design*.

Noncitizens are systematically rounded up without notice and released onto the streets of unfamiliar cities with no means to subsist, consigned to homelessness, violence, exploitation, and indefinite legal limbo. The forced precarity *further* exposes these individuals to harm by both state and non-state actors.

DHS's extensive removals to Mexico exemplify how the policy inflicts severe, foreseeable harm. Mexico has accepted nearly 13,000 non-Mexican deportees, many of whom find themselves in immigration limbo; after being expelled from the United States, they were released in Mexico without identification or any mechanism to resolve their legal status.[101] There, deportees are exposed to risks of kidnapping, extortion, violence, food and medical insecurity, among other harms.

Indeed, Mexican authorities routinely bus newly arrived noncitizens to Villahermosa, a notoriously dangerous city marred by pervasive conflict and gang violence. The city has minimal infrastructure to absorb them—there is reportedly

---

[101] Kate Linthicum, *Homeless and stateless: Deportees from U.S. are trapped in Mexico*, LA Times (Mar. 21, 2026), https://www.latimes.com/world-nation/story/2026-03-21/mexico-deportations.

only one migrant shelter and no institution equipped to process refugee claims.[102] In these conditions, DHS is not merely relocating people; it is depositing them into a dangerous vacuum of protection, housing, and basic services.

These harms would be unimaginable if they were not so predictable. DHS's actions follow a *decade* of policies that have left migrants abandoned in third countries such as Mexico, where they have been subjected to severe physical or psychological suffering. For example, DHS's "Remain in Mexico" policy exposed migrants to extensive violence, including over a thousand reported instances of rape, sexual assault, kidnapping and attempting kidnapping, extortion (including by Mexican authorities), armed robbery, assault, and murder, among other severe harms.[103] This policy, which required migrants to remain in Mexico while awaiting their immigration court hearings, resulted in nearly 83% of all asylum-seekers reporting that they had been victims of an attack or threats in the month leading up to their interviews.[104] Migrants "face[d] serious harm at the hands of criminal

---

[102] *Id.*

[103] *"Like I'm Drowning": Children and Families Sent to Harm by the US 'Remain in Mexico' Program*, Human Rights Watch (Jan. 6, 2021), https://www.hrw.org/report/2021/01/06/im-drowning/children-and-families-sent-harm-us-remain-mexico-program.

[104] *U.S. Asylum and Border Policies Resulting in Human Rights Violations Human Rights First's Submission for the Office of the High Commissioner for Human Rights (OHCHR) Special Rapporteur on the Human Rights of Migrants pursuant to Human Rights Council Resolution 43/6*, at 3, Human Rights First (Feb. 2022), https://humanrightsfirst.org/wp-content/uploads/2022/03/HRF-Submissionon-Human-Rights-Violations-at-U.S.-Borders.

organizations, including kidnapping, extortion, physical violence, and sexual assault."[105]

Beyond physical harm, migrants abandoned in Mexico or other third countries are virtually at the mercy of the state for support, housing, and benefits—services that are further inaccessible for those without requisite legal documents. Nor are there any safeguards or protections for those with medical or mental health needs, subjecting class members to chronic emotional distress and mental and physical suffering.

### *Identity-based harms*

DHS has removed class members to countries where they face substantial risk of harm based on their protected identities or known vulnerabilities. This is reflected in DHS's pattern of removing LGBTQ+ individuals to high-risk third countries, where homosexuality or gender nonconformity are criminalized and can be punished with imprisonment, torture, or even execution.[106]

*Farah, a gay woman from a country in North Africa*, fled to the United States after enduring severe familial abuse for being in a same-sex relationship. She

---

[105] Ari Sawyer, *Biden 'Asylum Ban' Rule Would Send Thousands to Danger*, Human Rights Watch (Feb. 28, 2023), https://www.hrw.org/news/2023/02/28/biden-asylum-ban-rule-wouldsend-thousands-danger.

[106] *From Safe Haven to Uncertainty: LGBTQ+ Asylum Rights Diminish Under Trump Policies*, Parriva (Feb. 20, 2026), https://www.parriva.com/lgbtq-asylum-seekers-deportation-policy/; *see also generally Kumar v. Wamsley*, No. C25-2055-KKE, 2025 WL 3204724 (W.D. Wash. Nov. 17, 2025).

was three days from a hearing on her release when ICE handcuffed her and forced her onto a plane to Cameroon, where homosexuality is illegal. Despite having been granted withholding of removal to her country of origin by a U.S. immigration judge, Farah was refouled by Cameroonian authorities and is now in hiding.

