

**National Immigration Litigation Alliance**
*Immigrant justice through the courts*

May 5, 2026

Anastasia Dubrovsky, Clerk of Court
U.S. Court of Appeals for the First Circuit
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210

> Re:    *D.V.D. v. U.S. Department of Homeland Security*, No. 26-1212
> Oral Argument set for May 13, 2026, at 2:00 p.m.
> (Judges Montecalvo, Howard, and Aframe)
> Letter Pursuant to Fed. R. App. P. 28(j)

Dear Ms. Dubrovsky:

Plaintiffs-Appellees submit *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, No. 25-5243, -- F.4th --, 2026 WL 1110616 (D.C. Cir. Apr. 24, 2026) (*RAICES*).

In *RAICES*, plaintiffs challenged Proclamation 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8333 (Jan. 20, 2025), and implementing agency guidance suspending the entry of noncitizens at the southern border as a vehicle to replace the congressionally prescribed removal scheme with extra-statutory summary removal procedures that denied them access to asylum, withholding of removal, and Convention Against Torture (CAT) protection. *Id*. at *1-2. The D.C. Circuit affirmed the district court's decision which: (1) certified a class, (2) declared the Proclamation unlawful to the extent it purports to suspend entry or restrict access to asylum, withholding, and/or CAT protection, (3) declared the guidance unlawful, (4) vacated the guidance under 5 U.S.C. § 706, and (5) enjoined agency officials from implementing the Proclamation without following the removal procedures and substantive protection framework in the Immigration and Nationality Act. *Id*. at *1-2, *7, *27.

The court held that § 1252(f)(1) does not bar vacatur because it is titled "Limit on injunctive relief" and targets only orders that "enjoin" or "restrain," whereas §

| National Immigration Litigation Alliance, Inc. | (617) 819-4649 | info@immigrationlitigation.org |

706(2) vacatur "h[olds] unlawful and set[s] aside" agency action. *Id*. at \*26-27. The court emphasized that vacatur "does not 'enjoin' or 'restrain' anyone" and instead divests unlawful agency action of legal force. *Id*.

The court also rejected the government's reliance on the entry-fiction that "inadmissible or not-yet-admitted individuals who have physically entered the country will be treated under the Due Process Clause as if they were 'stopped at the border.'" *Id*. at \*12 (citing *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020)). The court held that, even as to these individuals, "that limitation does not allow the Executive to remove individuals in violation of procedures Congress has guaranteed to them by statute." *Id*.

*RAICES* supports the District Court's authority to issue declaratory relief and vacatur of Defendants' third-country removal policy, Add. 77-79; Pls.-Apps. Br. 19-24, and its rejection of Defendants' entry-fiction argument in this case. Add. 55-58; Pls.-Apps. Br. 56-59.

Respectfully submitted,

s/ *Trina Realmuto*

| | |
|---|---|
| Trina Realmuto | Matt Adams |
| Kristin Macleod-Ball | Leila Kang |
| Mary Kenney | Aaron Korthuis |
| Olivia Callan | Glenda M. Aldana Madrid |
| NATIONAL IMMIGRATION | NORTHWEST IMMIGRANT |
| LITIGATION ALLIANCE | RIGHTS PROJECT |
| 10 Griggs Terrace | 615 Second Avenue, Suite 400 |
| Brookline, MA, 02446 | Seattle, WA 98104 |
| (617) 819-4447 | (206) 957-8611 |
| trina@immigrationlitigation.org | matt@nwirp.org |
| Anwen Hughes | |
| HUMAN RIGHTS FIRST | |
| 121 W. 36th St., PMB 520 | |
| New York, NY 10018 | |
| (212) 845-5244 | |
| hughesA@humanrightsfirst.org | |

*Attorneys for Plaintiffs-Appellees*

CC via ECF: Counsel for Defendants-Appellants

2026 WL 1110616
Only the Westlaw citation is currently available.
United States Court of Appeals,
District of Columbia Circuit.

REFUGEE AND IMMIGRANT
CENTER FOR EDUCATION AND
LEGAL SERVICES, et al., Appellees
v.
Markwayne MULLIN, Secretary of the
U.S. Department of Homeland Security,
in his official capacity, et al., Appellants

No. 25-5243
|
Argued November 3, 2025
|
Decided April 24, 2026

**Synopsis**

**Background:** Legal services organizations and noncitizens brought putative class action against President, Department of Homeland Security (DHS), Department of State, and other federal agencies and officials, contending, among other things, that presidential proclamation suspending entries at southern border outside ports of entry and entries anywhere without proper documentation violated and was ultra vires under Immigration and Nationality Act (INA), and that agencies' implementing guidance was arbitrary, capricious, and contrary to law in violation of Administrative Procedure Act (APA) because it was contrary to statutory and regulatory procedures for asylum and withholding of removal. Plaintiffs moved for class certification and summary judgment. Government cross-moved for summary judgment. The United States District Court for the District of Columbia, Randolph D. Moss, J., 793 F.Supp.3d 19, granted plaintiffs' motions in part and entered partial final judgment. Government appealed and moved for stay pending appeal. The Court of Appeals granted motion in part and denied it in part.

**Holdings:** The Court of Appeals, Childs, Circuit Judge, held that:

INA provision authorizing President to suspend entry of any noncitizens or any class of noncitizens did not authorize Executive to bypass INA's removal procedures;

INA provision generally prohibiting departures other than under reasonable rules, regulations, and orders did not authorize Executive to bypass INA's removal procedures;

proclamation and guidance violated INA's grant of right to apply for asylum;

guidance violated withholding-of-removal provision of INA;

guidance violated regulatory procedure for claims under Convention Against Torture (CAT);

class, as defined by Court of Appeals in ruling on motion for stay, comported with Article III's standing requirement; and

relief granted by district court did not contravene INA's limitation on enjoining or restraining operation of certain INA provisions.

Affirmed as clarified.

Walker, Circuit Judge, filed opinion concurring in part and dissenting in part.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment; Request or Application for Class Certification.

Appeal from the United States District Court for the District of Columbia (No. 1:25-cv-00306)

**Attorneys and Law Firms**

Drew C. Ensign, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were Brett A. Shumate, Assistant Attorney General, Yaakov M. Roth, Principal Deputy Assistant Attorney General, Benjamin Hayes, Special Counsel to the Assistant Attorney General, and David Kim and Katherine J. Shinners, Senior Litigation Counsel, Office of Immigration and Litigation, General Litigation and Appeals Section.

Christopher J. Hajec and Matt A. Crapo were on the brief for amicus curiae Federation for American Immigration Reform in support of appellants.

Patrick M. McSweeney, William J. Olson, and Jeremiah L. Morgan were on the brief for amicus curiae America's Future in support of appellants.

Lee Gelernt argued the cause for appellees. With him on the brief were Keren Zwick, Melissa Crow, Omar C. Jadwat, Morgan Russell, Cody Wofsy, Richard Caldarone, Arthur B. Spitzer, and Scott Michelman. Lindsay Harrison entered an appearance.

Thomas A. Berry was on the brief for amicus curiae the Cato Institute in support of appellees.

Elizabeth B. Wydra and Brianne J. Gorod were on the brief for amicus curiae Constitutional Accountability Center in support of appellees.

Ian M. Kysel, Courtney Bell, Student Counsel, and Michael Garcia Bochenek were on the brief for amici curiae the Global Strategic Litigation Council, et al. in support of appellees.

Before: Pillard, Walker and Childs, Circuit Judges.

**Opinion**

Opinion concurring in part and dissenting in part filed by Circuit Judge Walker.

Childs, Circuit Judge:

 **\*1**  More than a century of precedent assures that "over no conceivable subject is the legislative power of Congress more complete" than it is over the admission of foreign individuals. *Dep't of State v. Muñoz*, 602 U.S. 899, 903, 144 S.Ct. 1812, 219 L.Ed.2d 507 (2024) (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)); *see also INS v. Chadha*, 462 U.S. 919, 940, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question.").

Exercising this "broad power over naturalization and immigration," *Demore v. Kim*, 538 U.S. 510, 521, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), Congress enacted the Immigration and Nationality Act of 1952 (INA), 8 U.S.C. § 1101 *et seq*. The INA created a comprehensive and detailed scheme addressing all aspects of immigration. It articulates why and how foreign individuals may be admitted to our country and why and how they may be removed. In addition, federal law provides various forms of relief to foreign individuals who face persecution or torture if deported. Those protections include, as pertinent here, asylum, withholding of removal under the INA, and withholding of removal under the Convention Against Torture.

On Inauguration Day 2025, President Trump issued Proclamation 10888 (Proclamation). The Proclamation declares that "the current situation at the southern border qualifies as an invasion" because "[t]he sheer number" of foreign individuals "entering the United States has overwhelmed the system" and is "prevent[ing] the Federal Government from obtaining operational control of the border." Proclamation No. 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8,333, 8,334–35 (Jan. 20, 2025). Invoking authority from various provisions of the INA, the Proclamation and subsequently issued agency guidance (Guidance) suspend the entry of any person who has crossed the southern border outside a designated port of entry, as well as any person crossing at a designated entry port anywhere without sufficient documentation. The Proclamation and Guidance also subject those individuals who have entered the country despite the entry ban to new summary removal procedures without the rights the INA provides to seek asylum or other removal protections.

Shortly thereafter, thirteen individuals proceeding pseudonymously and three nonprofit organizations—Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, and Florence Immigrant and Refugee Rights Project—filed a putative class action claiming that the Proclamation and Guidance violate the INA. The Proclamation's authority to suspend entry is not challenged here. This case addresses only whether that entry-authority encompasses the power to order removals using new procedures that supplant the INA's existing removal procedures. The district court certified a class consisting of all individuals subject to the Proclamation, declared the Guidance unlawful and vacated it, and enjoined agency officials from perpetrating that same unlawful action under the Proclamation. The Government now appeals.

 **\*2**  This is a statutory interpretation case. Our task is to determine whether Congress has granted the Executive the authority to remove foreign individuals present in the United States without adhering to the removal procedures or providing the substantive removal protections that Congress prescribed in the INA.

We conclude that the INA's text, structure, and history make clear that in supplying power to suspend entry by Presidential proclamation, Congress did not intend to grant the Executive the expansive removal authority it asserts. The Proclamation and Guidance are thus unlawful to the extent that they

**WESTLAW**   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

circumvent the INA's removal procedures and cast aside federal laws affording individuals the right to apply and be considered for asylum or withholding of removal protections. Accordingly, we affirm the district court's grant of summary judgment in favor of Plaintiffs. We also affirm the district court's class certification order, modifying the class definition as clarified by this opinion.

**I.**

**A.**

Congress enacted the INA as an exercise of its "plenary power" over the creation of our Nation's immigration laws. *Zadvydas v. Davis*, 533 U.S. 678, 695, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); *see also Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954) (observing Congress is "exclusively" responsible for "formulating" the "[p]olicies pertaining to the entry of [foreign individuals] and their right to remain here").

The INA established a comprehensive framework governing all aspects of immigration, including entry and admissibility of foreign individuals into the United States, 8 U.S.C. §§ 1181, 1182, 1184, the criteria and procedures for removing those who are here but should not be, *id.* §§ 1227, 1225(b)(1), 1229a, and the protections afforded to individuals subject to removal, *see, e.g.*, *id.* §§ 1158, 1231(b)(3).

**1.**

When it was first enacted, the INA defined the term "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise." Pub. L. No. 82-414, § 101(a)(13), 66 Stat. 163, 167 (1952). That definition codified a technical and historical understanding of the term "entry" as requiring "an arrival from some foreign port or place." *Barber v. Gonzales*, 347 U.S. 637, 641–42 & n.3, 74 S.Ct. 822, 98 L.Ed. 1009 (1954); *see Vartelas v. Holder*, 566 U.S. 257, 261, 132 S.Ct. 1479, 182 L.Ed.2d 473 (2012) (explaining the same). So, the term entry connotes physically coming into the United States, irrespective of the individual's method of entry or their admitted status.

Section 1182 delineates the grounds of inadmissibility and identifies the classes of foreign persons who are ineligible for admission. 8 U.S.C. § 1182(a)(1)–(10); *see, e.g.*, *id.* § 1182(a)(2) (criminal history and related grounds), (a)(3)(B) (terrorist activities), (a)(3)(C) (foreign policy). By specifying categories of foreign individuals who are inadmissible in Section 1182(a), Congress has, in turn, also "defined the universe of [individuals] who are admissible." *Trump v. Hawaii*, 585 U.S. 667, 695, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018).

In addition, Congress has "delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances." *Id.* at 683, 138 S.Ct. 2392. That authority is found in Sections 1182(f) and 1185(a) of the INA. *See id.* at 683 n.1, 138 S.Ct. 2392.

Section 1182(f) allows the President "by proclamation" to "suspend the entry" of "any aliens or of any class of aliens" he finds "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Such entry suspension can last "for such period as he shall deem necessary." *Id.* Section 1182(f)'s proclamation power "provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [non-admissibility] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987). The INA includes no corresponding provision empowering the President to suspend the statute's expressly mandatory and exclusive procedures for removing individuals already present in the United States.

**\*3** Section 1185, titled "Travel control of citizens and aliens," allows the President to adopt "reasonable rules, regulations, and orders" to supplement and effectuate the INA's statutory provisions governing any foreign person's "depart[ure] from or ent[ry into] ... the United States ... subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a)(1).

**2.**

Foreign individuals who have entered the United States but are not legally authorized to be here are subject to "removal." *Id.* §§ 1225(b)(1)(A), 1229a. The INA and its implementing regulations provide comprehensive procedures for removing such individuals. These procedures detail the grounds on which foreign individuals may be removed, the process the

Executive must follow, and the rights of individuals facing removal.

The INA authorizes the Executive to remove a foreign individual from the United States but confines that authority to only two specified methods: regular removal under 8 U.S.C. § 1229a or expedited removal under 8 U.S.C. § 1225(b)(1). Regular removal is the "sole and exclusive procedure" for removal of foreign individuals "[u]nless otherwise specified in [the INA]." *Id.* § 1229a(a)(3); *see Refugee & Immigrant Ctr. for Educ. and Legal Servs. v. Noem (RAICES)*, 793 F. Supp. 3d 19, 79 n.2 (D.D.C. 2025). So far, Congress has only "otherwise specified" one additional removal procedure: "expedited removal," *see United States v. Guzman*, 998 F.3d 562, 567 (4th Cir. 2021), which applies to two classes of foreign individuals who are inadmissible because they lack valid papers or made misrepresentations in seeking protections under the INA, *see* 8 U.S.C. § 1225(b)(1)(A)(i) (referencing individuals generally inadmissible under "section 212(a)(6)(C) or 212(a)(7) of the INA," now codified at 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

Regular removal proceedings are as follows: Individuals present in the United States whom the Executive charges as removable are afforded the right to a hearing before an immigration judge whose decision may be appealed to the Board of Immigration Appeals and, in turn, to a federal court of appeals. *See id.* §§ 1229, 1229a, 1252; 8 C.F.R. § 1003.1. Removal proceedings before an immigration judge are formal, adversarial hearings, and the immigration judge has an affirmative duty to develop a record. *See* 8 U.S.C. § 1229a(a)(1), (b)(1); 8 C.F.R. § 1003.10(b). At the hearing, the foreign individual may be represented by counsel, present evidence, examine witnesses, and challenge the government's evidence. *See* 8 U.S.C. § 1229a(b)(4). An individual may avoid removal by either showing that she is "entitled to be admitted" or has been so admitted, *id.* § 1229a(c)(2), or by demonstrating her entitlement to relief from removal by way of asylum or withholding of removal under the INA or the Convention Against Torture. *See id.* § 1229a; 8 C.F.R. §§ 208.16–208.17, 1208.4, 1208.13, 1208.16–1208.17, 1240.10–1240.11; *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 527–29, 141 S.Ct. 2271, 210 L.Ed.2d 656 (2021) (detailing the regular removal process).

The second process, expedited removal, "lives up to its name." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020). Congress has authorized the Executive to apply expedited removal to individuals "who [are] arriving in the United States," 8 U.S.C. § 1225(b)(1)(A)(i), and to those who are not admitted or paroled and have "not affirmatively shown" to the immigration officer's satisfaction that they have been "physically present in the United States continuously" for two or more years. *Id.* § 1225(b)(1)(A)(iii)(II). If an individual is subject to expedited removal, an immigration officer "shall order the alien removed ... without further hearing or review unless the alien indicates either an intention to apply for asylum ... or a fear of persecution." *Id.* § 1225(b)(1)(A)(i). "Absent such an indication, all that stands between that individual and removal is a paper review by the officer's supervisor." *Make the Rd. N.Y.*, 962 F.3d at 619 (citing 8 C.F.R. § 235.3(b)(7)).

### 3.

**\*4** Regardless of the removal path, federal law provides limited statutory protections to individuals who have entered the United States, even without authorization, who face risks of torture or persecution if removed. Three such forms of relief are central to this appeal: asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and withholding of removal under the Convention Against Torture, Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note).

The most protective form of relief is asylum. *See* 8 U.S.C. § 1158. Asylum is generally available to any individual who is a "refugee," which the statute defines as any individual who is "unable or unwilling to return to" or "avail ... herself of the protection of" her country of nationality (or the last country where she resided) "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). Asylum confers valuable benefits including protections from deportation or removal, *id.* § 1158(c)(1)(A); 8 C.F.R. § 208.22, legal permission to work in the United States, 8 U.S.C § 1158(c)(1)(B), a pathway to seek lawful permanent residence, 8 C.F.R. § 209.2, and, eventually, citizenship, 8 U.S.C. § 1429. Congress directed the Attorney General to "establish a procedure for the consideration of asylum applications." *Id.* § 1158(d)(1); *see also id.* § 1158(d)(5)(A) (mandating certain procedures).

Per the INA, "[a]ny [individual] who is physically present in the United States or who arrives in the United States" may apply for asylum "irrespective of [their] status" and

"whether or not" they arrived "at a designated port of arrival." *Id.* § 1158(a). Individuals in removal proceedings—whether regular or expedited—may file an asylum application which, if granted, is a defense against removal. *See id.* § 1229a(c)(4); 8 C.F.R. § 208.2(b); 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 208.30(f). [1]

Congress has enumerated only three exceptions to the right to apply for asylum: Individuals are precluded from applying if (1) they can be removed to a safe third country, as determined by the Attorney General, where they may seek asylum; (2) they fail to apply for asylum within one year of arriving in the United States; or (3) they have previously applied for and been denied asylum. 8 U.S.C. § 1158(a)(2)(A)–(C). These application-right exceptions are in turn subject to carveouts not relevant here. *See id.* § 1158(a)(2)(D)–(E). The INA otherwise guarantees the right to apply for asylum.

Notably, the statutory right to *apply* reaches even foreign individuals whom the statute renders ineligible to *receive* it. Not all applicants who meet the statutory definition of refugee are eligible for asylum. The INA lists categories of otherwise qualified persons who are nevertheless ineligible for asylum. Among the INA's enumerated eligibility exceptions is a bar against granting asylum "if the Attorney General determines that" an applicant has "participated in the persecution of any person" on account of a protected ground, has been convicted of a "particularly serious crime," or "there are reasonable grounds for regarding" them to be a "danger to the security of the United States." *Id.* § 1158(b)(2)(A)(i), (ii), (iv). In addition to these statutory ineligibilities, "[t]he Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C). The requirement to proceed by regulation also applies to "any other conditions or limitations on the consideration of an application for asylum." *Id.* § 1158(d)(5)(B).

**\*5** Yet even an applicant who successfully establishes refugee status and is otherwise eligible may nevertheless be denied, because asylum is a form of "discretionary relief." *Moncrieffe v. Holder*, 569 U.S. 184, 187, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013); *see INS v. Aguirre–Aguirre*, 526 U.S. 415, 420, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) ("[T]he decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion." (citation omitted)). The statute provides only that, when all stars align for a refugee, the Attorney General or the Secretary of the Department of Homeland Security (DHS) "*may* grant

asylum." *See* 8 U.S.C. § 1158(b)(1)(A) (emphasis added). Discretionary denials are, however, reviewable in federal court and cannot be "manifestly contrary to the law" or "an abuse of discretion." *Id.* § 1252(b)(4)(D). The Executive has for decades consistently followed a case-specific approach to discretionary denials of asylum to individuals who meet the statutory criteria, and such denials are "exceedingly rare." *Thamotar v. U.S. Att'y Gen.*, 1 F.4th 958, 971 (11th Cir. 2021) (citation omitted).

In addition to asylum, two other forms of removal protection are available: withholding of removal under the INA and under the Convention Against Torture. Each applies only as protection against particularly grave types of risk, and neither allows an individual to remain in the United States. 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.17(a). Each does, however, offer individuals valuable protections by restricting countries to which an individual may be removed. *See Guzman Chavez*, 594 U.S. at 536–37, 141 S.Ct. 2271 (distinguishing "withholding-only relief" from asylum (citations omitted)).

The first type of withholding of removal, under 8 U.S.C. § 1231, forbids the Attorney General from removing a foreign individual "to a country if the Attorney General decides" that the individual's "life or freedom would be threatened in that country because of" their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

The second type of withholding of removal flows from the United States' obligations as a signatory to the Convention Against Torture and bars the removal of individuals to countries where they are likely to be tortured. *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. 19 (1988), 1465 U.N.T.S. 85. The Foreign Affairs Reform and Restructuring Act of 1998 implements the Convention Against Torture by requiring agencies that carry out immigration laws to promulgate regulations limiting the Executive's removal powers accordingly, *see* 8 U.S.C. § 1231 note, which the Department of Homeland Security has done, *see* 8 C.F.R. §§ 208.16–208.18, 1208.16–1208.18. A Convention Against Torture claim protects only against risk of torture but, unlike a claim for asylum or withholding of removal under the INA, requires no "existence of a nexus between the predicted torture and some statutorily protected ground." *Hincapie v. Gonzales*, 494 F.3d 213, 220 (1st Cir. 2007) (citing *Romilus v. Ashcroft*, 385 F.3d 1, 8 (1st Cir. 2004)).

### B.

Shortly after taking office, President Trump signed Proclamation No. 10888. The Proclamation directs federal action to: (1) suspend "entry into the United States" on or after January 20, 2025 of persons "engaged in the invasion across the southern border," Proclamation § 1; (2) suspend "entry into the United States" of persons who—regardless of their point of entry—"fail[ ], before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable" immigration officials to make statutorily required judgments about admissibility, *id.* § 3; and (3) prevent persons subject to the entry suspension from invoking "provisions of the INA that would permit their continued presence in the United States, including but not limited to" the asylum statute, until the President issues "a finding that the invasion at the southern border has ceased," *id.* §§ 2–3. The Proclamation directs the DHS Secretary, in coordination with the Attorney General and Secretary of State, to "take appropriate actions as may be necessary to achieve the objectives of [the Proclamation]" and to "take all appropriate actions to repel, repatriate, or remove" any person "engaged in the invasion across the southern border of the United States on or after" January 20, 2025. *Id.* §§ 4–5.

**\*6** To implement the Proclamation's directives, the Department of Homeland Security issued informal guidance via three emails, a memorandum, and training materials sent to immigration enforcement officials. We refer to these informal guidance documents collectively as the "Guidance."

The Guidance for "all Southwest Border Sectors" advises that individuals "who cross[ ] between the ports of entry on the southern land border" are "*not permitted to apply for asylum*." J.A. 101 (bolding replaced with italics). The Guidance for the northern and coastal borders further directs that entry is suspended for all individuals who "fail to provide" "sufficient medical information and reliable criminal history and background information to enable fulfillment of the requirements of" 8 U.S.C. § 1182(a)(1)–(3). J.A. 109 (citing Proclamation § 3). Persons failing to provide medical and criminal-history documentation are also "restricted from invoking provisions of the INA, *including asylum*, that would permit their continued presence." J.A. 109, 114 (bolding replaced with italics).

