**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

RECEIVED FOR FILING
IN CLERK'S OFFICE
2026 SEP 25 P 12: 57
US COURT OF APPEALS
FOR THE FIRST CIRCUIT

**No. 26-1212**

**D.V.D.; M.M.; E.F.D.; O.C.G.,**
Plaintiffs–Appellees,

v.

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary of the Department of Homeland Security; TODD BLANCHE, United States Attorney General; ANTONE MONIZ, Superintendent of the Plymouth County Correctional Facility,**
Defendants–Appellants.

---

**BRIEF OF AMICUS CURIAE**
**BRANDON MICHAEL HAYES, PRO SE,**
**PRESIDENT OF NATURAL LAW INSTITUTE**
**IN SUPPORT OF NEITHER PARTY**
**FOR CLARIFICATION OF THE STRUCTURAL SEQUENCE GOVERNING REMOVAL AUTHORITY, SOVEREIGN CAPACITY, AND ADMINISTRATIVE CONSEQUENCE**

---

## DISCLOSURE STATEMENT

Amicus curiae Brandon Michael Hayes submits this brief in his individual capacity as President of Natural Law Institute.

Natural Law Institute is an independent research organization. It has no parent corporation. No publicly held corporation owns ten percent or more of any interest in Natural Law Institute.

---

## STATEMENT REGARDING AUTHORSHIP, FUNDING, AND POSITION OF AMICUS

Pursuant to Fed. R. App. P. 29(a)(4)(E), as incorporated by Fed. R. App. P. 29(b)(4), amicus states:

No counsel for any party authored this brief in whole or in part.

No party or party's counsel contributed money intended to fund preparation or submission of this brief.

No person other than amicus curiae Brandon Michael Hayes or Natural Law Institute contributed money intended to fund preparation or submission of this brief.

Amicus submits this brief pro se in his individual capacity as President of Natural Law Institute.

This brief represents the independent analysis of amicus and does not represent the position of any party.

---

## SOURCE OF AUTHORITY TO FILE

Amicus contemporaneously moves for leave to file pursuant to **Fed. R. App. P. 29(b)(2)–(4).**

Rule 29(b)(2) provides that a nongovernmental amicus may file during consideration of panel rehearing or rehearing en banc only by leave of court. Rule 29(b)(3) incorporates the requirements of Rule 29(a)(3), under which the motion must state the movant's interest and explain why the proposed amicus brief is desirable and relevant to disposition of the matter.

The accompanying motion supplies those grounds.

---

## INTEREST OF AMICUS CURIAE

Natural Law Institute ("NLI") studies the operational structure of lawful decision-making, including the relationship among governmental authority, institutional function, administrative mechanism, causal nexus, and resulting consequence.

Amicus appears because this matter presents a recurring structural question:

**Before assigning additional legal duties to a governmental actor, courts must identify the governmental function being exercised, the authority supporting that function, the mechanism through which it operates, and the consequences legally attributable to that mechanism.**

This brief does not enlarge the factual record or advocate an individual immigration outcome. It offers an analytical sequence for determining where one governmental act ends, where another begins, and when a factual concern becomes a legally cognizable obligation.

That sequence is particularly relevant here because Congress has already prescribed a statutory framework governing both execution of removal orders and selection of countries of removal. See **8 U.S.C. § 1231(a), (b)**. The Supreme Court has likewise recognized that **8 U.S.C. § 1231(b)(2)** establishes the process for selecting the country to which a person ordered removed may be sent. *Jama v. Immigration & Customs Enforcement*, **543 U.S. 335, 341 (2005)**.

Administrative systems frequently contain multiple linked stages:

- classification of persons or circumstances;
- recognition of governmental authority;
- determination of removability;
- application of legally established protections;
- selection of an operative mechanism;
- evaluation of causal connection;
- execution;
- assignment of legal consequence.

When those stages are collapsed, courts risk transforming a statutory execution decision into a new adjudicative event without first identifying what new authority, object, relationship, or legally attributable consequence has arisen.

Amicus submits that clarity on this sequence will assist the Court in evaluating the relationship among removal authority, destination selection, foreign sovereign conduct, administrative discretion, and legally required protections.

---

## SUMMARY OF ARGUMENT

A final removal order begins from an antecedent legal determination: the individual is subject to removal from the United States.