**A.H.D., a transgender woman from Honduras**, was granted withholding of removal to Honduras in 2007 based on the likelihood of persecution due to her gender identity and sexual orientation.[107] Nearly twenty years later, A.H.D. was detained by DHS, forced onto a bus, and shuttled to danger in Mexico.[108]

In Mexico, A.H.D. is *acutely* vulnerable for the same reasons that established her fear of deportation to Honduras. She has no social network, is living in a shelter, and is a transgender woman in a country where it is highly dangerous to be transgender.[109] In Mexico, transfemicide—the killing of trans women—has been called a "silent epidemic" by researchers, and the impunity rate for violent crimes in Mexico is approximately 95%.[110] The combination of pervasive anti-trans violence, entrenched impunity, and A.H.D.'s extreme vulnerability has left her effectively trapped—homeless, isolated, and "fearing for her life and safety" each day she

---

[107] Appx.381, ¶¶ 2–3.

[108] *Id*. ¶ 6.

[109] Megan Janetsky, *Wave of transgender slayings in Mexico spurs anger and protests by LGBTQ+ community*, Associated Press (Jan. 15, 2024), https://apnews.com/article/mexico-transgender-killings-lgbtq-violence-samantha-gomez-266056d1f8a811b30ce69ef69741c26a.

[110] Appx.381, ¶ 7.

remains in Mexico.[111]

### *Medical vulnerability*

Many class members removed to third countries suffer from medical vulnerabilities or are placed in environments plainly detrimental to health. For example, public reporting reflects that a severely ill 67-year-old man confined to a wheelchair was removed to Mexico under DHS's third-country removal policy and died several months later.[112]

Deportees have been sent to areas where chloroquine resistant malaria is endemic without antimalarial medication, and to where they are completely disoriented and unable to communicate, compounding risks of untreated illness and preventable death. In South Sudan, one noncitizen was locked in a small room at night in stifling heat, bitten by mosquitoes, and contracted malaria; he became so sick he had to be taken to a hospital.[113]

These are not unforeseeable complications; they are direct consequences of shuttling vulnerable people to risky environments without even minimal healthcare.

### *Risks of homelessness, violence, exploitation, and legal limbo*

---

[111] César López Linares, *Journalists investigate 'silent epidemic' of transfemicide in Mexico*, LatAm Journalism Review (Jul. 17, 2025), https://latamjournalismreview.org/articles/journalists-investigate-silent-epidemic-of-transfemicide-in-mexico/.

[112] Linthicum, *supra* n. 9.

[113] Appx.293, ¶ 13.

DHS's third-country removal practice has plunged many into de facto statelessness and prolonged legal limbo. Functionally deprived of basic rights without legal status, individuals are sent to countries where they have no travel or identification documents and no path to resolve their immigration status. Without ties and no ability to meaningfully obtain basic resources for human survival, deportees are often at further risk of harm and exploitation by other state and non-state actors.

*J.M.G., a man from Mexico*, was ordered removed to Mexico in 2005 and reasonably expected to be returned there upon completing a criminal sentence.[114] Instead, DHS removed J.M.G. to South Sudan "without any travel documents or identification documents," and with no indication that DHS ever contacted Mexican consular authorities to arrange for his return to Mexico.[115]

While confined in South Sudan, J.M.G. existed in a legal vacuum. Neither his family nor his counsel were able to communicate with him for over a month and he had no documents attesting to his identity or nationality.[116] Only after the Mexican Foreign Ministry gathered enough evidence of his Mexican citizenship and repeatedly requested consular access did the Mexican embassy in Addis Ababa

---

[114] Appx.331, ¶ 4.
[115] *Id*. at ¶ 6.
[116] *Id*. at 331-32, ¶ 7–9.

secure an interview—roughly a month after the initial request.[117] Though Mexico issued him a passport, J.M.G. remained detained in South Sudan for *three additional weeks* without legal justification before release.[118]