The Guidance declares that individuals subject to the Proclamation may now be removed by one of two newly announced processes—either "Direct Repatriation" or "Expedited Removal." J.A. 101, 109. Plaintiffs refer to these as "repatriation" measures, to distinguish them from those in the INA; confusingly, the Guidance's "Expedited Removal" is distinct from expedited removal under 8 U.S.C. § 1225(b)(1). The only difference between the two newly declared pathways is that individuals subject to the Guidance's version of Expedited Removal "are served with a Notice to Alien Ordered Removed and issued an Expedited Removal Order" form, while those removed via Direct Repatriation receive no removal order. *RAICES*, 793 F. Supp. 3d at 55 (quoting Gov't Suppl. Br. at 7, *RAICES v. Noem*, No. 25-306 (D.D.C. July 2, 2025)). This distinction is material, according to the Government, because "repatriations do not carry the same immigration or criminal consequences as expedited removal." *Id.* (quoting Gov't Suppl. Br. at 8, *RAICES v. Noem*, No. 25-306 (D.D.C. July 2, 2025)). The Guidance provides that the "appropriate" removal procedure for each individual depends on "the totality of the circumstances." J.A. 101, 107, 109, 114, 126.

The Guidance's removal pathways purport to supplant several statutory protections from removal as well as their corresponding administrative procedures in several ways.

Under existing regulations, immigration officers overseeing expedited removal pursuant to Section 1225(b)(1) must inform the individual that "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country," and then prompt the individual to advise the officer of any "fear" or "concern" that they have about "being removed from the United States or about being sent home." *See* 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to read this information and instruction from Form I-867A to foreign individuals); *RAICES*, 793 F. Supp. 3d at 55; *see also* 9 Charles Gordon et al., *Immigration Law and Procedure*, App'x B, Ex. 16K (2024) (reproducing the text of Form I-867A). Next, the officer must ask the questions provided on Form I-877B and record the individual's answers concerning their fears about being removed. *See* 8 C.F.R. § 235.3(b)(2)(i); *see also* Gordon, *supra* Ex. 16L (reproducing the text of Form I-867B). If the foreign individual "indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country," the immigration officer must refer that individual for an interview by an asylum officer and provide them with "a written disclosure on

Form M-444." 8 C.F.R. § 235.3(b)(4). Form M-444 informs the individual about the credible-fear interview process, the right to consult with other persons before the interview, and the right to request review of the asylum officer's credible fear determination by an immigration judge. *Id.*; *see also* 8 U.S.C. § 1225(b)(1)(A)(i).

**\*7** Yet both summary repatriation processes under the Guidance countermand those statutory and regulatory procedures. The Guidance directs asylum officers to refrain from using Form I-867A, Form I-867B, or Form M-444, and to not "ask specific fear questions." J.A. 101, 107, 109, 114, 124. Instead, the Guidance directs that only individuals who spontaneously "manifest[ ] fear" to an immigration officer will be referred for additional assessment. J.A. 139–40. Even then, the referral is limited to a "[Convention Against Torture]-Only Assessment." *Id.* By designating the assessment as "[Convention Against Torture]-Only," the Guidance prevents even those individuals who manifest fear of persecution from being considered for asylum or withholding of removal under the INA. *See* J.A. 101, 109, 114 (guidance stating that subject individuals will not be permitted to apply for asylum); J.A. 134 (guidance explaining that implementing officials will "not assess[ ] [the risk of] persecution on account of a protected ground"). A [Convention Against Torture]-only assessment provides no relief from likely abuses apart from torture. It would appear to overlook deprivations of rights to speak, associate, worship, or vote based on ethnicity or political opinion, for example, or official threats, or even imprisonment, based on religion or social class, insofar as such abuses are not torture under the Convention.

The Guidance also instructs officers to use a screening standard for this "[Convention Against Torture]-Only" assessment that is more demanding of the applicant than the binding regulation requires. J.A. 140. Specifically, the Guidance collapses what is normally a two-stage review into a single initial assessment by a United States Citizenship Immigration Services (USCIS) officer. *Contrast* J.A. 140–42, *with* 8 C.F.R. § 208.9(a)(1)–(b). At that "interview," the individual must—without the benefit of counsel or time to assemble evidence—carry the burden to show that he or she is "more likely than not" to be tortured if removed to the proposed country. J.A. 134–35, 141–43. Finally, contrary to existing regulations, individuals facing removal under the Proclamation have no opportunity to seek an immigration judge's review of the immigration officer's determination. *Contrast* J.A. 134, 142, *with* 8 C.F.R. § 235.3(b)(4)(i).

## C.

In February 2025, Plaintiffs filed a putative class action challenging both the Proclamation and Guidance. The complaint names fifteen defendants: President Trump in his official capacity; the Departments of Homeland Security, State, and Justice; three components of the Department of Homeland Security (Customs and Border Patrol, Immigration and Customs Enforcement, and USCIS); and multiple agency officials in their official capacities.

Plaintiffs' complaint asserts that the summary removal provisions of the Proclamation and Guidance exceed the President's statutory authority under Sections 1182(f) and 1185(a) and violate the constitutional separation of powers by unilaterally countermanding acts of Congress. The complaint also alleges that the Proclamation and its implementation violate the INA's prescribed procedures for removal, asylum, and withholding of removal under 8 U.S.C. §§ 1225(b)(1)(A)(i), 1229a, 1158, 1231(b)(3), as well as the Convention Against Torture, *id.* § 1231 note, and its binding regulations, 8 C.F.R. §§ 208.16, 1208.16. Finally, the complaint claims that the Proclamation's implementation is contrary to law, arbitrary and capricious, and procedurally improper under the Administrative Procedure Act, 5 U.S.C. § 706.

The district court certified a class of "all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States." *RAICES*, 793 F. Supp. 3d at 98. The court also vacated the Guidance implementing the Proclamation as contrary to law, *see* 5 U.S.C. § 706, to the extent it purports to replace statutory removal with extra-statutory summary expulsion procedures. *RAICES*, 793 F. Supp. 3d at 105. It entered a declaratory judgment against all the defendants (except the President) holding that the Proclamation is unlawful "insofar as it purports to suspend or restrict access to asylum, withholding of removal, or the existing regulatory processes for obtaining [Convention Against Torture] protection." *Id.* at 105. Finally, the court permanently enjoined all defendants (other than the President) from implementing the Proclamation by adopting extra-statutory expulsion procedures, removing foreign individuals without complying with the statutorily mandated withholding procedures under the Convention Against Torture, and comprehensively barring applications for asylum. *Id.* at 110.

**\*8** The Government appealed and simultaneously asked this court to stay the district court's order pending the resolution of its appeal. We granted in part and denied in part the Government's motion for a stay. *Refugee & Immigrant Ctr. for Educ. and Legal Servs. v. Noem*, No. 25-5243, 2025 U.S. App. LEXIS 19422 (D.C. Cir. Aug. 1, 2025) [hereinafter Stay Order].

The stay panel first held that the Government was likely to succeed in part in challenging the class definition. The panel stayed the district court's class certification insofar as it applied beyond a class limited to:

> [A]ll individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementation, would seek asylum, 8 U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1231(b), or withholding under the Convention Against Torture, *see* FARRA, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note).

*Id.* at \*3–4.

Second, the panel held that the Government was unlikely to succeed in establishing that Section 1182(f) or Section 1185(a)(1) authorizes the President to act "outside of the INA's prescribed procedures" to remove individuals already present in the United States. *Id.* at \*38 (Millett, J., concurring); *id.* at \*54 (Pillard, J., concurring in relevant part); *id.* at \*66 (Katsas, J., concurring in relevant part). Third, the panel ruled that the Government was unlikely to succeed on its contention that the Proclamation and Guidance comply with the mandatory withholding of removal provisions under the INA and the Convention Against Torture. *Id.* at \*48 (Millett, J., concurring); *id.* at \*54 (Pillard, J., concurring in relevant part); *id.* at \*68 (Katsas, J., concurring in relevant part). Fourth, acknowledging it was "a close call," the stay

panel thought that the Government had said enough at the "very preliminary stay stage" to make it likely to succeed in defending the Proclamation's categorical suspension of the statutory right of individuals to apply for asylum. *Id.* at \*45, \*48 (Millett, J., concurring); *id.* at \*67 (Katsas, J., concurring in relevant part); *but see id.* at \*56–62 (Pillard, J. dissenting in relevant part). Finally, the panel deemed the Government unlikely to succeed in showing that 8 U.S.C. § 1252(f)(1) barred the district court from issuing class-wide injunctive relief. *Id.* at \*48–51 (Millett, J., concurring); *id.* at \*54 (Pillard, J., concurring in relevant part); *but see id.* at \*70–73 (Katsas, J., dissenting in relevant part).

## II.

The district court exercised jurisdiction under 28 U.S.C § 1331, and this court has appellate jurisdiction under 28 U.S.C. § 1291. "We review class certification decisions for an abuse of discretion." *In re White*, 64 F.4th 302, 312 (D.C. Cir. 2023) (citations omitted), *cert. denied sub nom. Hilton Hotels Ret. Plan v. White*, ––– U.S. ––––, 144 S. Ct. 487, 217 L.Ed.2d 255. We review *de novo* the district court's decision to grant summary judgment. *Thompson v. District of Columbia*, 967 F.3d 804, 812 (D.C. Cir. 2020) (citation omitted).

## III.

We affirm the district court's order granting summary judgment to Plaintiffs and its order granting class certification as clarified by the stay panel. The INA does not allow the President to remove Plaintiffs under summary removal procedures of his own making. Nor does it allow the Executive to suspend Plaintiffs' right to apply for asylum, deny Plaintiffs' access to withholding of removal under the INA, or curtail mandatory procedures for adjudicating Plaintiffs' Convention Against Torture claims. Finally, the district court's class-wide relief does not violate Article III or the INA's limit on injunctive relief under 8 U.S.C. § 1252(f)(1).

### A.

**\*9** The Proclamation and Guidance invoke Sections 1182(f) and 1185(a)(1) of Title 8 to supplant other provisions in the INA that govern the removal of foreign individuals already present in the United States. Neither statutory provision

empowers the Executive to displace the INA's exclusive and mandatory removal procedures.

For decades, federal immigration law has treated barring foreign individuals' entry into the United States differently from their removal once they are here. "The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas*, 533 U.S. at 693, 121 S.Ct. 2491 (citations omitted); *see Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality."). Entry and admission address whether foreign individuals outside the United States may come in, whereas removal addresses whether and how foreign individuals on the domestic side of the border may be expelled. Federal immigration law treats those as separate processes with different statutory constraints.

That distinction is etched into the INA's comprehensive and carefully calibrated statutory scheme. The statute codifies its differing treatment of entry and removal in separate statutory parts.

As detailed above, the removal process is governed by Section 1229a, which provides the "sole and exclusive procedure" for removal of foreign individuals "[u]nless otherwise specified in [the INA]." 8 U.S.C. § 1229a(a)(3); *see RAICES*, 793 F. Supp. 3d at 79 n.2. Recognizing that there may be reason to remove certain individuals more quickly than the regular process contemplates, Congress otherwise specified an expedited removal process in Section 1225(b)(1) of the INA. *See Guzman*, 998 F.3d at 567 ("The expedited procedure of § 1225(b)(1) is, of course, such an otherwise specified procedure."). Section 1225(b)(1)'s expedited removal process applies to only specified classes of inadmissible foreign individuals. *See* 8 U.S.C. § 1225(b)(1) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

The regular and expedited removal provisions spell out who may be removed, on what grounds, and with what procedural safeguards. But regardless of whether individuals are subject to removal under regular or expedited removal procedures, they are statutorily entitled to apply for asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and withholding of removal under the Convention Against Torture, 8 U.S.C. § 1231 note.

**1.**

The Proclamation invokes the President's authority under Section 1182(f), but that section authorizes a President to suspend only the "entry" of foreign individuals into the United States. It provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend *the entry* of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

**\*10** 8 U.S.C. § 1182(f) (emphasis added). The Government asserts that the President's authority to "by proclamation ... suspend the entry" of foreign individuals also empowers the President to summarily remove foreign individuals who have entered the United States in violation of the Proclamation's entry bar. *Id.* The statutory text forecloses the Government's ends-justifies-means approach.

By its plain text, Section 1182(f) authorizes the President to suspend only the "entry" of foreign individuals into the United States. The word "entry," as used in the immigration context since Congress enacted Section 1182(f), means "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise." Immigration and Nationality Act, Pub. L. No. 82-414, § 101(a)(13), 66 Stat. 163, 167 (1952); *see also Barber*, 347 U.S. at 641–42, 74 S.Ct. 822 (explaining that definition codified a technical and historical understanding of the term "entry" as requiring "an arrival from some foreign port or place"). Congress has more recently adopted the related term "admission," which is "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

Refugee and Immigrant Center for Education and Legal Services..., --- F.4th ---- (2026)
2026 WL 1110616

The word "removal" is noticeably absent from Section 1182(f). That omission by a Congress recognizant of the longstanding distinction between "entry" and "removal" is telling. *Contrast* 8 U.S.C. §§ 1229a ("Removal proceedings"), 1225 ("expedited removal of inadmissible arriving aliens"), *and* 1227 (identifying various classes of "deportable aliens" who "shall, upon the order of the Attorney General, be removed"), *with* §§ 1181, 1184 (admission or "lawful entry" into the United States), *and* 1182 (listing who is ineligible for lawful entry). More pointedly, Congress knows how to authorize alternative or expedited removal procedures. And when it does, it explicitly uses the word "removal." *See, e.g.*, *id.* §§ 1229a ("Removal proceedings"), 1225(b)(1) ("expedited removal of inadmissible arriving aliens").

The structure of the INA confirms that Section 1182(f) addresses entry and not removal. Section 1182 and its neighboring provisions, Sections 1181 and 1184, specify who may be "admitted" or may "lawful[ly] enter" the United States. *Id.* § 1101(a)(13)(A). Those provisions appear in Part II of the INA titled "*Admission* qualifications for aliens; travel control for citizens and aliens." Pub. L. No. 82-414, 66 Stat. 163 (emphasis added). Removal provisions are separately grouped in Part IV of the INA, titled "Inspection, apprehension, examination, exclusion, and removal." *Id.* It would contravene traditional interpretive principles to conclude that Congress acted tacitly—in a provision and statutory part addressing "entry" and "admissibility" with no mention of "removal"—to grant the President the authority to override the INA's removal provisions. *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 706, 145 S.Ct. 2482, 222 L.Ed.2d 800 (2025) (Kavanaugh, J., concurring) (noting "the commonsense interpretive maxim that Congress does not usually 'hide elephants in mouseholes' when granting authority to the President" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001))); *cf. Fl. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008) ("The placement of § 1146(a) within a subchapter expressly limited to postconfirmation matters undermines [the argument] that § 1146(a) covers preconfirmation transfers.").

**\*11** Past practice drives the point home. The Executive Branch has for decades acknowledged the limits of the authority Section 1182(f) confers to suspend "the entry" of foreign individuals: No prior President has used it to enhance the Executive's removal power. "The want of assertion of power by those who presumably would be alert to exercise it," as the Supreme Court has recently observed, "is ... significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725, 142 S.Ct. 2587, 213 L.Ed.2d 896 (2022) (quoting *FTC v. Bunte Brothers, Inc.,* 312 U.S. 349, 352, 61 S.Ct. 580, 85 L.Ed. 881 (1941)). Indeed, Presidents of both political parties have invoked Section 1182(f) at least 90 times over the last four decades. *See* Securing the Border, 89 Fed. Reg. 81,156, 81,163 n.53 (Oct. 7, 2024). Every one of those uses was confined to preventing foreign individuals from *entering* the territorial land or waters of the United States. *Id.*; *see, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (using "a naval blockade" to deny foreign individuals "the ability to disembark on our shores"); *Trump v. Hawaii*, 585 U.S. at 675, 138 S.Ct. 2392 ("restrict[ing] entry" of "nationals of countries that do not share adequate information for an informed entry determination, or that otherwise present national security risks"); *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 573, 137 S.Ct. 2080, 198 L.Ed.2d 643 (2017) ("suspend[ing] entry of foreign nationals from ... Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen"); *Goodluck v. Biden*, 104 F.4th 920, 922 (D.C. Cir. 2024) (suspending diversity-visa program); *Doe #1 v. Trump*, 957 F.3d 1050, 1056 (9th Cir. 2020) (restricting family-sponsored immigrant visas); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 754 (9th Cir. 2018) ("suspending the 'entry of any alien into the United States across the international boundary between the United States and Mexico' "); *Sesay v. INS*, 74 F. App'x 84, 86 (2d Cir. 2003) (suspending "entry" of "members of the military junta in Sierra Leone" and their families); *see also* Proclamation No. 5377, Suspension of Entry as Nonimmigrants by Officers or Employees of the Government of Cuba or the Community Party of Cuba, 50 Fed. Reg. 41,329 (1985) ("impos[ing] certain restrictions on entry into the United States of officers or employees of the Government of Cuba or the Communist Party of Cuba").

Brushing past the statute's text, structure, and uniform Executive Branch and judicial recognition that Section 1182(f) does not extend to removals, the Government now asserts that the power it confers to suspend entry is "toothless" absent a coordinate power to override, by proclamation, the INA's removal provisions. Gov't Br. 29. In its telling, "[Section] 1182(f)'s power to *exclude* must include the power to *expel* if the former is to have any meaningful force." *Id.* at 38. But its premise is mistaken. The Executive indeed has the power to remove foreign individuals who enter the country illegally, *see* 8 U.S.C. § 1229a, including

an "expedited removal" power that Congress adopted "to substantially shorten and speed up the removal process," *Make the Rd. N.Y.*, 962 F.3d at 618 (describing 8 U.S.C. § 1225(b)(1)). "Where Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions,"—as it has done here—"courts should not read one part of the legislative regime (the INA) to provide a different, and conflicting, solution to a problem that has already been specifically addressed elsewhere in the federal immigration regime." *Negusie v. Holder*, 555 U.S. 511, 545, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) (Thomas, J., dissenting) (quotation marks omitted). There is nothing "toothless" about Section 1182(f)'s power to proclaim exclusions—backed by the INA's existing statutory removal authorities—that justifies devising a new, unwritten form of *even more expedited* removal power distinct from that which Congress codified.

Against this backdrop, we are unpersuaded that our decision to sustain the preliminary injunction in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), warrants a different interpretation of Section 1182(f). There, we ruled that the authority of the Centers for Disease Control and Prevention (CDC), under a public health law, to prohibit the "introduction of persons and property" into the United States when they pose a "serious danger of the introduction of [a communicable] disease into the United States," *Huisha-Huisha*, 27 F.4th at 729 (citing 42 U.S.C. § 265), came with a companion "authority to expel" such persons as needed to stem the same contagion, *id.* The Government's reliance on *Huisha-Huisha* here is misplaced.

 **\*12**  For one, *Huisha-Huisha* involved not only a statute in a different title of the U.S. Code, but a provision therein that is both unaffiliated with the INA and has a substantially different aim. Congress enacted the Public Health Services Act to address public health, not immigration. *See* Pub. L. No. 78-410, 58 Stat. 682 (codified as amended at 42 U.S.C. § 201 *et seq.*). The CDC's Section 265 authority to control individuals or products that pose a communicable health threat to the United States is not an instrument of general immigration policy. It confers separate and distinct authority to limit movement to prevent the spread of disease. *See* 42 U.S.C. § 265; *see also id.* at § 264 (authorizing controls on spread within the United States). The President's Section 1182(f) authority, by comparison, is part of a comprehensive immigration statute that distinguishes and delineates the power to suspend entry into the United States from the power to remove (subject to certain mandatory conditions)

individuals who are already inside the country. We held in *Huisha-Huisha* that the CDC's Section 265 power to control entry to prevent the "introduction" and spread of disease allows expulsions not subject to the INA's removal procedures. The logic of *Huisha-Huisha* does not mean a Proclamation relying on the INA itself may order removals not subject to the INA's removal procedures.

A second reason *Huisha-Huisha* does not support the Government is that Section 265 and Section 1182(f) use materially different language. Section 265 does not use the terms "entry" or "removal" at all. Rather, it empowers the Surgeon General, through the CDC, to prevent the "introduction" of people or things anywhere in the United States that, in their judgment, would pose a serious risk of contagion. As *Huisha-Huisha* explains, "introduction into the United States of persons" is defined as "the movement of a person from a foreign country... into the United States so as to bring the person into contact with others in the United States ... in a manner that the director determines to present a risk of transmission of a communicable disease." 27 F.4th at 725 (quoting Suspension of Introduction of Persons Into the United States from Designation Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559, 16,563 (Mar. 24, 2020)). That authority over "introduction," we determined, granted the CDC broad power to prevent diseases like COVID-19 from affecting and infecting the people in the United States. The need to prevent the "introduction" of a disease, in other words, follows contagious persons across the border as they move through the country introducing illness again and again to different populations and regions. Because viruses do not obey borders, the power to prevent the introduction of disease would be "nugatory" if it allowed the CDC only to police the borders and not curb the continued presence of people who "managed to set foot on U.S. soil." *Huisha-Huisha*, 27 F.4th at 729. Section 1182(f), in contrast, empowers a President only to proclaim a suspension of "entry," making inapposite *Huisha-Huisha*'s reliance on the CDC's authority to prevent the "introduction" of potentially contagious persons.

The Government's reliance on the "entry fiction" theory, Gov't Br. 41–43, also fails to graft new removal powers onto Section 1182(f)'s authority to "suspend the entry" of foreign individuals. The "fiction" of this theory refers to the idea that inadmissible or not-yet-admitted individuals who have physically entered the country will be treated under the Due Process Clause as if they were "stopped at the border." *See DHS v. Thuraissigiam*, 591 U.S. 103, 139, 140

S.Ct. 1959, 207 L.Ed.2d 427 (2020) (citation omitted). But, as the Supreme Court has recognized, that limitation does not allow the Executive to remove individuals in violation of procedures Congress has guaranteed to them by statute. *Compare Thuraissigiam*, 591 U.S. at 140, 140 S.Ct. 1959 (recognizing that an individual physically within the United States has a statutory right to apply for asylum), *with Sale*, 509 U.S. at 160, 113 S.Ct. 2549 (interpreting Section 1182(f) to grant the President the authority to form a naval blockade outside U.S. territorial waters to "prevent[ ] Haitian[ ] [immigrants] from reaching our shores and invoking [the INA's] protections").

 **\*13**  In short, the plain language and structure of the INA, the longstanding and consistent practice of the Executive Branch, and binding Supreme Court and circuit precedent uniformly reject the notion that Congress, in authorizing the "suspen[sion]" of "entry," 8 U.S.C. § 1182(f), tacitly empowered the Executive to override the INA's carefully crafted "sole and exclusive" removal procedures, *id.* § 1229a(a)(3). The power by proclamation to temporarily suspend the entry of specified foreign individuals into the United States does not contain implicit authority to override the INA's mandatory process to summarily remove foreign individuals.

**2.**

Nor does Section 1185(a)(1) "independently," Gov't Br. 34, provide the Executive with removal authority. That section, titled "Travel control of citizens and aliens," reads:

> Unless otherwise ordered by the President, it shall be unlawful for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1). All agree that this language prohibits a foreign individual from "depart[ing] from or enter[ing]" or attempting to "depart from or enter" the United States except as allowed by rules, regulations, or orders prescribed by the President. Yet, like Section 1182(f), it makes no mention of any power to remove foreign individuals already present in the United States.

In the absence of the word "removal," the Government leans heavily on the statute's references to "depart[ures]." Its argument is as follows: Section 1185 "authorizes the President to prescribe 'limitations and exceptions' to the 'rules and regulations' governing how" foreign individuals "must depart," and so the President has the power to "repatriate[e] or remov[e]" foreign individuals "without recourse to [regular] or expedited removal proceedings." Gov't Br. at 33–34.

But "departure" is not a synonym for "removal." Section 1185(a)(1), by its plain terms, authorizes regulation of noncitizens' own departures or attempts to depart. The challenged Proclamation and Guidance, by contrast, apply to federal officers' forcible removals of foreign individuals who do not wish to leave.