Congress expressly directs that, once an individual is ordered removed, the government execute that order subject to the statutory framework governing the removal period and destination. **8 U.S.C. § 1231(a)(1)(A), (b).** Section 1231(b)(2) does not contemplate destination as an alien concept appended to removal after the fact; it contains an express hierarchy governing the countries to which removal may occur.

The operative governmental function therefore begins with **removal**, not continuing administration of the individual's future existence abroad.

That does not render destination irrelevant. Congress itself made destination legally relevant. Nor does it eliminate statutory or treaty-based protections. Section 1231(b)(3), for example, restricts

removal to a country where the Attorney General determines that the individual's life or freedom would be threatened on specified protected grounds, subject to statutory exceptions. **8 U.S.C. § 1231(b)(3)(A)–(B).** Other protection mechanisms exist through the statutory and regulatory framework governing asylum, withholding, and protection against torture. See, e.g., **8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. §§ 208.16–208.18.** The Supreme Court has expressly recognized these distinct forms of protection. *Jama*, 543 U.S. at 348.

The structural error arises when the existence of a new factual circumstance is treated as proof of a new sovereign act before that proposition is established.

The prior question is:

**What governmental act is occurring, and what legally distinct relationship does that act create?**

The existence of a destination different from one previously contemplated may create a new factual condition. It does not, by that fact alone, establish:

- a new source of governmental authority;
- a new regulated object;
- a new custodial relationship;
- or a new judicially enforceable obligation.

The statutory scheme itself contemplates alternative countries of removal. **8 U.S.C. § 1231(b)(2)(C)–(F).** It also contains specified limitations and protections. **8 U.S.C. § 1231(b)(3).** And implementing regulations expressly recognize administrative discretion concerning countries of removal. See **8 C.F.R. § 241.15(a)–(c).**

Accordingly, the Court must distinguish:

- sovereign authority from sovereign capacity;
- removal from continuing extraterritorial custody;
- execution discretion from creation of a new legal proceeding;
- direct governmental consequence from subsequent foreign sovereign action;
- legally established protections from generalized humanitarian concern;
- and factual risk from legally attributable injury.

The proper sequence is:

**Classification → Authority → Removal Determination → Protection Review → Destination Selection → Execution → Nexus → Consequence.**

Only after that sequence is established can the law coherently determine what additional obligations attach.

---

## ARGUMENT

### I. THE FIRST QUESTION IN REMOVAL CASES IS NOT WHAT PROCEDURE FOLLOWS, BUT WHAT GOVERNMENTAL ACT IS OCCURRING

Courts frequently encounter governmental actions containing multiple stages. The existence of multiple stages requires precision because legal consequences attach to acts, authorities, relationships, and legally cognizable interests—not merely to the chronological fact that one event follows another.

A sovereign may:

- determine legal status;
- adjudicate removability;
- issue a removal order;
- recognize a country-specific statutory or treaty protection;
- select a country of removal;
- execute the order;
- encounter subsequent conduct by another sovereign.

Those stages are related. They are not interchangeable.

The Immigration and Nationality Act itself reflects that separation. A final "order of deportation" is an order "concluding that the alien is deportable or ordering deportation." **8 U.S.C. § 1101(a)(47)(A).** The Supreme Court has correspondingly distinguished the validity of a final removal order from country-specific protection against execution of that order to a particular destination. *Nasrallah v. Barr*, **590 U.S. 573, 582 (2020)**. A grant of protection under the Convention Against Torture does not invalidate the underlying removal order; it prevents removal to the protected country while leaving removal to another lawful destination available. *Id.*

The Supreme Court made the same structural distinction in *Johnson v. Guzman Chavez*, **594 U.S. 523, 531–32 (2021)**: country-specific withholding prevents removal to the country as to which withholding applies, but does not prevent DHS from removing the individual to another country. The Court explained that withholding-only proceedings concern **where** an individual may be removed, not whether the underlying removal order remains operative.

That distinction matters here because the representative plaintiffs do not contest their removability, challenge the validity of their removal orders, or deny that third-country removal may lawfully occur under those orders. The dispute concerns the procedures accompanying execution to a third country not previously identified. *D.V.D. v. U.S. Department of Homeland Security*, No. 26-1212, slip op. at 19–20 (1st Cir. Sept. 18, 2026).

The first inquiry must therefore remain:

**What is the operative governmental act?**

The underlying act is removal.