**O.G.M., a man from El Salvador**, was granted CAT protection based on his kidnapping and torture by Salvadoran gangs and police.[119] Nevertheless, DHS removed O.G.M. to Mexico despite similar claims in his fear interview that he had been previously kidnapped, beaten, and extorted by Mexican police officers.[120] At the Hidalgo border, when O.G.M. refused to get off the bus, U.S. immigration officers used force: one punched him in the stomach and dragged him off; he saw officers drag another man out by his feet so his head slammed against the bus stairs and then kick him on the ground until he needed a wheelchair to complete the crossing.[121]

As they crossed into Mexico, U.S. officers told Mexican immigration officials in Spanish that they needed to "fix" O.G.M.[122] Inside the Mexican immigration institute, an official repudiated O.G.M.'s request for asylum and told him that he was in Mexico illegally and had ten days to leave the country; no protection options were

---

[117] *Id*. at ¶¶ 7, 11.
[118] *Id*. at 332, ¶ 12.
[119] Appx.369, ¶ 13.
[120] *Id*. at 368, ¶ 4.
[121] *Id*. at ¶ 7.
[122] *Id*. at 369, ¶ 8.

offered.[123] Mexican authorities then moved O.G.M. to Villahermosa, where he again asked for asylum, and again was denied. Instead, officials forced him to sign documents stating that he was in Mexico illegally.[124]

He now lives in de facto legal and physical limbo. He is isolated in Villahermosa without a way to leave because he has no passport nor "any valid identity documents." He was blocked at three immigration checkpoints where agents threatened him with arrest and detention for traveling without proper papers.[125] Hiding in a hotel, without resources, he received threatening extortion calls from people he believes to be cartel actors.[126] He is "afraid for his life" and feels he has "few options," trapped in a city he cannot safely leave and where both authorities and criminal groups present a constant danger.[127]

## CONCLUSION

Under its third-country removal policy, and administered through three frameworks, DHS repeatedly subjected class members to severe human rights violations abroad. This harm was predictable and intended as a "scare tactic." The district court correctly rejected a construction of domestic law that would permit such widespread violations and vacated DHS' inhumane third-country removal

---

[123] *Id*. at ¶ 9.
[124] *Id*. at ¶ 11.
[125] *Id*. at ¶ 12.
[126] *Id*. at ¶ 13.
[127] *Id*.

policy. Its decision should be affirmed.

Date: April 15, 2026

Respectfully submitted,

/s/ Amanda Lee-DasGupta
Amanda Lee-DasGupta (1223109)
Mary Sameera Van Houten Harper
(First Circuit Admission Pending)
Michael D. Hausfeld
(Not a member of the First Circuit)
Hausfeld LLP
1200 17th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 540-7200
alee@hausfeld.com
mvanhouten@hausfeld.com
mhausfeld@hausfeld.com

Anjali Dhillon
(First Circuit Admission Pending)
Hausfeld LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
(646) 357-1100
adhillon@hausfeld.com

Joanne Bui
(First Circuit Admission Pending)
Dovel & Luner LLP
201 Santa Monica Blvd #600
Santa Monica, CA 90401
(310) 656-7066
jbui@dovel.com

Blaine M. Bookey (1188528)
Center for Gender & Refugee Studies
University of California College of
Law, San Francisco
(415) 703-8202
bookbl@uclawsf.edu

30

Melissa Crow (1165021)
Center for Gender & Refugee Studies
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, DC  20006
(202) 355-4471
crowmelissa@uclawsf.edu

*Counsel for Amici Curiae*

31

## APPENDIX A: STATEMENT OF *AMICI*

**The Center for Gender & Refugee Studies ("CGRS")** has a direct interest and extensive expertise in the proper development of asylum and refugee law and related humanitarian protections, including claims under the Convention Against Torture. CGRS advances the human rights of refugees through litigation, scholarship, and policy recommendations. The Center also provides technical assistance to attorneys representing asylum seekers nationwide, reaching over 8,000 fear-based cases at all levels of the immigration and federal court system in the past year alone. A significant number of those cases involved individuals fearing return to a third country including to El Salvador, Eswatini and South Sudan. The questions presented in this petition for review relate directly to CGRS's core mission to ensure that asylum protections under U.S. law comport with international obligations.

**Human Rights Watch** is a non-profit, non-partisan organization established in 1978 that investigates and reports on violations of fundamental human rights in over 100 countries worldwide with the goal of securing the respect of these rights for all persons. It has regularly reported on human rights violations in countries to which the United States has removed or expelled people who are not citizens of those countries.  It has also regularly reported on human rights violations in Venezuela and other countries where people have been returned after third-country expulsions by the United States. Human Rights Watch has filed amicus briefs before the U.S.