Congress has used the terms "remove" and "depart" in distinct ways in the INA, and this distinction is consistent throughout the INA's implementing regulations. *See* 8 U.S.C. §§ 1229c (granting the Attorney General the authority to allow a foreign individual "voluntarily to depart the United States" at the individual's "own expense ... in lieu of being subject to [section 1229a removal] proceedings"), 1326 (creating criminal penalties for certain foreign individuals who "ha[ve] departed the United States while an order of ... removal is outstanding"); 8 C.F.R. § 215.1(h) ("The term depart from the United States means depart by land, water, or air: (1) From the United States for any foreign place, or (2) from one geographical part of the United States for a separate geographical part of the United States."); *see also Dada v. Mukasey*, 554 U.S. 1, 8, 128 S.Ct. 2307, 171 L.Ed.2d 178 (2008) ("Voluntary departure is a discretionary form of relief that allows certain favored aliens ... to leave the country willingly [rather than] undergo removal."). Given the clear and purposeful distinctions between the use of these two terms in the INA and its implementing regulations, references to departure in Section 1185(a)(1) cannot be read to grant the President authority to proclaim emergency-removal authority in conflict with the INA's express removal provisions. Nor do we understand the Supreme Court to have held anything to the contrary in *Trump v. Hawaii* when it observed that Section 1185(a)(1) "substantially overlaps" with Section 1182(f) and declined to resolve "the precise relationship between the two statutes." 585 U.S. at 683 n.1, 138 S.Ct. 2392.

**\*14**

\* \* \* \*

Section 1182(f) and Section 1185(a) afford the President discretionary powers over who may cross our borders and enter the United States. But those provisions do not confer presidential discretion over removal procedures. When federal officers act under the INA to remove foreign individuals who are here illegally, *see* 8 U.S.C. §§ 1229a, 1225, neither Section 1182(f) nor 1185(a) grants the President authority to countermand conditions Congress attached to the INA's expressly comprehensive removal provisions.

### B.

The Proclamation and Guidance purport to strip away the INA's protections against removal to places where the foreign individual faces risk of persecution or other harm, including torture or death. Plaintiffs claim the Proclamation and Guidance are unlawful insofar as they deny the right to seek relief as provided by statute: asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and withholding of removal under the Convention Against Torture, *see* 8 U.S.C. § 1231 note. We address and reject the Government's rationales for denying each form of statutory relief in turn.

### 1.

The Proclamation and Guidance announce an unprecedented decision to preemptively and categorically deny asylum to many thousands of foreign individuals. They purport to have thereby dispensed with the statutory right even to apply for asylum. That wholesale denial applies to any person crossing the southern border into the United States not at a designated port of entry, as well as any person crossing at a designated port of entry without a visa and other required documentation. Denying asylum in one stroke, without any information about the affected individuals, necessarily ignores every risk of persecution they face when forced back to where they came from. The challenged decision thus necessarily denies asylum even to foreign individuals who are sure to face persecution without it.

The Government asserts that the asylum statute itself authorizes the Executive to "restrict[ ]" every individual subject to the Proclamation from "invoking" the right to apply for asylum. Gov't Br. 43–44; *see also* Proclamation, §§ 2–3. It does not. To the contrary, barring foreign individuals who are physically present in the United States from applying for asylum and, if they make the statutory showing that they are eligible, from being considered to receive it cannot be squared with the statute.

Section 1158(a) grants foreign individuals physically present in the United States a right to apply for asylum:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)].

8 U.S.C. § 1158(a)(1). According to the plain text of Section 1158(a)(1), then, foreign individuals who are "physically present" in the United States have a statutory right to apply for asylum. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1013 (9th Cir. 2020) (observing that "the statutory right to apply attaches once the asylum seeker is on the doorstep"). To be sure, the right to apply is afforded "irrespective of such alien's status" and "whether or not [they arrived] at a designated port of arrival." 8 U.S.C. § 1158(a)(1).

**\*15** Following that provision are three enumerated restrictions on the right to apply for asylum: those who can be removed safely to a third country, those who fail to apply within one year of arriving to the United States, and those who have previously been denied asylum. *See id.* § 1158(a)(2)(A)–(C). Consistent with Section 1158(a)(1), none of those restrictions turns on where the individual enters the United States. Nor do they turn on the sufficiency of documentation.

The asylum statute thus makes plain that the right to apply for asylum is broadly available to all foreign individuals present or arriving in the United States unless expressly restricted from applying. But the Proclamation and Guidance purport to deny the right to all individuals who crossed the southern

border between ports of entry, in direct conflict with Section 1158(a)(1)'s instruction that any foreign individual who "arrives in the United States" may apply for asylum "whether or not [they arrived] at a designated port of arrival." 8 U.S.C. § 1158(a)(1). The plain text of Section 1158(a) defeats the Government's assertion that it may restrict everyone subject to the Proclamation from "invoking" the right to asylum.

The Government retorts that the Proclamation and Guidance work to preemptively and categorically *deny* asylum to all individuals subject to the Proclamation, and that "because the ultimate disposition of any asylum application is foreordained" it may "disallow [foreign individuals] from even filing such futile applications." Gov't Br. 44.

For support, the Government relies on 8 U.S.C. § 1158(b)(1)(A), which provides that the DHS Secretary or the Attorney General "may grant asylum" to an individual who has applied in accordance with the application procedures and meets the statutory definition of a "refugee." Congress framed the authority to grant asylum in discretionary terms: "*may* grant." 8 U.S.C. § 1158(b)(1)(A) (emphasis added). The Supreme Court has accordingly held that even if an applicant is eligible for asylum—*i.e.* meets the statutory definition of refugee and is not legally ineligible, *see* 8 U.S.C. § 1158(b)(2)(A)–(C); 8 C.F.R. § 208.13(c)—the DHS Secretary or the Attorney General may exercise their discretion to deny it. *Thuraissigiam*, 591 U.S. at 110 n.4, 140 S.Ct. 1959. [2] We do not question that asylum decisions are ultimately discretionary. But the INA does not support categorical, *ex ante* denial of asylum with no consideration of what the would-be applicant may face if removed.

The Government's and our dissenting colleague's interpretation of the Executive's discretionary authority over asylum, if accepted, would apply far beyond the context of this case. It would treat Congress as having empowered the Executive Branch to cut off asylum wholesale for any reason without any assessment of the nature of the risks the affected individuals would face if sent back. The Government, at bottom, urges us to adopt an interpretation of the asylum statute that would allow the Executive Branch to unilaterally and heedlessly return individuals even to countries where they will most certainly face persecution—forced labor, indefinite imprisonment, or even summary execution—on account of a protected ground. We decline to do so.

To start, the INA makes clear that the Executive's discretionary authority to deny asylum must be exercised

on an "individualized" basis. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 444, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("Congress has assigned to the Attorney General and his delegates the task of making the[ ] hard individualized decision[ ] ... of determin[ing] which, if any, eligible refugees should be denied asylum."). Congress's expectation of individualized consideration is evident throughout the INA's prescribed asylum application process. For instance, the asylum statute sets forth "procedures" for the "[c]onsideration of asylum applications," 8 U.S.C. § 1158(d)(5)(A), that require "the identity of the applicant" to be "checked against all appropriate records or databases," *id.* § 1158(d)(5)(A)(i), and require "[an] initial interview or hearing on the asylum application" to "commence not later than 45 days after the date an application is filed," *id.* § 1158(d)(5)(A)(ii).

**\*16** The procedures for reviewing asylum applications from individuals subject to expedited removal are likewise individualized. When an individual "indicates either an intention to apply for asylum under [section 1158] ... or [indicates] fear of persecution," Congress directs that "the officer *shall* refer" that person "for an interview by an asylum officer," *id.* § 1225(b)(1)(A)(i)–(ii) (emphasis added), and the "asylum officer *shall*," in turn, "conduct interviews of aliens referred" to them, *id.* § 1225(b)(1)(B)(i) (emphasis added). If the officer determines "at the time of the interview" that the individual "has a credible fear of persecution" then the individual "*shall* be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii) (emphasis added). We know this multi-step credible-fear screening process is mandatory because Congress reliably uses the word shall to "connote[ ] a requirement." *Jennings v. Rodriguez*, 583 U.S. 281, 300, 138 S.Ct. 830, 200 L.Ed.2d 122 (2018) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171, 136 S.Ct. 1969, 195 L.Ed.2d 334 (2016)).

Consistent with the statutory scheme, the promulgated regulation delineating asylum procedures explicitly directs that the Executive "shall adjudicate the claim of *each* asylum applicant whose application is complete." 8 C.F.R. § 208.9(a) (emphasis added); *see also id.* § 1003.10(b) ("[A]n immigration judge shall complete administrative adjudication of *an asylum application* within 180 days after the date an application is filed." (emphasis added)). The Executive's announcement by Proclamation of upfront, categorical asylum denials without "[c]onsideration of asylum applications," 8 U.S.C. § 1158(d)(5)(A), and without "adjudicat[ing] the claim of each asylum applicant," 8 C.F.R.

§ 208.9(a), directly contravenes these statutory and regulatory requirements.

The individualized approach long adhered to by the Executive Branch in exercising this discretionary authority powerfully reinforces Plaintiffs' reading of the statute to require asylum decisions based on individual circumstances.

The Attorney General and DHS Secretary have largely delegated their discretionary denial authority to Immigration Judges and the Board of Immigration Appeals (BIA). *See* 8 C.F.R. §§ 1003.10(b)–(c); *see also* 8 U.S.C. § 1101(b)(4). The BIA hears appeals from immigration judges' asylum decisions. 8 C.F.R. §§ 1003.1, 1003.10(c). Immigration Judges and the BIA may exercise discretion to deny asylum to eligible applicants, but they must do so case by case, based "on the totality of the [individual's] circumstances." *Matter of Pula*, 19 I. & N. Dec. 467, 473–74 (B.I.A. 1987); *see* Securing the Border, 89 Fed. Reg. at 81,170–71 (noting that *Matter of Pula* "remains the applicable standard for discretionary determinations"). Denials of asylum by the Attorney General (as opposed to an Immigration Judge or the BIA) are also decided on a case-by-case basis considering the individual applicant's circumstances. *See, e.g.*, *Matter of A-H-*, 23 I. & N. Dec. 774, 783 (2005) (making discretionary decision "based on a thorough review of the record and considering the balance of [various individualized] factors"). The Government's proposed approach of issuing upfront and categorical pre-application, preinterview denial decisions without considering the individual's circumstances cannot be squared with nearly four decades of individual and case-by-case discretionary asylum denial decisions.

In any event, even if the INA authorized the Executive to exercise its discretion to deny asylum in such a preemptive and categorical manner, the fact that any applications from individuals subject to such a decision would be futile is not a sufficient reason to deny them the right to apply for asylum. After all, the same could be said about individuals who are ineligible for asylum by statute or regulation, and no one disputes that they have a right to apply.

 **\*17**  Begin with Section 1158's text and structure. As detailed above, part (a) of Section 1158, titled "Authority to apply for asylum," establishes the asylum-application right and enumerates the three restrictions on applying; but it is the next part, part (b), titled "Conditions for granting asylum," that establishes asylum-eligibility grounds and enumerates the "exceptions" under which an otherwise eligible applicant

will be denied asylum. 8 U.S.C. § 1158(b)(1)–(2). Congress also authorized the Attorney General to promulgate by regulation additional grounds "under which an [applicant] shall be ineligible for asylum." *Id.* § 1158(b)(2)(C); *see* 8 C.F.R. § 208.13(c) (collecting rule-based grounds for "Mandatory denials" of asylum applications).

Part (b) works this way: An applicant that has exercised the right to apply under part (a) must first establish their status as a "refugee." 8 U.S.C. § 1158(b)(1). But even if an applicant qualifies as a "refugee" within the meaning of the statute, the Attorney General must still deny asylum if the applicant is found ineligible. The INA enumerates a series of grounds rendering applicants ineligible for asylum. *Id.* § 1158(b)(2). For example, if the applicant has been convicted of a "particularly serious crime," or there are "reasonable grounds for regarding the [applicant] as a danger to the security of the United States," the application must be denied. *Id.* § 1158(b)(2)(ii), (iv).

Importantly, in the scheme Congress devised, *eligibility* exceptions in part (b) are distinct from the *application* restrictions in part (a). And eligibility exceptions become relevant only after an individual has exercised the right to apply. *See id.* § 1158(b)(2). As a result, even though the INA prohibits ineligible individuals from receiving asylum, it leaves intact their right to apply for asylum in the first place.

Past Executive Branch practice has uniformly recognized and preserved the right to apply for asylum, including for individuals whose applications will ultimately be denied. Even as Attorneys General across administrations have exercised the prerogative to promulgate by regulation additional limitations and conditions on *eligibility*, none has restricted the right to *apply*—until now. *See, e.g.*, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,952 (Nov. 9, 2018) (to be codified at 8 C.F.R. pts. 208, 1003, 1208) (First Trump Administration); Securing the Border, 89 Fed. Reg. 48,710-01, 48,754–59 (June 7, 2024) (to be codified at 8 C.F.R. pts. 208, 235, 1208) (Biden Administration). To the contrary, "for four decades," the "Executive Branch's consistent position" has been that the INA guarantees foreign individuals—even those who are apparently ineligible—the right to apply for asylum. Securing the Border, 89 Fed. Reg. 81,156, 81,163 & n.53 (Oct. 7, 2024). Indeed, the First Trump Administration described a proposed rule to render certain individuals ineligible for asylum as "consistent with ... 8 U.S.C. § 1158(a)(1)," because

it "establishe[d] a condition on asylum *eligibility*, not on the ability to *apply* for asylum." Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,940–41 (Nov. 9, 2018) (to be codified at 8 C.F.R. pts. 208, 1003, 1208) (emphases added).

Finally, even if the Executive could categorically deny the right to apply for asylum based on a broad *ex ante* determination that all the potential applicants will be denied asylum, per the INA it can only promulgate that blanket determination by notice-and-comment rulemaking. Congress expressly contemplated the potential need for new asylum disqualification and provided tools for just that purpose. First, as described above, the asylum statute authorizes the Attorney General to "*by regulation* establish additional limitations and conditions, consistent with this section, under which an alien shall be *ineligible* for asylum." 8 U.S.C. § 1158(b)(2)(C) (emphases added). The asylum statute also authorizes the Attorney General to "provide *by regulation* any other *conditions or limitations on the consideration of an application for asylum* not inconsistent with this chapter." *Id.* § 1158(d)(5)(B) (emphases added).

**\*18**  Thus, even assuming that the Executive's decision to foreclose asylum to individuals subject to the Proclamation could be understood as an "additional limitation[ ] and condition[ ] ... under which an alien shall be ineligible for asylum," *id.* § 1158(b)(2)(C), and that such an eligibility limitation could foreclose the right to apply, that decision would have to be established "by regulation," *id.* Similarly, even assuming that the Executive's decision here could be understood as another "condition[ ] or limitation[ ] on the consideration of an application for asylum," it would have to be established "by regulation." *Id.* § 1158(d)(5)(B).

Here, it is undisputed that the challenged Guidance was not established "by regulation"—*i.e.*, through notice-and-comment rulemaking. We cannot license the Executive to do by Proclamation and informal guidance what Congress has determined must be done, if it can be done at all, by rule.[3] *See* 5 U.S.C. § 553(b)–(e) (describing the process of notice and comment rulemaking).

History illustrates this point. No previous Attorney General or DHS Secretary has asserted that the INA authorizes it to preemptively deny asylum to an entire class of individuals by Proclamation. *See West Virginia*, 597 U.S. at 725, 142 S.Ct. 2587. Instead, every administration that has sought to

categorically bar asylum to certain individuals—including the first Trump administration—has done so using its regulatory powers in 8 U.S.C. § 1158(d)(5)(B) to establish eligibility restrictions. *See, e.g.*, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. at 55,952 (interim final rule designating those who enter the United States in violation of "a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico" categorically ineligible for asylum); Securing the Border, 89 Fed. Reg. 48,710-01, 48,718 (interim final rule providing that, with limited exceptions, "persons who enter across the southern border will be ineligible for asylum unless they demonstrate ... exceptionally compelling circumstances").

We are unpersuaded by the Government's and our dissenting colleague's insistence that our decision in *Huisha-Huisha* counsels otherwise. As already described, the emergency orders in that case were issued pursuant to the CDC's authority under the Public Health Services Act, 42 U.S.C. § 265, to "suspen[d] ... the right to introduce" persons into the United States in response to a "serious danger" of spreading a communicable disease from a foreign country into the United States. We interpreted Section 265 to authorize the Executive to prevent foreign persons from coming "into contact with persons in the United States" or moving into the interior of the country after crossing the border, including by summarily expelling them from the country. *Huisha-Huisha*, 27 F.4th at 725, 729. We further held, at least "at [that] stage of the litigation," that the Executive could invoke Section 265 to summarily remove those individuals without providing them an opportunity to seek asylum, despite the INA's otherwise binding requirements. *Id.* at 730–31.

**\*19**  Our conclusion hinged on the explicit recognition that the public-health emergency authority in Section 265 conflicted with immigration law's requirement, *see* 8 U.S.C. § 1158(a), that "[foreign individuals]—even those who enter the country illegally—[be allowed] to apply for asylum before they are expelled." *Huisha-Huisha*, 27 F.4th at 730. But layering the asylum statute's guarantee of the right to apply for asylum over the Executive's power under Section 265 to "prohibit ... the introduction of persons" posing a threat of spreading communicable diseases into the United States would critically weaken that emergency power. *Id.* at 731. To "harmoniz[e]" the two statutes, we reasoned that Section 265's express authorization of the Surgeon General to effect "a suspension of the right to introduce such persons ...

[as] is required in the interest of the public health," 42 U.S.C. § 265, supported the orders' suspension of the INA's otherwise-required asylum procedures when the "dangers" to public health "are sufficiently pronounced." *Huisha-Huisha*, 27 F.4th at 731. This interpretation we noted, could "explain why Congress has excluded from asylum some categories" or foreign individuals—"such as those who have persecuted others—but has not categorically excluded from asylum those with communicable diseases." *Id.* at 731. Congress "may have trusted that the Executive would use § 265 to protect the country from the introduction of communicable diseases." *Id.* And we expressly limited the effect of our ruling by specifying that, if not deploying the statutory public-health emergency power, "the Executive violates § 1158(a)(1) when it expels [foreign individuals] before allowing them an opportunity to apply for asylum." *Id.*

Unlike *Huisha-Huisha*, this case asks us to interpret only the INA itself, a comprehensive and internally consistent statute that affords foreign individuals—even those whose asylum applications will ultimately be denied—the opportunity to apply for asylum and to receive an "individualized decision[ ]." *Cardoza-Fonseca*, 480 U.S. at 444, 107 S.Ct. 1207. What's more, we explicitly described our interpretation of the Public Health Services Act's emergency power as tentative: "No one should read our opinion to bind the District Court or future circuit panels regarding the final answer to the challenging merits questions raised by this case." *Huisha-Huisha*, 27 F.4th at 733. We decline the Government's invitation and resist the dissent's urging to extend the reasoning of that decision here.

Statutory text, structure, and consistent Executive Branch and judicial recognition of the law's constraints all lead to the same conclusion: Congress enacted the asylum statute, with narrow exceptions specified by statute, to grant all foreign individuals "physically present" in the United States a right to apply for asylum and have their individual applications adjudicated. 8 U.S.C. § 1158(a). If the Government wishes to modify this carefully structured and intricate system, it must present those arguments to the only branch of government able to amend the INA: Congress.

**2.**

The Proclamation and Guidance are also unlawful to the extent they suspend the statutory withholding-of-removal

protections that Congress has "mandat[ed]." *Aguirre-Aguirre*, 526 U.S. at 419, 119 S.Ct. 1439.

The INA's withholding-of-removal provision bars the Executive from removing a foreign individual to a country where they would be persecuted based on race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). Yet the Guidance explicitly states that USCIS is "not assessing persecution on account of a protected ground" in making removal decisions, nor is any other part of the Government making the statutorily mandated assessment. J.A. 134, 143; *see also* J.A. at 116, 120 (instructing Customs and Border Patrol agents to "refer[ ]" to USCIS only "for a [Convention Against Torture] screening" any individuals "who manifest a fear of the country to which [Customs and Border Control] intends to return them"). Thus, on its face, the Guidance refuses to provide persons in the United States the statutory withholding-of-removal protections against persecution that Congress has prescribed. This, it cannot do.

As this court has already explained, if the Executive wants to remove foreign individuals "to places prohibited by § 1231(b)(3)(A), it must identify a statute that creates an exception to § 1231(b)(3)(A)." *Huisha-Huisha*, 27 F.4th at 731–32. The Government has identified none. Neither Section 1182(f) nor Section 1185(a) creates such an exception. As spelled out above, *supra* Section III.A, neither provision mentions removal. Neither grants the Executive the authority to supplant the INA's removal procedures. And neither creates any exception to the mandatory withholding-of-removal provisions.

 **\*20** This conclusion is reinforced by *Huisha-Huisha*, where this court determined that the Executive's more robust authority under the Public Health Service Act to prevent the "introduction" of disease permitted it to temporarily supersede certain INA procedures. 27 F.4th at 728–31. Yet statutory withholding of removal to a country where the person's life or freedom would be threatened based on a statutorily protected characteristic, 8 U.S.C. § 1231(b)(3)(A), could not be superseded. *See Huisha-Huisha*, 27 F.4th at 732. Our observation in *Huisha-Huisha* about the steadfast nature of the withholding-of-removal right remains true here.[4]

**3.**

Likewise, the Convention Against Torture's bar against removal to a country where the person will be tortured is mandatory. "[A]n application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established." 8 C.F.R. § 208.16(d)(1); *see id.* § 1208.16(d)(1) (same); *see also Nasrallah v. Barr*, 590 U.S. 573, 575, 140 S.Ct. 1683, 207 L.Ed.2d 111 (2020) ("If the noncitizen demonstrates that he likely would be tortured if removed to the designated country of removal, then he is entitled to [Convention Against Torture] relief and may not be removed to that country.").

Congress directed that the Convention's protections be implemented by regulations, *see* 8 U.S.C. § 1231 note, and the Departments of Homeland Security and Justice have promulgated regulations doing just that. *See* C.F.R. §§ 208.1–31, 1208.1–33. The regulations require a two-stage process for handling Convention Against Torture claims.

At the first stage, an asylum officer conducts a credible fear screening where the applicant must demonstrate that there is "a significant possibility" that they are eligible for the Convention's protection. *Id.* §§ 208.30(e)(3), 1208.30(e); *see also id.* §§ 208.1(a)(1), 1208.1(a)(1). Applicants who clear that threshold move onto a second interview, which is designed "to elicit all relevant and useful information" for a final Convention Against Torture determination. *Id.* § 208.9(b). To qualify for Convention Against Torture protection, the applicant must demonstrate in the second interview that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id.* § 208.16(c)(2); *id.* § 1208.16(c)(2) (stating the same). The second interview must occur at least twenty-one days after the applicant receives the record of the officer's determination from the first-stage screening, allowing the individual to gather evidence and obtain representation if desired. *See id.* The applicant also "may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence." *Id.*

The Guidance casts aside the congressionally required rule and collapses the process it mandates into a single interview at which applicants must, without the benefit of time to assemble evidence or to prepare a presentation, carry the ultimate burden of proving they will likely be subjected to torture. In addition, contrary to existing regulations, in the now-prescribed single "[Convention Against Torture]-Only Assessment," the applicant is not "entitled to" any

"consultation period" and cannot be accompanied by a consultant or legal representative. J.A. 140, 141.

**\*21** Agencies may not adopt guidance or other procedures that conflict with or disregard duly promulgated regulations. *See U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35–36 (D.C. Cir. 2005). The Government has not withdrawn the published regulations. Its Guidance is accordingly arbitrary and capricious and contrary to law to the extent it substitutes the Guidance's less protective process for the Convention Against Torture procedures required under existing regulations.