The United States is exercising territorial immigration authority against persons already subject to final removal orders. Congress has directed that, except as otherwise provided by law, "the Attorney General shall remove the alien from the United States within a period of 90 days" after commencement of the statutory removal period. **8 U.S.C. § 1231(a)(1)(A).**

The object of that authority is not administration of the individual's future existence abroad.

The object is execution of a legal determination that the individual is to be removed from the United States.

The fact that execution necessarily involves destination selection does not erase the distinction between the removal determination and the mechanisms governing where that determination may lawfully be executed.

That distinction is the starting point for everything that follows.

---

## II. REMOVAL AUTHORITY MUST BE DISTINGUISHED FROM EXTRATERRITORIAL CUSTODIAL AUTHORITY

A sovereign possesses authority through legally defined jurisdiction and delegated power.

That authority has boundaries.

Congress has given the Executive substantial responsibilities concerning persons ordered removed, including:

- detention during the removal period, **8 U.S.C. § 1231(a)(2);**
- execution of the removal order, **id. § 1231(a)(1);**
- selection of countries of removal, **id. § 1231(b)(1)–(2);**
- application of statutory restrictions on removal to particular countries, **id. § 1231(b)(3);**

- and continued detention or supervision in specified circumstances, **id. § 1231(a)(3), (6).**

Section 1231(b) is especially significant because Congress did not reduce removal to mandatory return to a single home country. It prescribed a destination-selection structure containing designated countries, countries of nationality or citizenship, countries having specified connections to the individual, and, when preceding options are impracticable, inadvisable, or impossible, other countries permitted by the statutory scheme. **8 U.S.C. § 1231(b)(1)–(2).** *Jama v. Immigration & Customs Enforcement*, **543 U.S. 335, 341–42 (2005)**.

Thus, the existence of a third-country destination is not itself foreign to congressional design.

At the same time, the United States does not acquire by removal authority:

- governing authority over another sovereign's criminal system;
- administrative control over foreign institutions;
- territorial authority inside the receiving state;
- or continuing custody over every condition encountered by the individual after transfer from United States control.

The law must therefore identify the causal boundary between:

**United States governmental action**

and

**independent action occurring under another sovereign's authority.**

That distinction does not eliminate country-specific legal protections. Congress expressly supplied some. Section 1231(b)(3)(A), for example, provides that the Attorney General "may not remove an alien to a country" where the Attorney General determines that the person's life or freedom would be threatened because of race, religion, nationality, membership in a particular social group, or political opinion, subject to the exceptions in § 1231(b)(3)(B).

Likewise, CAT-related protections can prevent removal to a particular country where the governing legal standard is established, while leaving the underlying removal order intact. *Nasrallah*, **590 U.S. at 582**; see also **8 C.F.R. §§ 208.16(f), 1208.16(f)**.

Those provisions demonstrate the necessary distinction.

Where Congress or governing law creates a country-specific protection, the protection operates according to its terms.

Where the alleged future consequence instead depends upon independent conduct of another sovereign, the court must identify the legal source connecting that foreign conduct to a continuing obligation of the United States.

Without that inquiry, removal authority risks being transformed into an undefined extraterritorial custodial responsibility that neither the removal statute nor sovereign capacity necessarily supplies.

---

## III. THE LEGAL ANALYSIS MUST FOLLOW THE FUNCTIONAL SEQUENCE OF THE GOVERNMENTAL ACT

A coherent analysis begins upstream.

The questions presented by third-country removal are not resolved by starting with the feared consequence and working backward until a governmental actor can be found.

The legal sequence must move from authority to consequence.

### A. Classification

The first inquiry is:

**Who is the person before the sovereign?**

The legal relationship matters.

Relevant classifications can include:

- citizenship;
- lawful immigration status;
- physical presence;
- prior admission;
- a final removal order;
- reinstatement of a prior order;
- statutory eligibility for withholding;
- CAT protection;
- statutory disqualification from particular protections;
- and prior findings made in immigration proceedings.

Congress itself distinguishes among these conditions.

For example, § 1231(b)(3)(B) excludes specified categories of persons from statutory withholding, including certain individuals who participated in persecution, were convicted of particularly serious crimes and constitute a danger to the community, committed serious nonpolitical crimes abroad, or present specified national-security dangers. **8 U.S.C. § 1231(b)(3)(B).** The First Circuit's opinion recognizes that some members of the class may therefore be ineligible for statutory fear-of-persecution protection even though other forms of protection may remain relevant. *D.V.D.*, No. 26-1212, slip op. at 15.