Supreme Court, U.S. courts of appeal, and other courts.

**Asian Americans Advancing Justice-Atlanta ("Advancing Justice-Atlanta")** builds power in working-class, language minority AAPI, AMEMSA, and immigrant communities in Georgia, the U.S. Southeast, and beyond, working in broad multiracial coalitions to realize a fully reflective and inclusive democracy through immigration legal services, community organizing and education, policy advocacy, impact litigation, and civic engagement.

**Al Otro Lado** is a nonprofit legal services organization dedicated to serving indigent deportees, migrants, and refugees in the United States and Mexico. With staff and volunteers on both sides of the U.S.-Mexico border, Al Otro Lado provides direct legal representation, immigration legal services, and humanitarian assistance to individuals navigating the asylum and immigration systems—including many who have been removed or are at risk of detention and removal.

Al Otro Lado has a direct and substantial interest in the issues presented in this appeal. The organization serves individuals who are, or may become, members of the class defined in D.V.D. v. DHS—people subject to final orders of removal who face deportation to third countries in which they were never given an opportunity to raise claims of fear. Al Otro Lado's staff and volunteers regularly assist clients who have been removed to countries other than their countries of origin, as well as clients in the United States who live are at risk of being transferred without

notice to countries where they face persecution, torture, or death. Our Mexico team regularly conduct intakes with individuals who have been deported to Mexico. The team has been contacted by individuals who were granted withholding of removal or protection under the Convention Against Torture, only to be removed to Mexico and ultimately returned to their country of origin where they have faced persecution. We have filed successful petitions for habeas corpus on behalf of detained individuals facing third-country removal. We have begun the work of drafting petitions for habeas corpus only to have individuals transported to Mexico under an unwritten policy that Mexico will accept non-Mexican citizens that the United States wants to expel. The harms at issue in this case—including chain refoulement and the absence of any meaningful process before third-country removal—are not abstract to Al Otro Lado or the communities it serves. They are a lived reality that Al Otro Lado witnesses and responds to in its day-to-day work.

Al Otro Lado's cross-border presence and practice give it a distinct vantage point on both categories of harm addressed in this brief: the fear, uncertainty, and procedural deprivations experienced by class members remaining in the United States, and the concrete dangers faced by those who have already been removed to third countries. Al Otro Lado's legal and humanitarian work at the intersection of domestic immigration proceedings and cross-border services makes its perspective directly relevant to the Court's consideration of the real-world consequences of

DHS's third-country removal policy.

**Amica Center for Immigrant Rights ("Amica Center")** is a nonprofit immigrant rights organization that provides legal services to indigent noncitizens in immigration detention in Maryland, Virginia, Pennsylvania, Georgia, Texas, Louisiana, Arizona, California, Colorado, and beyond. Amica Center conducts know-your-rights presentations and pro se workshops and provides legal advice and assistance to individuals in immigration detention. It also provides in-house direct representation, secures pro bono representation, and brings impact litigation on behalf of such noncitizens. Amica Center's work focuses on advancing the rights of noncitizens in immigration detention. It therefore has a direct interest in ensuring that noncitizens are not removed to persecution, torture, or other grave harm without sufficient process.

Amica Center has represented and provided pro se assistance to individuals whom DHS has sought to remove to newly designated third countries after those individuals had previously received final grants of withholding of removal or protection under the Convention Against Torture. The outcome of this case is therefore central to Amica Center's mission to protect the rights and dignity of immigrants facing deportation and to prevent their return to danger.

## APPENDIX B

Judgment, *Comm'r Gen. of His Majesty's Correctional Services, et. al. v. S.M. Nhlabatsi*, Case No.102/2025 (Sup. Ct. Eswatini) (Apr. 6, 2026).

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 6,361 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: <u>April 15, 2026</u>                     <u>*/s/ Amanda Lee-DasGupta*</u>
                                        Amanda Lee-DasGupta
                                        *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2026, a true and correct copy of the foregoing

Brief of *Amici Curiae* was served on all counsel of record in this appeal via CM/ECF.


Dated: <u>April 15, 2026</u>          <u>*/s/ Amanda Lee-DasGupta*</u>
                                        Amanda Lee-DasGupta
                                        *Counsel for Amici Curiae*