### C.

We next consider the Government's challenge to the district court's class certification. Class certification is governed by Federal Rule of Civil Procedure 23. Rule 23 requires class representatives to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

A proposed class must also satisfy one of the three requirements of Rule 23(b). The district court certified the class under Rule 23(b)(2), which applies when a defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "To certify a class under this provision, a single injunction must be able to 'provide relief to each member of the class.' " *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011)). Rule 23(b)(2) "exists so that parties and courts ... can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief." *Id.*

At the stay stage of this case, we denied the Government's stay request only after clarifying that we thought the district court's judgment was properly limited to a class defined as:

> All individuals who (1) are present in
> the United States while Proclamation
> 10888 and/or its implementation is in

effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementing guidance, would seek asylum, 8 U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1231(b), or withholding under the Convention Against Torture, *see* FARRA, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note).

Stay Order, 2025 U.S. App. LEXIS 19422, at *3–4. So, as defined, the class is geographically limited to individuals present in the United States, temporally confined to the period the emergency Proclamation remains in effect, and includes only those individuals facing actual and imminent harm from the Proclamation and Guidance.

The Government agrees with the clarified definition in all but one respect: the inclusion of individuals who are not already in the United States. In support, the Government puts forth several arguments as to why we should further narrow the scope of the class, none of which is persuasive.

The Government's first and primary contention is that individuals who are not currently in the United States lack imminent injuries sufficient to establish Article III standing. This argument clashes with the established law that courts may award class-wide injunctive or declaratory relief under Rule 23(b)(2) so long as one member of the class has standing. *See J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019) ("It is settled that in a case involving joined, individual plaintiffs bringing a shared claim seeking a single remedy, Article III's case-or-controversy requirement is satisfied if one plaintiff can establish injury and standing."). Indeed, the Supreme Court has long recognized that only one plaintiff need demonstrate standing to satisfy Article III in cases seeking injunctive or declaratory relief. *See, e.g.*, *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439, 137 S.Ct. 1645, 198 L.Ed.2d 64 (2017) (requiring "[a]t least one plaintiff"— but only one plaintiff—to establish "standing to seek each form of relief requested in the complaint"); *see also Baggett v. Bullitt*, 377 U.S. 360, 366 n.5, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006); *Horne v. Flores*, 557 U.S. 433, 446–47, 129 S.Ct. 2579, 174

L.Ed.2d 406 (2009). As we have established in this circuit, "the same 'one plaintiff' rule ... applies with equal force to a Rule 23(b)(2) class action advancing a uniform claim and seeking uniform injunctive and declaratory relief." *J.D.*, 925 F.3d at 1324.

**\*22**  Notwithstanding this settled law, the Government and our dissenting colleague theorize that the one-plaintiff rule for a Rule 23(b)(2) class seeking only injunctive relief is untenable after the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021). The Government and dissent overread *TransUnion*.

In *TransUnion*, the Supreme Court considered whether each member of a Rule 23(b)(3) class must establish Article III standing to recover "individual *damages*." *Id.* at 431, 141 S.Ct. 2190 (emphasis added). True, the Court answered this question affirmatively. *Id.* at 431 & n.4, 141 S.Ct. 2190 (holding "[e]very class member must have Article III standing in order to *recover* individual damages" but declining to "address the distinct question whether every class member must demonstrate standing before a court *certifies* a class" (emphases added)). The Court did not, however, mention anything about the prevailing rule requiring only one plaintiff to establish Article III standing to *certify* a class seeking only *declaratory or injunctive* relief. *See id.*; *see also Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1023 (9th Cir. 2020), *rev'd and remanded*, 594 U.S. 413, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (clarifying that the court's holding did not "apply to class actions involving only injunctive relief"); *see, e.g.*, *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023) (concluding that because "at least one class representative ... has Article III standing to seek each form of *equitable* relief requested in the complaint[,] [n]othing more is required on that score" (emphasis added)); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 & n.32 (9th Cir. 2022) (en banc) (observing that "the Supreme Court has long recognized that in cases seeking injunctive or declaratory relief, only one plaintiff need demonstrate standing to satisfy Article III" (collecting cases)); *see also* 1 *Newberg and Rubenstein on Class Actions* § 2:3 (6th ed. 2025) ("If a class representative has standing, the case is justiciable and the proponent of the class suit need not demonstrate that each class member has standing."). *TransUnion*'s pronouncement about the Article III requirements for awarding individual damages to members of a Rule 23(b)(3) class did not address, and thus hardly "eviscerated," Diss. Op. ——, this

circuit's one-plaintiff rule in cases involving a Rule 23(b)(2) class seeking a single injunction, as articulated in *J.D.*, *see Bahlul v. United States*, 77 F.4th 918, 926 (D.C. Cir. 2023) ("[I]ntervening Supreme Court precedent must clearly dictate a departure from circuit law" to "eviscerate the law of our circuit." (citation modified)).

The different Article III requirements for a Rule 23(b)(3) class seeking to recover monetary damages, on one hand, and a Rule 23(b)(2) class seeking only injunctive relief, on the other, reflects the different remedy that the court awards.

For a Rule 23(b)(3) class seeking damages, the court orders the defendant to pay an individualized award of monetary damages to each plaintiff. *See Dukes*, 564 U.S. at 362, 131 S.Ct. 2541 (explaining that "individualized monetary claims belong in Rule 23(b)(3)"); *see also* 2 *Newberg and Rubenstein on Class Actions* § 4:54 (6th ed.) (explaining that "each [Rule 23(b)(3)] class member is likely to be entitled to a specific amount of damage pertinent to the harm she suffered"). Such individualized relief demands a concrete injury for each person who would recover, as the awarded damages must redress each plaintiff's individual harm. *See TransUnion*, 594 U.S. at 431, 141 S.Ct. 2190 (requiring every class member to demonstrate Article III standing to "recover individual damages"). For a Rule 23(b)(2) class seeking injunctive relief, however, a "single injunction or declaratory judgment ... provide[s] relief to each member of the class." *Dukes*, 564 U.S. at 361, 131 S.Ct. 2541.

 **\*23**  But even assuming that courts may not award class-wide injunctive or declaratory relief under Rule 23(b)(2) to a class including individuals who potentially lack Article III standing at the time the class was certified, *but see J.D.*, 925 F.3d at 1324; *Town of Chester*, 581 U.S. at 439, 137 S.Ct. 1645, the district court's class definition, as clarified by the stay panel, comports with Article III.

Under the operative class definition, a noncitizen becomes a member of the class—and thus obtains relief—only when present in the United States and only if they are "not statutorily ineligible for" asylum, withholding of removal, or withholding under Convention Against Torture and, "absent the Proclamation and/or its implementing [guidance]," would seek any of those forms of relief or protection. Stay Order, 2025 U.S. App. LEXIS 19422, at \*3–4. And it is well established that those who are not yet members of a Rule 23(b)(2) class may become class members in the future once they face imminent harm from the challenged policy. *See*

*Brown v. Plata*, 563 U.S. 493, 531–32, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011) (affirming class of all California prisoners who are or "*will become*" physically or mentally ill and "*will become* members of the plaintiff classes" (emphases added)); *INS v. Nat'l Ctr. for Immigrant Rights*, 502 U.S. 183, 186, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) (addressing the merits of the claims of a class that included "all those persons who have been *or may in the future* be denied the right to work" pursuant to a federal regulation (emphasis added)); *J.D.*, 925 F.3d at 1312 (affirming class of "pregnant [unaccompanied noncitizen minors] who are *or will be* in [federal] custody" (emphasis added)); *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 246, 271 (5th Cir. 2018) (affirming class of "all children now, *or in the future*" in the state's conservatorship program (emphasis added)); *Robidoux v. Celani*, 987 F.2d 931, 939 (2d Cir. 1993) (remanding with instruction to certify "a class comprising at least all current *and future* [state] applicants for [public] assistance" (emphasis added)); *see also A. B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) ("The inclusion of future class members in a class is not itself unusual or objectionable, because when the future persons referenced become members of the class, their claims will necessarily be ripe." (quotation marks omitted)); Newberg and Rubenstein, *supra* § 3:15 (adducing from federal cases that including "future claimants ... make[s] class certification more, not less, likely").

Defining a Rule 23(b)(2) class to encapsulate anyone who will face injury from the implementation of the Proclamation is proper because the "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). The scope of a Rule 23(b)(2) class likewise tracks the extent of the violation. *See Dukes*, 564 U.S. at 360, 131 S.Ct. 2541. Here, the implementation of the unlawful Proclamation will harm present and future class members alike, giving rise to "common claims aris[ing] from systemic harms" such that "a single injunction" will " 'provide relief' " to both present and future class members. *DL*, 860 F.3d at 726 (quoting *Dukes*, 564 U.S. at 360, 131 S.Ct. 2541). "Relief targeted only at present [class] members," however, in the words of the Supreme Court, would "fail to adequately protect future class members" who will uniformly be subject to the same harmful actions or unlawful policy. *Plata*, 563 U.S. at 531–32, 131 S.Ct. 1910; *cf. Council of and for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1542 n.39 (D.C. Cir. 1983) ("Since the future class members who actually suffer injury thereby become present class members

eligible for relief, a definition encompassing future members is superfluous." (citation omitted)).

**\*24** The Government next posits that certifying a class of all persons who have been or will be harmed by the challenged action is an "end-run around" the Supreme Court's condemnation of nationwide injunctive relief in *Trump v. CASA*, 606 U.S. 831, 145 S.Ct. 2540, 222 L.Ed.2d 930 (2025). Gov't Reply 28. The dissenting opinion echoes this sentiment. Diss. Op. ——. But *CASA*, to the extent it addresses class actions at all, says the opposite: *CASA* decried "universal injunctions" as a "workaround" to avoid the appropriate but rigorous process of certifying a class. 606 U.S. at 850, 145 S.Ct. 2540. The Court confirmed, however, that "universal relief" may be suitable in cases in which Rule 23's requirements are satisfied because class actions— unlike universal injunctions—have a preclusive effect and thus "protect" defendants "from future suits." *Id.* at 849 & n.15, 145 S.Ct. 2540; *accord id.* at 868, 145 S.Ct. 2540 (Alito, J., joined by Thomas, J., concurring); *id.* at 869, 145 S.Ct. 2540 (Kavanaugh, J., concurring); *id.* at 919, 145 S.Ct. 2540 (Sotomayor, J., joined by Kagan and Jackson, JJ., dissenting). The correct route to nationwide injunctive relief, *CASA* says, is to do exactly what Plaintiffs have done: "conduct... a proper[ ] class action" following the "procedure set out in Rule 23." *Id.* at 849, 145 S.Ct. 2540 (citation modified).

For these reasons, we hold the class definition as clarified by the stay panel is appropriate.

### D.

Finally, the Government argues that 8 U.S.C. § 1252(f)(1) barred the district court from both enjoining the Government from implementing the Proclamation and from vacating the Guidance. We disagree.

Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal

> Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). "[G]enerally," Section 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" part IV of the INA. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550, 142 S.Ct. 2057, 213 L.Ed.2d 102 (2022). Part IV of the INA encompasses 8 U.S.C. §§ 1221–1232. *See Aleman Gonzalez*, 596 U.S. at 549, 142 S.Ct. 2057.

### 1.

The district court did not "enjoin or restrain" the Government's "operation" of any provision covered by Part IV of the INA. The district court's injunction thus falls beyond Section 1252(f)(1)'s reach.

The district court enjoined government officials (other than the President) from relying on the Proclamation to enforce the directives in the Guidance—that the district court separately declared unlawful and vacated—to remove "individual plaintiffs or class members using non-statutory repatriation or removal proceedings." J.A. 319. The Proclamation invokes as its source of authority Sections 1182(f) and 1185(a) of Title 8, which are in Part II—not Part IV—of the INA.

More specifically, the district court enjoined government officials (1) "from removing any individual plaintiffs or class members without complying with the asylum statute, 8 U.S.C. § 1158(a)"; (2) from relying on the Proclamation or Guidance to "narrow[ ] the eligibility criteria for asylum without complying with 8 U.S.C. § 1158(b)(2)(C)"; and (3) from "using procedures other than those set forth in the relevant regulations when processing individual plaintiffs' or class members' [Convention Against Torture] protection claims." J.A. 319–20. Neither the asylum statute nor Convention Against Torture provisions are in Part IV of the INA: The asylum statute, 8 U.S.C. § 1158, appears in Part I of the INA and the Convention Against Torture provision appears in a different statute altogether, FARRA, Pub. L. No. 105-277, §

2242, 112 Stat. 2681-822 (1998). [5] So Section 1252(f)(1)'s injunction constraints do not apply.

**\*25** By contrast, the district court declined to enjoin the Government to comply with the withholding of removal statute, 8 U.S.C. § 1231(b)(2), which is in Part IV of the INA and thus subject to Section 1252(f)(1)'s bar on injunctive relief. *RAICES*, 793 F. Supp. 3d at 105–06. [6]

We see no error in how the district court navigated and applied the contours of Section 1252(f)(1) in crafting its injunctive relief. And neither the Government nor our dissenting colleague persuades us otherwise.

To start, it is not enough that the district court's Memorandum Opinion *discusses* provisions in Part IV. *See generally RAICES*, 793 F. Supp. 3d 19. The pertinent inquiry is whether the district court's order "enjoin[s] or restrain[s] the operation of [a] provision" located in Part IV. 8 U.S.C. § 1252(f)(1). True, the district court discussed the Executive's sole removal authorities within the INA—Sections 1229a and 1225(b), in Part IV—in reaching its holding that "neither § 1182(f) and § 1185(a) ... authorize[s] the President (or his subordinates) to adopt extra-statutory procedures for expelling" foreign individuals. *RAICES*, 793 F. Supp. 3d at 108. And, having concluded that the Proclamation lacks statutory support, the court determined that equitable considerations supported enjoining the Proclamation given the Government's admission that vacating the implementing guidance alone would not alter the Executive's conduct. *Id*. at 109. But just because the district court discussed provisions in Part IV does not mean that the district court enjoined provisions in Part IV.

Nor are we persuaded by the Government's argument that the injunction violates Section 1252(f)(1) because it could have the indirect effect of compelling the Executive to adhere to the INA's exclusive removal procedures, 8 U.S.C. §§ 1229a and 1225(b)(1), both of which are codified in Part IV of the INA. The injunction does not mandate removals; it requires only that if the Executive removes foreign individuals, it does so consistent with statutory and regulatory provisions that govern asylum and withholding of removal—neither of which are in Part IV of the INA. In this way, it is the INA itself, not the district court's injunction, that mandates how the Executive is to effectuate removals.

Our dissenting colleague takes a slightly different tack and reaches a contrary conclusion based on his *sua sponte* theory

for an "inherent Executive expulsion power." Diss. Op. ——. It is unclear to us how this theory supports the dissent's view that the district court's injunction runs afoul of Section 1252(f) (1)'s bar on enjoining the operation of provisions in Part IV of the INA. But regardless, the Government disclaims any inherent power to summarily remove noncitizens. *See* Gov't Br. 28–35; Oral Arg. Tr. 23:16. And the statutory provisions that the Government does invoke—8 U.S.C. §§ 1182(f), 1185(a)(1)—do not afford the authority it claims in the Proclamation and Guidance, *see supra* Section III.A, which the dissent seems to recognize, *see* Diss. Op. —— – ——. The district court's injunction against removing class members "using non-statutory repatriation or removal proceedings," J.A. 319, "merely prohibit[s] the [Executive] from doing what ... [it] cannot do," Diss. Op. ——. Section 1252(f)(1) does not bar such relief.

### 2.

**\*26** The Government next argues that Section 1252(f)(1) bars the district court from vacating the Guidance. Because vacatur under the APA is distinct from injunctive relief and Section 1252(f)(1) addresses only the latter, we hold Section 1252(f)(1) inapplicable to the vacatur.

Congress in Section 1252(f)(1) targeted orders that "enjoin" or "restrain" the "operation" of provisions in Part IV. As the Supreme Court has explained, "Putting these terms together, § 1252(f)(1) generally prohibits lower courts from entering *injunctions that order* federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550, 142 S.Ct. 2057 (emphasis added).

The heading Congress enacted for Section 1252(f)(1) describes it as a "Limit on injunctive relief." Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104–208 § 242(f), 110 Stat. 3009, 3009-611–612 (1996) (citation modified). That title reinforces the limits of the directive in the text. *See Dubin v. United States*, 599 U.S. 110, 120–21, 143 S.Ct. 1557, 216 L.Ed.2d 136 (2023) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (citation modified)). "By its plain terms, and even by its title, [Section 1252(f)(1)] is nothing more or less than a limit on injunctive relief." *Biden v. Texas*, 597 U.S. at 801, 142 S.Ct. 2528 (alteration in original) (quoting *Reno v. American-Arab Anti-*

*Discrimination Comm.*, 525 U.S. 471, 481, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999)).

Vacatur under Section 706 functions quite differently from an injunction. "When a court employs the extraordinary remedy of injunction, it directs the conduct of a party, and does so with the backing of its full coercive powers." *Nken v. Holder*, 556 U.S. 418, 428, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (citation modified). Put simply, an injunction "is a means by which a court tells someone what to do or not to do," *id.*, and such an order is "enforceable by contempt," *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986). By contrast, when a court vacates agency action, it simply "h[olds] unlawful and set[s] aside" the action, 5 U.S.C. § 706(2), as the district court did here in divesting the Guidance of enforceability. *See Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (holding that Section 1252(f)(1) does not bar vacatur under the APA because "a vacatur does nothing but re-establish the status quo absent the unlawful agency action," and "neither compels nor restrains further agency decision-making"). The district court's vacatur of the Guidance does not "enjoin" or "restrain" anyone; the court's separately specified injunctive relief served that role.

Vacatur is a well-established remedy for unlawful agency action. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *accord Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) ("When an agency's action is unlawful, vacatur is the normal remedy." (citation modified)). Cognizant of that norm, Congress can, and occasionally does, limit courts' power to vacate agency action under Section 706 of the APA. Those limits are quite unlike Section 1252(f)(1). Congressionally prescribed limits on the court's vacatur power explicitly refer to the inapplicability of APA remedies. *See, e.g.*, 42 U.S.C. § 7607(d)(1) ("[S]ection 706 of [the APA] shall not ... apply to actions to which this subsection applies.") (Clean Air Act); 15 U.S.C. § 57a(e)(5)(C) ("Section 706(2) (E) of [the APA] shall not apply to any rule promulgated under subsection (a)(1)(B).") (Magnuson-Moss Warranty – Federal Trade Commission Improvement Act); 16 U.S.C. § 1855(f) (1)(B) ("[T]he appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2) (A), (B), (C), or (D)," but not (E) or (F).) (Magnuson-Stevens Act). Section 1252(f)(1) makes no reference to the APA.

**\*27** At bottom, Section 1252(f)(1)'s prohibition is limited to enjoining the operation of certain statutory provisions.

It leaves intact the courts' power under the APA to hold unlawful or set aside agency action that violates its terms. Because the district court's vacatur does not enjoin or restrain Executive conduct, but instead sets aside the Guidance to the extent it is arbitrary and capricious or contrary to law, it is unaffected by Section 1252(f)(1).

## IV.

For these reasons we hold that the Proclamation and Guidance are unlawful insofar as they circumvent Congress's carefully crafted removal procedures and cast aside federal laws that afford individuals the opportunity to apply and be considered for a grant of asylum or withholding of removal. As such, we affirm the district court's grant of summary judgment and affirm the district court's class certification, as clarified by the stay panel and consistent with this opinion.

*So ordered*.

Walker, Circuit Judge, concurring in part and dissenting in part:

Last year, the Department of Homeland Security issued informal guidance related to a proclamation that President Trump signed on his inauguration day. The Proclamation and Guidance generally cover aliens who illegally cross the border. The Guidance subjects those aliens to summary removal procedures —procedures that conflict with more fulsome procedures required by 8 U.S.C. §§ 1225 and 1229a. Both the Proclamation and Guidance prevent those aliens from applying for asylum —a protection that Congress made entirely *discretionary*. And they strip away statutory protections against removal to countries where an alien will be persecuted —protections that Congress made entirely *mandatory*.

The plaintiffs sued. The district court certified a global class and issued, among other remedies, a class-wide injunction. The injunction orders the Executive, among other things, to abide by the procedures specified in 8 U.S.C. §§ 1225 and 1229a and to accept asylum applications.

I agree with much of the majority's thoughtful opinion. The Executive cannot remove aliens to countries where they will be persecuted, and the Proclamation and Guidance cannot strip them of mandatory procedures that protect against that removal. But unlike the majority, I conclude:

I. The district court wrongly issued relief to potentially millions of plaintiffs without standing.

II. The Executive has already exercised his lawful discretion to deny all asylum applications. So he may foreclose the application process as futile.

III. The injunctive relief the district court issued was barred by 8 U.S.C. § 1252(f)(1), which forbids inferior federal courts from issuing injunctions ordering the Executive to obey §§ 1225 and 1229a.

I take each in turn.


**I**

The district court issued injunctive relief to a class of potentially millions of plaintiffs without standing. The class includes "all individuals who are *or will be* subject to the Proclamation" or Guidance "and who are now *or will be* present in the United States."[1] That includes individuals who will be present in the United States and subject to the Proclamation or Guidance only after several years and the most speculative and attenuated chain of possibilities imaginable. That was wrong. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."[2]


**A**

 **\*28**  On a remote island some 700 miles off the coast of mainland India lies North Sentinel Island.[3] Its inhabitants, the Sentinelese, "may be the most isolated people group in the world."[4] Little is known about them, and strangers seeking to learn more have often been met with a shower of Sentinelese arrows.[5]

Do the Sentinelese people, who might hypothetically be contacted one day, and might hypothetically decide to come to the United States by illegally crossing the southern Border, have standing in today's case? No. Without knowing the United States exists, they can't even form vague " 'some day' intentions" to enter, let alone provide "concrete plans, or indeed even any specification of *when* the some day will be."[6]

True, a Sentinelese individual (let's call him Bob) may be contacted by fishermen who stray onto the shores of North Sentinel Island. Bob may then end up advocating for a less isolationist Sentinelese foreign policy. In response, Bob's Sentinelese brethren may persecute him for his views. Bob may then flee the island, arriving by boat on the shores of India. In India, Bob may learn of the United States and decide to make the voyage to our country. After saving up some funds, Bob may traverse half the globe, ultimately landing in Nuevo La-redo, near the southern border. Bob may then cross the border in violation of the President's entry ban. After Bob is found, he may learn of the asylum process and decide to apply.

Bob *may* do all these things. And if so, he would fall within the class definition. Still, to put it mildly, that is a speculative and attenuated chain of possibilities. So it cannot ground Article III standing.[7]

What is true of Bob is true of many who fall within the class definition —even those who may seem more likely than Bob to cross our borders. They face the same problem: What will subject them to the allegedly illegal government action is their illegal entry.[8] But the Supreme Court's "cases reveal that, for purposes of assessing the likelihood" that government actors will engage in allegedly illegal conduct toward a plaintiff, the Court has been "unwilling to assume that the party seeking relief will" engage in the sort of "misconduct" that would "place him or her at risk of that injury."[9] If that has been true when the individual has *already* broken the law before, and *already* been subject to the illegal conduct before,[10] then it follows a fortiori that it is true when there is no evidence the people have previously broken the laws at all.[11]

 **\*29**  Nor is there any particularized reason to think any particular plaintiff abroad will, in fact, break this nation's immigration laws. But that is what has generally been required to overcome the presumption that parties will not engage in illegal conduct.[12] And standing must be assessed plaintiff-by-plaintiff —even in a class action.[13]

Because the only class members who have standing are those who either (a) are already in the United States or (b) have shown some particularized reason for believing they will imminently break the immigration laws so as to render themselves subject to the alleged illegality from enforcement of the challenged Proclamation and Guidance, I would narrow the class.

**B**

This court's opinion in *J.D. v. Azar* doesn't defeat this analysis.[14] Although *J.D.* suggested that "*only* one plaintiff" needs "standing to seek each form of relief requested in the complaint,"[15] after *TransUnion* and *Trump v. CASA*,[16] *J.D.* bears no weight here.