The classification inquiry must precede assignment of duty because different legal relationships produce different legal protections.

---

**B. Authority**

The next question is:

**What authority is the government exercising?**

Here, the operative authority is removal under the Immigration and Nationality Act.

Congress has commanded execution of final removal orders and separately prescribed where removal may occur. **8 U.S.C. § 1231(a)–(b).**

That statutory design matters.

The government's objective is:

> **execution of lawful removal from United States territory.**

The governmental object is not, by default:

- resettlement of the individual;
- administration of the person's continuing affairs;
- supervision of another country's treatment of the individual;
- or indefinite preservation of United States custody when a lawful removal destination exists.

The legal inquiry must remain connected to the governmental authority actually exercised.

---

**C. Role**

The next question is:

**What governmental function is being performed?**

The function is execution of a removal order.

That function includes implementation decisions because an order that cannot be executed remains merely declaratory.

Congress accordingly placed within § 1231 provisions governing:

- the removal period;
- detention;
- supervision;
- destination;
- restrictions on particular destinations;
- and circumstances in which removal proves impracticable.

The agency is therefore acting as the administrator of an existing removal authority.

Its role is not automatically converted into foreign custodian merely because execution requires transfer to another sovereign.

---

**D. Object**

The next question is:

**What is the government acting upon?**

The immediate object is the individual's continued presence within United States territory pursuant to a final removal order.

That proposition is narrower than saying destination has no legal significance.

Destination plainly can have legal significance because Congress expressly regulated it.

But destination significance and removal authority remain distinct concepts.

One concerns whether the individual remains subject to removal.

The other concerns the lawful pathway through which removal may be executed.

---

**E. Mechanism**

The next question is:

**How does the government accomplish the authorized objective?**

Through execution of removal to a country permitted by the statutory framework.

Section 1231(b)(2) establishes a sequential country-selection process for persons covered by that subsection. The Supreme Court has described § 1231(b)(2) as prescribing "the procedure for selecting the country to which an alien ineligible to remain in the United States will be removed." *Jama*, **543 U.S. at 338**.

The existence of multiple possible destinations is therefore part of the statutory mechanism itself.

The question in this case is not whether Congress contemplated destination selection.

It did.

The question is what procedures and protections law requires when DHS executes that authority through a third-country destination not previously identified in the removal proceedings.

---

**F. Nexus**

Finally:

**What consequences are legally produced by the governmental mechanism itself?**

The direct governmental consequence of removal is termination of the individual's physical presence within United States territory.

A destination decision may also create legally cognizable country-specific consequences where statute, regulation, treaty implementation, or constitutional law makes those consequences material.

But the analysis must distinguish those legally recognized consequences from harms produced later by independent foreign actors.

The mere sequence:

**United States removal → foreign presence → possible foreign mistreatment**

does not itself resolve attribution.

The law must still identify:

- the source of the United States duty;
- the protected legal interest;
- the causal relationship;
- the governmental capacity to comply;
- and the remedy that law authorizes.

Only after those predicates are established can procedure be fitted coherently to the asserted obligation.

That brings the analysis to the point at which this appeal actually begins: the existing statutory and administrative decision points governing protection review, destination selection, agency discretion, and execution.

---

## IV. THE EXISTING REMOVAL FRAMEWORK ALREADY CONTAINS THE RELEVANT DECISION POINTS

The dispute presented by this appeal risks collapsing several distinct governmental functions into a single inquiry.

A removal process does not consist of one undifferentiated act.

It contains sequential legal and administrative decisions, each governed by a different question:

**Classification → Authority → Removal Determination → Protection Review → Destination Selection → Execution → Consequence**

Each stage identifies a different relationship between the sovereign, the individual, and the resulting legal effect.

The existence of a later stage does not automatically reopen every earlier stage.

That distinction is particularly important here because the First Circuit recognized that the challenged class consists of persons who already possess final removal orders and whose controversy concerns removal to countries not previously designated or identified in their earlier proceedings. *D.V.D. v. U.S. Department of Homeland Security*, No. 26-1212, slip op. at 7–10 (1st Cir. Sept. 18, 2026).

### A. Classification: Identifying the Person Before the Sovereign

The first inquiry concerns the individual's legal status.