Start with *J.D.*'s relationship to *TransUnion*. In *J.D.*, our court said that if there were multiple "individual plaintiffs bringing a shared claim seeking a single remedy, Article III's case-or-controversy requirement" was "satisfied if" only "one plaintiff" could "establish injury."[17] *TransUnion* had this to say about that: "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."[18]

*CASA* removes any doubt about whether *J.D.* remains good law. As *CASA* explained, courts lack equitable power to issue relief that is more sweeping than necessary to "offer complete relief to the plaintiffs before the court."[19] So *CASA* stayed the injunctions at issue in that case "to the extent that" they were "broader than necessary to provide complete relief to each plaintiff with standing to sue."[20] Thus, the upshot of *CASA* is clear. Courts lack equitable authority to do what *J.D.* said they could —issue injunctions that protect non-parties. So *J.D.* has been "eviscerated" by *TransUnion* and *CASA*.[21]

**C**

 **\*30**  The majority's alternative theory runs into its own problems.

Per the majority, it's no problem that many individuals who fall within the new class definition do not yet have standing. They are not parties. And the court has so far declined to issue relief to them. But in the future, one such individual may have standing. If so, in that very moment, he will be transformed into a class member. Then, and only then, will this new class member receive the protection of the court's remedial order. More may then follow suit, one by one being added to the class, and one by one getting relief against the Government.

I have questions about the majority's theory of the class as a brooding eternality hovering above our legal system, ever gathering new plaintiffs under the shadow of its wings. Here are some that come to mind:

- How does the majority's theory square with the notion of a "final" judgment given that the judgment remains open for all eternity?

- Can an injunction take on a life of its own, changing organically, ever commanding Executive officials to do new things to new individuals?

- How is the majority's theory consistent with the nature of a declaratory judgment, which is a declaration of the rights of the *parties*—not a contingent future declaration of rights of non-parties?[22]

- On the majority's theory, the court has not yet issued a remedy protecting those without standing. So will it sua sponte issue a new remedy automatically every time one of those individuals gets standing? Where do courts get authority to do that?

- Is the majority's theory consistent with the nature of a class action? As the Supreme Court has explained, at least for purposes of issuing relief, "[a] class action ... is a species" of "traditional joinder."[23] In ordinary suits, can we join new parties potentially several centuries after what one might otherwise call the close of the litigation?

- How does the majority's theory accord with *United States v. Mendoza*?[24] Under *Mendoza*, a plaintiff may not "seek[ ] to estop" the Government as defendant "from relitigating an issue which" it "previously litigated and lost against another plaintiff."[25] But per the majority, individuals who were never plaintiffs, who never earned relief during the pendency of the litigation, may show up into court years after the litigation has concluded and claim relief against the Government simply because the Government lost against other plaintiffs. Isn't that even worse than offensive non-mutual collateral estoppel, since on the majority's theory, the new individuals never even have to file suit?

- Is the majority forcing into the class countless future class members who have no opportunity to opt out or even to argue the adequacy of the representation of "their" class? That appears to be the logic of the majority's position.[26]

And that may seem fine for future class members if the class wins. But what if the class loses?[27]

• Do these individuals at least get an opportunity to object to "a proposed settlement, voluntary dismissal, or compromise"?[28] Rule 23(e) "entitles all class members to an opportunity to object" before a class action is "dismissed or compromised."[29] But these individuals aren't class members. Do they get to object anyway?

*31 • Do they get notice in case of "a proposed settlement, voluntary dismissal, or compromise?"[30] The court "must direct notice ... to all class members who would be bound by the proposal."[31] But although these individuals might one day be bound, they are not class members. So must the court provide them notice?[32]

• Does the majority's conception create potential adequacy problems? As the Court explained in *Devlin*, when the class "reach[es] a settlement that is approved over" a class member's "objections," the class member's "interests by definition diverge from those of the class representative."[33] How can we know whether any of these future class members would've objected? If we can't, how can we know whether representation is adequate?

• As soon as one of these non–class members satisfies standing, he gets ushered into the class. At that precise moment, does the matter become res judicata? Is there any other context where res judicata operates like that?

• How does the right to appeal work for these non–class members?[34] May they appeal a class-certification order?[35] May they appeal an unfavorable judgment, even though it doesn't bind them yet? If not, and they have to wait until they satisfy standing and join the class, will the appeal clock have run?[36]

• Does any of this accord with the class action's historical origins in the bill of peace?[37]

*32 The most fundamental question is this: Why think this extraordinary workaround to *TransUnion*, *CASA*, and Article III is available?[38] The majority's evidence boils down to a passing remark in *Brown v. Plata*.[39] But even read for all its worth, *Brown* does not support issuing relief to those who do not have standing.

In *Brown*, the Supreme Court upheld an injunction ordering California to release up to 46,000 convicted criminals from its prisons (nearly a third of California's prison population).[40] The reason for the injunction was generally that overcrowding in the prisons had led to such substandard medical and mental health care that it violated the Eighth Amendment's prohibition on cruel and unusual punishment.[41]

But the remedy faced a problem. The Prison Litigation Reform Act required that "a remedy ... extend no further than necessary to remedy the violation of the rights of a 'particular plaintiff or plaintiffs.' "[42] Yet, the injunction had ordered the release of tens of thousands of individuals, many of whom were not plaintiffs, nor suffering Eighth Amendment violations.

The Court justified that on the grounds that the injunction was necessary to give complete relief to those suffering Eighth Amendment violations. As the Court put it, "a narrow and otherwise proper remedy for a constitutional violation" is not "invalid simply because it will have collateral effects."[43] The Court also emphasized that the text of the PLRA "mean[t]" by narrow tailoring "only that the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court."[44] Those plaintiffs had established extensive violations —past, present, and certainly impending —to many individuals.

The Court also said that because many "[p]risoners" would later "become sick," "[r]elief targeted only at present members of the plaintiff classes" might "therefore fail to adequately protect future class members who w[ould] develop serious physical or mental illness."[45] The Court explained it could take those individuals into account because even if they did "not yet have a claim that they ha[d] been subjected to care that violate[d] the Eighth Amendment," they were "in no sense ... remote bystanders."[46]

I'm not sure *Brown*'s "future class members" language bears much weight here.[47] For starters, it is probably dicta, since the Court said both that the injunction was necessary in order to grant complete relief to the present plaintiffs and that in any event, the PLRA required only that the Court focus on the constitutional violations "established by the specific plaintiffs before the court," not the constitutional violations actually suffered by those particular plaintiffs.[48]

And regardless, *Brown* emphasized that it could take those individuals into account because they were "in no sense ... remote bystanders."[49]

**\*33** That is language the Court has used over and over again in describing the bedrock requirement of Article III standing.[50] So even if we were to squeeze everything we could out of *Brown*, we cannot draw from it authority to create the workaround par excellence to the rule of *TransUnion*, *CASA*, and Article III.

\* \* \*

I cannot subscribe to the majority's theory of class-action-cum-advisory-opinion. On the majority's theory, as soon as any one individual has standing to challenge a policy, he may certify a class. That class may include every single person who may ever have standing to challenge a given government policy —up to billions of people, many of whom may be born decades from now. As soon as those individuals check the standing box —even if it is not for a thousand years after "final" judgment —they get adopted into the class and inherit a judgment issued to their ancestors. The judgment then becomes res judicata for these newly added class members. Thus, via the class device, our holdings, and the holdings of the 94 district courts, will settle, at least for anyone who could ever have any interest in it, any potential legal dispute over a government policy for all time. And to think the Supreme Court once balked at a class action of a mere "one and a half million plaintiffs."[51] That is a modest proposal compared to the birth-right-for-billions bestowed by the majority.

At bottom, I do not see how the majority's class action accords with the proper understanding of our role. "[C]lass action or not," Article III stays the same.[52] And under Article III, "[t]he Judiciary's role is limited 'to provid[ing] relief to claimants ... who have suffered, or will imminently suffer, actual harm."[53] Either way, it does not countenance relief to those who may, only after the passage of a few decades, suffer harm.

## II

Next, asylum. As amended in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the asylum statute makes clear that the DHS Secretary or the Attorney General "may grant" or deny "asylum" in that official's discretion.[54]

And of course, "because the President *is* the Executive Branch," the discretion ultimately rests with him.[55] The majority does not dispute this.[56] Instead, it relies on three other theories offered by the plaintiffs: (A) The plaintiffs have a right to file their asylum applications; (B) the plaintiffs have a right to due consideration of their asylum applications; and (C) the Executive's exercise of discretion directly contravenes Congress's provision for additional asylum restrictions to be made only by regulation. All three fail.

### A

**\*34** I start with the main theory the majority and the plaintiffs press.[57] Pointing "to the plain text of Section 1158(a)(1)," they argue the plaintiffs have a "right to apply for asylum."[58] I do not think that is the best way to interpret the text. And even if it were, the plaintiffs' claim would still fail.

### 1

Even if § 1158(a)(1) conferred a "right" to apply, I do not think we should read it as conferring a right to file frivolous or futile applications.

Our court has already rejected that reading —twice. In *Huisha-Huisha v. Mayorkas*, we explained that "if the asylum decision has already been made," then "the statutorily mandated procedures that aliens use to apply for asylum ... would be futile."[59] Because of that, we held, the Executive could foreclose those procedures. And the stay panel in this case also held that the Executive could likely foreclose the asylum procedures as "futile" under the logic of *Huisha-Huisha*.[60]

That makes sense. Background principles of law show that the right to raise a claim doesn't include the right to raise a frivolous claim. Under the Federal Rules of Civil Procedure, for instance, plaintiffs may file complaints, other pleadings, and motions. But there's no right to file frivolous complaints, pleadings, and motions.[61] The rule for civil appeals is similar. "[A]ny party" "may ... file[ ]" a "notice of appeal" within a certain number of days "after entry of the judgment."[62] But if the "appeal is frivolous," the appellant may suffer penalties.[63] So too with criminal

appeals. Defendants may appeal a conviction or sentence.[64] And when they do, they generally have a right to counsel.[65] But there is no "right to bring a frivolous appeal," nor "concomitantly," to have "counsel for bringing a frivolous appeal."[66] Simply put, the rights to a criminal appeal and counsel during that appeal do "not include a right to present frivolous arguments to the court."[67]

The asylum statute's text captures these background rules. Section 1158(d)(4) requires the Attorney General to notify aliens applying for asylum "of the consequences ... of knowingly filing a frivolous application for asylum." And paragraph (6) of that subsection —entitled "Frivolous applications"[68] —prescribes consequences for aliens who have "knowingly made a frivolous application."[69] So § 1158 seems to assume individuals lack authority to file frivolous applications. And so it prescribes punishment for doing so (at least with a certain *mens rea*) —just like the Federal Rules of Civil Procedure do for submitting frivolous pleadings.[70]

### 2

 **\*35**  Even if the asylum statute doesn't by itself preclude the plaintiffs' right-to-apply theory, that theory relies on a right "to nothing but procedure."[71] So it is "inadequate even to support standing."[72]

The deprivation of the procedural "right" to apply is not itself a cognizable Article III injury. Because Congress cannot "enact an injury into existence," even if we were to read the statute to grant a right to apply, the plaintiffs would still need to prove that the harm of being deprived of the right to apply is the type of "harm traditionally recognized as providing a basis for a lawsuit in American courts."[73] But I am not aware of any traditional claim of tortious interference with futile filings.

To be sure, " 'procedural rights' are special."[74] So some procedural-standing cases recognize standing for the deprivation of procedural rights. But the Court's procedural-standing cases require a plaintiff to show he has "been accorded a procedural right *to protect his concrete interests*."[75] Only then can he "assert that right without meeting all the normal standards for redressability and immediacy."[76]

Even then, procedural rights aren't amulets one waves around to make Article III disappear. All that happens in procedural-standing cases is that the normal standards get "somewhat relaxed."[77] Or as the Court put it recently, "we tolerate uncertainty over whether observing certain procedures would have led to ... a different substantive outcome."[78]

But here, to find standing, we would need to "tolerate" more than mere "uncertainty over whether observing certain procedures would" change the "substantive outcome."[79] We would need to find standing despite complete certainty that observing the procedures would change nothing. The substantive result is pre-determined because the Executive has denied all the applications. So on even the most "relaxed" approach to causation and redressability, the plaintiffs lack standing to seek relief permitting them to file applications that have already been denied.[80]

### B

That brings us to the second theory. The majority says the Executive cannot "categorical[ly]" and "*ex ante*" deny asylum without "consideration of what the would-be applicant may face if removed."[81] The logic of this position seems to be that the alien is entitled to meaningful consideration of his individual application.

 **\*36**  One might wonder what source of law permits us to subject the Executive to this novel "meaningful consideration" requirement in exercising his discretion over asylum applications. The majority points to § 1158(d), which provides, among other things, that "[t]he Attorney General shall establish a procedure for the consideration of asylum applications."[82]

Nothing in § 1158(d) suggests we can glean some meta-principle about meaningful, individualized consideration out of its bare text. Section 1158(d) contains anodyne provisions, like that "[t]he Attorney General may require applicants to submit fingerprints and a photograph"[83] or that "[a]n applicant for asylum is not entitled to employment authorization."[84] And if we were to glean a principle out of § 1158(d)'s discrete provisions, § 1158(d)(7) would seem to suggest the opposite of what the majority proposes: "**Nothing in this subsection shall be construed to create**

**any substantive or procedural right** or benefit **that is legally enforceable** by any party **against the United States** or its agencies or officers or any other person."[85]

The majority also points to the expedited-removal provision, § 1225(b), which it understands to guarantee procedures for considering asylum applications for those otherwise subject to expedited removal. Section 1225(b) says that an immigration officer in an expedited-removal proceeding "shall refer" an alien who "indicates either an intention to apply for asylum ... or a fear of persecution ... for an interview by an asylum officer."[86] Then, for the aliens referred, "[a]n asylum officer shall conduct interviews."[87] "If the officer determines at the time of the interview that an alien has a credible fear of persecution ..., the alien shall be detained for further consideration of the application for asylum."[88] Moreover, § 1225(b) defines "credible fear of persecution" by reference to "eligibility for asylum under" the asylum statute.[89] What an oddity it would be, the majority might suggest, that aliens initially funneled into expedited-removal proceedings are entitled to individualized consideration of asylum claims, but other aliens are not.

I find much about that argument appealing, but for three reasons, I am not persuaded.

First, I don't think my reading creates much of an oddity because the "credible fear" interviews in § 1225(b) serve more purposes than protecting asylum. Those interviews also ensure that individuals subject to § 1225(b) get a chance to press withholding-of-removal claims.[90] And today this court unanimously holds that those claims must remain open. So on my reading (like the majority's), § 1225(b) credible-fear interviews still matter.

Second, even if you think the provisions in § 1225(b) really are about only asylum, then an oddity remains no matter what. The majority does not contest that the President may deny all asylum applications. If a President decides to do that, all § 1225(b) does is confer upon individuals the special privilege of being forced to languish in a detention facility while their individual asylum applications get inevitably denied.[91] That is pretty odd.

**\*37** To be sure, the Congress that wrote § 1225(b) may well have expected that the Executive would usually-or-always be amenable to granting *some* asylum applications. And that prediction has almost always been correct. But by giving the

Executive discretion to deny asylum claims, Congress chose not to require what it predicted.[92] And when the Executive exercises that discretion in a way Congress may not have predicted, the majority's interpretation creates quite the oddity —prolonged detention while detainees seek relief that will never be granted.

In short, the expedited-removal scheme creates oddities either way, whether under my interpretation or under the majority's.

Third and finally, whatever oddity remains isn't that suggestive. As noted, the oddity will emerge only in unusual circumstances. It emerges only when Presidents categorically foreclose asylum. So even granting for the moment that there is an odd discrepancy between the asylum statute (§ 1158) and the expedited-removal provisions (§ 1225(b)) when the Executive categorically forecloses asylum, it doesn't bear much weight. Sections 1158 and 1225(b) almost *never* give rise to that discrepancy. Yes, it has arisen here. But a rare oddity arising from the Executive's discretion in one case doesn't mean we must subject the Executive's discretion to novel restrictions in all cases —especially when an oddity arises under either interpretation of the statute.

### C

Now for the third and final theory the majority proffers. The majority suggests that the Executive's categorical, ex ante denial of asylum, and accompanying refusal to take applications, violates two discrete provisions of the INA: (1) 8 U.S.C. § 1158(b)(2)(C) and (2) 8 U.S.C. § 1158(d)(5)(B). That is wrong.

### 1

Section 1158(b)(2)(C) allows the Attorney General to prescribe additional conditions on asylum eligibility by regulation. The majority argues this undermines the Executive's categorical and ex ante exercise of his asylum discretion. I disagree.

That's because eligibility is just Step 1. At Step 2, the Executive gets to decide whether to grant or deny asylum to whoever is eligible according to his discretion. As the Supreme Court has explained, "even if an applicant" is eligible for asylum, "an actual grant of asylum is

discretionary."[93] Put another way, eligibility "does no more than establish that the alien *may* be granted asylum *in the discretion of*" the Executive Branch.[94] So any restriction on the Executive's power to create rules concerning who is *eligible* for asylum (the Step 1 inquiry) says nothing about the Executive's discretion to decide whether to *grant* asylum to anyone (the Step 2 inquiry).

**2**

The majority also points to § 1158(d)(5)(B), which authorizes "[t]he Attorney General" to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum." But the President's decision to bar the filing of applications by Proclamation doesn't contravene that provision. Section 1158(d)(5)(B) kicks in only after applications have been filed. It says nothing about the President's ability to foreclose applications from the get-go.[95]

Start with how § 1158(d) operates. Paragraph (1) provides that "[t]he Attorney General shall establish a procedure for the consideration of asylum applications filed under" § 1158(a).[96] Then, paragraph (5) deals with what procedures should govern the process for considering those applications that have been filed. Subparagraph (A) spells some out: "The procedure established under paragraph (1) shall provide," for example, "that in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed."[97] Subparagraph (B), then, authorizes the Attorney General to provide for additional measures by regulation.

 **\*38**  That shows that the Proclamation and Guidance, by foreclosing acceptance of applications in the first place, do not contravene § 1158(d)(5)(B). The procedures related to consideration of applications are inapplicable if there are no asylum applications to consider. If no applications have been filed, for example, there is no "initial interview or hearing on the" (nonexistent) "asylum application" to be had within "45 days after the date" that the (nonexistent) "application" was "filed."[98] Nor is there any "final administrative adjudication of the" (nonexistent) "asylum application" that must take place "within 180 days after the date" the (non-existent) "application" was "filed."[99] So, sure, (d)(5)(B) might impliedly restrict the President's

ability by proclamation to provide new rules governing the consideration of the applications that have already been filed. Maybe the President, for instance, cannot provide by proclamation that all hearings on an asylum application must take place in English. But (d)(5)(B) says nothing about whether the President needs to accept applications in the first place.

\* \* \*

"A major objective of IIRIRA was to protect the Executive's discretion from undue interference by the courts."[100] "Whether or not" an individual is "granted asylum is a matter which Congress has left" to the Executive's discretion.[101]

We should not interfere with that discretion. "[A]n influx of meritless" asylum claims can "strain detention capacity and degrade detention conditions; cause the release of many inadmissible aliens into States and localities that must shoulder the resulting costs; divert Department resources from protecting the border; and aggravate the humanitarian crisis created by human smugglers."[102]

Our court has already said twice that the Executive —and our country—need not suffer an influx of frivolous asylum claims when the Executive has already exercised his discretion to deny all of them. We were right both times.

**III**

Finally, I turn to the availability of class-wide injunctive relief.

For reasons I will explain below, the President has an inherent, generalized authority to expel aliens. In *Youngstown* terms, the President's authority to expel aliens is a Category 2 authority: The President may expel aliens without statutory authorization, but Congress may choose to limit his authority.[103]

Congress limited the President's inherent expulsion authority in 8 U.S.C. §§ 1225(b) and 1229a. Those provisions prescribe procedures that the Executive must follow. For example, the Executive must sometimes afford to an alien a hearing before an immigration judge.[104]

In today's case, the district court issued a class-wide injunction ordering the Executive to follow the procedural requirements of §§ 1225(b) and 1229a. But § 1252(f)(1) forbids a district court from issuing class-wide injunctive relief that orders the Executive to follow §§ 1225(b) and 1229a. So § 1252(f) forbids the injunction in this case.

### A

8 U.S.C. § 1252(f)(1) provides:

> [N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings ... have been initiated.

**\*39** The remedial question in this case is whether the class-wide injunction restrained the operation of the covered provisions. As relevant here, those covered provisions are 8 U.S.C. §§ 1225(b) and 1229a, which provide "the sole and exclusive procedure" for expelling someone from the country.[105]

But that question cannot be answered before first answering a different question —whether the President has a generalized expulsion authority that the procedural provisions of 8 U.S.C. §§ 1225(b) and 1229a regulate. If so, the injunction unlawfully restrained the operation of those statutory provisions. If the President *lacks* a generalized expulsion authority, then the majority is correct that the injunction did not restrain the operation of those provisions and therefore was lawful because it merely prohibited the President from doing what, *regardless* of §§ 1225(b) and 1229a, he cannot do.

The majority's logic works like this: The Government has invoked, as the legal basis for the President's system of removals, 8 U.S.C. §§ 1182(f) and 1185(a)(1). Those sections permit the President only to deny entry, not to expel those who have already entered. Thus, even if we set §§ 1225(b) and 1229a to one side, we can still hold the President's action unlawful because he has simply exceeded the scope of the authority vested in him by §§ 1182(f) and 1185(a)(1).

By that logic, the injunction need only order executive officials to stop exceeding the authority vested in the Executive Branch by §§ 1182(f) and 1185(a)(1). Those provisions aren't covered by 8 U.S.C. § 1252(f)(1). So, reasons the majority, the injunction is permissible.

The problem? Well, at first blush, the majority's theory doesn't seem to describe the district court's injunction. The district court "requir[ed]" executive officials "to return to the processes that Congress required" for removal.[106] So the injunction we are reviewing appears to order executive officials to follow the procedures laid out in §§ 1225 and 1229a.

That makes sense. The district court's injunction *had* to order executive officials to obey §§ 1225(b) and 1229a. As our decision in *Huisha-Huisha* makes clear, the President has "ample authority to expel" the aliens subject to the Proclamation.[107] So by expelling aliens subject to the Proclamation, the President doesn't exceed the scope of his authority. Rather, he exercises his expulsion authority in contravention of procedural protections provided by Congress in §§ 1225(b) and 1229a. In other words, as Judge Katsas suggested, the enjoined actions are "unlawful precisely because" they "conflict[ ] with" §§ 1225(b) and 1229a.[108] Thus, the injunction must order the President to comply with §§ 1225(b) and 1229a.

### B

In this section, I start with the Executive's potential statutory expulsion authority.

**\*40** The Executive has argued that 8 U.S.C. §§ 1182(f) and 1185(a)(1) imply a power to expel when they expressly supply a power to exclude. For that proposition, the Executive has relied on our Court's decision in *Huisha-Huisha*. There, the Executive argued that 42 U.S.C. § 265 likewise implicitly granted the Executive "ample authority to expel" covered aliens when it expressly gave the Executive the authority to

prohibit their introduction.[109] We held that the Executive was likely correct.

If the differences between the statutory provision there and those here were immaterial, the Executive should again likely prevail. But their differences matter. The provisions come from different statutes, with different lineages, passed at different times, codified in different titles of the United States Code. And unlike in *Huisha-Huisha* —where nothing overcame the presumption that the exclusion authority includes the expulsion authority[110] —the text, structure, and history of §§ 1182(f) and 1185(a)(1) suggest that *their* grant of the power to exclude certain aliens does not encompass the power to expel them.

In discussing the Executive's statutory expulsion authority, this section has four parts. First, because §§ 1182(f) and 1185(a)(1) come from §§ 212(e) and 215(a)(1) of the Immigration and Nationality Act, I start with the text and structure of the INA. Second, I turn to the rich historical tradition of immigration law that the INA channeled. Third, I discuss the precursor provisions to §§ 212(e) and 215(a)(1). That historical backdrop suggests §§ 1182(f) and 1185(a)(1) may not confer expulsion authority.[111] That historical backdrop, though, also raises the specter of another statutory candidate for expulsion authority. That leads to the fourth part. Still, that statute likely does not confer statutory expulsion authority either.