The government must determine:

- whether the person is subject to removal authority;
- whether the person has lawful status permitting continued presence;
- whether a final removal order exists;
- whether statutory protections apply;
- whether the individual is eligible to invoke those protections;
- and whether prior proceedings established findings material to later execution.

This classification determines the scope of governmental authority.

A citizen, a lawful permanent resident, an arriving noncitizen, an individual presently litigating removability, and an individual already subject to a final removal order do not occupy identical legal positions.

Neither do all persons subject to final removal orders occupy identical positions for purposes of country-specific protection.

Congress expressly excludes certain persons from withholding under **8 U.S.C. § 1231(b)(3)(A)** where one of the conditions stated in **§ 1231(b)(3)(B)** applies, including participation in persecution, conviction of a particularly serious crime coupled with danger to the community, commission of certain serious nonpolitical crimes abroad, or specified threats to national security.

The First Circuit itself recognized this distinction, noting that some class members are statutorily ineligible for fear-of-persecution protection under § 1231(b)(3), although the court concluded that class members may still invoke fear-of-torture protections under the FARRA/CAT framework. *D.V.D.*, slip op. at 14–16.

The classification question therefore must precede assignment of duty.

A court cannot coherently determine what procedure is legally required until it determines what protection the particular legal classification permits the individual to invoke.

---

### B. Authority: Identifying the Governmental Power Being Exercised

The next inquiry is:

**What authority is the government exercising?**

Here, the operative authority is execution of a final removal order.

Congress directs that, subject to the statutory scheme, the government remove an individual ordered removed. **8 U.S.C. § 1231(a)(1)(A).**

Congress separately prescribed where removal may occur. **8 U.S.C. § 1231(b).**

For noncitizens governed by § 1231(b)(2), Congress established an ordered structure that includes:

- designation of a country by the individual, **§ 1231(b)(2)(A);**
- circumstances permitting the government to disregard that designation, **§ 1231(b)(2)(C);**
- removal to a country of nationality, citizenship, or subjecthood, **§ 1231(b)(2)(D);**
- and additional countries of removal when the earlier alternatives cannot be used, **§ 1231(b)(2)(E).**

Congress therefore did not create a statutory regime in which removal necessarily means return to one predetermined "home country."

It created a removal authority containing destination alternatives.

The governmental objective remains:

> **execution of removal from United States territory pursuant to lawful authority.**

The object of that authority is not administration of the person's future life abroad.

Nor does the statute place the United States in continuing custody of every condition the individual encounters after transfer to another sovereign.

The legal inquiry must remain connected to the authority Congress actually created.

---

**C. Removal Determination: Establishing Whether Removal May Occur**

At this stage, the government determines whether removal is legally authorized.

Relevant questions include:

- Is there a final order?
- Has removability been adjudicated?

- Has the order become administratively final?
- Does a statutory bar prevent removal?
- Does an existing protection prohibit removal to a particular country?

This stage answers whether the United States may remove the person.

It does not necessarily resolve every later logistical condition of execution.

That distinction is embedded in the governing law.

The Supreme Court has explained that withholding or CAT protection does not invalidate the removal order itself. It restricts removal to a particular country. *Nasrallah v. Barr*, **590 U.S. 573, 582 (2020)**.

Likewise, in *Johnson v. Guzman Chavez*, **594 U.S. 523, 531–32 (2021)**, the Court explained that withholding-only proceedings address the country to which removal may occur rather than whether the individual remains subject to the existing removal order.

Thus:

**removability** and **destination-specific protection** are legally distinct inquiries.

That distinction must remain visible.

---

**D. Protection Review: Recognizing Existing Legal Safeguards**

The existence of humanitarian concerns does not demonstrate that the legal system lacks mechanisms to address them.

Congress and implementing regulations already identify particular harms that carry legal consequence.

Under **8 U.S.C. § 1231(b)(3)(A)**:

> "the Attorney General may not remove an alien to a country" where the Attorney General determines that the individual's life or freedom would be threatened on a protected ground.

The statute defines exceptions in **§ 1231(b)(3)(B).**

The regulations separately establish protection against torture. Under **8 C.F.R. § 208.16(c)(2)**, the applicant bears the burden of establishing that it is "more likely than not" that the applicant would be tortured if removed to the proposed country.

The regulatory structure expressly evaluates:

- past torture;
- ability to relocate within the proposed country;
- gross or flagrant human-rights violations;
- and other relevant country-condition evidence.