**1**

**\*41**  As the Supreme Court observed just a few years after the INA was enacted, the INA "carefully preserved" the longstanding "distinction" between exclusion and expulsion.[112] Sections 212(e) and 215(a)(1) —§§ 1182(f) and 1185(a)(1) respectively —fell on the exclusion side of the line.[113]

Start with the structure of the INA. The fundamental distinction in the INA was between exclusion and expulsion.[114] The dividing line was what it had been for decades preceding the INA: whether the alien had "already entered" the country.[115] If he had not entered, the alien would be put in "exclusion proceedings to determine whether" he should "be allowed to enter."[116] If he "ha[d] already

entered the United States," he was "subject to 'expulsion,' as distinguished from 'exclusion.' "[117]

Section 212 fell on the exclusion side of the line. The section was titled, "General classes of aliens ineligible to receive visas *and excluded from admission*."[118] Subsection (a) listed "classes of aliens" who were "excluded from admission."[119] And reflecting the historic tie between exclusion and entry, subsection (e) allowed the President to "suspend the entry" of certain aliens.[120]

Expulsion —referred to in the INA by a new "word of art," "deportation" —was covered elsewhere.[121] The deportation provisions were contained in their own chapter, Chapter 5, entitled "Deportation; Adjustment of Status."[122] The primary deportation provision was § 241.[123] For our purposes, the most relevant provision was § 241(a)(1), the "direct descendant" of the original generalized, statutory expulsion authority, which had been passed in 1891.[124] Section 241(a)(1) provided authority to expel those who unlawfully entered —like those who circumvented the restrictions on entry imposed by, say, § 212(e).

The text and structure of the INA suggest that § 212(e), now 8 U.S.C. § 1182(f), probably did not deal with expulsion. As noted, a separate provision, tracing to the original expulsion authority, covered expulsion. So any incidental expulsion authority conferred by § 1182(f) would have been superfluous. Moreover, reading § 1182(f), a provision that sat alongside other exclusion provisions, to confer expulsion authority would contravene the fundamental "distinction ... carefully preserved in" the INA between exclusion and expulsion, as identified by the Supreme Court in *Leng May Ma*.[125]

**2**

**\*42**  The historical backdrop to the INA supports *Leng May Ma*'s reading of the INA's text and structure. The INA tracked a distinction between exclusion and expulsion that arose with the dawn of federal immigration law. Ever since the first federal immigration restrictions, statutes distinguished between the power to deny entry (*i.e.*, exclude) and the power to remove those who had already entered (*i.e.*, expel).

Let's go back to the beginning of major federal restrictions on immigration —the Page Act of 1875. [126] Like many of the "first federal immigration controls," the Page Act "contained no deportation provision[ ]." [127] It punished the importation of certain immigrants, and it banned others from entering. [128] But it provided only for exclusion, not expulsion.

From there, entry and importation restrictions expanded. For example, the statute at issue in one of the most famous cases in the U.S. Reports, *Church of the Holy Trinity v. United States*, was the Alien Contract Labor Act of 1885. [129] It prohibited "any person, company, partnership, or corporation" to "assist or encourage the importation or migration of any alien" laborer. [130] Under that law, the "penalty" for violation was "visited only upon the party who aid[ed] and assist[ed] the immigrant," which is why the church was the defendant in the case. [131] So, in 1887, Congress amended the law to provide that the covered immigrants "should be sent back" upon arrival "to the nations to which they belonged." [132]

The Treasury Secretary, who was tasked with enforcing the law, thought it gave him only power to exclude, not to expel. So he wrote to Congress requesting "[a]n enlargement of [his] powers." [133] As he explained, his enforcement power "terminate[d] when the landing of the immigrant ha[d] been consummated." [134] But as should surprise no one, aliens had wised up to the restrictions. They would sneak into the country, often through Canada, thereby evading the exclusion and return provisions. [135]

Thus, the Secretary requested that Congress "provide that in all cases where, within a reasonable time after the landing or entry of the immigrant," if an alien were found to have unlawfully entered, the Secretary be empowered to seize and expel him. [136] The Secretary also included recommended statutory language. Just three months later, in October 1888, Congress passed legislation that tracked the Secretary's recommended expulsion provision nearly word-for-word. [137]

**\*43** That 1888 Act would lead to the passage of the first "generalized" expulsion authority just a few years later. [138] Specifically, the Act of March 3, 1891 "ma[de] noncitizens deportable for one year following entry if they were found to have entered in violation of the law." [139]

The Supreme Court seemed to understand that these provisions were what authorized expulsion. As the Court put it in *The Japanese Immigrant Case* about a decade later, these two Acts —from 1888 and 1891 —made "clear that Congress did not intend that" an alien's "mere entering the country, should place him at all times thereafter entirely beyond the control or authority of the executive officers of the government." [140]

This backdrop is important for two reasons.

*First*, it suggests that ever since the first federal immigration restrictions, exclusion and expulsion —or as Judge Katsas put it, "entry and removal" —were "distinct concepts." [141] And a ban on entry was understood to authorize exclusion but not expulsion.

*Second*, the 1891 Act did not go away. It continues to exist almost a century and a half later. The 1891 Act would be followed by its "direct descendant" in the INA, § 241(a)(1), the expulsion provision discussed above, which continued "to enable the government to expel aliens who had no right to enter the country." [142] That provision would later become 8 U.S.C. § 1227(a)(1)(A). [143] So the history of immigration law reinforces that to look for expulsion authority, we need to look elsewhere than § 1182(f). [144]

**3**

**\*44** One more note on §§ 1182(f) and 1185(a)(1). When Congress passed the INA in 1952, it did not create these provisions ex nihilo. It formed them out of two "[p]recursor provisions," the Alien Visa Act of 1941 and the Wartime Measure Act of 1918. [145] And although the evidence is far from conclusive, neither of those precursors appears to have been understood to confer expulsion authority.

To simplify a bit, both the Wartime Measure Act of 1918 and the Alien Visa Act of 1941 authorized the President during wartime to impose additional "restrictions and prohibitions ... upon the departure of persons from and their entry into the United States." [146] Both also made it "unlawful ... [f]or any alien to depart from or enter ... except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe." [147] The

provisions also prescribed fines and imprisonment for any violation. [148]

The courts, for their part, do not seem to have read these provisions as conferring expulsion authority. Instead, the courts reasoned that these provisions allowed the President to make entry unlawful. [149] And once he had made entry unlawful, he could expel on the basis of other provisions providing for expulsion. [150]

The presidential responses are also somewhat informative, even if far from dispositive. [151] The parties have identified no evidence that any President assumed expulsion authority under these provisions. President Wilson's proclamation in response to the 1918 Act, and his accompanying executive order, said nothing about expulsion; President Wilson announced conditions on entry and departure and cited the punishment provision included in the Act. [152] President Roosevelt's proclamation and regulations (contained in 8 C.F.R. §§ 175.53 and 175.57 [153] ) likewise said nothing about expulsion. [154] Instead, Roosevelt ordered executive officials to "bring[ ] to trial and punishment any" violators. [155]

### 4

**\*45** Earlier I adverted to a statutory provision that descends from the very first statutory expulsion provision. One might think that modern provision, 8 U.S.C. § 1227(a)(1)(A), continues to authorize expulsion today just as its predecessor did. But in what appears to have been an act of extraordinary irony, when Congress passed IIRIRA in 1996 "to protect the Executive's discretion," [156] Congress may have obliterated this century-old, statutorily authorized expulsion power.

How did Congress do it? By adding three little words. Pre-IIRIRA, the INA provided that "[a]ny alien ... in the United States" should "be deported if ... at the time of entry," he was "excludable by the law existing at such time." [157] IIRIRA replaced it with text providing that "[a]ny alien ... in **and admitted to** the United States" should "be removed if ... at the time of entry" he was "inadmissible by the law existing at such time." [158]

The key is that IIRIRA defines "admitted" to mean only "the *lawful entry* of the alien into the United States after inspection

and authorization by an immigration officer." [159] Millions upon millions of illegal immigrants fall outside that category —including the plaintiffs. [160]

### C

To be clear, I need not resolve —and do not purport to resolve —the question of the President's statutory expulsion authority. Perhaps he has that authority; perhaps he doesn't. For this case, it doesn't matter. Either way, he has *inherent* expulsion authority. [161]

**\*46** To support that conclusion, I start with the originalist case for an inherent Executive expulsion power. Then, I turn to the doctrinal case.

### 1

### a

Constitutional theory has long faced a problem. The Constitution expressly allocates a number of foreign affairs powers: the declare war power to Congress; the Commander-in-Chief power to the President; the power to define and punish international-law offenses to Congress; the power to receive ambassadors to the President. But the Constitution doesn't clearly allocate all foreign affairs powers. Many are missing. For example, nowhere does the Constitution spell out which "of the political branches is ... to communicate with foreign ministers, to issue passports, or to repel sudden attacks." [162] "These 'missing' powers, and a host of others, were clearly intended for, and have always been exercised by, the federal government, but where does the Constitution say that it shall be so?" [163]

The most plausible theory may come from an oft-criticized precedent of the Supreme Court, *United States v. Curtiss-Wright Export Corp*. [164]

*Curtiss-Wright* involved a law "that made it a crime to provide arms to two countries involved in a conflict in Latin America if the President determined that an arms embargo would 'contribute to the reestablishment of peace between those countries.' " [165] The Court held that that law did not violate

the non-delegation doctrine, because the doctrine did not apply with equal force in the foreign affairs context.[166]

The Court reasoned that domestic and foreign affairs were "different, both in respect of their origin and their nature."[167] For domestic powers, the Constitution "carve[d]" out those powers "from the general mass" of "powers then possessed by the states."[168] Those not expressly enumerated, then, stayed with the states.[169] But "the states severally never possessed international powers."[170] And they passed to the United States not from the express enumeration in the Constitution, but from the nature of the Union as the supreme sovereign.[171]

History supports *Curtiss-Wright*'s analysis. Even before the Founding, and "long before being granted them in the 1781 Articles of Confederation," "[t]he Continental Congress ... exercised" a host of powers understood to be inherent in sovereignty, including foreign affairs powers.[172] Justice Iredell recognized that in 1795. As he put it, "that previously thereto [the National Government] did exercise, with the acquiescence of the States, high powers of what I may, perhaps ... call external sovereignty, is unquestionable."[173] Or as Alexander Hamilton wrote in 1780, the Continental Congress "ha[s] done many of the highest acts of sovereignty, which were always che[e]rfully submitted to —the declaration of independence, the declaration of war, the levying an army, creating a navy, emitting money, making alliances with foreign powers," &c.[174] "[A]ll these implications of a complete sovereignty were never disputed ...."[175]

**\*47** *Curtiss-Wright* even finds theoretical support in the work of one of the most influential Founders, James Wilson.[176] Like the Court in *Curtiss-Wright*, Wilson thought that from the nature of the national structure recognized by the Constitution, certain powers to act "for national purposes" followed.[177] And Justice Sutherland, the author of *Curtiss-Wright*, "drew heavily on Wilson's views in his pre-judicial writings about sovereign power."[178]

One of the sovereign powers was the power to "control the country's borders."[179] As Vattel explained, "every nation has a right to refuse admitting a foreigner into her territory."[180] That right to exclude "flow[ed] from the rights of domain

and sovereignty."[181] And it included the power "to render" the prohibition "effectual,"[182] including by expelling the foreigner from the land.[183] So, as Justice Scalia explained, "there was no need to set forth control of immigration as one of the enumerated powers of Congress."[184] It was widely understood as "an inherent attribute of sovereignty."[185]

**\*48** That explains why in 1798, Congress could pass the Alien Friends Act, authorizing the President to "*order* all such *aliens* as he shall judge dangerous to the peace and safety of the United States ... to depart out of the territory of the United States."[186] No textual hook provided the authority, although the text does assume it.[187]

### b

A difficulty besets the sovereign-powers inquiry, though. We do not know which sovereign powers belong to which branch. Still, as *Curtiss-Wright* suggests, when neither text nor history suggests otherwise, sovereign powers over foreign affairs rest, by default, with the President.[188] And no text or history overrides that default rule as to the expulsion power.

### i

Start with the default rule. Many foreign affairs powers fall more naturally within the domain of the President, who has been granted the "executive Power,"[189] rather than Congress which has been granted "legislative Powers."[190]

The historical backdrop to the Constitution is telling. "English law undoubtedly informed" the Founders' "understanding of the government they were forging."[191] And the Founders knew that in England, foreign affairs powers traditionally belonged to the Executive. Blackstone, for example, "described powers over 'intercourse with foreign nations' as 'prerogative' powers naturally belonging to the King."[192] Locke wrote that the executive power and foreign affairs powers, though "really distinct in themselves," were "hardly to be separated, and placed at the same time in the hands of distinct persons."[193] And Montesquieu, who "had perhaps the most influence of any political theorist on our Constitution's division of powers,"[194] thought that foreign

affairs powers generally belonged to the Executive.[195] Thus, even scholars who have argued foreign affairs powers don't fit within the ordinary meaning of the term "executive Power" as used in Article II have agreed that "many thought that the various foreign affairs competences ought *usually* to be vested in the same hands that held the executive power."[196]

**\*49** Another reason to think foreign affairs powers generally fall to the President is that many are not legislative in nature. The core of the legislative power appears to have been the power to make "generally applicable rules of private conduct."[197] But President Jefferson didn't make a generally applicable rule of private conduct when he sent the Navy to fight off the Barbary pirates.[198] Nor did President Washington when he assumed authority to communicate on behalf of the nation with the King of Morocco.[199]

Structural considerations also support a default rule of presidential foreign affairs power. Take the protective power, for example. Justice Nelson explained why structural considerations support a presidential protective power in *Durand v. Hollins*, an antebellum case upholding an Executive Branch decision to bombard Greytown, Nicaragua:

> Now, as it respects the interposition of the executive abroad, **for the protection of the lives or property of the citizen, the duty must, of necessity, rest in the discretion of the president.** Acts of lawless violence, or of threatened violence to the citizen or his property, cannot be anticipated and provided for; and **the protection, to be effectual or of any avail**, may, not unfrequently, **require the most prompt and decided action**.[200]

Due to Congress's nature as a large, deliberative body, it does not have the tools to take the sort of "prompt and decided action" needed to protect "the lives or property of" our "citizen[s]" against sudden threats.[201] Only the President does. Only he has the requisite "characteristic of unity at all times,"[202] which is "essential to the protection of the community against foreign attacks."[203]

**\*50** What is true of the protective power is true of many powers touching on foreign affairs and national security. The President's power in these domains is grounded, in part, in "the structural advantages of a unitary Executive."[204] Success in national security and foreign affairs depends on "[d]ecision, activity, secrecy, and dispatch," traits that "characterize the proceedings of one man in a much more eminent degree than the proceedings of any greater number."[205] Just imagine how successful an operation like the recent Maduro arrest would be —an operation requiring "[d]ecision, activity, secrecy, and dispatch" if there ever was one —if every congressman had to approve it beforehand.[206] Or just imagine how negotiations with foreign powers would go if 535 congressmen got to participate.

The historical evidence from shortly after the Founding also supports the default rule I have suggested. "The president from the beginning has possessed the power, as Madison put it at the Convention, 'to repel sudden attacks' on the nation."[207] And when wrestling through whether to abide by certain treaties with France, Washington and his administration seemed to think Washington could unilaterally terminate the treaties so long as that termination accorded with the Law of Nations.[208] So too did Washington determine he had constitutional authority to proclaim on behalf of the United States that the nation would "with sincerity and good faith adopt and pursue a conduct friendly and impartial toward the belligerent powers" during the conflict between England and France.[209]

To be clear, I do not mean to suggest that the best originalist theory is that every foreign affairs power belongs exclusively to the President. Some powers may belong to Congress,[210] and some may be shared.[211] So one will need to proceed power by power. But the default constitutional position is that the President has inherent power over foreign affairs.

ii

**\*51** That default constitutional position is sufficiently supported by the history in the case of the expulsion power.

Before the Founding, the King appears to have exercised "the power to expel aliens ... without the consent of parliament."[212] Indeed, Blackstone called the power to

exclude and expel one of the "principal prerogatives of the king, respecting this nation's intercourse with foreign nations."[213] Even aliens who came from friendly nations and "behave[d] peaceably" were "liable to be sent home whenever the king s[aw] occasion."[214]

To be fair, a leading originalist scholar, Michael McConnell, has cast doubt on whether the Founders would have recognized this power. McConnell relies, in part, on the debates from 1792–93 in England about what to do in response to a refugee crisis from revolutionary France.[215] McConnell notes that "the British government investigated ... whether the Crown had authority to exclude or expel classes of foreigners without parliamentary sanction."[216] And he says that the British Government "obtained a legal opinion" —referring presumably to the report of Serjeant Hill rendered in November 1792 to the treasury solicitor —"which concluded, contrary to Blackstone, that although the king could exclude or expel" alien enemies, "he had no such authority" as to alien friends.[217]

With the utmost respect for McConnell's decades of exceptional scholarship, I have a somewhat different view about the history and importance of the British debates of 1792–93.

For one thing, those debates are less relevant than Blackstone's *Commentaries*, which were "widely read and accepted by the framing generation as the most satisfactory exposition of the common law of England."[218]

For another, the report of Serjeant Hill does not exist in a vacuum. The Crown lawyers also weighed in. They concluded "that the king did have a general power to prevent aliens from entering the kingdom or remaining there," although they acknowledged that it "had been so little used that it would be advisable" as a matter of political expediency "to have recourse to an act of parliament."[219] As then–Foreign Secretary Lord Grenville explained, "[o]ur lawyers seem clear, and Blackstone expressly asserts, that the King may prevent any alien from coming into the kingdom, or remaining there."[220]

 **\*52**  The ultimate resolution of the matter is at least consistent with these views. Parliament passed a statute giving the King absolute discretion to expel aliens whenever he should "think necessary for the publick Security."[221] That is hardly a grand statement of parliamentary authority.

Moreover, there is little evidence Parliament passed the statute because of a perceived legal necessity. In fact, Foreign Secretary Lord Grenville himself was the one who "introduced" the statute.[222] In doing so, Grenville reaffirmed "that it appeared to be part of the prerogative of the Crown to forbid foreigners to enter or reside within the realm; and this statement was apparently not challenged."[223]

The post-ratification practice fits this vision, too. The Alien Friends Act of 1798 authorized the President to deport "all such *aliens* as he shall judge dangerous to the peace and safety of the United States."[224] In the words of Justice Thomas, this Act "gave the President" virtually "unfettered discretion."[225] One explanation for that sweeping delegation might be that the President has an inherent expulsion power,[226] although admittedly it could also be that non-delegation concerns simply didn't apply in this context.[227]

**2**

I do not wish to draw overly firm conclusions about the originalist bona fides of an inherent executive expulsion power. But even if the original history is inconclusive, the doctrinal case is clear and compelling. It goes like this:

**P1**: The President has inherent power to exclude aliens.

**P2**: The power to exclude = the power to expel.

∴ The President has inherent power to expel aliens.

Premise 1 is grounded in a holding of the Supreme Court in *United States ex rel. Knauff v. Shaughnessy*.[228] Premise 2 is grounded in *Fong Yue Ting v. United States*, where the Court explained that "[t]he power to exclude aliens, and the power to expel them, rest upon one foundation, are derived from one source, are supported by the same reasons, and are in truth but parts of *one and the same power*."[229]

*Fong Yue Ting*'s conclusion was sensible. As our court explained in *Huisha-Huisha*, the power to block entry "could be rendered largely nugatory" if it did not bring with it the

power to take "action against a covered alien who disregarded the prohibition and managed to set foot on U.S. soil." [230]

**\*53** Take a hypothetical. Imagine you are serving as a bouncer for a Christmas gala. In that role, you are to exclude anyone you think poses a danger to any of the guests. The day of the event comes, and you are stationed at the entrance. A nefarious-looking gentleman approaches and begins inquiring into the whereabouts of one of the guests. [231] You grow suspicious. You determine the gentleman may pose a danger. So you deny him entry. A few moments later, you spot the gentleman advancing a couple steps into the venue, apparently attempting to sneak up behind the very man whose whereabouts he had inquired about. What to do? Must you stand on the sidelines and watch, simply because you only have authority to deny entry? Of course not. The authority to deny entry naturally brings with it some authority to remove. [232]

More fundamentally, though, *Fong Yue Ting*'s claim that exclusion and expulsion are "one and the same power" was a holding of the Court. [233] The logic of *Fong Yue Ting* worked like this:

**P1**: Congress has power to exclude aliens. [234]

**P2**: The power to exclude = the power to expel. [235]

∴ Congress has power to expel aliens. [236]

Thus, Premise 2 was "necessary to th[e] result" the Court reached, and so "we are bound" by it. [237]

Since *Fong Yue Ting*, many Supreme Court cases have followed suit in recognizing inherent executive expulsion

authority. [238] Even if the statements in these later cases are dicta, they reinforce my understanding of the doctrine. After all, 130 years of Supreme Court dicta, even if not binding, cannot be dismissed willy nilly. [239]

**\*54**

\* \* \*

The doctrine affirms what the originalist analysis suggests: The President possesses inherent expulsion authority. Thus, Judge Katsas was right that the executive actions enjoined by the district court were "unlawful" not because the president lacks expulsion authority but "because" they "conflict[ ] with" the procedural requirements in §§ 1225(b) and 1229a. [240] Thus, § 1252(f)(1), which forbids inferior courts from ordering executive officials to comply with §§ 1225(b) and 1229a, forecloses the injunctive relief issued here.

### IV

In sum, although I agree with the majority on several fronts, I disagree on three: First, the district court improperly issued relief to innumerable individuals without standing. Second, the Executive possesses discretion to categorically and ex ante deny asylum, and once he has done so, he need not accept frivolous and futile asylum applications. Third, § 1252(f)(1) stripped the district court of authority to issue the injunction in this case.

I respectfully concur in part and dissent in part. [241]

### All Citations

--- F.4th ----, 2026 WL 1110616

---

### Footnotes

1    Individuals who are not in any kind of removal proceeding may also file an affirmative application for asylum. 8 U.S.C. § 1158(a)(1); 8 C.F.R. § 208.1(a)(1).

2    We assume without deciding that the President may himself exercise the discretionary authority over asylum that the INA vests in the DHS Secretary and the Attorney General.

3    Any regulation under either Section 1158(b)(2)(C) or Section 1158(d)(5)(B) would also have to be "consistent" with the asylum statute, *see* 8 U.S.C. § 1158(b)(2)(C) (requiring regulations to be consistent "with this

section"), or the INA more broadly, *see id.* § 1158(d)(5)(B) (mandating regulations "not [be] inconsistent with this chapter"). *See, e.g.*, *E. Bay Sanctuary Covenant*, 993 F.3d at 669–71 (invalidating a Section 1158(b)(2)(C) regulation that made foreign individuals ineligible for asylum based on their place of entry as inconsistent with Section 1158(a)(1)). As already discussed, the Proclamation and Guidance squarely conflict with several statutory provisions.

4    We decline to address the Government's forfeited assertion that Section 1231(h) of Title 8 precludes judicial relief for APA claims challenging the legality of agency guidance under the withholding statute. The only place the Government even hinted at this argument to the district court was in a footnote in its summary judgment brief, *see* Gov't Summary Judgment Br. at 59 n.5, *RAICES v. Noem*, No. 25-306 (D.D.C. July 2, 2025), which simply quoted Section 1231(h) with no explanation. That is not enough to preserve an argument for appeal. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

5    The United States Code's codifiers, not Congress, chose to place the directive to promulgate Convention Against Torture removal-withholding rules at Section 1231 in the codified immigration laws. *See* 8 U.S.C. § 1231 note. Both because the rule, not the statute, establishes the applicable process, and because "[t]he legislative intent of Congress is to be derived from the language and structure of the statute itself, if possible, not from the assertions of codifiers," *United States v. Lanier*, 520 U.S. 259, 267 n.6, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), that placement does not subject the Convention Against Torture removal process to Section 1252(f)(1)'s remedial restriction. *See Warner v. Goltra*, 293 U.S. 155, 161, 55 S.Ct. 46, 79 L.Ed. 254 (1934) ("The compilers of the Code were not empowered by Congress to amend existing law, and doubtless had no thought of doing so.").