**8 C.F.R. § 208.16(c)(3).**

Where withholding is unavailable but CAT protection is established, the regulations provide for deferral of removal. **8 C.F.R. § 208.17(a).**

Critically, those protections remain country specific.

Section **208.16(f)** provides:

> "Nothing in this section or § 208.17 shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred."

Likewise, **8 C.F.R. § 208.17(b)(2)** requires an immigration judge to advise an individual granted CAT deferral that the deferral applies to the country where torture is likely and that the individual "may be removed at any time to another country where he or she is not likely to be tortured."

Those provisions matter because they demonstrate that the existing legal structure already distinguishes:

1. the validity of the removal order;
2. protection against removal to a particular country;
3. and continuing authority to execute removal to another country.

A legal protection therefore is not created merely because a concern exists.

A legal protection exists because law identifies:

- a protected interest;
- a triggering factual condition;
- a governmental duty;
- a burden of proof;
- a procedure;

- and a remedy.

That structure must remain the starting point.

---

**E. Destination Selection: Executing Removal Within Delegated Authority**

The central dispute concerns destination selection.

The relevant question is not:

> Does destination matter?

It plainly can.

The relevant question is:

> **Does destination selection constitute a new exercise of sovereign authority, or does it remain an execution decision within removal authority already conferred by Congress?**

Congress expressly included destination selection within the removal statute.

Section **1231(b)(2)(E)** identifies additional countries to which removal may occur when the earlier statutory pathways have not produced a destination.

The Supreme Court has characterized § 1231(b)(2) as prescribing "the procedure for selecting the country to which an alien ineligible to remain in the United States will be removed." *Jama v. Immigration & Customs Enforcement*, **543 U.S. 335, 338 (2005).**

The implementing regulation is equally direct.

Under **8 C.F.R. § 241.15(a)**:

> "the Secretary retains discretion to remove an alien to any country described in section 241(b) of the Act (8 U.S.C. 1231(b)), without regard to the nature or existence of a government."

Section **241.15(b)** further provides that the Secretary retains discretion concerning the effect of acceptance or lack of acceptance by the receiving country where acceptance is relevant.

Section **241.15(c)** states that absence of or lack of response from a functioning government does not itself preclude removal to the receiving country.

Thus, destination selection is not an authority invented outside the statutory structure. It exists within that structure.

The sharper inquiry is whether the particular method DHS selected complies with the statutory and regulatory limitations already governing that authority.

That is different from asking whether destination selection itself constitutes a new sovereign act.

A separate sovereign act ordinarily requires something legally separate:

- a new source of authority;
- a new regulated object;
- a new legal status;
- a new custodial relationship;
- or a new consequence independently imposed by the United States.

A different destination can create a different factual condition.

That alone does not establish a different sovereign power.

---

**F. The Existence of Discretion Does Not Establish Illegality**

Administrative discretion exists because Congress cannot specify every operational decision required to execute statutory commands.

Here, the statutory scheme itself contains discretionary language and alternative pathways.

Congress permits the Executive to disregard certain destination designations in specified circumstances. **8 U.S.C. § 1231(b)(2)(C).**

It provides alternative countries of removal. **§ 1231(b)(2)(D)–(E).**

And the implementing regulation expressly preserves discretion concerning destination and acceptance. **8 C.F.R. § 241.15(a)–(c).**

The relevant inquiry therefore is not:

> Could DHS have selected another method?

The relevant inquiry is:

> Did DHS act outside the authority or procedures established by governing law?

Those questions cannot be collapsed.

- A discretionary decision may be reviewable.
- It may be poorly exercised.
- It may conflict with a statute or regulation.

But **the existence of discretion is not itself evidence of illegality.**

Nor does administrative flexibility automatically create a new adjudication every time the agency selects among lawful execution pathways.

The First Circuit held that the particular Guidance at issue conflicts with existing statutory and regulatory provisions insofar as it permits third-country removal without effective notice and a meaningful opportunity to assert applicable fear-based claims. *D.V.D.*, slip op. at 41–49.

Amicus addresses the analytical step that precedes that conclusion:

**what legally cognizable interest triggers additional procedure, and where in the existing removal structure that interest belongs.**

---

### G. Humanitarian Concern and Legal Responsibility Remain Separate Inquiries

Plaintiffs identify a serious concern:

removal to a third country may expose an individual to persecution, torture, or onward removal to another country in which such harm could occur.