6    Contrary to our dissenting colleague's interpretation of the district court's injunction, the district court never held that it was requiring the Executive to follow statutory procedures "for removal." *See* Diss. Op. —— (quoting not from the district court's injunction but from its irreparable harm analysis—which applied to the injunction as a whole—in support of the assertion that the district court ordered the Government to follow the statutory removal procedures in Sections 1225(b)(1) and 1229a).

1    JA 292 (emphases added).

2    *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016) (Roberts, C.J., concurring)). Because here the district court both certified the class *and* issued relief to it, I need not reach the issue of whether certification posed a problem. *See id.* at 431 n.4, 141 S.Ct. 2190 (declining to "address ... whether every class member must demonstrate standing *before* a court certifies a class").

3    *See* Satyaki Paul et al., *Sentinelese Contacts: Anthropologically Revisiting the Most Reclusive Masters of the* Terra Incognita *North Sentinel Island*, 11 Humans. & Soc. Scis. Commc'ns 1, 2 (2024).

4    *Sentinelese in India*, Joshua Project (accessed February 25, 2026), https://perma.cc/Y3JN-863M; *see also The Sentinelese*, Survival International (accessed February 25, 2026), https://perma.cc/H8L8-WAN7 ("The Sentinelese are the most isolated Indigenous people on Earth ....").

5    *See, e.g.*, J. Oliver Conroy, *The Life and Death of John Chau, the Man Who Tried to Convert His Killers*, The Guardian (Feb. 3, 2019), https://perma.cc/SYK5-6J3F.

6    *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

7    *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 383, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024); *Clapper v. Amnesty International USA*, 568 U.S. 398, 401, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).

8      "The Proclamation's authority to suspend entry is not challenged here." Maj. Op. ——.

9      *Honig v. Doe*, 484 U.S. 305, 320, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

10      *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (discussing *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

11      *Id.* at 102, 103 S.Ct. 1660 (acknowledging that past conduct is relevant to assessing future risk).

12      *See, e.g.*, *Honig*, 484 U.S. at 320–21, 108 S.Ct. 592.

13      *See TransUnion*, 594 U.S. at 431, 141 S.Ct. 2190; *see also Mirabelli v. Bonta*, —— U.S. ——, 146 S. Ct. 797, 803, —— L.Ed.2d —— (2026) (per curiam) (assessing whether each class member had standing to seek injunctive relief under Rule 23(b)(2)).

14      925 F.3d 1291 (D.C. Cir. 2019).

15      *Id.* at 1324.

16      606 U.S. 831, 145 S.Ct. 2540, 222 L.Ed.2d 930 (2025).

17      *J.D.*, 925 F.3d at 1323.

18      *TransUnion*, 594 U.S. at 431, 141 S.Ct. 2190; *see also Mirabelli*, 146 S. Ct. at 803 (determining whether each plaintiff had standing to seek relief even in a Rule 23(b)(2) class action seeking injunctive relief).

19      *CASA*, 606 U.S. at 852, 145 S.Ct. 2540 (emphasis removed). I do not reach any issues with universal vacatur, which unlike a universal injunction, may be statutorily authorized, and like certain injunctions, may provide relief to non-parties only incidentally. *Cf. id.* at 847 n.10, 145 S.Ct. 2540.

20      *Id.* at 861, 145 S.Ct. 2540.

21      *Dellums v. U.S. Nuclear Regulatory Commission*, 863 F.2d 968, 978 n.11 (D.C. Cir. 1988).

I agree with Judge Katsas that *J.D.*'s "one-plaintiff rule" can at most apply "only when, the class seeks" a truly "indivisible remedy" such that "courts cannot dole" it "out plaintiff by plaintiff, or class-member by class-member." *RAICES v. Noem*, No. 25-5243 (Aug. 1, 2025) (slip op. at 57) (Katsas, J., concurring in part and dissenting in part) (cleaned up); *see also Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439–40, 137 S.Ct. 1645, 198 L.Ed.2d 64 (2017) (holding that any one-plaintiff rule still requires that additional parties "have Article III standing in order to pursue relief that is different from that which is sought by a party with standing").

22      28 U.S.C. § 2201(a) (authorizing courts to "declare the rights and other legal relations of any interested party seeking such declaration").

23      *Shady Grove Orthopedic Associates, PA v. Allstate Insurance Co.*, 559 U.S. 393, 408, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010) (plurality opinion of Scalia, J.); *see also TransUnion*, 594 U.S. at 431, 141 S.Ct. 2190 (treating even absent class members as ordinary plaintiffs when determining who may get relief).

24      464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984).

25      *Appling v. State Farm Mutual Auto Insurance Co.*, 340 F.3d 769, 775 (9th Cir. 2003) (describing offensive non-mutual collateral estoppel); *Mendoza*, 464 U.S. at 162, 104 S.Ct. 568 (holding that offensive non-mutual collateral estoppel doesn't apply against the Government).

26    An alternative approach would let future class members later opt in if the class wins and opt out if the class loses. But ending "one-way intervention" was "one of the major impetuses behind the modern Rule 23." Brian T. Fitzpatrick, *The Future of Class Actions after Oral Argument in Trump v. CASA*, FedSoc Blog (May 22, 2025), https://perma.cc/28PX-5E8T.

27    On opt out, see *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Of course, it has been commonly thought that opt out is not required in a Rule 23(b)(2) class. But the traditional explanation is that the "class seeks an indivisible" remedy "benefitting all its members at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362–63, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Perhaps dispensing with opt out makes sense when the relief *necessarily* "affect[s] the entire class at once." *Id.* at 361–62, 131 S.Ct. 2541. But it makes much less sense when a Rule 23(b)(2) class involves a remedy that is not truly indivisible. *Cf. RAICES*, *supra*, at 57 (Katsas, J., concurring in part and dissenting in part) ("[T]his case involves no such indivisible remedy because awarding complete relief to any one plaintiff or class-member would be readily feasible."); 2 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 4:34 (6th ed. 2022 and Dec. 2025 Update) (explaining that many courts find Rule 23(b)(2) class actions appropriate merely when the "class's claims are 'cohesive,'" an inquiry that "is similar to 23(b)(3)'s demand that common issues 'predominate'").

      As to adequacy, see *Shutts*, 472 U.S. at 812, 105 S.Ct. 2965 ("the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members"). Adequacy concerns loom all the larger if future class members get no opportunity to opt out. *See* Newberg & Rubenstein, *supra*, § 4:27 ("Because Rule 23(b)(2) classes are non-opt-out classes, Rule 23(a)'s insistence" on adequacy, among other things, "takes on special resonance ....").

28    Fed. R. Civ. P. 23(e); *id.* 23(e)(5).

29    *Devlin v. Scardelletti*, 536 U.S. 1, 8–9, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002).

30    Fed. R. Civ. P. 23(e).

31    *Id.* 23(e)(1)(B).

32    Would someone like Bob, *see supra*, get notice?

33    *Devlin*, 536 U.S. at 9, 122 S.Ct. 2005.

34    *Cf. id.* at 11, 122 S.Ct. 2005.

35    *See* Fed. R. Civ. P. 23(f).

36    *Cf.* Fed. R. App. P. 4 (a "notice of appeal ... must be filed with the district clerk within" a certain amount of time).

37    *See CASA*, 606 U.S. at 849, 145 S.Ct. 2540.

38    *Cf. id.* at 868, 145 S.Ct. 2540 (Alito, J., concurring) (cautioning against interpretations of class actions that would bring "the universal injunction" back "from the grave").

39    563 U.S. 493, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011).

40    *Id.* at 500–01, 131 S.Ct. 1910.

41    *Id.* at 510–11, 517–22, 131 S.Ct. 1910.

Refugee and Immigrant Center for Education and Legal Services..., --- F.4th ---- (2026)
2026 WL 1110616

42    *Id.* at 531, 131 S.Ct. 1910 (quoting 18 U.S.C. § 3626(a)(1)(A)).

43    *Id.*

44    *Id.* at 530, 131 S.Ct. 1910.

45    *Id.* at 531–32, 131 S.Ct. 1910.

46    *Id.* at 532, 131 S.Ct. 1910.

47    Even if the majority's reading were the most facially plausible, I would hesitate to read *Brown* that way for two reasons. First, it would be uncharitable to the Court. We would have to assume the Court adopted an extraordinary and novel theory of class actions in an off-hand comment. *See also supra*, at —— – —— (noting some concerns with this theory of class actions). Second, if the Court meant to announce this novel doctrine of class actions, it slipped past the dissent. That's telling. The dissent did not spare its criticism of the majority's understanding of class actions. *See Brown*, 563 U.S. at 552, 131 S.Ct. 1910 (Scalia, J., dissenting).

48    *Brown*, 563 U.S. at 531, 131 S.Ct. 1910 (majority opinion).

49    *Id.* at 532, 131 S.Ct. 1910.

50    *See, e.g.*, *Bost v. Illinois State Board of Elections*, —— U.S. ——, 146 S. Ct. 513, 519–20, 223 L.Ed.2d 357 (2026) (holding that candidates have standing to challenge "the rules that govern the counting of votes in [their] election[s]" because they "are not mere bystanders in their own elections" (quotation omitted)); *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 110, 145 S.Ct. 2121, 222 L.Ed.2d 370 (2025) ("To demonstrate standing, ... plaintiffs must show that they ... are not mere bystanders."); *Hollingsworth v. Perry*, 570 U.S. 693, 707, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013) ("Article III standing 'is not to be placed in the hands of "concerned bystanders" ' " (quoting *Diamond v. Charles*, 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986))).

51    *Wal-Mart*, 564 U.S. at 342, 131 S.Ct. 2541.

52    *TransUnion*, 594 U.S. at 431, 141 S.Ct. 2190.

53    *Bouaphakeo*, 577 U.S. at 466, 136 S.Ct. 1036 (Roberts, C.J., concurring) (quoting *Lewis v. Casey*, 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

54    IIRIRA, § 604(a), 110 Stat. 3009–690–3009–691 (1996); 8 U.S.C. § 1158(b)(1)(A); *see also INS v. Aguirre-Aguirre*, 526 U.S. 415, 420, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).

55    *Secretary of Labor v. KC Transport, Inc.*, No. 22-1071, —— F.4th ——, ——, 2026 WL 1042075, at *24 (D.C. Cir. 2026) (Walker, J., dissenting); *see also Trump v. United States*, 603 U.S. 593, 610, 144 S.Ct. 2312, 219 L.Ed.2d 991 (2024); *Myers v. United States*, 272 U.S. 52, 133, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (executive officials serve only as the President's "alter ego[s]"); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 610, 9 L.Ed. 1181 (1838) (explaining that "the discharge" of discretionary duties by "officers in the executive department ... is under the direction of the President"); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66, 2 L.Ed. 60 (1803).

56    Maj. Op. —— – —— & n.2.

57    *See* Maj. Op. ——.

58    Maj. Op. ——; *see also* 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States ... may apply for asylum ....").

59    27 F.4th 718, 731 (D.C. Cir. 2022).

60    *RAICES*, *supra*, at 37 (Millett, J., concurring); *see also id.* at 55 (Katsas, J., concurring in part and dissenting in part).

61    Fed. R. Civ. P. 11(b)(2).

62    Fed. R. App. P. 4(a)(1)(B); *see also id.* 4(a)(1)(A).

63    *Id.* 38.

64    *E.g.*, 18 U.S.C. § 3742(a) ("A defendant may file a notice of appeal in the district court for review of an otherwise final sentence ....").

65    *See Halbert v. Michigan*, 545 U.S. 605, 125 S.Ct. 2582, 162 L.Ed.2d 552 (2005); *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

66    *Smith v. Robbins*, 528 U.S. 259, 278, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

67    *Id.* at 272, 120 S.Ct. 746; *see also Griffin v. Illinois*, 351 U.S. 12, 24, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring in the judgment) (granting the right to counsel in criminal appeals but emphasizing that a State may "protect itself so that frivolous appeals are not subsidized and public moneys not needlessly spent").

68    IIRIRA, § 604(a), 110 Stat. 3009–694.

69    8 U.S.C. § 1158(d)(6).

70    *See* Fed. R. Civ. P. 11(b), (c).

71    *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 764, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005).

72    *Id.*

73    *TransUnion*, 594 U.S. at 424, 426, 141 S.Ct. 2190 (quotation omitted).

74    *Lujan*, 504 U.S. at 572 n.7, 112 S.Ct. 2130.

75    *Id.* (emphasis added).

76    *Id.* By "immediacy," *Lujan* is best read to mean imminence. *See id.* (explaining that an individual "has standing to challenge" an "agency's failure to prepare an environmental impact statement" before licensing a "dam," even if "the dam will not be completed for many years"). But in these contexts, imminence and causation may overlap. *See Alliance for Hippocratic Medicine*, 602 U.S. at 385 n.2, 144 S.Ct. 1540. And of course, redressability and causation are often —though not always —"flip sides of the same coin." *Id.* at 380–81 & n.1, 144 S.Ct. 1540; *see also Murthy v. Missouri*, 603 U.S. 43, 73–74 & n.11, 144 S.Ct. 1972, 219 L.Ed.2d 604 (2024); *United States v. Texas*, 599 U.S. 670, 676, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023).

77    *Gutierrez v. Saenz*, 606 U.S. 305, 321, 145 S.Ct. 2258, 222 L.Ed.2d 531 (2025) (Barrett, J., concurring in part and concurring in the judgment); *Lujan*, 504 U.S. at 572 n.7, 112 S.Ct. 2130.

78    *Department of Education v. Brown*, 600 U.S. 551, 565, 143 S.Ct. 2343, 216 L.Ed.2d 1116 (2023).

79    *Id.*

80    *Gutierrez*, 606 U.S. at 321, 145 S.Ct. 2258 (Barrett, J., concurring in part and dissenting in part).

81    Maj. Op. ——.

82    8 U.S.C. § 1158(d)(1).

83    *Id.*

84    *Id.* § 1158(d)(2).

85    *Id.* § 1158(d)(7) (emphases added)

86    *Id.* § 1225(b)(1)(A)(ii).

87    *Id.* § 1225(b)(1)(B)(i).

88    *Id.* § 1225(b)(1)(B)(ii).

89    *Id.* § 1225(b)(1)(B)(v).

90    *See* 8 C.F.R. § 208.30(e)(2); *see also DHS v. Thuraissigiam*, 591 U.S. 103, 110 n.5, 140 S.Ct. 1959, 207 L.Ed.2d 427 (2020); *cf. Aguirre-Aguirre*, 526 U.S. at 419, 119 S.Ct. 1439 (noting that withholding and asylum "serve similar purposes").

91    *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).

92    *Thuraissigiam*, 591 U.S. at 110 n.4, 140 S.Ct. 1959 ("even if an applicant" is eligible, "an actual grant of asylum is discretionary").

93    *Id.*

94    *INS v. Cardozo-Fonseca*, 480 U.S. 421, 428 n.5, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (cleaned up).

95    The majority also points to two regulations. But they also depend on applications having been filed. *See* 8 C.F.R. § 208.9(a); *id.* § 1003.10(b).

96    8 U.S.C. § 1158(d)(1).

97    *Id.* § 1158(d)(5)(A)(ii).

98    *Id.*

99    *Id.* § 1158(d)(5)(A)(iii).

100    *Thuraissigiam*, 591 U.S. at 112, 140 S.Ct. 1959 (cleaned up).

101    *Cardozo-Fonseca*, 480 U.S. at 450, 107 S.Ct. 1207.

102    *Thuraissigiam*, 591 U.S. at 112 n.9, 140 S.Ct. 1959 (quotation omitted).

103    *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) ("2. When the President acts in absence of either a congressional grant or denial of authority,

he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility.").

104    8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."); *see also* 8 U.S.C. § 1225(b)(1)(A)(i) (carving out an exception for certain aliens).

105    8 U.S.C. § 1229a(a)(3).

106    JA 314; *see also* JA 319 (enjoining executive officials from removing individuals "using non-statutory repatriation or removal proceedings"); JA 313 ("prohibit[ing] defendants from implementing the Proclamation, including by adopting extra-statutory expulsion procedures pursuant to § 1182(f) and § 1185(a) and the President's residual constitutional authority").

107    27 F.4th at 729.

108    *See RAICES*, *supra*, at 58 (Katsas, J., concurring in part and dissenting in part).

109    27 F.4th at 729.

110    That presumption is unrebutted with regard to the President's inherent power to exclude and expel. Rather, it is suggested by original history and confirmed by subsequent caselaw. *See infra*, Part III.C.

111    My analysis overlaps with the majority's to some degree. But not fully. For instance, the majority seems to invoke the major questions doctrine. *See* Maj. Op. ——. I do not believe that the doctrine applies in this context. To begin with, the doctrine will usually not apply when a delegation implicates foreign affairs, *see Learning Resources, Inc. v. Trump*, —— U.S. ——, 146 S. Ct. 628, 691, —— L.Ed.2d —— (2026) (Kavanaugh, J., dissenting), even if there are exceptions to that rule, *see id.* at 638–39 (lead opinion of Roberts, C.J.) (applying the major questions doctrine in a foreign affairs case that implicates the taxing power because of that power's distinctive importance). In addition, to delegate an expulsion power, Congress did not need to speak with the clarity required by the major questions doctrine because Congress did not need to speak *at all* —for the reasons I explain below, the President has inherent expulsion power. *See infra*, Part III.C; *see also* Curtis Bradley & Jack Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743, 1789–1801 (2024).

That said, because I largely agree with the majority's explanation that "departure" and "removal" are separate concepts, I do not retread that ground. *See* Maj. Op. —— – ——; *see also Trump v. Hawaii*, 585 U.S. 667, 683 n.1, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) (explaining that §§ 1182(f) and 1185(a)(1) "substantially overlap[ ]," something that would presumably be false if § 1185(a)(1) provided distinctive expulsion authority); Proclamation No. 2523, *Control of Persons Entering and Leaving the United States* (Nov. 14, 1941) (Proclamation issued under the Alien Visa Act of 1941, a "precursor provision[ ]" to § 1185(a)(1), *Trump v. Hawaii*, 585 U.S. at 692, 138 S.Ct. 2392, making it unlawful for any alien to "depart from or attempt to depart from the United States" without "a valid permit to depart").

112    *Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958).

113    To avoid the redundancy of speaking both of § 212(e) and § 215(a)(1), I refer only to § 212(e). But what is true of § 212(e) is generally true of § 215(a)(1).

114    *Id.* at 187, 78 S.Ct. 1072; *see also Landon v. Plasencia*, 459 U.S. 21, 25–27, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).

115 *Leng May Ma*, 357 U.S. at 187, 78 S.Ct. 1072.

116 *Id.* (cleaned up).

117 *Id.*

118 *See* INA, Table of Contents, 66 Stat. 163 (1952) (emphasis added); *see also id.* § 212, 66 Stat. 182.

119 *Id.* § 212(a), 66 Stat. 182.

120 *Id.* § 212(e), 66 Stat. 188.

121 *Leng May Ma*, 357 U.S. at 187, 78 S.Ct. 1072.

122 INA, Table of Contents, 66 Stat. 163; *see also Leng May Ma*, 357 U.S. at 187, 78 S.Ct. 1072.

123 *See* INA, Table of Contents, 66 Stat. 163 ("General classes of deportable aliens"); *see also id.* § 241, 66 Stat. 208.

124 Thomas Alexander Aleinikoff et al., *Immigration Process and Policy* 536–37 (3d ed. 1995); *see also infra*, Parts III.B.2, III.B.4 (discussing § 241(a)(1) and its backdrop in more depth).

125 *Leng May Ma*, 357 U.S. at 187, 78 S.Ct. 1072. There are countervailing arguments. That is part of the reason I do not reach a firm conclusion on the statutory grounds. For instance, over half a century before the INA, *Fong Yue Ting v. United States* held that the power to exclude and the power to expel go hand in hand. *See* 149 U.S. 698, 713, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); *see also infra*, at ——— – ———. That legal backdrop may also inform the proper interpretation of §§ 1182(f) and 1185(a)(1). Similarly, the Government has argued that the President's power to "impose on the entry of aliens" the restrictions and conditions "he may deem to be appropriate" allows him to provide for expulsion as a condition on illegal entry. 8 U.S.C. § 1182(f); *see also id.* § 1185(a)(1); Tr. of Oral Arg. at 19–21. That, too, finds some support in the legal backdrop to §§ 1182(f) and 1185(a)(1). *See The Japanese Immigrant Case*, 189 U.S. 86, 99, 23 S.Ct. 611, 47 L.Ed. 721 (1903) (upholding removal of an alien on the theory that he "must be taken to have entered subject to the condition that he might be sent out of the country by order of the proper executive officer ... if he was found to have ... illegally entered"). Perhaps for these reasons and others, the Supreme Court, albeit in dicta, has suggested that these provisions confer removal power. *See Trump v. Hawaii*, 585 U.S. at 683 n.1, 138 S.Ct. 2392 (noting that § 1185(a)(1) "grants the President authority to adopt reasonable rules, regulations, and orders governing entry *or removal* of aliens" and that that provision "substantially overlaps with § 1182(f)" (emphasis added) (cleaned up)).

126 Act of Mar. 3, 1875, 18 Stat. 477.

127 Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 512 & n.184 (2009).

128 *See* Act of Mar. 3, 1875, § 3, 18 Stat. 477 (banning "the importation into the United States of women for the purposes of prostitution"); *id.* § 5 (making it "unlawful" for those "undergoing" certain "sentence[s] for conviction in their own country" from "immigrat[ing] into the United States").

129 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892); *see also Zuni Public School District No. 89 v. Department of Education*, 550 U.S. 81, 108, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007) (Scalia, J., dissenting) (bemoaning *Church of the Holy Trinity*).

130 Act of February 26, 1885, § 1, 23 Stat. 332.

131 *United States v. Craig*, 28 F. 795, 798 (C.C.E.D. Mich. 1886); *see also Lees v. United States*, 150 U.S. 476, 480, 14 S.Ct. 163, 37 L.Ed. 1150 (1893). It was unclear whether the statute should be read as banning the immigration itself, rather than just the importation. *Compare Craig*, 28 F. at 798 (suggesting it did), *with* C.S. Fairchild, *Letter from the Secretary of the Treasury* 1 (July 17, 1888), https://perma.cc/X75Z-2BZQ (suggesting it did not).

132 *Treasury Letter*, *supra*, at 2; *Lees*, 150 U.S. at 480, 14 S.Ct. 163 (noting that the Act of February 23, 1887, permitted the alien "to be returned to the country from which he came").

133 *Treasury Letter*, *supra*, at 3.

134 *Id.*

135 *Id.*

136 *Id.* at 3–4. The importer or contractor would be required to pay. *Id.* at 4.

137 *Compare* Act of October 19, 1888, 25 Stat. 566, *with Treasury Letter*, *supra*, at 4.

138 Cox & Rodríguez, *supra*, at 514.

139 *Id.*

140 189 U.S. at 99, 23 S.Ct. 611.

141 *RAICES*, *supra*, at 54 (Katsas, J., concurring in part and dissenting in part).

142 *See* Aleinikoff, *supra*, at 536–37.

143 *See* IIRIRA, § 305(a)(2), 110 Stat. 3009–597–3009–598.

144 The Government suggests that this case is not even about expulsion, but about exclusion. *See* Appellant Br. 41–42. For that, the Government relies on the "entry fiction." But the Government has failed to provide adequate support for that theory in this case. The entry fiction is a doctrine holding that certain aliens present in the United States are treated as if they never entered for due process purposes. *See Thuraissigiam*, 591 U.S. at 139–40, 140 S.Ct. 1959; *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215, 73 S.Ct. 625, 97 L.Ed. 956 (1953). The entry fiction responds, in part, to the "perverse incentive" created by Supreme Court precedent applying due process rights to aliens who unlawfully sneak into the United States, but not to those who have yet to "effect[ ] an entry." *Thuraissigiam*, 591 U.S. at 140, 140 S.Ct. 1959. A problem for the Government, though, is that the entry fiction that existed in 1952, when § 212(e) was enacted, seems to have applied only to those who, say, disembarked at places like Ellis Island. *See Mezei*, 345 U.S. at 213, 73 S.Ct. 625. The Government has failed to show that the aliens subject to this Proclamation should be considered not to have effected an "entry" under that seemingly narrow exception. The Government's best argument relies on the concept of "admission." *See* Appellant Br. 41. But that fails to persuade. "Admission" was a new concept introduced by IIRIRA in 1996 largely to replace "entry." *See* Stephen H. Legomsky & Cristina M. Rodríguez, *Immigration and Refugee Law and Policy* 522 (5th ed. 2009). So the fact that these immigrants haven't been "admitted" doesn't mean they haven't "entered."