The record refers to this latter possibility as "chain refoulement." *D.V.D.*, slip op. at 6–8.

The existence of that concern does not end the legal inquiry.

It begins another one:

**What legal duty does the United States possess, and from what source does that duty arise?**

The analysis must distinguish:

- humanitarian concern;
- legally protected interest;
- attribution;
- legal obligation;
- causation;

- and judicial remedy.

Where Congress has established a prohibition, that prohibition governs.

Where CAT or implementing regulations establish protection, those protections govern.

Where another sovereign later acts independently, however, attribution cannot be presumed merely from temporal sequence.

The law must identify:

1. the United States governmental act;
2. the legally protected interest implicated by that act;
3. the consequence directly attributable to that act;
4. any intervening sovereign conduct;
5. the legal source connecting that later conduct to a United States duty;
6. and the remedy the court possesses authority to order.

Without those steps, the inquiry moves from:

**possible harm**

directly to:

**mandatory United States procedure**

without identifying the legal bridge between them.

Humanitarian concern may justify diplomacy, executive caution, private assistance, international advocacy, or additional policy protections.

Judicial obligation, however, requires law.

---

**H. The Existing Administrative Structure Already Addresses the Type of Concern Identified by Plaintiffs**

The administrative record does not demonstrate that DHS regarded third-country risk as irrelevant.

The challenged Guidance expressly distinguishes between countries from which the United States has received diplomatic assurances and countries from which it has not.

Under the Guidance described by the First Circuit, DHS was to determine before a third-country removal whether the receiving country had supplied diplomatic assurances against persecution or torture and whether the Department of State regarded those assurances as credible. Where such assurances were absent, the Guidance contemplated notice before removal. *D.V.D.*, slip op. at 4–8.

The First Circuit concluded that those procedures were legally insufficient under the statutes and regulations presently governing fear-based claims. *Id.* at 36–49.

That holding does not erase the structural fact relevant to this amicus:

**the agency itself was already treating destination-specific risk as an operational condition requiring administrative consideration.**

Thus, the dispute is not accurately reduced to:

> humanitarian concern versus governmental indifference.

The dispute concerns:

> whether the method DHS selected for accommodating that concern fits within the procedures existing law requires.

That is a narrower and more administrable question.

It preserves the distinction between:

- delegated removal authority;
- execution discretion;
- statutory protection;
- administrative safeguards;
- and judicial review.

Where law already contains those categories, a court ought to identify which one failed before constructing an additional procedural layer.

---

## V. ADMINISTRATIVE DISCRETION EXISTS TO ADDRESS OPERATIONAL CONDITIONS WITHIN STATUTORY AUTHORITY

Administrative systems exist because statutes establish legal commands while executive agencies must translate those commands into executable acts.

Removal illustrates this necessity.

A final order does not transport anyone.

Execution requires decisions concerning:

- custody;
- travel documentation;
- transportation;
- diplomatic availability;
- receiving-country acceptance where legally required;
- timing;
- detention;
- statutory sequencing;
- individual protection claims;
- and operational feasibility.

Congress acknowledged those realities directly.

For example, **8 U.S.C. § 1231(b)(2)(C)** permits disregard of an individual's country designation where the country does not respond within the statutory period, refuses acceptance, or where removal there would be prejudicial to the United States.

Section **1231(b)(2)(E)** supplies additional removal countries.

And the regulation governing destination expressly preserves administrative discretion. **8 C.F.R. § 241.15.**

The existence of such discretion does not demonstrate absence of law.

It demonstrates that Congress established boundaries within which executive judgment must operate.

The court's function is therefore to determine whether an agency crossed those boundaries.

It is not necessary to convert every discretionary execution decision into an entirely new removal proceeding.

Indeed, existing regulations expressly contemplate that protection against one country does not terminate removal authority.

**8 C.F.R. § 208.16(f)** states that withholding or deferral does not prevent removal to another country.

**8 C.F.R. § 208.17(b)(2)** expressly contemplates removal to another country where the individual is not likely to be tortured.

The law therefore already accommodates both propositions:

1. country-specific protection can matter; and
2. removal authority can continue.

A coherent judicial analysis must preserve both.

---

## VI. HUMANITARIAN CONCERNS MUST REMAIN WITHIN THE LEGAL STRUCTURE THAT GOVERNS THEM

A person may face serious consequences after removal.

Nothing in the structural framework offered here denies that possibility.