145 *Trump v. Hawaii*, 585 U.S. at 692, 138 S.Ct. 2392; *see also* Congressional Research Service, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* 1 (Feb. 21, 2024) (calling these statutes "predecessor statutes").

146 Act of May 22, 1918, § 1, 40 Stat. 559; *see also* Act of June 21, 1941, § 1, 55 Stat. 252–53.

147    Act of May 22, 1918, § 1(a), 40 Stat. 559.

148    *Id.* § 3, 40 Stat. 559; Act of June 21, 1941, § 2, 55 Stat. 253.

149    *Felich v. Meier*, 23 F.2d 185, 186–87 (8th Cir. 1927); *United States ex rel. Vajta v. Watkins*, 179 F.2d 137, 139 (2d Cir. 1950); *United States ex rel. Faneco v. Corsi*, 57 F.2d 868, 868 (S.D.N.Y. 1932).

150    *Felich*, 23 F.2d at 187; *see also Vajta*, 179 F.2d at 138–39; *Faneco*, 57 F.2d at 868–69.

151    They are not dispositive for at least two reasons. First, Presidents didn't need to provide for expulsion since it appears to have already been provided for elsewhere. Second, the failure to exercise a power does not prove that the power doesn't exist. Still, I mention this evidence because it at least accords with the theory that §§ 1182(f) and 1185(a)(1) shouldn't be read as conferring expulsion authority.

152    *See* Proclamation No. 1473, *Regulating the Issuance of Passports and the Granting of Permits to Depart From and Enter the United States* (Aug. 8, 1918); *see also* Exec. Order No. 2932, *Prescribing Rules and Regulations Governing the Issuance of Permits to Enter and Leave the United States* (Aug. 8, 1918).

153    *United States ex rel. Knauff v. Watkins*, 173 F.2d 599, 601–02 (2d Cir. 1949); *see also Mezei*, 345 U.S. at 210 n.7, 73 S.Ct. 625.

154    They spoke only of "deport[ing]" those who showed up "at a port of entry" and were excluded by the official who determined the alien was "excludable under one of the categories" set forth in the regulation. 8 C.F.R. § 175.57(a) (1945 Supp.); *see also Knauff*, 173 F.2d at 602 (Knauff "excluded and ordered deported").

155    Proclamation No. 2523, 55 Stat. 1698 (Nov. 14, 1941); *Mezei*, 345 U.S. at 211 n.7, 73 S.Ct. 625 (noting that "Presidential Proclamation No. 2523" was "promulgated" "pursuant to" these Acts).

156    *Thuraissigiam*, 591 U.S. at 112, 140 S.Ct. 1959 (cleaned up).

157    *See* 8 U.S.C. § 1251(a)(1)(A) (1995).

158    8 U.S.C. § 1227(a)(1)(A) (emphasis added); *see also* IIRIRA, § 301(d)(1), 110 Stat. 3009–579; *id.* § 305(a)(2), 110 Stat. 3009–597–3009–598.

159    8 U.S.C. § 1101(a)(13)(A) (emphasis added).

160    *See* JA 272 n.13 ("none of" the "individual plaintiffs" or "putative class members in this case" have been "admitted" under IIRIRA).

161    I reach this argument for at least four reasons. First, the "issue" here is whether § 1252(f)(1) forecloses the injunction. *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). That is squarely before us. In addressing that issue, we are "not limited to the particular legal theories advanced by the parties." *Id.* So we can address this legal theory, which helps resolve the issue whether § 1252(f)(1) forecloses the injunction. Second, this case "is founded on concerns broader than those of the parties," involving a major executive effort to curb illegal immigration. *Wood v. Milyard*, 566 U.S. 463, 471, 132 S.Ct. 1826, 182 L.Ed.2d 733 (2012); *cf. Nken v. Holder*, 556 U.S. 418, 437, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Third, addressing the President's constitutional expulsion power avoids resolving two thornier questions: (1) whether §§ 1182(f) and 1185(a)(1) confer expulsion authority and (2) whether § 1252(f)(1), "a curious provision" without "analogue elsewhere in the United States Code," is subject to forfeiture at all. *United States v. Texas*, 599 U.S. 670, 692, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023) (Gorsuch, J., concurring in the judgment) (cleaned up); *see also Biden v. Texas*, 597 U.S. 785, 801 n.4, 142 S.Ct. 2528, 213 L.Ed.2d 956 (2022) (leaving open whether § 1252(f)(1) is subject to forfeiture). There is precedent for exercising our

discretion to avoid answering that thorny forfeiture question concerning § 1252(f)(1). *See N.S. v. Dixon*, 141 F.4th 279, 288 (D.C. Cir. 2025). Fourth, if the President possesses inherent power, we might be quicker, as the Government argues, to find expulsion authority within §§ 1182(f) and 1185(a)(1). *See* Tr. of Oral Arg. at 11, 23. So these constitutional grounds may be unavoidable.

162    *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 34, 135 S.Ct. 2076, 192 L.Ed.2d 83 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part).

163    Louis Henkin, *Foreign Affairs and the U.S. Constitution* 15 (2d ed. 1996).

164    299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *see also* Curtis A. Bradley, *Sovereign Power Constitutionalism*, 92 U. Chi. L. Rev. 1807, 1810 (2025) ("*Curtiss-Wright* has been subjected to what has been described as withering criticism." (quotation omitted)). Another plausible theory is the Vesting Clause theory proposed by Saikrishna B. Prakash & Michael D. Ramsey. *See generally* Saikrishna B. Prakash and Michael D. Ramsey, *The Executive Power over Foreign Affairs*, 111 Yale L.J. 231 (2001). If correct, that theory would provide even stronger originalist grounding for an inherent executive expulsion power.

165    Bradley, *supra*, at 1816 (quoting Joint Resolution of May 28, 1934, 48 Stat. 811); *Curtiss-Wright*, 299 U.S. at 312, 57 S.Ct. 216.

166    *Curtiss-Wright*, 299 U.S. at 315, 319–22, 57 S.Ct. 216.

167    *Id.* at 315, 57 S.Ct. 216.

168    *Id.* at 316, 57 S.Ct. 216.

169    *Id.*

170    *Id.*

171    *Id.* at 316–17, 57 S.Ct. 216.

172    Bradley, *supra*, at 1831–32.

173    *Penhallow v. Doane's Administrators*, 3 U.S. (3 Dall.) 54, 91, 1 L.Ed. 507 (1795); *see also id.* at 80 (Paterson, J.) (discussing "high acts of sovereignty" that the Continental Congress took before being explicitly allocated such powers in 1781).

174    Letter from Alexander Hamilton to James Duane (Sept. 3, 1780), *in* 2 *The Papers of Alexander Hamilton, 1779–1781*, at 401 (Harold C. Syrett ed., 1961).

175    *Id.*

176    Wilson's influence at the convention has been described as "[s]econd to Madison and almost on a par with him." Max Farrand, *The Framing of the Constitution of the United States* 197 (1913); *see also* Clinton Rossiter, *1787: The Grand Convention* 247–48 (1966) (calling Wilson "[s]econd only to Madison —and an honorable second").

177    Jud Campbell, *Four Views of the Nature of the Union*, 47 Harv. J.L. & Pub. Pol'y 13, 30, 32 (2024); Jonathan Gienapp, *In Search of Nationhood at the Founding*, 89 Fordham L. Rev. 1783, 1793–1807 (2021).

178    Bradley, *supra*, at 1833 (citing George Sutherland, *The Internal and External Powers of the National Government*, 191 N. Am. Rev. 373, 377 (1910)).

179    *Id.* at 1831. Some have sought to ground powers over exclusion and expulsion in the Foreign Commerce Clause. That is doubtful.

The Foreign Commerce Clause might explain why Congress could ban ship-owners from introducing individuals. *Cf. United States ex rel. Turner v. Williams*, 194 U.S. 279, 290, 24 S.Ct. 719, 48 L.Ed. 979 (1904) (citing "the power to regulate commerce with foreign nations" as a basis for provisions dealing with "the entrance of ships, the importation of goods, and the bringing of persons into the ports of the United States"). But it likely does not explain why Congress can ban the entry by the immigrant, *id.* (citing inherent sovereign power as the basis for "forbid[ding] the entrance of foreigners" themselves), especially immigrants who enter the country for non-commercial purposes, *see Gonzales v. Raich*, 545 U.S. 1, 58, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (Thomas, J., dissenting) ("[A]t the time of the founding, the term 'commerce' consisted of selling, buying, and bartering, as well as transporting *for these purposes.*" (emphasis added) (cleaned up)); *see also* Thomas Sheridan, *A Complete Dictionary of the English Language* (4th ed. 1790) (defining "commerce" as the "[e]xchange of one thing for another"); *The Federalist* No. 41, at 262 (Clinton Rossiter ed., 1961) (James Madison). In addition, it may not explain the extensive state control over immigration at the Founding, *see* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776–1875),* 93 Colum. L. Rev. 1833 (1993) (describing these early state laws), given that the Court early on suggested Congress's commerce powers are exclusive, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 197–201, 6 L.Ed. 23 (1824); *id.* at 229–30 (John-son, J., concurring); *see also* Stephen E. Sachs, *Dormant Commerce and Corporate Jurisdiction*, 2023 Sup. C. Rev. 213, 234–35 (2024).

That said, perhaps the Necessary and Proper Clause could explain why the Federal Government may authorize expulsion as part of the punishment for an unlawful entry after a judicial proceeding. But that's not the expulsion we're dealing with. Instead, we're dealing with whether immigrants should be allowed to remain in the country. *Fong Yue Ting*, 149 U.S. at 730, 13 S.Ct. 1016 (explaining that expulsion "is not a punishment for [the] crime" of entry but instead depends on "whether the conditions exist upon which congress has enacted that an alien of this class may remain within the country"). Thus, expulsion provisions —even when responding to unlawful entry —would be, *at most*, like a regulation of people and articles that were *once in* commerce, rather than a punishment affixed to violation of a ban on transporting those people or trading in those articles. But the former probably exceeds Congress's Commerce Clause powers even as supplemented by the Necessary and Proper Clause. *Cf. United States v. Lopez*, 514 U.S. 549, 587, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Thomas, J., dissenting) (suggesting Congress does not have power to regulate articles just because they were "in the flow of commerce at one time").

180    Emer de Vattel, *The Law of Nations*, bk. 1, ch. xix, § 230 (1758) (trans., 1797).

181    *Id.* bk. 2, ch. vii, § 94.

182    *Id.*

183    *See id.* bk. 1, ch. xix, § 228 (discussing "exile" as a form of "expulsion of a foreigner" "but without a mark of infamy" attached).

184    *Arizona v. United States*, 567 U.S. 387, 422, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (Scalia, J., concurring in part and dissenting in part).

185    *Id.*

186    An Act concerning Aliens § 1, 1 Stat. 571 (1798).

187    *See Arizona*, 567 U.S. at 422, 132 S.Ct. 2492 (Scalia, J., concurring in part and dissenting in part). Whatever immigration powers the Foreign Commerce Clause might ground, it appears unable to explain the free-floating

expulsion power under the Alien Friends Act. *See supra*, note 179. Nor do textual war powers provide firmer grounding. The Alien Enemies Act was the Act more plausibly grounded in Congress's war powers. And even then, the textual basis remains unclear, as the Alien Enemies Act could be triggered without a declaration of war. *See* An Act respecting Alien Enemies, § 1, 1 Stat. 577 (1798); *see also WMM v. Trump*, 154 F.4th 207, 245–46 (5th Cir. 2025) (Oldham, J., dissenting). As far as the Alien Friends Act is concerned, it applied to aliens from any nation in the world. So it is not best grounded in war powers, since "[t]he United States" was "not at war with every nation in the world." *Learning Resources*, 146 S. Ct. at 638.

188    *Curtiss-Wright*, 299 U.S. at 319–20, 57 S.Ct. 216.

189    U.S. Const. art. II, § 1, cl. 1.

190    U.S. Const. art. I, § 1.

191    John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 27 (2001).

192    *Learning Resources*, 146 S. Ct. at 684 (Thomas, J., dissenting) (quoting 1 William Blackstone, *Commentaries on the Laws of England* *245 (1765)); *see also* 1 Blackstone, *supra*, at *240 (describing the "substantive or direct prerogatives," which are necessary "to maintain the executive power in due independence and vigour").

193    John Locke, *Two Treatises of Government* bk. 2, ch. 12, § 148 (1690). Locke generally referred to the foreign affairs powers as the "federative" power. *See id.* bk. 2, ch. 12, § 146; *see also* Curtis A. Bradley & Martin S. Flaherty, *Executive Power Essentialism and Foreign Affairs*, 102 Mich. L. Rev. 545, 560–61 (2004).

194    Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 745–46; *see also* Donald S. Lutz, *The Relative Influence of European Writers on Late Eighteenth-Century American Political Thought*, 78 Am. Political Science Rev. 189, 192–96 (1984).

195    To be sure, Montesquieu might have "betrayed some confusion" over whether this was part of the very concept of executive power. Bradley & Flaherty, *supra*, at 563–64 n.81.

196    Julian Davis Mortenson, *Article II Vests the Executive Power, Not the Royal Prerogative*, 119 Colum. L. Rev. 1169, 1257 (2019).

197    *DOT v. Association of American Railroads*, 575 U.S. 43, 76, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015) (Thomas, J., concurring); *see also Gundy v. United States*, 588 U.S. 128, 152–53, 139 S.Ct. 2116, 204 L.Ed.2d 522 (2019) (Gorsuch, J., dissenting) ("When it came to the legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons."); *see also The Federalist* No. 78, *supra*, at 465 (Alexander Hamilton); 1 Blackstone, *supra*, at *44. Of course, Congress received other powers, too, and we have come to think of those powers "as quintessentially legislative powers." Michael W. McConnell, *The President Who Would Not Be King* 274 (2020). But "many of them were actual, former, or asserted powers of the Crown, which the drafters decided to allocate to the legislative branch." *Id.*; *see also Zivotofsky*, 576 U.S. at 36, 135 S.Ct. 2076 (Thomas, J., concurring in judgment in part and dissenting in part). "These include the powers to raise and support armies, to fix the standards of weights and measures," and "to grant copyrights," among others. *Learning Resources*, 146 S. Ct. at 682 (Thomas, J., dissenting). Those are, of course, still "legislative." *See* U.S. Const. art. I, § 1 (vesting Congress with "[a]ll legislate Powers herein granted"); *see also Learning Resources*, 146 S. Ct. at 669 (Gorsuch, J., concurring). Still, the point remains. The general concept of legislative power concerned general rules of private conduct. *See* 1 Blackstone, *supra*, at *44. The unenumerated sovereign powers implicating foreign affairs generally do not fall within that bucket, although text and history may suggest that some such powers do still belong to the legislative branch.

198   *See* John Yoo, *Jefferson and Executive Power*, 88 Boston U. L. Rev. 421, 430–33 (2008) (discussing this event).

199   *See* Letter from George Washington to Sidi Mohammed (Dec. 1, 1789), https://perma.cc/UH9U-KWLN.

200   8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4,186) (emphases added).

201   *Id.*

202   *Zivotofsky*, 576 U.S. at 14, 135 S.Ct. 2076.

203   *The Federalist* No. 70, at 423 (Clinton Rossiter ed., 1961); *id.* at 424.

204   *Hamdi v. Rumsfeld*, 542 U.S. 507, 580–81, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (Thomas, J., dissenting).

205   *The Federalist* No. 70, *supra*, at 424; *see also* George Washing-ton, *Message to the House Regarding Documents Relative to the Jay Treaty* (Mar. 30, 1796), https://perma.cc/WF3N-X3QL ("The nature of foreign negotiations requires caution, and their success must often depend on secrecy ...."); *Curtiss-Wright*, 299 U.S. at 319–20, 57 S.Ct. 216.

206   *The Federalist* No. 70, *supra*, at 424. As to secrecy in particular, see *id.* (explaining that the more people privy to certain information, the more the "qualit[y]" of secrecy "will be diminished"); *WMM*, 154 F.4th at 255 (Oldham, J., dissenting) (John Adams learned a lesson about secrecy and Congress "when [Adams] set off a nationwide panic about an invasion from France simply by handing over to Congress the secret dispatches about the XYZ affair"); *id.* at 243–44 (discussing the XYZ affair and these secret dispatches).

207   Jack Goldsmith, *The Middle East and the President's Sweeping Power Over Self-Defense*, Lawfare (Oct. 23, 2023), https://perma.cc/WR9W-LX8L (quoting 2 Max Farrand, *Records of the Federal Convention of 1787*, at 318 (1911)).

208   Prakash & Ramsey, *supra*, at 324–27.

209   *Id.* at 328 (cleaned up); *see also id.* at 327–40 (discussing this with a brief postscript on the Nootka Sound Incident).

210   *See* Curtis A. Bradley, *Extradition in the Early Republic: International Law and Constitution Authority* (manuscript at 4), https://ssrn.com/abstract=5387662 (arguing that the extradition power was believed fairly early on to belong to Congress). One might also think "the law-making component of" any sovereign, foreign affairs power is "vested in Congress." Henkin, *supra*, at 90; *see also* Prakash & Ramsey, *supra*, at 327–28 n.415; *id.* at 340–46 (Congress ultimately passed a law to give legal force to President Washington's Neutrality Proclamation).

211   In fact, text and history suggest at least some immigration power is shared with Congress. *See infra*, note 227; *see also supra*, note 210; Henkin, *supra*, at 90 ("Presumably," the President "cannot enact general immigration laws by executive order.").

212   *Fong Yue Ting*, 149 U.S. at 709, 13 S.Ct. 1016.

213   1 Blackstone, *supra*, at *261.

214   *Id.* at *259–60.

215   Michael W. McConnell, *The President Who Would Not Be King* 225 (2020). McConnell also notes that "[t]he last time a monarch had exercised the prerogative to expel a class of foreigners was in 1575." *Id.* Still,

Blackstone and the debates of the early 1790s seem to provide more relevant evidence concerning the Founders' understanding of British law.

216    *Id.*

217    *Id.*; *see also* Cedric H.R. Thornberry, *Dr. Soblem and the Alien Law of the United Kingdom*, 12 Int'l & Comparative L. Quarterly 414, 423–24 (1963); J.R. Dinwiddy, *The Use of the Crown's Power of Deportation Under the Aliens Act, 1793–1826*, 41 Historical Research 193, 193 (1968).

218    *Rogers v. Tennessee*, 532 U.S. 451, 472, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001) (Scalia, J., dissenting) (cleaned up); *see also* Davison M. Douglas, *Foreword: The Legacy of St. George Tucker*, 47 Wm. & Mary L. Rev. 1111, 1112–13 (2006) ("Blackstone's *Commentaries* soon became the most widely read legal text in late-eighteenth-century America ...."); Mortenson, *supra*, at 1194 (Blackstone's "landmark treatise on English law probably influenced the Founders more than any other single source."); *id.* at 1260 n.375 ("Blackstone ... was to American lawyers what the Bible was to Protestants.").

219    Dinwiddy, *supra*, at 193.

220    Letter from Lord Grenville to the Marquis of Buckingham (Sept. 20, 1792), in *2 Duke of Buckingham and Chandos, Memoirs of the Court and Cabinets of George III* 217 (1853).

221    33 Geo. III, ch. 4, § 18, 39 Eng. Stat. 16.

222    Dinwiddy, *supra*, at 194.

223    *Id.*

224    An Act concerning Aliens, § 1, 1 Stat. 571.

225    *Sessions v. Dimaya*, 584 U.S. 148, 211, 138 S.Ct. 1204, 200 L.Ed.2d 549 (2018) (Thomas, J., dissenting).

226    *Id.* at 217–18, 138 S.Ct. 1204; *see also Learning Resources*, 146 S. Ct. at 666 (Gorsuch, J., concurring) (stating that if early statutes "granted substantial discretion" to the President over a given power, that would suggest the President was understood to have "inherent Article II authority").

227    *See Learning Resources*, 146 S. Ct. at 681 (Thomas, J., dissenting). Regardless, in this case, the power is likely shared. After all, Congress passed the Alien Friends Act.

228    338 U.S. 537, 542–43, 70 S.Ct. 309, 94 L.Ed. 317 (1950).

229    149 U.S. 698, 713, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) (emphasis added). True, *Fong Yue Ting* didn't quite say the exclusion and expulsion power are one and the same. It said only that they are parts of the same power. But in this context, that is a distinction without a difference. The logic of *Fong Yue Ting* is that the powers are indivisible. And whether the powers are indivisible or identical, the conclusion follows. So for simplicity's sake, I retain my version of Premise 2.

230    27 F.4th at 729.

231    This hypothetical generally stems from the famous dispute between Benjamin Constant and Immanuel Kant. *See* Immanuel Kant, *On a Supposed Right to Tell Lies from Benevolent Motives* (1797), *in* Immanuel Kant, *Critique of Practical Reason and Other Works on the Theory of Ethics* 232 (Thomas Kingsmill Abbott ed., 1898).

2026 WL 1110616

This, of course, also supports the Government's argument that §§ 1182(f) and 1185(a)(1) implicitly confer some expulsion authority. I agree, as I did in *Huisha-Huisha*. Still, the countervailing historical evidence I discussed above —which was not before our court in *Huisha-Huisha*, both because of the emergency posture and because the case dealt with a different statute —suggests §§ 1182(f) and 1185(a)(1) may not necessarily be best read in line with this common-sensical approach.

To be clear, though, that understanding of the statutory case does not defeat my constitutional analysis. The fact that a century after the Founding statutes seem to have separated exclusion and expulsion does not resolve the constitutional question. On the constitutional question, *Fong Yue Ting* seemed right to think that it would be strange indeed for the Government to possess constitutional authority to restrict entry while utterly lacking the constitutional authority to expel those who evade the entry restrictions. Instead, as *Fong Yue Ting* recognized, the powers travel together, at least for constitutional purposes.

149 U.S. at 713, 13 S.Ct. 1016.

*The Chinese Exclusion Case*, 130 U.S. 581, 603 (1889).

*Fong Yue Ting*, 149 U.S. at 713, 13 S.Ct. 1016.

*Id.* at 713–14, 13 S.Ct. 1016.

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

*See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (The "power to expel or exclude aliens" is "a fundamental sovereign attribute exercised by the Government's political departments."); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) ("The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government.") (quoting *Fong Yue Ting*, 149 U.S. at 713, 13 S.Ct. 1016); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ("any policy toward aliens" —including one involving "deportation" or "expulsion" —"is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government," matters which are "exclusively entrusted to the political branches of government").

*Cf. Boumediene v. Bush*, 553 U.S. 723, 799, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (Souter, J., concurring) ("if dictum it was, it was dictum well considered").

*See RAICES*, *supra*, at 58 (Katsas, J., concurring in part and dissenting in part).

I join Part III.D.2 of the majority's eloquent opinion: "Because vacatur under the APA is distinct from injunctive relief and Section 1252(f)(1) addresses only the latter," I too would "hold Section 1252(f)(1) inapplicable to the vacatur." Maj. Op. ——. In addition, for many of the reasons explained by the majority in Parts III.B.2 and III.B.3, I agree (1) that the Proclamation and Guidance are "unlawful to the extent they suspend the statutory withholding-of-removal protections that Congress has mandated" and (2) that the Guidance infringes on mandatory rules related to "the Convention Against Torture's bar against removal to a country where the person will be tortured." Maj. Op. ——, —— (cleaned up).

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.