But law requires more than identification of a possible harm.

It requires identification of the legal mechanism governing that harm.

The existing framework contains such mechanisms.

They include:

- statutory withholding under **8 U.S.C. § 1231(b)(3);**
- CAT protection under **8 C.F.R. §§ 208.16(c), 208.17, 208.18;**
- parallel EOIR provisions under **8 C.F.R. §§ 1208.16–1208.18;**
- country-selection rules under **8 U.S.C. § 1231(b)(2);**
- and administrative rules governing countries of removal under **8 C.F.R. § 241.15.**

Those provisions convert particular factual concerns into legal questions by supplying:

- defined standards;
- burdens of proof;
- decision-makers;
- procedures;
- and consequences.

Generalized humanitarian concern cannot substitute for those elements.

Otherwise, courts risk imposing a duty whose:

- scope is undefined;
- causation is speculative;
- endpoint lies beyond United States control;
- and remedy depends on supervision of a foreign sovereign.

The legal system is strongest when concern is translated through law rather than when law is expanded until it becomes indistinguishable from concern.

---

## VII. JUDICIAL REVIEW OUGHT NOT REPLACE A FUNCTIONING ADMINISTRATIVE SEQUENCE WITH A PARALLEL SYSTEM

The central institutional question is whether judicial intervention clarifies existing legal boundaries or creates a competing decisional structure.

The government remains bound by:

- statute;
- regulation;
- treaty implementation;
- the Administrative Procedure Act;
- and applicable constitutional limitations.

When those boundaries are exceeded, judicial review supplies correction.

But correction must identify the boundary crossed.

A court ought to exercise caution before transforming:

- a discretionary execution decision;
- into a new adjudication;
- a new adjudication into a new source of duty;
- and a new duty into continuing judicial supervision of outcomes beyond the United States' operational control.

The governing relationship must remain:

- **Authority creates function.**
- **Function identifies mechanism.**
- **Mechanism produces consequence.**
- **Law determines which consequences become legally cognizable.**
- **Legally cognizable consequences determine the procedure and remedy that attach.**

That order matters.

Reversing it invites courts to begin with a feared consequence and construct backward whatever governmental duty appears necessary to prevent it.

Administrative law ordinarily proceeds in the opposite direction.

It begins with lawfully delegated authority and asks whether the challenged action remained within it.

---

**CONCLUSION**

The Court must evaluate third-country removal through the complete sequence of sovereign action.

Before assigning additional procedure, the analysis must identify:

- the legal classification of the individual;
- the removal authority already established;
- the continuing validity of the removal order;
- any country-specific statutory or treaty protection;
- the destination-selection authority Congress provided;
- the administrative discretion governing execution;
- the causal nexus between United States action and the asserted harm;
- any independent foreign sovereign action;
- and the remedy authorized by law.

Congress has expressly authorized country selection within the removal process. **8 U.S.C. § 1231(b).**

Congress and implementing regulations have expressly provided protection against defined country-specific harms. **8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.16–208.18.**

The regulations likewise expressly contemplate removal to third countries notwithstanding withholding or deferral as to another country. **8 C.F.R. §§ 208.16(f), 208.17(b)(2).**

Those provisions reveal a legal system already designed to accommodate both sovereign removal authority and defined protection against specified harms.

The Court therefore ought to preserve the distinctions already embedded in that system:

**removal is not resettlement; destination is not necessarily a new sovereign act; discretion is not illegality; humanitarian concern is not itself a judicial duty; and country-specific protection does not erase the underlying removal authority.**

Respectfully submitted,

**Brandon Michael Hayes, Pro Se**
President
Natural Law Institute
Amicus Curiae

Suite 2500

Retail

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

US POSTAGE PAID

$18.05

Origin: 01922
09/23/26
2410540922-12

PRIORITY MAIL®

1 Lb 15.40 Oz

RDC 03

EXPECTED DELIVERY DAY: 09/25/26

C079

SHIP TO:
1 COURTHOUSE WAY
BOSTON MA 02210-3002

USPS SIGNATURE® TRACKING #

9510 8114 0402 6266 0681 26

FROM: Brandon Hayes
159 Indian Hill St.
West Newbury MA 01985

TO: Clerks office
US District Court
District of MA
John Joseph Moakley Courthouse
1 Courthouse Way Suite 2300
BOSTON MA 02210

TRACK

PS00001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2

PAPER POUCH
how2recycle.info